UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| | . | Chapter 7 |
| IN RE: | . | |
| | . | Case No. 21-10848 (KBO) |
| STREAM TV NETWORKS, INC., | . | |
| | . | Courtroom No. 1 |
| | . | 824 North Market Street |
| | . | Wilmington, Deleware 19801 |
| Debtor. | . | |
| | . | June 10, 2021 |
| . . . . . . . . . . . . . . . | . | 10:00 a.m. |

TRANSCRIPT OF HEARING ON EMERGENCY MOTION OF SEECUBIC, INC. AND
SLS HOLDINGS VI, LLC, FOR AN ORDER DISMISSING INVOLUNTARY
CHAPTER 7 CASE VIA ZOOM TELECONFERENCE
BEFORE THE HONORABLE KAREN OWENS
UNITED STATES BANKRUPTCY COURT JUDGE

TELEPHONIC APPEARANCES:

For the Debtor:              Chris Ward, Esq.
                            POLSINELLI
                            222 Delaware Avenue
                            Suite 1101
                            Wilmington, DE 19801

For the U.S. Trustee:        Rosa Sierra, Esq.
                            OFFICE OF THE U.S. TRUSTEE
                            U. S. Department of Justice
                            844 King Street, Suite 2207
                            Lockbox #35
                            Wilmington, DE 19801

(Telephonic Appearances continued on next page.)

Audio Operator:              Lisa Brown

Transcription Company:       Reliable
                            1007 N. Orange Street
                            Wilmington, Delaware 19801
                            (302)654-8080
                            Email: gmatthews@reliable-co.com

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

TELEPHONIC APPEARANCES (Cont'd):

| | |
|---|---|
| For Petitioning Creditor: | John D. McLaughlin, Jr., Esq.<br>FERRY JOSEPH, P.A.<br>4 West Market Street<br>Georgetown, DE 19947 |
| For Visual Technology<br>Innovations, Inc.: | Rafael X. Zahralddin, Esq.<br>ARMSTRONG TEASDALE, LLP<br>300 Delaware Avenue<br>Suite 210<br>Wilmington, DE 19801 |
| For SeeCubic, Inc.: | Joseph Larkin, Esq.<br>SKADDEN, ARPS, SLATE, MEAGHER<br>& FLOM, LLP<br>One Rodney Square<br>920 North King Street<br>PO Box 636<br>Wilmington, DE 19899 |
| For Rembrandt 3D<br>Holding Ltd.: | Christopher Michaels, Esq.<br>BROWN & MICHAELS, PC.<br>400 M & T Bank Building<br>118 North Tioga Street - The<br>Commons<br>Ithaca, NY 14850 |
| Also Appearing: | Reji Abraham<br>JAMUNA TRAVELS, INC. |

INDEX

MATTERS GOING FORWARD:

1. Emergency Motion of SeeCubic, Inc. and SLS Holdings VI. LLC for an Order Dismissing Involuntary Chapter 7 Case, filed 5/27/21 [D.I. 5].

**RULING: Motion To Dismiss Granted with Prejudice ......... 63**

Responses Received:

A. Objection of the Petitioning Creditors to the Emergency Motion of SeeCubic, Inc. and SLS Holdings VI. LLC for an Order Dismissing Involuntary Chapter 7 Case, filed 6/6/21 [D.I. 22]

B. Joinder of Visual Technology Innovations, Inc. to the Objection of the Petitioning Creditors to the Emergency Motion of SeeCubic, Inc. and SLS Holdings VI. LLC for an Order Dismissing Involuntary Chapter 7 Case the Emergency Motion of SeeCubic, Inc. and SLS Holdings VI. LLC for an Order Dismissing Involuntary Chapter 7 Case and Request to Adjourn the Emergency Hearing, filed 6/8/21 [D.I. 26].

C. Joinder of the Alleged Debtor to the Objection of the Petitioning Creditors and Objection to the Emergency Motion of SeeCubic, Inc. and SLS Holdings VI. LLC for an Order Dismissing Involuntary Chapter 7 Case Emergency Motion of SeeCubic, Inc. and SLS Holdings VI. LLC for an Order Dismissing Involuntary Chapter 7 Case, filed 6/8/21 [D.I. 27].

D. Omnibus Reply of SeeCubic, Inc. and SLS Holdings VI. LLC in Support of the Emergency Motion of SeeCubic, Inc. and SLS Holdings VI. LLC for an Order Dismissing Involuntary Chapter 7 Case, filed 6/9/21 [D.I. 29].

1          (Proceedings commence at 10:00 a.m.)

2          THE COURT:  Good morning, Counsel.  This is Judge

3   Owens.  We're gathered today for a hearing on an emergency

4   motion to dismiss the involuntary Chapter 7 petition filed by

5   SeeCubic in the Stream involuntary bankruptcy case.

6          Mr. Larkin, this is your motion so I'll let you

7   present first.

8          MR. LARKIN:  Good morning, Your Honor, and thank you

9   again for agreeing to hear us on an emergency basis.

10         Your Honor, it was just three and a half weeks ago

11  that we were in front of Your Honor on our motion to dismiss

12  the Chapter 11 petition filed by Stream TV.  And as Your Honor

13  knows and I won't spend a lot of time on it, Your Honor

14  dismissed the Chapter 11 petition in that case principally

15  because it was designed to stop SeeCubic and the debtor's

16  secured creditors from fully implementing the omnibus

17  agreement, to unravel it, and to avoid the Chancery Court's

18  order and very likely a mandatory injunction.

19         Your Honor, it was clear at least to us about the

20  appropriate path forward in light of that ruling.  We were to

21  return to the Court of Chancery, complete that litigation and

22  the asset transfers pursuant to the omnibus agreement.  And

23  only then once that litigation was completed and the asset

24  transfers were completed, I think Your Honor noted that, you

25  know, at some point in the future, the unsecured creditors may

1  want to return to bankruptcy court.  And so that's why it was

2  dismissed without prejudice.

3          In our view, Your Honor, that's what should have

4  happened if the objectors to our motion to dismiss the chapter

5  7 petition had respected Your Honor's decision and, frankly,

6  the rule of law.  But, instead, here we are three and half

7  weeks later on another motion to dismiss.  But nothing has

8  really changed.

9          From a factual standpoint, and I'll talk about it a

10 little bit, you know, the notice of appeal that was filed by

11 Mr. Rajan and Stream on May 21 divested this Court of

12 jurisdiction over that Chapter 11 case and all of the issues

13 raised in that case, many of which are now being raised by the

14 objectors here.

15         Importantly, I think consistent with Your Honor's

16 ruling on the motion to dismiss the Chapter 11 case, we

17 promptly filed out reply brief with Vice Chancellor Laster on

18 May 22.  And so the briefing on that motion for summary

19 judgment is now complete.  I guess unsurprisingly based on the

20 tactics that have been implemented by Mr. Rajan and his cronies

21 so far, the day after our reply brief was filed the Chapter 7

22 petition was filed here, once again trying to obtain the

23 benefits of an automatic stay and get out from under the

24 preliminary injunction order and the omnibus agreement.

25         Your Honor, with all due respect, we think it's sort

of time to put an end to this.  There are still -- you know, as
Your Honor noted in her motion to dismiss ruling, there are
enormous hurdles that are present for any recovery for the
unsecureds, right, under any set of circumstances.  It would
require the unraveling of the omnibus agreement.  It would
require, I think, you know, an extensive litigation about a
number of issues, right.  And that's one of the reasons why
Your Honor dismissed.

And that ruling was completely ignored by the
petitioning creditors.  And now it's become clear just based on
the last 72 hours, some of the documents that the objectors
have actually put in front of Your Honor, that this has all
been part of the same plan by Mr. Rajan to continue to get out
from under the preliminary injunction and to unravel the
omnibus agreement.

Now as we state in our papers, Your Honor, we think
there's really two principal bases for dismissing the Chapter 7
petition.  The first is divestiture.  Your Honor, the Chapter 7
petition has to be dismissed under the divestiture rule
because, frankly, Your Honor, as much as I enjoy appearing in
front of you, I don't think Your Honor has jurisdiction over
the issues that are being raised here.

When Stream at Mathu Rajan's direction filed its
notice of appeal on May 21, it divested this Court of
jurisdiction over aspects of the case involved in the appeal.

1  It's not just whether there was a Chapter 7 petition that was
2  being appealed.  It's all of the issues.  And most importantly,
3  I think it's going to create the real risk of inconsistent
4  judgments and rulings, and it will require the Court to
5  reconsider your finding that dismissal rather than conversion
6  to a Chapter 7 is in the best interest of the estate.

7         Now the objectors really haven't -- you know,
8  collectively the objectors really haven't addressed the
9  divestiture rule.  They haven't addressed any of the case law
10  that we cited on this point.  They say that the divestiture
11  rule does not apply because the issue of a Chapter 7
12  liquidation is not on appeal.  But, again, that's wrong.  The
13  rule prohibits the lower courts considering issues that even if
14  not expressly on appeal so impact the appeal as to effectively
15  interfere or circumvent the appeal process.

16         Your Honor, I was -- you know, just before we started
17  here, again, I was reviewing the statement of issues to be
18  presented on appeal and designation of record on appeal and
19  designation of record on appeal that was filed by Stream TV and
20  Mr. Rajan last week.  If you overlay the issues that are now on
21  appeal with the papers that were submitted by the objectors,
22  they're very duplicative.

23         I mean, for example, they're appealing Your Honor's
24  finding that the debtor acted in bad faith where the debtor was
25  in financial hardship, there was a reasonable possibility of

1 reorganization, and numerous legitimate bankruptcy purposes

2 would be served by the proceedings.

3        They're appealing Your Honor's decision that the

4 bankruptcy court -- did the bankruptcy court err in giving

5 credence to the position of the Unsecured Creditors' Committee.

6 Your Honor, the Unsecured Creditors' Committee filed the

7 Chapter 7 petition, one of which -- one of those petitioners

8 was on the committee, and yet they're taking the position that

9 there's no risk of inconsistent judgments here.  I think,

10 frankly, permitting the Chapter 7 petition to proceed is going

11 to set up a procedural morass, and it will create confusion and

12 inefficiency in this case.

13        And just thinking practically about it, assume that

14 the Chapter 7 case proceeds and the district court reverses,

15 who's in charge then of the debtor?  That is precisely the type

16 of procedural morass that courts have guarded against in

17 enforcing the divestiture rule.

18        The debtors -- you know, amazingly, Stream TV and VTI

19 have now argued in support of the objection to the motion to

20 dismiss that the Chapter 7 petition should be permitted to

21 proceed so that next week they can convert the Chapter 7

22 petition into a whole new Chapter 11, a complete redo of

23 everything we just did for the last three and a half months.

24 Essentially, you know, a bridge to a new Chapter 11 is how

25 they're treating the Chapter 7 petition.

1          Your Honor, with all due respect, for purposes of,
2   you know, really judicial economy and efficiency and, you know,
3   to prevent the risk of inconsistent judgments and rulings, we
4   think the divestiture rule applies here and the Chapter 7
5   petition should be dismissed for that reason alone.

6          But, you know, putting the divestiture rule aside,
7   the case should be dismissed under Rule 707 for cause.  The
8   reasons are outlined in our brief, both in our opening brief
9   and in our reply brief.  And we've cited to at least one piece
10  of evidence that's come to light, you know, in the last 48
11  hours showing what we think is, you know, pretty clear evidence
12  of collusion here.

13         But before you even get there, you know, Your Honor,
14  under Rule 707 and the case law, Your Honor, has, you know, the
15  discretion to dismiss the Chapter 7 petition under Rule 707 for
16  cause.  And one of the reasons you can do that is for judicial
17  economy, right.  We think the next step here is to finish the
18  litigation in the Chancery Court, resolve the issues that are
19  in front of the Chancery Court, as well as the issues between
20  the parties with respect to the omnibus agreement and the asset
21  transfer.

22         The briefing is complete.  Mr. Rajan has continued to
23  pepper the Court of Chancery with filings.  Since Your Honor's
24  ruling, he's submitted I think three or four separate pleadings
25  to Vice Chancellor Laster arguing that -- you know, arguing

1  against the preliminary injunction and arguing against summary

2  judgment.  He has a forum where he can make those arguments.

3  But there's no reason to do it here.

4           And, frankly, the Chapter 7 petition serves no valid

5  bankruptcy purpose.  There's still no business operations and

6  employees, cash, income, ability to generate revenue, and no

7  material assets.  The debtor is -- the debtor, I keep saying

8  the debtor, you know, Stream is what it is.  We're just three

9  and a half weeks later.

10          And I think when you sort of, you know, peel all that

11 away, it becomes very clear that the Chapter 7 petition, which

12 was filed 72 hours after the briefing in Chancery was complete,

13 is just part and parcel of Mr. Rajan's ongoing crusade to avoid

14 the effects of the preliminary injunction.

15          When you look at the objectors' submissions, I mean

16 they're literally copying and pasting each other's papers and

17 yet claiming that they're not in collusion with each other and

18 somehow not recognizing the inconsistency of a Chapter 7

19 petition which would take the debtor out of possession of the

20 estate, teaming up with the debtor for a redo of the Chapter 11

21 case.

22          Again, Your Honor, I know that the briefing is fresh.

23 We just completed it.  I'm not going to redo or rehash

24 everything that's in there, but we think for those basis, the

25 motion to dismiss should be granted.

1          THE COURT:  Okay.  Thank you, Mr. Larkin.  Why don't
2  I hear from Mr. McLaughlin on behalf of the petitioning
3  creditors.  And, Mr. McLaughlin, you are on mute, and it
4  appears coming from us from Ireland if my knowledge of travel
5  is correct.

6          MR. McLAUGHLIN:  That is the Grianan Of Aileach
7  (phonetic) in Donegal, and it is a lot more attractive than --
8  I do these calls from my basement which is definitely not
9  attractive.  So we put up something a little bit more visually
10 pleasing to my listeners.

11         Good morning, Your Honor.  Let me clarify one thing
12 for Mr. Larkin.  I don't represent Mr. Rajan.  Mr. Rajan is not
13 a petitioning creditor.  The creditors are and have separate
14 complete interests from Mr. Rajan.  I recognize that throughout
15 the history of this case, and as I got involved in it every
16 time I turned the page, there was another piece of litigation,
17 that there's a lot of incest here.  We've got -- and that
18 includes the folks on the SeeCubic side, you know, through Mr.
19 Stasney.  There's a lot of interactions here.

20         However, the petitioning creditors are different.
21 They have a different dog in the fight.  Quite frankly, they
22 just want to get paid.  Your Honor, I read before -- when I was
23 engaged here, I read your opinion, I read Vice Chancellor
24 Laster's opinion.  And I respect those opinions.  However,
25 that's -- my clients were not participants -- were not active

1  participants in either piece of litigation.

2        Mr. Abraham, Reji Abraham who is present in court

3  today and prepared to testify was a member of the Creditors'

4  Committee, but he was not -- he did not enter into any

5  agreement on his own behalf and, in fact, will testify that he

6  voted against the settlement agreement the Creditors' Committee

7  made, so recognizing that a legitimate creditors' committee was

8  appointed and took a position in a Chapter 11 case.  That

9  doesn't bind the other 152 general unsecured creditors that

10 were disclosed on the schedule E/F that was filed.

11       SeeCubic has made a big deal that this is a two-party

12 dispute and, respectfully, Your Honor, I would suggest that

13 it's not.  There are 152 plus or minus general unsecured

14 creditors who are not -- who have a dog in the fight here of

15 the creditors -- of the debts that were assumed pursuant to the

16 omnibus agreements.  And, again, presuming for the sake of

17 argument the omnibus agreement is valid and enforceable.

18       None of these people's debts were assumed.  They were

19 all left in the dust on the wayside.  Only very, very large

20 creditors who also I think were equityholders had their debts

21 assumed.  And, again, that's -- pursuant to the omnibus

22 agreement, that's not -- we're not here, you're not here, I

23 don't think, to determine ultimately what that is or means or

24 if it's enforceable.

25       That's up to the Vice Chancellor, and that's an issue

13

1  for the Chancery Court.  If SeeCubic wants to go forward, then

2  they could file an emergency motion to lift stay and go forward

3  with litigation.  That's fine.  I think they misapprehend the

4  purpose of a Chapter 7.

5         It's a lot more simple than they would suggest.

6  There are some assets left in the estate, we believe.  I have

7  present in court today Mr. Michaels who represents -- who is an

8  officer as well as an IP attorney for Rembrandt 3D as well as

9  Mr. Blumenthal who is the owner of Rembrandt.  Rembrandt is the

10 holder of the -- or is the owner of the key intellectual

11 property that makes this 3D technology work.

12        Their position is, and they're prepared to testify,

13 that there is no lien on that, that pursuant to the omnibus

14 agreement or pursuant to the pre-omnibus agreement security

15 documents, that interest -- there was no security interest

16 attached to that.  It didn't pass over to SeeCubic.  So

17 basically, that relationship is still in the Stream estate.

18 They will also testify why they believe the Stream estate or

19 that Stream is better situated to move forward to develop the

20 product.  But, again, that's a much more complicated issue.

21        The bottom line is that here we do not -- you know,

22 we're different people from Rajan -- or Mr. Rajan or both Mr.

23 Rajans for that matter.  With regard to the suggestion of

24 collusion, which I quite frankly take a little bit of offense

25 at, there are -- they're adjoined interests.

1        I mean, obviously, the big -- one of the undergirding

2   issues here, Your Honor, is whether or not there's any value or

3   what is the value of the Stream TV estate, I'll call it, use

4   the bankruptcy term.  The secured lenders, presumably, have a

5   right to the value of their collateral, just like in any case.

6   However, the suggestion has been made, and I think there's some

7   error to it and it needs to be investigated that the value of

8   the estate is far in excess of the amount of the secured

9   claims.

10        The argument that's being made by the litigants in

11  the Chancery Court, I believe, is that the omnibus agreement

12  was in fact a subterfuge for the purpose of basically acquiring

13  Stream TV rather than just foreclosing on the collateral.

14  Whether that's true or not, again, that's up for Vice

15  Chancellor Laster to, pardon me, to determine.  But there's a

16  very real concern here that there's a lot of value that could

17  be residual after payment in full of the secured lenders that

18  would flow to the general unsecured creditors, including my

19  three petitioning creditors.

20        And alls we want in Chapter 7 is an opportunity for

21  an independent trustee who doesn't have a dog in the fight,

22  who's not a member of this incestuous relationship, to take a

23  look at, you know, what's going on in the Chancery Court and to

24  determine whether or not the debtor should continue to litigate

25  that; secondly, to look at the issue of whether or not the

1  omnibus agreement even if it's valid and enforceable, was a

2  breach of fiduciary responsibility because even under state law

3  under the _Gheewalla_ opinion, when a debtor is insolvent, the

4  (indiscernible) fiduciary duty to the board of directors

5  expands to the equity holders but expands out to include other

6  stakeholders including the general unsecureds.

7           And it does look like this deal that was cut in fact

8  disenfranchised, for whatever reason, $20 million plus or minus

9  of general unsecured debt for the 152 plus or minus general

10 unsecured creditors who really did get harmed by the deal.

11 Whether it's a breach of fiduciary responsibility, again,

12 that's a matter for later, but that's something that the

13 trustee could and (indiscernible) --

14           THE COURT:  Mr. McLaughlin, I apologize.  I just want

15 to let --

16           MR. McLAUGHLIN:  -- derivative suit if necessary.

17 The other one --

18           THE COURT:  Mr. McLaughlin?

19           MR. McLAUGHLIN:  -- is on the same --

20           THE COURT:  Mr. McLaughlin, let me interrupt you

21 because your connection is going in and out so I just want to

22 let you know we're having trouble understanding you.  So if you

23 could back up and --

24           MR. McLAUGHLIN:  Oh geez.

25           THE COURT:  -- yeah, and start over.  I'm sorry.  And

1  why don't you pick up the breach of fiduciary duty argument.

2        MR. McLAUGHLIN:  Okay.  Yeah, I'm sorry.  I'm in my

3  office here at 824, and sometimes I have a bad connection.

4  Anyway, basically, two issues with regard to the enterprise

5  valuation.  One is whether or not there was a breach of

6  fiduciary responsibility by the directors of Stream in entering

7  into the omnibus agreement and the latter agreement which again

8  is it's been suggested was really not fully briefed or

9  discussed in the Chancery Court in a preliminary hearing --

10  preliminary injunction hearing.

11        But, again, under the Delaware state law and the

12  Gheewalla decision, there are -- the duties of a board of

13  directors expands out when the debtor is insolvent -- and I

14  don't think there's any question this debtor was insolvent and

15  is insolvent at this point -- to include other stakeholders

16  including the general unsecured creditors and, specifically, my

17  three petitioning creditors.

18        So that's something that needs to be looked at,

19  whether it's looked at ideally by a trustee because, again, in

20  a Chapter 7, the Trustee is acting for the benefit of all the

21  general unsecured creditors.  So a trustee would be an ideal

22  person to look into that and make an independent decision.

23  Maybe there's nothing there, but maybe there is.  And, again,

24  for $20 million worth of debt over 150-some people, it's worth

25  looking into.

1          Secondly with regard --

2          THE COURT:  But, Mr. McLaughlin, let me interrupt you

3 for one second because you understand that I now have pleadings

4 in front of me indicating that there will not be a Chapter 7

5 trustee, that Stream wants to convert this case to an 11.

6          MR. McLAUGHLIN:  Your Honor, and that (indiscernible)

7 Stream.  Again, I don't represent Stream, okay.  We brought a

8 Chapter 7 petition.  If -- Stream has to answer the petition by

9 June 17.  That would be the 21 days under the statute and the

10 rule.  There's an option.  If they do not respond, then we

11 would file a certificate of objection, ask the Court to enter

12 the order in Chapter 7.

13          If they respond either then, or I guess

14 theoretically, they could respond earlier, and consent to the

15 order for relief, then an order for relief would be entered in

16 Chapter 7.  But then, under Section 706(a), I believe it us, of

17 the Code, a Chapter 7 debtor has a right to convert to Chapter

18 11.  Now they could do that, but again then if they do that,

19 then we'd be back where you are now or where Mr. Larkin is now

20 arguing they shouldn't be in Chapter 11.

21          But to be in Chapter 11 is a completely different

22 thing than being in Chapter 7.  A Chapter 7 estate doesn't have

23 operations.  It doesn't need them.  It can't have them.

24 Obviously, it doesn't have any money to speak of other than the

25 possibility of getting funding to pursue litigation.  It

1  doesn't have any employees, but the employees would be laid off

2  anyway.  The whole Chapter 7 is basically hospice care.  It is

3  not -- you know, it's not rehabilitating the debtor.

4          If the debtor wishes, it could, you know, consent and

5  then ask for a conversion under 706(a).  And then the Court

6  would have to rule on that whether or not, you know, to

7  immediately flip it back.  I mean I've seen cases -- I've

8  represented debtors in the situation where, you know, the 707

9  -- or the Chapter 7 was entered by the Court over objection and

10  then the debtor converted.  But, again, they run the risk then

11  of having to defend yet another motion to dismiss.

12          One question I have with regard to the Chapter 7,

13  Your Honor, is why does the secured lender care.  Secured

14  lenders have the benefit of the collateral, okay.  Nothing in a

15  Chapter 7 is going to defeat them as long as their collateral

16  is properly secured.

17          If there are -- if there's something for the Chapter

18  7 trustee to look at in terms of other litigation or breaches

19  or fraudulent transfers, that shouldn't bother the unsecured

20  creditors.  They can make a 9013 oral motion for relief from

21  stay -- in fact, I think they include it in the papers -- give

22  them relief from stay for something, whether it's to foreclose

23  on their collateral.  There is actually a foreclosure matter

24  pending before Judge Mary Johnson in the Superior Court that I

25  think was one of the earlier pieces of litigation that predated

1  the Chancery litigation.

2       But they could perhaps have relief from stay for

3  that.  Perhaps relief from stay to complete the litigation in

4  Chancery Court.  But that wouldn't defeat a trustee, you know,

5  coming in and looking at these other issues.  Again, the

6  problem is I think they're trying to mush everything together.

7  And this is like a Gordian Knot.  And the bankruptcy court, the

8  Bankruptcy Code, and the bankruptcy trustee would have the

9  ability, you know, to cut that Gordian Knot and, you know,

10 break down the individual pieces.

11      That's part of the -- I won't say confusion, but the

12 complexity here is that there's so many different legal

13 theories.  You've got the secured creditor -- you start off

14 with the secured creditor which is pretty simple.  Then you

15 have the litigation in Chancery Court that essentially concerns

16 itself with corporate governance and, therefore, the

17 enforceability of this omnibus agreement.  The omnibus

18 agreement, again, has -- it raises issues as to whether or not

19 it is -- was fair under state law to the unsecured creditors

20 and also whether or not if it was -- I can't provide it right

21 now that it was subterfuge to do basically an acquisition that

22 there was a fraudulent transfer of a great deal of value that's

23 left in the estate.

24      So there's lot of stuff for a Chapter 7 trustee to

25 do.  Again, if the debtor wants to move to convert it, that's a

1  different issue.  But right now, my creditors have nothing to

2  lose.  They think at least there's a hope that there may be

3  something for that.  If a Chapter 7 trustee is appointed --

4  and, again, I can present testimony today that (indiscernible)

5  --

6          THE COURT:  Mr. McLaughlin, we're losing you again.

7  I apologize, but I didn't hear you after you intended that you

8  could put evidence on.

9          MR. McLAUGHLIN:  -- (indiscernible).  Let me try and

10 stand up by the window and see if that helps.

11         THE COURT:  Okay.

12         MR. McLAUGHLIN:  This is why I say usually I do these

13 from home because my connection at home is better.  Can you

14 hear me now, Your Honor?

15         THE COURT:  I can.  Yes.

16         MR. McLAUGHLIN:  Can you hear me?

17         THE COURT:  Yes, we can hear you.

18         MR. McLAUGHLIN:  Do you have me?

19         THE COURT:  Yes.  Can you hear me?

20         MR. McLAUGHLIN:  I like the old days when we were

21 actually sitting in a room all together.  (indiscernible).

22 Their secured creditor, they had the benefit of the collateral.

23 To the extent that they do not have the collateral, then, you

24 know, they're just another creditor and they would be actually

25 an unsecured creditor for the deficiency amount.

1          What I was saying before I faded out again there was

2  if in fact SeeCubic does not have a lien or any sort of an

3  interest, possessory interest, in the intellectual property,

4  the non-exclusive license granted by Rembrandt 3D Holding who

5  is one of the petitioning creditors, then maybe what they

6  foreclosed on, what they seized, what they have come into

7  possession of may not have a whole lot of value.  And maybe

8  then it might be worthwhile to sit down with a Chapter 7

9  trustee and all the parties in interest and maybe have a

10  discussion.

11          I am told, and I'm not a party to the appeal, but

12  that the appeal in district court has been referred to

13  Magistrate Judge Stein for mediation.  I mean that's another --

14  you know, mediation is another, you know, way of getting

15  everybody to sit down and negotiate because, quite frankly,

16  Your Honor, it sounds to me that without Rembrandt 3D's

17  cooperation, ain't nobody going to be happy because they

18  apparently have what Mr. Michaels would refer to as a blocking

19  position.  So without their IP license, maybe nobody's going to

20  make any money in this deal.

21          So at this point in time, dismissal is overkill.  If

22  the secured lenders, SeeCubic, wishes relief from stay for

23  limited purposes of foreclosing on the collateral, which is a

24  normal type of thing in a chapter -- in any sort of a chapter

25  whether or not it is -- relief is granted to go ahead and

1  finish up the litigation in Chancery Court, which is, quite

2  frankly, okay with us.  Again, if the trustee's appointed, the

3  trustee can weigh in on behalf of the debtor.

4       The docket the last time I looked of the Chancery

5  Court indicates that both counsel for Stream TV were allowed to

6  withdraw so right now the debtor is unrepresented in that

7  matter.  And that's a source of concern as well because, again,

8  quite frankly -- I mean SeeCubic is very ably represented in

9  that matter, very zealously represented and the debtor is not.

10 And if, in fact, some of these concerns I've reached the Court

11 have merit, then it ought to be brought forward in the Chancery

12 Court, argued to the Vice Chancellor and included in whatever

13 subsequent record.  He may elect to permit it to be made.

14      With regard to the divestiture argument, Your Honor,

15 again, Chapter 7 is a completely different thing.  It's

16 different parties.  It's a different type of relief.  What is

17 being -- what was appealed was a (indiscernible) order out of

18 Chapter 11.  If that order would be -- if the Court ultimately

19 would reverse or remand, then under Rule 1015(a), you have the

20 right to determine how the two bankruptcy cases would be dealt

21 with and presumably consolidated.

22      Again, the debtor certainly doesn't seem to have any

23 problem with being in Chapter 11.  In fact, I guess they want

24 to be in Chapter 11.  I don't think my constituency would have

25 any problem with this thing going back to 11 if all of the

1  representations made about funding and so on and so forth are

2  carried forward because ultimately the creditors have been told

3  that if the deal can be done that was proposed originally in

4  Chapter 11, and I believe is now proposed in the

5  (indiscernible) motion, they're going to pay 100 cents on the

6  dollar, including the secured lenders.

7          And basically, if you distilled all that down, it

8  would be essentially a foreclosure where there was a property

9  of the debtor was redeemed, and everybody goes back in getting

10 what they wanted.  And if in fact the secured lender can get

11 100 cents on the dollar plus their interest plus their fees,

12 whatever they're owed, then they shouldn't care.  If in fact

13 this is a subterfuge to try and take over the company, then,

14 you know, that's not kosher and perhaps does warrant further

15 litigation in the Chancery Court or litigation for fraudulent

16 transfer in some court, whether it's your Court, the state

17 court, wherever it would go.

18         There's really no downside to not permitting this

19 thing to go forward in Chapter 7.  Again, we're not asking for

20 the entry of the order today.  You know, the 17th is the

21 deadline.  It would not be until the 18th that a C&O would be

22 filed and a request that the order be entered.

23         So maybe the best bet is to (indiscernible) --

24         THE COURT:  Mr. McLaughlin, let me interrupt you and

25 I apologize.

1      MR. McLAUGHLIN:  -- if that IP --

2      THE COURT:  Mr. McLaughlin --

3      MR. McLAUGHLIN:  -- belongs to Rembrandt, it's not

4  under a contract but it may not be available to SeeCubic.

5      THE COURT:  Mr. McLaughlin, I have to interrupt you

6  because you've been breaking up pretty consistently for the

7  last few minutes.  And I'm not in the interest of cutting

8  parties off from their presentation, but I think it would be

9  most efficient at this point if we perhaps take a five-minute

10  break and see if you can get a better wireless connection

11  because I'm really having --

12      MR. McLAUGHLIN:  Okay.

13      THE COURT:  -- difficulty hearing your presentation,

14  okay.

15      MR. McLAUGHLIN:  I apologize.

16      THE COURT:  So let's take a five -- that's okay.

17  That's okay.  Let's take a five-minute break and we'll come

18  back on at 10:35.  If you're not able to correct the situation,

19  then I'll just hear from other parties who wish to be heard in

20  connection with this matter to give you the opportunity to

21  correct that.

22      But with that, let's take a five-minute break.

23      MR. McLAUGHLIN:  I apologize.  Thank you, Your Honor.

24      THE COURT:  Okay.  Thank you.

25      (Recess at 10:30 a.m./Reconvened at 10:40 a.m.)

1          THE COURT:  Okay, Counsel, we're back on the record.

2  I gave you a little bit of extra time.  Mr. McLaughlin, are you

3  with us?  And you're on mute, sir.

4          MR. McLAUGHLIN:  Okay, Your Honor, I am waiting --

5  I've hooked in through another computer with a hard line and

6  I'm waiting to be connected by the Court.  There I come.  Okay.

7          THE COURT:  Okay.  I see you and I hear you, so you

8  are in.

9          MR. McLAUGHLIN:  Okay.  Now --

10          THE COURT:  And if we have any further issues, I

11  think you could just dial in through telephone.

12          MR. McLAUGHLIN:  Okay.

13          THE COURT:  And I don't need to see you.

14          MR. McLAUGHLIN:  Okay.

15          THE COURT:  I can make an exception for that, okay?

16          Okay.  And I apologize.  I just want to make sure

17  that we have a very clear record.  Did I lose Mr. McLaughlin

18  again?  Yes, I did.

19          MR. ZAHRALDDIN:  Your Honor, I think -- this is Mr.

20  Zahralddin from Armstrong Teasdale.  I was trying to help Mr.

21  McLaughlin as well with -- as well your chambers.  And he's

22  switching to a hardwire, so I think he was taking himself off

23  of one computer and putting him onto another.  So he should

24  come back on in a second.

25          MR. McLAUGHLIN:  Can you see me now?

1          THE COURT:  We can and we hear you, we see you, and

2  it seems to be a little bit -- much more clearer.

3          MR. McLAUGHLIN:  Okay.

4          THE COURT:  So let me tell you where you left off at

5  least from my perspective, Mr. McLaughlin.

6          MR. McLAUGHLIN:  And I apologize for the

7  technological thing there.

8          THE COURT:  That's okay.

9          MR. McLAUGHLIN:  Go ahead.

10          THE COURT:  So I think you were talking about -- the

11  last thing I think I digested was the fact that mediation could

12  be used in district court to come up with a global resolution

13  --

14          MR. McLAUGHLIN:  Right.

15          THE COURT:  -- to the issues before the Court.

16          MR. McLAUGHLIN:  And my suggestion, Your Honor, is

17  not -- that would be one way because that -- you know, as Mr.

18  Larkin's pointed out, there's a matter pending on appeal.  And

19  I understand that it was referred to Magistrate Judge Stein.

20  But that's one way.

21          The other way would be, you know, in my estimation, I

22  guess I'm more comfortable with bankruptcy, if you have a

23  Chapter 7 trustee, then the parties are going to say, well,

24  tell you what, let's make a deal.  We can -- you know, we have

25  a way to pay everybody 100 cents on the dollars, plus of course

1  the trustee's commission, you know.  And that is a grand slam

2  home run in the world of bankruptcy.  If that deal was not

3  made, then the trustee can still look at the various assets

4  that may remain.

5          I'm told but again cannot prove that there are

6  actually some hard assets in China that have not passed over to

7  the secured lender that may be available.  Obviously, from my

8  perspective, from my constituents, the litigation is very, very

9  key because there is a perception that they have been done

10  wrong in all these transactions.

11          And the bottom line, if none of it works, Your Honor,

12  it's a no-asset Chapter 7.  I'm sure in your career you've seen

13  more than one no-asset Chapter 7s including corporate ones.  I

14  know I'm involved in one right now before Judge Dorsey, a

15  medical center down state.  It's not uncommon.  But at least

16  you got a trustee who again is not part of any sort of lengthy

17  historical litigation, who's not related, who really doesn't

18  care much one way or the other.  Here she will get her $75 at

19  worst.  At best, they'll make a home run and everybody will get

20  paid 100 cents on the dollar.

21          The bottom line is that there would be some forum to

22  sit down and negotiate other than litigation.  Litigating

23  obviously is not working.  And perhaps that would be most

24  beneficial.

25          Again, the reason this is different from what

1  happened back on in May was that Rembrandt who is and was an

2  unsecured creditor was not a participant in that.  I don't even

3  think they were advised of the motion to dismiss.  But they

4  hold a blocking position with regard to the use of their IP.

5  Without them, I don't think anybody makes any money.  So that's

6  why I would suggest that to dismiss the case at this point

7  would be premature.

8          The argument of judicial economy, while that works

9  for a Chapter 11, which is long and complicated and expensive,

10  in a Chapter 7, it's not.  I mean, you know, hundreds of

11  thousands of Chapter 7s go through personal, corporate all the

12  time.  There are fixed procedures that the U.S. Trustee has,

13  that trustees have.  It's just not that burdensome to the

14  Court.  And for you as the judge, if it's a no-asset case,

15  presumably, you would never even touch it.

16          So we would ask that the Court deny the motion to

17  dismiss.  Again, if the Court wishes to grant relief from stay

18  on specific issues, I think that -- you know, we could discuss

19  that.  But we would ask let the matter go forward.  Let's see

20  what the debtor decides to do on the 17th.  Maybe in the

21  interim the folks can have a meaningful dialogue and obviate

22  all this mishegoss.

23          So that's I guess my opening argument, Your Honor.

24  Again, if you wish to hear witnesses, I can put them on.

25          THE COURT:  I mean I read the declarations, Mr.

1  McLaughlin.  I think I know what the declarations say and

2  (indiscernible) declarations are.  Why don't we reserve the

3  issue until the end to see if I need evidence here.

4          MR. McLAUGHLIN:  I also have Mr. Abraham on the line

5  here.  Mr. Abraham is one of the petitioning creditors and was

6  the creditor or was one of the members of the Official

7  Unsecured Creditors' Committee.  And I have him available to

8  testify that, you know, why he wanted to become a petitioning

9  creditor and how the disclosures made by the Creditors'

10 Committee to the general unsecureds were perhaps less than

11 fulsome before they cut their deal.

12         I don't know how terribly germane it is other than to

13 show that the fact that the Creditors' Committee supported the

14 dismissal of the 11 may have been not strongly supported by the

15 great bulk of unsecured creditors.  But again I don't want to

16 waste the Court's time.  If the Court does not wish to hear

17 from Mr. Abraham, he would like to be excused because he

18 operates his business in Upper Darby and there's nobody to

19 operate the business but him.

20         THE COURT:  This is your presentation.  This is your

21 case.  I'm not going to tell you who to put on or not to put

22 on.  So I'm not going to make that determination.

23         MR. McLAUGHLIN:  Okay.

24         THE COURT:  If you think it's worthwhile to have him

25 take the stand, then he can take the stand.  But otherwise --

1   and I'll just say I don't think it's relevant to this

2   proceeding about what happened in the 11.  It's been dismissed

3   and it's on appeal.  So that's not relevant.

4           MR. McLAUGHLIN:  In that case, Your Honor, I think

5   I'll not put Mr. Abraham on the stand and ask that he be

6   excused so he can go about running his business.

7           THE COURT:  Okay.  Well, that would be fine then.

8           MR. McLAUGHLIN:  Reji?

9           MR. ABRAHAM:  Thank you.  Thank you so much, Your

10  Honor.

11          THE COURT:  Thank you very much.  You are excused.

12  Take care.

13          MR. ABRAHAM:  Thank you.

14          THE COURT:  Okay.  Well, Mr. McLaughlin, thank you

15  very much.  I appreciate the presentation.  Why don't I turn

16  the podium over to Mr. Ward, counsel for Stream it seems.

17          MR. WARD:  Yes, Your Honor.  For the record, Chris

18  Ward of Polsinelli on behalf of Stream Networks TV, Inc.  Good

19  to be in front of Your Honor.  I am very much looking forward

20  to our combined virtual in-person hearings that hopefully we'll

21  be having soon in the Delaware Bankruptcy Court and getting

22  back to a new normal.

23          I'm appearing before Your Honor for the first time in

24  this case, and maybe fortunately I was not here as part of the

25  original case.  You know, it looks like a lot of the issues are

1  still unresolved but, unfortunately, we were just retained on

2  Monday.  We were contacted over the weekend by Mr. Rajan to

3  represent Stream TV Network, so I do apologize as noted in our

4  joinder for filing a late-filed reply.

5       It has been a whirlwind of a couple of days of

6  getting up to speed and, frankly, Your Honor probably knows a

7  little bit more about the background than I do at this point.

8  But I think we have been as productive as we can over the last

9  couple of days with our client, Your Honor.

10      We are here on what we think is a very different case

11 than the voluntary case that was filed by my client and was

12 dismissed by Your Honor.  That filing was made by the debtor.

13 It was a voluntary Chapter 11 petition by a want-to-be Chapter

14 11 debtor.  We are here today on an involuntary petition filed

15 by three unaffiliated creditors of the debtors who are here to

16 protect their interest, Your Honor.

17      This is not anything done in concert with the

18 company.  This was done, as Mr. McLaughlin said, by his clients

19 that are three individuals creditors of the debtor who each

20 meet the statutory requirement to file an involuntary petition

21 and have done so.

22      THE COURT:  Let me just interrupt you, Mr. Ward.  I

23 want to be very careful here.  You're not here to advocate on

24 behalf of the petitioning creditors, so I want to hear your

25 perspective from Stream and we'll go from there.  But I don't

1 want another argument or a substitution argument by Stream

2 about the good-faith nature of this case from the perspective

3 of the petitioning creditors.

4       MR. WARD:  Absolutely, Your Honor.  And I think

5 that's fair because as I was going to get into, this is not

6 something that we have one with the petitioning creditors.

7 Actually, Mr. McLaughlin and I have not spoken other than a

8 conversation about who was filing the agenda in this case, Your

9 Honor.  So, yes, I am --

10       THE COURT:  And I have no doubt that you did not,

11 okay.  The questioning is whether there were behind-the-scenes

12 discussions between Mr. Rajan and the petitioning creditors.

13 And I don't need evidence of that right now, but I don't need

14 to have -- I understand that you probably didn't talk to Mr.

15 McLaughlin.

16       MR. WARD:  Understood, Your Honor, and I appreciate

17 that.  And I think the crux of really what the movants have

18 gotten at -- and I said movants, that SeeCubic has gotten at in

19 its arguments and its reply was this was really the same plan

20 that Stream Networks, Stream TV had in the first case.  And

21 nothing's happened since the first case.

22       Frankly, Your Honor, our conversations leading up to

23 today were we absolutely -- we being the debtor -- absolutely

24 need a chief restructuring officer in there.  There's arguments

25 about independence of the company.  This company clearly needs

1 a chief restructuring officer.  Why haven't we done that?  We

2 haven't done it out of respect for your ruling, Your Honor.

3 Have we discussed whether we should do that?  Absolutely.

4         Is it done?  There is an agreement in principle that

5 Mr. Howard Brownstein will step in as the chief restructuring

6 officer.  We have decided -- we being the debtor has decided

7 not to do that because Your Honor has this order dismissing our

8 original case.  How would this have progressed if not for the

9 original case?  There would have been an involuntary petition

10 filed.  As Mr. McLaughlin said, we have until June 17 to file

11 -- or the debtor has until June 17 to file a response.

12         Your Honor, my client would have responded to this by

13 filing a voluntary Chapter 11 petition on or before June 19.

14 We would have filed all the related first-day pleadings, and we

15 would have moved forward with a voluntary Chapter 11 case.

16 Given Your Honor's ruling, the debtor determined that it was in

17 its best interest not to run afoul of any prior ruling of the

18 Court to come here today to support the petitioning creditors

19 and their request to have this case -- have the involuntary

20 petition granted.

21         And, yes, Your Honor, the debtor would prefer and the

22 debtor wants to be, as this Court knows, wants to be a Chapter

23 11 debtor.  We would either file a voluntary petition with the

24 leave of the Court.  We don't want to do that without this

25 Court's blessing.  The Court did not dismiss the case with

1  prejudice, so I do think that we had the right to file a

2  voluntary petition.  But trying to be mindful of Your Honor, we

3  had not done that or, as Mr. McLaughlin noted, we can convert

4  -- we have a right to convert the case from Chapter 7 to

5  Chapter 11.

6         And why do we believe that we need to be in Chapter

7  11 is there was a plan in the first case, a lower case "P" plan

8  in quotations.  Here I think we are prepared to move forward

9  with an upper case "P" plan as a term of art in the

10  restructuring industry.  We have spent time with our client on

11  coming up with that plan that would pay all creditors in full.

12  As Your Honor saw, we attached a term sheet to our joinder.

13  Yes, the term sheet is with VTI, a company that Mr. Rajan is

14  affiliated with.

15         Why is his name --

16         THE COURT:  And let me ask you, I assume the term

17  sheet is predicated on capturing, recapturing the assets that

18  are in the process of being transferred to SeeCubic.  Is that

19  correct?

20         MR. WARD:  The term sheet -- absolutely, Your Honor.

21  The debtor believes that the asset should stay with the estate.

22  There is no way around it, but --

23         THE COURT:  That's not going to happen.  I just want

24  -- I'm really trying to control my temper here because I do

25  have a temper.  And I'm trying to control it, okay.  But I want

1 to be abundantly clear to everybody that is on this line that
2 regardless of what happens in these cases, okay, there will be
3 a relief from stay to allow the omnibus agreement and the
4 Chancery Court litigation to continue and I will allow the
5 assets to continue to be transferred, okay.

6          So if we're proceeding under some (indiscernible),
7 but that is not going to happen, okay.  Everyone is abundantly
8 mistaken.  And that was more than I wanted to say, but I'm
9 really having trouble here.  So let me just -- I just felt like
10 I needed to say that.  And that's if these cases continue.  So
11 the idea that we're going to move forward on a plan that's
12 predicated on recapturing the assets and doing exactly what was
13 proposed in the Chapter 11 proceeding that was dismissed for
14 bad faith is just simply not going to happen at this stage.

15          So I don't mean to usurp your presentation, Mr. Ward,
16 and I know that you are a newcomer to these proceedings.  But I
17 don't feel like I can continue to sit here silently, as I
18 should sit silently when I was hearing statements that seem to
19 be contradictory to the TRO that was in place in the Chancery
20 Court.  So I just want to tell you I have many concerns, and
21 I'm extremely troubled by what has been put forth in the
22 supposed plan and in VTI's joinder.

23          So with that, let me do this.  I need to take a five-
24 minute break.  I have to take a phone call real quick.  So
25 let's take a break for five minutes, and I apologize.  I know

1  we're going -- we're ping-ponging back and forth with this

2  proceeding, but I have to take a phone call.  And then, Mr.

3  Ward, I'll allow you to continue with your presentation.

4          So at 11 o'clock we'll resume, okay.  I apologize.

5  Thank you very much.

6          MR. WARD:  Thank you, Your Honor.

7          (Recess at 10:53 a.m./Reconvened at 11:06 a.m.)

8          THE COURT:  Okay.  We're back on the record, and I

9  apologize to all the parties.  My call ran over.  When Mr. Ward

10 is back on and can join us, we will resume.

11         MR. WARD:  I had my video, Your Honor.

12         THE COURT:  Oh, there you are.

13         MR. WARD:  I'm here.

14         THE COURT:  Okay.  And, Mr. Ward, I do apologize.

15 I'm not -- I don't like to interrupt and stop in the middle of

16 Counsel's presentation.  So I apologize for that.

17         So with that, why don't we continue.

18         MR. WARD:  Your Honor, it is not a problem at all.

19 You were able to take about 14 pages of notes and turn them

20 into 3.  So I very much appreciate the Court's candor on where

21 you stand.  And I think a lot of what we've heard and what's in

22 the movant's paper and I think the Court probably agrees with

23 is hollow promises is the comment they use.

24         And I think that we're here now to show that these

25 aren't hollow promises, that we are prepared to move forward

1  with Mr. Brownstein as a CRO, that we had a commitment from VTI

2  for lending.  There is a business plan.  I understand Your

3  Honor's comments, and I'm not going to get into anything with

4  respect to the omnibus agreement.  But there's still the

5  possibility that Stream Networks can survive even after the

6  omnibus agreement, and that's given the assets that remain.

7          And why this case should be in bankruptcy and should

8  be in Chapter 11 is it is not just about SeeCubic and the

9  secured lenders here.  There are other parties involved.

10 There's the petitioning creditors.  There's $25 million worth

11 of unsecured debt out there.  And most importantly, Your Honor,

12 the representatives of Rembrandt who are on the phone today,

13 and there are declarations of Christopher Michaels and Stephen

14 Blumenthal that were filed with the Court.

15         The debtor and Rembrandt entered into a settlement

16 agreement, Your Honor, and that settlement agreement called for

17 several important things to happen.  One of them was a payment

18 to Rembrandt, which obviously has not occurred.  But one of

19 them was a license back to Stream to use the Rembrandt

20 technology, and another important component was a provision

21 where Rembrandt would buy TVs from Stream at a discounted

22 price.  So there is a potential line of revenue that's

23 available to this debtor and a potential line of business

24 working with Rembrandt, Your Honor, that this company

25 potentially could move forward.

1          Given the Court's comments, we have to have a very
2   frank conversation with VTI and Mr. Rajan about is this
3   something that you still want to fund under these parameters
4   that this judge has put before us.  We understand that.  But
5   there is still an opportunity for this debtor to be in Chapter
6   11 and potentially reorganize given the issues with Rembrandt,
7   Your Honor.

8          And I think those declarations were very clear that
9   Rembrandt is unaffiliated and independent of the debtor.  It is
10  a separate entity.  It struck a deal with Mr. Stasney when Mr.
11  Stasney was with the debtor.  He's now with SeeCubic or I guess
12  he was always with the lender but he was the lender's
13  representative on the board.  So there was a transaction that
14  was entered into between the debtor and Rembrandt, Your Honor.

15         There's a potential viable business stream there in
16  that settlement agreement giving the licensing rights and this
17  ongoing agreement that Rembrandt would buy TVs from the debtor.
18  And there's the intellectual property issue that the debtor is
19  the one that holds the licensing agreement with Rembrandt, Your
20  Honor.  It is not SeeCubic.  And that cannot be transferred to
21  SeeCubic under the omnibus agreement.

22         We actually fully appreciate Your Honor's comments.
23  The automatic stay and something I was prepared to address was
24  I think that's something that the debtor was prepared to live
25  with coming back before this Court was the Chancery Court

1  litigation's going to go forward if Vice Chancellor Laster

2  enters a final injunction.  We understand that that's -- it is

3  what it is, and that is an issue for a different court.

4          But there's an opportunity for more proceedings in

5  the Chancery Court to happen, and Vice Chancellor Laster will

6  come down however he comes down.  But one of the assets that

7  cannot be transferred under that omnibus agreement is the

8  Rembrandt license, Your Honor.  And we believe this is the

9  appropriate court for that to be adjudicated in, and I believe

10 Rembrandt would agree with this that that is an asset of this

11 bankruptcy estate, that license, and it is a potential cause of

12 action that this estate and/or Rembrandt may have against

13 SeeCubic is the transfer of that intellectual property license.

14         So there is a valuable asset to this bankruptcy

15 estate that needs to stay here and needs to be adjudicated in

16 order for -- to determine who owns that license and whether

17 SeeCubic can use it or whether it is an intellectual property

18 right of Stream that Stream could use as part of a business

19 plan going forward even assuming that the omnibus agreement

20 goes forward and is finalized by Vice Chancellor Laster.

21         In addition to the Rembrandt issues, Your Honor, as

22 Mr. McLaughlin noted, the estate does believe that there are

23 potential breach of fiduciary duty claims that are out there.

24 Mr. McLaughlin did a good job of summarizing the Delaware law,

25 but I think it's abundantly clear since Gheewalla in the late

1  '90s all the way through Vice Chancellor Laster's opinion in

2  (indiscernible) when a company is insolvent, the fiduciary

3  duties shift from equity to all creditors.

4         We believe that entering in the omnibus agreement,

5  whether it's valid or not, was a potential breach of those

6  fiduciary duties, and that's something that should be

7  investigated as part of this bankruptcy estate.  And if there's

8  claims, we can bring those claims against the Ds and Os with

9  respect to that decision.  If there's not claims, there's not

10 claims.

11        And then, finally, Your Honor, there's potential

12 issues related to the omnibus agreement on fraudulent transfer

13 and other claims that we don't need to get into today.  But we

14 do believe that there are claims and causes of action in

15 addition to the intellectual property rights with respect to

16 the Rembrandt technology that are part of this estate, that are

17 potentially valuable assets that need to be protected for

18 creditors.

19        And we have three creditors here today that are

20 asserting their interest, and the debtor is prepared to fulfill

21 its duty, put in an independent chief restructuring officer,

22 not Mr. Rajan to make the decisions going forward but that Mr.

23 Brownstein be the independent party to make those decisions

24 moving forward.

25        And I think all we're asking for is the right to file

1  a voluntary Chapter 11 petition, assuming that we have

2  conversations with VTI, with SeeCubic, with any party that may

3  be willing to finance the Chapter 11 case, Your Honor, and

4  still -- assuming they're still willing to fund it and come

5  back before this Court with a voluntary Chapter 11 petition in

6  order to protect those potentially valuable rights, Your Honor.

7  That is at the crux of it, taking apart all the other arguments

8  that we were going to make about breathing spell and two-party

9  dispute and everything, that's what we're here today asking

10 for.

11         And we're trying to fix what the Court and what

12 SeeCubic and others have found as wrongs that this debtor has

13 done in the past by putting in an independent fiduciary and

14 moving forward or not moving forward if there is an agreement

15 on funding, Your Honor.  Without funding, we understand there's

16 not much that this debtor can do.  We have, you know, basically

17 a week I think to figure out if there's funding of someone who

18 wants to take this on and push this Chapter 11 forward and

19 attempt to protect these assets or at that point, potentially

20 consent to a Chapter 7 as well, Your Honor.

21         You know, we're here on the motion to dismiss today.

22 And as the Court's well aware, we've been involved for a few

23 days, but I do think that this debtor is prepared to move

24 forward on the grounds that I just set forth to protect these

25 few assets and there may be others.  My knowledge is a little

1 bit lacking outside of the kind of core subset of what is out

2 there.

3      But I do believe that the Rembrandt technology, it

4 could be the core to this bankruptcy.  It could be a new

5 potential business that is out there.  There could be claims

6 related to that.  And I think those need to be protected

7 because they do fall outside the omnibus agreement, and they're

8 not within the purview of the Chancery Court.  They're within

9 the purview of the bankruptcy estate, and they're assets of

10 this debtor.

11      So given the Court's comments, I had a much longer

12 presentation and we touch on a lot of it in our joinder, but

13 that is the crux of the debtor's argument.  And I will

14 apologize to the Court.  I meant to support my earlier apology.

15 There is a paragraph in our pleading that is identical to Mr.

16 McLaughlin's pleading.  I asked our associate who was drafting

17 this, I said I like that section of the pleading, please put

18 that as something similar in ours.  And I did not do a

19 sufficient job reviewing that to assure that we kind of changed

20 it and made it our own.

21      So that was not anything that, you know, we concerted

22 with Mr. McLaughlin on.  I thought he did a good job on it, and

23 we borrowed his language for our pleading.

24      THE COURT:  Okay.  Well, that's a good compliment to

25 Mr. McLaughlin.  So let me just ask you this.  There's some

1    discussion about an independent fiduciary at Stream now, but

2    there's no independent director, correct?

3         MR. WARD:  I guess there's a dispute over whether

4    there's independent -- my understanding, Your Honor, from the

5    -- we have not been retained to do any of the Chancery Court

6    stuff as of this point.  I haven't really gotten too much

7    involved with that.  My understanding is there's a dispute on

8    word composition, but I think Your Honor is correct.

9         But I think as this Court knows, if we file a motion

10   to approve a chief restructuring officer, Ms. Sierra's going to

11   weigh in heavily on who that CRO reports to and who he takes

12   direction from in the Chapter 11.  And I think our intent is to

13   assure that the CRO is independent and acting as an independent

14   fiduciary.

15        And, frankly, the reason that we believe a CRO is

16   more apropos than a Chapter 7 trustee is there is a hope that

17   this business can restart, and that can't happen in Chapter 7.

18   If we go into Chapter 7, you know, it's end game, business is

19   shut down.  You know, we've seen trustees do limited

20   operations, but that's very difficult.  We do believe that

21   there's a lifeline here to a future business, and that's why we

22   believe we should be in Chapter 11 and try and restart that

23   business with or without the omnibus agreement, Your Honor.

24        THE COURT:  Okay.  Well, thank you, Mr. Ward.  I

25   appreciate your perspective on this.

1          Okay.  Well, I think there's at least two other

2   parties that probably wish to be heard.  So why don't I turn

3   the podium over to Mr. Zahralddin on behalf of VTI.

4          MR. ZAHRALDDIN:  Good morning, Your Honor.  Rafael

5   Zahralddin from Armstrong Teasdale on behalf of VTI.  Thank

6   you, Your Honor, for your time this morning.

7          I think I'm going to try to make this as short as

8   possible.  I will refer back.  Mr. Larkin said earlier that he

9   believed nothing had changed from the first time around when we

10  were before Your Honor.  I think that that is a little bit

11  inaccurate in the sense, and as we've heard from other folks,

12  that we have now a real serious issue in terms of what is

13  important to our client which is intellectual property that's

14  out there.

15         And I will clear the air and certainly happy to

16  answer any questions you have, Your Honor, but we have been

17  speaking with Rembrandt only because Rembrandt spoke to the

18  debtor and the debtor said -- and this wasn't obviously Mr.

19  Ward.  It was Mr. McMichael in the last case.  And Mr.

20  McMichael responded back and told Mr. Michaels that he had to

21  wait until after the motion to dismiss because they were really

22  occupied with trying to deal with that issue.

23         Then, Mr. Michaels also told me that he had contacted

24  and spoken to SeeCubic which is in his declaration, spoken to

25  them and spoken directly to Mr. Stasney who he knew from the

1  prior settlement, and that they indicated that it wasn't their

2  responsibility and that they weren't going to honor any sort of

3  payment for the license.  They were going to use the license

4  despite the fact that it's not transferrable and non-exclusive.

5  And so then he came to us, and he asked us, you know,

6  do you guys have an interest in this.  And so we did some due

7  diligence, looked at the licensing issues.  I had our

8  intellectual property department review it.  And we came back

9  and said that, yes, this would be something of interest to us

10  under the hope that either there was a superior right to what

11  SeeCubic holds or that there was an alternative pathway.

12  And also, part of the settlement with Mr. Michaels

13  included an order and preferred pricing on a go-forward basis

14  which was combined with the licensing.  And he's much more

15  sophisticated in this area than I am, but that that would

16  present a viable project as well for the debtor as well as

17  perhaps even independently just with -- between Rembrandt and

18  VTI.

19  So I'm not here to try to argue against the omnibus

20  agreement or the PI.  I mean, obviously, we disagree with some

21  of the things that happened in that case.  But the face of the

22  omnibus agreement itself says it is subject to creditor

23  remedies, and I'm not even talking about the fraudulent

24  conveyance in the bankruptcy.  I'm talking simply about the

25  remedies of Mr. Michaels and his license and the terms of, you

1  know, that he has those rights under U.S. patent laws.

2         So we're not here to argue that.  I also understand

3  that Judge Laster gave warnings to both parties.  He said, you

4  know, that his opinion was susceptible to insider abuse.  And

5  the one piece of information that he didn't have when he wrote

6  his opinion was that there would be 25 now million dollars of

7  unsecured debt.  And he made a specific reference to the

8  liabilities -- if Your Honor doesn't know, Schedule 1-B was

9  released after the PI.

10         And that presents a situation where again on the face

11  of the omnibus, it says it's subject to creditor remedies.  Now

12  you have $15 million worth of creditor remedies, part of which

13  4.8 million or so, it's roughly 25 -- 4.8 directly relates to

14  the patent rights of Mr. Michaels.  So we have been discussing

15  that.

16         And again, we're looking at it from the point of view

17  that VTI just wants to make 3D products and they want to

18  acquire as much intellectual property as possible.  That's why

19  they're willing to fund this.  They believe in this technology.

20  We are funded.  We have escrows that are being funded right now

21  through the transfer of money from Burlington and its partners.

22  And we would like to try and facilitate this.

23         I know you said that the prior Chapter 11 isn't

24  significant, but I will just reiterate that, you know, Mr.

25  McCarthy indicated and I think he called himself a white

1  knight, VTI would like to facilitate something that is

2  beneficial for everyone.  We are welcome -- we welcome any sort

3  of option, whether it's a Chapter 7, whether it's a Chapter 11

4  where it's a combination with Mr. Larkin and his clients.  We

5  have offered to pay them in the past.

6          You know, we would continue to work on something else

7  that would maybe involve a resolution of Mr. Michaels' issues

8  since he believe he has a blocking patent as well as exclusive

9  licenses and that there's also an issue with the Stream

10 license.  I think we're open to any of those things, and we

11 would like -- and that's the reason that we asked for some time

12 to use.  And I'm glad Mr. Ward brought it up.  We'd like to do

13 our best to facilitate some sort of resolution.

14         But I wanted to make sure that you understood that

15 our conversations only came up on the VTI side with Rembrandt

16 after they were, you know, pretty much brushed aside by both

17 the debtor and by SeeCubic, and that's something that Mr.

18 Michaels has laid out in his affidavit and he's here to attest

19 to, as well.

20         So I'm going to cut off my presentation with that,

21 Your Honor, because I think that those were the salient issues.

22 And, of course, we would also welcome -- if we have to go back

23 and go in front of Judge Laster and fund something in front of

24 Judge Laster, we would do that as well but, again, the parties

25 we're talking about, they're not really involved in that

1 preliminary injunction hearing.  Mr. Michaels doesn't get a

2 resolution out of that; neither do any of these other folks.

3        And in order to make TV, in order to make flat panels

4 and displays, we need to speak -- there's only a limited group

5 of people that fit in this.  If not, everyone would be making

6 those 3D panels already.  It's a complex supply chain.  But I'm

7 going to conclude with that, and I appreciate you letting me

8 speak, Your Honor.

9        THE COURT:  My pleasure, and nice to hear from you.

10 I appreciate the perspectives.

11        MR. ZAHRALDDIN:  Thank you, Your Honor.

12        THE COURT:  Okay.  All right.  Is there anyone else

13 that wishes to be heard in connection with this matter?  Ms.

14 Sierra, I see you're on the line, and I didn't see any papers

15 that were filed on behalf of the U.S. Trustee.  But if you wish

16 to be heard, this may be the appropriate time.

17        MS. SIERRA:  Good morning, Your Honor.  Rose Sierra

18 on behalf of the U.S. Trustee.  Your Honor is correct.  The

19 U.S. Trustee did not file any papers in this matter as of this

20 time.  And just to talk about that a little bit, this case or

21 this matter comes to this Court in the posture of an

22 involuntary Chapter 7 case filed by petitioning creditors in

23 which no order for relief has been entered yet.

24        For these reasons, the U.S. Trustee does see

25 limitations to its involvement in this case for statutory

1 reasons.  But, nonetheless, we have a few observations that if

2 it would aid your Court, we would like to make on the record

3 today.

4            THE COURT:  That would be fine and appreciated.

5            MS. SIERRA:  Okay.  So, Your Honor, in the context of

6 the Chapter 11 case filed by the now-alleged debtor in this

7 case, based on the record before the Court at that time in

8 which -- which was the result of weeks of discovery,

9 depositions, and a two-day trial, without question, the UST

10 believes that the Court's dismissal order of that case was

11 proper.

12            Now in the context of this involuntary Chapter 7

13 case, given the circumstances and the facts that belied the

14 Court's prior dismissal order, the parties pushing and

15 requesting that this Court allow this Chapter 7 case to

16 continue need to show something different in how they will

17 prosecute this case that is, you know, not just the same record

18 and the same factual circumstances and the same situations that

19 belied the Chapter 11 case or, at the very least, they need to

20 show that the record before -- the record in that case and the

21 Court's dismissal order in that case is something that the

22 parties here are not bound to.

23            Now as to these questions, Your Honor, whether

24 there's, you know, the record in the Chapter 11 case and the

25 Court's dismissal of the Chapter 11 case bears on this present

1 case, the UST has a few observations and concerns that we'd

2 like to raise at this time.

3       First of all, the timing of this involuntary petition

4 just weeks after the Court's dismissal of the 11 case raises

5 some serious concerns as to whether the parties here are just

6 attempting to relitigate and come to this Court again at the

7 same posture that they came before the Chapter 11 case.

8       Exhibit D to the movant's motion to dismiss this

9 involuntary case strongly suggests that there were some

10 discussions between the debtor and one of the petitioning

11 creditors prior to the filing of the petition.  The UST has not

12 investigated this nor do we -- are we saying as a matter of

13 fact that those discussions happened.  But it's strongly

14 suggestive of that.

15       The papers filed by the parties opposing the

16 dismissal of this case largely raise the same issues, the same

17 facts, the same circumstances that were raised in the context

18 of the dismissal and the litigation in the Chapter 11 case.

19 Again, with respect to the alleged debtor in this case, they've

20 been very open and forward about the fact that the attempt here

21 is to let this Chapter 7 case go forward, and when the time is

22 right to convert to a Chapter 11 case and again implement the

23 same strategies that they were going to implement in the

24 context of a Chapter 11 case.

25       And with respect to this Rembrandt issue that, quite

1  frankly, I'm trying to wrap my head around because I don't

2  understand it and I don't -- I'm trying to make sense of how

3  it's relevant to whether this Chapter 7 case should go forward.

4  Exhibit C to the declaration filed I believe at some point

5  yesterday by Mr. Michaels shows an agreement and a settlement

6  agreement that was executed by the debtor, by Rembrandt, and by

7  the debtor with Mr. Rajan's signature the day that the

8  involuntary petition was filed.  Rembrandt, as you know, Your

9  Honor, is one of the petitioning creditors in this case.

10        Your Honor, so those are our observations in this

11  case which to sum it all up I think are strongly suggestive of

12  the fact that this attempt and this filing of this involuntary

13  Chapter 7 case is another attempt to circumvent this Court's

14  dismissal order.  And with that, Your Honor, you know, those

15  were the observations that we wanted to make to the extent that

16  it would aid this Court and, quite frankly, the other parties

17  in this case.

18        And, you know, there's been -- I've heard something

19  about, you know, Mr. McLaughlin made some suggestions as to how

20  he thinks this case would run as a Chapter 7 case and what are

21  some of the purposes and goals here in the appointment of a

22  Chapter -- an independent Chapter 7 trustee to look into

23  certain issues.  I've also heard from Mr. Ward about the -- now

24  that there's a CRO in the case and an agreement in principle.

25        Your Honor, at this juncture, I understand that we

1  are at a limited -- what I thought would be the limited issue

2  of deciding whether a Chapter 7 case should go forward.  But

3  with all of the assertions that have been made about the

4  purpose of this being another Chapter 11 case with a CRO really

5  -- I think really negate or contradict or are inconsistent with

6  the fact that there's now -- that the petitioning creditors

7  want a Chapter 7 independent trustee to take a look at things.

8          So it's very hard, Your Honor, for the U.S. Trustee

9  to kind of wrap its head around what's happening here.  So for

10 that reason, all we think we can do here to aid is make the

11 observations that we've made, raise the concerns that we've

12 raised and, Your Honor, if an order for relief is entered, we

13 will fulfill our duty to appoint a Chapter 7 trustee.  But at

14 this point, I'm quite frankly at a loss for what exactly is

15 going on.  Thank you, Your Honor.

16         THE COURT:  Thank you.  And I do appreciate those

17 observations of the U.S. Trustee.

18         Okay.  Well, let me ask is there anyone else --

19 before I turn the podium back over to SeeCubic's counsel, why

20 let me ask is there any other party that wishes to be heard in

21 connection with the motion to dismiss?

22         MR. McLAUGHLIN:  Your Honor, I'm going to want to put

23 on Mr. Michaels as a witness, please, at --

24         THE COURT:  I'm sorry.

25         MR. McLAUGHLIN:  I'm going to call Christopher

1  Michaels as a witness at some point in time whenever the

2  Court's ready to hear evidence.

3          THE COURT:  Okay.  Well, then, Mr. Larkin?

4          MR. LARKIN:  Your Honor, I --

5          THE COURT:  Did you wish to be heard in connection

6  with that request?

7          MR. LARKIN:  I do.  I object to the calling of Mr.

8  Michaels as a witness at this hearing.  The affidavit that was

9  submitted was submitted yesterday after the objections were due

10 and I think after our reply brief was filed.  I haven't had an

11 opportunity to depose him or really digest the full extent of

12 the affidavit or the declaration.

13          At the same time, Your Honor, I really think that

14 this is turning into a sideshow about this motion.  And I'm

15 happy to address this in, you know, sort of my rebuttal

16 remarks.  But I just heard for the last hour argument from

17 three different lawyers, none of whom addressed the principal

18 legal issue here which is divestiture.  There wasn't a single

19 word uttered about it.

20          And the divestiture issue was created by the debtor

21 when they filed the notice of appeal.  The notice of appeal is

22 still on file.  They filed their statements of issues on appeal

23 last week with Judge Andrews.  As I said at the outset, the

24 issues that are laid out in the statement of issues, if you

25 overlaid them on top of the arguments that have been made by

1  the last hour by the objecting parties, they line up perfectly.

2        As Ms. Sierra said, it's hard to really make sense of

3  everything that was said over the last hour because -- and this

4  is precisely the procedural morass that the Third Circuit

5  warned about.  You know, this is from the <u>Main Line Federal</u>

6  <u>Savings and Loan</u> case, it's 721 F.2d 904.  The procedural

7  morass in this case illustrates the problems created by

8  assertions of concurrent jurisdiction.  That is precisely where

9  we are headed.

10        We're hearing about IP licensing and settlement

11  agreements with Rembrandt.  We're hearing about -- I heard

12  about breach of fiduciary duties.  Your Honor, I mean with all

13  due respect to Mr. McLaughlin, I know he just came on the

14  scene, but Vice Chancellor Laster found after, you know -- on a

15  full body of evidence that no evidence suggests that the

16  members of the resolution committee breached their fiduciary

17  duties in connection with the execution of the omnibus

18  agreement.  That's at -- you know, it's page 24 of the Chancery

19  Court decision.

20        We heard today about how we're going to litigate

21  fraudulent transfer issues if the Chapter 7 petition is

22  permitted to proceed or to convert into a Chapter 11 preference

23  actions.  These are all arguments that were made three and a

24  half weeks ago unsuccessfully by the debtor and VTI.

25        And so, you know, if Mr. Michaels is going to

1  testify, I think we reserve all rights.  Certainly, we'll

2  cross-examine him.  But I really don't think -- I think it's a

3  sideshow, and I don't think we need to go there today.

4       THE COURT:  Okay.  Mr. McLaughlin, why don't i heard

5  from you about the relevancy of the declaration.

6       MR. McLAUGHLIN:  Well, again, Your Honor, we're here

7  on a Chapter 7, a liquidation.  The issue -- and Mr. Larkin has

8  suggested we haven't addressed divestiture.  And I don't know

9  how else to say it.  It's not the same issue that's pending --

10  there is no bankruptcy case pending anywhere.  There's an

11  appeal of a dismissal of the case.  There's no bankruptcy

12  estate.  There's no automatic -- well, I guess there's an

13  automatic stay based upon a Chapter 7.

14       But the Chapter 11 was over.  So there's nothing that

15  -- there's no bankruptcy -- you're not going to rule adverse

16  anything.  The district court would rule because the district

17  court -- the issue before it is whether or not the case should

18  have been dismissed.  That's the issue.  There may be

19  subsidiary issues, you know, that were raised, but the issue is

20  was the dismissal proper or not proper.  If it was proper, then

21  you affirm.  If it wasn't proper, they reverse or remand or do

22  whatever appellate courts do.  That has nothing to do with

23  liquidation of the assets.

24       I don't see any inconsistency in our position.

25  Again, we just want somebody to look at this independently and

1  determine whether or not there are -- you know, there's

2  appropriate litigation that can be brought or whether or not

3  any of these vestigial (phonetic) assets that still exist in

4  the estate not in derogation of the omnibus agreement or the

5  security interest can be made -- can yield any value.

6       That was why I wanted to have Mr. Michaels testify is

7  because he can tell you about the intellectual property and why

8  he believes -- I believe he believes that there's still value

9  left in the Stream estate.  Again, that would be value

10 available to a Chapter 11 trustee if the case converts over.

11      Again, the debtor and VTI, they're talking about a

12 possible conversion.  That's a possibility.  That's up to them.

13 That's up to you.  That's not the Chapter 7 issue.  The Chapter

14 7 issue is whether or not it's appropriate to let my creditors,

15 my constituents have an independent party to take a look and

16 see what is there.  If there's nothing there, then there's

17 nothing there.  It's a no-asset case, thank you very much, the

18 trustee gets his $75, and everybody leaves.

19      But that's not going to -- if the debtor elects to

20 try and convert the case to a Chapter 11, then a lot of these

21 issues may become more relevant.  Right now they're not.  This

22 is a real simple matter.  It's a corporate case where there may

23 or may not be assets, and we were looking for someone to take

24 one last look and see.

25      Again, throughout this case, all of the players have

1  been interrelated in a lot of litigation.  Let somebody who

2  doesn't have an emotional dog in the fight take a look at

3  things.  It doesn't cost that much.  There's very little burden

4  on the system at all.  And, again, the difference in a Chapter

5  7 you have a trustee, if -- you know, the debtor's talking

6  about a CRO, if that becomes appropriate.

7       The bottom line is either way it's an independent

8  third party who's not -- who hasn't been involved in this from

9  day one.  So, again, we would just like to show that there is

10 some at least vestigial value in the estate that a trustee

11 could look at.  If the trustee determines it's not worth

12 anything, then they abandon it under 554 and it's over.  But

13 it's really not that complicated, I don't think.

14      And, again, I understand that if the debtor decides

15 it wants to try and convert to 11, then a lot of the arguments

16 raised by the United States Trustee, by Mr. Larkin, they may

17 have some more substance to be fought over.  But in my petition

18 -- and, again, this is a motion to dismiss the case.  We would

19 ask that the motion be denied and let's find out what happens

20 on the 17th, if the debtor consents, you know, if the debtor

21 moves under 706 to convert.  And then, you know, we can see

22 where we go.

23      But, again, I would like to put Mr. Michaels on just

24 to testify as to the value that Rembrandt sees in Stream TV.

25           THE COURT:  Okay.  Well --

1          MR. LARKIN:  Your Honor, may I respond?

2          THE COURT:  You may, although I think that the way

3   that I want to proceed -- I want to complete the arguments on

4   -- I want to complete argument.  Then I'm going to take a break

5   and I will let you know if I need further evidence, although I

6   did read the declarations and I understand what the position is

7   that you're putting forth with those declarations, which is

8   that there is some assets possibly in this current Stream

9   estate that could be valuable to creditors.

10          I understand that position, and positions were

11  proffered of that nature in the Chapter 11.  So I certainly

12  understand that position.  I'm not sure if I need actual

13  testimony on that issue given that you filed the declarations

14  and I read those.  I can determine what the relevancy of that

15  is to the legal position before me.  But let's do this, let's

16  conclude with argument and then, like I said, I'll take a break

17  and I'll come back and let you know whether I need evidence.

18          So, Mr. Larkin, I believe you made some closing

19  argument, at least on the jurisdictional piece.  But I yield

20  the podium back to you for the last word since it's your

21  motion.  And then I'll take a break.

22          MR. LARKIN:  Thank you, Your Honor.  I didn't mean to

23  interrupt you.  I thought we were still on the witness issue.

24  And I won't rehash the divestiture point other than to say,

25  again, I don't think any of the objecting parties have

1 addressed it squarely and, particularly, the debtor who has

2 filed supporting papers; VTI who has filed supporting papers.

3       Mr. Rajan who, as Mr. Ward said, Mr. Rajan is still

4 firmly in control of Stream TV.  He retained Mr. Ward over the

5 weekend.  He's still the controlling stockholder of Stream TV.

6 Our understanding is I think he's still the only director.

7 There's been no governance changes.  There's no CRO as of this

8 date.  Mr. Rajan's in charge and, frankly, his fingerprints are

9 all over this.  And no one has addressed the divestiture point

10 that the debtor created by filing the notice of appeal.

11       With respect to the 707 issues that I went through at

12 the outset, Your Honor, I think the last hour and a half of

13 argument really just highlights again the procedural morass

14 that we're going to be dealing with if the Chapter 7 petition

15 is permitted to proceed even if, you know, the automatic stay

16 is lifted and we're permitted to proceed in Chancery.  I mean

17 the longer that this plays out in multiple forums, I think the

18 greater the risk is of inconsistent rulings.  I think, frankly,

19 will play directly into Mr. Rajan's playbook here to try and

20 sort of fight a multi-front war to maintain control over

21 Stream.

22       And I don't see the benefit of it, right.  Again, as

23 I said at the outset, you know, we understood Your Honor's

24 ruling on May 17 to go back to the Chancery Court, complete

25 that litigation, complete the asset transfers, and if there was

1 | anything left after that, the unsecured creditors could come
2 | back to bankruptcy court.  I still don't understand why that
3 | isn't an appropriate path to go down.

4 | And my friends on the other side haven't addressed
5 | that.  They haven't explained why they ignored Your Honor's
6 | ruling and four days after the order was entered came in and
7 | filed a Chapter 7 petition and then the debtor comes in and
8 | wants to bootstrap the Chapter 7 petition into a complete redo
9 | of the Chapter 11, right.  There's been no explanation why
10 | that's a better path than the one Your Honor laid out on May
11 | 17.

12 | So, again, you know, I laid out my arguments at the
13 | outset.  I think we can all sort of see the writing on the wall
14 | here.  If this is permitted to proceed in a Chapter 7 or if
15 | it's converted to a new Chapter 11, we're all going to be
16 | having the same arguments we had over the last three and a half
17 | months while an appeal is pending.  While an appeal is pending.
18 | And, of course, we're going to, you know, want to litigate in
19 | the Court of Chancery.

20 | So, again, Your Honor, we would ask that the motion
21 | be granted that the Chapter 7 petition be dismissed.  We would
22 | ask that it be dismissed with prejudice at least until such
23 | time as the Chancery Court litigation is completed and the
24 | asset transfers have been complete.  Thank you.

25 | THE COURT:  Mr. Larkin, what's the estimated time

1 frame you think that the omnibus -- or, excuse me, the Chancery

2 Court litigation -- how long is that going to take?

3       MR. LARKIN:  Your Honor, the briefing is complete.  I

4 don't believe Vice Chancellor Laster has scheduled oral

5 argument on the motion.  And so, you know, I can't give you a

6 timeline other than, you know, I know the Vice Chancellor, at

7 least back in December, had indicated that, you know, he would

8 be, you know, I think ready to rule promptly on a motion if it

9 was brought.  So -- but I don't think there's anything beyond

10 that.

11       And I don't want to speak out of turn.  I can confer

12 with one of my colleagues offline if we're going to have a

13 break if anything's changed on that front, but I don't believe

14 so, Your Honor.  I don't anticipate taking very long.

15       THE COURT:  Okay.  Thank you very much.

16       MR. LARKIN:  Thank you.

17       MR. MICHAELS:  Your Honor, may I interject on that

18 point?  You asked about that that appearance.  To be clear,

19 Rembrandt was not a party to that litigation to this point and

20 has not been put on notice of any of the prior proceedings.

21 But to the extent that -- and part of what we have argued is

22 that SeeCubic is trying to walk away again with our IP rights.

23 It's reasonable for them to expect that we are going to appear

24 or file our own papers in that Chancery Court proceeding and

25 then likely remove it to federal court because many of the

1  issues are exclusively federal court jurisdiction.

2         So the idea that that's going to be over quickly
3  without having us heard is frankly unrealistic.  We have an
4  express interest in protecting our intellectual property.  We
5  have been in litigation on this point since 2017, and we
6  thought we'd reached a settlement agreement with Mr. Stasney in
7  April of 2019 far predating any omnibus agreement.  I mean we
8  are not new.

9         I understand that they failed to disclose that in
10 this proceeding or any of the other proceedings.  But by no
11 stretch of the imagination are our claims new in this regard.
12 And the idea that SeeCubic is going to somehow walk away with
13 our intellectual property without us doing something about it
14 is -- they have express -- our actions to date show otherwise.

15        And once it became clear that they were trying to
16 take it away from Stream and that was actually going to happen,
17 we have filed this involuntary petition.  But, you know, we are
18 -- if this is dismissed, they can expect us to be there in
19 Chancery Court and in federal court otherwise.

20        THE COURT:  Okay.  Well, that's very helpful.  I
21 understand the issues.  It sounds as if you have a pathway
22 outside of this Court, but I understand why you're trying to
23 proceed in this Court, as well.  So I appreciate your
24 perspective on timing.

25        Okay.  Well, I'd like to take a break until 12:30 and

1 at that point, I'll come back and let you know whether we need

2 to move on to some evidence in connection with the issues that

3 are before me.  So with that, let's adjourn today's hearing and

4 I'll resume back on Zoom, same Zoom link, at 12:30.  All right?

5 Thank you all very much.  I appreciate the arguments.  Take

6 care.

7            (Recess at 11:46 a.m./Reconvened at 12:35 p.m.)

8            THE COURT:  We are back on the record shortly after

9 12:30 in the Stream involuntary Chapter 7 case.  I want to

10 thank you all for the opportunity for giving me the opportunity

11 to collect my thoughts and determine whether I need evidence on

12 the issues before me.

13            And I've concluded that I don't need Mr. Michaels'

14 testimony because even considering and giving weight to the

15 contents of his declaration as well as those of the declaration

16 of Mr. Blumenthal, I would still come to the same conclusion

17 which is that this proceeding must be dismissed.

18            Considering the totality of the facts and

19 circumstances presented, including the arguments that were made

20 by counsel today -- pardon me, I'm getting some feedback.  As I

21 was saying, considering the totality of the facts and

22 circumstances presented, including the arguments that were made

23 by counsel present today and the pleadings submitted and the

24 documents attached thereto, it's clear to me that this

25 proceeding was filed as another attempt by the parties to

1  circumvent my dismissal order, gain some sort of litigation

2  leverage over the secured lenders and the disputes in the

3  Chancery Court, and essentially get another bite of the apply

4  to try and pursue the previously submitted plan and theories

5  that are already considered and rejected in the prior Chapter

6  11 proceeding.

7         And this implicates and gives rise to issues of

8  divestiture and judicial economy and also amounts to cause

9  under Section 707.  And I understand the petitioning creditors'

10  positions that they are not a party to the proceedings in the

11  Chancery Court and that they do not support the Unsecured

12  Creditors' Committee's actions and conclusions in the Chapter

13  11 case.  But the Creditors' Committee represented not only

14  their interests but also the interests of all creditors in

15  discharging its fiduciary duties and concluding -- and

16  concluded that going down the path suggested by the petitioning

17  creditors, Stream and VTI would not be beneficial to the

18  creditor body.  And I continue to agree.

19         Moreover, the relief and the remedies that the

20  creditors hope that they or a Chapter 7 trustee can pursue in

21  bankruptcy can be pursued outside of bankruptcy.  And I thought

22  I made myself clear when I dismissed the Chapter 11 case that I

23  did not expect to see another case until the Chancery Court

24  action was completed and the transfers to SeeCubic were

25  accomplished.  The arguments presented today do not change my

1  opinion.

2          So accordingly, I'm going to enter an order

3  dismissing the case with prejudice so that no further

4  bankruptcy filings for Steam can occur for 12 months.  And I

5  will enter that order shortly after the conclusion of today's

6  proceedings.

7          With that, unless there's anything else we need to

8  discuss, we can adjourn today's hearing.

9          MR. McLAUGHLIN:  Nothing further --

10          THE COURT:  Okay.  I'm not hearing --

11          MR. LARKIN:  Thank you, Your Honor.

12          THE COURT:  Okay.  Thank you all for your time and

13  attention to the matter today, and we'll consider this hearing

14  adjourned.  Take care.

15          UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

16          UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

17              (Proceedings concluded at 12:38 p.m.)

18                      *  *  *  *  *

19

20

21

22

23

24

25

1   **CERTIFICATION**

2       I, DIPTI PATEL, certify that the foregoing is a correct

3   transcript from the electronic sound recording of the proceedings

4   in the above-entitled matter to the best of my knowledge and

5   ability.

6

7   _/s/ Dipti Patel_                 Date:   June 11, 2021

8   DIPTI PATEL, CET

9   **RELIABLE**

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25