# EXHIBIT A

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Stream TV Networks, Inc., | Case No. 21-10433 (KBO) |
| Debtor. | **Hearing Date:  April 15, 2021 at 1:00 p.m. ET**<br>**Objection Deadline:  March 29, 2021 at 4:00 p.m. ET** |

## MOTION OF SEECUBIC, INC. AND SLS HOLDINGS VI, LLC FOR
## AN ORDER DISMISSING DEBTOR'S CHAPTER 11 CASE

SeeCubic, Inc. ("**SeeCubic**") and SLS Holdings VI, LLC ("**SLS**", and collectively with SeeCubic, the "**Movants**") by and through their undersigned counsel, hereby move (the "**Motion**") this Court for entry of an order dismissing the Chapter 11 case of the above-captioned debtor Stream TV Networks, Inc. ("**Stream**" or the "**Debtor**") pursuant to 11 U.S.C. § 1112(b).  In support of the Motion, Movants rely upon and incorporate by reference the Declaration of Shadron L. Stastney (the "**Stastney Declaration**"), filed contemporaneously herewith.  In further support of the Motion, Movants respectfully represent the following:

### PRELIMINARY STATEMENT

1.      On February 24, 2021, Stream – a Delaware corporation that currently has no meaningful business assets, employees, or operations to speak of – filed for bankruptcy pursuant to Chapter 11.  Despite being an empty shell of a corporation, the Debtor's bare-bones petition claims that it currently holds between $100-500 million in assets and that it expects that funds will be available for distribution to unsecured creditors.  The Debtor's petition, however, was unaccompanied by the routine first-day filings for a business that claims to have significant assets and ongoing operations.  Moreover, the Debtor did not apprise any of its key constituents that it intended to seek relief in this Court despite the fact that Stream and its controlling

founders, Mathu and Raja Rajan, remain subject to an ongoing order issued by the Delaware

Court of Chancery enjoining them from taking virtually any action with respect to Stream or its

assets.  *See* **Exhibit A**, *Order Granting Motion For Preliminary Injunction* (Dec. 8, 2020).

2.      The Court of Chancery's blistering, 52-page opinion (the "**Chancery Opinion**")

issued on December 8, 2020 is illuminating.  In the Chancery Opinion granting SeeCubic a

preliminary injunction against the Debtor and the Rajans, Vice Chancellor Laster found based on

a substantial evidentiary record, as follows:

- "Stream does not yet have a product.  Eleven years after its founding, Stream remains a pre-revenue, development-stage company" controlled by the Rajan family.  Chancery Opinion. at 5.[1]

- "During its existence, Stream's corporate governance practices have been virtually nonexistent." *Id*. at 6.

- The Rajan brothers ***fraudulently backdated*** a stockholder consent in an attempt to terminate a valid agreement between SeeCubic and Stream that resulted in the transfer of Stream's assets to its secured lenders after Stream defaulted on more than $50 million (of principal) secured debt.  *See id*. at pp. 12-13, 25-27 (emphasis added).

3.      With respect to that certain May 6, 2020 agreement governing the transfer of

substantially all of Stream's assets to SeeCubic (the "**Omnibus Agreement**"),[2] the Chancery

Court explained that:

> In the Omnibus Agreement, Stream agreed to transfer all of its assets to SeeCubic, a newly formed entity controlled by its secured creditors. Stream also granted its secured creditors a power of attorney to effectuate the transfers. Stream's secured creditors already held security interests in all of Stream's assets and had the right to foreclose on those assets. In the Omnibus Agreement, Stream's secured creditors agreed to release their claims against Stream upon completion of the transfer of Stream's assets to SeeCubic.

---

[1]    The Chancery Opinion is attached hereto as **Exhibit B**.

[2]    The Omnibus Agreement is appended as Exhibit 1 to the Stastney Declaration.

Chancery Opinion p. 1.

4.      Stream's Chapter 11 filing is a bad-faith litigation tactic by the Rajans, who are seeking to avoid the Chancery Court's entry of summary judgment in favor of SeeCubic, and against Stream and the Rajan brothers, with respect to the validity and enforceability of the Omnibus Agreement.  Stream commenced its Chapter 11 case only two days before briefing was to be completed on SeeCubic's motion for summary judgment, which the Chancery Court already indicated would be entered based on the record before it.  *See* Chancery Opinion at 52.

5.      The Rajans utilized their leverage as controlling stockholders to remove and dispense with any outside or independent directors at Stream, and the petition and Board resolution commencing this Chapter 11 case were executed by the one-and-only remaining Board member at Stream: Mathu Rajan (who also participated in the fraudulent backdating of the stockholder consent).

6.      Substantially all of Stream's assets were previously transferred to SeeCubic pursuant to the Omnibus Agreement validated by the Chancery Court under governing Delaware law, and Stream has no meaningful business assets, employees, or ongoing operations to reorganize.  Indeed, the Debtor's application to employ Dilworth Paxson LLP explains that the Debtor does not have assets or funds sufficient to pay counsel – and counsel's payments and retainers to date have come from a patchwork of "investors" and dubious entities with ties to the Rajans (including entities created by the Rajans to compete with the Debtor).  *See* D.I. 15-1, *Declaration Of Lawrence G. McMichael Of Dilworth Paxson LLP*, at ¶¶ 11-21.

7.      In short, the Debtor's Chapter 11 filing is a sham.  It was filed in bad faith by the Rajans and reflects their continued desperate flailing to avoid the effects of the Omnibus Agreement by any means necessary, including obstruction, outright fraud, and abuse of the

judicial process.  There is no legitimate basis for this Chapter 11 case to proceed, and it should be dismissed.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012. This is a core proceeding under 28 U.S.C. § 157(b). Venue of this Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

9.      The legal predicates for the relief requested herein are sections 105(a) and 1112(b) of title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 1017, 2002(a)(4), and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Local Rule 1017-2 of the *Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware* (the "**Local Bankruptcy Rules**").

10.      Pursuant to Rule 9013-1(f) of the Local Bankruptcy Rules, Movants consent to the entry of a final judgment or order with respect to this Motion if it is determined that this Court would lack Article III jurisdiction to enter such final order or judgment absent the consent of the parties.

## BACKGROUND[3]

### I.      Stream

11.      Stream was founded in 2009 to develop and commercialize technology that enables viewers to watch three-dimensional content without 3D glasses.  In 2010 and 2011,

---

[3]    Much of this Background section comes directly from, and includes citations to, the Chancery Opinion's factual background findings.  *See* Chancery Opinion at pp. 5-15.  Those findings are based on more than 200 exhibits and seven deposition transcripts.

Stream formed subsidiaries in the Netherlands.  Chancery Opinion at 5.  Eleven years after its founding, Stream remains a pre-revenue, development-stage company.  *Id*.

12.     The Rajan family controls Stream. Mathu Rajan holds 18,000 shares of Stream's Class A common stock, which carry one vote per share. A family investment vehicle owned by Mathu, his brother Raja Rajan, and their parents holds 19,000,000 shares of Stream's Class B common stock, which carry ten votes per share. Through these holdings, the Rajan brothers control a majority of the Class B common stock and a majority of Stream's outstanding voting power.  *Id*.

13.     At the board level, the Rajan brothers historically have controlled Stream. From July 2019 until March 2020, Mathu and Raja were Stream's only directors. Mathu has served as a director since the Company's founding. Raja served as a director from shortly after the Company's founding until July 2020, when he resigned from that role.  *Id*. at pp. 5-6.

14.     At the officer level, Mathu has served as Stream's CEO since the Company's founding. Raja has served as general counsel and COO since soon after the Company's founding. *Id*. at 6.

15.     During its existence, Stream's corporate governance practices have been virtually nonexistent. Stream has never held annual meeting of stockholders and has not kept regular minutes of Board meetings.  *Id*.

## II.    Stream's Secured Lenders

16.     Since 2009, Stream has raised approximately $160 million from third party investors. The investments have taken the form of a combination of debt and equity.  Chancery Opinion at 6.

17.      Stream's senior secured creditor is SLS.  Between 2011 and 2012, SLS loaned $6 million to Stream through a series of secured notes (the "**SLS Notes**").  Stream pledged all of its assets and the assets of its wholly owned subsidiaries as security for the SLS Notes.  Stream executed a security agreement in connection with the SLS Notes, which authorized SLS to take control of Stream's assets to satisfy the SLS Notes if Stream defaulted.  *Id*. at pp. 6-7.

18.      Stream's junior secured creditor is Hawk Investment Holdings Limited ("**Hawk**").  Between 2010 and 2014, Hawk loaned more than £50 million to Stream, plus another $1.336 million, through a series of junior secured notes (the "**Hawk Notes**").  Subject to the senior security interest held by SLS, Stream pledged all of its assets as security for the Hawk Notes.  Stream executed a security agreement in connection with the Hawk Notes, which authorized Hawk to take control of Stream's assets to satisfy the Hawk Notes if Stream defaulted.  *Id*. at 7.

19.      In February 2020, Stream defaulted on the SLS Notes and Hawk Notes.  As of the date of this filing, the SLS Notes and the Hawk Notes remain outstanding.  *Id*. at 8.

20.      After Stream defaulted on its debt obligations to SLS, SLS filed suit against Stream and the Rajans in the Superior Court for the State of Delaware (Case No. N20C-03-225 MMJ CCLD) on March 23, 2020.

III.    **The Omnibus Agreement and Transfer of Substantially All of Stream's Assets to SeeCubic**

21.      As early as 2019, Stream was in financial distress and engaged in discussions with its secured lenders and equity holders with respect to a potential restructuring.  Chancery Opinion at pp. 7-8.  In December 2019, one of Stream's significant equity holders provided SLS, Hawk, and the Rajan brothers with a draft of the Omnibus Agreement.  *Id*. at 8.  The Rajan brothers refused to agree to any restructuring, and the discussions broke down in January and

February 2020.[4]  Also in January 2020, certain of Stream's equity investors filed a lawsuit in the

Delaware Court of Chancery against the Rajan brothers for fraud and breach of fiduciary duty.

*Id*.

22.    Around the time Stream defaulted on the SLS Notes and Hawk Notes in February

2020, SLS, Hawk, and certain equity holders attempted to resume discussions with Stream about

a restructuring.  *Id*.  With the company failing, SLS, Hawk, and certain of the equity investors

urged the Rajan brothers to appoint outside directors.  In February and March 2020, the Rajan

brothers extended invitations to four outside directors to join Stream's Board.  *Id*. at pp. 8-9.

23.    By March 12, 2020, all four of the outside directors agreed to join Stream's

Board.  All were independent outsiders, and none had prior ties to the Rajan brothers, SLS, or

Hawk.  *Id*. at 9.  After joining the Board and learning about Stream's financial difficulties, the

outside directors concluded that the only path forward was to negotiate a resolution with

Stream's secured creditors and equity holders.  *Id*. at 9.

24.    The Board, including the outside directors, established a "Resolution Committee"

that would have "the full power and authority of the full Board of Directors to resolve any

existing or future debt defaults or claims, and any existing or future litigation, or threats thereof,

on behalf of [Stream], without further action being required from the Board of Directors or any

executive of the [C]ompany."  *Id*. at 10.

25.    As of May 6, 2020, the Resolution Committee approved the Omnibus Agreement.

By doing so, the Resolution Committee bound Stream to comply with its terms.  The

---

[4]    Lest there be any doubt about what constituency the Rajans seek to serve in their roles at Stream, Raja Rajan
posited under oath in connection with the Chancery Court litigation that "[i]f you are not taking care of yourself
how can you take care of" minority stockholders and other stakeholders.  *See Stream TV Networks, Inc. v.
SeeCubic, Inc.*, No. 2020-0766-JTL (Del. Ch.), Deposition of Raja Rajan at 42-45 (Nov. 10, 2020).

counterparties to the Omnibus Agreement were SLS, Hawk, and certain equity investors.  *Id*. at
11.

26.     The Omnibus Agreement provided that SLS and Hawk would not foreclose on
Stream's assets and that they would accept delivery of Stream's assets in satisfaction of their
debts.[5]  The assets would be transferred to a newly formed entity controlled by SLS and Hawk,
which they later identified as SeeCubic. Upon transfer of the assets, SLS and Hawk would
extinguish the SLS Notes and Hawk Notes in their entirety.  *Id*.

27.     The Omnibus Agreement gave holders of Stream's Class A common stock, other
than the Rajan brothers and their affiliates, the right to exchange their shares of Stream's Class A
common stock for an identical number of shares of SeeCubic's common stock and also provided
that Stream would receive one million shares of SeeCubic Class A common stock.  *Id*.

28.     The Chancery Court described the Omnibus Agreement as follows in its
December 8, 2020 Chancery Opinion:

> In the Omnibus Agreement, Stream agreed to transfer all of its assets to
> SeeCubic, a newly formed entity controlled by its secured creditors. Stream
> also granted its secured creditors a power of attorney to effectuate the
> transfers. Stream's secured creditors already held security interests in all of
> Stream's assets and had the right to foreclose on those assets. In the
> Omnibus Agreement, Stream's secured creditors agreed to release their
> claims against Stream upon completion of the transfer of Stream's assets to
> SeeCubic.

Chancery Opinion p. 1.

---

[5]     In connection with the Chancery Court litigation, one of Stream's independent directors with decades of
experience in business and finance testified that the Omnibus Agreement was a "no-brainer" where "[l]iterally
everybody won", and that "had [SLS and Hawk] just waited long enough they would've gotten the assets
completely to themselves."  He further explained that, "[C]onsidering the absolute plight that the company was
in and the rights [SLS and Hawk] had to take over, they were the losers and the shareholders and the Rajans
were the winners."  *Stream TV Networks, Inc. v. Seecubic, Inc.*, No. 2020-0766-JTL; Deposition of Asaf Gola at
pp. 94-97, 111-13 (Nov. 8, 2020).

29.     Effectively all of Stream's material assets were held by its wholly owned direct and indirect subsidiaries in the United States and overseas.[6] Pursuant to the Omnibus Agreement, substantially all of Stream's assets were transferred to SeeCubic in connection with the transfer of ownership of Stream's wholly owned direct and indirect subsidiaries including those in the United States, China, and the Netherlands (which included effectively all of the functioning business operations and remaining employees).  Ownership of Stream's top-level subsidiary, a Delaware corporation called TechnoVative Media, Inc., was transferred to SeeCubic – and, with it, ownership of all of the direct and indirect subsidiaries and affiliates falling below TechnoVative Media, Inc. in the corporate structure – as documented in and effectuated by a September 4, 2020 Stock Transfer and Power as well as an Action By Written Consent of the Board of Directors of TechnoVative Media, Inc.  *See* Stastney Declaration ¶¶ 7-8 (providing copies of the Stock Transfer and Power and the Action By Written Consent).

30.     SeeCubic owns, controls, and operates the assets and business formerly held by Stream pursuant to the Omnibus Agreement validated by the Court of Chancery under governing Delaware law.  *See* Stastney Declaration ¶ 10.[7]

## IV.    The Rajan Brothers' Efforts to Attack and Undermine the Omnibus Agreement, Including Abuse of Litigation and Bankruptcy Process

31.     In its December 8, 2020 opinion, the Chancery Court determined that the Omnibus Agreement – and thus the transfer of Stream's assets to SeeCubic pursuant to that

---

[6]     *See* Stastney Declaration ¶ 7 and Exhibit 2 (providing organizational chart prepared by Stream as of 2018, reflecting Stream's pre-transfer corporate organizational structure).

[7]     As further described below, the Rajans have repeatedly sought to undermine, interfere with, and terminate the Omnibus Agreement, the actions of the Stream Resolution Committee, and the transfers of Stream's assets to SeeCubic.  The Rajans' efforts included interfering with transitions of the composition of boards of directors and related administrative and ministerial changes at TechnoVative Media, Inc. and its domestic and foreign subsidiaries, including with respect to corporate registrations relating to foreign subsidiaries.  *See* Stastney Declaration ¶ 9.  The Chancery Court rejected each and every one of the bases of the Rajans bad-faith actions and arguments seeking to thwart the Omnibus Agreement and the transfers of assets to SeeCubic.

agreement – were valid and binding under governing Delaware law. *See*, *e.g.*, Chancery Opinion at 2 ("On May 6, 2020, the [Stream] Resolution Committee approved the Omnibus Agreement. As of that date, the Omnibus Agreement became effective and binding on Stream.").

32.     Moreover, in light of the Rajans' repeated attempts to undermine and terminate the Omnibus Agreement, the Chancery Court also entered a preliminary injunction against Stream and the Rajans, enjoining them from interfering with the parties' rights and obligations under the Omnibus Agreement. *See* Chancery Opinion at 2 ("SeeCubic… contends that the Omnibus Agreement is valid and seeks a preliminary injunction preventing Stream or any of the third-party defendants from taking any action to interfere with it. SeeCubic's motion is granted"); *see also* Exhibit A, Preliminary Injunction Order.

33.     The Chancery Opinion documents some, but not all, of the actions taken by the Rajans to interfere with the Omnibus Agreement from immediately after its signing until Stream commenced the Chancery Court litigation four months later:

- After the independent, outside directors who were members of Stream's Resolution Committee approved the Omnibus Agreement as of May 6, 2020 and delivered the executed copy of the Omnibus Agreement to the Rajan brothers the next day, the Rajan brothers fraudulently backdated a stockholder consent purporting to have removed those outside directors before the Resolution Committee approved the Omnibus Agreement. *See* Chancery Opinion at pp. 12-13, 25-27.

- The Rajans took the position that the outside directors (who began acting in their roles on the Board no later than March 12, 2020) had never "formally accepted" their Board memberships or that the outside directors were "advisors waiting to formally be appointed to the board of directors," but never actual directors. *Id*. at 13.

- When the secured creditors attempted to engage the Rajans in further negotiations to stop them from interfering with the Omnibus Agreement, "[t]he Rajan brothers pushed for personal benefits for themselves, including employment, compensation, and indemnification for litigation expenses." *Id*. at 14.

- "On May 11, 2020, the Rajan brothers and Hodgson, the only remaining Outside Director, convened a meeting of the Board. During the meeting, they adopted a resolution purporting to nullify and void the Omnibus Agreement. ***The Rajan brothers refused to take any action to comply with the Omnibus Agreement. Instead, they tried to change who managed certain Stream subsidiaries, and they attempted to remove prototype technology from a storage facility in the Netherlands. Mathu also incorporated a new entity named Glasses-Free Technologies, Inc., and purported to grant it a license to use Stream's technology.*** *Id.* (emphasis added).

- Stream (controlled by the Rajans) then commenced the Chancery Court litigation on September 8, 2020, seeking a determination the Omnibus Agreement was invalid. The Chancery Court recounted that "[d]iscovery did not go smoothly" because, among other things, "Stream took aggressive positions that included objecting to producing documents to support its defenses" and "failed to produce a privilege log or redaction log in compliance with the scheduling order." *Id.* at 15. During the course of the Chancery Court litigation (to date), Stream went through three different sets of counsel. *Id.*[8]

34.     In addition to the Rajans' bad-faith conduct addressed in the Chancery Opinion, they also have previously used and threatened to use litigation and the bankruptcy process as a weapon. For example, as the secured creditors attempted to negotiate with Stream, through the Rajan brothers, in early 2020 (prior to the appointment of the independent directors), Mathu Rajan threatened the principal of Hawk to "[p]lease cooperate" with an investor group setting forth an alternative proposal to the one propounded by Hawk and to "answer our questions . . . if you wish to avoid chapter 11." Later, after execution of the Omnibus Agreement, as the secured creditors attempted to negotiate with the Rajans to stop their interference with that agreement, one of the independent directors summarized Mathu Rajan's attitude succinctly: he would rather "[s]ell this company for $1 . . . than to see it" in the hands of the secured creditors.

35.     This Chapter 11 case is not the Rajans' first misuse of the judicial process to serve their self-interests or gain negotiating leverage. In late May 2020, for example, the Rajans filed

---

[8]    Moreover, Stream and the Rajans were sanctioned by Vice Chancellor Laster for failing to adhere to orders and were compelled to both produce documents previously withheld for privilege and pay SeeCubic's fees relating to their conduct.

a defamation suit in the Pennsylvania Court of Common Pleas against two of the equity investors who participated in negotiation of the Omnibus Agreement and signed that agreement, alleging that the investors defamed the Rajans in the suit filed against them for fraud in the Court of Chancery.  Perhaps recognizing the frivolousness of the suit — as Pennsylvania law recognizes an absolute privilege for statements made in court filings — the Rajans did not even attempt to serve the complaint upon the investors until February 2021, nine months after it was filed and just days before filing this Chapter 11 case.  Further doubling down on frivolous litigation, Raja Rajan filed a second nearly identical case in the same court against one of the same investors in February 2021.

**V.      Chancery Court Summary Judgment Proceedings and Stream's Chapter 11 Case**

36.      In its December 8, 2020 Chancery Opinion, the Chancery Court ruled in favor of SeeCubic on every dispute in the preliminary injunction litigation.  But the Chancery Court went even further, stating that the evidentiary record before the court would also support entry of final summary judgment in favor of SeeCubic.  *See* Chancery Opinion at 52.  The parties commenced summary judgment briefing shortly after issuance of the Chancery Opinion, and SeeCubic was scheduled to file its reply brief – the last event to occur before the Chancery Court could enter a final summary judgment order – on Friday, February 26, 2021.

37.      On February 24, two days before the Chancery Court would have been in a position to grant final summary judgment in favor of SeeCubic, Stream sought to halt the Chancery Court litigation by filing for bankruptcy.  The petition [D.I. 1] and Board resolution [D.I. 6] commencing this Chapter 11 case were executed by the one-and-only remaining Board member at Stream: Mathu Rajan (who also participated in the fraudulent backdating of the stockholder consent).

38.     Stream did not file any operational or other first day motions; did not file a first day declaration or other papers setting forth in any detail its plans or reasons for filing for this Chapter 11 case; and has not sought to schedule a first day hearing in this case.  Instead, Stream has requested an initial hearing in the Chapter 11 case to occur on March 22, 2021 – a full month after the bankruptcy was filed.

39.     Stream's application to employ Dilworth Paxson LLP as bankruptcy counsel makes a few oblique references to potential "investors" that are never identified, and suggests that if the mystery "investors" do not materialize then Stream might pursue a Section 363 sale. *See Application Of Stream TV Networks, Inc. Pursuant To 11 U.S.C. § 327(A), Federal Rule Of Bankruptcy Procedure 2014 And Local Bankruptcy Rule 2014-1 For Authority To Employ Dilworth Paxson LLP As Bankruptcy Counsel* [D.I. 15] at ¶ 4.  The papers are silent, however, as to what assets, exactly, Stream intends to reorganize around or offer in a Section 363 sale scenario.  Indeed, upon information and belief, after the transfer of substantially all of Stream's assets to SeeCubic pursuant to the Omnibus Agreement, Stream has no material business assets or operations to administer or rehabilitate in the Chapter 11 case.

40.     This view is bolstered by the fact that Stream's application to employ Dilworth Paxson LLP explains that the Debtor does not have assets or funds sufficient to pay counsel – and counsel's payments and retainers to date have come from a patchwork of "investors" and dubious non-debtor entities with ties to the Rajans (including entities created by the Rajans to compete with the Debtor).  *See Declaration Of Lawrence G. McMichael Of Dilworth Paxson LLP* [D.I. 15-1]  at ¶¶ 11-21.

41.     Moreover, Stream's DIP Motion[9] indicates that it is seeking to borrow an initial amount of $200k from a company owned by Mathu Rajan (incorporated only two months ago), which appears to be slated almost entirely to pay counsel fees and retainers, as opposed to operational or administrative funding.  *See* DIP Motion at ¶¶ 2(b), (c), and (i); 9; 18.  And Stream's Insurance Motion[10] indicates that Stream cannot afford to pay the $8,209.80 of outstanding premium balances for its insurance policies, and those premiums will be paid by non-debtor MediaTainment, Inc. – another Rajan affiliated entity – as "an investment into Stream with MediaTainment receiving equity in Stream as compensation."  Insurance Motion at ¶¶ 11-13.

### BASIS FOR RELIEF REQUESTED AND APPLICABLE AUTHORITY

### I.     Cause Exists Under Bankruptcy Code Section 1112(b) to Dismiss Stream's Chapter 11 Case Because Stream Filed its Petition in Bad Faith.

42.     Section 1112(b) of the Bankruptcy Code provides in relevant part that, "the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interest of creditors and the estate, for cause...."  11 U.S.C. § 1112(b).  The Third Circuit Court of Appeals has held the statutory provision to require chapter 11 petitions be filed in good faith.  *In re Integrated Telecom Express, Inc.*, 384 F.3d 108, 118 (3d Cir. 2004) (citing *In re SGL Carbon Corp.*, 200 F.3d 154, 159–62 (3d Cir. 1999)).  When a party in interest moves to dismiss a case under section 1112(b) of the Bankruptcy Code, the debtor bears the burden of establishing that its case was filed in good faith.  *Id.*

---

[9]    *Motion Of Stream TV Networks, Inc. For Entry Of Order: (I) Authorizing It To Obtain Post-Petition Financing Pursuant To Sections 363 And 364 Of The Bankruptcy Code, (II) Authorizing It To Enter Into The Support Agreement, And (III) Granting Administrative Priority Claims To Lender Pursuant To Section 364 Of Bankruptcy Code And Modifying The Automatic Stay To Implement The Terms Of The Order* [D.I. 30] (the "**DIP Motion**").

[10]   *Stream TV Networks, Inc. Motion For Authorization To Continue Insurance Coverage Entered Into Pre-Petition And Honor Obligations Related Thereto* [D.I. 16] (the "**Insurance Motion**").

43.     The good faith analysis generally requires an inquiry examining "the totality of
the facts and circumstances" to determine where a "'petition falls along the spectrum ranging
from the clearly acceptable to the patently abusive.'" *In re Integrated Telecom*, 384 F.3d at 118
(quoting *In re SGL Carbon Corp.*, 200 F.3d at 162).  The inquiry is primarily an objective
analysis into whether the filing is abusive, but "the subjective intent of the debtor may play a role
in a court's determination of good faith."  *In re 15375 Mem'l Corp. v. Bepco, L.P.*, 589 F.3d 605,
618 (3d Cir. 2009).

44.     In conducting the 'totality of the circumstances' inquiry, courts in the Third
Circuit focus on two factors in particular: (1) whether the petition serves a valid bankruptcy
purpose, and (2) whether the petition is filed merely to obtain a tactical litigation advantage.  *In
re Integrated Telecom*, 384 F.3d at 118.

**A.    Stream's petition was not filed in good faith because Stream does not have a
valid bankruptcy purpose.**

45.     For a debtor's chapter 11 filing to serve a valid bankruptcy purpose, the debtor's
bankruptcy must seek to achieve one of the basic goals of chapter 11 of either preserving going
concerns or maximizing value of the estate available to satisfy creditors.  *In re Integrated
Telecom*, 384 F.3d at 119-20.

46.     Even if a firm is experiencing financial distress, for a debtor's chapter 11 petition
to have a valid bankruptcy purpose, "[the petition] must seek to create or preserve some value
that would otherwise be lost – not merely distributed to a different stakeholder – outside of
bankruptcy." *In re Integrated Telecom*, 384 F.3d at 129.  For that reason, filing chapter 11 to take
advantage of the automatic stay and to stay pending litigation, without more, does not establish a
debtor's good faith.  *In re Integrated Telecom*, 384 F.3d at 128 ("For example, 11 U.S.C. § 362
protects debtors by staying litigation against them during the pendency of the bankruptcy. Yet

15

courts universally demand more of Chapter 11 petitions than a naked desire to stay pending

litigation").  Using the more specific factors delineated in *In re Primestone Inv. Partners* to

determine "bad faith" this Chapter 11 case presents (1) no ongoing business or employees; (2) no

cash or income; (3) improper prepetition conduct; (4) no possibility of reorganization; and (5) a

presence of subjective bad-faith intent of the Debtor.  *In re Crown Vill. Farm, LLC*, 415 B.R. 86,

92 (Bankr. D. Del. 2009); *In re Primestone Inv. Partners*, 272 B.R. 554, 557 (D. Del. 2002); *see

also Bepco*, 589 F.3d at 625 ("In sum, the Debtors' filing for bankruptcy did not maximize the

value of their estates. Indeed, it would be exceedingly difficult to do so where neither Santa Fe

nor Memorial had any real assets to preserve besides various insurance policies.").

47.     Here, Stream's sparse filings to date and lack of urgency – Stream has not

requested any hearings be held on an expedited basis and the first hearing before the Court is

scheduled for a month after the bankruptcy was filed – demonstrate that it has no ongoing

business or going concern value to preserve; it has no material business assets to preserve or

enhance through a Chapter 11 case; and it has no plan or roadmap for reorganizing or

rehabilitating through the bankruptcy process.  This is not surprising: the Chancery Opinion

describes in detail the facts and circumstances that led to the transfer of substantially all of

Stream's assets to its secured creditors – after Stream defaulted on more than $50 million (of

principal) secured debt – pursuant to the Omnibus Agreement which the Chancery Court

determined to be valid and binding under governing Delaware law.

48.     Indeed, the little information available from the Debtor to date indicates that the

Debtor cannot afford to pay $8,209.80 of outstanding premium balances for its insurance policies

(which Debtor suggests will be paid by an insider-affiliated non-debtor entity); and that the

Debtor intends to borrow monies from another insider-affiliated non-debtor entity almost entirely

for the purpose of paying counsel fees (while providing effectively no funding for operations or other administration of a Chapter 11 case or assets).

49.     Moreover, the bankruptcy filing is being driven solely by the Rajans, and more specifically Mathu Rajan as the one-and-only remaining Board member at Stream.  The Chancery Opinion provides multiple examples of the Rajans' ongoing self-interested and bad-faith conduct, including fraudulently backdating stockholder consents in an attempt to terminate the Omnibus Agreement, and – when given the opportunity to negotiate with the secured lenders on behalf of Stream – "[t]he Rajan brothers pushed for personal benefits for themselves, including employment, compensation, and indemnification for litigation expenses."  Chancery Opinion at 14.

50.     The Chancery Court's description of the Rajans' prior self-interested conduct demonstrates that the Rajans' efforts in this Chapter 11 case are driven by self-interest alone, and not any attempt to preserve or maximize value for any other stakeholder:

> On May 11, 2020, the Rajan brothers and Hodgson, the only remaining Outside Director, convened a meeting of the Board. During the meeting, they adopted a resolution purporting to nullify and void the Omnibus Agreement. The Rajan brothers refused to take any action to comply with the Omnibus Agreement. ***Instead, they tried to change who managed certain Stream subsidiaries, and they attempted to remove prototype technology from a storage facility in the Netherlands. Mathu also incorporated a new entity named Glasses-Free Technologies, Inc., and purported to grant it a license to use Stream's technology.***

Chancery Opinion at 14 (emphasis added).

51.     Here, the Rajans' self-interested conduct in filing the Chapter 11 petition was designed to halt the Chancery Court from entering the inevitable final summary judgment against Stream and the Rajans, which would formally bring to a close the Rajans' desperate attempts to unwind the Omnibus Agreement and asset transfers that were approved by Stream's outside

independent directors and affirmed by the Chancery Court.  *See, e.g.*, Chancery Opinion at pp.

49-51 (explaining that the evidence indicates the outside directors acted in good faith and in the

best interest of Stream while discharging their duties under the business judgment rule).

52.    The Debtor has not, and cannot, satisfy its burden of establishing that this Chapter

11 case was filed in good faith.  There is no valid bankruptcy purpose for this abusive and self-

interested Chapter 11 filing by the Rajans, and the case should be dismissed.

**B.    Stream's petition was filed in bad faith because Stream's primary purpose in bankruptcy is to hinder and gain tactical litigation advantages in its proceeding in the Court of Chancery.**

53.    The filing of a chapter 11 petition "merely to obtain tactical litigation advantages

is not within the legitimate scope of the bankruptcy laws[.]"  *In re Integrated Telecom*, 384 F.3d

at 120  (quoting *SGL Carbon*, 200 F.3d at 165).  Moreover, filing to obtain a tactical litigation

advantage is a "classic" bad faith petition.  *In re Integrated Telecom*, 384 F.3d at 128.  In that

regard, "[w]here the timing of the filing of a Chapter 11 petition is such that there can be no

doubt that the primary, if not sole, purpose of the filing was a litigation tactic, the petition may

be dismissed as not being filed in good faith."  *In re SGL Carbon Corp.*, 200 F.3d at 165.

54.    Here, the timing of Stream's Chapter 11 petition – just two days before the

Chancery Court would be in position to enter final summary judgment against Stream and the

Rajans – should be determinative and dictates dismissal of this Chapter 11 case.  The Omnibus

Agreement was entered into in May 2020 and substantially all of Stream's assets – including any

ongoing operations – were previously transferred to SeeCubic pursuant to that agreement

validated by the Court of Chancery under governing Delaware law.  The Debtor's filings to date

demonstrate that it has no other ongoing business operations, material business assets, or active

concerns that would have led Stream to file a Chapter 11 petition on February 24, 2021 but for

the Rajans' desire to stop the Chancery Court litigation from proceeding.

55.     The Chapter 11 filing by the Rajans is primarily, if not solely, a litigation tactic in

order to prevent the Chancery Court from entering summary judgment against them and Stream.

This Court has dismissed Chapter 11 cases under similar circumstances in the past.  *See Bepco*,

589 F. 3d at 625 (finding pre-existing litigation was the principal factor in the debtor's filing

because debtors, who were no longer operating, filed their petitions after discovery was complete

and expert reports showed debtors and their parent were responsible for significant

contamination); *In re Derma Pen, LLC*, No. 14-11894 (KJC), 2014 WL 7269762, at *7 (Bankr.

D. Del. Dec. 19, 2014) (finding bad faith because debtor's petition "unquestionably" was timed

to stop litigation as the petition was filed shortly after the court found in favor of debtor's

adversaries on two motions for partial summary judgment and one business day prior to the start

of a jury trial).

56.     There is no valid purpose for Stream's Chapter 11 case, and the timing of the

filing demonstrates that the bankruptcy petition was a litigation tactic by the Rajans.  The Debtor

has not, and cannot, satisfy its burden of establishing that this Chapter 11 case was filed in good

faith; and the Chapter 11 case should be dismissed.

## NOTICE

57.     Notice of the Motion will be given to: (a) the U.S. Trustee, (b) counsel to the

Debtor, (c) the creditors identified in the creditor matrix filed by the Debtor, and (d) all parties

that have requested notice pursuant to Local Bankruptcy Rule 2002-1(b).  Under the specific

facts and circumstances of this case, Movants submit that no other or further notice should be

required.

19

## CONCLUSION

Movants respectfully request that this Court enter the Order, substantially in the form filed herewith, granting dismissal of this Chapter 11 case pursuant to Section 1112(b) and such other and further relief as may be just and proper.

Dated: Wilmington, Delaware
      March 12, 2021

| | |
|---|---|
| ROBINSON & COLE | SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP |
| By: */s/ Davis Lee Wright* | |
| Davis Lee Wright (No. 4324) | */s/ Joseph O. Larkin* |
| James F. Lathrop (No. 6492) | Joseph O. Larkin (I.D. No. 4883) |
| 1201 N. Market Street, Suite 1406 | Jenness E. Parker (I.D. No. 4659) |
| Wilmington, DE 19801 | Jason M. Liberi (I.D. No. 4425) |
| Telephone: (302) 516-1700 | 920 N. King Street, One Rodney Square |
| | Wilmington, Delaware 19801 |
| -and- | Telephone: (302) 651-3000 |
| | |
| QUARLES & BRADY LLP | - and - |
| Brittany S. Ogden (admitted *pro hac vice*) | |
| 33 East Main Street Suite 900 | Eben P. Colby (*pro hac vice* pending) |
| Madison, Wisconsin 53703 | Marley Ann Brumme (*pro hac vice* pending) |
| Telephone: (608) 251-5000 | 500 Boylston Street, 23rd Floor |
| | Boston, Massachusetts 02116 |
| Brandon M. Krajewski (admitted *pro hac vice*) | Telephone: (617) 573-4800 |
| 411 East Wisconsin Avenue Suite 2400 | |
| Milwaukee, Wisconsin 53202 | *Counsel for SeeCubic, Inc.* |
| Telephone: (414) 277-5000 | |
| | |
| Alissa Brice Castañeda (admitted *pro hac vice*) | |
| Gabriel M. Hartsell (admitted *pro hac vice*) | |
| One Renaissance Square | |
| Two North Central Avenue | |
| Phoenix, Arizona 85004 | |
| Telephone: (602) 229-5200 | |
| | |
| *Counsel for SLS Holdings VI, LLC* | |

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| Stream TV Networks, Inc., | Case No. 21-10433 (KBO) |
| Debtor. | **Hearing Date:  April 15, 2021 at 1:00 p.m. ET**<br>**Objection Deadline:  March 29, 2021 at 4:00 p.m. ET** |

**NOTICE OF MOTION OF SEECUBIC, INC. AND SLS HOLDINGS VI, LLC**
**FOR AN ORDER DISMISSING DEBTOR'S CHAPTER 11 CASE**

   **PLEASE TAKE NOTICE** that SeeCubic, Inc. and SLS Holdings VI, LLC filed

today the attached *Motion Of SeeCubic, Inc. and SLS Holdings VI, LLC for an Order Dismissing*

*Debtor's Chapter 11 Case* (the "**Motion**").

   **PLEASE TAKE FURTHER NOTICE** that objections, if any, to the Motion or

the relief requested therein must be made in writing, filed with the United States Bankruptcy

Court for the District of Delaware (the "**Bankruptcy Court**"), 824 Market Street, Wilmington,

Delaware 19801, and served so as to be received by the undersigned counsel no later than

**March 29, 2021, at 4:00 p.m. (Eastern).**

   **PLEASE TAKE FURTHER NOTICE** that if an objection is properly filed and

served in accordance with the above procedures, a hearing on the Motion will be held on **April**

**15, 2021 at 1:00 p.m. (Eastern)** before the Honorable Karen B. Owens, United States

Bankruptcy Judge for the District of Delaware, pursuant to procedures to be filed on the

Bankruptcy Court's docket.  Only those objections made in writing and timely filed and received

will be considered by the Bankruptcy Court at such hearing.

**PLEASE TAKE FURTHER NOTICE THAT IF NO OBJECTIONS TO THE MOTION ARE TIMELY FILED AND RECEIVED IN ACCORDANCE WITH THE PROCEDURES SET FORTH ABOVE, THEN THE RELIEF REQUESTED IN THE MOTION MAY BE GRANTED WITHOUT FURTHER NOTICE OR A HEARING.**

Dated: March 12, 2021
      Wilmington, Delaware

| ROBINSON & COLE | SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP |
|---|---|
| By: */s/ Davis Lee Wright* | |
| Davis Lee Wright (No. 4324) | */s/ Joseph O. Larkin* |
| James F. Lathrop (No. 6492) | Joseph O. Larkin (I.D. No. 4883) |
| 1201 N. Market Street, Suite 1406 | Jenness E. Parker (I.D. No. 4659) |
| Wilmington, DE 19801 | Jason M. Liberi (I.D. No. 4425) |
| Telephone: (302) 516-1700 | 920 N. King Street, One Rodney Square |
| | Wilmington, Delaware 19801 |
| -and- | Telephone: (302) 651-3000 |
| | |
| QUARLES & BRADY LLP | - and - |
| Brittany S. Ogden (admitted *pro hac vice*) | |
| 33 East Main Street Suite 900 | Eben P. Colby (*pro hac vice* pending) |
| Madison, Wisconsin 53703 | Marley Ann Brumme (*pro hac vice* pending) |
| Telephone: (608) 251-5000 | 500 Boylston Street, 23rd Floor |
| | Boston, Massachusetts 02116 |
| Brandon M. Krajewski (admitted *pro hac vice*) | Telephone: (617) 573-4800 |
| 411 East Wisconsin Avenue Suite 2400 | |
| Milwaukee, Wisconsin 53202 | *Counsel for SeeCubic, Inc.* |
| Telephone: (414) 277-5000 | |
| | |
| Alissa Brice Castañeda (admitted *pro hac vice*) | |
| Gabriel M. Hartsell (admitted *pro hac vice*) | |
| One Renaissance Square | |
| Two North Central Avenue | |
| Phoenix, Arizona 85004 | |
| Telephone: (602) 229-5200 | |
| | |
| *Counsel for SLS Holdings VI, LLC* | |

**EXHIBIT A**

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| STREAM TV NETWORKS, INC.,     ) | |
|     ) | |
|     Plaintiff,     ) | |
|     ) | |
| v.     ) | C.A. No. 2020-0766-JTL |
|     ) | |
| SEECUBIC, INC.,     ) | |
|     ) | |
|     Defendant.     ) | |

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

STREAM TV NETWORKS, INC.,    )
                             )
            Plaintiff,       )
                             )
    v.                       )   C.A. No. 2020-0766-JTL
                             )
SEECUBIC, INC.,              )
                             )
            Defendant.       )
_____)
                             )
SEECUBIC, INC.,              )
                             )
    Counterclaim and         )
    Third-Party Plaintiff,   )
                             )
    v.                       )
                             )
STREAM TV NETWORKS, INC.,    )
                             )
            Counterclaim Defendant,  )
                             )
    and                      )
                             )
MATHU RAJAN, and RAJA RAJAN, )
                             )
            Third-Party Defendants.  )

## ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

IT IS HEREBY ORDERED, for the reasons stated in the opinion of this same

date:

1.    Pending the final disposition of this action, plaintiff and counterclaim

defendant Stream TV Networks, Inc. ("Stream") and third-party defendants Mathu

Rajan and Raja Rajan are preliminarily enjoined from taking any action to interfere with the Omnibus Agreement dated May 6, 2020, including, but not limited to:

(a) Disputing the validity of the Omnibus Agreement (except as part of their claims and defenses in this litigation);

(b) Interfering with the exercise of the power of attorney granted by the Omnibus Agreement or the use of the power of attorney to transfer any of the assets subject to the Omnibus Agreement (the "Assets") to defendant, counterclaimant, and third-party plaintiff Seecubic, Inc.;

(c) Asserting ownership rights (except as part of their claims and defenses in this litigation) to any of the Assets, including but not limited to ownership rights in the "Ultra-D" technology and other intellectual property;

(d) Asserting ownership rights (except as part of their claims and defenses in this litigation) to the stock or comparable equity of TechnoVative, Inc. ("TechnoVative") or Ultra-D Ventures, C.V., Ultra-D Coöperatief U.A., Stream TV International B.V. and SeeCubic B.V. (collectively, the "the Dutch Subsidiaries");

(e) Asserting control over TechnoVative or the Dutch Subsidiaries;

(f) Appointing, electing or removing directors, or taking any other actions with respect to the boards of TechnoVative and the Dutch Subsidiaries, including, but not limited to, making or causing any third party to make any changes to the Trade Register in the Netherlands with respect to the Dutch Subsidiaries; or

(g) Transferring, liquidating, converting, encumbering, pledging, loaning, selling, concealing, dissipating, disbursing, assigning, licensing, spending, withdrawing, mortgaging, granting a lien or security interest in, or otherwise disposing of any of the Assets in a manner inconsistent with the Omnibus Agreement.

2. The restrictions in this order are binding upon the parties to this action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order.

2

Stream and Mathu and Raja Rajan shall distribute copies of this order to the employees and agents of Stream.

3.      The injunction is effective immediately. Bond is set at $1 million. Bond is initially unsecured; however, the injunction will lift unless Seecubic posts security in the amount of the bond within fourteen days. Either party may seek to lower or increase the bond for good cause shown.

Vice Chancellor Laster
December 8, 2020

**EXHIBIT B**

**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

|  |  |  |
|---|---|---|
| STREAM TV NETWORKS, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2020-0310-JTL |
| | ) | |
| SEECUBIC, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| SEECUBIC, INC., | ) | |
| | ) | |
| Counterclaimant and | ) | |
| Third-Party Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| STREAM TV NETWORKS, INC., | ) | |
| | ) | |
| Counterclaim Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| MATHU RAJAN, and RAJA RAJAN, | ) | |
| | ) | |
| Third-Party Defendants. | ) | |

**OPINION**

Date Submitted: November 30, 2020
Date Decided: December 8, 2020

Scott D. Cousins, COUSINS LAW, LLC, Wilmington, Delaware; Luis Salazar, Jose Ceide, Daniel Halperin, SALAZAR LAW, Miami, Florida; *Attorneys for Plaintiff and Counterclaim Defendant Stream TV Networks, Inc.*

Robert S. Saunders, Jenness E. Parker, Bonnie W. David, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Wilmington, Delaware; Eben P. Colby, Marley Ann Brumme, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Boston, Massachusetts; *Attorneys for Defendants and Counterclaim Plaintiff Seecubic, Inc.*

**LASTER, V.C.**

Plaintiff and counterclaim defendant Stream TV Networks, Inc. ("Stream" or the "Company") and defendant, counterclaim plaintiff, and third-party plaintiff Seecubic, Inc. ("SeeCubic") have filed competing motions for preliminary injunction. Both motions turn on the validity of an agreement dated May 6, 2020, between Stream, its two secured creditors, and fifty-two of its stockholders (the "Equity Investors"). The parties refer to this agreement as the "Omnibus Agreement."

By the time the Omnibus Agreement was executed, Stream had defaulted on more than $50 million in debt to its secured creditors, owed another $16 million to trade creditors, and could not pay its bills as they came due. Stream had missed payroll in January 2020, furloughed a number of workers, and avoided missing payroll in February 2020 only because of an emergency loan from one of its secured creditors and another investor. By any measure, Stream was insolvent and failing.

In the Omnibus Agreement, Stream agreed to transfer all of its assets to SeeCubic, a newly formed entity controlled by its secured creditors. Stream also granted its secured creditors a power of attorney to effectuate the transfers. Stream's secured creditors already held security interests in all of Stream's assets and had the right to foreclose on those assets. In the Omnibus Agreement, Stream's secured creditors agreed to release their claims against Stream upon completion of the transfer of Stream's assets to SeeCubic.

If Stream's secured creditors had foreclosed on Stream's assets, then Stream and its stockholders would have been left with nothing. Instead, the Omnibus Agreement provided Stream's minority investors with the right to swap their shares in Stream for shares in

SeeCubic. The Omnibus Agreement also provided for the issuance of one million shares in SeeCubic to Stream.

Stream contends that the Omnibus Agreement is invalid and seeks a preliminary injunction to prevent SeeCubic from taking any action to enforce it. Stream first contends that the directors who approved the Omnibus Agreement were never validly appointed. The evidence establishes that Mathu and Raja Rajan acted by unanimous written consent as Stream's only directors to expand Stream's board of directors (the "Board") and fill the newly created directorships with four outside directors (the "Outside Directors"). At a subsequent meeting, the Board validly created a committee, populated it with two of the Outside Directors, and empowered it to negotiate and resolve the outstanding claims against Stream (the "Resolution Committee"). On May 6, 2020, the Resolution Committee approved the Omnibus Agreement. As of that date, the Omnibus Agreement became effective and binding on Stream.

Assuming for the sake of argument that Mathu and Raja did not validly appoint the Outside Directors, those individuals were *de facto* directors. Mathu and Raja intended to appoint the Outside Directors to their positions. Mathu, Raja, and Stream treated the Outside Directors as directors. And Mathu, Raja, and Stream represented to third parties that the Outside Directors were directors. Mathu, Raja, and Stream cannot now contend that the two Outside Directors who comprised the Resolution Committee lacked authority to act. Once again, the Omnibus Agreement binds Stream.

Stream next contends that the Omnibus Agreement is invalid because it constituted a sale of all of Stream's assets, which required stockholder approval under Section 271 of

the Delaware General Corporation Law (the "DGCL"). Under the majority rule at common law, the directors of a solvent corporation lack authority to transfer all of the corporation's assets. But authorities dating back a century recognize an exception to this rule for insolvent corporations, whose directors can transfer corporate assets to creditors.

In a decision issued in 1915, this court embraced and applied the common law rules, but held that a provision in the corporation's certificate of incorporation authorized the board of directors to sell all of the corporation's assets with the approval of its stockholders. In 1917, the General Assembly adopted the predecessor to Section 271 to make clear that the directors of a solvent Delaware corporation have authority to sell all of the corporation's assets with the approval of its stockholders. The circumstances surrounding the adoption of the statute and its subsequent evolution demonstrate that the General Assembly did not intend Section 271 to constrain the ability of an insolvent or failing corporation to transfer corporate assets to secured creditors.

Interpreting Section 271 to require a stockholder vote before an insolvent or failing corporation can transfer its assets to secured creditors would conflict with Section 272 of the DGCL, which authorizes a corporation to mortgage or pledge all of its assets without complying with Section 271. Section 272 is silent as to whether a secured creditor can foreclose on its security interest in the debtor corporation's assets, but the statutory scheme would not function if the debtor corporation had to comply with Section 271 before the creditor could foreclose. When facing the prospect of foreclosure, the board and stockholders of the debtor corporation would have no incentive to approve the transfer of the corporation's assets. As a practical matter, any creditor who wanted to ensure that it

3

had the ability to levy on the pledged collateral would have to obtain a stockholder vote when entering into the credit agreement, contrary to the plain language of Section 272.

Stream therefore did not need to comply with Section 271 before transferring its assets to its secured creditors. The voluntary foreclosure contemplated by the Omnibus Agreement is not governed by Section 271.

Stream also argues that under its certificate of incorporation (the "Charter"), the Omnibus Agreement required the separate approval of holders of a majority of the Class B Common Stock (the "Class Vote Provision"). The Class Vote Provision applies to an "Asset Sale," which it defines using language that parallels the text of Section 271. The Class Vote Provision therefore warrants the same interpretation as Section 271: The Class Vote Provision does not restrict Stream's ability to transfer its assets to its secured creditors when the Company is insolvent and failing.

Finally, Stream argues that the members of the Resolution Committee breached their fiduciary duties by approving the Omnibus Agreement. The business judgment rule protects the Resolution Committee's decision to enter into the Omnibus Agreement.

Stream therefore has not established a reasonable likelihood of success on the merits of its challenges to the Omnibus Agreement. Accordingly, Stream's motion for a preliminary injunction is denied. SeeCubic, by contrast, contends that the Omnibus Agreement is valid and seeks a preliminary injunction preventing Stream or any of the third-party defendants from taking any action to interfere with it. SeeCubic's motion is granted.

# I.    FACTUAL BACKGROUND

The facts are drawn from the parties' submissions in connection with their competing motions for preliminary injunction. In total, the parties provided seven deposition transcripts, ten affidavits, and 206 documentary exhibits. What follows are not formal factual findings, but rather the facts as they appear reasonably likely to be found after trial, based on the current record.

## A.    Stream

Stream was founded in 2009 to develop and commercialize technology that enables viewers to watch three-dimensional content without 3D glasses. In 2010 and 2011, Stream formed subsidiaries in the Netherlands. Through these subsidiaries, Stream hired engineers to develop Stream's technology. By all accounts, the technology is promising, even revolutionary, but Stream does not yet have a product. Eleven years after its founding, Stream remains a pre-revenue, development-stage company.

The Rajan family controls Stream. Mathu Rajan holds 18,000 shares of Stream's Class A common stock, which carry one vote per share. A family investment vehicle owned by Mathu, his brother Raja Rajan, and their parents holds 19,000,000 shares of Stream's Class B common stock, which carry ten votes per share. Through these holdings, the Rajan brothers control a majority of the Class B common stock and a majority of Stream's outstanding voting power.

At the board level, the Rajan brothers historically have controlled Stream. From July 2019 until March 2020, Mathu and Raja were Stream's only directors. Mathu has served as a director since the Company's founding. Raja served as a director from shortly after the

Company's founding until July 2020, when he resigned from that role. From time to time, other individuals have served as directors. From approximately 2015 until 2019, Leo Hindery served as an outside director, but he resigned in July 2019 over disputes with the Rajan brothers. From approximately 2018 until 2019, Mark Coleman served as a second outside director. He too resigned in July 2019 over disputes with the Rajan brothers. From 2011 until 2014, Shad Stastney, the principal of Stream's senior secured creditor, served as an outside director. He rejoined the Board in 2019 and served as CFO before resigning on January 30, 2020.

At the officer level, the Rajan brothers dominate Stream. Mathu has served as Stream's CEO since the Company's founding. Raja has served as general counsel and COO since soon after the Company's founding.

During its existence, Stream's corporate governance practices have been virtually nonexistent. Stream has never held annual meeting of stockholders and has not kept regular minutes of Board meetings. Stream has officers and employees, but their roles are not well defined.

**B.     Stream's Investors**

Since 2009, Stream has raised approximately $160 million from third party investors. The investments have taken the form of a combination of debt and equity.

Stream's senior secured creditor is SLS Holdings VI, LLC ("SLS"). Between 2011 and 2012, SLS loaned $6 million to Stream through a series of secured notes (the "SLS Notes"). Stream pledged all of its assets and the assets of its wholly owned subsidiaries as security for the SLS Notes. Stream executed a security agreement in connection with the

SLS Notes, which authorized SLS to take control of Stream's assets to satisfy the SLS Notes if Stream defaulted.

Stream's junior secured creditor is Hawk Investment Holdings Limited ("Hawk"). Between 2010 and 2014, Hawk loaned more than £50 million to Stream, plus another $1.336 million, through a series of junior secured notes (the "Hawk Notes"). Subject to the senior security interest held by SLS, Stream pledged all of its assets as security for the Hawk Notes. Stream executed a security agreement in connection with the Hawk Notes, which authorized Hawk to take control of Stream's assets to satisfy the Hawk Notes if Stream defaulted.

In 2018, Stream entered into an agreement with Hawk, which provided that the Hawk Notes would convert into equity if and when Stream raised additional equity capital (the "Hawk Conversion Agreement"). Stream and SLS contemporaneously entered into a parallel agreement governing the SLS Notes (the "SLS Conversion Agreement"). The SLS Conversion Agreement provided that it would terminate if the Hawk Conversion Agreement was amended. In April 2019, the Hawk Conversion Agreement was amended, which caused the SLS Conversion Agreement to terminate. In any event, neither the Hawk Notes nor the SLS Notes ever converted into equity, and the notes remain outstanding.

## C.    Stream's Financial Difficulties

Alistair Crawford is a significant stockholder of Stream. He also represents the Equity Investors. During 2019, Crawford engaged in discussions with SLS, Hawk, and the Rajan brothers about a restructuring of Stream. Crawford proposed forming a "NewCo" that would acquire Stream's assets and have a more transparent and investor-friendly

governance structure. In December 2019, Crawford provided SLS, Hawk, and the Rajan brothers with a draft of the Omnibus Agreement and other documents to implement the restructuring.

The Rajan brothers refused to agree to the restructuring, and the discussions broke down. In January 2020, the Equity Investors filed a lawsuit in this court against the Rajan brothers.

At the end of February 2020, Stream defaulted on the SLS Notes and Hawk Notes. On March 9, 2020, SLS notified Stream that it was in default.

In addition to the debts that Stream owed to its secured creditors, Stream carried more than $16 million in trade debt and had fallen months behind on payments to customers and suppliers. Stream even failed to make the payments necessary to maintain the patents on its technology, which are the key to Stream's potential success. In January 2020, Stream missed payroll at least once. In February, Stream managed to make payroll, but only due to an emergency infusion of capital from Hawk and a short-term loan from another investor. Stream still furloughed numerous employees.

During this period, SLS, Hawk, and Crawford attempted to resume discussions with Stream about a restructuring. They also discussed the capital structure of a new entity and its governance arrangements.

## D.    The Outside Directors

With the company failing, SLS, Hawk, and Crawford urged the Rajan brothers to appoint outside directors. In February and March 2020, the Rajan brothers extended invitations to the four Outside Directors: Krzystof Kabacinski, Asaf Gola, Kevin Gollop,

8

and Frank Hodgson. All were independent outsiders, though Kabacinski was a potential candidate to serve as CEO of the new entity if a restructuring could be achieved. None of the Outside Directors had prior ties to the Rajan brothers, SLS, or Hawk.

By March 12, 2020, all four of the Outside Directors had agreed to join the Board. On that date, the Rajan brothers acted by unanimous written consent as Stream's only two directors to add the Outside Directors to the Board. Dkt. 102 Ex. 105 (the "March Director Consent"). That same day, Stream announced to its investors and employees that the Outside Directors would join the Board.

From March through May 2020, the Outside Directors participated in Board meetings, approved minutes, voted on resolutions, and approved other corporate actions. The Rajan brothers and other Stream employees referred to them as "directors" and as members of the "Board" and held them out as such to third parties.

## E.    The Resolution Committee

After joining the Board and learning about Stream's financial difficulties, the Outside Directors concluded that the only path forward was to negotiate a resolution with the Company's secured creditors and the Equity Investors. In April 2020, the Outside Directors resumed discussions about a restructuring. Raja initially participated in the discussions, but his presence generated obvious tensions. It became clear that the Outside Directors would have to attempt to broker a resolution.

On May 4, 2020, during a meeting of the Board, Gola proposed three resolutions for consideration. Hodgson left early for personal reasons, before Gola proposed the resolutions, so Hodgson did not vote on them.

Gola's first resolution provided that all directors would serve for no less than one year without being removed. Raja seconded the motion, and Gola, Gollop, Kabacinski, Raja, and Mathu voted in favor. The unanimous vote resulted in the resolution being adopted.[1]

Gola's second resolution proposed that the Board create the Resolution Committee, with Gola and Gollop as its members. The Resolution Committee would have "the full power and authority of the full Board of Directors to resolve any existing or future debt defaults or claims, and any existing or future litigation, or threats thereof, on behalf of [Stream], without further action being required from the Board of Directors or any executive of the [C]ompany." Dkt. 101 Ex. 56 at 1057. Gola, Gollop, and Kabacinski voted in favor; the Rajan brothers abstained. The three directors who voted in favor constituted a majority of a quorum, and the motion carried.

Gola's third resolution proposed removing Mathu as CEO and replacing him with Kabacinski. Gola, Gollop, and Kabacinski voted in favor; the Rajan brothers abstained. The three directors who voted in favor of the resolution constituted a majority of a quorum, and the motion carried. But after further discussion, Raja proposed an alternative: instead of replacing Mathu as CEO, Stream would stop all fundraising efforts until the Board authorized them to resume. The Outside Directors agreed to replace Gola's third resolution with Raja's alternative, all five directors voted in favor, and the motion carried.

---

[1] The parties have not addressed the validity of the resolution. *But see* 8 *Del. C.* § 141(k).

**F.     The Omnibus Agreement**

On May 6, 2020, the Resolution Committee approved the Omnibus Agreement. *See* Dkt. 100 Ex. 10 [hereinafter "OA"]. By doing so, the Resolution Committee bound Stream to comply with its terms. The counterparties to the Omnibus Agreement were SLS, Hawk, and the Equity Investors.

The signatories to the Omnibus Agreement executed it at different times. SLS and Hawk signed on May 6, 2020. So did Gola. Gollop signed on May 7. The Equity Investors signed at various points.

The Omnibus Agreement provided that SLS and Hawk would not foreclose on Stream's assets and that they would accept delivery of Stream's assets in satisfaction of their debts. The assets would be transferred to a newly formed entity controlled by SLS and Hawk, which they later identified as SeeCubic. Upon transfer of the assets, SLS and Hawk would extinguish the SLS Notes and Hawk Notes in their entirety. *See* OA § 1.1(a).

The Omnibus Agreement gave holders of Stream's Class A common stock, other than the Rajan brothers and their affiliates, the right to exchange their shares of Stream's Class A common stock for an identical number of shares of SeeCubic's common stock at no cost. *See* OA §1.1(d). As a result, Stream's minority investors can share in the future success of Stream's assets. SLS and Hawk initially proposed that Stream's minority investors pay a fee to exchange their shares, but the Resolution Committee negotiated for the exchange to occur at no cost to the participating stockholders.

The Omnibus Agreement provided that Stream would receive one million shares of SeeCubic Class A common stock. *See* OA §1.1(f). Because the Rajan brothers hold an

11

ownership interest in Stream, they will benefit from Stream's ownership interest in SeeCubic.

Without the Omnibus Agreement, Stream's creditors would have foreclosed on Stream's assets, leaving its equity investors with nothing. Or Stream would have filed for bankruptcy, and its equity investors likely would have been wiped out.

## G.    The Rajan Brothers Respond.

Soon after the Board created the Resolution Committee, the Rajan brothers began planning to neutralize it. As early as May 6, 2020, the same day on which the Resolution Committee approved the Omnibus Agreement, the Rajan brothers began drafting a written consent of stockholders that would remove the Outside Directors (the "May Stockholder Consent"). A Stream employee circulated an initial version of the May Stockholder Consent on May 7, then a second version on May 8. On the evening of May 8, the Rajan brothers were still discussing whether and how to remove the Outside Directors and when the removal would become effective. *See* Dkt. 102 Ex. 71. It was not until May 9 that the Rajan brothers informed Gola and Kabacinski that they had been removed as directors. It was not until May 11 that Stream notified Gollop of his removal.

In this litigation, Stream has claimed that the Rajan brothers executed a version of the May Stockholder Consent on May 6, 2020, which resulted in the removal of Gola, Gollop, and Kabacinski. Stream contends that the Rajan brothers accomplished the removal before the Resolution Committee approved the Omnibus Agreement. The evidence weighs against that assertion. The evidence instead demonstrates that the Rajan brothers executed

the May Stockholder Consent later, possibly during the evening of May 8 or on May 9, and then backdated it to May 6 in an effort to preempt the Omnibus Agreement.

The Rajan brothers developed other theories designed to undermine the Resolution Committee. On May 6, 2020, the same day that the Rajan brothers purportedly executed the May Stockholder Consent, Raja asked his assistant, Nicole Maneen, to search for documentation reflecting whether the Outside Directors had accepted their directorships. Maneen responded that they had accepted via email and attached the relevant communications. But while handling Raja's request, Maneen and Mathu's assistant, Amanda von Ahnen, brainstormed ways to claim that the Outside Directors had never become directors. At 6:56 p.m. on May 6, von Ahnen suggested to Maneen that the anyone who had not formally accepted their offer to join the Board by signing a "Director Services Agreement" should not be considered a director.

No one had informed the Outside Directors that their positions as directors depended on signing any particular documents. Nor would the Rajan brothers have needed this theory if they had removed the Outside Directors by delivering the May Stockholder Consent.

On May 7, 2020, the day after the Resolution Committee approved the Omnibus Agreement, the Rajan brothers invented another basis to challenge the status of the Outside Directors. They claimed that the Outside Directors were "advisors waiting to formally be appointed to the board of directors," but never actual directors. Dkt. 101 Ex. 62; *see* Dkt. 101 Ex. 61. Until that point, no Stream employee, including the Rajan brothers, had suggested that the Outside Directors were merely advisors. Gola challenged that argument as "patently ridiculous," and the Rajan brothers dropped it. Dkt. 102 Ex. 64 at 1598. If the

Rajan brothers had already removed the Outside Directors by delivering the May Stockholder Consent, then they would not have needed to claim that the Outside Directors were only advisors.

## H.   Further Negotiations

Once it became clear that the Rajan brothers intended to challenge the Omnibus Agreement, SLS, Hawk, the Equity Investors, and the Resolution Committee attempted to negotiate with the Rajan family to convince them to support a deal. SLS, Hawk, and the Equity Investors offered to amend the Omnibus Agreement to give the Rajan brothers greater consideration. The Rajan brothers pushed for personal benefits for themselves, including employment, compensation, and indemnification for litigation expenses.

After those negotiations broke down, the Rajan brothers refused to comply with the Omnibus Agreement. On May 11, 2020, the Rajan brothers and Hodgson, the only remaining Outside Director, convened a meeting of the Board. During the meeting, they adopted a resolution purporting to nullify and void the Omnibus Agreement. The Rajan brothers refused to take any action to comply with the Omnibus Agreement. Instead, they tried to change who managed certain Stream subsidiaries, and they attempted to remove prototype technology from a storage facility in the Netherlands. Mathu also incorporated a new entity named Glasses-Free Technologies, Inc., and purported to grant it a license to use Stream's technology. *See* Dkt. 102 Ex. 74.

## I.   This Litigation

On September 8, 2020, Stream filed this litigation and moved for a temporary restraining order to bar SeeCubic from seeking to enforce the Omnibus Agreement.

14

SeeCubic filed counterclaims and third-party claims and moved for a temporary restraining order of its own. This court entered a status quo order and scheduled a hearing on the parties' competing motions for preliminary injunction.

Discovery did not go smoothly. In its discovery responses, Stream took aggressive positions that included objecting to producing documents to support its defenses. SeeCubic filed a motion to compel, which Stream rendered moot by belatedly supplementing its responses. Stream then missed the deadline to start producing documents on a rolling basis. Before the deadline for substantial completion of the production of documents, Stream had produced a paltry 201 documents. On the deadline, Stream produced more than 11,000 documents, necessitating an extension in the deadline for completing fact discovery. During this period, Stream's initial counsel withdrew, and successor counsel appeared.

The parties subsequently agreed on deposition dates for six witnesses, but Stream unilaterally put the deposition schedule on hold. After SeeCubic filed a second motion to compel, Stream negotiated a new deposition schedule. Then, at the start of the deposition of Kabacinski, Raja Rajan claimed that he would be taking the deposition, even though he was a party to and fact witness in the case and represented by counsel who attended the deposition. SeeCubic's counsel objected but allowed the deposition to proceed.

After a dispute over whether Raja would conduct further depositions, Stream's successor counsel withdrew. Stream next failed to produce a privilege log or redaction log in compliance with the scheduling order. SeeCubic filed a third motion to compel, which this court granted. Stream is currently on its third set of lawyers. The Rajan brothers are currently representing themselves.

## II.    LEGAL ANALYSIS

To obtain a preliminary injunction, the movant must demonstrate (i) a reasonable probability of success on the merits, (ii) a threat of irreparable harm if an injunction is not granted, and (iii) that the balance of the equities favors the issuance of an injunction. *Revlon, Inc. v. MacAndrews & Forbes Hldgs., Co.*, 506 A.2d 173, 179 (Del. 1986).

In this case, each side's arguments are the flipside of its opponent's:

- Stream claims that the Omnibus Agreement is invalid and that it therefore still owns the assets. SeeCubic claims the opposite.

- Stream claims that it is suffering irreparable harm because SeeCubic is depriving Stream of control over the assets. SeeCubic claims the opposite.

- Stream claims that because it owns the assets, the balance of hardships favors an injunction to prevent SeeCubic from interfering with its rights. SeeCubic claims the opposite.

Because of the parties' mirror-image claims, there is no dispute about the existence of irreparable harm or the balancing of the hardships. The outcome of the dueling motions turns on who has established a reasonable probability of success on the merits, which in turn depends on the validity of the Omnibus Agreement.

### A.    The Resolution Committee Had Authority To Bind Stream To The Omnibus Agreement.

Stream argues that the Omnibus Agreement is invalid because the Resolution Committee did not have authority to cause Stream to enter into it. Stream contends that the Resolution Committee could not have acted validly because its members either were not validly appointed as directors or were removed before the Omnibus Agreement was

approved. The weight of the evidence establishes that the Resolution Committee validly adopted the Omnibus Agreement.

### 1.    The Outside Directors Were Appointed Validly.

The evidence establishes that the Outside Directors were appointed validly. As authorized by Section 141(b) of the DGCL,[2] the Charter provides that "[t]he number of directors which shall constitute the whole Board shall be fixed by the Board in the manner provided in the Bylaws . . . ." Dkt. 101 Ex. 41 § VI.A. Stream's bylaws provide that "[t]he Board of Directors shall consist of one or more members, the number thereof to be determined from time to time by the Board." Dkt. 100 Ex. 40 (the "Bylaws") § 2.1. Consistent with Section 141(f) of the DGCL,[3] the Bylaws recognize that "[a]ny action required or permitted to be taken by the Board of Directors, or any committee thereof, may

---

[2] *See* 8 *Del. C.* § 141(b) ("The number of directors shall be fixed by, or in the manner provided in, the bylaws, unless the certificate of incorporation fixes the number of directors, in which case a change in the number of directors shall be made only by amendment of the certificate."); *Stroud v. Milliken Enters., Inc.*, 585 A.2d 1306, 1308 (Del. Ch. 1988) ("Proposed Article 11(a) provides that the Board of Directors shall consist of 9 to 13 members, to be fixed by a majority vote of directors. Unquestionably, Delaware law allows the Board to fix the number of directors within the restrictions imposed by the Certificate of Incorporation."), *appeal dismissed as not ripe*, 552 A.2d 476 (Del. 1989).

[3] *See* 8 *Del. C.* § 141(f) ("Unless otherwise restricted by the certificate of incorporation or bylaws[,] any action required or permitted to be taken at any meeting of the board of directors or of any committee thereof may be taken without a meeting if all members of the board or committee, as the case may be, consent thereto in writing, or by electronic transmission . . . .").

be taken without a meeting if all of the members of the Board or of such a committee, as the case may be, consent in writing to such action . . . ." *Id.* § 2.8.

Before adding the Outside Directors to the Board, Mathu and Raja Rajan were Stream's sole directors. On March 12, 2020, the Rajan brothers executed the March Director Consent. As Stream's sole directors, they validly increased the size of the Board to six and filled the newly created directorships with the Outside Directors.[4]

---

[4] The parties agree that Mathu and Raja were Stream's sole directors when they executed the March Director Consent. Matters would become more complicated if Mathu and Raja had been the two remaining directors on a board with five seats, three of which remained vacant after the resignations in June 2019 and January 2020. In that scenario, Mathu and Raja would have constituted two members of a five-member board, meaning that they could not have satisfied the requirements for a quorum, taken action at a meeting, or acted unanimously by written consent. *See Applied Energetics, Inc. v. Farley*, 239 A.3d 409, 425–29 (Del. Ch. 2020). However, they still would have been able to fill vacancies or newly created directorships because under the Bylaws and consistent with Section 223(a) of the DGCL, "vacancies and newly-created directorships resulting from any increase in the authorized number of directors may be filled by a majority of the directors then in office, although less than a quorum, or by the sole remaining director." Dkt. 100 Ex. 40 § 2.2; *accord* 8 *Del. C.* § 223(a)(1) ("Unless otherwise provided in the certificate of incorporation or bylaws . . . [v]acancies and newly created directorships resulting from any increase in the authorized number of directors elected by all of the stockholders having the right to vote as a single class may be filled by a majority of the directors then in office, although less than a quorum, or by a sole remaining director."). If the Board had three vacancies, then Mathu and Raja could have filled them.

Mathu and Raja could not have added all four Outside Directors because the Board had only five seats. An advocate might argue that the references to "newly-created directorships" in the Bylaws and in Section 223(a)(1) meant that Mathu and Raja could have expanded the Board, established a sixth directorship, and filled it, even though they would not have constituted a quorum. That is not a viable interpretation of the Bylaws or Section 223(a)(1). The reference to newly created directorships in Section 223(a)(1) addresses uncertainty about whether a board can fill newly created directorships or whether that power rests exclusively with the stockholders. *See* 1 David A. Drexler et al., *Delaware Corporation Law and Practice* § 13.02, at 13-29 (2018 & Supp. 2020) ("[A] series of cases

_____

held that the power of directors to fill vacancies did not extend to newly created directorships. It was not until 1949 that the statue was amended to grant such power to directors expressly." (footnote omitted)). It also ensures that a board can act if directors comprising a majority of a quorum expand the size of the board such that they no longer can supply a quorum (e.g., a board of three expands its size to a board of nine). Under those circumstances, the directors in office, though now less than a quorum, could fill the newly created directorships. But Section 223(a)(1) does not empower the remaining directors constituting less than a quorum to reduce or enlarge the size of the Board.

From a technical standpoint, Mathu and Raja could have accomplished their goal of adding all four Outside Directors to the Board by filling a sufficient number of vacancies to satisfy a quorum, and then acting along with those new directors to enlarge the board to six seats and fill the newly created directorship. At the time, Mathu and Raja wanted to add all four Outside Directors, so they doubtless would have taken those steps if they understood it was necessary.

SeeCubic suggests that Mathu and Raja also could have acted as stockholders. They could have filled the existing vacancies as stockholders, but they could not have enlarged the Board because the Charter states that "[t]he number of directors which shall constitute the whole Board shall be fixed by the Board in the manner provided in the Bylaws . . . ." Dkt. 101 Ex. 41 § VI.A. Such a provision gives the board the sole authority to set the number of directors. *See Henley Gp., Inc. v. Santa Fe S. Pac. Corp.*, 1988 WL 23945, at *16, *19 (Del. Ch. Mar. 11, 1988) (explaining that under a comparable provision, "the size of the Santa Fe Board is presently determined exclusively by the Board"; finding provision valid). As Stream's controlling stockholders, Mathu and Raja had the voting power necessary to amend the certificate of incorporation, but the Board first had to adopt the amendment and declare its advisability. *See* 8 *Del. C.* § 242(b)(1). Mathu and Raja could not supply the majority of a quorum necessary for the Board to act. Notably, Mathu and Raja's inability to supply a quorum in this scenario also would infect any other action that they took as the two remaining members of a five-member board.

For purposes of the issues in this case, this potential defect does not affect the outcome. If trial established that Mathu and Raja were the two remaining members of a five-member board when they executed the March Director Consent, then that would undermine the status of the Outside Directors only as *de jure* directors. It would not alter their status as *de facto* directors, and Gola and Gollop, as the sole members of the Resolution Committee, would have had authority as *de facto* directors to approve the Omnibus Agreement.

19

Consistent with Stream's practice of disregarding corporate formalities, the language of the March Director Consent does not deploy the specific concepts that the Bylaws and the DGCL contemplate. A Delaware practitioner would want the March Director Consent to (i) refer to the directors' power to act by unanimous written consent, supported by citations to Section 2.8 of the Bylaws and Section 141(f) of the DGCL, (ii) expand the number of seats on the Board from two to six, supported by citations to Section 2.1 of the Bylaws and Section 141(b) of the DGCL, and (iii) state that the directors were filling the newly created directorships with the Outside Directors, supported by citations to Section 2.2 of the Bylaws and Section 223(a)(1) of the DGCL. The operative resolution instead stated,

> **NOW, THEREFORE, BE IT HEREBY RESOLVED**, that Frank Hodgson, Asaf Gola, Krzysztof Kabacinski and Kevin Gollop are elected to the Board of Directors of Company [sic], each as an Interim Director, with an official start date for those posts to be within twenty four (24) hours of the time and date of the signatures of Messrs. Mathu and Raja Rajan below and continue until determined otherwise by the mutual agreement of the Company and the individual Interim Director.

Dkt. 102 Ex. 105 at 1.

Although lacking in technical precision, the language of the March Director Resolution made clear that the Rajan brothers intended to expand the Board and add the Outside Directors. Stream cannot now take advantage of Mathu and Raja's informality to achieve a result that would benefit themselves. Equity regards as done what ought to have been done. *See Eddington v. Turner*, 26 A.2d 80, 82 (Del. Ch. 1942) (Wolcott, C.).

In an effort to escape the implications of the Rajan brothers' actions, Stream claims that the March Director Consent appointed the Outside Directors as "Interim Directors,"

20

and conditioned their actual directorships on them satisfying certain requirements, including investing in Stream and executing a Director Services Agreement. That argument fails for three reasons.

First, Delaware law does not recognize the role of "Interim Director," and Stream's constitutive documents did not contemplate such a position. Perhaps a certificate of incorporation provide for an interim director using the authority granted under Section 141(d) of the DGCL, but the Charter did not attempt to do that. As a matter of Delaware law, and under Stream's constitutive documents, the Outside Directors became directors entitled to serve until their successors' election and qualification.

Second, Delaware law does not permit the March Director Consent to impose conditions on the ability of the Outside Directors to become directors. By doing so, the March Director Consent attempted to impose director qualifications. Under Section 141(b) of the DGCL, any director qualifications must appear in the certificate of incorporation or bylaws. The pertinent language of Section 141(b) states,

> Directors need not be stockholders unless so required by the certificate of incorporation or the bylaws. The certificate of incorporation or bylaws may prescribe other qualifications for directors.

8 *Del. C.* § 141(b). The Charter and Bylaws did not require that directors invest in Stream or sign a Director Services Agreement, and the Rajan brothers could not impose those qualifications through the March Director Consent.

Third, director qualifications must be reasonable. The offer letter and Director Services Agreement resemble documents used with employees. They contain terms that,

when applied to directors, are inconsistent with Stream's constitutive documents and Delaware law.

For example, the offer letter sent to the Outside Directors stated, "You will begin on Friday, February 14, 2020. This is a 3 year term, but at the end of every year, both parties can renew." *E.g.*, Dkt. 100 Ex. 8. The Board was not divided into classes, so all directors served for one-year terms, not three-year terms. Moreover, a Delaware corporation and its directors do not "renew" the directors' service. Under Delaware law, "[e]ach director shall hold office until such director's successor is elected and qualified or until such director's earlier resignation or removal." 8 *Del. C.* § 141(b). And except for the filling of vacancies or new directorships, directors are elected by stockholders to oversee the business and affairs of the corporation. *See id.* §§ 141(a), 141(d), 211(b). The corporation cannot elect or appoint its own directors. To the contrary, a corporation may not vote its own shares. *See* 8 *Del. C.* § 160(c).

The Director Services Agreement went even further astray. Contrary to the status of directors under Delaware law, the Director Services Agreement purported to provide that the "Director's relationship with the Company will be that of an independent contractor . . . ." Dkt. 102 Ex. 76 at '040. The Services Agreement also purported to impose a contractual confidentiality obligation on the director that (i) would be superfluous in light of the director's fiduciary duties, *see Holdgreiwe v. Nostalgia Network, Inc.*, 1993 WL 144604, at *6 (Del. Ch. Apr. 29, 1993) (Allen, C.), and (ii) could not prevent the director from making disclosures if the director's fiduciary duties required it, *see Quickturn Design Sys., Inc. v. Shapiro*, 721 A.2d 1281, 1291–92 (Del. 1998). The Director Services Agreement

22

also purported to impose various mandatory obligations on the director to support the corporation. As with the confidentiality obligation, the director's fiduciary duties rendered those mandatory obligations both redundant (to the extent that they contemplated actions consistent with what the director believed to be in the best interests of the corporation) and ineffective (to the extent that they required action contrary to what the director believed would be in the best interests of the corporation). Overall, the Director Services Agreement was unreasonable, and the Rajan brothers could not condition the Outside Directors' status as directors on their signing the Director Services Agreement.

As a matter of Delaware law, the Outside Directors were validly appointed as directors through the March Director Consent. Gola and Gollop therefore had authority to bind Stream to the Omnibus Agreement as members of the Resolution Committee.

### 2.    The Outside Directors' Status As *De Facto* Directors

Assuming for the sake of argument that the Outside Directors were not validly appointed, it is reasonably probable that this court would conclude after trial that the Outside Directors were *de facto* directors. *See Hockessin Cmty. Ctr., Inc. v. Swift*, 59 A.3d 437, 459–60 (Del. Ch. 2012). As *de facto* directors, their acts are valid and bind the corporation for purposes of its interactions with third parties.[5] The Omnibus Agreement therefore would be valid and binding on Stream.

---

[5] *See President & Fellows of Harvard Coll. v. Glancy*, 2003 WL 21026784, at *17 (Del. Ch. Mar. 21, 2003) ("[D]e facto directors have the authority to take valid corporate action when third parties are affected."); *see also Gassis v. Corkery*, 2014 WL 2200319, at *13 (Del. Ch. May 28, 2014) ("[E]ven if [the court] were to find that [the directors in

Stream and the Rajan brothers treated the Outside Directors as directors, and all other relevant parties reasonably believed that the Outside Directors were directors. The Rajan brothers, on behalf of Stream, sent letters of invitation to join the Board to the Outside Directors. Each of the Outside Directors agreed to join the Board, and Stream announced to its investors and employees that the Outside Directors had become members of the Board. The Outside Directors attended eight Board meetings, during which they received privileged legal advice and confidential information and were asked to vote on corporate actions. The minutes of those meetings list the Outside Directors as "Board Members" and were submitted to the Outside Directors for approval. In discussions with the Outside Directors, the Rajan brothers asserted that the Outside Directors owed fiduciary duties to Stream, which they could only owe if they were really directors. Throughout this period, the Rajan brothers and other Stream employees repeatedly referred to the Outside Directors as "directors" and the "Board" and held out the Outside Directors as directors to third parties, including when soliciting investments. By the time of the hearing on the preliminary injunction, Stream no longer disputed that it treated the Outside Directors as *de facto* directors.

---

question] ultimately had no valid claim to their director seats, that finding would not invalidate prior actions of the board."), *aff'd*, 113 A.3d 1080 (Del. 2015). *See generally* 2 William Meade Fletcher et al., *Fletcher Cyclopedia of the Law of Private Corporations* § 383, at 225 (perm.ed., rev. vol. 2014) (explaining that the acts of *de facto* directors "are just as valid and biding upon the corporation" as the acts of *de jure* directors).

Stream now argues that the Outside Directors could not be *de facto* directors because the *de facto* director doctrine only protects third parties, and the Board's vote to establish the Resolution Committee did not involve third parties. But the motions for preliminary injunction turn on the validity of the Omnibus Agreement, which is an agreement between Stream and third parties. Under the *de facto* director doctrine, Gola and Gollop had authority to approve the Omnibus Agreement.

As a fallback, Stream argues that SLS and Hawk are not third parties because they were intimately familiar with Stream's internal affairs, and Stastney, the principal of SLS, previously had served as a director and officer of Stream. For purposes of the Omnibus Agreement, SLS and Hawk were third parties. Neither was an insider or represented by an insider, and neither had any first-hand knowledge about the roles of the Outside Directors. They only knew what the Rajan brothers and other Stream representatives told them.

Assuming for the sake of argument that the Outside Directors were not validly appointed as *de jure* directors, they nevertheless had authority to act as *de facto* directors. As members of the Resolution Committee, Gola and Gollop had authority to bind Stream to the Omnibus Agreement.

### 3.   The May Stockholder Consent Did Not Remove Gola And Gollop Before They Approved The Omnibus Agreement.

Stream next argues that the Resolution Committee could not have approved the Omnibus Agreement because the Rajan brothers removed Gola, Gollop, and Kabacinski on May 6, 2020, before Gola and Gollop could act. The weight of the evidence establishes that the Rajan brothers backdated the May Stockholder Consent, which they did not

actually execute until the evening of May 8 or on May 9, after the Resolution Committee already had approved the Omnibus Agreement.

As a matter of Delaware law, the Resolution Committee was formed validly and had authority to bind Stream to the Omnibus Agreement. During the meeting of the Board on May 4, 2020, the directors validly created the Resolution Committee. Section 2.6 of the Bylaws provides that "a majority of the authorized number of directors shall constitute a quorum," and "[t]he vote of a majority of the directors present at a meeting at which a quorum is present shall be shall be [sic] the act of the Board . . . ." The Bylaws authorize the Board to "designate one or more committees, each consisting of one or more directors," which "shall have and may exercise all the powers and authority of the Board . . . ." Gola, Gollop, Kabacinski, and the Rajan brothers constituted a quorum. Gola, Gollop, and Kabacinski voted in favor of the proposal to form Resolution Committee, and the Rajan brothers abstained. As a result, the Board acted by a majority of a quorum to create the Resolution Committee and empower it with authority to resolve pending disputes between Stream and its investors.

On May 6, 2020, the Resolution Committee, approved the Omnibus Agreement. By taking that action, the Resolution Committee bound Stream to the Omnibus Agreement. Gola signed the Omnibus Agreement on May 6, memorializing that decision. Gollop did not sign the agreement until May 7, but the delay in securing the second signature does not alter the fact that the Omnibus Agreement was approved on May 6 and bound Stream from that point on.

The evidence indicates that the Rajan brothers did not execute the May Stockholder Consent until the evening of May 8 at the earliest. The Rajan brothers backdated the May Stockholder Consent to May 6. Although the evidence suggests that the Rajan brothers started working on the May Stockholder Consent on May 6, the evidence also makes clear that they did not execute the document on that date. By the time the Rajan brothers executed the May Stockholder Consent, the Resolution Committee had already approved the Omnibus Agreement. The May Stockholder Consent thus does not impair the validity of the Omnibus Agreement.

**B.      The Omnibus Agreement Did Not Require Stockholder Approval.**

Having failed to undermine the Omnibus Agreement at the director level, Stream moves to the stockholder level, claiming that the Omnibus Agreement is ineffective because it required stockholder approval. Stream identifies two sources of a stockholder-approval requirement: Section 271 and the Class Vote Provision. Neither applies to the transfer of assets contemplated by the Omnibus Agreement.

**1.      Section 271**

Section 271 of the DGCL requires a stockholder vote for a sale of all or substantially all of a corporation's assets. Everyone agrees that the Omnibus Agreement encompasses all of Stream's assets. The question is whether the transfer of Stream's assets to its secured creditors under the circumstances presented here constitutes a sale or exchange within the scope of Section 271. It does not.

The current dominance of the merger as the transactional vehicle for selling a corporation has caused the earlier predominance of the sale of assets to fade from memory.

Before the General Assembly liberalized Delaware's merger statutes,[6] the preferred

transaction structure involved the target corporation selling all of its assets to the acquirer,

---

[6] "In the Nineteenth Century, a merger almost always meant the melding of two different businesses into one, akin to the formation of a partnership among individual proprietorships. All of the stockholders in all of the constituent corporations had to approve the combination, and each automatically became a stockholder of the surviving corporation." 2 Drexler, *supra*, § 35.03, at 35-4. The concept of a "merger" thus meant a direct, stock-for-stock merger between two entities, and it required unanimous stockholder approval to effectuate.

During the first half of the twentieth century, the merger remained a "cumbersome, seldom-used mechanism," even after the General Assembly lowered the voting requirement to two-thirds of the outstanding shares and then to a bare majority. *Id*. The DGCL continued to "require[] that the outstanding shares of each constituent corporation be converted into equity shares of the surviving corporation," making cash deals impossible. *Id.*

In 1941, the General Assembly amended the long-form merger statute so that the shares of a constituent corporation could be converted into "shares or other securities." 43 Del. Laws ch. 132, § 12 (1941). Hypothetically, this amendment permitted a merger to provide target stockholders with the functional equivalent of cash consideration by converting their shares into short-term notes. *See* 2 Drexler, *supra*, § 35.03, at 35-4. In 1957, the General Assembly authorized the conversion of shares into cash in short-form mergers. 51 Del. Laws ch. 121, § 6 (1957); *see* 8 *Del. C.* § 253. Stockholder plaintiffs challenged the statute as unconstitutional, claiming that it destroyed a vested right to stock consideration, but the Delaware Supreme Court rejected this argument based on "the reserved power of the State to amend corporation charters . . . ." *Coyne v. Park & Tilford Distillers Corp.*, 154 A.2d 893, 897 (Del. 1959).

In 1967, as part of a substantial rewrite of the DGCL, the General Assembly amended the long-form merger statute to authorize the conversion of a constituent corporation's shares into cash, debt securities, securities of other corporations, or other property. 56 Del. Laws ch. 50 (1967); *see* 1 R. Franklin Balotti & Jesse A. Finkelstein, *The Delaware Law of Corporations & Business Organizations* § 9.11 (3d ed. 1998 & 2011 Supp.); *see also* 8 *Del. C.* § 251. After these amendments, it became possible to "structure mergers to accomplish a broad spectrum of transactions, including the cashout of minority interests and the acquisition of other corporations for cash . . . ." 2 Drexler, *supra*, § 35.03, at 35-6. The amendments also authorized triangular mergers, allowing acquirers to use a

then dissolving and distributing the consideration to its stockholders.[7] Before the 1980s,

the great Delaware takeover cases largely involved sales of assets.[8] "[T]he decisions in

subsidiary as a constituent corporation and convert the shares of the target corporation into shares of the parent. *See* 1 Balotti & Finkelstein, *supra*, § 9.7. With these changes, the merger began its steady rise to predominance.

[7] *See generally* 2 Drexler, *supra*, § 37.04 at 37-8 to -9; Henry Winthrop Ballantine, *Ballantine on Corporations* §§ 279–80 (1946); George S. Hills, *Consolidation of Corporations by Sale of Assets and Distribution of Shares*, 19 Cal. L. Rev. 349 (1931).

[8] *E.g.*, *Gimbel v. Signal Cos., Inc.*, 316 A.2d 599, 609–18 (Del. Ch. 1974) (granting preliminary injunction against third-party sale of assets based on apparent breaches of the duty of care, citing the haste with which the board acted and disparate testimony regarding value), *aff'd*, 316 A.2d 619 (Del. 1974); *Alcott v. Hymann*, 184 A.2d 90, 96–97 (Del. Ch. 1962) (rejecting claim that sale of assets was a *de facto* merger and holding that price was fair even if controlling stockholder stood on both sides of transaction), *aff'd*, 208 A.2d 501 (Del. 1965); *Baron v. Pressed Metals of Am.*, 117 A.2d 357, 364 (Del. Ch. 1955) (holding that directors and majority stockholders did not breach their fiduciary duties when effectuating sale of corporation's assets), *aff'd*, 123 A.2d 848 (Del. 1956); *Robinson v. Pittsburgh Oil Refin. Co.*, 126 A. 46, 50–51 (Del. Ch. 1924) (Wolcott, C.) (denying motion for preliminary injunction to enjoin sale of assets; holding that directors legitimately chose nominally lower-valued bid with more certain consideration over nominally higher-valued bid); *Allied Chem. & Dye Corp. v. Steel & Tube Co. of Am.*, 120 A. 486, 491, 496–97 (Del. Ch. 1923) (Wolcott, C.) (holding that controlling stockholder owed fiduciary duty to minority and granting preliminary injunction against sale of assets by controlling stockholder that appeared motivated by desire for short-term profit). *See generally* 2 Drexler, *supra*, § 37.04 at 37-8 ("A review of annotations suggests that perhaps more judicial scrutiny was given prior to 1967 to Section 271 than any other Section of law."); Ernest L. Folk, III, *The Delaware General Corporation Law: A Commentary and Analysis* 399–424 (1972) (collecting cases and describing range of issues raised by sales of assets under Section 271). Demonstrating the reversal of transactional fortunes, in 1931, this court issued a decision that described the settled principles governing a claim for breach of fiduciary duty in connection with a sale of assets and then applied them by analogy to a merger, explaining that "from the viewpoint of the constituent companies, a sale of assets is in substance involved." *Cole v. Nat'l Cash Credit Ass'n*, 156 A. 183, 188 (Del. Ch. 1931) (Wolcott, C.). The court further explained that the transaction could be regarded as "one where the stockholders of the defendant are in substance selling its assets to another in exchange for securities issued by the latter . . . ." *Id.*

29

Section 271 transactions provided the vehicle for much of the development and refinement in Delaware of the law with respect to the business judgment presumption and the fiduciary duty owed by directors and majority stockholders to a minority." 2 Drexler, *supra*, § 37.04 at 37-8 to -9.

At common law, the general rule was "that the directors have no power or authority to sell out the entire property of a corporation and terminate its business. They have only the power of management in conducting ordinary business affairs." Ballantine, *supra*, § 281, at 666. The common law even prevented directors from selling the assets of the business with approval from a majority or supermajority of the stockholders. Unanimous stockholder approval was required, and "[t]he general rule in the absence of statute" was "that such a disposition of assets or a dissolution may be restrained on the objection of a single shareholder." *Id.*

A widely recognized exception to the rule applied to insolvent or failing firms. A late nineteenth century treatise noted that for "a failing company the rule is different, and sale of the whole property may be made by the directors." 1 Charles Fisk Beach, Jr., *Company Law: Commentaries on the Law of Private Corporations* § 357, at 582 (1891); *see id.* § 358, at 582 ("A corporation through a majority of its directors may make a transfer of all its property in payment of one creditor if it be done *bona fide*."). An early twentieth century treatise expressed the rule similarly: "The directors may, however, without authorization of the stockholders, sell the corporate assets if necessary to pay the corporate debt, and they may, in the absence of statutory or other prohibitions, make an assignment for the benefit of creditors." Thomas Conyngton & R. J. Bennett, *Corporation Procedure*

30

232 (rev. ed. 1927) (footnote omitted). And a mid-twentieth century treatise stated the rule

plainly:

> If a corporation is insolvent or in failing condition[,] the board of directors
> have authority to sell the entire assets in order to pay the debts and avoid the
> sacrifice of an execution sale[,] even without the vote or consent of the
> shareholders. They may also make an assignment for the benefit of creditors
> or file a voluntary petition in bankruptcy.

Ballantine, *supra*, § 281, at 667 (footnote omitted). When making these statements, the

treatise authors relied on cases from numerous jurisdictions.[9] Even today, a leading

---

[9] *See, e.g.*, *City Nat. Bank v. Fuller*, 52 F.2d 870, 872–873 (8th Cir. 1931) (holding
that directors of insolvent national bank had authority to convey assets to creditors without
stockholder approval); *Autauga Coop. Leasing Ass'n v. Ward*, 33 So.2d 904, 906 (Ala.
1948) (holding that when a commercial corporation is insolvent or in failing condition, "the
directors . . . could sell all its property without any special procedure"); *Candor v. Mercer
Cty. State Bank*, 257 Ill. App. 192, 197–98 (Ill. App. Ct. May 3, 1930) ("The general rule
is that where a business is in a failing condition and has become financially involved and
insolvent, and the creditors are pressing their claims, the directors may dispose of the assets
without the sanction of the stockholders, when it is deemed of imperative necessity."); 
*Sherrard State Bank v. Vernon*, 243 Ill. App. 122, 128 (Ill. App. Ct. Oct. 8, 1926) ("Where,
however, the corporation is insolvent or in failing circumstances and the business can no
longer be carried on profitably and advantageously, such a sale may be made and minor
stockholders cannot object thereto in the absence of fraud."); *Oskaloosa Sav. Bank v.
Mahaska Cty. State Bank*, 219 N.W. 530, 533 (Iowa 1928) ("[I]t is an exception to the
general rule [requiring stockholder approval for a sale of assets] that where a business is in
a failing condition and has become financially involved and insolvent, and the creditors are
pressing their claims, the power of the directors to alienate the property is conceded where
it is regarded as of imperative necessity."); *Howard v. Republic Bank & Tr. Co.*, 76 S.W.2d
187, 191 (Tex. Civ. App. 1934) ("While the general rule is well settled that the directors
of a solvent corporation cannot dispose of all of the corporation's assets without first
obtaining the consent of the stockholders, there is also a well-recognized rule that, where
a corporation is in failing circumstances and its business can no longer be carried on
profitably, or where an emergency exists wherein delay would prove disastrous to its
creditors, the directors may validly do so without the consent of the other stockholders."). 
*See* R. P. Davis, Annotation, *Applicability of Statutes Regulating Sale of Assets or Property
of Corporation as Affected by Purpose or Character of Corporation*, 9 A.L.R.2d 1306 § 4

Delaware treatise acknowledges the "failing business" exception to the common law rule.

1 Balotti & Finkelstein, *supra*, § 10.7, at 10-34.

The Delaware Court of Chancery first confronted litigation involving a sale of assets

in 1915, before the enactment of any statute addressing sales of assets. Chancellor Curtis[10]

summarized the law as follows:

> The general rule as to commercial corporations seems to be settled that
> neither the directors nor the stockholders of a prosperous, going concern have
> power to sell all, or substantially all, the property of the company if the holder
> of a single share dissent. But if the business be unprofitable, and the
> enterprise be hopeless, the holders of a majority of the stock may, even
> against the dissent of the minority, sell all the property of the company with
> a view to winding up the corporate affairs.

*Butler v. New Keystone Copper Co.*, 93 A. 380, 382 (Del. Ch. 1915). Chancellor Curtis

thus acknowledged the general prohibition on selling all of a corporation's assets, as well

as the exception for an insolvent or failing firm. *See id.* The defendant corporation in *Butler*

had a provision in its charter that authorized the directors to sell all of its assets after

---

(1950 & Supp.) (addressing "[r]eorganization of companies in financial difficulties"). *See generally* G. M. H., Annotation, *Power of Directors to Sell Property of Corporation Without Consent of Stockholders*, 60 A.L.R. 1210 (1929 & Supp.); R.S., Annotation, *Power of Directors to Sell Property of Corporation Without Consent of Stockholders*, 5 A.L.R. 930 (1920 & Supp.).

[10] Chancellor Charles M. Curtis served from 1909 until 1921. He was succeeded by Chancellor Josiah O. Wolcott, who served from 1921 until 1938. Both presided during the period after New Jersey adopted the Seven Sisters Acts, which opened the door for envious upstarts (as Delaware then was) to compete for the chartering business. Both Chancellors played major—and today underappreciated—roles in establishing this court's reputation as a preeminent venue for deciding corporate cases.

receiving approval from three-fourths of its stockholders, and the principal issue for decision was whether that provision supplied the necessary authority and overrode the common law rule. Chancellor Curtis held that the charter provision was effective and denied the stockholders' application for a preliminary injunction. *Id.* at 381–82.

The General Assembly enacted the statutory predecessor to Section 271 against this common law backdrop. In 1917, the General Assembly authorized the board of a corporation to sell all of the corporation's assets with the approval of a majority of its stockholders.[11] The statute read as follows:

> Section 64a. *Sale of Assets and Franchises.*—Every corporation organized under the provisions of this chapter, may at any meeting of its board of directors, sell, lease or exchange all of its property and assets, including its good will and its corporate franchises, upon such terms and conditions as its board of directors deem expedient and for the best interests of the corporation, when and as authorized by the affirmative vote of the holders of a majority of the stock issued and outstanding having voting power given at a stockholders' meeting duly called for that purpose, or when authorized by

---

[11] *See* Folk, *supra*, at 399 n.1 ("Apparently, the sale of assets statute was first enacted in 1916, probably as a legislative reaction to the restrictive dicta in *Butler* . . . ." (italics added)). Sources conflict on whether the statute was adopted in 1916 or 1917. Professor Folk says 1916, as does another treatise. *See* 2 Drexler, *supra*, § 37.01 at 37-1 (explaining that *Butler* "led to the adoption in 1916 of the predecessor to present Section 271"). A source closer in time says 1917. Russell Carpenter Larcom, *The Delaware Corporation* 34–35 (1937) ("The statute contained no provisions for such sales until 1917 when regulations were included, doubtless as a result of the controversy over a similar charter clause which was settled by the courts in 1915." (footnote omitted) (citing *Butler*)); *accord* 1 Balotti & Finkelstein, *supra*, § 10.1, at 10-4 ("Section 271 was first enacted in 1917 . . . .") The statute appears to have been enacted in 1917, so this decision uses that date. *See* 29 Del. Laws ch. 113, § 17 (1917); Lewis S. Black, Jr., & Craig B. Smith, *Antitakeover Charter Provisions: Defending Self-Help for Takeover Targets*, 36 Wash. & Lee L. Rev. 699, 700 n.8 (1979) (citing the enactment of 29 Del. Laws ch. 113, § 17 in 1917).

the written consent of a majority of the holders of the voting stock issued and outstanding, provided, however, that the certificate of incorporation may require the vote or written consent of a larger proportion of the stockholders.

29 Del. Laws ch. 113, *quoted in Allied Chem.*, 120 A. at 490.

The General Assembly enacted the statute to confer authority on corporations that did not exist at common law.[12] There is no indication that the General Assembly intended to restrict or eliminate authority that already existed at common law, such as the power of the directors of an insolvent and failing corporation to sell its assets.

The 1917 statute was silent as to the permissible forms of consideration. A 1929 amendment confirmed that the consideration could consist "in whole or in part [of] shares of stock in, and/or other securities of, any other corporation or corporations."[13] In 1967, after a systematic review of the DGCL, the General Assembly revised the statute to appear substantially in its current form. The revised statute expanded the expressly permitted forms of consideration: "[T]o the original authority to sell assets for stock and securities of

---

[12] Balotti & Finkelstein, *supra*, § 10.1, at 10-4 ("Section 271 was first enacted in 1917 to supersede and mitigate the common law requirement, in most situations, of unanimous stockholder consent to the alienation of all or substantially all of the corporation's property. The statutory change was intended to eliminate the veto power of minority stockholders and not to limit the powers of the directors to manage the business of the corporation." (footnotes omitted)); Folk, *supra*, at 400 (explaining that the statute was intended to alter the common law rule that "neither the directors nor stockholders of a prosperous going concern could sell all or substantially all of the property of the corporation if a single stockholder objected").

[13] 36 Del. Laws ch. 135, § 19 (1929); *see* Nelson Ferebee Taylor, *Evolution of Corporate Combination Law: Policy Issues and Constitutional Questions*, N.C. L. Rev. 687, 883 n.812 (1998).

'any other corporation or corporations,' the 1967 revision added 'money or other property.'" Folk, *supra*, at 400. The revised provision also encompassed sales of "all or substantially all" of the corporation's assets, but the addition of "substantially all" was not viewed as a substantive change, because "the general consensus was that the old statute applied in that situation as well."[14]

The 1967 revision made two related changes to the DGCL. First, the General Assembly added a new provision—Section 272—which states, "The authorization or consent of stockholders to the mortgage or pledge of a corporation's property and assets shall not be necessary, except to the extent that the certificate of incorporation otherwise provides." 8 *Del. C.* § 272. The General Assembly included this section "to clarify that [S]ection 271 . . . does not apply to a mortgage or pledge of assets."[15] In Professor Folk's original commentary on the DGCL, written shortly after the 1967 revisions, he explained that the new section did not "reflect a departure from the understanding of prior law which,

---

[14] Folk, *supra*, at 400; *accord* Balotti & Finkelstein, *supra*, § 10.1, at 10-4 ("The addition of this language was intended merely to codify the interpretation generally accorded to the language of the pre-1967 statute that the word 'all' meant 'substantially all,' so that the statute could not be evaded by retaining a small amount of property not vital to the operation of the business." (footnotes omitted)); Drexler, *supra*, § 37.01 at 37-2 ("This modification merely codified what had been the generally held understanding of what was implicit in the prior Section.")

[15] 2 Edward P. Welch et al., *Folk on the Delaware General Corporation Law* § 272.01, at 10-59 (2020-2 Supp.) (footnotes omitted); *accord* 1 Balotti & Finkelstein, *supra*, § 10.1, at 10-4 to -5 ("The 1967 revision . . . added Section 272 to expressly permit the mortgage or pledge of corporate assets without stockholder consent absent an express provision in the certificate of incorporation to the contrary . . . .").

it was generally assumed, did not require stockholder approval to mortgage or pledge corporate assets."[16] Professor Folk cited with apparent disapproval a federal decision that had "assumed without deciding that a mortgage of the assets was covered by the predecessor of § 271." Folk, *supra*, at 425 (citing *Greene v. Reconstr. Fin. Corp.*, 100 F.2d 34, 35–36 (1st Cir. 1938)).

Second, before the 1967 revisions, the DGCL contained a provision that authorized "[s]ales of the property and franchises" of a corporation "under a decree of Court . . . ."[17] The provision stated that the sale was "made in the foreclosure of one or more mortgages, the Court may order such sale to be made for the whole amount of the outstanding bonds and interest secured by such mortgage or mortgages . . . ." Marvel, *supra*, § 67, at 314. The statute did not require either board approval or a stockholder vote to accomplish a sale of assets to a secured creditor by decree. *See id.* As part of the 1967 revision, the General Assembly eliminated this provision, presumably regarding it as unnecessary given the rights generally available to secured creditors.[18]

---

[16] Folk, *supra*, at 424–25. A contemporary treatise suggests that authorities conflicted on this point. *See* 2 Drexler, *supra*, § 37.01, at 37-2 ("Section 272 was added to make clear a proposition which had theretofore been the subject of conflicting views—*viz*, that a pledge or mortgage of all or substantially all of a corporation's assets was not a transaction requiring stockholder approval under Section 271.").

[17] Josiah Marvel, *Delaware Corporations and Receiverships* § 67, at 314 (6th ed. 1939); *accord* Robert Pennington, *A Treatise on Delaware Corporation Law* § 64-A, at 152 (1925).

[18] The revisions attempted to eliminate redundant and unnecessary provisions. For example, "[i]n the pre-1967 statute[,] § 272 authorized the purchasers of corporate assets

Today, Section 271(a) states,

> Every corporation may at any meeting of its board of directors or governing
> body sell, lease or exchange all or substantially all of its property and assets,
> including its goodwill and its corporate franchises, upon such terms and
> conditions and for such consideration, which may consist in whole or in part
> of money or other property, including shares of stock in, and/or other
> securities of, any other corporation or corporations, as its board of directors
> or governing body deems expedient and for the best interests of the
> corporation, when and as authorized by a resolution adopted by the holders
> of a majority of the outstanding stock of the corporation entitled to vote
> thereon or, if the corporation is a nonstock corporation, by a majority of the
> members having the right to vote for the election of the members of the
> governing body and any other members entitled to vote thereon under the
> certificate of incorporation or the bylaws of such corporation, at a meeting
> duly called upon at least 20 days' notice. The notice of the meeting shall state
> that such a resolution will be considered.

8 *Del. C.* § 271(a). The statute thus mandates a two-step process: the board must approve

the sale, and the stockholders must approve it.[19]

Extensive Delaware case law addresses the factors that Delaware courts consider

when determining whether the assets involved in a transaction rise to the level of "all or

---

to organize a successor corporation to hold and use the assets. This provision was deleted
in its entirety as unnecessary in view of the broad general power to organize a corporation
for any lawful purpose." Folk, *supra*, at 424 n.1; *accord* 1 Balotti & Finkelstein, *supra*,
§ 10.9, at 10-36 n.156. The revisions also eliminated a provision that authorized
stockholders to approve a sale of assets through action by written consent because "the
provision was redundant in light of the adoption of Section 228 . . . ." *Id.* § 10.1, at 10-5.

[19] *See* 1 Balotti & Finkelstein, *supra*, § 10.3, at 10-14.1 ("As set forth in Section
271, the approval of the proposed transaction by the board of directors generally is required
prior to the submission of the proposed sale of assets to stockholders."). Cases have reached
different outcomes regarding the extent to which the stockholders must approve a specific
transaction as opposed to providing "blank check" authority. *See id.* at 10-15; 2 Drexler,
*supra*, § 37.02, at 37-3 to -4.

substantially all." Virtually no Delaware authority addresses what constitutes a "sale" or "exchange." Section 271 does not define either term. Nor does it speak to the ability of a failing or insolvent firm to transfer assets to creditors, much less speak to the ability of a struggling firm to transfer assets in which a creditor holds a security interest to the creditor.

Except for one transcript ruling, the parties have not identified any relevant decisions. The one transcript ruling involved a claim by a stockholder that Section 271 required a stockholder vote before a secured creditor could acquire all of a corporation's assets by engaging in a strict foreclosure under the Uniform Commercial Code. Former Chief Justice Strine, then a Vice Chancellor, dismissed the claim as a matter of law, reasoning as follows:

> [T]he Delaware General Corporation Law clearly makes a distinction between financing transactions, mortgage transactions, collateral transactions, and sales of assets. And I don't think you can have a situation where there's the original financing transaction that pledges the collateral is outside 271's reach and then say when the creditor exercises rights under that that are within the four corners or arguably a lesser -- lesser-included option, that that somehow then triggers a stockholder vote. I think that would be bad for -- frankly, for equity investors in general, because I think it would raise the cost of capital, because it would -- it would create sort of a [hijack] situation that you sometimes see in new bankruptcies where it appears that everybody has to get something simply because they're present.

*Gunnerman v. Talisman Cap. Talon Fund, Ltd.*, C.A. No. 1894-VCS, tr. at 33–34 (Del. Ch. July 12, 2006).

Whether Section 271 applies to a transaction like the Omnibus Agreement presents an issue of statutory interpretation.

> The rules of statutory construction are well settled. The goal, in all cases, is to ascertain and give effect to the intent of the legislature. If the statute is unambiguous, there is no room for interpretation, and the plain meaning of

the words controls. If the statute is ambiguous, several principles guide the
Court's interpretation. First, the statute must be read as a whole in a manner
that will promote its purposes. Second, courts should consider the statute's
history and examine the text of the statute and draw inferences concerning
the meaning from its composition and structure.

*Rubick v. Sec. Instrument Corp.*, 766 A.2d 15, 18 (Del. 2000) (alterations, footnotes, and

internal quotation marks omitted). When construing a statute, "literal or perceived

interpretations which yield mischievous or absurd results are to be avoided." *One-Pie Invs.,*

*LLC v. Jackson*, 43 A.3d 911, 914 (Del. 2012). "When a statute has been applied by courts

and state agencies in a consistent way for a period of years, that is strong evidence in favor

of that interpretation." *State v. Barnes*, 116 A.3d 883, 890 (Del. 2015).

When interpreting an undefined statutory term, a Delaware court starts with "its

commonly accepted meaning." *Freeman v. X-Ray Assocs., P.A.*, 3 A.3d 224, 227 (Del.

2010). "Because dictionaries are routine reference sources that reasonable persons use to

determine the ordinary meaning of words," Delaware courts "often rely on them for

assistance in determining the plain meaning of undefined terms." *Id.* at 227–28.

*Black's Law Dictionary* contains an extensive section on the term "sale." The

hallmarks of the various definitions include (i) the status of the parties as "buyer" and

"seller," (ii) the exchange of money or other property in return for goods and services, and

(iii) a transfer of title. *See* Sale, *Black's Law Dictionary* (11th ed. 2019). *Black's Law*

*Dictionary* distinguishes a "sale" from a "foreclosure sale," defining "foreclosure sale" to

mean "[t]he sale of mortgaged property, authorized by a court decree or a power-of-sale

clause, to satisfy the debt." In a separate entry, *Black's Law Dictionary* defines the term

"foreclosure" as "[a] legal proceeding to terminate a mortgagor's interest in property,

39

instituted by the lender (the mortgagee) either to gain title or to force a sale in order to satisfy the unpaid debt secured by the property."

*Black's Law Dictionary* defines "exchange" to mean "[t]he act of transferring interests, each in consideration for the other," and defines the related term "bargained-for exchange" to mean "[a] benefit or detriment that the parties to a contract agree to as the price of performance." As with the definition of a "sale," the hallmarks of these definitions include a voluntary transfer of interests between similarly situated parties.

Stream does not cite any dictionary definitions, but argues without support that the plain meaning of the terms "sale" and "exchange" must encompass the transfer of all of Stream's assets to SeeCubic. In light of the definitions set forth above, that conclusion is plausible but not mandated. Those definitions envision a buyer and seller, acting in those capacities, and transferring or exchanging property or services. One could conceive of SeeCubic as a buyer and Stream as a seller, but it is more accurate to regard SeeCubic as a vehicle for Stream's creditors and Stream itself as a debtor. One also could view the Omnibus Agreement as involving a transfer or exchange of property (the assets) in exchange for other property (the intangible rights reflected by the antecedent debts), but it is more accurate to view SLS and Hawk as levying on their security. In substance, the transaction contemplated by the Omnibus Agreement functions as a private foreclosure. It is a contractual substitute for the legal proceeding through which SLS and Hawk otherwise would have obtained Stream's assets.

Rather than artificially parsing debatable dictionary definitions, the better course is to accept that the language of Section 271 is ambiguous as to whether it applies to

40

transactions like the Omnibus Agreement. At that point, principles of statutory interpretation call for examining the legislative history of the statute and its position in the broader context of the DGCL. These sources demonstrate that Section 271 does not apply to a transaction like the one contemplated by the Omnibus Agreement, in which an insolvent and failing firm transfers its assets to its secured creditors in lieu of a formal foreclosure proceeding.

First, the origins of Section 271 demonstrate that the General Assembly did not intend for the statute to govern a transfer of assets by a failing firm. The General Assembly enacted the statutory predecessor to Section 271 to make clear that the board of directors of a corporation, with the approval of a majority of its stockholders, could sell all of the firm's assets, even if the corporation was profitable and solvent. *See Allied Chem.*, 120 A. at 490. The common law rule regarded such a transaction as *ultra vires*, at least absent a provision in the certificate of incorporation that specifically granted such authority. By contrast, the common law did not prohibit the board of directors of an insolvent or failing firm from transferring its assets to creditors. A board of directors had authority to take that course of action, so the General Assembly did not need to establish that point by statute. In light of the common law backdrop, Section 271 does not apply to that transactional setting.[20]

---

[20] Courts in other jurisdictions have held that statutes similar to Section 271 did not modify the failing business exception. *See In re E.T. Russell Co.*, 291 F. 809, 816 (D. Mass. 1923) (explaining that a common-law assignment for the benefit of creditors was not a "sale of assets" for purposes of the section of Massachusetts corporate law comparable to

Second, the language of Section 271 has evolved over time to confirm that particular types of consideration are permissible in a "sale, lease or exchange." The original statute did not identify any specific forms of consideration. The General Assembly later amended the statute to confirm that the consideration could include shares of stock or other securities, and the General Assembly subsequently added money or other property. The statute has never referred to forgiveness of debt as a form of consideration.[21]

----

Section 271, reasoning that "[t]he stockholder is only interested in what remains after debts are paid"); *Mills v. Tiffany's, Inc.*, 198 A. 185, 640–41 (Conn. 1938) (explaining that Connecticut analog to Section 271 is "inapplicable to a sale of all [assets] by a corporation which is insolvent or in failing circumstances made for the purpose of closing up its affairs"); *Basset v. City Bank & Trust Co.*, 165 A. 557, 561 (Conn. 1933) (explaining that the purpose of Connecticut analog to Section 271 "was to change [the common law rule that barred a sale of all assets] so as to permit such a sale upon vote of two-thirds of the outstanding stock" and that the statute did not apply because "[t]he common-law rule does not apply to a sale, as here, of all its assets by a corporation which is insolvent or in failing circumstances, made for the purpose of closing up its affairs"); *In re Avard*, 144 N.Y.S.2d 204, 209 (N.Y. Sup. Ct. 1955) (holding that statute requiring approval of two-thirds of stockholders for sale of all assets did not apply; explaining that "[i]f corporate management determines that a business is unprofitable, it may dispose of the property or business to eliminate further loss without the consent of its stockholders"). A prior decision of this court declined to address whether Section 271 applied "to a sale of assets by a failing company facing an emergency situation," concluding that the facts of the case did not involve an emergency. *See Russell v. Morris*, 1990 WL 15618, at *5 (Del. Ch. Feb. 14, 1990), *appeal refused*, 577 A.2d 754 (Del. 1990) (ORDER); *see also* 1 Balotti & Finkelstein*, supra*, § 10.7, at 10-35 (noting uncertainty about "whether the failing business exception of the common law remains viable in Delaware" and citing *Russell*).

[21] This observation should not be taken too far. A situation in which a solvent and profitable corporation sold all of its assets for a package of consideration that included some forgiveness of secured debt might be a sale of all or substantially all assets for proposes of Section 271. This decision only addresses the Omnibus Agreement, which involves an insolvent and failing firm transferring all of its assets to creditors who already hold a security interest in those assets.

42

Third, the stewards of the 1967 revision did not regard Section 271 as applying to mortgages or pledges of all of a corporation's assets. To confirm that interpretation, they added Section 272.[22] The question then becomes whether a corporation must obtain stockholder approval under Section 271 before a creditor can foreclose on its security interest, even though the corporation did not need to obtain stockholder approval to grant the security interest. The pre-1967 code suggests not, because it contemplated a judicial foreclosure on a mortgage or pledge of all of the corporation's assets without complying with Section 271's predecessor. As part of the 1967 revision, the General Assembly appears to have regarded the special foreclosure provision as superfluous in light of the rights generally available to a secured creditor.

As *Gunnerman* indicates, public policy considerations point in the same direction, because interpreting Section 271 as applying to a creditor's efforts to levy on its security would undercut the value of the security interest. If stockholders were asked to approve the transfer of an insolvent or failing corporation's assets to a secured creditor, they might well

---

[22] *See* 1 Balotti & Finkelstein, *supra*, § 10.9, at 10-38 (noting that Section 272 "was added during the 1967 general revision in order to confirm the generally accepted understanding that stockholder approval is not required to mortgage or pledge corporate assets"); Folk, *supra*, at 424–25 (stating that prior law "did not require stockholder approval" for these types of arrangements with creditors"); *see also* 2 Drexler, *supra*, § 37.01, at 37-2. ("Section 272 was added to make clear a proposition which had theretofore been the subject of conflicting views—*viz*, that a pledge or mortgage of all or substantially all of a corporation's assets was not a transaction requiring stockholder approval under Section 271.").

vote to reject the transfer, if only to create bargaining leverage against the creditor.[23] To avoid this problem, a creditor would have to insist that the corporation comply with Section 271 up front, as part of the process of obtaining credit. The result would be a regime that, as a practical matter, required the corporation to comply with Section 271 before mortgaging or pledging its assets. That result would be contrary to the plain language of Section 272, which states that such authorization "shall not be necessary."

As *Gunnerman* suggests, a regime of this sort would have detrimental effects for everyone. Creditors would suffer the first-order effects when they tried to foreclose on collateral. Corporations and stockholders would suffer the second-order effects as creditors adjusted to the new reality, insisted on additional protections, and raised the cost of capital. Section 271 should not be interpreted to produce such a mischievous and harmful result.

Finally, there is the dog that has not barked. Except for the transcript ruling in *Gunnerman*, no one has cited any Delaware case involving a claim that Section 271 applied

---

[23] A creditor that needed to comply with Section 271 before foreclosing on its security interest would face other hurdles as well. Because there is no statutory method for a creditor to cause a corporation to comply with Section 271, the credit agreement would have to create a contractual structure that addressed both the board-level decision and the stockholder vote. A creditor could bargain for the contractual right to force the corporation to call a meeting of stockholders, but the creditor could not contractually bind the directors to recommend that stockholders vote in favor of foreclosure. Such an obligation would be invalid to the extent it required the board to violate its statutory obligation to provide a meaningful, current recommendation to stockholders or breach its fiduciary duty of disclosure. *See generally In re Primedia, Inc. S'holders Litig.*, 67 A.3d 455, 490–92 (Del. Ch. 2013) (collecting authorities addressing comparable obligation under Section 251(b)). A creditor thus would struggle to create a meaningful contractual mechanism that would enable it to enforce compliance with Section 271 before foreclosing.

to a transfer of assets to a secured creditor. Given the prevalence of security interests and the fact that Section 271 and its predecessor have been around since 1917, this issue surely would have arisen if Section 271 applied in such a setting. The absence of cases implicating the issue indicates that virtually no one thinks that Section 271 would apply in that context.

Perhaps anticipating that Section 271 logically cannot apply to an agreement that allows a secured creditor to levy on the collateral that is subject to its security interest, Stream argues that the Omnibus Agreement is more than a foreclosure equivalent. Stream notes that the Omnibus Agreement contemplates SeeCubic issuing one million shares to Stream, and it grants Stream's minority stockholders the right to exchange their shares in Stream for shares in SeeCubic. That is true, but those additional features involve give-backs from the creditors, who otherwise could foreclose on all of Stream's assets and leave Stream and its stockholders with nothing. This is not a case in which the creditors hold security interests in only some of Stream's assets, and Stream is throwing in more assets on top. Because Stream is insolvent and failing, its stockholders no longer have a meaningful interest in the firm, and the secured creditors are entitled to its assets. Nothing prevents the creditors from agreeing to provide some of their resulting bundle of property rights to Stream and its stockholders in an effort to avoid disputes. Because Section 271 does not cover the worst case transaction for Stream—a foreclosure involving all of its assets—it logically does not apply to a lesser included alternative that provides greater benefits to Stream and its stockholders.

Section 271 therefore does not apply to the Omnibus Agreement. Under the DGCL, the Omnibus Agreement did not require a stockholder vote.

2.    **The Class Vote Provision**

In addition to Section 271, Stream relies on the Class Vote Provision, which requires

approval by the Class B Voting Stock in order for Stream to consummate an "Asset

Transfer." Dkt. 101 Ex. 41 § IV.D.2(d). The language of the Class Vote Provision tracks

Section 271 of the DGCL, resulting in the same outcome: Stream need not obtain

stockholder approval under the Class Vote Provision to transfer mortgaged or pledged

assets to the secured creditors who hold security interests in those assets.

When interpreting a charter provision that closely resembles the language of a

section of the DGCL, Delaware courts will give the language the same meaning as the

statute. *See Warner Commc'ns Inc. v. Chris-Craft Indus.*, *Inc.*, 583 A.2d 962, 969 (Del.

Ch. 1989). In the *Warner* decision, Chancellor Allen considered whether a provision in the

certificate of incorporation that gave holders of preferred stock the right to vote on any

amendment necessary "to alter or change any rights, preferences or limitations of the

Preferred Stock so as to affect the holders of all such stock adversely" resulted in the

preferred stockholders being entitled to vote on a merger. *Id.* Chancellor Allen cited the

"close similarity between the operative language of [the class vote provision] and Section

242(b)(2) of the General Corporation Law," which grants stockholders a class vote on any

amendment that "would . . . alter or change the powers, preferences or special rights of the

shares of such class so as to affect them adversely." *Id.* (omission in original) (emphasis

omitted). Noting that "the parallel is plain," Chancellor Allen accorded significant weight

to the fact that Delaware law had not held that Section 242(b)(2) created a class vote on a

merger. *Id.* He found it "extraordinarily unlikely that the drafters of [the class vote

provision], who obviously were familiar with and probably expert in our corporation law, would have chosen language so closely similar to that of Section 242(b)(2) had they intended a merger to trigger the class vote mechanism of that section." *Id.* at 970.

The same reasoning applies here. The Class Vote Provision requires separate approval by the Class B stock for any "Asset Transfer."[24] The Charter defines that term as

---

[24] The Class Vote Provision also calls for a class vote on any "Acquisition," defined as

(A) any consolidation, stock exchange or merger of [Stream] with or into any other corporation or other entity or person, or any other corporate reorganization,

other than any such consolidation, merger or reorganization in which the stockholders of [Stream] immediately prior to such consolidation, merger or reorganization, continue to hold a majority of the voting power of the surviving entity in substantially the same proportions (or, if the surviving entity is a wholly-owned subsidiary, its parent) immediately after such consolidation, merger or reorganization; or

(B) any transaction or series of related transactions to which [Stream] is a party and in which in excess of fifty percent (50%) of [Stream's] voting power is transferred;

provided that an Acquisition shall not include

(x) any consolidation or merger effected exclusively to change the domicile of [Stream], or

(y) any transaction or series of transactions principally for bona fide equity financing purposes in which cash is received by [Stream] or any successor or indebtedness of [Stream] is cancelled or converted or a combination thereof.

Dkt. 101 Ex. 41 § IV.D.4(b)(i) (formatting added). Stream claims in conclusory fashion that the Omnibus Agreement qualifies as an Acquisition, but does not explain what noun might apply. The Omnibus Agreement does not contemplate a consolidation or merger,

47

a sale, lease or other disposition of all or substantially all of the assets or intellectual property of [Stream] or the granting of one or more exclusive licenses which individually or in the aggregate cover all or substantially all of the intellectual property of [Stream].

Dkt. 101 Ex. 41 § IV.D.4(b)(ii). Section 271 uses parallel phrasing, allowing a corporation to "sell, lease or exchange all or substantially all of its property and assets, including its goodwill and its corporate franchises."

There are only two differences between Section 271 and the Class Vote Provision. The first is the express reference in the Class Vote Provision to "intellectual property" in the phrase "all or substantially all of the assets or intellectual property of [Stream]." Mentioning "intellectual property" in this phrase does not enlarge the voting obligation beyond the scope of Section 271, because intellectual property is already a type of asset.

The other difference is the reference to "the granting of one or more exclusive licenses which individually or in the aggregate cover all or substantially all of the intellectual property of [Stream]." The Omnibus Agreement does not contemplate an exclusive license.

———————————————

which are specific types of transactions having independent legal significance, so those aspects of part (A) of the definition are not implicated. The Omnibus Agreement does not result in the transfer of any of Stream's voting power, so part (B) of the definition does not apply. By process of elimination, perhaps Stream thinks the Omnibus Agreement contemplates a "reorganization." That at least is a relatively general term, but Stream would have to provide authorities delineating the content of the term and why it could encompass the Omnibus Agreement. Stream also would have to explain why that concept would trigger a stockholder vote when the definition of "Asset Transfer" did not. The Omnibus Agreement involves a transfer of assets, so if any aspect of the Class Vote Provision covered the transaction, it would be the definition of "Asset Transfer."

48

It is true that through its reference to exclusive licenses, the Class Vote Provision encompasses a type of transaction that does not plainly fall within Section 271. But that fact cuts against Stream for purposes of this proceeding, because it shows that the drafters of the Class Vote Provision knew how to define the concept of an "Asset Sale" to include transactions that Section 271 would not otherwise reach. If the drafters of the Class Vote Provision wanted to require a class vote before a secured creditor could foreclose on pledged or mortgaged assets, then the definition of "Asset Sale" should have referred to that type of transaction.

In the current case, for purposes of determining whether the Class Vote Provision has a broader scope than Section 271, the critical language in the Class Vote Provision is the reference to "a sale, lease or other disposition of all or substantially all of the assets … of [Stream." That language tracks the text of Section 271 and warrants the same interpretation. The transaction contemplated by the Omnibus Agreement, in which Stream agreed to transfer its assets to its secured creditors, does not implicate the Class Vote Provision.

## C.   The Members Of The Resolution Committee Did Not Breach Their Fiduciary Duties.

Stream finally argues that the Omnibus Agreement is void because the members of the Resolution Committee breached their fiduciary duties by approving it. Setting aside the fact that this argument conflicts with Stream's position that the Outside Directors were never directors, the theory lacks merit.

"Delaware has three tiers of review for evaluating director decision-making: the business judgment rule, enhanced scrutiny, and entire fairness." *Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d 442, 457 (Del. Ch.2011). Which standard of review applies will depend initially on whether the board members

> (i) were disinterested and independent (the business judgment rule), (ii) faced potential conflicts of interest because of the decisional dynamics present in particular recurring and recognizable situations (enhanced scrutiny), or (iii) confronted actual conflicts of interest such that the directors making the decision did not comprise a disinterested and independent board majority (entire fairness). The standard of review may change further depending on whether the directors took steps to address the potential or actual conflict, such as by creating an independent committee, conditioning the transaction on approval by disinterested stockholders, or both.

*In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 36 (Del. Ch. 2013).

This case does not involve any of the recurring and recognizable situations in which enhanced scrutiny applies. Nor does this case involve a transaction in which a controlling stockholder stands on both sides of the sides of the deal, will receive a non-ratable benefit, or will avoid a unique detriment, meaning that entire fairness does not apply *ab initio*. Instead, the default standard of review is the business judgment rule, which presumes that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984), *overruled on other grounds by Brehm v. Eisner*, 746 A.3d 244, 253–54 (Del. 2000). Unless one of the rule's elements is rebutted, "the court merely looks to see whether the business decision made was rational in the sense of being one logical approach to advancing the corporation's objectives." *In re Dollar Thrifty S'holder Litig.*, 14 A.3d 573, 598 (Del. Ch. 2010).

50

Stream has not pointed to any evidence that would rebut the protections of the business judgment rule. No evidence suggests that either member of the Resolution Committee was interested in the Omnibus Agreement or lacked independence from someone who was. No evidence suggests that the members of the Resolution Committee acted in bad faith or for an improper purpose. The evidence indicates that Gola and Gollop believed the Omnibus Agreement to be in the best interests of Stream and its stockholders (including the Rajan family) because it prevented Stream's creditors from foreclosing on all of its assets and leaving Stream and its stockholders with nothing.

Relatedly, Stream argues that the Omnibus Agreement has never been "ratified" under Section 7.4 of the Bylaws. That section tracks Section 144 of the DGCL by providing three avenues for approval of an interested transaction. *See* 8 *Del. C.* § 144(a). Stream does not explain how the Omnibus Agreement could be an interested transaction, precisely because it is not. Assuming for the sake of argument that it was, then the approval of the Resolution Committee validates it under the plain language of Section 7.4 of the Bylaws and Section 144 of the DGCL.

**D.     Whether SeeCubic Seeks A Mandatory Injunction**

In its reply brief, Stream asserts that SeeCubic seeks a mandatory injunction that is equivalent to a decree of specific performance. "Relief by mandatory injunction should only be awarded in a clear case, free from doubt, and when necessary to prevent irreparable injury." *Richard Paul, Inc. v. Union Improvement Co.*, 86 A.2d 744, 748 (Del. Ch. 1952). Generally speaking, "[m]andatory injunctions should only issue with the confidence of

51

findings made after a trial or on undisputed facts." *C & J Energy Servs., Inc. v. City of Miami Gen. Empls.' & Sanitation Empls.' Ret. Tr.*, 107 A.3d 1049, 1053–54 (Del. 2014).

This court does not need to enter a mandatory injunction. This court will enter a prohibitive injunction that prevents Stream from taking action to interfere with the rights of SLS, Hawk, the Equity Investors, and SeeCubic under the Omnibus Agreement. Those rights include a power of attorney that empowers Stastney "to take all action necessary or advisable to effect the delivery, conveyance, transfer and assignment to [SeeCubic] of the Transferred Assets." OA § 1.4. Using the power of attorney, Stastney can accomplish the transfers contemplated by the Omnibus Agreement.

Were it necessary to grant a mandatory injunction to enforce the Omnibus Agreement, then the record would be sufficiently clear to support it. The evidence that the Outside Directors either were validly appointed or acted as *de facto* directors would support a grant of summary judgment in SeeCubic's favor. The evidence that the Rajan brothers did not execute the May Stockholder Consent until May 8, 2020, or later likewise suffices to support a grant of summary judgment in SeeCubic's favor. No evidence suggests that the members of the Resolution Committee breached their fiduciary duties. The other issues in the case present questions of law.

## III.    CONCLUSION

Stream's motion for a preliminary injunction is denied. SeeCubic's motion is granted. This court will enter an order implementing the relief to which SeeCubic is entitled.

52

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Stream TV Networks, Inc., | Case No. 21-10433 (KBO) |
| Debtor. | |

## <u>ORDER DISMISSING DEBTOR'S CHAPTER 11 CASE</u>

This matter having come before the Court on the motion (the "<u>Motion</u>")[1] of

SeeCubic, Inc. and SLS Holdings VI, LLC for an order, pursuant to 11 U.S.C. §§ 105(a) and

1112(b), dismissing the chapter 11 case of Stream TV Networks, Inc. (the "<u>Debtor</u>"); and this

Court having jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the *Amended*

*Standing Order of Reference from the United States District Court for the District of Delaware*,

dated February 29, 2012; and entry of this Order dismissing this chapter 11 case being a core

proceeding within the meaning of 28 U.S.C. § 157(b)(2); and venue of this proceeding and the

Motion in this District being proper pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper

notice of the Motion having been provided; and it appearing that no other or further notice need

be provided; and the relief requested in the Motion being in the best interests of the Debtor's

estate, its creditors and other parties in interest; and this Court having determined that the legal

and factual bases set forth in the Motion and at the hearing establish just cause for the relief

granted herein; and after due deliberation and sufficient cause appearing therefor,

IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:

1. The Motion is GRANTED as set forth herein.

---

[1]    Unless otherwise defined, capitalized terms used herein shall have the meanings ascribed to them in the Motion.

2.    Pursuant to Bankruptcy Code sections 105(a) and 1112(b), the chapter 11 case of Stream TV Networks, Inc. is hereby dismissed.

3.    The Court retains jurisdiction with respect to all matters arising from or relating to the implementation, interpretation, and enforcement of this Order.

887547-WILSR01A - MSW