# EXHIBIT B

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Stream TV Networks, Inc., | Case No. 21-10433 (KBO) |
| Debtor. | |

## DECLARATION OF SHADRON L. STASTNEY IN SUPPORT OF MOTION OF SEECUBIC, INC. AND SLS HOLDINGS VI, LLC FOR AN ORDER DISMISSING DEBTOR'S CHAPTER 11 CASE

I, Shadron L. Stastney, hereby declare under penalty of perjury:

1.       My name is Shadron L. Stastney, and I am the Executive Chairman of SeeCubic,

Inc. ("**SeeCubic**").  I am also a principal of SLS Holdings VI, LLC ("**SLS**").  I am over eighteen

years of age and am competent to testify.

2.       I submit this declaration (the "**Declaration**") in support of the *Motion Of*

*SeeCubic, Inc. and SLS Holdings VI, LLC For An Order Dismissing Debtor's Chapter 11 Case*

(the "**Motion**"), pursuant to which SeeCubic and SLS seek entry of an order dismissing the

Chapter 11 case of the above-captioned debtor Stream TV Networks, Inc. ("**Stream**" or the

"**Debtor**") pursuant to 11 U.S.C. § 1112(b).

3.       As further described in the December 8, 2020 opinion (the "**Chancery Opinion**")

of the Delaware Court of Chancery (the "**Chancery Court**") appended as an exhibit to the

Motion, Stream's senior secured creditor is SLS.  Between 2011 and 2012, SLS loaned $6

million to Stream through a series of secured notes (the "**SLS Notes**").  Stream pledged all of its

assets and the assets of its wholly owned subsidiaries as security for the SLS Notes.  Stream

executed a security agreement in connection with the SLS Notes, which authorized SLS to take

control of Stream's assets to satisfy the SLS Notes if Stream defaulted.

4.      Stream's junior secured creditor is Hawk Investment Holdings Limited ("**Hawk**").  Between 2010 and 2014, Hawk loaned more than £50 million to Stream, plus another $1.336 million, through a series of junior secured notes (the "**Hawk Notes**").  Subject to the senior security interest held by SLS, Stream pledged all of its assets as security for the Hawk Notes.  Stream executed a security agreement in connection with the Hawk Notes, which authorized Hawk to take control of Stream's assets to satisfy the Hawk Notes if Stream defaulted.

5.      In February 2020, Stream defaulted on the SLS Notes and Hawk Notes.  After a series of negotiations, on May 6, 2020, the Resolution Committee of the Stream Board of Directors approved an agreement (the "**Omnibus Agreement**") which resulted in the transfer of Stream's assets to its secured creditors after Stream defaulted on more than $50 million (of principal) secured debt.  The counterparties to the Omnibus Agreement were SLS, Hawk, and certain of Stream's equity investors.  A true and correct copy of the Omnibus Agreement is attached to this Declaration as **Exhibit 1**.

6.      The Omnibus Agreement provided that SLS and Hawk would not foreclose on Stream's assets and that they would accept delivery of Stream's assets in satisfaction of their debts.  The assets would be transferred to a newly formed entity controlled by SLS and Hawk, which was later identified as SeeCubic.  The Chancery Court described the May 6, 2020 Omnibus Agreement, in relevant part, as follows:

> In the Omnibus Agreement, Stream agreed to transfer all of its assets to SeeCubic, a newly formed entity controlled by its secured creditors. Stream also granted its secured creditors a power of attorney to effectuate the transfers. Stream's secured creditors already held security interests in all of Stream's assets and had the right to foreclose on those assets.

Chancery Opinion p. 1.

7.    Effectively all of Stream's material assets were held by its wholly owned direct and indirect subsidiaries in the United States and overseas.  Attached to this Declaration as **Exhibit 2** is a copy of an organizational chart, prepared by Stream in 2018 and accurate to the best of my knowledge, reflecting Stream's pre-transfer corporate organizational structure.

8.    Pursuant to the Omnibus Agreement, substantially all of Stream's assets were transferred to SeeCubic in connection with the transfer of ownership of Stream's wholly owned direct and indirect subsidiaries including those in the United States, China, and the Netherlands (which included effectively all of the functioning business operations and remaining employees). Ownership of Stream's top-level subsidiary, a Delaware corporation called TechnoVative Media, Inc., was transferred to SeeCubic – and, with it, ownership of all of the direct and indirect subsidiaries and affiliates falling below TechnoVative Media, Inc. in the corporate structure – as documented in and effectuated by a September 4, 2020 Stock Transfer and Power as well as an Action By Written Consent of the Board of Directors of TechnoVative Media, Inc.  True and correct copies of the Stock Transfer and Power and the Action By Written Consent (excluding its Exhibit A) are attached to this Declaration as **Exhibit 3**.

9.    As further described in the Chancery Opinion, from May 6, 2020 and continuing through the date of this Declaration, the Rajans have repeatedly sought to undermine, interfere with, and terminate the Omnibus Agreement, the actions of the Stream Resolution Committee, and the transfers of Stream's assets to SeeCubic.  The Rajans' efforts included interfering with transitions of the composition of boards of directors and related administrative and ministerial changes at TechnoVative Media, Inc. and its domestic and foreign subsidiaries, including with respect to corporate registrations relating to foreign subsidiaries.  In the Chancery Opinion, the Chancery Court rejected each and every one of the bases of the Rajans bad-faith actions and

3

arguments seeking to thwart the Omnibus Agreement and the transfers of assets to SeeCubic. *See, e.g.*, Chancery Opinion p. 2 (determining that as of May 6, 2020 "the [Stream] Resolution Committee approved the Omnibus Agreement. As of that date, the Omnibus Agreement became effective and binding on Stream.").

10.    SeeCubic owns, controls, and operates the assets and business formerly held by Stream pursuant to the Omnibus Agreement validated by the Court of Chancery under governing Delaware law.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct.

Dated: March 12, 2021                    _____

                                          Shadron L. Stastney

**EXHIBIT 1**

**OMNIBUS AGREEMENT**

OMNIBUS AGREEMENT (this "Agreement"), dated as of May 6, 2020, by and among Stream TV Networks, Inc., a Delaware corporation (the "Company"), SLS Holdings VI, LLC, a Delaware limited liability company ("SLS"), Hawk Investment Holdings Limited, an entity registered in Guernsey ("Hawk"), and certain equity investors of the Company listed on Annex I attached hereto (each an "Investor" and collectively, the "Investors").

WHEREAS, certain of the Investors have brought claims against Mathu Rajan, an individual ("MR"), Raja Rajan, an individual ("RR"), Suby Joseph, an individual ("SJ" and together with MR and RR, the "Company Officers"), Mediatainment, Inc., a Delaware corporation ("Mediatainment"), and Akshaya Holding LLC, a Nevada limited liability company ("Akshaya") in an action filed with the Court of Chancery of the State of Delaware (the "Lawsuit");

WHEREAS, the Company and SLS have entered into that certain (i) 5% Senior Secured Note, dated April 8, 2011, in the principal amount of $3,000,000 ("SLS Note 1"); (ii) 5% Senior Secured Note, dated February 8, 2012, in the principal amount of $1,500,000 ("SLS Note 2"); (iii) 5% Senior Secured Note, dated May 1, 2012, in the principal amount of $500,000 ("SLS Note 3"); (iv) 5% Senior Secured Note, dated May 29, 2012, in the principal amount of $500,000 ("SLS Note 4"); and (v) 5% Senior Secured Note, dated July 5, 2012, in the principal amount of $500,000 ("SLS Note 5", together with SLS Note 1, SLS Note 2, SLS Note 3 and SLS Note 4, each as amended through the date hereof, the "SLS Notes"), and SLS has filed a foreclosure action in Delaware Chancery Court to enforce such rights (such lawsuit and any responses or counterclaims related thereto, the "Foreclosure Action");

WHEREAS, the Company and Hawk have entered into that certain (i) Promissory Note, dated March 26, 2014, in the principal amount of £6,000,000 ("Hawk Note 1"); (ii) Promissory Note, dated October 15, 2014, in the principal amount of £3,000,000 ("Hawk Note 2"); (iii) Promissory Note, dated January 2, 2015, in the principal amount of £8,000,000 ("Hawk Note 3"); (iv) Promissory Note, dated August 6, 2015, in the principal amount of £8,000,000 ("Hawk Note 4"); (v) Promissory Note, dated October 12, 2015, in the principal amount of £5,000,000 ("Hawk Note 5"); (vi) Promissory Note, dated February 15, 2016, in the principal amount of £3,000,000 ("Hawk Note 6"); (vii) Promissory Note, dated July 8, 2016, in the principal amount of £3,500,000 ("Hawk Note 7"); (viii) Promissory Note, dated September 27, 2016, in the principal amount of £2,500,000 ("Hawk Note 8"); (ix) Promissory Note, dated May 3, 2017, in the principal amount of £650,000 ("Hawk Note 9"); (x) Promissory Note, dated December 11, 2017, in the principal amount of £3,500,000 ("Hawk Note 10"); (xi) Promissory Note, dated June 26, 2018, in the principal amount of £600,000 ("Hawk Note 11"); (xii) Promissory Note, dated December 6, 2018, in the principal amount of £1,250,000 ("Hawk Note 12"); (xiii) Promissory Note, dated July 2, 2019, in the principal amount of £3,000,000 ("Hawk Note 13"); (xiv) Promissory Note, dated September 18, 2019, in the principal amount of $770,000 ("Hawk Note 14"); (xv) Promissory Note, dated October 3, 2019, in the principal amount of £2,000,000 ("Hawk

Note 15"); (xvi) Promissory Note, dated January 16, 2020, in the principal amount of £600,000 ("Hawk Note 16"); (xvii) Promissory Note, dated February 26, 2020, in the principal amount of $183,601.19 ("Hawk Note 17a"); (xviii) Promissory Note, dated February 26, 2020, in the principal amount of $382,757.14 ("Hawk Note 17b", together with Hawk Note 1, Hawk Note 2, Hawk Note 3, Hawk Note 4, Hawk Note 5, Hawk Note 6, Hawk Note 7, Hawk Note 8, Hawk Note 9, Hawk Note 10, Hawk Note 11, Hawk Note 12, Hawk Note 13, Hawk Note 14, Hawk Note 15, Hawk Note 16, Hawk Note 17a and any other indebtedness of the Company in favor of Hawk, each as amended through the date hereof, the "Hawk Notes", and together with the SLS Notes, the "Notes");

WHEREAS, each of the SLS Notes and each of the Hawk Notes have matured or are in default and immediately due and payable, and the Company is obligated to pay to the holders of the respective notes, the amounts due thereunder (including, without limitation, principal and accrued and unpaid interest thereon) (such amounts, with respect to any such note, the "Applicable Obligations") without the giving of notice or demand by the applicable holder;

WHEREAS, the Company is unable to satisfy and pay the Applicable Obligations as required;

WHEREAS, each of SLS and Hawk has notified the Company that (i) the Applicable Obligations are immediately due and payable, an Event of Default has occurred and is continuing and the default rates of interest and late fees, as applicable, provided thereunder, are in effect and (ii) each of SLS and Hawk intend to exercise all rights and remedies available to them under the SLS Notes and Hawk Notes, and under the Amended and Restated Security Agreement, dated as of February 8, 2012, by and between the Company and SLS (the "SLS Security Agreement") and each Security Agreement and Pledge Agreement, relating to Hawk Notes 1 through 12, entered into by and between the Company and Hawk (the "Hawk Security Agreements", together with the SLS Security Agreement, the "Security Agreements"), as applicable, including foreclosure on all assets of the Company (the "Foreclosure");

WHEREAS, SLS and Hawk have each agreed to stay the Foreclosure and satisfy and extinguish each of the SLS Notes and the Hawk Notes in their entirety subject to the Company assigning all right, title and interest in and to all assets of the Company to a newly-formed holding company ("Newco") established by SLS and Hawk, in satisfaction of the SLS Notes and the Hawk Notes;

WHEREAS, subject to the performance by the Company of its obligations hereunder, the Investors have agreed to forebear from asserting any claims against the Company related to the Lawsuit; and

WHEREAS, the parties desire to memorialize in this Agreement the terms and conditions of certain other actions to be performed by the parties, and this Agreement shall govern the respective rights and obligations of the parties in connection with such actions.

## ARTICLE I

## THE TRANSACTIONS

1.1    <u>Transactions</u>. Subject to the terms and conditions set forth herein, and on the basis of and in reliance upon the representations, warranties, covenants and agreements set forth herein, the parties hereto shall promptly take the actions described in this <u>Section 1.1</u> (each, a "<u>Transaction</u>" and, collectively, the "<u>Transactions</u>"):

(a)    Each of SLS and Hawk shall agree to stay the Foreclosure and satisfy and extinguish, in their entirety, the SLS Notes and the Hawk Notes, respectively (collectively, the "<u>Discharged Indebtedness</u>"), upon the Company's immediate conveyance, transfer, delivery and assignment, of all right, title and interest of the Company in, to or under all of the rights, properties and assets of the Company (including those of any direct or indirect subsidiary of the Company) of every kind and description, wherever located, real, personal, or mixed, tangible or intangible, to the extent owned, leased, licensed, used or held for use in or relating to the business, as the same shall exist on the date hereof, to Newco, including, but not limited to, all right, title and interest of the Company (or any direct or indirect subsidiary of the Company) in, to and under the assets listed or described below (the "<u>Transferred Assets</u>"):

(i)    all accounts receivable (whether current or noncurrent) outstanding as the date hereof;

(ii)    all intercompany accounts receivables as to which any subsidiary is an obligor or is otherwise responsible or liable and which are owed or payable to the Company;

(iii)    all credits, claims for refunds and prepaid expenses and other prepaid items;

(iv)    the contracts listed, described or otherwise identified on <u>Schedule 2.5</u> for transfer to Newco as such schedule may be amended from time to time and the rights thereunder;

(v)    all raw materials, work-in process, prototypes, finished goods, supplies, components, packaging materials, and other inventories to which the Company or any of its subsidiaries have title that are in the possession of the Company or any of its subsidiaries or any third party and used or held for use in connection with the business, including, but not limited to, those items set forth on <u>Schedule 2.9</u>;

(vi)    all machinery, equipment, apparatus, appliances, computers and computer-related hardware, network and internet and information technology systems-related equipment and all other tangible personal property used or held for use in conduct of the business, including, but not limited to, those items set forth on <u>Schedule 2.8</u>;

3

(vii)    all equity, voting and economic interest in each subsidiary of the Company;

(viii)    all intellectual property (including, but not limited to, patents, trademarks, trade secrets, copyrights, internet domain names and all applications for, and registrations of, any of the foregoing) and all of the rights of the Company or any of its subsidiaries therein, including all rights to sue for and recover and retain damages for present and past infringement thereof, and, in the case of any trademarks, all goodwill appurtenant thereto, including, but not limited to, those items set forth on Schedule 2.10;

(ix)    all rights under non-disclosure or confidentiality, invention and intellectual property assignment covenants executed for the benefit of the Company or any of its subsidiaries with current or former employees, consultants or contractors of the Company, its subsidiaries or with third parties;

(x)    all books and records of the Company and its subsidiaries;

(xi)    to the extent transferable, all permits required for the operation of the business and all pending applications therefor;

(xii)    to the extent transferable, all insurance policies and rights thereunder;

(xiii)    all goodwill associated with the business and the Transferred Assets;

(xiv)    all rights, claims, rebates refunds, causes of action, actions, suits or proceedings, hearings, audits, rights of recovery, rights of setoff, rights of recoupment, rights of reimbursement, rights of indemnity or contribution and other similar rights (known and unknown, matured and unmatured, accrued or contingent, regardless of whether such rights are currently exercisable) against any person, including all warranties, representations, guarantees, indemnities and other contractual claims (express, implied or otherwise) to the extent related to the business or the assets of the Company or any of its subsidiaries (including any claims for past infringement or misappropriation); and

(xv)    any and all insurance proceeds, condemnation awards or other compensation in respect of loss or damage to any of the assets to the extent occurring on or after the date hereof, and all rights and claims of the Company or any of its subsidiaries to any such insurance proceeds, condemnation awards or other compensation not paid by the date hereof.

4

(b)     Newco shall assume and agree to pay, perform, fulfill and discharge solely those liabilities and obligations of the Company, in each case, to the extent expressly set forth on Schedule 1.1(b), to be provided as promptly as practicable hereafter (the "Assumed Liabilities").

(c)     SLS and Hawk shall form Newco in accordance with the applicable laws of its jurisdiction of formation. Newco shall issue promissory notes and shares to SLS and to Hawk as decided between them. The holders of such promissory notes shall jointly determine the size and composition of the initial Board of Directors of Newco, and shall name the initial executive officers of Newco.

(d)     Each holder of shares of Class A Common Stock of the Company (as defined in the Third Amended and Restated Certificate of Incorporation of the Company, dated as of December 17, 2018 (the "Existing Charter"), other than the Company Officers, Mediatainment, Akshaya or their respective affiliates, shall be entitled to exchange their respective shares of Class A Common Stock of the Company for an identical number of the common shares of Newco for no cost, and otherwise on such terms and conditions as will be decided by Newco.

(e)     Each holder of shares of common stock of Mediatainment, other than the Company Officers, Akshaya or their respective affiliates (as such are defined jointly by SLS and Hawk, the "Redeemed Mediatainment Holders"), shall have their respective shares of Mediatainment redeemed by Mediatainment in exchange for their pro rata portion of the shares of Class A Common Stock of the Company held by Mediatainment (the "Redemption"). Immediately following the Redemption, the Redeemed Mediatainment Holders shall be entitled to exchange their respective shares of Class A Common Stock of the Company for an identical number of the common shares of Newco for no cost, and otherwise on such terms and conditions as will be decided by Newco.

(f)     The Company shall be entitled to receive 1,000,000 shares of Class A Common Stock of Newco in respect of any residual interest it may have in the transferred assets (the "Company Issuance"), on the terms and conditions as set forth on Annex II.

(g)     Each holder of shares of Class A Common Stock of the Company that elects to exchange his, her or its respective shares of Class A Common Stock of the Company for a pro rata portion of the common shares or equity of Newco pursuant to Sections 1.1(d), (e), and (f) hereof, shall, in addition to those terms and conditions set by Newco and as a condition to such transfer, irrevocably, unconditionally, and fully release the Company, SLS, Hawk, the Investors and each of their respective affiliates, and shareholders, officers and directors, from any and all, actual or potential, charges, complaints, claims, counterclaims, duties, actions, causes of action in law or in equity, suits, liens, liabilities, debts due, sums of money, demands, obligations, accountings, damages, punitive damages, losses, costs or expenses, attorneys' fees or any nature whatsoever and liabilities of any kind or nature whatsoever, known or unknown, suspected or unsuspected, whether arising under state, federal or other law, or based on

common law, statutory law, regulations or otherwise, that such holders of shares of Class A Common Stock of the Company at any time had or claimed to have in respect of their investment in the Company.

(h)     The Company and the Board shall promptly take all action necessary to change the name of the Company to exclude any reference to "Stream TV", "Ultra D" or any similar service or technology.

1.2     <u>Dismissal of Lawsuit and Foreclosure Action</u>.  In consideration of the Transactions contemplated by <u>Section 1.1</u> of this Agreement and such other agreements as made be made among the parties hereto and upon consummation thereof, (i) the Investors hereby irrevocably agree to forbear from including any claims against the Company or any of the Transferred Assets as part of the Lawsuit, and (ii) each of the SLS and the Company agree to dismiss their applicable claims or responses in the Foreclosure Action.

1.3     <u>Employees</u>.  Effective as of the date of the assignment of the Transferred Assets to Newco, (a) each employee of the Company set forth on <u>Annex II</u> hereto or subsequently identified to the Company in writing shall be released from all of his or her employment obligations to the Company, so that he or she may commence employment with Newco or its subsidiaries, and (b) without limiting the foregoing, the Company shall waive any restrictive covenants between the Company and any such employee solely to the extent such waiver allows such employee to be employed by Newco or its subsidiaries and not be subject to such covenants in connection with his or services to Newco or its subsidiaries.

1.4     <u>Consent to Transactions</u>.  Subject to the last sentence of this <u>Section 1.4</u>, each of the parties hereto, and their respective directors, officers, employees and representatives, shall use best efforts to (i) execute and deliver such other instruments of conveyance, transfer or assumption, as the case may be, and take such other action as may be reasonably requested to implement more effectively the conveyance and transfer of the Transferred Assets to Newco and (ii) effect, or cause to be effected, to the extent within its control, each of the Transactions.  In furtherance of the foregoing, each of the Company and its subsidiaries hereby grants to Shad Stastney an irrevocable power of attorney to take all action necessary or advisable to effect the delivery, conveyance, transfer and assignment to Newco of the Transferred Assets.  If, following the date hereof, the Company receives or becomes aware that it holds any asset, property or right which constitutes a Transferred Asset, then the Company shall transfer such asset, property or right to Newco and/or, as applicable, one or more designees of Newco as promptly as practicable for no additional consideration.  In furtherance and without limitation of the foregoing, the Company shall use its best efforts and shall take all action necessary to solicit and obtain any approvals, consents, or waivers that may be necessary or appropriate in order to effect the Transactions contemplated hereby.  Each of SLS, Hawk and the Investors hereby irrevocably agrees to execute any written consent and to vote, and to cause their respective affiliates to execute any written consent and to vote, in each case to the extent necessary or requested by the Company or the Investors, all of the

6

shares of capital stock of the Company over which each has voting control in favor of the Transactions contemplated hereby.

## ARTICLE II

## REPRESENTATIONS AND WARRANTIES

2.1     <u>Representations and Warranties</u>.  Each party hereto hereby represents and warrants to all of the other parties hereto as follows:

(a)     The execution, delivery and performance by such party of this Agreement and of the other documents contemplated hereby, to the extent a party thereto, has been duly authorized by all necessary action (subject to receipt by the Company of all of the applicable approvals).  If such party is not an individual, such party is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization or incorporation.

(b)     Such party has the requisite power, authority, legal right and, if such party is an individual, legal capacity, to execute and deliver this Agreement and each of the other documents contemplated hereby, to the extent a party thereto, and to consummate the transactions contemplated hereby and thereby, as the case may be.

(c)     This Agreement and each of the other documents contemplated hereby, to the extent a party thereto, has been duly executed and delivered by such party and constitutes the legal, valid and binding obligation of such party, enforceable against such party in accordance with its terms, subject to (i) the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar laws relating to or affecting creditors' rights generally and (ii) general equitable principles (whether considered in a proceeding in equity or at law).

(d)     Neither the execution, delivery and performance by such party of this Agreement and the other documents contemplated hereby, to the extent a party thereto, nor the consummation by such party of the transactions contemplated hereby, nor compliance by such party with the terms and provisions hereof, will, directly or indirectly (with or without notice or lapse of time or both), (i) if such party is not an individual, contravene or conflict with, or result in a breach or termination of, or constitute a default under (or with notice or lapse of time or both, result in the breach or termination of or constitute a default under) the organizational documents of such party, (ii) constitute a violation by such party of any existing requirement of law applicable to such party or any of its properties, rights or assets or (iii) require the consent or approval of any person or entity, except, in the case of clauses (ii) and (iii), as would not reasonably be expected to be material to the ability of such party to consummate the transactions contemplated by this Agreement.

2.2     Except for the Lawsuit, the Investors represent and warrant to the Company that the Investors have not filed and will not file any complaints, claims, or

7

actions against the Company or any Released Party (as defined in <u>Section **Error! Reference source not found.**</u> below) with any state, federal, or local agency or court.

2.3      Except for the Foreclosure Action, each of SLS, the Company and Hawk represent and warrant to each other party hereto that it has not filed and will not file any complaints, claims, or actions against such other party or any Released Party (as defined in <u>Section **Error! Reference source not found.**</u> below) with any state, federal, or local agency or court.

2.4      The Company represents and warrant to the Investors that it has not filed and will not file any complaints, claims, or actions against the Investors or any Released Party (as defined in <u>Section 3.1</u> below) with any state, federal, or local agency or court. The Company covenants and agrees that it shall not file any complaints, claims, or actions against the Investors or any Released Party with respect to a claim released pursuant to <u>Section 3.1</u> below at any time hereafter.

2.5      The Company represents and warrants that <u>Schedule 2.5</u> of this Agreement sets forth a true, complete and correct capitalization table of the Company including (a) the number and class of shares of capital stock or other equity interests (including, all warrants, options, convertible securities or other similar interests) that are (i) authorized and (ii) issued and outstanding, (b) the class and number of such equity interests held by each record holder thereof, and (c) the identity of each record holder thereof. Except as set forth in <u>Schedule 2.5</u>, there are not issued, reserved for issuance or outstanding, and there are not any outstanding obligations of the Company to issue, deliver or sell, or cause to be issued, delivered or sold, (x) any capital stock or any securities of the Company convertible into or exchangeable or exercisable for shares of capital stock or voting securities of, or other equity interests in, the Company, (y) any warrants, calls, options, phantom stock, stock appreciation rights or other rights to acquire from the Company, or any other obligation of the Company to issue, deliver or sell, or cause to be issued, delivered or sold, any capital stock or voting securities of, or other equity interests in, the Company or (z) any rights issued by, or other obligations of, the Company that are linked in any way to the price of any class of Company capital stock, the value of the Company or any part of the Company or any dividends or other distributions declared or paid on any shares of capital stock of the Company.

2.6      The Company represents and warrants to the Investors, SLS and Hawk that true, complete and correct copies of all contracts material to the business of the Company or any of its subsidiaries or their respective assets, liabilities, operations or prospects, including all amendments, modifications, and supplements thereto have been made available to the Investors, SLS and Hawk as are listed on <u>Schedule 2.6</u> hereto. Each such material contract is valid, binding, enforceable and in full force and effect in all material respects in accordance with its terms with respect to the Company, and to the knowledge of the Company, each other party to such material contracts.

2.7      The Company represents and warrants to the Investors that <u>Schedule 2.7</u> of this Agreement sets forth a true, complete and correct list of (i) all of the

8

creditors of the Company or any of its subsidiaries and (ii) the outstanding obligations owed to each such creditor.

2.8     The Company represents and warrants to the Investors that Schedule 2.8 of this Agreement sets forth the addresses of all of the real property owned, leased (as lessor or lessee), subleased (as sublessor or sublessee), licensed (as licensor or licensee) by the Company or any of its subsidiaries and a true, complete and correct list of all of the leases relating thereto (including all amendments and modifications thereof) as in effect on the date hereof.

2.9     The Company represents and warrants to the Investors that Schedule 2.9 of this Agreement sets forth a true, complete and correct list of all of the machinery, equipment, apparatus, appliances, computers and computer-related hardware, network and internet and information technology systems-related equipment and all other tangible personal property owned or leased by the Company or any of its subsidiaries.

2.10     The Company represents and warrants to the Investors that Schedule 2.10 of this Agreement sets forth a true, complete and correct list of all of the raw materials, work-in process, prototypes, finished goods, supplies, components, packaging materials, and other inventories to which the Company or any of its subsidiaries have title that are in the possession of the Company or any of its subsidiaries or any third party and used or held for use in connection with the business.

2.11     The Company represents and warrants to the Investors that Schedule 2.11 of this Agreement sets forth a true, complete and correct list of all of the intellectual property (including, but not limited to, patents, trademarks, trade secrets, copyrights, internet domain names and all applications for, and registrations of, any of the foregoing) of the Company or any of its subsidiaries.

**ARTICLE III**

**RELEASE OF CLAIMS**

3.1     Company Release of Claims. In consideration for the promises and obligations set forth in this Agreement, and subject to the consummation of the Transactions contemplated by Section 1.1 of this Agreement, the Company and each of its subsidiaries (the "Releasing Parties"), on behalf of themselves and the Released Parties, hereby irrevocably, unconditionally and fully release the Investors, SLS, Hawk and each of their respective heirs, family, and affiliates, and all trusts established by the Investors and the trustees thereof, whether or not such individuals are acting as trustees as of the date hereof, and each of their respective agents, trustees, trust beneficiaries, employees, officers, directors, attorneys, executors, successors, assigns and administrators (the "Released Parties"), from any and all, actual or potential, charges, complaints, claims, counterclaims, actions, causes of action in law or in equity, suits, liens, liabilities, debts due, sums of money, demands, obligations, accountings, damages, punitive damages, losses, costs or expenses, attorneys' fees of any nature whatsoever and liabilities of any kind or nature whatsoever, known or unknown, suspected or

unsuspected, whether arising under state, federal or other law, or based on common law, statutory law, regulations or otherwise (hereinafter referred to as "claim" or "claims"), that the Releasing Parties or any Released Party at any time had or claimed to have or that the Releasing Parties or any Released Party may have or claim to have regarding any matter from the beginning of time up to and including the date of this Agreement and any matter related to the Lawsuit.

3.2    No Admission of Liability.

(a)    *No Admission of Liability by the Releasing Parties or any Released Party.* This Agreement and compliance with this Agreement shall not be construed as an admission by the Releasing Parties or any Released Party of any liability whatsoever, or as an admission by the Releasing Parties or any Released Party of any violations of the rights of the Investors or any person or violation of any order, law, statute, duty, or contract whatsoever against the Investor or any person.

(b)    *No Admission of Liability by the SLS, Hawk or the Investors.* This Agreement and compliance with this Agreement shall not be construed as an admission by the Investors or any Investor Released Party of any liability whatsoever, or as an admission by the Investors or any Investor Released Party of any violations of the rights of the Releasing Parties or any person or violation of any order, law, statute, duty, or contract whatsoever against the Releasing Parties or any person.

3.2    Communication with Government Agency. Nothing in this Agreement in any way interferes with an Investor's or the Company's right and responsibility to give truthful testimony under oath. The releases set forth in this Article III are effective except to the extent prohibited by law.

## ARTICLE IV

## INDEMNIFICATION

4.1    Indemnification. From and after the date hereof, except for the Assumed Liabilities, the Company shall indemnify (on a full indemnity basis), defend and hold harmless SLS, Hawk, the Investors, Newco and each of their affiliates, and each such party's directors, officers, managers, employees, stockholders, representatives, successors and assigns (each, an "Indemnified Party") from and against any and all losses, liabilities, expenses, costs, claims, suits, actions, penalties, judgments, fines and damages resulting from, imposed upon or suffered by any Newco Indemnified Party, arising out of or related to:

(a)    any claims against or liabilities or obligations of the Company or its affiliates and subsidiaries not explicitly assumed hereunder;

(b)    any claims, liabilities or obligations arising out of the Transferred Assets not explicitly assumed hereunder; and

10

(c) any claims, liabilities or obligations brought against the Company, its affiliates and subsidiaries or any Indemnified Party by any equity investor or creditor of the Company and its affiliates and subsidiaries.

## ARTICLE V

## MISCELLANEOUS

5.1     <u>Amendments and Waivers</u>.  This Agreement may be modified, amended or waived only with the written approval of each of the parties hereto.  The failure of any party to enforce any of the provisions of this Agreement shall in no way be construed as a waiver of such provisions and shall not affect the right of such party thereafter or any other party hereto to enforce each and every provision of this Agreement in accordance with its terms.

5.2     <u>Successors and Assigns</u>.  This Agreement shall bind and inure to the benefit of and be enforceable by the parties hereto and their respective successors and permitted assigns.  No rights or obligations under this Agreement may be assigned by any party hereto without the prior written consent of each other party hereto.

5.3     <u>Notices</u>.  All notices, requests and other communications to any party hereunder shall be in writing (including electronic mail ("e-mail") transmission, so long as a receipt of such e-mail is requested and not received by automated response or notice is given on the next business day by alternative means permitted by this <u>Section 5.3</u>).  All such notices, requests, and other communications shall be deemed received on the date of receipt by the recipient thereof if received prior to 5:00 p.m. on a business day in the place of receipt.  Otherwise, any such notice, request or communication shall be deemed to have been received on the next succeeding business day in the place of receipt.  All such notices, requests and other communications to any party hereunder shall be given to such party as follows:

If to the Company and the Company Officers:

Stream TV Networks, Inc.
2009 Chestnut Street
Philadelphia, Pennsylvania 19103
Attention: Raja Rajan
Email: raja@streamtvnetworks.com

with a copy (which shall not constitute notice) by email to:

[●]

If to the Investors:

Alastair Crawford

c/o Adams & Remers LLP
55-58 Pall Mall
London, United Kingdom SW1Y 5JH
Attention: Alastair Crawford
Email: alastair.crawford@gmail.com

with a copy (which shall not constitute notice) by email to:

Skadden, Arps, Slate, Meagher & Flom LLP
920 North King Street
Wilmington, Delaware 19801
Attention: Faiz Ahmad
Email: faiz.ahmad@skadden.com

If to SLS:

SLS Holdings VI, LLC
392 Taylor Mills Road
Marlboro, New Jersey 07746
Attention: Shad Stastney
Email: slstastney@hotmail.com

with a copy (which shall not constitute notice) by email to:

Quarles & Brady
411 E. Wisconsin Avenue, Suite 2400
Milwaukee, Wisconsin 53202-4426
Attention: Jonathan Hackbarth, Esq.
Email: jon.hackbarth@quarles.com

If to Hawk:

Hawk Investment Holdings Limited
Newport House
15 The Grange
St. Peter Port, Guernsey GY1 2QL, Channel Islands
Attention: [●]
Email:a.holt@albanytrustee.com; r.maunder@albanytrustee.com

with a copy (which shall not constitute notice) by email to:

First Sentinel
Attention: Colin Maltby
Email: colin@first-sentinel.com

5.4    Entire Agreement. Except as otherwise expressly set forth herein, this Agreement, together with the other documents contemplated hereby, embodies the complete agreement and understanding among the parties hereto with respect to the subject matter hereof and supersedes and preempts any prior understandings, agreements, or representations by or among the parties, written or oral, that may have related to the subject matter hereof in any way. Each party acknowledges that it is not entering into this Agreement on the basis of or in reliance upon any promise, representation, or warranty other than as explicitly contained in this Agreement. This Agreement shall be valid, binding and enforceable among the parties that have executed this Agreement as between such parties, notwithstanding the failure of any other person expected to be a party to this Agreement to so execute.

5.5    No Third Party Beneficiary. Nothing in this Agreement shall confer any rights, remedies or claims upon any creditors of a party hereto or any other natural person, corporation, company, partnership, association, limited liability company, limited partnership, limited liability partnership, joint venture, business enterprise, trust, or other legal entity not a party or a permitted assignee of a party to this Agreement.

5.6    Governing Law; Jurisdiction; Enforceability. This Agreement shall be governed in all respects by the laws of the State of Delaware, without regard to the conflicts of law rules of such State that would result in the application of the laws of any other State. Each party hereby agrees and consents to be subject to the exclusive jurisdiction of the Court of Chancery of the State of Delaware or, if the Court of Chancery lacks subject matter jurisdiction, any court of the State of Delaware situated in New Castle County or the United States District Court for the District of Delaware in any suit, action, or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby. Each of the parties irrevocably and unconditionally waives any objection to the laying of venue of any action, suit or proceeding arising out of or in connection with this Agreement in the Court of Chancery of the State of Delaware or, if the Court of Chancery lacks subject matter jurisdiction, any court of the State of Delaware situated in New Castle County or the United States District Court for the District of Delaware and hereby further irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such action, suit, or proceeding brought in any such court has been brought in an inconvenient forum, and agrees not to raise any other objection to venue in any such court. It is agreed and understood that monetary damages would not adequately compensate an injured party for the breach of this Agreement, that this Agreement shall be specifically enforceable, and that any breach or threatened breach of this Agreement shall be the proper subject of a temporary or permanent injunction or restraining order. Further, each party hereto waives any claim or defense that there is an adequate remedy at law for such breach or threatened breach.

5.7    WAIVER OF JURY TRIAL. FOR THE AVOIDANCE OF DOUBT, EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

5.8     Counterparts; Facsimile Signatures. This Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which together shall constitute one instrument. This Agreement may be executed by facsimile, e-mail or .pdf format signature(s).

5.9     Other Definitional and Interpretative Provisions. The words "hereof", "herein" and "hereunder" and words of like import used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. The captions herein are included for convenience of reference only and shall be ignored in the construction or interpretation hereof. References to Sections and Exhibits are to Sections and Exhibits of this Agreement unless otherwise specified. All Exhibits annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Exhibit but not otherwise defined therein shall have the meaning as defined in this Agreement. Any singular term in this Agreement shall be deemed to include the plural, and any plural term the singular. Whenever the words "include", "includes", or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation", whether or not they are in fact followed by those words or words of like import. "Writing", "written", and comparable terms refer to printing, typing, and other means of reproducing words (including electronic media) in a visible form. References to any statute shall be deemed to refer to such statute as amended from time to time and to any rules or regulations promulgated thereunder. References to any agreement or contract are to that agreement or contract as amended, modified, or supplemented from time to time in accordance with the terms hereof and thereof. References to any person or entity include the successors and permitted assigns of that person or entity. References from or through any date mean, unless otherwise specified, from and including or through and including, respectively. This Agreement is being entered into between sophisticated parties, each of which or whom has reviewed the Agreement, had the opportunity to discuss it with its, his or her counsel, and is fully knowledgeable about its terms and conditions. The parties therefore agree that this Agreement shall be construed without regard to the authorship of the language and without any presumption or rule of construction in favor of any of them.

5.10    Expenses. Each party shall bear its own expenses in connection with the Transactions contemplated by this Agreement, including costs of their respective attorneys, accountants, investment bankers, brokers, and other representatives.

5.11    Non-Disparagement. In consideration of the transactions contemplated hereunder, each party hereto agrees that, as long as the other parties comply with each of their respective obligations under this Agreement, such party shall not, directly or indirectly, (i) make any public statement concerning the circumstances resulting in the execution of this Agreement or (ii) make comments which are intended to disparage any other party hereto.

5.12    Confidentiality. All information contained herein or related to the contents of this Agreement, including the terms and existence of this Agreement, is

confidential, and shall not be disclosed to anyone including to any stockholder or investor of the Company not a party hereto, other than the parties hereto and their legal or financial advisors who (a) need to know the information to evaluate the Transactions or perform their respective obligations hereunder and (b) are bound to keep such information confidential, unless disclosure is expressly required in order to comply with, law, regulatory authority or judicial, legal or regulatory process, or in order to enforce a party's rights hereunder, in which case the other parties shall be notified in advance to the extent practicable and permitted by law.

[Signature Page to Follow.]

IN WITNESS WHEREOF, the parties hereto have executed this Omnibus Agreement as of the date first above written.

**STREAM TV NETWORKS, INC.**

By: _____

Name: Asaf Gola
Title: Authorized Signatory

By: _____

Name:
Title:

**SLS HOLDINGS VI, LLC**

By: _____

Name:   Shad L. Stastney
Title:   Managing Member

**HAWK INVESTMENT HOLDINGS LIMITED**

By: _____

Name:
Title:

[Signature Page to the Omnibus Agreement]

IN WITNESS WHEREOF, the parties hereto have executed this Omnibus Agreement as of the date first above written.

**STREAM TV NETWORKS, INC.**

By: _____

    Name:

    Title:

By: _____

    Name: KEVIN JOHN GOLLOP

    Title: AUTHORIZED SIGNATORY.

**SLS HOLDINGS VI, LLC**

By: _____

    Name:

    Title:

**HAWK INVESTMENT HOLDINGS LIMITED**

By: _____

    Name:

    Title:

IN WITNESS WHEREOF, the parties hereto have executed this Omnibus Agreement as of the date first above written.

**STREAM TV NETWORKS, INC.**

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

**SLS HOLDINGS VI, LLC**

By: _____
    Name:
    Title:

**HAWK INVESTMENT HOLDINGS LIMITED**

By: _____
    Name: EMMA MCINTOSH & LEE MEALING
    Title: AUTHORISED SIGNATORIES FOR ALBANY DIRECTORS LIMITED AS SOLE DIRECTOR OF HAWK INVESTMENT HOLDINGS LIMITED

[Signature Page to the Omnibus Agreement]

**Signed for and behalf of the Investors
listed in Annex I**

_____
Alastair Crawford

_____
Robert Petch

_____
Patrick Miles

## ANNEX I

## <u>INVESTORS</u>

Adam Bidwell
Adrian Conrad Holmes
Alan Wood
Alastair Duncan Hadfield Crawford
Amlin Investments Ltd.
Andrew Charles Finnemore Capon
Andrew Mark Slinger
Anthony Wigram
Batten Trustee Ltd. As Trustee of the Arrow Trust
Broughton Ltd.
Charles J. Caminada
Charles William David Birchall
David Taylor
DEAR SPA
Keith Owen Claude Merrick
Eamonn Manson
Edward Napier Tremayne Miles
Framse Holding GmbH
Guy Henry Toller
Reyker Nominees Limited
Hadron Master Fund
Hallfield Holdings SA
Hanson Holdings Lux S.a.r.l.
Guy H.A. Chisenhale-Marsh
Jacopo Franzan
Keith Gordon Marsden
Keith Young
Lapis Ventures SAC Limited
Leman Management Nominees Limited
Leonardo Zampatti
Londer Securities S.A.
Mark Andrew Vully De Candole
Mark Dyer
Joel Pace Kallan
Michael Haggiag Family Trust u/a dtd 1/6/2014
Hugh Rokeby Holland
Nicholas P Wentworth-Stanley
Oliroma Holdings SRL
Patrick Miles
Pepper Grove Holdings Limited
Kathryn Toller
Pershing Nominees Ltd. a/c CCCLT

[Exhibit A]

Puddles 2 Limited
Richard F.B. Milligan-Manby
Rupert Corfield
S F Booth
Tarlton Parsons
Timothy D.K. Simond
Tracy Anne Pernice
Victoria Alice Slinger
Walmer Capital Limited
Windsor International Corporation

**ANNEX II**

**RELEASED EMPLOYEES**

To be provided

## LETTER AGREEMENT

AGREEMENT (this "Agreement"), dated as of May 6, 2020, by and among SLS Holdings VI, LLC, a Delaware limited liability company ("SLS"),  Hawk Investment Holdings Limited, an entity registered in Guernsey ("Hawk"), and certain equity investors of the Company listed on Annex I attached hereto (each an "Investor" and collectively, the "Investors").

WHEREAS, of even date herewith, the parties hereto have also executed that certain OMNIBUS AGREEMENT (the " Omnibus Agreement"), dated as of May 6, 2020, by and among Stream TV Networks, Inc., a Delaware corporation (the "Company"), SLS Holdings VI, LLC, a Delaware limited liability company ("SLS"), Hawk Investment Holdings Limited, an entity registered in Guernsey ("Hawk"), and certain equity investors of the Company listed on Annex I attached hereto (each an "Investor" and collectively, the "Investors").  All terms not defined herein shall be used according to their definitions in the Omnibus Agreement.

WHEREAS, the parties hereto wish to agree among themselves to certain additional matters related to the Omnibus Agreement, and on which their execution of the Omnibus Agreement is conditioned; and

WHEREAS, the parties desire to memorialize in this Agreement the terms and conditions of certain other actions to be performed by the parties, and this Agreement shall govern the respective rights and obligations of the parties in connection with such actions.

## ARTICLE I

## THE TRANSACTIONS

1.1    Transactions.  Subject to the terms and conditions set forth herein, and on the basis of and in reliance upon the representations, warranties, covenants and agreements set forth herein, the parties hereto shall promptly take the actions described in this Section 1.1 in addition to all such transactions to be taken by each of them pursuant to the Omnibus Agreement (each, a "Transaction" and, collectively, the "Transactions"):

(a)    SLS and Hawk shall form Newco in accordance with the applicable laws of its jurisdiction of formation.  Newco shall issue (i) a promissory note to SLS as provided in Annex II, and (ii) a promissory note to Hawk as provided in Annex II.  The holders of such promissory notes shall jointly determine the size and composition of the initial Board of Directors of Newco, and shall name the initial executive officers of Newco.  Each promissory note issued by Newco referenced in clauses (i) and (ii) above shall have such other terms and conditions as set forth on Annex II.

(b)    Hawk shall receive 40,000,000 shares of Class A Common Stock of the Company in respect of any and all foregone accrued interest, penalties and

fees (including placement, brokerage, finder's or similar fees) applicable to the Hawk Notes (the "<u>Hawk Issuance</u>").  Immediately following the Hawk Issuance, Hawk shall be entitled to exchange its shares of Class A Common Stock of the Company for a pro rata portion of the common shares or equity interests of Newco on the terms and conditions as set forth on <u>Annex II</u>.

(c)  SLS shall receive 4,000,000 shares of Class A Common Stock of the Company in respect of any and all foregone accrued interest, penalties and fees (including placement, brokerage, finder's or similar fees) applicable to the SLS Notes (the "<u>SLS Issuance</u>").  Immediately following the SLS Issuance, SLS shall be entitled to exchange its shares of Class A Common Stock of the Company for a pro rata portion of the common shares or equity interests of Newco on the terms and conditions as set forth on <u>Annex II</u>.

(d)  In consideration of the Investors signing the Omnibus Agreement the Investors shall receive (i) 4,000,000 shares of Class A Common Stock of the Company, and (ii) 2,000,000 warrants of the Company, with a three-year term and a strike price of $1.00 per common share, in respect of any and all legal or other fees and expenses incurred in connection with the Lawsuit or the transactions contemplated hereby (the "Investor Issuance").  Immediately following the Investor Issuance, each Investor shall be entitled to exchange its shares of Class A Common Stock of the Company for a pro rata portion of the common shares or equity interests of Newco as on the terms and conditions as set forth on <u>Annex II; provided, however,</u> that the warrants included in the Investor Issuance shall be carried over in exactly the same number and terms.

1.2  <u>Investors' Expenses</u>.  Each of the Investors has funded or agreed to fund a pro rata portion of the fees and expenses related to the Lawsuit, this Agreement and the Transactions pursuant to one or more Inter-Party Agreements among the Investors. Each of the Investors, SLS, Hawk and Newco hereby agree that all such amounts shall constitute contributions made by such Investors to Newco respectively on the same terms and conditions and in exchange for notes of the same term and tenor as those to be issued by Newco to SLS and Hawk; provided, however, that any Investor may choose to instead forego all or a portion of such note in exchange for and in satisfaction of any future subscription for shares of Newco.

## ARTICLE II

## REPRESENTATIONS AND WARRANTIES

2.1  <u>Representations and Warranties</u>.  Each party hereto hereby represents and warrants to all of the other parties hereto as follows:

(a)  The execution, delivery and performance by such party of this Agreement and of the other documents contemplated hereby, to the extent a party thereto, has been duly authorized by all necessary action (subject to receipt by the Company of all of the applicable approvals).  If such party is not an individual, such party

is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization or incorporation.

(b)    Such party has the requisite power, authority, legal right and, if such party is an individual, legal capacity, to execute and deliver this Agreement and each of the other documents contemplated hereby, to the extent a party thereto, and to consummate the transactions contemplated hereby and thereby, as the case may be.

(c)    This Agreement and each of the other documents contemplated hereby, to the extent a party thereto, has been duly executed and delivered by such party and constitutes the legal, valid and binding obligation of such party, enforceable against such party in accordance with its terms, subject to (i) the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar laws relating to or affecting creditors' rights generally and (ii) general equitable principles (whether considered in a proceeding in equity or at law).

(d)    Neither the execution, delivery and performance by such party of this Agreement and the other documents contemplated hereby, to the extent a party thereto, nor the consummation by such party of the transactions contemplated hereby, nor compliance by such party with the terms and provisions hereof, will, directly or indirectly (with or without notice or lapse of time or both), (i) if such party is not an individual, contravene or conflict with, or result in a breach or termination of, or constitute a default under (or with notice or lapse of time or both, result in the breach or termination of or constitute a default under) the organizational documents of such party, (ii) constitute a violation by such party of any existing requirement of law applicable to such party or any of its properties, rights or assets or (iii) require the consent or approval of any person or entity, except, in the case of clauses (ii) and (iii), as would not reasonably be expected to be material to the ability of such party to consummate the transactions contemplated by this Agreement.

## ARTICLE III

## MISCELLANEOUS

3.1    <u>Amendments and Waivers</u>.  This Agreement may be modified, amended or waived only with the written approval of each of the parties hereto.  The failure of any party to enforce any of the provisions of this Agreement shall in no way be construed as a waiver of such provisions and shall not affect the right of such party thereafter or any other party hereto to enforce each and every provision of this Agreement in accordance with its terms.

3.2    <u>Successors and Assigns</u>.  This Agreement shall bind and inure to the benefit of and be enforceable by the parties hereto and their respective successors and permitted assigns.  No rights or obligations under this Agreement may be assigned by any party hereto without the prior written consent of each other party hereto.

3.3    <u>Notices</u>.  All notices, requests and other communications to any party hereunder shall be in writing (including electronic mail ("e-mail") transmission, so long as a receipt of such e-mail is requested and not received by automated response or notice is given on the next business day by alternative means permitted by this <u>Section 3.3</u>).  All such notices, requests, and other communications shall be deemed received on the date of receipt by the recipient thereof if received prior to 5:00 p.m. on a business day in the place of receipt.  Otherwise, any such notice, request or communication shall be deemed to have been received on the next succeeding business day in the place of receipt. All such notices, requests and other communications to any party hereunder shall be given to such party as follows:

If to the Investors:

Alastair Crawford
c/o Adams & Remers LLP
55-58 Pall Mall
London, United Kingdom SW1Y 5JH
Attention: Alastair Crawford
Email: alastair.crawford@gmail.com

with a copy (which shall not constitute notice) by email to:

Skadden, Arps, Slate, Meagher & Flom LLP
920 North King Street
Wilmington, Delaware 19801
Attention: Faiz Ahmad
Email: faiz.ahmad@skadden.com

If to SLS:

SLS Holdings VI, LLC
392 Taylor Mills Road
Marlboro, New Jersey 07746
Attention: Shad Stastney
Email: slstastney@hotmail.com

with a copy (which shall not constitute notice) by email to:

Quarles & Brady
411 E. Wisconsin Avenue, Suite 2400
Milwaukee, Wisconsin 53202-4426
Attention: Jonathan Hackbarth, Esq.
Email: jon.hackbarth@quarles.com

If to Hawk:

Hawk Investment Holdings Limited
Newport House
15 The Grange
St. Peter Port, Guernsey GY1 2QL, Channel Islands
Attention: [●]
Email:a.holt@albanytrustee.com; r.maunder@albanytrustee.com

with a copy (which shall not constitute notice) by email to:

First Sentinel
Attention: Colin Maltby
Email: colin@first-sentinel.com

       3.4    <u>Entire Agreement</u>.  Except as otherwise expressly set forth herein, this Agreement, together with the other documents contemplated hereby and the Omnibus Agreement, embodies the complete agreement and understanding among the parties hereto with respect to the subject matter hereof and supersedes and preempts any prior understandings, agreements, or representations by or among the parties, written or oral, that may have related to the subject matter hereof in any way. Each party acknowledges that it is not entering into this Agreement on the basis of or in reliance upon any promise, representation, or warranty other than as explicitly contained in this Agreement.  This Agreement shall be valid, binding and enforceable among the parties that have executed this Agreement as between such parties, notwithstanding the failure of any other person expected to be a party to this Agreement to so execute.

       3.5    <u>No Third Party Beneficiary</u>.  Nothing in this Agreement shall confer any rights, remedies or claims upon any creditors of a party hereto or any other natural person, corporation, company, partnership, association, limited liability company, limited partnership, limited liability partnership, joint venture, business enterprise, trust, or other legal entity not a party or a permitted assignee of a party to this Agreement.

       3.6    <u>Governing Law; Jurisdiction; Enforceability</u>.  This Agreement shall be governed in all respects by the laws of the State of Delaware, without regard to the conflicts of law rules of such State that would result in the application of the laws of any other State.  Each party hereby agrees and consents to be subject to the exclusive jurisdiction of the Court of Chancery of the State of Delaware or, if the Court of Chancery lacks subject matter jurisdiction, any court of the State of Delaware situated in New Castle County or the United States District Court for the District of Delaware in any suit, action, or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby.  Each of the parties irrevocably and unconditionally waives any objection to the laying of venue of any action, suit or proceeding arising out of or in connection with this Agreement in the Court of Chancery of the State of Delaware or, if the Court of Chancery lacks subject matter jurisdiction, any court of the State of Delaware situated in New Castle County or the United States District Court for the District of Delaware and hereby

5

further irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such action, suit, or proceeding brought in any such court has been brought in an inconvenient forum, and agrees not to raise any other objection to venue in any such court.  It is agreed and understood that monetary damages would not adequately compensate an injured party for the breach of this Agreement, that this Agreement shall be specifically enforceable, and that any breach or threatened breach of this Agreement shall be the proper subject of a temporary or permanent injunction or restraining order.  Further, each party hereto waives any claim or defense that there is an adequate remedy at law for such breach or threatened breach.

3.7    WAIVER OF JURY TRIAL.  FOR THE AVOIDANCE OF DOUBT, EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

3.8    Counterparts; Facsimile Signatures.  This Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which together shall constitute one instrument.  This Agreement may be executed by facsimile, e-mail or .pdf format signature(s).

3.9    Other Definitional and Interpretative Provisions.  The words "hereof", "herein" and "hereunder" and words of like import used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. The captions herein are included for convenience of reference only and shall be ignored in the construction or interpretation hereof.  References to Sections and Exhibits are to Sections and Exhibits of this Agreement unless otherwise specified.  All Exhibits annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any capitalized terms used in any Exhibit but not otherwise defined therein shall have the meaning as defined in this Agreement.  Any singular term in this Agreement shall be deemed to include the plural, and any plural term the singular.  Whenever the words "include", "includes", or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation", whether or not they are in fact followed by those words or words of like import.  "Writing", "written", and comparable terms refer to printing, typing, and other means of reproducing words (including electronic media) in a visible form. References to any statute shall be deemed to refer to such statute as amended from time to time and to any rules or regulations promulgated thereunder.  References to any agreement or contract are to that agreement or contract as amended, modified, or supplemented from time to time in accordance with the terms hereof and thereof. References to any person or entity include the successors and permitted assigns of that person or entity.  References from or through any date mean, unless otherwise specified, from and including or through and including, respectively.  This Agreement is being entered into between sophisticated parties, each of which or whom has reviewed the Agreement, had the opportunity to discuss it with its, his or her counsel, and is fully knowledgeable about its terms and conditions. The parties therefore agree that this

Agreement shall be construed without regard to the authorship of the language and without any presumption or rule of construction in favor of any of them.

      5.10    <u>Expenses</u>.  Except as set forth in <u>Section 1.2</u> above, each party shall bear its own expenses in connection with the Transactions contemplated by this Agreement, including costs of their respective attorneys, accountants, investment bankers, brokers, and other representatives.

      5.11    <u>Non-Disparagement</u>.  In consideration of the transactions contemplated hereunder, each party hereto agrees that, as long as the other parties comply with each of their respective obligations under this Agreement, such party shall not, directly or indirectly, (i) make any public statement concerning the circumstances resulting in the execution of this Agreement or (ii) make comments which are intended to disparage any other party hereto.

      5.12    <u>Confidentiality</u>.  All information contained herein or related to the contents of this Agreement, including the terms and existence of this Agreement, is confidential, and shall not be disclosed to anyone including to any stockholder or investor of the Company not a party hereto, other than the parties hereto and their legal or financial advisors who (a) need to know the information to evaluate the Transactions or perform their respective obligations hereunder and (b) are bound to keep such information confidential, unless disclosure is expressly required in order to comply with, law, regulatory authority or judicial, legal or regulatory process, or in order to enforce a party's rights hereunder, in which case the other parties shall be notified in advance to the extent practicable and permitted by law.

      [Signature Page to Follow.]

IN WITNESS WHEREOF, the parties hereto have executed this Omnibus Agreement as of the date first above written.

**SLS HOLDINGS VI, LLC**

By: _____
    Name:   Shad L. Stastney
    Title:
        Managing Member

**HAWK INVESTMENT HOLDINGS LIMITED**

By: _____
    Name:
    Title:

IN WITNESS WHEREOF, the parties hereto have executed this Omnibus Agreement as of the date first above written.

**SLS HOLDINGS VI, LLC**

By: _____
    Name:
    Title:

**HAWK INVESTMENT HOLDINGS LIMITED**

By: _____
    Name: EMMA MCINTOSH + LEE MCFLUNG
    Title: AUTHORISED SIGNATORIES FOR
    ALBANY DIRECTORS LIMITED AS SOLE
    DIRECTOR OF HAWK INVESTMENT
    HOLDINGS LIMITED

[Signature Page to the Omnibus Agreement]

Signed for and behalf of the Investors
listed in Annex I


Alastair Crawford


Robert Petch


Patrick Miles

# Annex I

| Holder ID | Investor Name | Gross Investment | Class A Common | Series B Preferred | Warrants* | Options | Voting Only (B) Shares Paid |
|---|---|---|---|---|---|---|---|
| 16666 | Adam Bidwell | $26,666 | 24,666 | | 19,256 | | Adam Richard Bidwell |
| 16664 | Adrian Conrad Holmes | $705,000 | 323,333 | | 696,851 | | Adrian Conrad Holmes |
| 16695 | Alan Wood | $16,666 | 33,333 | | 71,666 | | Alan James Wood |
| 16653 | Alastair Duncan Hadfield Crawford | $1,232,640 | 1,131,806 | | 1,366,672 | | Alastair Duncan Hadfield Crawford |
| 16633 | Aptia Investments Ltd | $705,000 | 196,666 | | 423,208 | | Aptia Investments Limited |
| 16661 | Andrew Charles Finnemore Capoo | $56,666 | 33,333 | | 26,875 | | Andrew Charles Finnemore Capoo |
| 16658 | Andrew Mark Slinger | $26,666 | 26,666 | | 200,660 | | Andrew Mark Slinger |
| 16644 | Anthony Wigram | $146,666 | 97,336 | | 208,575 | | Anthony Francis Wigram |
| 16630 | Bolton Trustee Ltd as Trustee of the | $406,666 | 306,666 | | 931,335 | | Bolton Trustee Limited as Trustee of the Arrow Trust |
| 16656 | Broughton Ltd. | $166,250 | 78,535 | | $10,607 | | Broughton Limited |
| 16655 | Charles J Quesnada | $196,666 | 166,666 | | 88,625 | | Charles (Charlie) Jerome Quesnada |
| 16664 | Charles William David Birchall | $2,300,000 | 1,532,330 | | 4,463,332 | | Charles William David (Bill) Birchall |
| 16637 | David Taylor | $200,000 | 200,000 | | 102,386 | | David Anthony Taylor |
| 16676 | DEAR SPA | $300,000 | 66,667 | | 320,335 | | Dear Spa |
| 16636 | Keith Owen Claude Morrish | $400,000 | 304,666 | | 471,400 | | Keith Owen Claude Morrish |
| 16635 | Eastena Maesen | $464,666 | 334,817 | | 269,075 | | Eastena George Maesen |
| 16668 | Edward Hector Tranayne Miles | $44,320 | 29,300 | | 152,720 | | Edward Hector Tranayne Miles |
| 16639 | Frames Holding GmbH | $615,000 | 343,382 | | 1,385,750 | | Frames Holding GmbH |
| 16662 | Guy Henry Teller | $76,666 | 38,666 | | 102,620 | | Guy Henry Teller |
| 16640 | Raylon Nominees Limited | $303,277 | 200,184 | | 252,586 | | Clareyod Wealth Limited |
| 16690 | Hedron Master Fund | $3,000,000 | 2,000,666 | | 5,746,602 | | Hedron Master Fund |
| 16631 | Hallfield Holdings SA | $2,300,000 | 833,334 | | 1,336,400 | | Hallfield Holdings S.A. |
| 16654 | Hanson Holdings Lux S.à r.l. | $300,000 | 66,667 | | 53,750 | | Arlington Holdings Luxembourg zlist |
| 16633 | Guy H.A. Chisonholy-Marsh | $355,666 | 170,000 | | 331,335 | | Guy Chisonholy-Marsh |
| 16637 | Jacopo Prosuno | $50,000 | 33,333 | | 105,406 | | Jacopo Prosuno |
| 16664 | Keith Gordon Marsden | $306,321 | 306,364 | | 141,335 | | Keith Marsden |
| 16696 | Keith Young | $250,000 | 123,300 | | - | | Keith Young |
| 16626 | Lapis Ventures SAC Limited | $250,600 | 166,667 | | 125,000 | | Lapis Ventures LAC Limited |
| 16641 | Loman Management Nominees Ltr | $300,000 | 130,333 | | 166,666 | | Loman Management Nominees Limited |
| 16636 | Leonardo Zampatti | $300,000 | 333,333 | | 250,880 | | Leonardo Valentino Zampatti |
| 16646 | Leader Securities S.A. | $600,000 | 333,353 | | 256,256 | | Leader Investments S. A. |
| 16667 | Mark Andrew Vully De Candole | $400,000 | 216,667 | | 162,306 | | Mark Andrew Vully De Candole |
| 16636 | Mark Dyer | $406,624 | 267,340 | | 235,500 | | Mark William Barry Galloway Dyer |
| 16666 | Joel Pace Kalon | $300,000 | 66,667 | | 300,335 | | Joel Pace Kalon |
| 16636 | Michael Hogging Family Trust u/a d | $325,000 | 216,667 | | 475,869 | | The Michael Hogging Family Trust |
| 16630 | Hugh Ralaeby Holland | $75,000 | 50,000 | | 62,709 | | Hugh Raleby Holland |
| 16648 | Nicholas P Wentworth-Stanley | $75,001 | 50,000 | | 62,709 | | Nicholas Philip Wentworth-Stanley |
| 16666 | Oltrano Holdings SRL | $75,000 | 50,000 | | 356,660 | | Oltrano Holding Srl |
| 16639 | Patrick Miles | $75,600 | 50,000 | | 365,000 | | Patrick (Paddy) William Miles |
| 16686 | Pepper Grove Holdings Limited | $1,366,511 | 736,604 | | 1,360,795 | | Pepper Grove Holdings Limited |
| 16667 | Kathryn Teller | $67,500 | 45,000 | | 207,000 | | Kathryn Teller |
| 16676 | Pershing Nominees Ltd a/c CCCLT | $2,940,135 | 1,467,694 | | 1,253,450 | | RON GRANGER WILLIAMS |
| 16625 | Puddles 2 Limited | $1,733,662 | 706,337 | | 71,697 | | Puddles II Limited |
| 16632 | Richard F.B. Milligan-Manby | $50,000 | 33,333 | | 26,674 | | Richard Milligan-Manby |
| 16632 | Rupert Corfield | $300,000 | 20,000 | | | | Rupert John Greyngham Corfield |
| 16696 | S F Booth | $213,310 | 87,683 | | 10,600 | | Simon Frank Booth |
| 16637 | Tarlton Parsons | $300,000 | 47,667 | | - | | Tarlton (Terry) Fleming Parsons III |
| 16638 | Timothy D.K. Smond | $292,500 | 195,000 | | 643,654 | | Timothy David Kyrle Smond |
| 16646 | Tracy Anne Pernice | $25,000 | 16,667 | | 35,694 | | Tracy Anne Pernice |
| 16664 | Victoria Alice Slinger | $30,000 | 20,000 | | 308,000 | | Victoria Alice Slinger |
| 16663 | Walmar Capital Limited | $53,125 | 35,417 | | 331,360 | | Walmar Capital Limited |
| 16632 | Windsor International Corporation | $600,000 | 400,000 | | 2,000,000 | | Windsor International Corporation |
| | **Total** | **$23,518,636** | **14,682,730** | | **20,300,303** | | |

## ANNEX II

## NEWCO CAPITALIZATION TERMS AND CONDITIONS

- <u>Incorporation</u>.  Newco shall be incorporated as a Delaware entity.

- <u>Bylaws</u>.  Newco shall be governed by bylaws or an operating agreement (the "<u>Bylaws</u>") in form and substance reasonably and mutually satisfactory to the Parties and shall include customary minority shareholder protections including tag along rights and pre-emption rights.

- <u>Board of Managers</u>.  With respect to the management of Newco, the Bylaws shall provide, among other things:
    - o Newco shall be managed by a board of directors (the "<u>Board</u>").
    - o The Board shall initially consist of three (3) persons.
    - o SLS shall have the power to nominate not more than one (1) person to the Board (who shall be the Executive Chairman of the Board).
    - o Hawk shall have the power to nominate not more than two (2) persons to the Board (one of whom shall be the Chief Executive Officer of Newco).
    - o Each of the Executive Chairman and the Chief Executive Officer of Newco shall earn an annual salary of not more than $250,000 per year (unless otherwise agreed to by the unanimous consent of the Board).

- <u>Business Plan.</u> The board will provide a detailed business plan to all parties within 30 days of incorporation including a pro-forma balance sheet.

## CONTRIBUTION AND EXCHANGE

- <u>Contribution of SLS Obligations</u>.

    - o Simultaneously upon the formation of Newco as described in Section 2(a), SLS shall contribute to Newco all of the outstanding SLS Obligations as of the date of the formation of Newco (the "Formation Date"), including all accrued but unpaid interest, fees and expenses allowable under the SLS documentation through such date (the "<u>SLS Contributed Obligations</u>").

    - o In exchange for the contribution of the SLS Contributed Obligations, SLS shall receive from Newco: (i) a secured promissory note, executed by Newco in favor of SLS, maturing on the date that is three (3) years following its execution, in a principal amount equal to the total amount of the net amount funded in cash by SLS to StreamTV (the "SLS Net Funded Amount") and bearing interest at 3.00% per annum (the "<u>New SLS Note</u>"); (ii) Common Stock of Newco in an amount equal to its current StreamTV common shares, plus a number of common shares as set forth in Section

1.1(g) hereof, and  (iii) Warrants of Newco in an amount equal to SLS's current Warrants issued to it by StreamTV on the terms described below.

- Contribution of Hawk Obligations.

  o Simultaneously upon the formation of Newco as described in <u>Section 2(a)</u>, Hawk shall contribute to Newco all of the outstanding Hawk Obligations as of the Formation Date, including all accrued by unpaid interest, fees and expenses allowable under the Hawk documentation through such date (the "<u>Hawk Contributed Obligations</u>"; and, together with the SLS Contributed Obligations, the "<u>Contributed Obligations</u>").

  o In exchange for the contribution of the Hawk Contributed Obligations, Hawk shall receive from Newco: (i) a secured promissory note, executed by Newco in favor of Hawk, maturing on a date that is three (3) years following its execution, in a principal amount equal to the total amount of the net amount funded in cash by Hawk to StreamTV (the "Hawk Net Funded Amount"), and bearing interest at 3.00% per annum (the "<u>New Hawk Note</u>"); (ii) Common Stock of Newco in an amount equal to Hawk's current share ownership of Newco, plus a number of common shares equal to the number of common shares as set forth in Section 1.1(f) hereof; and (iii) Warrants of Newco in an amount equal to Hawk's current Warrants issued to it by StreamTV on the terms described below.

- <u>Pari Passu</u>.  Any and all of the liens and security interests granted to SLS and Hawk in connection with the New SLS Note and New Hawk Note, respectively, shall be of equal priority and rank *pari passu* in all respects.

- <u>Conversion Option</u>.  Each of the New SLS Note and New Hawk Note shall be convertible at any time by the holder thereof into such number of common units of Newco at the greater of (i) $1.50 per common share, or (ii) the same terms and conditions as the most recent offering by the Company (the "<u>Conversion Option</u>"); <u>provided</u>, <u>however</u>, that in the case of (ii), the amount convertible by each of SLS and Hawk in respect to any particular offering shall be no greater than the total amount of such offering.  The New SLS Note and New Hawk Note may be converted in whole or in part from time to time.    Other terms and conditions of the Conversion Option shall be set forth in the definitive documentation governing the New SLS Note and New Hawk Note, and the terms of the Conversion Option shall be identical as to the New SLS Note and the New Hawk Note.

- <u>Amendments to the New SLS Note and the New Hawk Note</u>.  No amendment, modification or other change may be made to any of the terms and conditions contained in, and no action may be made by either SLS or Hawk to enforce, the New SLS Note or the New Hawk Note without the unanimous written consent of both SLS and Hawk.

- <u>Additional Shareholders</u>.  Promptly following the Formation Date, SLS and Hawk shall be issued shares in Newco equal to their previously-issued shares and warrants in the Company, and shall cause Newco to offer to all other shareholders of Stream TV as of the date Newco is incorporated (including the Investors as per Annex I and other than, for the avoidance of doubt, any person or entity affiliated with Mathu and/or Raja Rajan, or any such other party as deemed necessary by both SLS and Hawk, and any affiliated entities) for subscription Common Stock and Warrants at a price of $0.00 per share of Common Stock  (with no additional payment for a number of such Stream TV shareholders' associated  Warrants pro rata to the number of  its shares so  purchased),  and otherwise on the terms and conditions set forth herein, but only upon the execution and delivery by each such shareholder of a release for the benefit of the Investors, SLS and Hawk, on terms and conditions mutually agreeable to each of the Investors, SLS and Hawk; provided, however, that the issued and outstanding shares of Common Stock (following any issuances pursuant to this <u>Section 2(g)</u>), may not exceed 150,000,000 shares.

- <u>Warrant Terms</u>.

  - 1/2 of Warrants exercisable at $1.00/share with a maturity date 3 months after the Formation Date
  - 1/2 of Warrants exercisable at $1.50/share with a maturity date 12 months after the formation date.
  - Warrant holders to have the option prior to maturity of  any option to exchange any 6 such warrants for 1 warrant with the same strike price, expiring 3 years from the date of original issuance

- <u>Shareholders  Agreement</u>.     Subject to  final  terms set  forth  in definitive documentation, each shareholder shall, as part of  its subscription for shares  or otherwise, enter into a Shareholders Agreement that shall govern the material terms of ownership of Newco, including but not limited to control of Newco, protections from anti-dilution and transferability of shares.

**EXHIBIT 2**

Corporate Structure:
*Ultra-D Coöperatief U.A.*
*SeeCubic B.V.*
*Stream TV International B.V.*



**EXHIBIT 3**

## STOCK TRANSFER AND POWER

**FOR VALUE RECEIVED**, effective as of September 4, 2020, in accordance with Section 1.1 of that certain Omnibus Agreement, dated as of May 6, 2020, by and among Stream TV Networks, Inc., a Delaware corporation ("Stream TV"), SLS Holdings VI, LLC, a Delaware limited liability company ("SLS"), Hawk Investment Holdings Limited, an entity registered in Guernsey, and certain equity investors of Stream TV (the "Omnibus Agreement"), Stream TV hereby, in each case to the extent such action was not validly completed at an earlier date, irrevocably conveys, transfers, delivers and assigns all of the issued and outstanding shares of Common Stock, par value $0.001 per share, of TechnoVative Media Inc., a Delaware corporation (the "Company") to SeeCubic, Inc., a Delaware corporation, and does hereby irrevocably constitute and appoint Shad Stastney as the Company's attorney-in-fact to transfer the foregoing on the books of the Company, with full power of substitution and re-substitution, hereby ratifying and confirming all that said attorney shall lawfully do by virtue hereof.

Dated: September 4, 2020

_____
Shad Stastney
Pursuant to irrevocable power of attorney granted by Stream TV and its subsidiaries pursuant to Section 1.4 of the Omnibus Agreement, and solely in such capacity

# ACTION BY WRITTEN CONSENT

## OF

## THE BOARD OF DIRECTORS

## OF

## TECHNOVATIVE MEDIA INC.

### Effective as of September ⊣, 2020 (the "<u>Effective Date</u>")

The undersigned, being all of the members of the Board of Directors (the "<u>Board</u>") of TechnoVative Media Inc., a Delaware corporation (the "<u>Corporation</u>"), acting pursuant to Section 141(f) of the Delaware General Corporation Law, do hereby consent to the adoption of, and does hereby adopt, the following resolutions as if they were adopted at a duly convened meeting of the Board and direct that this action by written consent be filed with the minutes of the proceedings of the Board:

## <u>Transfer of Corporation Shares</u>

**WHEREAS**, Stream TV Networks, Inc., a Delaware corporation ("<u>Stream TV</u>") entered into that certain Omnibus Agreement, dated as of May 6, 2020, by and among Stream TV, SLS Holdings VI, LLC, a Delaware limited liability company ("<u>SLS</u>"), Hawk Investment Holdings Limited, an entity registered in Guernsey, and certain equity investors of Stream TV (the "<u>Omnibus Agreement</u>"), pursuant to which Stream TV agreed to irrevocably convey, transfer, deliver and assign all of its assets described therein, including, but not limited to, the issued and outstanding shares of common stock, par value $0.001 per share, of the Corporation (the "<u>Common Shares</u>");

**WHEREAS**, on or about May 10, 2020, the Resolution Committee of the board of directors of Stream TV (the "<u>Stream Committee</u>"), adopted resolutions (the "<u>May 10 Resolutions</u>") whereby the Stream Committee resolved that ownership of all subsidiaries of Stream TV were transferred to SLS on behalf of the counterparties to the Omnibus Agreement, to be accomplished by endorsing and transferring in full for no additional consideration that certain certificate 001 representing ownership of all of the outstanding Common Shares;

**WHEREAS**, following adoption of the May 10 Resolutions, Stream TV did not provide evidence that it had endorsed and transferred certificate 001 of the Corporation to SLS; and

**WHEREAS**, effective as of the date of these resolutions, all of the Common Shares have been transferred, conveyed, delivered and assigned to SeeCubic, Inc., a Delaware corporation pursuant to that certain Stock Transfer and Power executed by Stream TV and effecting the transfer

of shares of capital stock of the Corporation contemplated by the Omnibus Agreement (the "Stock Transfer and Power"); and

**WHEREAS**, pursuant to the Stock Transfer and Power, SeeCubic, Inc. is the sole stockholder of the Corporation as of the date hereof.

**NOW, THEREFORE, BE IT RESOLVED**, that any certificate representing shares of capital stock of the Corporation issued prior to the date of these resolutions, including certificate 001 of the Corporation, be and they hereby are, cancelled and void in all respects; and

**FURTHER RESOLVED**, that SeeCubic, Inc. be and it hereby is reflected in the Corporation's books and records as the sole stockholder of the Corporation.

**Amended and Restated Bylaws**

**WHEREAS**, it is contemplated that the Corporation adopt those certain Amended and Restated Bylaws of the Corporation, substantially in the form attached hereto as Exhibit A (the "A&R Bylaws"); and

**WHEREAS**, the Board has determined that it is advisable and in the best interest of the Corporation to approve and adopt the A&R Bylaws, substantially in the form attached hereto as Exhibit A.

**NOW, THEREFORE, BE IT RESOLVED**, that the form, terms and provisions of the A&R Bylaws, substantially in the form attached hereto as Exhibit A, be, and they hereby are, authorized, approved and adopted in all respects, in the name and on behalf of the Corporation, the A&R Bylaws, substantially in the form attached hereto as Exhibit A.

**Removal of Officers; Appointment of Officer**

**WHEREAS**, the Board wishes to remove all current officers of the Corporation as of the Effective Date of these resolutions; and

**WHEREAS**, the Board wishes to appoint Shad Stastney as an officer of the Corporation as of the Effective Date of these resolutions.

**NOW, THEREFORE, BE IT RESOLVED**, that all current officers, be and they hereby are removed as officers of the Corporation, as of the Effective Date of these resolutions; and

**FURTHER RESOLVED**, that Shad Stastney, be and he hereby is appointed as an officer of the Corporation, as of the Effective Date of these resolutions; and

**General Authorizations**

**FURTHER RESOLVED**, that any officer of the Corporation, on behalf of the Corporation (each such person, acting jointly or independently, being an "Authorized Person") be, and each of them hereby is, authorized and directed to take or cause to be taken, in the name of the

Corporation and on its behalf, all such further actions as are necessary in order to carry out and implement the foregoing resolutions; and

**FURTHER RESOLVED**, that any and all lawful actions previously taken by any Authorized Person, to the extent subsequently authorized by the foregoing resolutions, hereby are adopted, ratified, confirmed and approved in all respects as and for the acts and deeds of the Corporation; and

**FURTHER RESOLVED**, that any number of counterparts of this action by written consent may be executed by facsimile or other electronic delivery, and, upon such execution, shall have the same force and effect as an original and that each counterpart will be deemed to be an original instrument and all counterparts taken together will constitute one and the same action by written consent.

**[SIGNATURE PAGE FOLLOWS]**

**IN WITNESS WHEREOF**, the undersigned, being all of the members of the Board of Directors of TechnoVative Media Inc., have executed this written consent as of the date first above written.

_____
Shad Stastney

[Signature Page to Action by Written Consent (TechnoVative Media Inc.)]