## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | | |
| Stream TV Networks, Inc. | : | Case No. 21-10433(KBO) |
| | : | |
| Debtor. | : | **Hearing: April 15, 2021 at 1:00 p.m.** |
| | : | **Objection Deadline: April 2, at 12:00 p.m.** |

## DEBTOR'S RESPONSE IN OPPOSITION TO (i) THE MOTION OF SEECUBIC, INC. AND SLS HOLDINGS VI, LLC FOR AN ORDER DISMISSING DEBTOR'S CHAPTER 11 CASE AND (ii) THE UNITED STATES TRUSTEE'S MOTION FOR AN ORDER DISMISSING OR CONVERTING THE CASE TO CHAPTER 7

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND .................................................................................................................... 3

    A.   Corporate History and Related Entities. .......................................................... 3

    B.   The Omnibus Agreement. .................................................................................. 5

    C.   Prepetition Litigation. ........................................................................................ 7

    D.   Bankruptcy. ........................................................................................................ 7

JURISDICTION .................................................................................................................... 8

DISCUSSION ....................................................................................................................... 8

    I.     The Bankruptcy Case Was Properly Commenced .................................. 8

    II.    The Bankruptcy Code Provides a Debtor with Tools to Achieve its Goal of Treating All Creditors Fairly .............................................................. 9

    III.   No Cause for Dismissal Exists. ............................................................... 11

    IV.   The Petition Was Filed For A Valid Bankruptcy Purpose .................... 13

    V.    The Petition Was Not Filed Merely To Obtain A Tactical Litigation Advantage . 16

    VI.   The Petition Was Filed In Good Faith ................................................... 18

    VII.  Cause Does Not Exist for Conversion. ................................................... 23

CONCLUSION .................................................................................................................... 24

## TABLE OF AUTHORITIES

**Cases**

*Carolin Corp. v. Miller*,
  886 F.2d 693 (4th Cir. 1989) ............................................................ 12, 19

*In Re 15375 Memorial Corp. v. BEPCO*,
  589 F.3d 605 (3d Cir. 2009) .............................................................. 12, 13

*In re American Capital Equipment, LLC*,
  2008 WL 4597221 (3d Cir. Oct. 6, 2008) .............................................. 22

*In re Balboa Street Beach Club, Inc.*,
  319 B.R. 736 (Bankr. S.D. Fla. 2005) ................................................... 16

*In re Capitol Food Corp. of Fields Corner*,
  490 F.3d 21 (1st Cir. 2007) ............................................................... 11, 12

*In re Clinton Centrifuge Inc.*,
  72 B.R. 900 (Bankr. E.D. Pa. 1987) ..................................................... 13

*In re Crown Village Farm, LLC*,
  415 B.R. 86 (Bankr. D. Del. 2009) ................................................... 16, 17

*In re Gulf Coast Oil Corp.*,
  404 B.R. 407 (Bankr. S.D. Tex. 2009) .................................................... 9

*In re Integrated Telecom Express, Inc.*,
  384 F.3d 108 (3d Cir. 2004), *cert. denied*, 545 U.S. 1110 (2005) ........... 12

*In re James Wilson Assocs.*,
  965 F.2d 160 (7th Cir. 1992) ............................................................... 16

*In re Medifacts International, Inc.*,
  No. 07–10110 PJW, 2007 WL 521917 (Bankr. D. Del. Feb. 8, 2007) ...... 8

*In re Myers*,
  491 F.3d 120 (3d Cir. 2007) ............................................................... 16

*In re PPI Enterprises (U.S.), Inc.*,
  324 F.3d 197 (3d Cir. 2003) ............................................................... 22

*In re Primestone Inv. Partners*,
  272 B.R. 554 (D. Del. 2002) ........................................................... 13, 22

*In re S. Canaan Cellular Invs., Inc.*,
  No. 09-10474, 2009 WL 2922959 (Bankr. E.D. Pa. May 19, 2009) ...... 19, 22

*In re S. Canaan Cellular Invs., LLC*,
  420 B.R. 625 (E.D. Pa. 2009) ............................................................. 19

*In re S.B. Properties, Inc.*,
  185 B.R. 198 (E.D. Pa. 1995) ............................................................. 22

*In re SGL Carbon Corp.*,
  200 F.3d 154 (3d Cir. 1999) ........................................................... 12, 19

*In re Spoverlook, LLC*,
  560 B.R. 358 (Bankr. D.N.M. 2016) .................................................... 16

*In re Tamecki*,
  229 F.3d 205 (3d Cir. 2000).................................................................... 12

*In re Timbers of Inwood Forest Assocs., Ltd.*,
  808 F.2d 363 (5th Cir. 1987) ................................................................. 9

*In re Westlake Property Holdings, LLC*,
  606 B.R. 772 (Bankr. N.D. Ill. 2019) ................................................... 9

*In the Matter of Woodbrook Associates*,
  19 F.3d 312 (7th Cir. 1994) ................................................................. 11

*Medek v. Medek*,
  C.A. No. 2559-VCP, 2008 WL 4261017 (Del. Ch. Sept. 10, 2008)........ 9

*Perlin v. Hitachi Capital America Corp.*,
  497 F.3d 364 (3d Cir. 2007)................................................................. 12

*United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*,
  484 U.S. 365 (1988)............................................................................... 9

**Statutes**

11 U.S.C. § 101(31)(B) ............................................................................. 15

11 U.S.C. § 362(a)(1) ................................................................................ 11

11 U.S.C. § 362(a)(2) ........................................................................... 10, 11

11 U.S.C. § 362(a)(3) ........................................................................... 10, 11

11 U.S.C. § 365 ............................................................................... 2, 11, 15

11 U.S.C. § 541(a) .................................................................................... 10

11 U.S.C. § 541(a)(3) ................................................................................ 10

11 U.S.C. § 544.................................................................................. passim

11 U.S.C. § 545 ........................................................................................ 10

11 U.S.C. § 547 .............................................................................. 2, 3, 11

11 U.S.C. § 548 ............................................................................. 2, 11, 15

11 U.S.C. § 548(a)(1)(A) ...................................................................... 3, 15

11 U.S.C. § 1107(a) .................................................................................. 10

11 U.S.C. § 1112(b) ............................................................................ 11, 12

28 U.S.C. § 1334(e)(1)............................................................................. 10

28 U.S.C. § 157(b)(2) ................................................................................. 8

**Rules**

Bankruptcy Rule 7001(2)........................................................................... 10

Stream TV Networks, Inc. ("Stream" or the "Debtor") respectfully submits this memorandum of law in opposition to (i) the Motion of SeeCubic, Inc. and SLS Holdings VI, LLC for an Order Dismissing Debtor's Chapter 11 Case (the "SLS Motion") [D.I. 46] and (ii) the United States Trustee's Motion for an Order Dismissing or Converting the Case to Chapter 7 (the "UST Motion" and, together with the SLS Motion, the "Motions to Dismiss") [D.I. 84].

<u>**PRELIMINARY STATEMENT**</u>

1.      SeeCubic, Inc. ("SeeCubic") and SLS Holdings VI, LLC ("SLS" and, together with SeeCubic, the "Movants"), wishing to avoid the effects of bankruptcy law on the pre-petition Omnibus Agreement (described below) and on the various prepetition transfers that benefitted Movants and their principal, seek dismissal of this case, preventing the Debtor from obtaining relief under the Bankruptcy Code and insulating Movants from bankruptcy scrutiny. The Omnibus Agreement, while determined preliminarily to be enforceable as a matter of state law, requires, on its face, the transfer of all of the Debtor's assets to the Debtor's secured creditors **and a group of the Debtor's shareholders,** leaving more than $17 million of unpaid unsecured debt behind.  Bankruptcy relief is absolutely necessary to avoid this unfair result and to enable the Debtor to reorganize and respect bankruptcy priorities.  Bankruptcy relief is in the best interests of the Debtor and all of its creditors, including Movants.  Contrary to Movants' assertions, SeeCubic does not yet have ownership of all of the Debtor's assets. Debts owed to the secured creditors have not been forgiven. The Omnibus Agreement remains executory. Moreover, the Debtor has supportive investors (who are neither dubious nor tied to the Rajans - as baldly and repeatedly alleged by Movants) and significant business opportunities that will enable the Debtor to successfully and quickly reorganize through this bankruptcy case for the benefit of all of its stakeholders.

2.      The UST Motion parrots many of the allegations of the SLS Motion, apparently unconcerned with the treatment of unsecured creditors under the Omnibus Agreement. It adds, as a new fact, that the Stream website, which is under the control of SeeCubic, contains an announcement that Stream has been acquired by SeeCubic.  *See* UST Motion at ¶15. This announcement was not posted by the Debtor but rather by SeeCubic and is nothing more than a claim by SeeCubic.  As alternative relief, the United States Trustee (the "UST") requests that the case be converted to a Chapter 7 case, but does not describe how conversion will benefit the Debtor's creditors.   Indeed, conversion will not benefit the Debtor's estate or its creditors because the best means by which the Debtor's creditors (other than SLS) will benefit is through the Debtor's reorganization with new capital or sale as a going concern after prepetition transfers have been avoided.

3.      The Debtor has a right to utilize the Bankruptcy Code and the tools afforded by bankruptcy process to rehabilitate its business, preserve its estate, and present a bankruptcy plan for the benefit of all creditors.  As is evident from the Debtor's bankruptcy schedules and statement of financial affairs – which were filed on time and without extension – the Debtor owes millions of dollars of debt to more than 100 creditors.  There is no reason to prevent the Debtor from using the bankruptcy avoidance and rejection powers to achieve a more equitable result for its creditors.

4.      The Debtor's bankruptcy filing was not made to challenge, relitigate or invalidate any order or judgment entered by the Chancery Court.  None of the issues involved in this case are entwined with any order entered by the Chancery Court.[1]  The Omnibus Agreement, which

---

[1] Whether the Omnibus Agreement is valid and enforceable as a matter of state law is a separate and independent issue from whether federal bankruptcy law provides the Debtor with relief from that agreement, including under Sections 365, 544, 545, 547, 548, that will enable the Debtor to resolve its debts under a Chapter 11 plan.

was found enforceable under Delaware law, can nevertheless be rejected under § 365 or avoided under § 547 or § 548(a)(1)(A). The Debtor submits that it is in the best interest of all of the stakeholders in this case that the Debtor be permitted the opportunity to reorganize in Chapter 11.

5.      For the reasons set forth herein, the Debtor submits that the Bankruptcy Court must deny the Motions to Dismiss.

## **BACKGROUND**

A.      Corporate History and Related Entities.

6.      As described in the Declaration of Mathu Rajan in Support of First Day Motions (the "Rajan Declaration")[2] [D.I. No. 51], Stream was founded in 2009 as a Philadelphia-based new media company created to develop technology allowing consumers to view 3D content without the need to wear glasses or goggles.

7.      Through its global engineering team, the Debtor developed breakthrough glasses-free 3D display technology it trademarked Ultra-D™.  As a core technology, Ultra-D can be applied to panels of nearly any type and size and is compatible with touch screen features.

8.      While developing its product for market, the Debtor engaged in global business development efforts to introduce Ultra-D to commercial and consumer brands interested in integrating the new technology into their various products, solidifying a strategic business relationship with the world's largest manufacturer of video display panels, and cultivating global customer relationships, including Robert Bosch GmbH, Lenovo Group Limited, Skyworth Group Co., Ltd. and Chunghwa Telecom.

---

[2] The Rajan Declaration describes the Debtor's background and history in greater detail.

9.      The Debtor is the parent and ultimate parent company of a group of related and integrated entities located in the United States and abroad, several of which are operating entities and others of which serve as holding companies as more fully described in the Rajan Declaration.

10.     The Debtor itself had been an operating company until December of 2020, at which time its operations were temporarily suspended as a result of the ongoing litigation between the Debtor and SLS.  The Debtor intends to quickly resume operations as part of its Chapter 11 case.[3]

11.     In addition to the Debtor's corporate structure, two other entities, also founded by Mathu Rajan, have provided and/or will provide services and support to the Debtor.

12.     MediaTainment, MediaTainment, Inc. ("MediaTainment"), a Delaware corporation, was formed by Mathu Rajan in 2009.  MediaTainment was originally the Debtor's holding company while it raised early investor funds for the Debtor's operations through the issuance of MediaTainment shares and warrants. In 2019, the shareholders of MediaTainment exchanged those shares and warrants for shares and warrants in the Debtor. At this time, MediaTainment no longer owns shares or warrants in the Debtor, but it does hold a note in the approximate amount of $990,000 for the investor funds previously raised by MediaTainment and transferred to the Debtor. Until December of 2020, MediaTainment also provided accounting and banking services for the Debtor.

13.     VTI.  Visual Technology Innovations, Inc. ("VTI"), a Nevada corporation, was formed by Mathu Rajan in January 2021.  VTI has no formal affiliation with the Debtor and is an independent operating company, though a potential merger with the Debtor may be contemplated

---

[3] These efforts have been put on hold pending resolution of the Motions to Dismiss.

in the future. VTI has engaged in fundraising efforts to attract investor support for the development of innovative commercial and consumer visual technologies, including those of the Debtor and is prepared to support the Debtor's restructuring. Many former employees of the Debtor, not employed by Movants, are providing consulting services to VTI and continue to support the Debtor and its restructuring efforts.

14.     Stream's Current Product Mix Contemplates Three Paths to Market. As set forth in detail in the Robertson Declaration [D.I. 77], Stream's current business strategy contemplates three paths to market. Only one path contemplates utilizing the Ultra-D technology that was at issue in the prepetition litigation pending in the Chancery Court (described below). The other two paths, Two View Products and Multi-View Products, involve Stream working with strategic partners to utilize technology owned by others to develop products that do not require the Ultra-D technology developed by Stream.

B.     The Omnibus Agreement.

15.     In connection with the Debtor's negotiations with its secured lenders, the Omnibus Agreement, dated as of May 6, 2020, was entered into by certain board members of Stream, SLS, Hawk Investments Holdings Limited ("Hawk") and certain equity owners of Stream (the "Omnibus Agreement"). The Omnibus Agreement resulted in the stay by SLS and Hawk of their pursuit of certain rights and remedies under their notes and security agreements. *See* Omnibus Agreement, Exhibit 1 to Exhibit B (Declaration of Shadron L. Stastney in support of the Omnibus Objection of SLS Holdings VI, LLC to Debtor's First Day Motions) [Dkt. No. 59], p. 2.[4]  Pursuant to the Omnibus Agreement, SLS and Hawk were obliged to satisfy and extinguish their notes. *Id.* at ¶1.1(a).  In addition, SLS and Hawk were obligated to dismiss the

---

[4] The Debtor disputes that the Omnibus Agreement attached to Mr. Stastney's Declaration is a true and correct copy of the Omnibus Agreement and leaves Movants to their proofs.

foreclosure action pending in the Court of Chancery. *Id.* at ¶1.2. SeeCubic, the entity formed to hold the assets of Stream that were being transferred under the Omnibus Agreement, was to designate employees for hiring. *Id.* at ¶1.3.

16.     Some equity owners of Stream were entitled under the Omnibus Agreement to swap their Stream shares for SeeCubic shares. *Id.* at ¶1.1(d), (e), (g). SeeCubic is also obligated to issue stock to Stream. In exchange, however, SeeCubic was obligated to assume, pay and perform, fulfill and discharge certain of the Stream debt – to be designated by SeeCubic after the Omnibus Agreement was executed. *Id.* at ¶1.1(b), Schedule 1.1(b). Ultimately, after the Omnibus Agreement was executed, SeeCubic cherry picked the liabilities, agreeing to assume only certain investor debts (including debts to SLS and Hawk) and a $1 million license fee that was not then due. *Id.* No trade debt was assumed by SeeCubic. Rather the trade debt of more than $17,000,000 is left unpaid at Stream.

17.     For its part, subject to the terms and conditions of the Omnibus Agreement, Stream was obligated to convey right, title and interest of the Transferred Assets to SeeCubic. *Id.* at ¶1.1(a).[5] To the extent that SeeCubic needed help to effectuate the asset transfer, Shad Stastney, a principal of SLS and a former director and chief financial officer of the Debtor, was granted an irrevocable power of attorney to take all actions necessary or advisable to affect delivery, conveyance, transfer and assignment to SeeCubic of the Transferred Assets. *Id.* at ¶1.4.

18.     Stream was also obliged to release identified employees from their employment obligations at Stream so as to permit those employees to work prospectively for SeeCubic. *Id.* at ¶1.3. In addition, Stream was obligated to indemnify, among others, SLS, Hawk and SeeCubic. *Id.* at ¶4.1.

---

[5] The Transferred Assets are defined as including all rights, property and assets of Stream. *See* Operating Agreement at ¶1.1(a).

19.     Ultimately, the Omnibus Agreement contemplated that SeeCubic would acquire all of Stream's assets, and that Hawk and SLS would have notes payable to them within in three (3) years by SeeCubic.  Many of Stream's equity holders (those who were selected by SLS) would receive equity in SeeCubic.  Stream's unsecured creditors, owed approximately $17 million, would receive nothing.

C.      Prepetition Litigation.

20.     Prior to its bankruptcy filing, Stream was a party to two (2) State Court litigations involving SLS.[6]  The first is an action pending in the Delaware Superior Court on the underlying notes owed to SLS.

21.     The second action was commenced in the Delaware Court of Chancery and resulted in a preliminary injunction being entered against the Debtor on December 8, 2020.  By this injunction, Stream was enjoined, on a non-final basis, from taking action to interfere with the Omnibus Agreement pending a final resolution of the matter.

22.     The preliminary injunction expressly carved out litigation positions "in this litigation."  *See* Order Granting Motion for Preliminary Injunction (the "Preliminary Injunction"), Exhibit A to the SLS Motion, at paragraph 1(a), (c), and (d).

D.      Bankruptcy.

23.     On February 24, 2021 (the "Petition Date"), Stream continued to control or possess many of its assets and the parties' performance of the Omnibus Agreement was far from completed.

---

[6] A third litigation involving the Debtor is described in the Debtor's Statement of Financial Affairs and does not involve SLS.  The Debtor has subsequently become aware of several other litigations that were brought against it by unsecured creditors and will be amending its Statement of Financial Affairs to include reference to those cases.

24.     After the entry of the preliminary injunction, Stream, in response to specific requests by SLS, began to turn over assets to SeeCubic and SLS.  For example, all cash was either paid over to SeeCubic, or Stream's bank accounts were assigned to SeeCubic.  Some employee computers were returned at the request of SeeCubic.

25.     SeeCubic did not, however, take possession or control of all of Stream's assets.  To the Debtor's knowledge, no title to any assets has been conveyed to SeeCubic.  To this day, Stream continues to receive inquiries from its vendors seeking payment for obligations such as storage facilities containing Stream property that SeeCubic has not taken and is now stayed from taking.  Unaffiliated third parties overseas have declined SeeCubic's attempts to assert its control over Stream's assets.  The purported transfer of the stock of Stream's main subsidiary to SeeCubic does not appear to have been accomplished in a manner that satisfies state law nor will it survive challenge under § 544 of the Bankruptcy Code. These and other assets remain in Stream's estate as § 541 property and are described in the Robertson Declaration.

## JURISDICTION

26.     A motion to dismiss or convert is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  To the extent that the Motions to Dismiss are not a core proceeding, the Debtor consents to the entry of final orders adjudicating this matter.

## DISCUSSION

### I.      The Bankruptcy Case Was Properly Commenced

27.     The preliminary injunction did not prevent the Debtor from filing a bankruptcy petition, on its face or by implication.  *See In re Medifacts International, Inc.*, No. 07–10110 PJW, 2007 WL 521917, at *1 (Bankr. D. Del. Feb. 8, 2007) (State Court does not have authority

to enjoin a filing of a bankruptcy petition). *In re Westlake Property Holdings, LLC*, 606 B.R. 772 (Bankr. N.D. Ill. 2019) (same).

28.    In *Westlake*, the debtor was subject to a prepetition state court injunction prohibiting it from, among other things, ceasing to operate.  Notwithstanding the injunction, the debtor filed a Chapter 7 petition.  The Bankruptcy Court denied the motion to dismiss, reasoning that, to the extent that the State Court injunction could be construed as prohibiting a bankruptcy filing, the Supremacy Clause of the United States Constitution and the Bankruptcy Code render such injunctions invalid.  *Westlake*, 606 B.R. at 778.  The *Westlake* Court similarly concluded that a State Court injunction could not prohibit the managing member of the debtor from filing the petition on behalf of the debtor.

## II.    The Bankruptcy Code Provides a Debtor with Tools to Achieve its Goal of Treating All Creditors Fairly

29.    <u>Collective Proceedings</u>.    Bankruptcy is a collective proceeding that exists to benefit all creditors.  *See In re Gulf Coast Oil Corp.*, 404 B.R. 407, 426 (Bankr. S.D. Tex. 2009) ("[B]ankruptcy is, at is essence, a collective remedy intended to benefit all creditors, not just the secured lender."); *In re Timbers of Inwood Forest Assocs., Ltd.*, 808 F.2d 363, 373 (5th Cir. 1987), *aff'd sub nom. United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365 (1988) ("A principal goal of the reorganization provisions of the Bankruptcy Code is to benefit the creditors of the Chapter 11 debtor by preserving going-concern values and thereby enhancing the amounts recovered by all creditors.").

30.    By comparison, the Court of Chancery is a court of limited jurisdiction.  *Medek v. Medek*, C.A. No. 2559-VCP, 2008 WL 4261017, at *3 (Del. Ch. Sept. 10, 2008).  As such, and as here, the Court of Chancery decides only the matter involving the parties before it, within the confines of its limited jurisdiction.

31.    <u>Tools</u>.            The Bankruptcy Code provides a debtor with tools to accomplish an equitable result for all creditors. The use of these tools is a legitimate bankruptcy purpose.

32.    The filing of a bankruptcy petition creates an estate. *See* 11 U.S.C. § 541(a). Because the estate is created by filing the petition, by definition, the estate does not exist prior to the bankruptcy and is not a party to pre-bankruptcy litigation.  Enforcement against the estate of pre-bankruptcy judgments obtained against a debtor is automatically stayed under § 362(a)(2).

33.    The estate consists of all legal and equitable interests of the debtor in property as of the commencement of the case. *See* § 541(a)(1).  The estate also includes any property recovered under other sections of the Bankruptcy Code.  *See* § 541(a)(3).  All of these property rights are automatically transferred to the estate from the debtor upon commencement of the bankruptcy case.[7]

34.    The district court (and by reference, the bankruptcy court) has exclusive jurisdiction of all property, wherever located, of the debtor as of the commencement of the case and of all property of the estate. *See* 28 U.S.C. § 1334(e)(1). This jurisdiction, being **exclusive**, preempts any state court jurisdiction over property of the estate.

35.    A debtor in possession has all of the rights of a trustee.  *See* 11 U.S.C. § 1107(a). A trustee is the fiduciary for the estate and has an obligation to act in the best interests of the estate for the benefit of **all creditors** and, if the estate is solvent, for the benefit of equity holders.

36.    The commencement of a bankruptcy case automatically stays the commencement or continuation of any litigation against the debtor and the enforcement of any judgment obtained before the bankruptcy against the debtor or against property of the estate. *See* 11 U.S.C. §

---

[7] To the extent there is a dispute as to whether property belongs to the estate, Bankruptcy Rule 7001(2) provides a mechanism for determining the extent of the estate's interest in property.  *See* Bankruptcy Rule 7001(2). The decision about estate property can only be made by the bankruptcy court because of its exclusive jurisdiction.  28 USC § 1334(e)(1).

362(a)(1) and (2). It also stays any act to obtain possession of or control over property of the estate. *See* 11 U.S.C. § 362(a)(3).

37.     The Bankruptcy Code also affords the Debtor the ability to reject burdensome executory contracts. *See* 11 U.S.C. § 365.

38.     The Bankruptcy Code provides for a series of avoidance powers authorizing the Debtor to recover property and assets and avoid certain transfers for the benefit of the estate. These include the preference and fraudulent conveyance statutes found in 11 U.S.C. §§ 544, 547, and 548.  Avoidance powers are property of the Debtor's estate.  The bankruptcy process also provides for equitable subordination and other remedies to ensure that all constituents are treated fairly.

39.     The Debtor's exercise of rights under these sections of the Bankruptcy Code will not require the Bankruptcy Court to revisit any issue decided by the Chancery Court, will not involve a collateral attack on any order or judgment of the Chancery Court, and will not result in the invalidation of any order or judgment of the Chancery Court.  The remedies available for the benefit of the estate under the Bankruptcy Code involve issues that are separate and distinct from those at issue before the Chancery Court.  The Debtor filed this case to avail itself of federal bankruptcy rights and remedies, consistent with its fiduciary duty to its creditors.

### III.    No Cause for Dismissal Exists.

40.     A party in interest may seek dismissal of a bankruptcy case for "cause."  *See* 11 U.S.C. § 1112(b).  On a motion to dismiss, the movant bears the initial burden of demonstrating, by a preponderance of the evidence, that cause exists to dismiss a bankruptcy case.  *In the Matter of Woodbrook Associates*, 19 F.3d 312, 317 (7th Cir. 1994); *see also, In re Capitol Food Corp.*

*of Fields Corner*, 490 F.3d 21, 24 (1st Cir. 2007) (Once the movant meets an initial burden of production, the debtor bears the ultimate burden of persuasion on the issue of good faith.)

41.     Section 1112(b), in pertinent part, provides:

> (b)(1)…. on request of a party in interest, and after notice and a hearing, the court shall … dismiss a case under this chapter … for cause ….

42.     Dismissal for bad faith is an extraordinary remedy under the Bankruptcy Code.  It is a drastic decision in light of which a court must consider the myriad remedies available to creditors involved in the chapter 11 case.  *Carolin Corp. v. Miller*, 886 F.2d 693, 700 (4th Cir. 1989) ("dismissal on grounds of bad faith filing should not be judicially [employed] as an easy alternative to other post-petition creditor remedies").  Moreover, a finding that a bankruptcy petition was filed in bad faith "'should not [be] lightly infer[red].'" *Perlin v. Hitachi Capital America Corp.*, 497 F.3d 364, 373 (3d Cir. 2007) (quoting *In re Tamecki*, 229 F.3d 205, 208 (3d Cir. 2000)).

43.     Whether a bankruptcy case is filed in bad faith depends on the totality of the circumstances.  *See*, *e.g., Perlin*, 497 F.3d at 372; *In re SGL Carbon Corp.*, 200 F.3d 154, 162 (3d Cir. 1999).  Although the Court must consider the particular facts of each case, the Third Circuit has noted that the inquiries particularly relevant to whether cause exists to dismiss a case filed in bad faith are: "(1) whether the petition serves a valid bankruptcy purpose, e.g., by preserving a going concern or maximizing the value of the debtor's estate, and (2) whether the petition is filed merely to obtain a tactical litigation advantage."  *In re Integrated Telecom Express, Inc.*, 384 F.3d 108, 118-19 (3d Cir. 2004), *cert. denied*, 545 U.S. 1110 (2005); *SGL Carbon*, 200 F.3d at 165; *see also, 15375 Memorial Corp. v. BEPCO (In re 15375 Memorial*

*Corp.*), 589 F.3d 605, 618 (3d Cir. 2009).  These, however, are not the exclusive factors that the Court should consider.  *See In re Primestone Inv. Partners*, 272 B.R. 554, 557 (D. Del. 2002).

44.     In this case, Movants and the UST have failed to demonstrate cause for dismissal. This case was commenced to use bankruptcy remedies to benefit all of the creditors of the Debtor, recapitalize the Debtor and confirm a plan that honors bankruptcy priorities.  The bankruptcy will create no advantage in the state court litigation; that litigation is stayed like all litigation is.  The automatic stay is not a ground for dismissal.  Movants cannot show that the Chapter 11 case was filed in bad faith as a litigation tactic and not for a legitimate bankruptcy purpose.  Accordingly, the Motions to Dismiss must be denied.

### IV.     The Petition Was Filed For A Valid Bankruptcy Purpose

45.     The Debtor has bona fide bankruptcy reasons to file this case. By initiating this case, the Debtor seeks to preserve the value of its enterprise for all interested parties - not simply for SLS, Hawk and certain equity holders.  The Debtor has sought refuge in the bankruptcy court for the very purpose for which the Bankruptcy Code was designed – to give the Debtor a breathing spell from its creditors and time to develop a plan.  *See In re Clinton Centrifuge Inc*., 72 B.R. 900, 906 (Bankr. E.D. Pa. 1987).

46.     The Debtor has a viable and valuable business.  As set forth in more detail in the Robertson Declaration, the Debtor has certain hard assets, customer relationships, vendor relationships, access to licensing, and access to financing to continue operations.  These core business elements exist regardless of whether Stream is ultimately entitled to any aspect of the Ultra-D technology.

47.     The Debtor also has the ability to file a reorganization plan in this case.  In addition to a viable business model, the Debtor has the interest of outside investors, some of

which were original investors in Stream and continue to support Stream's business.  In fact, certain of these investors have "put their money where their mouth is" and stepped up to fund the Chapter 11 proceeding through VTI.

48.    The Chapter 11 case is also a proceeding in which all of the Debtor's creditors and interest holders, including unsecured creditors can have their claims addressed and interests protected.  The Court of Chancery was tasked with resolving only a dispute between an insider secured creditor and the Debtor – without consideration of the rights or interests of any other creditor or party in interest.  The Debtor's unsecured creditors were not parties to the Chancery Court litigation, and the Omnibus Agreement at issue in that proceeding provides that unsecured creditors will receive nothing while an insider creditor, certain other secured creditors and certain equity holders receive the entire value of and interest in the company.[8]

49.    Unlike rights and remedies available outside of bankruptcy, there are also particular bankruptcy rights and potential causes of action that exist here that will inure to the benefit of the estate, its creditors, and the Debtor's reorganization efforts.

50.    Colorable claims for avoidance actions exist.[9]  While review is ongoing and the Court can assume that the recipients of the transfers at issue will contest any liability, the fact remains that the claims exist and need to be investigated and, if appropriate, pursued for the benefit of the estate.  For example, the alleged transfer of the TechnoVative Media stock purports to have been accomplished by a document that was neither witnessed nor notarized and does not include the necessary endorsement of the original share certificate as required by the TechnoVative corporate by-laws and as printed on the stock certificate itself.    The

---

[8] The UST, unconcerned about the actual fairness of the Omnibus Agreement to unsecured creditors, has elected not to form a committee of unsecured creditors until the Motions to Dismiss are decided. The many unsecured creditors of Stream are entitled to a voice on the issue of dismissal.

[9] The Court is not being asked to adjudicate avoidance actions at this time, but only to acknowledge their existence.

documentation has never been produced by SLS before its Motion was filed in this Court. If improperly transferred, the transaction would not survive a challenge by a bona fide purchaser or an executing judgment creditor and is voidable under Section 544.

51.    The Schedules also disclose payments made to Stastney in excess of $200,000 since early February of 2020.[10]  As a former officer and director of the Debtor and significant shareholder, Stastney is an insider under the Bankruptcy Code.  *See* 11 U.S.C. § 101(31)(B) (nonexclusive definition of "insider" includes corporate debtor's officers, directors and persons in control).

52.    The Omnibus Agreement was entered into within one year of the Petition Date, and at a time where the Court of Chancery stated that the Debtor was "insolvent and failing." *See* December 8, 2020 Opinion (the "Opinion"), Exhibit B to the SLS Motion, p. 2, 45.   The Omnibus Agreement contemplated conveying all of Stream's assets to SeeCubic for the benefit of its insider and secured creditors and select equity holders and to the detriment of its unsecured creditors.  This transaction appears on its face to be avoidable pursuant to Sections 548(a)(1)(A) and 544, and applicable state fraudulent transfer law, none of which was at issue in the Chancery Court.

53.    As set forth previously, performance of the Omnibus Agreement remains due by both parties; therefore, the Omnibus Agreement is likely an executory contract that can be rejected under § 365.[11]

---

[10] The Debtor is investigating the avoidability of various payments and transfers to insiders and others that occurred before the bankruptcy case was filed, all of which may be subject to recovery and made available for distribution to the Debtor's creditors.

[11] SLS alleges that no legitimate bankruptcy purpose exists because the Debtor's petition was "unaccompanied by the routine first-day filings" for a business claiming to have significant assets and ongoing operations; however, in seeking Chapter 11 relief, the Debtor has never claimed to be presently operating.  The Debtor admits that its operations are temporarily suspended as a result of SLS's tactics to starve the Debtor of funding and prevent the

54.     Importantly, initiating a bankruptcy case for the purpose of exercising federal bankruptcy rights, including rejecting contracts and pursuing avoidance actions, is not bad faith. *See, e.g., In re Spoverlook, LLC*, 560 B.R. 358, 364 (Bankr. D.N.M. 2016) (citing *In re Balboa Street Beach Club, Inc.*, 319 B.R. 736, 740 (Bankr. S.D. Fla. 2005)) (noting "there is no such thing as 'bad faith' in bringing a bankruptcy case solely for the purposes of rejecting an overly burdensome executory contract").   The power to reject burdensome contracts was provided to debtors by Congress.  *Id.* at 365.  Accordingly, in this case, by approving rejection or avoidance of the Omnibus Agreement under federal law, the Bankruptcy Court is not being asked to nor will it disturb or collaterally attack the state law determination of the Chancery Court.  *See Id.*

## V.    The Petition Was Not Filed Merely To Obtain A Tactical Litigation Advantage

55.     As recognized in the Third Circuit, the mere filing of a petition during pending state court litigation is not per se bad faith.  *In re Myers*, 491 F.3d 120, 125 (3d Cir. 2007) (citing *In re James Wilson Assocs.*, 965 F.2d 160, 170-71 (7th Cir. 1992)).

56.     Indeed, the Bankruptcy Court for the District of Delaware has applied the test for bad faith broadly to account for a debtor's bankruptcy planning while involved in litigation:

> Defendants have expressed outrage that Debtor obtained numerous extensions to respond to their complaints without disclosing (and denying when asked) their plans to file for bankruptcy protection. Debtor's lawyer in the State Court Actions was not involved in the bankruptcy planning and it is unclear if he knew or didn't know of the imminent filing. … The situation adds flavor to the dispute but does not bear upon the substance and does not rise to the level of improper conduct.

*In re Crown Village Farm, LLC*, 415 B.R. 86, 93, n.5 (Bankr. D. Del. 2009).  In *Crown Village*, the Court denied the motion to dismiss and concluded that the Debtor had a proper purpose in

---

Debtor from accessing certain source codes and technology.  As it was not operating as of the Petition Date, the Debtor elected not to waste the Court's time with expedited requests for "routine first-day" relief.

seeking to preserve the value of assets, stating, "[t]he overarching reality is that the Debtor had two choices, either abandon its sole asset or seek to maximize the value of its asset through the bankruptcy process.  In choosing the latter, Debtor acted in good faith." *Id.* at 93.

57.     In this case, Movants and the UST portray the Debtor as having filed this case solely as a litigation tactic on the eve of the Chancery Court entering summary judgment in Movants' favor.

58.     Setting aside Movants' factual embellishments[12], the petition was filed shortly before briefing on Movants' request for summary judgment was completed - not on the eve of any ruling by the Chancery Court or in response to any order entered by the Chancery Court.  To be sure, if the Debtor intended to file the petition merely as a litigation tactic, the Debtor would have filed its petition before the Chancery Court issued the preliminary injunction or just before the date on which the Chancery Court was scheduled to rule on SLS's summary judgment motion.  It did neither.  Instead, unrelated to the pending litigation, the Debtor elected to file for bankruptcy after it had secured sufficient funding to initiate and proceed through the Chapter 11 process to preserve its business for the benefit of all constituencies.

59.     It would be disingenuous to suggest that filing for bankruptcy to utilize the automatic stay to halt State Court litigation is never a consideration.  Indeed, as here, where the debtor is insolvent and out of money, and does not have the ability (or, in this case, is forbidden) to pay counsel to defend itself, it is often a significant factor in the determination to file.  But staying litigation does not make the filing bad faith.

---

[12] For example, on multiple occasions Movants claim that the Chancery Court found certain defendants engaged in fraudulent conduct – even placing its allegation in bold type.  *See* SLS Motion at ¶¶2, 49.  Nowhere in the Chancery Court's Opinion, however, does the word "fraud" appear in connection with defendants' conduct, or otherwise.

60. Moreover, even if the Chancery Court had entered judgment in favor of SLS, the Court's ruling would not have transferred ownership of any of the Debtor's assets to SLS. As it has had to do to date, outside of the Chancery Court litigation, Movants would still need to proceed through all of the steps required by applicable law to obtain ownership of the Debtor's various assets. Many of the Debtor's most valuable assets are located outside of the United States, where an order of the Chancery Court would have little or no effect, and where Movants would need to initiate and succeed in separate litigation in order to acquire the particular assets. As set forth above, to the Debtor's knowledge, no title to assets was conveyed to SeeCubic prior to the Petition Date.

61. Accordingly, the timing of the Debtor's petition provided the Debtor with no tactical litigation advantage beyond that which any debtor obtains by availing itself of the bankruptcy system.[13] Simply because the Debtor filed its petition during the pending litigation does not provide a basis for dismissal or a finding of bad faith.

62. Because Movants and the UST cannot establish that either factor indicative of bad faith exists under the facts of this case, the Motions to Dismiss must be denied.

### VI.    The Petition Was Filed In Good Faith

63. The facts and circumstances of this case not only reveal Movants' and the UST's failure to demonstrate cause for dismissal, but show that the Debtor sought bankruptcy protection in good faith.

---

[13] Even accepting that the Chancery Court determined that the Omnibus Agreement is valid and enforceable, the Debtor nevertheless has rights under federal bankruptcy law to avoid or reject the Omnibus Agreement – neither of which actions will disrupt, undo, or challenge the orders of the Chancery Court.

64.     The "good faith" filing requirement is intended to "deter filings that seek to achieve objectives outside the legitimate scope of the bankruptcy laws." *SGL Carbon*, 200 F.3d at 165.

65.     The Third Circuit has instructed that "a debtor's burden to establish good faith in filing a bankruptcy petition is not a heavy one." *In re S. Canaan Cellular Invs., Inc.*, No. 09-10474, 2009 WL 2922959, at \*8 n.6 (Bankr. E.D. Pa. May 19, 2009), *aff'd sub nom. In re S. Canaan Cellular Invs., LLC*, 420 B.R. 625 (E.D. Pa. 2009).  Similarly, the Fourth Circuit's standard as set forth in *Carolin Corp.*, 886 F.2d at 701, holds that "it is better to risk proceeding with a wrongly motivated invocation of Chapter 11 protections whose futility is not immediately manifest than to risk cutting off even a remote chance that a reorganization effort so motivated might nevertheless yield a successful rehabilitation."[14]

66.     Despite Movants reference to only a few of the factors considered by courts to determine lack of good faith (*See* SLS Motion at ¶ 46), Courts in this Circuit consider a host of factors to determine whether a petition was filed in good faith.  Those factors and their application to this case are as follows:

(a)     whether the debtor has few or no unsecured creditors (the Debtor has more than 100 unsecured creditors who are owed more than $17 million);

(b)     whether the debtor has previously filed for bankruptcy (the Debtor has not);

(c)     the propriety of the prepetition conduct of the debtor (the Debtor operated successfully for well over a decade until Movants took action to try to take the Debtor's business for themselves; there is nothing improper with the Debtor

---

[14] The Third Circuit Court of Appeals "appears not to have adopted the Fourth Circuit's light standard as set forth in *Carolin.*" *S. Canaan Cellular,* 2009 WL 2922959, at \*8 n.6.

defending itself, even unsuccessfully, in litigation against Movants' attempts to take over the Debtor's business);

(d)     whether the petition allows the debtor to effectively evade court orders (the Debtor was in compliance with the preliminary injunction order at the time of the petition and intends to take no action to evade that order or any order of the Chancery Court);

(e)     the number of debts to non-moving creditors (Movants are owed a senior secured debt – one of more than 100 significant debts owed by the Debtor to its creditors);

(f)     the timing of the petition (the petition was filed as soon as the Debtor lined up financing to support the Debtor restarting its operations and funding a successful reorganization);

(g)     whether a foreclosure action was pending on the sole or major asset of a debtor (the petition was filed during briefing with regard to a pending motion for summary judgment before the Chancery Court as to which no hearing had yet been scheduled; the proceeding involved the validity of an agreement providing for a transfer of the Debtor's assets but no ruling by the Chancery Court would have effected a transfer of the Debtor's assets to Movants);

(h)     whether the debtor has an ongoing business or employees (the Debtor has a significant and worldwide business operation as well as highly skilled employees, which business was temporarily suspended in December 2020 when Movants prevented the Debtor from funding its operations; nevertheless, the Debtor retains access to its critical employees, technology and other assets such that it can restart operations quickly in Chapter 11);

(i)    whether the debtor can reorganize (the Debtor has obtained funding for its reorganization and is pushing exit funding to effectively and efficiently propose a Chapter 11 restructuring plan);

(j)    whether the Debtor's income is sufficient to operate (because Movants are taking action to take over the Debtor's assets, the Debtor is receiving support from its investors through a separate entity with similar, but broader business goals, which funding will provide the Debtor with sufficient operating income to restart operations in Chapter 11 and beyond);

(k)    whether the Debtor received pressure from non-moving creditors (the Debtor is also involved in several other litigation matters involving non-moving creditors and has received several other demands seeking repayment from the Debtor);

(l)    whether reorganization involves the resolution of a two party dispute (Movants and the Debtor - constituting at least 3 parties - are involved in pending litigation that will be resolved as part of the Debtor's Chapter 11 plan, along with all other litigation and claims asserted against the Debtor);

(m)    whether a corporate debtor was formed and obtained title to its major assets immediately before the petition date (the Debtor was formed in 2009 and had obtained and maintained title to its assets throughout the course of its existence); and

(n)    whether the debtor filed solely to create the automatic stay (while the automatic stay will provide the Debtor with a breathing spell during which it can reorganize and hopefully prevent Movants from continuing to disrupt the Debtor's contractual relationships with its customers, the automatic stay was not the sole

> purpose of the Debtor's filing; the Debtor intends to exercise its rights under the
> Bankruptcy Code to recover assets and maximize the value of its business for its
> benefit and the benefit of all stakeholders).

*Primestone Inv. Partners*, 272 B.R. at 557; *In re S.B. Properties, Inc.*, 185 B.R. 198, 205 (E.D. Pa. 1995) (footnotes and citations omitted).

67.     Despite the Debtor's belief that all of these factors favor a finding that the petition was filed in good faith, even a finding that one or more these factors may not favor the Debtor does not compel a finding that the bankruptcy petition was filed in bad faith.  Instead, a court must consider all of the relevant circumstances surrounding the filing, giving due regard to the Congressional purposes behind chapter 11.

68.     As the Third Circuit has recognized, even if a chapter 11 debtor is not operating and has no employees, its bankruptcy petition will be in good faith if its filing is designed to maximize the value of assets for creditors and equity security interests.  *S. Canaan Cellular,* 2009 WL 2922959, at *7; *see also In re American Capital Equipment, LLC*, 2008 WL 4597221, at *3 (3d Cir. Oct. 6, 2008) (non-precedential); *In re PPI Enterprises (U.S.), Inc.*, 324 F.3d 197, 201 (3d Cir. 2003) ("debtor's sole asset was a valuable stock certificate and had but one employee.").

69.     Examining all of the circumstances surrounding the Debtor's bankruptcy filing in light of the purpose and policy of Chapter 11 reveals that the Debtor's petition was entirely proper and filed in good faith.  The Debtor's business cries out for Chapter 11 relief; therefore, the Debtor should be permitted to remain in Chapter 11 and have a full and fair opportunity to reorganize its business for the benefit of its creditors, estate and all parties in interest.

70.     The Debtor has assets, has insurance and has investor support for its business. The Debtor filed this case to prevent its senior secured creditor (who is an insider) and certain equity holders, from taking all of the Debtor's value and assets for themselves, to the exclusion of the many other creditors.  The Debtor filed the petition, not to limit or avoid its liabilities, but with the intention of restarting operations and preserving and/or reclaiming assets so that it can continue as a going concern for the benefit of all constituencies.

71.     The likelihood that the Debtor will successfully reorganize is favorable at this stage given the pre-bankruptcy planning undertaken by the Debtor that has provided the Debtor with access to capital that will enable it to restart its operations and fund a plan of reorganization. The Debtor's efforts are entirely consistent with the Debtor performing appropriate duties as required by the Bankruptcy Code and the reorganization proceeding in a manner consistent with the Chapter 11 process toward consummation of a feasible Chapter 11 plan for the benefit of all constituencies.

72.     Movants and the UST have failed to meet their burden of demonstrating that "cause" exists to dismiss this Chapter 11 case.  Even if they had met their initial burden, the Debtor has demonstrated that the petition was filed in good faith and the Chapter 11 process will benefit the Debtor and all constituencies – not just an insider, senior secured lender, second lien lender, and select equity owners; therefore, dismissal is not warranted and the Motions to Dismiss must be denied.

### VII.    Cause Does Not Exist for Conversion.

73.     The Court should not convert a Chapter 11 case without affording the Debtor a meaningful opportunity to put its plan of reorganization together and present it to the Court and its creditors for consideration and, ideally, confirmation.

74.     While conversion would allow a Chapter 7 trustee to recover assets and reject the Omnibus Agreement or avoid it under the provisions of the Bankruptcy Code (just as the Debtor intends to do in Chapter 11), converting the case to Chapter 7 would foreclose new capital and preclude the Debtor from restarting and continuing its business operations as a going concern, eliminating the Debtor's ability to generate future revenues to provide for any creditor other than its secured creditors and denying creditors the ability to benefit from the Debtor's operations.

75.     As this case is in its infancy and the Debtor has not been afforded a meaningful opportunity to avail itself of the protections of the Bankruptcy Code, and for the reasons set forth above, cause does not exist to convert this case.[15]

## **CONCLUSION**

76.     For the reasons set forth herein, the Motions to Dismiss and the UST's request for conversion must be denied.

WHEREFORE, the Debtor respectfully requests that the Court deny the Motions to Dismiss, and grant such other and further relief that the Court deems just and proper.

DATED: April 2, 2021

/s/ Anne M. Aaronson
**DILWORTH PAXSON LLP**
Lawrence G. McMichael (admitted pro hac vice)
Anne M. Aaronson (admitted pro hac vice)
Yonit A. Caplow (admitted pro hac vice)
1500 Market Street, Suite 3500E
Philadelphia, PA 19102
Telephone: (215) 575-7000
Facsimile: (215) 575-7200

And

---

[15] Of note, only the UST seeks the conversion remedy and does not present any argument why or how conversion would benefit the Debtor's estate or any creditor of the estate.  There is no evidence of or allegation that assets of the Debtor are diminishing since the Petition Date, that the Debtor is being mismanaged in Chapter 11 or any other basis for conversion of this case at this time.

**DILWORTH PAXSON LLP**
Martin J. Weis (No. 4333)
P.O. Box 1031
Wilmington, DE 19899-1031
Telephone: (302) 571-9800
Facsimile: (302) 655-1480

*Proposed Counsel for the Debtor and Debtor in Possession*