# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>Stream TV Networks, Inc.,<br><br>　　　　　　　　　　　　Debtor. | Chapter 11<br><br>Case No. 21-10433 (KBO)<br><br>**Re: D.I. No. 46.** |

### VISUAL TECHNOLOGY INNOVATIONS, INC.'S RESPONSE IN OPPOSITION TO THE MOTION OF SEECUBIC, INC. AND SLS HOLDINGS VI, LLC FOR AN ORDER DISMISSING DEBTOR'S CHAPTER 11 CASE

Visual Technology Innovations, Inc. ("**VTI**"), by and through its undersigned counsel, hereby files this response (the "**Response**") in opposition to the *Motion of SeeCubic, Inc. and SLS Holdings VI, LLC for an Order Dismissing Debtor's Chapter 11 Case* [D.I. 46] (the "**Motion to Dismiss**"). In support of this Response, VTI avers as follows.

### PRELIMINARY STATEMENT

1.　　Stream TV Networks, Inc. ("**Debtor**," "**Stream**" or the "**Company**") has sought relief under the Bankruptcy Code to preserve and maximize the value of its business as a going concern for the benefit of *all* creditors and interest holders—using the especially unique tools and rights provided to a debtor to accomplish that purpose. In this case, the Debtor sought protection under the Bankruptcy Code in order to:

- prevent the further dissipation of its assets and business resulting from a nefarious scheme engineered by its former Vice-Chairman of the Board and Chief Financial Officer, Shadron L. Stastney ("**Stastney**"), to steal the assets of Stream for the benefit of himself and his selected group of company insiders and investors;

- reject and/or avoid agreements which resulted in the fraudulent transfer of Stream's assets; and

- restructure its debt through a fair plan of reorganization which is anticipated will leverage the Debtor's intellectual property and manufacturing capabilities with VTI's complementary technology and financial resources to maximize the marketability of both the Debtor's and VTI's technologies.

2.     In order to achieve these objectives for the benefit of all stakeholders—including the $17 million in unsecured creditors who were excluded from participation and any recovery under Stastney's orchestrated hi-jacking of Stream's assets for the benefit of a select few—the Motion to Dismiss must be denied.

3.     In making this request, no one is disputing the *preliminary* finding of a Delaware state court here.  It is irrelevant for the purposes of this opposition.  VTI's opposition here is entirely consistent with both the letter and spirit of the Bankruptcy Code, as well as the Chancery Court's preliminary injunction order, as it is respectfully requesting that this Court deny the Motion to Dismiss and, for the benefit of all creditors, provide Stream with the opportunity to: (a) seek rejection of the Omnibus Agreement as an executory contract (which it clearly is); (b) seek avoidance and recovery of property transferred pursuant to the Omnibus Agreement; (c) investigate, including the conduct of needed discovery, and prosecute the claims against Stastney, SLS and others relating to their wrongful conduct concerning the Debtor; and (d) seek confirmation of a plan of reorganization. This request is entirely consistent with both the letter and spirit of the Bankruptcy Code, as well as the Chancery Court's preliminary injunction order.

## FACTUAL BACKGROUND

I.     **The Debtor**

4.     On February 24, 2021 (the "**Petition Date**"), the Debtor filed a voluntary petition for relief under Chapter 11 of Title 11 of the Bankruptcy Code. Pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code, the Debtor is a debtor-in-possession and remains in possession of its assets. A list of the assets in the possession of the Debtor is attached as **Exhibit A** and incorporated herein by reference. No official committee of unsecured creditors has been appointed.

5.     Stream was founded in 2009 as a "new media" company to pursue new technologies that enhance user entertainment and communications experiences. Stream has developed, and is currently seeking to launch, technology that allows TV and tablet manufacturers to convert two-dimensional devices into three-dimensional ("**3D**") without the need for viewing glasses.

6.     Stream projects that generation of revenue will come from providing 3D components to final market assemblers such as TV manufacturers and tablet makers. This approach is similar to how major computer manufacturers use processors in their products and note their products include such components.

II.     **The Debtor's Loans from SLS and Hawk**

7.     Stream's technological innovations and the projections related thereto allowed the Company to obtain loans and raise funds from investors. Since 2009, Stream has raised approximately $150 million from lenders and investors who are interested in the Company's technology. *See Declaration of Mathu Rajan in Support of First Day Motions* [D.I. 51] ("**Rajan Declaration**") at ¶ 23. SLS Holdings VI, LLC ("**SLS**") and Hawk Investment Holdings Limited ("**Hawk**") were among the many companies and individuals that financed or invested in Stream.

8.     Between 2011 and 2012, SLS, of which Stastney is a principal, loaned $6 million to Stream through five separate notes (the "**SLS Insider Notes**") and in exchange, received a pledge of substantially all of the assets of Stream. *See Rajan Declaration* at ¶ 23.  Between 2014 and 2020, Hawk loaned Stream more than £50 million and $1.336 million.  Hawk's loans are documented in 18 separate notes (the "**Hawk Notes**") and are secured by a subordinate lien in substantially all of the assets of Stream. *Id.* at ¶ 24.

9.      In October of 2014, Intrinsyc Technologies Corporation of Canada ("**Intrinsyc**") made a $1.5 million loan to Stream in exchange for Stream's commitment to place purchase orders with Intrinsyc for guaranteed future work. *Rajan Declaration* at ¶ 25.

10.      In 2018, Stream initiated negotiations with SLS and Hawk to convert the SLS Insider Notes and the Hawk Notes into equity for the purpose of facilitating the raising of additional capital from investors.  In May of 2018, knowing that Stream was negotiating similar conversion agreements with SLS and Hawk, Intrinsyc executed a conversion agreement (the "**Intrinsyc Conversion Agreement**").  The negotiations with SLS and Hawk also resulted in the execution of parallel conversion agreements with SLS and Hawk under which each agreed to convert its debt holdings to equity in Stream (collectively, the "**Conversion Agreements**").  Under each of the Conversion Agreements, Stream had the sole and unilateral discretion to convert debt to equity.  More than 100 investors subsequently invested in Stream with the Conversion Agreements being a substantial positive factor in their investment decisions. *Rajan Declaration* at ¶ 25.

11.      On May 2, 2018, Intrinsyc honored the Intrinsyc Conversion Agreement and received 415,346 common shares of Stream for the accreted value of its $1,661,384 debt. The effective conversion of the SLS Insider Notes and the Hawk Notes to equity has been one of the various issues that have raised conflicts and disputes between SLS, Hawk and Stream. *See Rajan Declaration* at ¶ 30.

III.      **Stastney's Appointment as Vice-Chairman and CFO of the Debtor**

12.      Stastney was appointed Vice-Chairman of the Debtor's Board of Directors in September of 2018 and Chief Financial Officer in December of 2018.  The intended objective of Stastney's appointments was to guide the financial and business direction of Stream, to assist the

Company in raising additional capital from institutional investors and to help the Company prepare for a potential public offering or acquisition. *See Rajan Declaration at ¶ 31.* In connection with his appointment as CFO, on December 1, 2018, Stastney entered into an Employment Agreement with Stream whereby Stastney expressly agreed not to (a) solicit any Stream employee for other employment; or (b) compete with Stream or solicit others to do so.

13.     From the start, however, Stastney's fiduciary role as Vice-Chairman of the Debtor's Board of Directors and CFO conflicted with his status as a principal of Stream's senior secured creditor, SLS, and created multiple difficulties in both the development and management of Stream's business. For example, in July of 2019, Stream was achieving a degree of success in fundraising. But, fundraising remained an ongoing challenge for Stream partially because of the debt held by SLS. As a result, Stream attempted to negotiate with Stastney to have SLS convert its debt into equity, among other things. Being on both sides of that negotiation presented an incurable conflict of interest for Stastney. But rather than recuse himself and have others at SLS conduct the negotiations, Stastney doubled down and demanded that Stream set up a "sweep" account for the benefit of SLS to aggressively pay down SLS's outstanding debt and interest. *See* July 8, 2019 E-Mail from Leo Hindery to Mathu Rajan, attached hereto as **Exhibit B**. Specifically, Stastney demanded that Stream immediately pay a $3 million lump sum to SLS and create an account that would automatically "sweep" $1,000,000 of Stream's cash to SLS every month, provided that certain minimum operating capital requirements were maintained. **Exhibit B**. This is an outrageous action by a fiduciary to a company. Even were Stastney not on the Board, his demands while in a position of power and dominance created significant lender liabilities for SLS, which Stream will pursue against SLS and Stastney, among others.

14.     Stastney's position as CFO also hurt the Company's reputation in the investing community.  Unbeknownst to the Company when Stastney initially joined the Board, the Securities and Exchange Commission had previously instituted and settled administrative and cease-and-desist proceedings against Stastney for willful violations of federal securities laws. The SEC action alleged that Stastney breached his fiduciary duties to an investment fund (whose assets ultimately found their way into SLS) while he was affiliated with the investment adviser. Stastney was required to disgorge and pay interest and penalties of nearly $3 million and barred from association with any investment company, investment advisor, broker, dealer, municipal securities dealer or transfer agent.  When Stream's auditor, Deloitte, found out about this while preparing the 2018 audited financials to support due diligence requests from prospective investors, it informed Stream that it would not complete and certify the audit as long as Stastney held such significant roles in the Company.  Shastney's tarnished reputation also hurt fund-raising, as institutional investors were reluctant to invest with Stream due, in part, to concerns about Stastney's past misconduct.

IV.     **Stastney's Scheme to Take the Assets and Business of Stream**

15.     Soon after being made an officer of the Company in 2018, and now armed with inside influence over the Company's financial position and operations, Stastney began his scheme to acquire control of Stream and its assets.  One method was his campaign of contacting certain of Stream's investors and criticizing them for having made a "bad decision" to support Stream's existing management. *Rajan Declaration* at ¶ 36.  Another was his contacting of prospective investors in an attempt to dissuade them from investing in the Company. *Id*.

16.     These, and the other illicit activities described herein, continued throughout 2019 and into early 2020, culminating with a meeting between Stastney (while still serving as

Stream's Chief Financial Officer and Vice-Chairman of its Board of Directors); Alastair Crawford, an investor in the Company; and others. At that meeting, Stastney advised them of his plan to take over Stream's assets and procure benefits for his select group of creditors and investors, including, among other things:

(a)  securing positions on the board of directors of a new company to be formed (Newco);

(b)  securing lucrative engagements with the Newco; and

(c)  leaving behind the remaining Stream employees and creditors.

17.     At the time, Stastney was fully aware that his actions were in breach of his fiduciary duties and also in breach of the Non-Competition and Non-Solicitation terms of his December 1, 2018 Employment Agreement.

A.     **Stastney Resigns and Intensifies his Interference Efforts**

18.     On January 30, 2020, Stastney notified Stream of his resignation from the Board and as CFO, and made certain demands on Stream in connection with that resignation. In open acknowledgment of his ongoing conflicts and insider dealings, Stastney offered—as part of his resignation package—to extend the maturity of the SLS Insider Notes from February 1 to March 1, 2020 in exchange for a lump sum payment to him personally of $202,500 on or before February 7, 2020. *Rajan Declaration* at ¶ 39.

19.     Further, Stastney offered to extend the maturity of the SLS Insider Notes as long as Stream continued to pay Stastney's annual salary of $360,000 (despite the termination of his employment responsibilities). *Rajan Declaration* at ¶ 39. Stastney did this knowing that he had no intention of SLS honoring that agreement. It was all a ruse in furtherance of his scheme to deceive Stream and take its assets for less than fair market value.

B.     **Stastney Initiates Action to Take Stream's Assets**

20.     After his exit from Stream, Stastney continued to interfere with Stream's prospective and existing investors in an effort to stop the flow of funds, thereby making it impossible for Stream to retire the SLS Insider Notes, and Stastney advised Hawk to do the same. *Rajan Declaration* at ¶ 40.  Specifically, in February 2020, Stastney convinced Hawk to follow his strategy of claiming to have unilaterally seized Stream's assets, after declaring their debts to be in default.  In another example, MotivIt, one of the Debtor's information technology providers that secured Stream's servers, networks, hard drives and corporate e-mail accounts, reported that at the request of SLS and Hawk, it had initiated an offboarding process for Stream and would prepare onboarding a new client in its place.  *Id.* at ¶ 46.  In addition to contacting the Company's vendors, Stastney informed Stream's employees, investors, strategic partners and others that SLS would be issuing a Notice of Default on March 1, 2020 and would then immediately take possession of Stream's assets. This created the false impression that the unpaid SLS Insider Notes would result in the immediate loss by Stream of its assets.  *Id.* at ¶ 42.

21.     Stastney's efforts to separate key employees from Stream are evidenced by a detailed written employment offer drafted and executed between Stastney and Stream's Vice-President of Engineering. Stastney promised employment to the Vice-President with a to-be-determined future entity. This employment offer was signed while Stastney was still employed by the Debtor as Vice-Chairman of the Board and Chief Financial Officer. *Rajan Declaration* at ¶ 43.

22.     As he and SLS continued "to apply maximum pressure" (as he called it), Stastney continued to offer to extinguish the SLS Insider Notes in exchange for all of Stream's assets. Each time, the Rajans and other Stream management declined because they felt that such a

concession would unfairly impact Stream's other investors and creditors. *Rajan Declaration* at ¶ 41. Therefore, Stastney employed new tactics.

C.     **SLS Issues its Notice of Default**

23.     After issuing a Notice of Default to the Debtor on March 9, 2020, SLS filed a complaint on March 23, 2020 in the Superior Court of the State of Delaware in and for New Castle County ("**Superior Court**") seeking to obtain (a) money damages on the alleged obligations due to SLS by the Debtor, and (b) replevin of its collateral. *Rajan Declaration* at ¶ 44.

24.     Despite SLS's request for expedited relief and an injunction, the Superior Court did not order the immediate transfer of the Debtor's assets to SLS. Rather, the Superior Court set a trial date for June 7, 2021 in the matter. *Rajan Declaration* at ¶ 45.

25.     Stymied again, and now faced with a 14-month delay in liquidating the amount claimed due SLS and seizing control of Stream's assets, Stastney began to engage in various "self-help" schemes to take possession of the Company's valuable technology and its customers. *Rajan Declaration* at ¶ 45.  One such scheme is as follows.  In late March and early April 2020, Stastney and Stream's Vice-President of Engineering, (who had previously signed a lucrative employment offer with Stastney's to-be-determined company), seized physical control of Stream's engineering computer servers in Silicon Valley from MotivIT, a third-party IT company managing the Company's IT infrastructure in the United States. To do this, it was falsely represented to MotivIT that SLS's Superior Court complaint was, in fact, a judgment from the Superior Court whereby SLS had become the new legal owner of the assets. *Rajan Declaration* at ¶ 46. To that end, in early March 2020, Stastney sent an official notice to MotivIT in which he stated that SLS owned all of the Debtor's assets, saying:

- Stream and its subsidiaries and affiliates are in default on their senior secured debt owed to SLS of approximately $9.7mm.

- Stream failed to deliver the collateral which secures the debt owed to SLS and as to which SLS has perfected UCC liens.

- Stream is in foreclosure, and all assets of Stream belong SLS. Additionally, SLS has been granted power of attorney by Stream to direct disposition of its collateral until it is repaid in full.

- Whether or not Stream pays its outstanding obligations to MotivIT, SLS directs MotivIT to hold any Stream assets in trust for SLS until directed otherwise by SLS using its power of attorney for Stream.

- If MotivIT complies, SLS will agree not to claw back any amounts MotivIT receives from Stream, and will pay any further amounts due upon receipt of all Stream property in MotivIT's possession.

In making these false statements, Stream's Vice-President of Engineering and Stastney not only interfered with Stream's operations and contracts by blocking the Company's access to its own valuable equipment and computer code, but they unlawfully seized control of those Stream assets. Once Stream realized what had happened, it filed a motion for preliminary injunction in the Delaware Court of Chancery. *Rajan Declaration* at ¶ 46.

        D.      **<u>Stastney Executes his Takeover Plan</u>**

26.     With his plan now fully in motion, Stastney colluded with Hawk, Ruffena Capital Ltd, (a London based investment bank previously engaged by Stream to provide investment banking services), as well as some other of the Company's shareholders, to commence a hostile takeover of Stream's Board of Directors.

27.     To take Stream's assets under this method, Stastney and his associates needed to stack Stream's Board to neutralize the votes of those Board Members who would oppose him. As an initial step, Stastney, SLS and Hawk demanded that Stream appoint new directors who, because of their purported "independence," would contribute to the development of Stream's business. However, as evidenced by their conduct discussed below, the new directors were not

independent. Instead, they knowingly worked as Stastney's instruments: first, to eliminate board and management opposition to the scheme; and second, to authorize the transfer of all Stream's assets to Newco (i.e., SeeCubic).

28.     At Hawk's insistence, the Company agreed to expand its Board of Directors in March 2020 and offered seats to individuals recommended by Hawk and certain other Stream investors. *Rajan Declaration* at ¶ 48. During the discussion regarding the expansion of the Board at the end of February 2020, Hawk suggested that Kevin Gollop be appointed to the Board to represent Hawk's interests.

### E.      The Resolution Committee is Appointed

29.     At the May 4, 2020 meeting of Stream's Board of Directors, the new so-called "independent" directors, Kevin Gollop, Asaf Gola and Krzyztof Kabacinski, proposed a number of resolutions, contrary to Stream's bylaw and charter, that enabled Stastney to begin executing on his scheme to take the assets of Stream. *Rajan Declaration* at ¶ 48.

30.     The three resolutions submitted by Gollop, Gola and Kabacinski (a) provided that all directors would serve for no less than one year without being removed, (b) removed Mathu Rajan as Stream's Chief Executive Officer, (c) created and authorized a "Resolution Committee" to settle the disputes and conflicts with SLS and Hawk and (d) appointed Gollop and Gola to the Resolution Committee.

31.     The motion for (a) passed with broad Board approval because the directors who were not part of Stastney's scheme were unaware that this was yet another calculated move. Motions (c) and (d) passed by three-to-two votes. However, the resolution for (b) was altered so that Mathu Rajan retained his position as CEO—but restricted him from fundraising or executing any strategic deals without Board approval. Bizarrely, during the course of the meeting, the

various resolutions were emailed, one at a time by the "independent" directors to the other directors—and only after each previous resolution had been voted on. This unorthodox conduct by Gollop, Gola and Kabacinski resulted in keeping the overall agenda and strategy hidden from the other Board Members until the last minute.

32.     As discovered and later confirmed by their conduct, these so-called "independent" directors were not only consulting with Stastney on the transfer of Stream's assets to SLS' and Hawk's Newco the whole time, but they were relying on documents and resolutions prepared by Stastney.

33.     During the Board Meeting, Directors Raja Rajan and Mathu Rajan voiced their concerns and requested an adjournment to review and analyze the legality and meaning of the proposed resolutions. The three so-called "independent" directors refused to adjourn and forced an immediate vote on the resolutions without deliberation.

**F.     The Omnibus Agreement and the Letter Agreement**

34.     Two days after that series of three-to-two Board votes, the Resolution Committee, at the direction of Stastney, approved the Omnibus Agreement which provided for the transfer of all of Stream's assets to Newco.  Stream's directors who signed the Omnibus Agreement clearly were doing so in favor of Stastney and his creditor group as they knew they were to be employed and would receive compensation and other benefits upon the transfer of the Company's assets to Stastney's new company, which would later be formed and is Movant SeeCubic, Inc. ("**SeeCubic**").  *Rajan Declaration* at ¶ 49.

35.     The Omnibus Agreement terms are essentially identical to the settlement terms previously proposed by Stastney and rejected by Stream's management in the Spring of 2020. *Rajan Declaration* at ¶ 49. There is no evidence of arm's length negotiations, independent legal

or financial advisors for the directors, or any measure to safeguard Stream's position, investors, and creditors. Almost all the interactions of the alleged "independent" directors were with Stastney, who acted as their advisor and scrivener, explaining to them how they should sign the Omnibus Agreement, drafting their e-mails and resolutions, controlling their communications with the Rajan family and investors, and granting authorization to share information about the Omnibus Agreement with third parties. With respect to the Omnibus Agreement's terms, Asaf Gola and Kevin Gollop only raised two issues—both of which pertained to the treatment of shareholders of Newco.

36. There is no record that the Resolution Committee sought independent legal or financial advice or conducted any due diligence action before the execution of the Omnibus Agreement. All advice, both legal and financial, came from Stastney. Nonetheless, the "independent" directors sold off all of the Debtor's assets of a company—valued at over $300 million—to settle less than $140 million in debt; all without legal and financial advice, reasonable negotiation or adequate Board deliberation.

37. Having obtained the Resolution Committee's commitment to the Omnibus Agreement, Stastney then commenced his efforts to buy-off the dissenters. On the morning of May 6, 2020, Stream's "independent" director Krzyztof Kabacinski[1] approached the Rajan family with a settlement package, including the offer of SeeCubic shares and warrants, payment of salary and benefits, and the release of claims, all designed to buy compliance.

38. Only after the Omnibus Agreement's execution were the directors of Stream who opposed the appointment and constitution of the Resolution Committee advised that SLS, Hawk and certain investors had also entered into a side "**Letter Agreement**" of May 6, 2020 that

---

[1] That Kabacinski, a Stream board member, had SeeCubic's authority to make an offer on behalf of SeeCubic again indicates his major conflict of interest and identity of the master to whom he served.

materially altered the terms of the Omnibus Agreement. In so doing, Kabacinski hid the existence of the Letter Agreement and its terms from the Rajan family. Director Asaf Gola sent a similar communication on May 7, 2020—again, through omission, misleading the Rajan family about the existence and terms of the Letter Agreement. Although the Letter Agreement was not executed by Stream or any of its authorized representatives, it nonetheless provided for Stream to issue 48,000,000 shares of its Class A Common Stock as follows:

(a)     4,000,000 shares of Class A Common Stock to SLS;

(b)     40,000,000 shares of Class A Common Stock to Hawk;

(c)     4,000,000 shares of Class A Common Stock to certain investors; and

(d)     The newly issued Stream shares were to be immediately exchanged for shares of common stock of Newco.

As consideration for the issuance of the shares to SLS and Hawk, the Letter Agreement provided that Stream was to receive satisfaction of interest and fees accrued on the SLS and Hawk Notes. However, those same Notes were to have been satisfied and extinguished under Omnibus Agreement, indicating that Stream was to receive nothing for the issuance of those 44,000,000 shares. More offensively, the Letter Agreement provided that the investors were to receive their shares in consideration for supporting the Omnibus Agreement. Whether the members of the Resolution Committee had knowledge of the Letter Agreement and the issuance of new shares at the time they executed the Omnibus Agreement should be investigated by the Debtor.

## G.    <u>Future Employment for the "Independent" Directors</u>

39.     As further evidence of the Resolution Committee members' fealty to Stastney and his plan, the "independent" directors received invitations to serve on the board of, and/or employment with, Newco/SeeCubic or entities affiliated with Alastair Crawford and his investor group. *See Rajan Declaration* at ¶ 49. Because they refused to resign from the board of the

Company for strategic reasons even after the execution of the Omnibus Agreement, they occupied seats on the boards of both Stream and SeeCubic simultaneously.

**H.**     **The Omnibus Agreement's Harmful Impact on the Company's Creditors**

40.     A careful review of the Omnibus Agreement confirms Stastney's favoritism of certain investors and disdain for the fair treatment of other creditors. Section 1.1(b) of the Omnibus Agreement provides that Newco will assume and pay those liabilities and obligations of the Company set forth on Schedule 1.1(b). However, that Schedule was "to be provided as promptly as practicable hereafter." Therefore, the Resolution Committee members executed the Omnibus Agreement without knowing what, if any, obligations were to be assumed by Newco. It is clear that the Resolution Committee did not consider how the Omnibus Agreement would impact the Company's employees, creditors or contract parties to whom Stream was indebted.

41.     Stastney's strategy to avoid payment of the Company's unsecured creditors (beyond those in his circle) was later revealed. On December 15, 2020, more than seven months after the execution of the Omnibus Agreement, Stastney sent a list of Stream's liabilities that were to be assumed by SeeCubic. While notes owed to SLS, Hawk (which were to have been satisfied under the Omnibus Agreement) and six other investor/lenders were listed as being assumed, SeeCubic assumed the obligation owed to only *one* unsecured creditor, that being Philips Electronics for royalty fees that were not yet due under a license agreement.

**OPPOSITION TO DISMISSAL AND APPLICABLE AUTHORITY**

**I.**     **Reorganization is in the Best Interest of the Creditors and Bankruptcy Estate**

42.     The purpose of Stream's bankruptcy case is not merely a litigation tactic to gain an advantage in the Chancery Court. Rather, the Company has sought relief here in order to use the unique provisions of the Bankruptcy Code to:

- protect Stream from further damage resulting from the dissipation of assets and the interference with its contracts;

- shed the agreements, either through rejection or avoidance, that were implemented to accomplish Stastney's scheme to seize the assets and business of Stream;

- recapture those assets that have been preferentially or fraudulently transferred under the Omnibus Agreement;

- investigate and pursue actions to recover the damages suffered by the Company as a result of Stastney's scheme, including actions against SLS and others, pursuant to certain theories of lender liability; and

- reorganize the Company to maximize its value for the benefit of all of its creditors, equity holders and employees.

43. The evaluation of the debtor's good faith is a "'fact-intensive inquiry' in which the court must examine 'the totality of the facts and circumstances' and determine where a 'petition falls along the spectrum ranging from the clearly acceptable to the patently abusive.'" *In re Memorial Corp. v. Bepco, L.P.*, 589 F.3d 605, 618 (3d Cir. 2009) (quoting *NMSBPCSLDHB, L.P. v Integrated Telecom Express, Inc. (In re Integrated Telecom Express, Inc.)*, 384 F.3d 108, 118 (3d Cir. 2004)). No single factor is dispositive, but two questions are particularly relevant to the issue of good faith: (1) whether the petition serves a valid bankruptcy purpose; and (2) whether the petition is filed <u>merely</u> to obtain a tactical litigation advantage. *Id.* (emphasis added).

44. A Chapter 11 petition can serve a valid bankruptcy purpose if it enables a debtor to preserve a going concern or to maximize the value of the estate for the benefit of all its creditors where some or all of that value would be lost outside of bankruptcy. *Id.* at 619. Both factors are present here and necessitate the denial of Movants' Motion to Dismiss. Without the protections and powers provided by Chapter 11, the Company would be unable to preserve its

going concern value and protect its creditors and shareholders from the illegitimate transfer of assets to SLS, Hawk and a select few creditors and investors.

45.     It is well-settled law that a bankruptcy case is a collective proceeding that exists to benefit <u>all</u> creditors. *See In re Gulf Coast Oil Corp.*, 404 B.R. 407, 426 (Bankr. S.D. Tex. 2009) (essence) ("[B]ankruptcy is, at its essence, a collective remedy intended to benefit all creditors, not just the secured lender."); *In re Timbers of Inwood Forest Assocs., Ltd.*, 808 F.2d 363, 373 (5th Cir. 1987) ("A principal goal of the reorganization provisions of the Bankruptcy Code is to benefit the creditors of the Chapter 11 debtor by preserving going-concern values and thereby enhancing the amounts recovered by all creditors.").  As fully detailed herein, Stastney and his cronies schemed to preferentially or fraudulently transfer Stream's assets, and ultimately hand over the value of the entire company (worth over $300 million), to Stastney's hand-picked group of creditors and investors; who hold less than $140 million in debt.  If allowed to occur, this would result in a windfall to Stastney and his conspirators that is far above the amounts owed to them by Stream—and all to the detriment of the remaining creditors and investors.  In the face of that, this bankruptcy case instead should allow Stream to recapture assets, pursue claims and reorganize itself, all of which serves to maximize the Debtor's estate for the good of all of the creditors and investors.  *See BEPCO*, 589 F.3d at 619.

## II.     <u>A State Court Order Does Not Bind the Bankruptcy Court</u>

46.     Judge Peter Walsh has held that "State Courts do not have subject matter jurisdiction to hear a claim that a particular bankruptcy filing was an abuse of process under state law."  *In re Medifacts Int'l, Inc.*, C.A. No. 07-10110 (PJW), 2007 WL 521917, at *1 (Bank. D. Del. Feb. 8, 2007) (citing *Gonzales v. Parks*, 830 F.2d 1033, 1035 (9th Cir. 1987); *James v.*

*Draper*, 940 F.2d 46, 53-54 (3d Cir. 1991); and *Koffman v. Osteoimplant Tech., Inc.*, 182 B.R. 115, 125 (D. Md. 1995)). Judge Walsh further held:

> Since a state court clearly has no jurisdiction to interfere with a commenced bankruptcy proceeding, it seems to me to equally follow from the rationale discussed in these cases, that a state court would not have any authority to enjoin the filing of a petition. Indeed, the court in *In re Corporate and Leisure Event Productions, Inc.*, 351 B.R. 724, 731 (Bankr. D. Az. 2006) so held.

*Id.* Judge Walsh's holding is consistent with a large body of case law that illustrates the Federal Bankruptcy law preempts any action by a state court to disturb a case filed under the United States Bankruptcy Code. Even where a state court has by final order enjoined or taken the far more draconian step of placing a party's assets under a receivership, the Bankruptcy Code preempts such state action and has the primary jurisdiction over the debtor's assets.

47. That Movants do not challenge Stream's ability to file bankruptcy is instructive here—and gives the lie to their claim that the Preliminary Injunction Order has preclusive effect in this action (which it does not). Indeed, in failing to challenge Stream's authority to file for bankruptcy, Movants essentially concede that: (1) Mathu Rajan, as Stream's sole director, has the authority to authorize Stream's bankruptcy filing; and (2) the Court of Chancery's preliminary injunction order does not—and cannot—bar Stream from availing itself of the protections and tools set forth in the Bankruptcy Code. As Judge Walsh noted, "a state court [does] not have any authority to enjoin the filing of a petition." *In re Medifacts Int'l, Inc.*, C.A. No. 07-10110 (PJW), 2007 WL 521917, at *1 (Bank. D. Del. Feb. 8, 2007). *See also In re Westlake Property Holdings, LLC,* 606 B.R. 772, 777-78 (Bankr. N.D. Ill. 2019) ("[A] party may not use a state court injunction to support dismissal of a bankruptcy petition; only federal courts hold the remedies to challenge the filing of a bankruptcy petition."); *In re Sino Clean Energy, Inc.*, 901 F.3d 1139, 1142 (9th Cir. 2018) (acknowledging that "where a state court purports to

enjoin a corporation from filing bankruptcy altogether, federal law preempts that injunction"); *In re S & S Liquor Mart, Inc.*, 52 B.R. 226, 227 (Bankr. D.R.I. 1985) ("[I]t is fundamental that a state court receivership proceeding may not operate to deny a corporate debtor access to the federal bankruptcy courts … and it has been held that an order in a state court receivership specifically restraining the debtor corporation, its stockholders, officers and directors from instituting federal reorganization proceedings is an unconstitutional deprivation of the right to bankruptcy relief.").

48.     As discussed more fully *infra*, the Preliminary Injunction Order merely prohibited Stream (and others) from challenging the validity of the Omnibus Agreement or interfering in the transfer of certain of its assets to SeeCubic.  No one is disputing the validity of the Omnibus Agreement for purposes of this proceeding.  Moreover, once Stream filed for bankruptcy protection, the prohibition regarding interfering in the transfer of assets to SeeCubic was preempted.  Federal bankruptcy law, including most immediately the automatic stay, now controls the transfer or use of the property of this Bankruptcy Estate.  *See* U.S. CONST. art. VI, § 1, cl. 2. *See In re Medifacts Int'l, Inc.*, 2007 WL 521917, at *1 ("[A] state court clearly has no jurisdiction to interfere with a commenced bankruptcy proceeding.").

## III.    The Issues Addressed in the Preliminary Injunction are Irrelevant to this Case

49.     Despite Movants' protestations, the purpose of this bankruptcy case is not a bad faith litigation tactic to gain advantage in the Chancery Court.  Nor is it to re-litigate the Chancery Court's December 8, 2020 Preliminary Injunction and Opinion's findings that the "independent" directors were not validly in office during the May 6, 2020 time period.  Rather, it is to protect and enhance the assets and value of the Bankruptcy Estate for the benefit of <u>all of its creditors</u>, not solely for those selected for preferential treatment by Stastney under his scheme.

50.     As the facts of this case make plain, the "independent" directors, in concert with Stastney, improperly sought, through the Omnibus Agreement and the Letter Agreement, to improperly favor some creditors and investors over others. This factual issue was never before the Chancery Court.  As this Court is aware, the vast majority of the Chancery Court's discussion of its preliminary finding of facts focused on disputes concerning (a) whether the "independent" directors were (i) appointed validly, or (ii) were acting as de facto directors, or (iii) whether they were removed before approving the Omnibus Agreement; and (b) whether the Omnibus Agreement required shareholder approval.[2]  Indeed, forty-nine out of the court's fifty-two-page opinion concern those two issues.  None of those points are disputed here.  Moreover, the Chancery Court made it crystal clear that its view of the facts was preliminary in nature and was not "formal factual findings, but rather the facts as they appear reasonably likely to be found after trial, based on the current record."  Opinion at 5.

51.     The Chancery Court's distinction as to its factual findings in this regard is consistent with the well-settled general rule that preliminary injunctions are not final judgements for the purpose of res judicata. *See Kuzinich v. Santa Clara Cty.,* 689 F.2d 1345, 1350–51 (9th Cir. 1982) ("[I]ssues litigated in a preliminary injunction action are not res judicata and do not form a basis for collateral estoppel."); *Horner Int'l Co. v. McKoy,* 232 N.C. App. 559, 561, 754

---

[2] The only part of the Chancery Court's opinion that even comes close to the issues of conduct amounting to fraudulent or preferential transfers is a scant two pages of the Opinion that concerned whether or not the "independent directors" breached their fiduciary duties—and not a single page of that concerned the illicit schemes of Stastney detailed here.  *See* Chancery Court Op. at 49-51.  Further, the Chancery Court made no findings of fact regarding these important issues of director misconduct, instead stating simply that "Stream has not pointed to evidence" or that "[n]o evidence suggests" that the "independent directors" lacked independence or were acting for an improper purpose.  As such, the Court's vague statements, and quick dismissal of the topic, make it clear that the issues that will come before this Bankruptcy Court, including the rejection or avoidance of the Omnibus Agreement, were not before or focused on by the Chancery Court in connection with the preliminary injunction.  Further, Movants misstate the Chancery Court's opinion.  For example, on page two of their Motion to Dismiss, Movants claim that the Chancery Court found that "[t]he Rajan brothers fraudulently backdated a stockholder consent…."  That is a lie.  Nowhere in its opinion is there a finding or an assertion of fraud by the Chancery Court.

S.E.2d 852, 855 (2014) (quoting *A.E.P. Indus., Inc. v. McClure,* 308 N.C. 393, 400, 302 S.E.2d 754, 759 (1983)) (a preliminary injunction is "temporary and lasts no longer than the pendency of the action. Its decree bears no precedent to guide the final determination of the rights of the parties. In form, purpose, and effect, it is purely interlocutory."). In Bankruptcy Courts, the same conclusion has been reached; findings and conclusions made in a preliminary injunction do not have any res judicata or collateral estoppel effect on the parties. *In re Plevyak,* No. 5-16-AP-00047-JJT, 2018 WL 1686083, at *1 (Bankr. M.D. Pa. Apr. 5, 2018). *See also Red Bell Brewing Co. v. GS Capital, L.P. (In re RBGSC Inv. Corp.),* 240 B.R. 536, 544 (Bankr. E.D. Pa. 1999) (noting that a preliminary injunction is not a "final order" entitled to preclusive effect and in the absence of a final state court order neither res judicata nor collateral estoppel applies).

52.     This principle is common-sense because a preliminary injunction is not based on a full trial on the merits. As the U.S. Supreme Court explained in *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981):

> [t]he purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held. Given this limited purpose, and given the haste that is often necessary if those positions are to be preserved, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits. A party thus is not required to prove his case in full at a preliminary injunction hearing ... and the *findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits.* (emphasis added).

## IV.     The Debtor Has Substantial Valuable Assets

53.     Movants repeatedly claim that Stream has no assets, having transferred substantially all of its assets to SeeCubic pursuant to the Omnibus Agreement. Motion to Dismiss, ¶29. According to Stastney, the Omnibus Agreement resulted in the transfer of the Stream's assets to its secured creditors. *Declaration of Shadron L. Stastney in Support of Motion of SeeCubic, Inc. and SLS Holdings VI, LLC for an Order Dismissing Debtor's Chapter 11 Case*

[D.I. 47] (the "**Stastney Declaration**"), ¶ 8.  To the contrary and notwithstanding the Omnibus Agreement, Stream is the owner of substantial assets.  These include:

(a)     Assets that were not the subject of conveyance under the Omnibus Agreement, including the 1,000,000 shares of common stock of SeeCubic;

(b)     Assets that were not conveyed as of the Petition Date (even if authorized under the Omnibus Agreement), including all personal property, Technovative stock, intellectual property and licenses owned by the Debtor and, as previously explained, assets outside the territorial jurisdiction of Delaware;

(b)     Causes of action to avoid and recover any assets transferred under the Omnibus Agreement; and

(c)     Claims and causes of action against Newco (aka SeeCubic), SLS and Hawk for breach of contract and pursuant to various theories of lender liability.

In addition, subject to further discovery, Stream may have the following additional claims and causes of action:

(d)     Claims against Gola, Gollop and Kabacinski for breach of fiduciary duty;

(e)     Claims against Stastney for breach of fiduciary duty, breach of his Stream Employment Agreement, fraud and tortious interference; and

(f)     Claims against Stastney, SLS, Hawk and certain investors for civil conspiracy, aiding and abetting breach of fiduciary duty and other causes of action.

54.     A plain reading of the Omnibus Agreement contradicts Movants' claim that substantially all of the Debtor's assets have been transferred.  Like a garden-variety sale contract, the Omnibus Agreement is not an instrument of conveyance.  Movants can't point to any provision or language in the Omnibus Agreement which automatically acts to transfer right, title or ownership of any assets.[3]  To the contrary, Section 1.4 of the Omnibus Agreement contains language granting to Stastney an irrevocable power of attorney precisely *to take action to effect*

---

[3] As to at least some of the Debtor's assets, the Omnibus Agreement would be insufficient to transfer them. For example, the Bylaws of TechnoVative Media Inc. provide that any transfer of its certificated stock (of which Debtor is the 100% owner) must be accomplished by surrender of the stock certificate to the corporation. No such transfer has been executed.

the conveyance and transfers of the assets to Newco. Stastney's appointment would be unnecessary if substantially all of Stream's assets had been automatically conveyed under the Omnibus Agreement. Similarly, there would have been no reason for SeeCubic to seek mandatory injunctive relief from the Chancery Court—as there would have been nothing for the Rajans to have purportedly interfered with. Even the Chancery Court recognized that the transfer of assets was not automatic. In denying SeeCubic's request for a mandatory injunction, the Chancery Court found that it was unnecessary as Stastney, using the power of attorney, "**can accomplish** the transfers contemplated by the Omnibus Agreement." See Chancery Opinion, p. 52 (emphasis added). It was plainly understood that the transfer of assets was a contemplated future act. Finally, had all of the assets been transferred, SLS would have no claim against the Debtor as a creditor, as there would be nothing owed to it.[4]

55.     Indeed, Movants own actions show they understood this to be true. Attached as Exhibit 3 to Stastney's Declaration is a document that purports to be a Stock Transfer and Power that transfers certain assets of Stream. Although that Stock Transfer and Power was inadequate, for reasons of law, to convey Stream's ownership of the common stock of TechnoVative Media, Inc. to SeeCubic, it nonetheless is illustrative of the need for Movants' to have taken action to execute on the terms of the Omnibus Agreement. Moreover, even then, it would have not been adequate, as it does not address the transfer of the other Stream assets, which remain within the ownership and possession of Stream.

56.     Movant's post-Omnibus Agreement conduct also belies its argument that the Debtor has no assets as substantially all of Stream's assets were transferred. If such were the case, then Movant SLS and Hawk became contractually obligated to satisfy and extinguish the

---

[4] Taking SeeCubic's argument to its logical extreme, under its theory, SeeCubic is neither a creditor of the Debtor nor a party-in-interest. It has no standing to appear and be heard in this case.

SLS and Hawk Notes. Omnibus Agreement, §1.1(a). However, as of this date, those Notes, which are negotiable, have not been extinguished and returned to the Debtor and continue to be subject to litigation in Delaware Superior Court. Neither have SLS or Hawk released the liens securing the Notes. By asserting that Stream has transferred all of its assets to Newco, SLS is admitting that it is in breach of the Omnibus Agreement as those SLS Notes and Hawk Notes were conveyed to and, upon information and belief, are currently held by Movant SeeCubic.

57. Further, any assets of Stream located outside of the United States were singularly unaffected by the Chancery Court's order. It is not disputed that the Chancery Court, as a state court, has only limited jurisdiction in the context of any assets located outside the borders of the state of Delaware, much less outside the borders of the United States. Here, Stream possesses many assets that reside in foreign locales, far outside the reach of a Delaware state court.

58. The United States Supreme Court has long held that if there is any exercise of state power regarding foreign relations by a court, executive, or legislature, it must defer to the Federal Government. *See Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 413 (2003) ("There is, of course, no question that at some point an exercise of state power that touches on foreign relations must yield to the National Government's policy, given the concern for uniformity in this country's dealing with foreign nations that animated the Constitution's allocation of the foreign relations power to the National Government in the first place") (quoting *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 427, n. 25, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964)); *see also Salzberg v. Sciabacucchi*, 227 A.3d 102, 136 (Del. 2020) (holding that "a well-developed body of law, including Commerce Clause precedent, already exists to prevent a valid state law from having extraterritorial application. The limits on a State's power to enact substantive legislation are similar to the limits on the jurisdiction of state courts. In either case, any attempt directly to

assert extraterritorial jurisdiction over persons or property would offend sister states and exceed the inherent limits of the State's power.") (internal citations omitted).

59.     Here, any application of the Chancery Court's ruling must comply with the treaty determinations of the United States and a foreign sovereign—if any such treaty arrangements exist.  Otherwise, the law of the foreign jurisdiction concerning extraterritorial judicial orders will apply. *See Remington Rand Corp.-Delaware v. Bus. Sys. Inc.*, 830 F.2d 1260, 1268 (3d Cir. 1987) ("There was and is no guarantee that Remington U.S.'s judgment will ever be recognized by a Dutch court. There is no treaty on recognition of foreign judgments between The Netherlands and the United States. Therefore, a United States judgment must be presented to a Dutch court for its consideration.").  Here, Stream owns assets in the following foreign countries, none of which are obligated to follow the Chancery Court's Opinion:

- Netherlands
- Curacao
- United Kingdom
- Spain
- Germany
- Japan
- China
- Taiwan
- Malaysia

60.     Stream also is the owner or the holder of claims to 1,000,000 shares of common stock of SeeCubic.  Under the terms of the Omnibus Agreement, SLS, Hawk and the investors contracted to deliver one million shares of SeeCubic common stock to Stream.  As of the date of this response, they have failed to deliver those shares.  The Debtor's claims against SeeCubic and the parties to the Omnibus Agreement, whether sounding in breach of contract or misrepresentation, are assets of this bankruptcy estate.

**V.      Stream is a Going Concern**

61.      Stream has created the Ultra-D technology, which is a fully-adjustable Glasses-Free 3D technology for all types of displays.  Stream's business model is to be a technology provider to device makers as well as content makers and their distributors, similar to the licensing and sales that companies such as Intel provide to their customers.  Stream also expects worldwide market presence, including critical markets in the Middle East and Asia.  Stream is pursuing multiple paths to market based on three (3) separate product platforms, Two-View Products, Multi-View Products, and Ultra-D Products, all of which are viable options in the overall Glasses-Free 3D global market.  *Declaration of Charles M. Robertson in Support of First Day Motions* [D.I. 77] (the "**Robertson Declaration**") at ¶ 4.  Stream has spent years developing valuable relationships with customers, vendors, and strategic partners in this market.  *Id.*

62.      Two-View Products, which variously incorporate "stitching" and/or "tiling" technologies, provide relatively simple Glasses-Free 3D solutions.  *Robertson Declaration* at ¶ 7.  There are many technology developers, manufacturers and distributors worldwide currently offering two-view products for the global market.  *Id.*  A variety of multi-view Glasses-Free 3D solutions have been developed in recent years, but Stream is interested in pursuing development, sales and distribution of products utilizing technology developed by Philips (the "**Philips Technology**") prior to 2009.  *Id.* at ¶ 16.  This technology, called WOWvx by Philips and referred to internally by Stream as "modified light field," uses a 2D color image paired with a grayscale depth map to communicate data to a render engine that produces a three-dimensional image on the display.  *Id.*  Products also require specially-designed optical lenses that are bonded to a 2D video panel.  *Id.*  Philips disbanded its 3D Solutions business unit in 2009 and has subsequently licensed patents to the Philips Technology to several companies competing in the

Glasses-Free 3D industry, including Stream. *Id.* As set forth below, Stream has access to an additional license for the Philips Technology as well as the necessary computer source codes for product development. *Id.* at ¶ 18. Equipment required for optical bonding of the lenses for multi-view products is in Suzhou, China and remains in Stream's possession. *Id.* at ¶ 19. Stream also has access to experienced optical bonding engineers in connection with the production. *Id.*

63. Stream has developed significant market opportunities for its Ultra-D™ technology, which is a proprietary multi-view solution incorporating the Philips Technology and certain improvements made thereupon by Stream between 2011 and 2020. *Robertson Declaration* at ¶ 21. While Ultra-D™ was in technical development, Stream's business unit forged relationships with potential customers, consumer brands, strategic partners, and others interested in bringing Ultra-D™ products to market. *Id.*

64. Stream has current relationships and projects ready to begin with Lenovo, Skyworth, Chunghwa Telecom, and is in discussions with Apple, ASUS and Hewlett-Packard. *Robertson Declaration* at ¶ 28. Chunghwa Telecom, the largest telecommunications company in China, intends to develop an 8K-resolution (ultra-high-definition) Ultra-D™ consumer television as an offering to its subscriber base to support the rollout and growth of its 5G content delivery service, much like domestic cellular services offer subsidized phone equipment to their customers in exchange for subscription commitments. *Id.* at ¶ 24. Skyworth, the sixth largest television manufacturer in the world as of 2020 and gaining market share with its focus on ultra-high-definition product offerings, intends to develop 8K-resolution Ultra-D™ televisions for the consumer market. *Id.* at ¶ 23. Skyworth is already working with Stream to create custom components for Stream's projects with other customers. *Id.* Lenovo intends to develop an 8K-resolution Ultra-D™ gaming laptop for the consumer market. *Id.* at ¶ 22. The product

development interest follows successful demo samples delivered by Stream to Lenovo and numerous Lenovo in-house demonstrations. *Id.*

65.     Glasses-Free 3D engineering is a small, highly-specialized field where competition for quality engineers is at a premium, and Stream's inability to retain its engineering teams would put it at a significant disadvantage in satisfying any request of customers and the loss of any skilled labor would have a negative impact on the Debtor's going concern value. *Robertson Declaration* at ¶ 34. Stream has already had key employee attrition in at least one case because the DIP motion was continued. In terms of manufacturing, the Debtor also has available engineering resources in a wide variety of critical areas. *Id.* at ¶ 29. One key source is its relationship with JoveAI Innovation, Inc. ("**JoveAI**"), giving the company access to a highly-experienced team of electronics professionals in Silicon Valley. *Id.* JoveAI is a firm whose executives and engineers have been contributing to digital video, audio and image processing since the creation of MPEG1, the first video compression technology in the early 1990's. *Id.* Its experience includes participation in the first release of DVD, Blu-ray, HDTV (high definition), IPTV (internet) and OTT (Over-the-Top) streaming technologies. *Id.* Stream also has access to an optical, mechanical engineering and production team of former Stream employees (who were not hired by SeeCubic) in Asia, including A.J. Yeh, Liu Zhen, Linlin Zhu, and Jack Wu. *Id.* at ¶ 30. Many of these engineers have several years' experience with Glasses-Free 3D technology in general, and with Ultra-D™ in particular. *Id.*

66.     Stream has access to 3D content creation and global sales teams comprised of individuals also not employed by SeeCubic. *Robertson Declaration* at ¶ 31. Stream maintains a good relationship with and intends to employ or contract Zygintas Papartis and Sara Brewer, who have a combined 16 years' experience in Glasses-Free 3D content creation for multi-view

and Ultra-D™ displays.  *Id.*  For global sales, Stream intends to re-engage its primary business development and sales agent, Matt JJ Lo, who developed customer leads and product interest with Skyworth, Lenovo, Chunghwa Telecom and other major consumer brands like Hisense, ASUS, and Apple.  *Id.*  Mr. Lo's longtime experience and personal contacts in the consumer electronics industry is a valuable asset for Stream.  *Id.*

## VI.    Stream and VTI have a Viable Plan of Reorganization

67.    During the brief period during which this Chapter 11 case has been pending, Stream and VTI have already identified several lucrative opportunities that they believe evidence the viability of the contemplated reorganization strategy.

68.    VTI was formed to acquire and develop technology, primarily in the glasses-free 3D technology industry, but also in other visual technologies.  VTI's Response in Support of DIP Motion, ¶ 3 [D.I. 67]. VTI is invested in certain technology projects unrelated to the Debtor's Ultra-D technology.  *Id.*  Nevertheless, VTI is interested in acquiring the Debtor's Ultra-D technology and has solicited investment from third parties for the purpose of capturing the glasses-free three-dimensional screens market.  *Id.*  On March 1, 2021, the Debtor filed the DIP Financing Motion.  The DIP Financing Motion seeks approval of DIP Financing in an initial amount of $200,000, up to $1,000,000 to be provided by VTI.  *See* DIP Financing Motion at ¶¶ 1, 2 [D.I. 30].  The DIP Financing would be unsecured, subject only to administrative expense priority pursuant to Section 503 of the Bankruptcy Code.  *Id.*  Interest would accrue only at 6.00% per annum.  *Id.*, Ex. B at 6.

69.    Mathu Rajan, while owning 100% of the voting shares of VTI, owns less than 10% of the Class A common stock of VTI.  VTI Response in Support of DIP Motion at ¶ 3.  The majority of VTI's Class A shares are owned by third parties who are not investors in Stream.  *Id.*

VTI's Board currently consists of 6 directors, three of whom were appointed by Mathu Rajan, and three of whom were appointed by Burlington Resources Asia Limited ("**Burlington**"), a third party unrelated to Mr. Rajan, his family or the Debtor. *Id.* Burlington, a venture capital and investment banking firm, which specializes on South East Asia and the ASEAN markets as well as India, has extensive experience and relationships with industry and government officials in those geographic areas. Not coincidentally, key parts of Stream's marketing, sales, manufacturing, and distribution chain are located in these markets, as are key potential customers and business partners.

70.     Burlington has over 35 years' experience and raised over USD $1 billion of new capital funding in South East Asia including Thailand, Singapore, Hong Kong, India and China, as well as Papua New Guinea and the United Arab Emirates. Burlington also has extensive experience in new technologies.

71.     Burlington is led by Tim McCarthy, one of VTI's six directors, who has 35 years of experience as an investment banker, stockbroker for Japan and South East Asia, corporate finance specialist, and entrepreneur. He worked in London from 1979-93 with Morgan Grenfell & Co, Bank of America International Limited, WI Carr, Swiss Bank Corporation and was a director of Asia Equity a South East Asian brokerage which subsequently merged with Banque Paribas. He has been on the board of directors of public and private companies, most notably as a director of Victory Corporation plc, Sir Richard Branson's Virgin branded cosmetics and clothing company, and his record label, V2 Music Holdings plc. He has also been a director of a major private property group in Delhi, India - Sweta Estates Pvt. Ltd.

72.     VTI and Stream have multiple opportunities to generate revenue for both companies by leveraging their existing and complementary relationships with vendors, strategic

partners, and customers seeking a variety of glasses-free 3D products for the global market. For instance, one significant opportunity involves the use of Stream's high-yield optical bonding equipment to service customers for a variety of product platforms. *See Rajan Declaration* at ¶ 22 and **Exhibit C** attached hereto. Another opportunity lies in VTI's identification of a two-view glasses-free 3D tablet developed by a third-party manufacturer seeking assistance with global distribution and future product enhancement. By leveraging the 3D expertise of Stream's content creation and engineering teams and VTI's complementary financial connections, both companies have an opportunity to generate near-term revenue from these products, which do not require long lead-time development to bring to market. *See Id.* at ¶ 20 and **Exhibit D** attached hereto. A third opportunity is with the Multi-View and Ultra-D technology platforms for 65-Inch Displays. In addition to satisfying immediate customer interest in ordering and reordering 4K-resolution displays, Stream intends to submit Motions to the Court to proceed with development of 8K-resolution glasses-free 3D products for Skyworth, a major consumer television brand, and Chunghwa Telecom, China's largest telecommunications provider. *Id.* and **Exhibit E** attached hereto. Finally, Stream has an ongoing contractual obligation and opportunity through its Dutch subsidiary Stream TV International B.V. to co-develop a high-resolution glasses-free 3D automotive instrument cluster with Robert Bosch GmbH ("Bosch"). The development deal will generate non-recurring engineering revenue in excess of $2 million during the course of the 18-month product development period. Although development costs will be covered through the arrangement with Bosch, VTI expects to participate in the product revenue stream as consideration for financial support it expects to provide to Stream, either directly or through its financial connections, related to automotive industry-specific manufacturing setup and expansion costs. *Id.* and **Exhibit F** attached hereto. VTI and the Debtor are in ongoing discussions

regarding a potential plan of reorganization that would serve to recapitalize the Debtor's business and leverage the Debtor's valuable technological and manufacturing capabilities to create synergy with VTI's own technology offerings. By early 2019, Stream had perfected its optical bonding process and was preparing to produce demonstrator samples for the consumer brands interested in adopting Ultra-D into their product lines. With its technology and business development plans ramping up, the Company began to seek large institutional investment and planned for simultaneous conversion of the SLS and Hawk debt. *Rajan Declaration* at ¶ 34. Although the Company did not achieve self-sustaining commercialization of its technology prior to the petition date, the technology is near-market and VTI and the Debtor expect that it will soon generate sufficient revenue to fund the Company as a going concern, particularly when combined with VTI's complementary technology offerings.

73. Stream and VTI expect to file a motion for authority to enter into contracts for the benefit of all stakeholders utilizing Stream's and VTI's complementary technology in the coming weeks. Stream and VTI further expect to file a reorganization plan involving substantial new investment in Stream to preserve the Company's going concern value and revitalize the business through the anticipated combination of Stream's and VTI's technologies. Although Stream has not yet filed its plan, there is more than sufficient momentum toward a viable reorganization to demonstrate that this case was filed in good faith.

## CONCLUSION

74.     Accordingly, for all these reasons, the Motion to Dismiss must be denied, and the

Debtor should be allowed to proceed with its plan of reorganization under Chapter 11 of the

Bankruptcy Code.


Dated: April 2, 2021                          **ARMSTRONG TEASDALE LLP**

                                              /s/ *Rafael X. Zahralddin-Aravena*
                                              Rafael X. Zahralddin-Aravena (#4166)
                                              Jonathan M. Stemerman (#4510)
                                              300 Delaware Ave., Suite 210
                                              Wilmington, DE 19801
                                              Telephone:  302-824-7089
                                              Email:     rzahralddin@atllp.com
                                                         jstemerman@atllp.com
                                              and

                                              John A. Sten, Esq. (admitted *pro hac vice*)
                                              225 Franklin Street, 26th Floor
                                              Boston, MA 02110
                                              Telephone:  (617) 217-2030
                                              Email:  jsten@atllp.com

                                              and

                                              David L. Going, Esq. (*pro hac vice* pending)
                                              7700 Forsyth Blvd., Suite 1800
                                              St. Louis, MO 63105
                                              Telephone:  (314) 621-5070
                                              Email:  dgoing@atllp.com

                                              *Attorneys for Visual Technologies Innovations, Inc.*