IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Stream TV Networks, Inc., | Case No. 21-10433 (KBO) |
| Debtor. | Re: Dkt. Nos. 46, 84 |

**REPLY OF STREAM TV NETWORKS, INC. TO STATEMENT OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS REGARDING THE MOTIONS TO DISMISS THIS CHAPTER 11 CASE AND JOINDER TO THE OMNIBUS OBJECTIONS**

Stream TV Networks, Inc. ("Stream" or the "Debtor") hereby responds to the Statement of the Official Committee of Unsecured Creditors Regarding the Motion to Dismiss This Chapter 11 Case and Joinder to the Omnibus Objections (the "UCC Statement") [D.I. 159] as follows:

**BACKGROUND**

1. On February 24, 2021, Stream filed its Chapter 11 petition in this Court. [D.I. 1].

2. On March 12, 2021 SeeCubic, Inc. ("SeeCubic") and SLS Holdings VI, LLC ("SLS") filed their motion to dismiss the bankruptcy case [D.I. 46] alleging that the case was filed in bad faith.

3. On March 24, 2021, the United States Trustee (the "UST") filed its motion to dismiss or convert the bankruptcy case [D.I. 84], similarly claiming that case was filed in bad faith.

4. On April 13, 2021, the Official Committee of Unsecured Creditors (the "UCC") was formed. [D.I. 121].

5. On April 15, 2021, this Court held a status conference regarding scheduling for the motions to dismiss. At that conference, counsel for the UCC appeared and made several points to the Court, including that (1) the UCC needed additional time to review a significant amount of

1222458951

information relevant to the motions to dismiss; (2) the UCC viewed its initial position in the case as a zero recovery; and (3) the UCC anticipated challenging the omnibus agreement as a fraudulent conveyance.

6.      On April 30, 2021, the UCC filed the UCC Statement.

## THE UCC SETTLEMENT WITH SEECUBIC

7.      As set forth in the UCC Statement, the UCC entered into an agreement (the "Settlement Agreement") with SeeCubic which calls for the UCC to support the SeeCubic motion to dismiss in exchange for SeeCubic's agreement to, among other things, pay the UCC's counsel fees in cash and fund a to-be-established litigation trust with a $2.5 million 3-year note payable and up to 2 million shares of SeeCubic stock.

8.      The litigation trust is also proposed to receive certain direct or derivative claims which SeeCubic has against Mathu Rajan and Raja Rajan. Significant exclusions are identified as being reserved by and for SeeCubic, thus providing no benefit to the litigation trust or Debtor's unsecured creditors.

9.      The Statement further provides that, notwithstanding the description of the Settlement Agreement in the UCC Statement, the actual terms of the Settlement Agreement govern.  UCC Statement, fn 8.

10.      The Settlement Agreement, however, is not attached to the UCC Statement.

11.      A review of the Settlement Agreement subsequently obtained by the Debtor suggests that the Committee may be contractually bound to support SeeCubic's motion to dismiss in a *quid pro quo* arrangement.  In the event that the Court does not grant the motions to dismiss, the Committee is no longer bound by the Settlement Agreement and can, among other things, support the First Day Motions.

## RESPONSE TO THE UCC STATEMENT

A.     <u>The Settlement Agreement demonstrates that the case is bonafide.</u>

12. Both motions to dismiss contend that the bankruptcy case should be dismissed as a bad faith filing. Each motion states that the case is a bad faith filing because there is no valid bankruptcy purpose to be served by it. *See* SeeCubic Motion, ¶44; UST Motion, ¶30. Indeed, both motions suggest that the case was filed solely to stay pending litigation.

13. The Debtor, in its papers, identified multiple valid bankruptcy purposes for the commencement of the case (which it will not repeat here, with one exception). The Debtor identified one of the purposes as being to address the claims of its unsecured creditors, a constituency not heard before, and hence not addressed by, the Delaware Court of Chancery.

14. Absent a bankruptcy, the unsecured creditors would receive no recovery of their claims in the event that the Omnibus Agreement was enforced as advocated by SeeCubic. As will be demonstrated at trial, in Exhibit 1.1(b) to the Omnibus Agreement, SeeCubic proposed to only assume the trade debt associated with one license, thereby leaving appropriately $18 million in trade and other unsecured debt without a meaningful source of recovery.

15. The filing of the bankruptcy creates a collective proceeding whereby all creditors can address their claims. As such, the Chapter 11 filing allowed the unsecured creditors to organize and to negotiate a threshold level of some recovery in this case.

16. This did not happen in the Delaware Court of Chancery proceeding.

17. In short, given that the unsecured creditors have been able to form a committee and negotiate a threshold recovery, it can neither be said that the bankruptcy has provided no value to creditors nor that no legitimate bankruptcy purpose is being served here.

### B. The Court should give no weight to the UCC Statement.

18. The UCC Statement was issued in the context of a settlement agreement that itself is a *quid pro quo* exchange for support for the SeeCubic position on its motion to dismiss.[1]

19. In addition to permitting the UCC to change its position on other matters if the motion is not granted, the Settlement Agreement does not contain other terms that one would expect if this were a global resolution.

20. The Settlement Agreement does not appear to reduce or resolve any of the debts vis-à-vis the estate; therefore, the Settlement Agreement is not in the best interests of the Debtor or the estate.

21. Moreover, neither the terms of the Settlement Agreement nor the Settlement Agreement itself appears to have been vetted with the entire creditor body. Because the Settlement Agreement appears to be little more than the UCC hedging its bet in the event of a negative outcome on the motion to dismiss, the Court should give it little or no weight.

### C. The Settlement Agreement is an impermissible attempt to shortcut the bankruptcy process.

22. The Bankruptcy Code contemplates several means for creditors to resolve their bankruptcy rights and prepetition claims and debts. All of these require notice and an opportunity to be heard by affected parties. As the UCC's Settlement Agreement attempts to affect rights and or otherwise shortcut the bankruptcy process, the Court should not consider the Settlement Agreement or the UCC Statement.

23. The Settlement Agreement contemplates the creation of a litigation trust into which certain assets, including cash, a note receivable, a right to stock and causes of action will be placed.

---

[1] The UCC Statement opposes conversion, which is relief sought only in the UST's Motion.

The beneficiaries of this yet-to-be-created trust arrangement, pursuant to a yet-to-be-drafted trust document, appear to be the general unsecured creditors. The precise terms or beneficiaries of the arrangement, though, are not known, nor is the priority scheme for payment identified.

24. In other circumstances, this arrangement, once finalized and documented, could be a component of a Chapter 11 plan; however, there are two problems here. First, the Debtor is in its exclusive period for the filing and acceptance of a plan. The Settlement Agreement is inconsistent with the Debtor's anticipated treatment of unsecured creditors, which treatment is intended to provide unsecured creditors with a more favorable return. *See* 11 U.S.C. §1121. Second, a plan requires creditor solicitation, which is lacking here.

25. A second approach to claims resolution that could include a litigation trust (and is available in rarer circumstances) is a structured dismissal. This approach is also problematic here. In a structured dismissal, the debtor is the proponent and the dismissal is done on notice to creditors of the proposed dismissal terms. The Settlement Agreement is an attempt to short-circuit these requirements and preclude the Debtor's constituencies from having a voice.[2]

---

[2] The Settlement Agreement also suffers from *Jevic* problems insofar as it attempts to circumvent the bankruptcy distribution scheme. While the Debtor does not agree that *Jevic* is cured here by the inclusion of non-estate assets in the trust, it should be noted that the trust is proposed to include derivative causes of action and deal with shares of stock that are proposed to be distributed to Stream under the Omnibus Agreement. *See* Statement, ¶15; *see also* Hearing Transcript at 254-54, *In re Constellation Enterprises LLC,* No. 1:16-bk-11213 (CSS) (Bankr. D. Del. May 18, 2017), ECF No. 967 (finding that the settlement agreement funded by the debtors' noteholders did not adhere to the Bankruptcy Code's priority scheme and was impermissible under *Jevic*, and noting that *In re ICL Holding Co., Inc.*, 802 F.3d 547, 555 (3d Cir. 2015), which held that non-estate funds paid to creditors outside the bankruptcy code priority scheme was permissible, had either likely been overruled or significantly narrowed by *Jevic*).

26. A third method of resolving claims can be in the context of a motion to approve a settlement. This approach, though, also requires the debtor (or trustee) to propose the settlement and provide notice and an opportunity to be heard.[3] Neither of these requirements is present here.

27. In sum, the Settlement Agreement is an inappropriate attempt to shortcut the bankruptcy process and deny the various parties their bankruptcy and due process rights. The Court should not consider the Settlement Agreement or the Committee Statement.

## **CONCLUSION**

If anything, the Settlement Agreement demonstrates that the bankruptcy process is working as it should. The unsecured creditors have been given a forum in which to address their claims and have negotiated protection from the downside risks associated with dismissal of the case. That said, while the Settlement Agreement does show value to creditors and the legitimacy of these proceedings, its implementation is inconsistent with the process contemplated by the Bankruptcy Code and Rules. As is evident from the pleadings filed to date, and as will be shown at trial, the Debtor has legitimate and valid reasons for having filed this bankruptcy case and, at a minimum, should be given the opportunity to reorganize as provided by the Bankruptcy Code to maximize the value of its business and estate in the best interests of the Debtor and its creditors. At this stage in this case, there is no indication whatsoever that the Debtor lacks the ability to reorganize or cannot file a plan of reorganization within the time frame provided by the Bankruptcy Code. To the contrary, before filing this case, the Debtor secured funding to initiate this case and has continued to secure the resources needed to successfully proceed through and emerge from the

---

[3] F.R.B.P. 9019(a) ("On motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement."); *In re Managed Storage Int'l, Inc.*, 601 B.R. 261, 265 (Bankr. D. Del. 2019), *aff'd*, No. 09-10368 (MWF), 2020 WL 1532390 (D. Del. Mar. 31, 2020)(same).

Chapter 11 process. The Court should deny the Motions to Dismiss and allow the Bankruptcy process to continue as Congress intended so as to afford all parties the opportunity to achieve the statutory and equitable resolutions contemplated by the Bankruptcy Code.

Dated:  May 2, 2021 /s/ *Martin J. Weis*
**DILWORTH PAXSON LLP**
Martin J. Weis (I.D. No. 4333)
One Customs House – Suite 500
704 King Street
P.O. Box 1031
Wilmington, DE 19801
Telephone:    (302) 571-9800
Facsimile:     (302) 655-1480

-and-

**DILWORTH PAXSON LLP**
Lawrence G. McMichael
Anne Aaronson
1500 Market St., Suite 3500E
Philadelphia, PA 19102
Telephone:    (215) 575-7000
Facsimile:     (215) 575-7200

*Proposed Attorneys for Debtor, Stream TV Networks, Inc.*