# EXHIBIT A

Proposed Redacted Document Of The *Objection Of Seecubic, Inc. To Debtor's Motion For Order Under 11 U.S.C. § 365(A) Authorizing Rejection Of The Omnibus Agreement Motion* [D.I. 166]

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Stream TV Networks, Inc., | Case No. 21-10433 (KBO) |
| Debtor. | **Related Docket No.: 128** |

## OBJECTION OF SEECUBIC, INC. TO
## DEBTOR'S MOTION FOR ORDER UNDER 11 U.S.C. § 365(a)
## AUTHORIZING REJECTION OF THE OMNIBUS AGREEMENT

SeeCubic, Inc. ("**SeeCubic**" or the "**Objector**"), by and through its undersigned

counsel, hereby files this objection (the "**Objection**") to the *Debtor's Motion For Order Under 11*

*U.S.C. § 365(a) Authorizing Rejection Of The Omnibus Agreement* [D.I. 128] (the "**Rejection**

**Motion**"). In support of the Objection, SeeCubic respectfully represents the following:

### PRELIMINARY STATEMENT

1.      The Rejection Motion rests on the conceit that rejection somehow rescinds rights

conferred under, or unwinds the transfers that have already take place pursuant to, the Omnibus

Agreement. The U.S. Supreme Court has renounced this rejection-as-rescission argument, holding

instead that rejection operates as a breach of the contract but does not unwind the contract as

though it never existed, and further holding that both the text of Bankruptcy Code section 365 and

fundamental principles of bankruptcy law "command" the "rejection-as-breach approach."[1]

Moreover, even if a Court-approved breach of the Omnibus Agreement occurs, that breach "means

---

[1]     *Mission Prod. Holdings, Inc. v. Tempnology, LLC*, 139 S. Ct. 1652, 1657, 1661-1663 (2019).

*(cont'd)*

in the Code what it means in contract law outside bankruptcy."[2]

2. The Debtor's CEO and sole director has gone to great lengths in his attempts to contest and obfuscate both the Debtor's entry into the Omnibus Agreement and the prepetition transactions that took place pursuant to the Omnibus Agreement. But ownership of the Debtor's "Transferred Assets" referred to in the Omnibus Agreement was transferred to SeeCubic at the latest in September 2020 in accordance with the Omnibus Agreement and by operation of law.[3]

3. At the level of process, the Rejection Motion fails to satisfy the business judgment standard because the Debtor's decision to reject is driven by Mathu Rajan, a self-interested and deeply conflicted sole director and CEO. The Rejection Motion is the latest salvo in Mr. Rajan's nearly year-long offensive to undo and obstruct the Omnibus Agreement so he can regain control of the Debtor's operating subsidiaries.[4]

4. Mr. Rajan's conflicts of interest and self-interested machinations have only accelerated in bankruptcy. While Mr. Rajan is the CEO and sole director of the Debtor, he is also the President and controlling shareholder of the proposed DIP lender, Visual Technology Innovations, Inc. ("**VTI**"). At his deposition, Mr. Rajan on numerous occasions made clear that

---

[2] *Id.*

[3] *See* Omnibus Agreement §§ 1.1, 1.4; *see also* 6 Del C. § 9-622(a)(2) ("A secured party's acceptance of collateral in full or partial satisfaction of the obligation it secures . . . transfers to the secured party all of a debtor's rights in the collateral.").

[4] For example, immediately after the Omnibus Agreement was executed, Mr. Rajan sought to undermine it. Among other things, he (i) removed the independent directors, (ii) fraudulently backdated a stockholder consent, and (iii) purported to adopt a board resolution nullifying the agreement. Yet, as described below, entry into the Omnibus Agreement was approved by the Debtor's Resolution Committee of independent, outside directors that examined the Omnibus Agreement and concluded that the agreement was a "no-brainer" for the Debtor. Deposition of Asaf Gola at 94-97, 111-13 (Nov. 8, 2020), attached hereto as **Exhibit H**. The Chancery Court affirmed the Resolution Committee's business judgment, but Mathu Rajan now wants the Court to believe that his own judgment about the financial wisdom of the Omnibus Agreement is superior to that of the independent directors, whose transparent process and judgments were blessed by the Chancery Court.

*(cont'd)*

VTI would be acting as plan sponsor for the Debtor.[5] But the evidence has revealed that he formed VTI in January 2021 so he could ██████████████████████████████████████████████████ ███████████████████████████ Lest there be any doubt regarding his intentions in this Chapter 11 Case, he recently admitted under oath that ████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████████ ████████████████████

████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
█████████████████████████

The evidence adduced to date confirms Mr. Rajan devised this plan prior to the Debtor filing for chapter 11.[8] He caused the Debtor to commence this chapter 11 filing, in bad faith, to stop the Chancery Court from entering final orders against Stream and Mr. Rajan that would jeopardize his efforts to acquire the assets for his own personal benefit. Mr. Rajan is not acting, and never was acting, in good faith or in the best interests of the Debtor's estate.

5.     The Rejection Motion uses the talismanic phrase "business judgment" repeatedly, as though its sheer repetition entitles the Debtor's desire to reject the Omnibus Agreement to review under the deferential business judgment rule standard. But as a matter of Delaware law,

- ████████████████████████████████████████████
- ████████████████████████████████████████████████████████████████████
- ████████████████████████████████████████████████████████████
  ██████████████
- ████████████████████████████████████████████████████████████████████████████
  ████████████████████████████████████████████████████████████████████████████
  ████████████████████████████████████

*(cont'd)*

the protections of the deferential business judgment rule only apply where directors "acted on an informed basis, in good faith, and in the honest belief that the action taken was in the best interest of the company."[9] Discovery has confirmed that literally the opposite has occurred here. In reality, the Rejection Motion is just the latest effort in Mathu Rajan's ongoing scheme to invalidate the Omnibus Agreement and unwind the transfers that took place pursuant to the Omnibus Agreement prior to the Petition Date, all in an effort to siphon the Debtor's assets to VTI (and, thus, himself).

6.      Finally, in the alternative, even taking as true (which it is not) the Debtor's and Mr. Rajan's oft-repeated counterfactual assumption that ownership of the Transferred Assets has not already passed to SeeCubic and somehow remained with the Debtor, rejection of the Omnibus Agreement still fails the business judgment test. In that view of the world, the Secured Creditors (as defined below) hold over $150 million of valid, perfected secured debt (well in excess of any realistic view of the current value of the Transferred Assets) and the ability to take all of the Transferred Assets while the Debtor, via rejection, places into jeopardy certain of the benefits provided to the Debtor and other stakeholders pursuant to the Omnibus Agreement.

7.      For these reasons, and as further explained below, the Debtor's (*i.e.*, Mathu Rajan's) attempt to reject the Omnibus Agreement is a bridge to nowhere, does not satisfy the business judgment test, and should be denied.

## BACKGROUND

8.      The facts uncovered during discovery reveal a pattern of flagrant self-dealing and misconduct by the Debtor, Mathu Rajan, and his most recent creation, VTI. As SeeCubic will further demonstrate at the upcoming dismissal trial, those facts are as follows:

---

[9]     *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).

- Mr. Rajan is not only the CEO and sole director of the Debtor, he is also the founder and controlling shareholder of VTI, holding 92% of its voting shares.



- Mr. Rajan has insisted that he negotiate on behalf of the Debtor even though a restructuring advisory firm informed him earlier this month that VTI acting as plan sponsor was very problematic because he was serving as ███████████████

9.     Mr. Rajan's recent conflicted self-dealing is consistent with his long pattern of self-interested disregard for the best interests of the Debtor and its creditors.

### A.     Stream's Corporate History And Capital Structure

10.     Rewinding twelve years, Stream was founded in 2009 by Mathu Rajan to develop and commercialize technology that enables viewers to watch three-dimensional content without 3D glasses. *Stream TV Networks, Inc. v. SeeCubic, Inc.*, C.A. No. 2020-310-JTL, 2020 WL 7230419, at *3 (Del. Ch. Dec. 8, 2020). Shortly after Mathu Rajan founded Stream, his brother,

Raja Rajan, joined as an officer and director. *Id.* Since its founding in 2009, the Rajan brothers have controlled and dominated Stream.[10] *Id.*

11.     Stream historically conducted its business through its wholly-owned direct and indirect subsidiaries. All of its material assets were therefore held by its wholly-owned direct and indirect subsidiaries in the United States and overseas. *See* Declaration of Shadron L. Stastney ¶ 7 [D.I. 47] (hereinafter the "**Stastney Declaration**"). After over a decade of Mathu Rajan's leadership, Stream still does not have a product to market and "remains a pre-revenue, development-stage company." *Stream TV Networks*, 2020 WL 7230419, at *3.

12.     Since 2009, Stream raised approximately $125 million from third-party investors in a combination of debt and equity investments. *Id.* Between 2011 and 2012, SLS Holdings VI, LLC ("**SLS**") loaned $6 million to Stream through a series of secured notes (the "**SLS Secured Notes**"). Stream pledged all of its assets, and the assets of its wholly owned subsidiaries, as security for the SLS Secured Notes. Stream executed security agreements in connection with the SLS Secured Notes, which authorized SLS to take control of Stream's assets to satisfy the SLS Secured Notes if Stream defaulted. *Stream TV Networks*, 2020 WL 7230419, at *3.

13.     Stream raised junior secured debt from Hawk Investment Holdings Limited ("**Hawk**"). Between 2010 and 2014, Hawk loaned more than £50 million to Stream, plus another $1.336 million, through a series of junior secured notes (the "**Hawk Secured Notes**"). *Id.* Subject to the senior security interest held by SLS, Stream pledged all of its assets as security for the Hawk Secured Notes. Stream executed security agreements in connection with the Hawk Secured Notes,

---

[10]     The Rajan family ownership of Stream stock gives them a majority of Stream's outstanding voting power. At the board level, the Rajan brothers historically have controlled Stream. From July 2019 until March 2020, Mathu and Raja were Stream's only directors. Mathu has served as a director since Stream's founding. Raja served as a director starting shortly after the Company's founding until July 2020, when he resigned from that role.

which authorized Hawk to take control of Stream's assets to satisfy the Hawk Notes if Stream defaulted. *Id.*

14.     Both SLS and Hawk (together, the "**Secured Creditors**") filed UCC-1 Financing Statements against Stream. SLS and Hawk are the only parties who have filed UCC-1 Financing Statements against Stream. A copy of a recent UCC Lien Search against Stream is attached hereto as **Exhibit F**.

## B.     Stream Defaults On Its Secured Debt

15.     By February 2020, Stream had defaulted on the SLS Secured Notes and the Hawk Secured Notes. *Id.* at 4; Letter Re: Notice of Default and Reservation of Rights dated March 9, 2020. On March 9, 2020, SLS notified Stream that it was in default.[11] *See* Letter Re: Notice of Default and Reservation of Rights dated March 9, 2020; *see also Stream TV Networks*, 2020 WL 7230419, at *4. SLS notified Stream that several of these defaults "qualified as immediate default events with no cure period." Letter Re: Notice of Default and Reservation of Rights dated March 9, 2020.

## C.     The Foreclosure Action

16.     Over a year ago, on March 23, 2020, SLS initiated an action against Stream and certain of its then-subsidiaries (including TechnoVative USA, Technology Holdings, and Media Holdings) in Delaware Superior Court alleging that the Debtor had defaulted on the SLS Secured Notes, and seeking to obtain money damages on the obligations due to SLS by Stream, and replevin of collateral.

---

[11]     The Notice of Default identified six events of default: (1) Stream's failure to notify SLS when its warrants became exercisable; (2) Stream's failure to obtain SLS's consent to amend its corporate charter with respect to Stream's Series B common shares; (3) Stream's making of settlement payments on behalf of MediaTainment, Inc. without prior written consent; (4) Stream's modification of the Employment Agreements of Mathu and Raja Rajan without prior written consent; (5) Stream's failure to pay all amounts due under the SLS Notes by the date due; and (6) the failure of Stream's subsidiaries to execute guaranties.

**D.     The Formation Of The Debtor's Resolution Committee**

17.     As early as 2019, Stream's combination of secured debt and lack of operating income put significant financial strain on Stream.  As a result, it commenced discussions with its secured lenders and equity holders with respect to a potential restructuring.  *Stream TV Networks*, No. 2020-310-JTL, 2020 WL 7230419, at *4.  In December 2019, one of Stream's significant equity holders provided the Secured Creditors and the Rajan brothers with a draft document for a proposed comprehensive restructuring.  *Id.*  The Rajans initially rejected the proposed out-of-court restructuring of Stream, but eventually agreed to appoint independent, outside directors after they were sued by certain of Stream's equity investors for fraud and breach of fiduciary duty, and with the imminent default on the SLS Notes and the Hawk Notes.  *Stream TV Networks*, 2020 WL 7230419, at *4-5.

18.     In February and March 2020, the Rajan brothers extended invitations to four outside directors to join Stream's board of directors (the "**Board**").  *Id.* at *4.  By March 12, 2020, all four of the outside directors agreed to join the Board.  All were independent outside directors, and none had prior ties to the Rajan brothers, SLS, or Hawk.  *Id.*  After joining the Board and learning about Stream's financial difficulties, the outside independent directors concluded that the only path forward was to negotiate a resolution with Stream's secured creditors for a comprehensive restructuring of Stream's secured debt.  *Id.* at *4-5.

19.     On May 4, 2020, the Board established a "Resolution Committee" with "the full power and authority of the full Board of Directors to resolve any existing or future debt defaults or claims, and any existing or future litigation, or threats thereof, on behalf of [Stream], without further action being required from the Board of Directors or any executive of the [C]ompany."  *Id.* at *5. All three of the independent outside directors present during the Board meeting voted in

favor of forming the Resolution Committee. Predictably, Mathu and Raja Rajan voted against forming the Resolution Committee. *See Stream TV Networks, Inc., List of Resolutions Voted on at Board Meeting of May 4, 2020*, attached hereto as **Exhibit G**. The Resolution Committee was comprised of two of Stream's independent directors.

### E. The Omnibus Agreement

20. On May 6, 2020, after negotiations between the Resolution Committee and the Secured Creditors, the Resolution Committee approved Stream's entry into the Omnibus Agreement. Summarizing the Omnibus Agreement, the Chancery Court explained:

> In the Omnibus Agreement, Stream agreed to transfer all of its assets to SeeCubic, a newly formed entity controlled by its secured creditors. Stream also granted its secured creditors a power of attorney to effectuate the transfers. Stream's secured creditors already held security interests in all of Stream's assets and had the right to foreclose on those assets. In the Omnibus Agreement, Stream's secured creditors agreed to release their claims against Stream upon completion of the transfer of Stream's assets to SeeCubic.

*Stream TV Networks*, 2020 WL 7230419, at *1.

21. The Omnibus Agreement provided that the Secured Creditors would forbear from pursuing the pending foreclosure actions and that they would instead accept immediate "conveyance, transfer, delivery and assignment" of "all right, title, and interest of [Stream] in, to or under all of the rights, properties and assets of [Stream] (including those of any direct or indirect subsidiary of [Stream])" in exchange for full satisfaction of the SLS Secured Notes and the Hawk Secured Notes. *See* Omnibus Agreement § 1.1. Pursuant to the Omnibus Agreement, the assets would be transferred to a newly formed entity controlled by the Secured Creditors, which they later identified as SeeCubic. As noted above, upon immediate completion of the transfer of

Stream's assets, the SLS Secured Notes and Hawk Secured Notes would be fully satisfied and discharged.

22.    In addition, the Omnibus Agreement gave holders of Stream's Class A common stock, other than the Rajan brothers and their affiliates, the right to exchange their shares of Stream's Class A common stock for an identical number of shares of SeeCubic's common stock and also provided that Stream would receive one million shares of SeeCubic Class A common stock. *Stream TV Networks,* 2020 WL 7230419, at *6. Although the Secured Creditors initially proposed that Stream's minority investors pay a fee to exchange their shares, the Resolution Committee negotiated for the exchange to occur at no cost to the participating stockholders. *Id.* at *5.

23.    In order to effectuate the transfers to SeeCubic under the Omnibus Agreement, Stream granted to Shadron Stastney "an irrevocable power of attorney to take all action necessary or advisable." *See* Omnibus Agreement § 1.4.[12]

## F.    Transfer Of The Stock Of TechnoVative And Other Transferred Assets To SeeCubic

24.    In transactions occurring on September 4, 2020 and September 6, 2020, Stream transferred all of its stock in TechnoVative and its other subsidiaries to SeeCubic. Specifically, Mr. Stastney, exercising the power of attorney granted to him under the Omnibus Agreement, executed that certain Stock Transfer and Power, dated September 4, 2020, which transferred all of the Debtor's common stock in TechnoVative to SeeCubic; and concurrently therewith, the board

---

[12]    It is well-established that a creditor's interest in a debt is one example of an interest sufficient to support an irrevocable grant of authority. *See, e.g., Aveta Inc. v. Cavallieri*, 23 A.3d 157, 168 (Del. Ch. 2010) (citing Restatement (Third) of Agency § 3.12 (2006) and noting that "the law will specifically enforce, for example, the borrower's irrevocable grant of authority to the creditor to act as the borrower's agent in disposing of collateral securing the debt.").

of directors of TechnoVative executed that certain Action by Written Consent, which cancelled TechnoVative's certificated share. *See* Stastney Decl. ¶¶ 7-10.

25.     In addition, on September 6, 2020, pursuant to that certain Assignment and Assumption Agreement (the "**Assignment Agreement**") between the Debtor (as assignor) and SeeCubic (as assignee), the Debtor assigned all of its rights, title, and interest in the Transferred Assets to SeeCubic.

## G.     Mathu Rajan's Prepetition Campaign To Obstruct And Undermine The Omnibus Agreement

26.     Immediately after the Resolution Committee approved the Omnibus Agreement, Mathu and Raja Rajan set out on a self-interested campaign involving various attempts to sabotage or otherwise rescind the Omnibus Agreement.  In the four months following Stream's execution of the Omnibus Agreement, the Rajans: (a) removed three of the four outside directors; (b) fraudulently backdated a stockholder consent purporting to have removed those outside directors before the Resolution Committee approved the Omnibus Agreement; (c) claimed that the outside directors had never "formally accepted" their Board memberships; (d) falsely claimed that the outside directors were merely "advisors waiting to formally be appointed to the board of directors"; (e) purported to adopt a board resolution to nullify the Omnibus Agreement; (f) tried to change who managed certain Stream subsidiaries; (g) attempted to remove prototype technology from a storage facility in the Netherlands; and (h) purported to grant a license to use Stream's technology to an entity newly incorporated by Mathu Rajan named Glasses-Free Technologies, Inc. *Stream TV Networks*, 2020 WL 7230419, at *6-7.

27.     When the Secured Creditors attempted to engage the Rajans in further negotiations to stop them from interfering with the Omnibus Agreement, "[t]he Rajan brothers pushed for

personal benefits for themselves, including employment, compensation, and indemnification for litigation expenses." *Id.*

28.     Having failed in their prior corrupt efforts to thwart the Omnibus Agreement, the Rajans eventually decided to challenge the validity of the Omnibus Agreement in Chancery Court. On September 8, 2020, Stream, under the control of the Rajans, commenced an action in the Chancery Court seeking a determination the Omnibus Agreement was invalid.

29.     After seven depositions, ten affidavits, and 206 documentary exhibits, the Chancery Court issued its opinion on December 8, 2020, affirming the validity of the Omnibus Agreement and finding that "[n]o evidence suggests that the members of the Resolution Committee [consisting of the independent directors, which executed the Omnibus Agreement], acted in bad faith or for an improper purpose." *Id.* at \*24. The Chancery Court therefore concluded that "[n]o evidence suggests that the members of the Resolution Committee breached their fiduciary duties." *Id.*

30.     The Chancery Court not only affirmed the validity of the Omnibus Agreement, but also recognized the benefits the agreement conferred upon Stream.  As the Chancery Court observed, "[w]ithout the Omnibus Agreement, Stream's creditors would have foreclosed on Stream's assets, leaving its equity investors with nothing.  Or Stream would have filed for bankruptcy, and its equity investors likely would have been wiped out." *Stream TV Networks*, 2020 WL 7230419, at \* 6.

31.     In connection with the Chancery Court litigation, one of Stream's independent directors with decades of experience in business and finance testified that the Omnibus Agreement was a "no-brainer" where "[l]iterally everybody won," and that "had [SLS and Hawk] just waited long enough they would've gotten the assets completely to themselves." Deposition of Asaf Gola at 94-97, 111-13 (Nov. 8, 2020), attached hereto as **Exhibit H**.

32.     Based on these findings, the Chancery Court issued a preliminary injunction forbidding Stream, and the Rajans in their individual capacity, from taking action to interfere with the rights of the Secured Creditors and SeeCubic under the Omnibus Agreement. Explaining its decision to grant the preliminary injunction, the Chancery Court noted that the record was "sufficiently clear" to support a mandatory injunction and summary judgment in favor of SeeCubic, but that a mandatory injunction was unnecessary in light of the irrevocable power of attorney that the Omnibus Agreement grants to Mr. Stastney. *Stream TV Networks*, 2020 WL 7230419, at *24.

## H.     Mathu Rajan's Postpetition Campaign To Obstruct And Undermine The Omnibus Agreement

33.     On February 24, 2021, Mr. Rajan, as the Debtor's sole director, caused Stream to file for chapter 11. As of the Petition Date, the Debtor had no business assets, employees, operations, or income. Stastney Decl. ¶¶ 7, 8; *Declaration of Mathu Rajan In Support of First-Day Motions* ¶¶ 4, 17 [D.I. 51]. Stream's petition was not accompanied by the routine first-day motions that are typical for a rehabilitating or stabilizing operating business. For example, in Stream's insurance motion, it noted that it could not afford to pay the $8,209.80 of outstanding premium balances for its insurance policies, even though those policies had only recently been bound, clearly in anticipation of bankruptcy. *Stream TV Networks, Inc. Motion For Authorization To Continue Insurance Coverage Entered Into Pre-Petition And Honor Obligations Related Thereto* ¶¶ 11-13 [D.I. 16].

34.     As discussed above (*see supra* ¶ 8), the evidence adduced to date demonstrates that Mr. Rajan is a hopelessly conflicted fiduciary who has already repeatedly breached his fiduciary duties to the Debtor and its estate in the short time Stream has been in chapter 11. Glaringly absent from the Rejection Motion is any evidence supporting the Debtor's decision to reject the Omnibus

Agreement. The lack of such support is because the Rejection Motion is just the latest in Mr. Rajan's scheme to misuse Stream's bankruptcy in an attempt to undo and unwind the Omnibus Agreement, as a predicate for acquiring the collateral pledged—and then transferred—to the Secured Creditors for his own personal benefit.

## OBJECTION

### I. REJECTING THE OMNIBUS AGREEMENT WILL NOT BENEFIT THE DEBTOR'S ESTATE.

35.     The Rejection Motion should be denied because rejecting the Omnibus Agreement does not benefit the Debtor's estate. "A debtor's determination to reject an executory contract is governed by the business judgment standard." *E.g.*, *In re Trans World Airlines, Inc.*, 261 B.R. 103, 120 (Bankr. D. Del. 2001). For a debtor to satisfy the business judgment standard in the Third Circuit, the debtor must show that rejection of the executory contract will benefit the estate.[13] *Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 39–40 (3d Cir. 1989) (citing *In re Wheeling–Pittsburgh Steel Corp.*, 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987)); *In re Trans World Airlines, Inc.*, 261 B.R. at 120-21. Stream raises essentially four arguments for why rejection of the Omnibus Agreement would benefit the Debtor's estate.

36.     *First*, Stream implies that rejection of the Omnibus Agreement somehow unwinds the prepetition asset transfers to SeeCubic. *See* Rejection Mot. ¶¶ 4, 36, 42. That is incorrect. The U.S. Supreme Court has made clear that "[r]ejection of a contract—any contract—in bankruptcy

---

[13]    The business judgment standard "requires the Court to determine whether a reasonable business person would make a similar decision under similar circumstances." *In re Vencor, Inc.*, Nos. 99-3199 (MFW) et seq., 2003 WL 21026737, at *3 (Bankr. D. Del. Apr. 30, 2003); *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also Off. Comm. Of Unsecured Creditors Plaintiff v. Aust (In re Network Access Sols., Corp.)*, 330 B.R. 67, 75 (Bankr. D. Del. 2005). "The Court's role in the assumption/rejection process is one of an 'overseer of the wisdom with which the bankruptcy estate's property is being managed by the trustee or debtor-in-possession.' [A] bankruptcy court reviewing a trustee's or debtor-in-possession's decision to assume or reject an executory contract should examine [the] contract and the surrounding circumstances and apply its best 'business judgment' to determine if it would be beneficial or burdensome to the estate to assume it." *In re Vencor, Inc.*, 2003 WL 21026737, at *3 (quoting *In re Orion Pictures Corp.*, 4 F.3d 1095, 1099 (2d Cir. 1992)).

operates not as a rescission but as a breach." *Mission Prod. Holdings*, 139 S. Ct. at 1661. Thus, rejection does not rescind the agreement, nullify previously granted interests, or undo the transfer of the Debtor's interests in its subsidiaries. Nor does rejection revert the Debtor and SeeCubic back to their pre-contract positions. Rather than unwinding transfers, "[r]ejection relieves the estate of the debtor's remaining obligations under the contract." *In re Taylor-Wharton Int'l LLC*, No. 09-14089 BLS, 2010 WL 4862723, at *3 (Bankr. D. Del. Nov. 23, 2010). Most of the Transferred Assets are already in SeeCubic's possession, the Debtor's rejection is merely an attempt to obtain court-approval for its ongoing tort of conversion of property that now belongs to SeeCubic.

37.     *Second*, Stream's assertion that the Omnibus Agreement caused or contributed to Stream's insolvency is a nonsensical reversal of causation. *See* Rejection Mot. ¶ 5 (claiming that the Omnibus Agreement is "burdensome and has contributed to [its] current insolvency"). The Omnibus Agreement did not cause Stream to be insolvent. Indeed, the Debtor defaulted on its obligations to the Secured Creditors well before the agreement was executed.[14] The Omnibus Agreement was designed to alleviate Stream's debt by efficiently allowing the Secured Creditors to acquire their collateral.

38.     *Third*, rather than explaining how rejection will benefit its estate, Stream instead attempts to justify its decision by explaining how rejection will benefit third parties. *See* Rejection Mot. ¶ 35-36 (arguing rejection will benefit former employees and certain vendors). As an initial matter, SLS, SeeCubic, and the Official Committee of Unsecured Creditors believe these cases

---

[14]  The Chancery Court noted that after defaulting, but before entering into the Omnibus Agreement, "Stream even failed to make the payments necessary to maintain the patents on its technology, which are the key to Stream's potential success. In January 2020, Stream missed payroll at least once." *Stream TV Networks*, 2020 WL 7230419, at *4.

should be dismissed. But putting that aside, the impact of a debtor's decision to reject an executory contract on third parties is irrelevant under the business judgment standard. *In re Trans World Airlines*, 261 B.R. at 123 (dismissing counterparty's argument that the court should take into account the impact of rejection on the counterparty because "in a rejection motion determination the focus is the benefit to the debtor's estate").

39. ***Fourth***, Stream has failed to acknowledge that to the extent the Debtor even has any of the Transferred Assets, the Secured Creditors possess valid liens on all of the Debtor's assets.[15] Even assuming Stream now somehow owned the Transferred Assets and rejects the Omnibus Agreement, whatever assets Stream possesses would still be subject to the Secured Creditors' liens and potential exercise of remedies, including lifting the automatic stay to seize their collateral.

## II. STREAM'S DECISION TO REJECT THE OMNIBUS AGREEMENT IS SO MANIFESTLY UNREASONABLE THAT IT COULD ONLY BE THE PRODUCT OF BAD FAITH.

40. The Rejection Motion should be denied because the Debtor's decision to reject is manifestly unreasonable and is the product of bad faith. A debtor's request to reject an executory contract should be denied if "the debtor's decision that rejection will be advantageous to the estate is so manifestly unreasonable that it could not be based on sound business judgment, but only on bad faith, or whim, or caprice." *In re Wheeling-Pittsburgh Steel Corp.*, 72 B.R. 845, 849 (Bankr. W.D. Pa. 1987); *see also In re Matusalem*, 158 B.R. 514, 522 (Bankr. S.D. Fla. 1993) (denying rejection motion where debtor "failed to demonstrate good business judgment or even mediocre business judgment" and the evidence demonstrated that the "case was probably filed in bad faith

---

[15] Tellingly, the Debtor's schedules and statements [Docket No. 87] notes that it has secured debt, but makes no mention of that in the Rejection Motion.

for the principal purpose of taking another bite at an apple that has already been eaten and digested in the United States District Court for the Southern District of Florida.").

41.     Stream presents no evidence to support the conclusion that its decision—that is, the decision of Mathu Rajan, Stream's sole director—to reject was the result of an informed, deliberative process.  On the contrary, the facts demonstrate that Stream's decision to reject the Omnibus Agreement is not the product of a sound business judgment.  A business judgment requires "an informed decision, in good faith and in the honest belief that [rejection] is in the best interest of the debtors."  *In re Caribbean Petroleum Corp.*, 444 B.R. 263, 269 (Bankr. D. Del. 2010).

42.     Stream's decision to reject the Omnibus Agreement stands in stark contrast with the Resolution Committee's approval of the agreement.  The Resolution Committee engaged in a reasoned, fact-based decision-making process to enter into the Omnibus Agreement.  The Resolution Committee's decision making was blessed by the Chancery Court.  *Stream TV Networks*, 2020 WL 7230419, at *24.  Here, however, Stream's decision-making process is opaque and plainly driven by Mr. Rajan's self-interested motives.  Whereas the Resolution Committee was composed of independent, outside directors, the sole decision-maker and director now is Mr. Rajan, who was deemed too conflicted and self-interested to be appointed to the Resolution Committee.

43.     The Rejection Motion requires the Court to believe that the judgment of Mathu Rajan is superior to the judgment of the independent directors of the Resolution Committee who concluded that the Omnibus Agreement was in Stream's best interests, and the Chancery Court, who confirmed it. ████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████ In other words, the Court would have to accept the assertions of an individual who was too conflicted and self-interested to be appointed to the Resolution Committee over the Chancery Court's-affirmed conclusions of the independent directors. Affirming any judgment of Mr. Rajan over that of the Resolution Committee and the Chancery Court with respect to the Omnibus Agreement is all the more inappropriate now as Mr. Rajan's conflicts have only multiplied.

44. The Debtor's unreasonable decision-making with respect to the Omnibus Agreement is made even clearer by Mr. Rajan's purpose for causing the Debtor to file this Chapter 11 Case. If Stream reacquires the assets it transferred to SeeCubic, Mr. Rajan intends for ████████ ███████████████████████████████████████████████████████████ Similarly, in presentation materials to potential investors of VTI, Mr. Rajan has boasted that VTI has the ██████████████████████████████████████████████████████████████ ████████ It is clear from Mr. Rajan's statements that he does not, and has never, intended to pursue the Debtor's best interests. As the decision-maker of both Stream and VTI, he intends for VTI, where he holds an economic stake more than ten times greater than he does at Stream, to pillage Stream's assets.

45. Not only is Mr. Rajan hopelessly conflicted, but Charles Robertson, the Debtor's first-day declarant and the purported Executive Vice President of the Debtor, is also conflicted. ██████████████████████████████████████████████████████████████ ██████████████ Mr. Rajan purposefully created these conflicts of interest to effectuate his scheme to abscond with the Debtor's assets. █████████████████████████████

46. Rejection is also manifestly unreasonable because Stream's reorganization is futile. The Debtor offers no evidence that it will even be able to pay its administrative claims in the Chapter 11 Case, let alone (i) reorganize a business that in 11 years still has no product or revenue or (ii) propose a confirmable chapter 11 plan without the support of the Secured Creditors given the Debtor's inability to provide acceptable treatment for their secured claims under a chapter 11 plan (specifically, the Debtor cannot reinstate their secured claims (*see* 11 U.S.C. §§ 1123(b)(1), 1124(2)) or cram them down (*see* 11 U.S.C. § 1129(b)(2)(A)). Accordingly, as the evidence shows that the Debtor's decision to reject the Omnibus Agreement is the product of self-interested, bad faith conduct, the Court should deny the Rejection Motion.

## III. STREAM'S REJECTION OF THE OMNIBUS AGREEMENT IS NOT PROTECTED BY THE BUSINESS JUDGMENT RULE AND SHOULD BE REVIEWED FOR ENTIRE FAIRNESS.

47. The Debtor's decision to pursue the Rejection Motion should be reviewed under the entire fairness standard. When reviewing the actions of a fiduciary, Delaware courts apply one of three standards of review: (a) the business judgment rule, (b) enhanced scrutiny, or (c) entire fairness. *Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d 442, 457 (Del. Ch. 2011).

48. The business judgment rule provides a "powerful presumption in favor of actions taken by the directors in that a decision made by a loyal and informed board will not be overturned by the courts unless it cannot be 'attributed to any rational business purpose.'" *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993). Although bankruptcy's business judgment standard with respect to section 365 and Delaware's business judgment rule are similar, they are not identical. *E.g.*, *In re The Great Atl. & Pac. Tea Co., Inc.*, 544 B.R. 43, 48 (Bankr. S.D.N.Y.

2016).

49.     "When a majority of the board of directors is the ultimate decision maker and a majority of the board is interested in the transaction, the presumption of the business judgment rule is rebutted." *Krasner v. Moffet*, 826 A.2d 277, 287 (Del. 2003). "When the presumption of the business judgment rule has been rebutted, the entire fairness rule is implicated and defendants bear the burden of proof." *Id.* As Mr. Rajan is the sole member of the Board and is interested in the decision to reject, the business judgment rule is rebutted.  The entire fairness standard encompasses both fair dealing (*i.e.*, how the transaction was timed, initiated, structured, negotiated, disclosed to the directors, and approved) and fair price (i.e., economic and financial considerations). *Weinberger v. UOP, Inc.*, 457 A.2d 701, 711 (Del. 1983).

50.     Stream fails to demonstrate that Mathu Rajan's decision to reject the Omnibus Agreement is entirely fair.  As the evidence has shown, the decision to reject the Omnibus Agreement was made so that Mr. Rajan can ████████████████████████████████ ████████████  The Debtor's attempt to reject the Omnibus Agreement is nothing more than Mr. Rajan furthering his scheme to funnel assets to VTI, where he holds a much greater economic stake than at Stream, at a deep discount.  Under Delaware corporate law, Mr. Rajan's decisions are not entitled to any deference, but instead are subject to review under the entire fairness standard. Under any standard of review, let alone entire fairness, the Court should not authorize the Debtor to reject the Omnibus Agreement under Bankruptcy Code section 365.

**CONCLUSION**

51.     The Objector respectfully requests that the Court deny the Rejection Motion and order such other and further relief as may be just and proper.

Dated: Wilmington, Delaware
       May 3, 2021

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

*/s/ Joseph O. Larkin*
Joseph O. Larkin (I.D. No. 4883)
Jenness E. Parker (I.D. No. 4659)
Carl T. Tullson (I.D. No. 6704)
Jason M. Liberi (I.D. No. 4425)
920 N. King Street, One Rodney Square
Wilmington, Delaware 19801
Telephone: (302) 651-3000
Fax: (302) 651-3001

- and -

Eben P. Colby (admitted *pro hac vice*)
Marley Ann Brumme (admitted *pro hac vice*)
500 Boylston Street, 23rd Floor
Boston, Massachusetts 02116
Telephone: (617) 573-4800
Fax: (617) 573-4822

*Counsel for SeeCubic, Inc.*

## EXHIBIT A

**DOCUMENT FILED UNDER SEAL**

# EXHIBIT B

## DOCUMENT FILED UNDER SEAL

# EXHIBIT C

## DOCUMENT FILED UNDER SEAL

# EXHIBIT D

## DOCUMENT FILED UNDER SEAL

# EXHIBIT E

## DOCUMENT FILED UNDER SEAL

## **EXHIBIT F**

## **UCC Lien Search**

**CSC**

www.cscglobal.com

CSC- Springfield

801 Adlai Stevenson Drive
Springfield, IL 62703
217-544-5900
217-492-2727 (Fax)

**Matter#**    240070/0003          **Order#**      762402-1
**Project Id :**                          **Order Date**   04/13/2021
**Additional Reference :**  DARRIN HALCOMB

|  |  |
|---|---|
| **Subject:** | **STREAM TV NETWORKS, INC.** |
| **Jurisdiction:** | **DE - Secretary Of State** |
| **Request for:** | **Federal Tax Lien Search** |
| **Thru Date:** | **April 07, 2021** |
| **Result:** | **Clear** |
| **Followup:** | Direct access search performed using Article 9 search logic. |

Ordered by UCC FILING UNIT at SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

Thank you for using CSC. For real-time 24 hour access to the status of any order placed with CSC, access our website at www.cscglobal.com.

If you have any questions concerning this order or CSCGlobal, please feel free to contact us.

Tiffany Vacca
tvacca1@cscinfo.com

**Corporation Service Company(R) Terms and Conditions**
You agree that all information that Corporation Service Company furnishes to you will be used solely as one factor in your credit, insurance, marketing or other business decisions and will not be used (i) in determining a consumer's eligibility for credit or insurance where such credit or insurance is to be used primarily for personal, family or household purposes, (ii) for employment purposes, or (iii) for governmental licenses. Use of the information in the above manner is a violation of the Fair Credit Reporting Act.

**CSC**

www.cscglobal.com

CSC- Springfield

801 Adlai Stevenson Drive
Springfield, IL 62703
217-544-5900
217-492-2727 (Fax)

| | | | |
|---|---|---|---|
| **Matter#** | 240070/0003 | **Order#** | 762402-1 |
| **Project Id :** | | **Order Date** | 04/13/2021 |

**Additional Reference :** DARRIN HALCOMB

| | |
|---|---|
| **Subject:** | **STREAM TV NETWORKS, INC.** |
| **Jurisdiction:** | **DE - Secretary Of State** |
| **Request for:** | **UCC Debtor Search** |
| **Thru Date:** | **April 07, 2021** |
| **Result:** | **Certified results retrieved** |
| **Original:** | 3 |
| **Continuation:** | 2 |
| **Followup:** | Direct access search performed using Article 9 search logic. |

Ordered by UCC FILING UNIT at SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

Thank you for using CSC. For real-time 24 hour access to the status of any order placed with CSC, access our website at www.cscglobal.com.

If you have any questions concerning this order or CSCGlobal, please feel free to contact us.

Tiffany Vacca
tvacca1@cscinfo.com

**Corporation Service Company(R) Terms and Conditions**

You agree that all information that Corporation Service Company furnishes to you will be used solely as one factor in your credit, insurance, marketing or other business decisions and will not be used (i) in determining a consumer's eligibility for credit or insurance where such credit or insurance is to be used primarily for personal, family or household purposes, (ii) for employment purposes, or (iii) for governmental licenses. Use of the information in the above manner is a violation of the Fair Credit Reporting Act.

# Delaware

## The First State

CERTIFICATE

SEARCHED APRIL 13, 2021 AT 2:04 P.M.
FOR DEBTOR, STREAM TV NETWORKS, INC.

1 OF 3          FINANCING STATEMENT                    20113097535

EXPIRATION DATE: 08/10/2021
DEBTOR:    STREAM TV NETWORKS, INC

2009 CHESTNUT STREET                    ADDED    08-10-11

PHILADELPHIA, PA US 19103

SECURED:   SLS HOLDINGS VI, LLC

445 PARK AVENUE, FLOOR 19               ADDED    08-10-11

NEW YORK, NY US 10022


F I L I N G   H I S T O R Y

20113097535    FILED 08-10-11    AT 3:46 P.M.    FINANCING STATEMENT

20161042157    FILED 02-22-16    AT 9:46 A.M.    CONTINUATION


2 OF 3          FINANCING STATEMENT                    20153458683

EXPIRATION DATE: 08/10/2025
DEBTOR:    STREAM TV NETWORKS, INC.

2009 CHESTNUT STREET, 3RD FLOOR         ADDED    08-10-15



Jeffrey W. Bullock, Secretary of State



The First State

PHILADELPHIA, PA US 19103

SECURED:     HAWK INVESTMENT HOLDINGS LIMITED

NEWPORT HOUSE, 15 THE GRANGE          ADDED    08-10-15

ST. PETER PORT, GUERNSEY,  GG GY12QL


F I L I N G   H I S T O R Y

20153458683     FILED 08-10-15    AT 3:38 P.M.    FINANCING STATEMENT

20201246075     FILED 02-20-20    AT 10:58 A.M.   CONTINUATION


3 OF 3          FINANCING STATEMENT              20201971003

EXPIRATION DATE: 03/17/2025
DEBTOR:     STREAM TV NETWORKS, INC.

2009 CHESTNUT STREET, 3RD FLOOR       ADDED    03-17-20

PHILADELPHIA, PA US 19103

SECURED:     HAWK INVESTMENT HOLDINGS LIMITED

NEWPORT HOUSE, 15 THE GRANGE          ADDED    03-17-20

ST. PETER PORT, GUERNSEY,   GG GY12QL


F I L I N G   H I S T O R Y



Jeffrey W. Bullock, Secretary of State



## The First State

*20201971003     FILED 03-17-20     AT 12:40 P.M.     FINANCING STATEMENT*

E N D   O F   F I L I N G   H I S T O R Y

*THE UNDERSIGNED FILING OFFICER HEREBY CERTIFIES THAT THE ABOVE LISTING IS A RECORD OF ALL PRESENTLY EFFECTIVE FINANCING STATEMENTS, FEDERAL TAX LIENS AND UTILITY SECURITY INSTRUMENTS FILED IN THIS OFFICE WHICH NAME THE ABOVE DEBTOR, STREAM TV NETWORKS, INC. AS OF APRIL 7, 2021 AT 11:59 P.M.*



Jeffrey W. Bullock, Secretary of State

# UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

SUSAN LAPINSKI          4142775189

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

SUSAN LAPINSKI

411 EAST WISCONSIN AVENUE

MILWAUKEE WI 53202

DELAWARE DEPARTMENT OF STATE
U.C.C. FILING SECTION
FILED 03:46 PM 08/10/2011
INITIAL FILING # 2011 3097535

SRV: 110908269

---

**1. DEBTOR'S EXACT FULL LEGAL NAME** - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| STREAM TV NETWORKS, INC | | | | |

OR

| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 2009 CHESTNUT STREET | PHILADELPHIA | PA | 19103 | US |

| | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION |
|---|---|---|
| | CORPORATION | DE |

**2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME |
|---|
| |

OR

| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION |
|---|---|---|
| | | |

**3. SECURED PARTY'S NAME** (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME |
|---|
| SLS HOLDINGS VI, LLC |

OR

| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 445 PARK AVENUE, FLOOR 19 | NEW YORK | NY | 10022 | US |

**4. This FINANCING STATEMENT covers the following collateral:**

Collateral Description - please see attachment

---

| 6. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. Attach Addendum [if applicable] | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE] [optional] | ☐ All Debtors | ☐ Debtor 1 | ☐ Debtor 2 |
|---|---|---|---|---|

8. OPTIONAL FILER REFERENCE DATA

Debtor's Organizational ID # 4747282

The Collateral is all of Debtor's personal properties and assets, wherever located, whether tangible or intangible, and whether now owned or hereafter acquired or arising, including without limitation:

(a)     all Inventory and documents relating to Inventory;

(b)     all Accounts and documents relating to Accounts;

(c)     all equipment, fixtures and other goods, including without limitation machinery, furniture, vehicles and trade fixtures;

(d)     all general intangibles (including without limitation payment intangibles, software, customer lists, sales records and other business records, contract rights, causes of action, and licenses, permits, franchises, patents, copyrights, trademarks, and goodwill of the business in which the trademark is used, trade names, or rights to any of the foregoing), promissory notes, chattel paper, documents, letter-of-credit rights and instruments;

(e)     all motor vehicles;

(f)     (i) all deposit accounts and (ii) all cash and cash equivalents deposited with or delivered to Secured Party from time to time and pledged as additional security for the Obligations;

(g)     all investment property;

(h)     all commercial tort claims; and

(i)     all additions and accessions to, all spare and repair parts, special tools, equipment and replacements for, and all supporting obligations, proceeds and products of, any and all of the foregoing assets described in Sections (a) through (h), inclusive, above.

"Accounts" shall mean all accounts, including without limitation all rights to payment for goods sold or services rendered that are not evidenced by instruments or chattel paper, whether or not earned by performance, and any associated rights thereto.

"Inventory" shall mean all inventory, including without limitation all goods held for sale, lease or demonstration or to be furnished under contracts of service, goods leased to others,

trade-ins and repossessions, raw materials, work in process and materials used or consumed in Debtor's business, including, without limitation, goods in transit, wheresoever located, whether now owned or hereafter acquired by Debtor, and shall include such property the sale or other disposition of which has given rise to Accounts and which has been returned to or repossessed or stopped in transit by Debtor.

"Obligations" shall have the meaning set forth in the Security Agreement dated August 8, 2011, as the same shall be amended or amended and restated from time to time, by and between the Secured Party and Debtor, together with any schedules and exhibits attached thereto.

# UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
(414)277-5191

**B. E-MAIL CONTACT AT FILER (optional)**
CYNTHIA.JORGENSEN@QUARLES.COM

**C. SEND ACKNOWLEDGMENT TO:** (Name and Address)

QUARLES & BRADY LLP
411 EAST WISCONSIN AVENUE
SUITE 2400
MILWAUKEE, WI 53202

Delaware Department of State
U.C.C. Filing Section
Filed: 09:46 AM 02/22/2016
U.C.C. Initial Filing No: 2011 3097535
Amendment No: 20161042157
Service Request No: 20160991079

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1a. INITIAL FINANCING STATEMENT FILE NUMBER**
20113097535

**1b.** ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS
Filer: attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13

**2.** ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

**3.** ☐ **ASSIGNMENT (full or partial)** Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9
For partial assignment, complete items 7 and 9 and also indicate affected collateral in item 8

**4.** ☑ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

**5.** ☐ **PARTY INFORMATION CHANGE:**

Check one of these two boxes: **AND** Check one of these three boxes to:

| This Change affects ☐ Debtor or ☐ Secured Party of record | ☐ CHANGE name and/or address: Complete item 6a or 6b; and item 7a or 7b and item 7c | ☐ ADD name: Complete item 7a or 7b, and item 7c | ☐ DELETE name: Give record name to be deleted in item 6a or 6b |

**6. CURRENT RECORD INFORMATION:** Complete for Party Information Change - provide only one name (6a or 6b)

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **OR** 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

**7. CHANGED OR ADDED INFORMATION:** Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **OR** 7b. INDIVIDUAL'S SURNAME | | | |
| INDIVIDUAL'S FIRST PERSONAL NAME | | | |
| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | SUFFIX |
| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

**8.** ☐ **COLLATERAL CHANGE:** Also check one of these four boxes: ☐ ADD collateral ☐ DELETE collateral ☐ RESTATE covered collateral ☐ ASSIGN collateral

Indicate collateral:

**9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT:** Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

| 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| SLS HOLDINGS VI, LLC | | | |
| **OR** 9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

**10. OPTIONAL FILER REFERENCE DATA:**

# UCC FINANCING STATEMENT **AMENDMENT ADDENDUM**

FOLLOW INSTRUCTIONS

**11. INITIAL FINANCING STATEMENT FILE NUMBER:** Same as item 1a on Amendment form
20113097535

**12. NAME of PARTY AUTHORIZING THIS AMENDMENT:** Same as item 9 on Amendment form

**12a. ORGANIZATION'S NAME**
SLS HOLDINGS VI, LLC

OR

**12b. INDIVIDUAL'S SURNAME**

**FIRST PERSONAL NAME**

**ADDITIONAL NAME(S)/INITIAL(S)** | **SUFFIX**

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**13. Name of DEBTOR on related financing statement** (Name of a current Debtor of record required for indexing purposes only in some filing offices - see Instruction item 13). Provide only <u>one</u> Debtor name (13a or 13b) (use exact, full name, do not omit, modify, or abbreviate any part of the Debtor's name), see Instructions if name does not fit

**13a. ORGANIZATION'S NAME**
STREAM TV NETWORKS, INC.

OR

| **13b. INDIVIDUAL'S SURNAME** | **FIRST PERSONAL NAME** | **ADDITIONAL NAME(S)/INITIAL(S)** | **SUFFIX** |
|---|---|---|---|
| | | | |

**14. ADDITIONAL SPACE FOR ITEM 8 (Collateral)**

**15. This FINANCING STATEMENT AMENDMENT:**
☐ covers timber to be cut  ☐ covers as-extracted collateral  ☐ is filed as a fixture filing

**16. Name and address of a RECORD OWNER of real estate described in item 17**
(if Debtor does not have a record interest)

**17. Description of real estate:**

**18. MISCELLANEOUS:**
156338.00002

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

DELAWARE DEPARTMENT OF STATE
U.C.C. FILING SECTION
FILED 03:38 PM 08/10/2015
INITIAL FILING # 2015 3458683

SRV: 151153017

A. NAME & PHONE OF CONTACT AT FILER (optional)
**Diane S. Williams, Paralegal**

B. E-MAIL CONTACT AT FILER (optional)

C. SEND ACKNOWLEDGMENT TO: (Name and Address)

**DLA Piper LLP (US)**
**Attn: Diane S. Williams, Sr. Paralegal**
**6225 Smith Avenue**
**Baltimore, Maryland 21209-3600**

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME – Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| **Stream TV Networks, Inc.** | | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| **2009 Chestnut Street, 3rd Floor** | **Philadelphia** | **PA** | **19103** | **USA** |

2. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| | | | | |
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| **Hawk Investment Holdings Limited** | | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| **Newport House, 15 The Grange** | **St. Peter Port, Guernsey** | | **GY1 2QL** | **Channel Islands** |

4. COLLATERAL: This FINANCING STATEMENT covers the following collateral:

**See Exhibit A attached hereto.**

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA
DE SoS and PA Commonwealth

FILING OFFICE COPY — NATIONAL UCC FINANCING STATEMENT (FORM UCC1) (REV.04/20/11)

<u>Exhibit A</u>

**COLLATERAL DESCRIPTION ATTACHMENT
TO NATIONAL UCC FINANCING STATEMENT**

*Debtor:*  **Stream TV Networks, Inc.**

*Secured Party:*  **Hawk Investment Holdings Limited**

## COLLATERAL

This financing statement covers all of the Debtor's right, title and interest in all of the following:

1.    The membership interests, shares of capital stock or other equity interests listed on Schedule I attached hereto and made a part hereof (the *"Pledged Interests"*).

2.    All personal properties and assets of Debtor, wherever located, whether tangible or intangible, and whether now owned or hereafter acquired or arising, including without limitation (in each case, (i) subject to liens in favor of SLS Holdings VI LLC (*"SLS"*) and Hawk Investment Holdings Limited by virtue of the Securities Purchase Agreements, Security Agreements and related documents dated August 8, 2011 and February 8, 2012, by and between SLS and the Debtor, and (ii) except for those personal properties and assets of Debtor subject to senior security interests granted to equipment financing lenders through one or more Equipment Financing Agreements entered into after the date hereof):

   (a)    all Inventory and documents relating to Inventory;

   (b)    all Accounts and documents relating to Accounts;

   (c)    all equipment, fixtures and other goods, including without limitation machinery, furniture, vehicles and trade fixtures;

   (d)    all general intangibles (including without limitation payment intangibles, software, customer lists, sales records and other business records, contract rights, causes of action, and licenses, permits, franchises, patents, copyrights, trademarks, and goodwill of the business in which the trademark is used, trade names, or rights to any of the foregoing), promissory notes, contract rights, chattel paper, documents, letter-of-credit rights and instruments;

   (e)    all motor vehicles;

   (f)    (i) all deposit accounts and (ii) all cash and cash equivalents deposited with or delivered to Hawk from time to time and pledged as additional security for the Obligations;

   (g)    all investment property;

(h)     all commercial tort claims; and

(i)     all additions and accessions to, all spare and repair parts, special tools, equipment and replacements for, and all supporting obligations, proceeds and products of, any and all of the foregoing assets described in Sections (a) through (h), inclusive, above.

Capitalized terms used herein are defined as follows:

"*Equipment Financing Agreements*" shall mean one or more agreements entered into after the date hereof by and among one or more equipment financing lenders ("*EFLs*") and the Debtor which would call for, among other protections, the grant of senior security interests to the EFLs over certain of the Debtor's assets

Capitalized terms used herein and not otherwise defined herein shall have the meaning applicable thereto under the Security Agreement dated as of August 6, 2015, by and between the Debtor and the Secured Party (the "*Agreement*").

## Schedule I
## to
## National UCC Financing Statement

| Pledgor | Issuer | Class(es) of Interest | Certificate No(s). | No. of Shares Pledged or Percentage of Equity Pledged | Percentage of Issuer's Securities Pledged |
|---|---|---|---|---|---|
| Stream TV Networks, Inc | TechnoVative Media, Inc., a Delaware corporation | Common Stock | 01 | 1,000 | 100% |

# UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
Jolene Beaty 704-331-5731

**B. E-MAIL CONTACT AT FILER (optional)**

**C. SEND ACKNOWLEDGMENT TO:  (Name and Address)**

Jolene Beaty
K&L Gates LLP
Hearst Tower, 47th Floor
214 North Tryon Street
Charlotte, NC 28202

Delaware Department of State
U.C.C. Filing Section
Filed: 10:58 AM 02/20/2020
U.C.C. Initial Filing No: 2015 3458683
Amendment No: 2020 1246075
Service Request No: 20201295488

Print    Reset

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1a. INITIAL FINANCING STATEMENT FILE NUMBER**
2015 3458683 Filed August 10, 2015

**1b.** ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record]
(or recorded) in the REAL ESTATE RECORDS
Filer: _attach_ Amendment Addendum (Form UCC3Ad) _and_ provide Debtor's name in item 13

**2.** ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

**3.** ☐ **ASSIGNMENT (full or partial)**  Provide name of Assignee in item 7a or 7b, _and_ address of Assignee in item 7c _and_ name of Assignor in item 9
For partial assignment, complete items 7 and 9 _and_ also indicate affected collateral in item 8

**4.** ☑ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

**5.** ☐ **PARTY INFORMATION CHANGE:**

Check _one_ of these two boxes:                    **AND**  Check _one_ of these three boxes to:

This Change affects ☐ Debtor _or_ ☐ Secured Party of record | ☐ CHANGE name and/or address: Complete item 6a or 6b; _and_ item 7a or 7b _and_ item 7c | ☐ ADD name:  Complete item 7a or 7b, _and_ item 7c | ☐ DELETE name:  Give record name to be deleted in item 6a or 6b

**6.** CURRENT RECORD INFORMATION:  Complete for Party Information Change - provide only _one_ name (6a or 6b)

| 6a. ORGANIZATION'S NAME |
|---|
| |

OR

| 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | OPTIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

**7.** CHANGED OR ADDED INFORMATION:  Complete for Assignment or Party Information Change - provide only _one_ name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 7a. ORGANIZATION'S NAME |
|---|
| |

OR

| 7b. INDIVIDUAL'S SURNAME |
|---|
| |
| INDIVIDUAL'S FIRST PERSONAL NAME |
| |
| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

**8.** ☐ **COLLATERAL CHANGE:**  _Also_ check _one_ of these four boxes: ☐ ADD collateral ☐ DELETE collateral ☐ RESTATE covered collateral ☐ ASSIGN collateral

Indicate collateral:

**9.** NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT:  Provide only _one_ name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

| 9a. ORGANIZATION'S NAME |
|---|
| Hawk Investment Holdings Limited |

OR

| 9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

**10. OPTIONAL FILER REFERENCE DATA:**
Filed with Delaware SOS (5100206.00001)                    Debtor: Stream TV Networks, Inc.

# UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
Jolene Beaty 704-331-5731

**B. E-MAIL CONTACT AT FILER (optional)**

**C. SEND ACKNOWLEDGMENT TO:** (Name and Address)

Jolene Beaty
K&L Gates LLP
Hearst Tower, 47th Floor
214 N. Tryon Street
Charlotte, NC 28202

Delaware Department of State
U.C.C. Filing Section
Filed: 12:40 PM 03/17/2020
U.C.C. Initial Filing No: 2020 1971003

Service Request No: 20202191791

Print   Reset

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

**1. DEBTOR'S NAME:** Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Stream TV Networks, Inc. | | | |

| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 2009 Chestnut Street, 3rd Floor | Philadelphia | PA | 19103 | USA |

**2. DEBTOR'S NAME** Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| | | | |

| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

**3. SECURED PARTY'S NAME** (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Hawk Investment Holdings Limited | | | |

| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| Newport House, 15 The Grange | St. Peter Port, Guernsey | | GY1 2QL | Channel Islands |

**4. COLLATERAL:** This financing statement covers the following collateral
The membership interests, shares of capital stock or other equity interests listed on Schedule 1 hereto.

**5.** Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

**6a.** Check only if applicable and check only one box:
☐ Public-Finance Transaction  ☐ Manufactured-Home Transaction  ☐ A Debtor is a Transmitting Utility

**6b.** Check only if applicable and check only one box:
☐ Agricultural Lien  ☐ Non-UCC Filing

**7. ALTERNATIVE DESIGNATION (if applicable):** ☐ Lessee/Lessor  ☐ Consignee/Consignor  ☐ Seller/Buyer  ☐ Bailee/Bailor  ☐ Licensee/Licensor

**8. OPTIONAL FILER REFERENCE DATA:**
Filed with Delaware SOS (5100206.00001)

Debtor: Stream TV Networks, Inc.

**FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)**   International Association of Commercial Administrators (IACA)

## SCHEDULE 1

### DESCRIPTION OF PLEDGED INTERESTS

| Pledgor | Issuer | Class of Interest | Certificate No. | No. of Shares Pledged or Percentage of Equity Pledged | Percentage of Issuer's Securities Pledged |
|---|---|---|---|---|---|
| Stream TV Networks, Inc. | TechnoVative Media, Inc., a Delaware corporation | Common Stock | 01 | 1,000 | 100% |

## EXHIBIT G

**Stream TV Networks, Inc., List of Resolutions Voted on at Board Meeting of May 4, 2020**



**Stream TV Networks, Inc.**
**List of Resolutions Voted on at Board Meeting of May 4, 2020, 8:00am EST, held by teleconference**
**Board Members:**
**Present**: Mathu Rajan, Raja Rajan, Asaf Gola, Krzysztof Kabacinski, Kevin Gollop
**Absent**: Frank Hodgson
**Quorum present?** Yes
**Others Present:** Nicole Maneen, Amanda Von Ahnen


1. Statement: Terms:  We hereby resolve pursuant to the authority granted to the Board of Directors by the Bylaws of StreamTV Networks, Inc. that all directors shall be granted a term of no less than 1 year, during which time no removal shall be permitted.

Voted for: Asaf Gola, Krzysztof Kabacinski, Kevin Gollop, Mathu Rajan, Raja Rajan

Voted against: None

**Resolution passed.**


2. Statement: We hereby resolve pursuant to the authority granted to the Board of Directors by Article III, Section 3.1 of the Bylaws of Stream TV Networks, Inc. that the board hereby creates a Resolution Committee, consisting of Asaf Gola and Kevin Gollop which shall have, and may exercise, the full power and authority of the full Board of Directors to resolve any existing or future debt defaults or claims, and any existing or future litigation, or threats thereof, on behalf of the Company, without any further action being required from the Board of Directors or any executive of the company.

Voted for: Asaf Gola, Krzysztof Kabacinski, Kevin Gollop

Voted against: Mathu Rajan, Raja Rajan

**Resolution passed.**


3: Statement: Mathu Rajan and Company has to stop all fundraising until further notice from board of directors.

Voted for: Asaf Gola, Krzysztof Kabacinski, Kevin Gollop

Voted against: Mathu Rajan, Raja Rajan

**Resolution passed.**

# EXHIBIT H

## DOCUMENT FILED UNDER SEAL