**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| Stream TV Networks, Inc. | : | Case No. 21-10433 (KBO) |
| | : | |
| Debtor. | : | |
| | : | |

**SUPPLEMENTAL DECLARATION OF CHARLES M. ROBERTSON IN SUPPORT OF**
**DEBTOR'S OPPOSITION TO MOTIONS TO DISMISS**

I, Charles M. Robertson, hereby incorporate my Declaration of Charles M. Robertson In Support Of First Day Motions and declare under penalty of perjury:

1.     At all times relevant hereto, I have been the Executive Vice President at Stream TV Networks, Inc. ("the Debtor" or "Stream"), a Delaware Corporation, and the debtor in possession in the above captioned Chapter 11 bankruptcy case.  In this capacity, I am generally familiar with the Debtor's day to day operations, organization, financial affairs, and books and records.   At all times relevant hereto, I have been over 18 years old and am competent to make this declaration.

2.     Except as otherwise indicated, all facts set forth herein are based upon my personal knowledge of the Debtor's operations and finances, information learned from my review of relevant documents, and information supplied to me by the Debtor's advisors.  I am authorized to submit this Declaration on behalf of the Debtor, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

3.     As described in my initial Declaration, in addition to the other operating assets described therein, the Debtor previously purchased and continues to own certain optical bonding equipment located in Suzhou, China.  This equipment was purchased by the Debtor in 2015

pursuant to a sales agreement.

4.      While pending the hearing on the Motions to Dismiss, Debtor is unable to obtain relief from the Bankruptcy Court that would enable it to restart its operations and begin earning post-petition revenues; Debtor has nevertheless been actively engaged in developing its business plan and securing the resources necessary to effectively and efficiently reorganize in Chapter 11 once it obtains authorization to do so.

5.      Debtor has actively explored two-view glasses-free 3D product offerings currently available in the global market to determine potential strategic partners and/or distribution relationships. As of the date of this Supplemental Declaration, Debtor has identified two such products that provide the potential to generate distribution revenue with minimal financial risk.

6.      Debtor has also actively explored options to form strategic partnerships with other companies engaged in the glasses-free 3D industry, particularly those in possession of a valid Philips technology license for multi-view displays so that Debtor will be able to offer products similar to the Ultra-D products it has previously developed. While these multi-view products may not have the superior quality of Ultra-D, Debtor believes that the quality is more than acceptable for certain markets and for certain product sizes. One of the products is a very large Video Wall that has never been available as an Ultra-D offering. Debtor has identified a preferred partner for developing multi-view products and is currently negotiating terms for cooperation should Debtor be allowed to proceed with its reorganization under Chapter 11.

7.      Debtor has communicated with its previous and potential customers to determine current interest in various glasses-free 3D product offerings, particularly those that do not require

use of or access to the Ultra-D technology in the event that Debtor is not successful in reclaiming the Ultra-D assets in turnover actions subsequent to a successful prosecution of its fraudulent conveyance claims.

8.      As described below, Debtor has established close relationships with Visual Technology Innovations, Inc. ("VTI") to provide financing for its operations, with AOTEX to provide financing for specific development projects on a case-by-case basis, and with an Asian commercial brand to provide financing for Debtor's optical bonding operations.

**Debtor financing and revenue generation.**

9.      Debtor has been working closely with proposed DIP financier VTI for financing that will not only allow Debtor to operate in bankruptcy but emerge from it as well. An initial DIP financing motion [D.I. 30] in the amount of $1 million has been submitted to this Court already and additional DIP financing motions are expected to follow, based on $30 million in investment that VTI is securing at the moment. It is my understanding that VTI is also in the process of securing an additional $2 million in investment specifically for the purpose of supporting Debtor's bankruptcy, subject to Court approval. To the best of my knowledge, the terms of additional DIP financing from VTI to Debtor are currently being negotiated.

10.      As stated in my initial declaration (D.I. 77), Debtor has made a concerted effort since the Petition Date to explore synergies with its strategic partners and customers to share both the risks and rewards. Debtor is negotiating with a third party interested in providing $1,500,000 toward an optical bonding/production co-venture. These funds would be applied to various factory costs, including equipment installation, clean room build-out, and operations. Having such a partner to jointly operate the bonding factory will reduce Debtor's expense and

provide synergistic opportunities for revenue generation through the partner's network of customers.

11.     Another strategic relationship referenced in my initial declaration is one with AOTEX, which has represented to Debtor that it has secured many millions of Euros in a credit facility that it will make available to Debtor for a variety of projects to be approved on a case-by-case basis. I have been personally involved in the negotiations with the principal of AOTEX as well as his legal counsels in both Europe and the Middle East, and it is my impression that AOTEX has both the resources and the desire to engage with Debtor on many levels. To the extent that Debtor needs project financing, AOTEX will be a viable option, subject to, of course, mutually-acceptable terms and conditions.

12.     Once Debtor is approved to accept the DIP financing requested in D.I. 30, it intends to restart certain basic operations, particularly those required to fulfill customer orders. A significant customer inquiry currently waiting for Debtor's response is valued at approximately $8 million for 10,000 units of 65" glasses-free 3D displays. Debtor anticipates it could begin making partial deliveries to this customer as early as mid-Summer 2021.

**Attempts by SeeCubic to seize Debtor assets post-petition**

13.     As described in my initial Declaration, in addition to the other operating assets described therein, the Debtor previously purchased and continues to own certain optical bonding equipment located in Suzhou, China.  This equipment was purchased by the Debtor on March 12, 2015 pursuant to a sales agreement. *See* Sales Agreement, SEECUBIC-BKR-1741 and 2461, which has been provided to SeeCubic. Despite SeeCubic's full knowledge of the bankruptcy case and the automatic stay, SeeCubic has made post-petition attempts to take control of Debtor's

bonding equipment and the Suzhou, China subsidiary that controls it.

- On March 11, 2021, well after the February 24, 2021 Petition Date, Jasmin Zhang, directed by and on behalf of SeeCubic, contacted Debtor's former contract employee, A.J. Yeh a/k/a Ye Rijun ("Yeh"), and threatened legal action against him and others on Debtor's former Asia team if they did not assist with transferring possession of a legal stamp (the "chops") and other administrative items that would enable SeeCubic to take possession of Debtor's optical bonding equipment.

- On March 25, 2021, a local Chinese attorney, directed by and on behalf of SeeCubic, contacted Yeh threatening legal action if he did not assist with transfer of the Suzhou subsidiary's "Articles and Documents" which are not fully defined but include "the official seal and licenses" of the subsidiary so that SeeCubic may engage with the Suzhou landlord which holds physical custody of the bonding equipment to which Debtor holds title.

- On April 8, 2021, Stastney signed and sent a power of attorney letter to a local Chinese lawyer authorizing the lawyer to resolve the debt owed by Debtor's Suzhou subsidiary to Hold Jumper (Suzhou) Packing Co., Ltd., the landlord of a building housing the optical bonding equipment owned by Debtor (the "Suzhou Landlord"). The equipment is not the property of the Dutch subsidiary, but this is a move clearly designed to curry favor with the landlord and take possession of the equipment in violation of the Automatic Stay.

- The Suzhou Landlord has informed the Debtor that SeeCubic has offered to make past-due rent payments on behalf of the Suzhou, China subsidiary and subsequently take possession of Debtor's equipment stored there.

14.    Despite SeeCubic's extensive post-petition efforts to obtain possession and control of that equipment, it has been unable to obtain possession and ownership to date.  To the extent that SeeCubic's postpetition efforts violate the provisions of the Bankruptcy Code, the Debtor intends to bring claims against SeeCubic and, to the extent necessary, unwind SeeCubic's post-petition violation of the automatic stay in order to preserve the value of this equipment for the Debtor's estate.

### Assets and the Omnibus Agreement

15.    The Debtor continues to own and/or control all of the assets set forth in my

original Declaration and, if it is allowed to proceed in Chapter 11, using its avoidance powers and other rights provided by the Bankruptcy Code, intends to seek recovery of its assets that were transferred to third parties prior to the Petition Date or are otherwise held by third parties.

16.     In particular, I have reviewed the Omnibus Agreement, in the form attached to the Declaration of Shadron L. Stastney [D.I. 47] (the "Bankruptcy Version") as well as the document that Mr. Stastney alleges to be Schedule 2.6 of the Omnibus Agreement that is attached to his Supplemental Declaration.  The Bankruptcy Version differs from the form of the Omnibus Agreement presented to the Debtor at the time that the agreement was executed and subsequently shared by Stastney with Debtor's employees and other interested parties.  In particular, when executed, the Omnibus Agreement did not include any schedules, nor did include the Letter Agreement that appears to be a document added without exhibit number or other attachment reference at the end of the Bankruptcy Version.  Indeed, to date, the Debtor has not been provided with many of the schedules to the Omnibus Agreement, which schedules are also not attached to the Bankruptcy Version. While Mr. Stastney claims that the document attached as Exhibit 2 to his Supplemental Declaration is Schedule 2.6 to the Omnibus Agreement, prior to reviewing the Supplemental Declaration, I have not seen that document and the document includes no indication that it is an exhibit or Schedule to the Omnibus Agreement. Nevertheless, taking the Bankruptcy Version as the operative version for purposes of the Motions to Dismiss, none of the parties to the Omnibus Agreement has yet completed its obligations thereunder.

17.     By way of example, as described herein and in my initial Declaration, the Debtor retains possession and control of a significant amount and value of its assets as of the Petition Date.  None of the stock transfers to or from the Debtor has been effectuated in accordance with Delaware or other applicable law. Indeed, the stock issuance contemplated by the Letter

Agreement included in the Bankruptcy Version cannot be effectuated without an amendment to the Debtor's charter, which to the best of my knowledge, has not been undertaken to date nor does Mr. Stastney allege that the Debtor's charter has been amended or that such stock has been issued.

18.    While Mr. Stastney provides a document purporting to be a copy of a resolution of the board of TechnoVative Media appointing himself as sole director of that company, the Debtor's records do not contain any record of any meeting of the Debtor's Board of Directors appointing Mr. Stastney as sole shareholder of the Debtor or of the Debtor's subsidiary Technovative Media pursuant to which Mr. Stastney could have obtained authority to act on behalf of either entity to transfer the stock certificate of Technovative Media from Debtor to SeeCubic.  The Debtor's records do not include reference to any such meeting or authorization being given to Mr. Stastney, and none of Mr. Stastney's documents relating to the TechnoVative Media stock is notarized, certified or even witnessed to provide any authentication.

19.    Moreover, the Omnibus Agreement was signed on May 6, 2020 among equity holders, secured creditors and insiders of the Debtor.  Based on my understanding of the Bankruptcy Code, the Omnibus Agreement, which provides that the parties will transfer substantially all of the Debtor's assets to insiders, secured creditors and equity holders, was signed within one year prior to the bankruptcy filing and the Debtor may be able to avoid that agreement as a fraudulent transfer under Delaware law and federal bankruptcy law in order to preserve the value of the Debtor's assets and business for the benefit of all of its creditors – those who are involved in the pending Chancery Court litigation and those who did not have the opportunity to participate and otherwise stand to recover nothing on account of their claims and interests.  Additionally, the Debtor has yet to receive any of the consideration provided by the

Omnibus Agreement in exchange for any of the assets that have been transferred to SeeCubic or those that SeeCubic has it its possession.  Neither of the Debtor's secured creditors has released its claims and liens or terminated its UCC filings.  SeeCubic has not issued stock in SeeCubic to Debtor.  Neither of the litigations referenced in the Omnibus Agreement has been dismissed. To date, the Debtor has received *no value* in exchange for any of the assets that have been transferred to SeeCubic.

### Refutation of the Supplemental Declaration of Shadron L. Stastney

20.     Mr. Stastney states in his Supplemental Declaration at ¶ 38 that the proprietary technology developed by the Debtor, trademarked at Ultra-D™, "was previously transferred to, and is now owned and controlled by, SeeCubic through its direct and indirect subsidiaries." The Ultra-D patents are held by the Netherlands subsidiary Ultra-D Cooperatief U.A. and the know-how resides with engineers employed at the Netherlands subsidiary SeeCubic B.V. (not to be confused with SeeCubic, Inc.). Mr. Stastney's assertion that SeeCubic owns and controls the Ultra-D technology is valid only if SeeCubic has taken proper and legal steps in the Netherlands to assume ownership and control of those Dutch subsidiaries, which it did not, as will be revealed by expert Dutch legal testimony. The preliminary injunction Order from Chancery Court gave SeeCubic the preliminary right to transfer ownership and control of those subsidiaries, but due to improper and incomplete actions of SeeCubic, proper legal title to the subsidiaries remained with the Debtor as of February 24, 2021 (the "Petition Date").

21.     Mr. Stastney states in his Supplemental Declaration at ¶ 39 that Debtor "acquired a license to utilize certain technology and intellectual property created and owned by Koninklijke Philips N.V." ("Philips"), but that statement is false. The license to use the Philips technology

was obtained by Debtor's Netherlands subsidiary Ultra-D Cooperatief U.A. and was subsequently transferred to Debtor's Curacao subsidiary Ultra-D Ventures, CV, which currently holds the Philips license. *See* Philips Technology License Agreement, SEECUBIC-BKR-1479. As per Section 11 of the Philips license agreement, titled "NO ASSIGNMENT," the license "may not be delegated or assigned … in whole or in part, to any third party without the written consent of an authorized representative of Philips…" Mr. Stastney further states in his Supplemental Declaration at ¶ 41 that "the Philips Technology license that previously belonged to [Debtor] was transferred to, and is now owned and controlled by, SeeCubic pursuant to the Omnibus Agreement" and he cites Schedule 2.6 to the Omnibus Agreement and attaches a document to his Supplemental Declaration with no markings to indicate that it is a Schedule to the Omnibus Agreement. In any event, even if the document is a list of the Debtor's contracts that for some reason includes the Philips Technology license that belongs to a subsidiary and not the Debtor, simply because a contract is on a list provides no proof that a contract has been assumed by or assigned to SeeCubic unilaterally, particularly when the agreement specifically requires the written approval of the other party to any assignment. To the extent that SeeCubic asserts that it holds the Philips license directly, it has offered no evidence that Philips has granted written approval of the license transfer as required by the license agreement.

22.     To the extent that SeeCubic claims it controls the license through the Curacao subsidiary Ultra-D Ventures, CV, such control and ownership would be valid only if SeeCubic has taken proper and legal steps in Curacao to assume ownership and control of the Curacao subsidiary, which it has not. This is evidenced by Mr. Stastney's post-petition email outreach on March 24, 2021, a full month after Debtor's Chapter 11 filing, to former Ultra-D Ventures, CV director Ad Luijks. In that email, Mr. Stastney seeks the cooperation of Mr. Luijks to "instruct"

Curado Trust, the local administrator of the Curacao subsidiary, to liaise with SeeCubic's Dutch legal representative on *transitional matters* (emphasis added). He further states in the email that "if we could resolve this quickly, that would help us moving things forward without delay." *See* Stastney email Exhibit 1. Too late, Mr. Stastney learned that ownership and control of international corporations and foreign assets cannot be transferred by a simple document signed by himself in two or three places without apostille, certification or other official authentication, even if he has been granted power of attorney through the Omnibus Agreement. International jurisdictions do not simply recognize foreign documents or court rulings.  Appropriate validation in the local courts in the foreign jurisdictions is required, particularly given that these jurisdictions are not members of the Hague Convention or parties to treaties with the United States. SeeCubic has shown no evidence that it has taken such required steps in either Curacao or the Netherlands.  Instead, Mr. Stastney simply restates his mantra that "all assets have been transferred," a claim Mr. Stastney has been making since his initial foreclosure action was filed in Delaware Superior Court in March of 2020 - two months before the Omnibus Agreement was signed. There is no dispute that the preliminary injunction order issued in December of 2020 by the Chancery Court gave SeeCubic a preliminary right to take action to obtain ownership and control of Debtor's subsidiaries and enjoined the Debtor and its principals from interfering in those actions, but, SeeCubic has not yet completed the steps necessary to obtain proper legal title to and ownership of the Debtor's Curacao subsidiary (or the Philips license it holds) or many of the Debtor's other assets.

23.     Mr. Stastney states in his Supplemental Declaration at ¶ 40 that SeeCubic owns and controls the Netherlands subsidiary, SeeCubic B.V., and all of the human resources there. Similarly to the status of the Debtor's Curacao subsidiary, SeeCubic has not taken the steps

necessary to assume legal ownership and control of those assets.

24.     Mr. Stastney states in his Supplemental Declaration at ¶ 42 that "any party willing to pay the standard license fee to Philips can obtain a license to use the basic Philips Technology," which merely confirms Debtor's assertion that it has a backup license available to develop glasses-free 3D Multi-View products incorporating the Philips Technology. Debtor acknowledges that its Ultra-D improvements to the basic Philips Technology resulted in a superior 3D performance, but companies such as Dimenco and Marvel Digital have successfully brought non-Ultra-D products to market over the years using that same base technology. Debtor believes that it can, if necessary, secure customers and bring products to market, even without the Ultra-D improvements, using the Philips Technology. Mr. Stastney's belief in what constitutes a "viable path" for the Debtor is both subjective and ill-informed.  Mr. Stastney is a hedge fund financial advisor who has claimed entitlement to Debtor's 3D technology assets only recently, and only as collateral seized pursuant to his loan to Debtor. Mr. Stastney has no experience or relationship with the customer base that Debtor has worked to establish over a period of many years, nor does he have experience in developing or bringing any 3D products to market, so any speculation on the business prospects of Debtor is just that – speculation.

25.     Mr. Stastney states in his Supplemental Declaration at ¶ 43 that "pre-Chapter 11 [Debtor] did not 'contemplate,' develop, manufacture, produce, market, or sell any 'Two-View Products'," but this statement is false. Debtor did, in fact, contemplate and conduct some preliminary development work on a Two-View phone manufactured by a third party. After Debtor created new content that significantly improved the performance of the third-party hardware, Debtor and the third party explored a potential business relationship, but ultimately could not reach mutually-acceptable terms. That experience, however, convinced Debtor's

management that Two-View products could achieve acceptable quality for certain markets. While it is true that the "pre-Chapter 11" Debtor focused the majority of its efforts on the Ultra-D technology, which offered superior quality, since initiating this bankruptcy case, Debtor has revisited other paths to market as part of its reorganization strategy. To exclude potential paths to revenue generation simply because such paths were not fully implemented previously would be short-sighted and foolish.

26.     Mr. Stastney states in his Supplemental Declaration at ¶ 43 that he "understands" that Glasses-Free Technologies, Inc. ("GFT") and Visual Technology Innovations, Inc. ("VTI") "were formed or operated for the purpose of competing *against* and taking opportunities *from* [Debtor] (and now, SeeCubic)." Mr. Stastney's understanding is incorrect and contrary to the record in this case. GFT was formed as a potential manufacturing and distribution partner to Debtor, providing funding that Debtor was unable to secure on its own due primarily to SeeCubic's actions related to the Omnibus Agreement. VTI was formed for the purpose of acquiring glasses-free 3D technologies, including Debtor and its Ultra-D technology, should Debtor succeed in retaining and, as necessary, reclaiming its intellectual property in its bankruptcy case. In such event, the financial resources of VTI, coupled with the technological innovations of Debtor, will result in a profitable collaboration and/or acquisition.

27.     Mr. Stastney states in his Supplemental Declaration at ¶ 45 that "the Chancery Court's Preliminary Injunction Order required [Debtor] to transfer those assets to SeeCubic." Again, this is another false statement by Mr. Stastney, but it is one he and SeeCubic have continued to make time and time again. The preliminary injunction Order does not require the transfer of *any* assets and does not transfer *any* assets. The Order, which is preliminary, simply prevents Debtor from *interfering with* the transfer of assets as described in the Omnibus

Agreement. There is no court order mandating a transfer of assets, yet SeeCubic continues to promote the preliminary injunction Order as a ruling that magically moved all the assets from Debtor's possession to SeeCubic, regardless of actions SeeCubic was required to take in jurisdictions all over the world to obtain a transfer of title or ownership of the various types of assets.

28.     Further, the focus of the Chancery Court was extremely narrow and covered only two primary questions: (i) Were the "independent directors" authorized to bind the Debtor? and (ii) Did the transfer of all or substantially all of Debtor's assets require a vote of the Class B shareholders as required by Debtor's Third Amended and Restated Certificate of Incorporation? There was no review of the equitable transfer of Debtor's assets or the impact that the Omnibus Agreement would have on Debtor's unsecured creditors, all of whom have been abandoned by SeeCubic.

29.     Mr. Stastney states in his Supplemental Declaration at ¶ 45 that the assets defined in ¶¶ 26-27 of my Declaration (D.I. 77) "are only [in] the Debtor's possession because of [Debtor's] and the Rajans' violations of the Omnibus Agreement and disregard for the Chancery Court's Preliminary Injunction Order." Mr. Stastney would have this Court believe that the preliminary injunction Order is so broad that it allows SeeCubic to seize assets that it has no entitlement to, even under the Omnibus Agreement. For example, the STL bonding equipment that SeeCubic claims to have acquired has not even been purchased by Debtor in the first instance.  It remains available to the Debtor from the vendor, but is owned by the vendor. The mechanicals and back light units developed by Skyworth in Asia remain the property of Skyworth, yet their engineering resources and product development team remains committed to working with Debtor. Similarly, the 8K electronics for the Silicon Valley "special project"

remain the property of JoveAI Innovation, Inc. ("JoveAI"), not the Debtor. JoveAI remains committed to working with Debtor on a variety of potential future projects. Non-Debtor assets and the personal relationships developed over many years are not subject to transfer.

30.     Other assets, like the multi-million-dollar bonding equipment currently located in China, remain the property of and under the control of Debtor because SeeCubic never took appropriate action to initiate and consummate the transfer of ownership in China.

31.     Further, to the best of my knowledge, neither Debtor nor any of its employees have violated the preliminary injunction Order by refusing to cooperate with any request of SeeCubic related to the transfer of any asset under the Omnibus Agreement. In fact, upon demand after issuance of the preliminary injunction Order, I personally surrendered the Ultra-D technology demonstrator units in my possession as well as the business laptop I was using to SeeCubic.

32.     As stated above, SeeCubic has expanded the application of the preliminary injunction Order well beyond its effect. SeeCubic seized possession of the Debtor's email and document servers, locking Debtor out from its own communications, while helping itself to a review of anything it wanted, *even privileged attorney-client communications related to a case that was still pending*. This was done despite my caution to the IT manager, who was ordered by Mr. Stastney to immediately comply with SeeCubic's turnover demand.

33.     Mr. Stastney states in his Supplemental Declaration at ¶ 48 that the customer relationships described in ¶ 28 of my Declaration are "just more empty promises" because Debtor has not yet successfully brought products to market with them. Mr. Stastney would have this Court believe that Debtor is simply "name-dropping" to create an illusion that it has

potential business opportunities. But again, Mr. Stastney has no personal experience with these customers. I do. The Lenovo relationship is the result of more than two years of presentations and the creation of multiple laptop demonstrators used by Lenovo for internal meetings over a period of many months. Finally, after generating internal enthusiasm for a glasses-free 3D laptop, and with 8K-resolution laptop video panels finally becoming available from panel manufacturers, Lenovo has indicated that is it ready to assign engineers to work with Debtor on developing the first product.

34.     I have personally observed through weekly development meetings the evolution of Debtor's business relationship with Skyworth, which began with presentation of Debtor's technology in the Skyworth booth at the Consumer Electronics Show several years ago. In its most recent collaboration with Debtor, Skyworth created the special back light unit and mechanicals for the Silicon Valley special project. As evidence of its interest in developing a glasses-free 3D television with Debtor, Skyworth has shipped several of its 75-inch 8K-resolution video panels to Debtor's Netherlands subsidiary. This is more than discussion; active steps toward product development have begun.

35.     As Taiwan's largest telecommunications company, Chunghwa Telecom ("CT") has been interested in glasses-free 3D technology for quite some time. Debtor has maintained an ongoing and growing relationship with CT. In 2019, CT announced the rollout of its 5G data service and sought to pair the advanced digital service with a technology that would resonate with its subscribers. Debtor worked closely with CT on a special demonstration that streamed glasses-free 3D content across the 5G service through a mobile phone that broadcast to one of Debtor's 3D displays. The demonstration was shown to the president of Taiwan and other high-level officials. As CT rolls out its 5G service, it has expressed interest in a glasses-free 3D

content service and offering its subscribers free or subsidized 3D televisions much like cellular providers offer discounted phones to their subscribers. This development, which can lead to real products and revenue, exists precisely *because* Debtor has spent years cultivating the business relationship instead of demanding an immediate purchase order.

36.    Mr. Stastney states in his Supplemental Declaration at ¶ 49 that the business opportunities described above "are stale and irrelevant now that [Debtor] has no access to, or ability to utilize, SeeCubic's Ultra-D™ technology," but that presumes that the Debtor will be unable to pursue remedies under the Bankruptcy Code for the benefit of its estate and all of its creditors. Even if Debtor does not regain access to the Ultra-D technology, however, it has access to the underlying Philips technology through a development partner and has access to skilled engineers who can make improvements to the base technology without infringing on any Ultra-D patents. None of the business relationships are "stale" as characterized by Mr. Stastney, and Debtor is confident that the effort it has expended to build and maintain such relationships makes business opportunities available to it despite any limitations that may be imposed if it cannot access the Ultra-D technology.

37.    Mr. Stastney states in his Supplemental Declaration at ¶ 50 that he is "personally aware that Google canceled the prior existing 'project' referenced in Mathu Rajan's declaration because of Stream's historical failures to timely deliver a promised demonstration unit." He further states that Mathu Rajan was "touting" the project even after its cancelation in early February 2021 and asserts that [e]ither Mathu Rajan had so little information regarding the status of the Google project (and a lack of contact with Google) that he did not know of the cancelation … or he was aware of the cancelation and touted the project nonetheless." This statement is both false and absurd on multiple levels.

38.     First, Mathu Rajan was on weekly project calls with Google for most of 2020, up until the preliminary injunction Order on December 8, 2020 and SeeCubic's demand that Debtor no longer participate in those planning calls. I was personally on most of those calls as well, attending probably 30 or 40 virtual meetings during the course of 2020 until the Friday call of December 4, 2020. As of that date, the project was very much alive and we were making plans for assembly of a demonstrator unit in the Netherlands and final electronics adjustments by JoveAI in Silicon Valley before making delivery to Google. The project was not canceled due to any delays by Debtor. In fact, the impact of COVID-19 on the global operations of both parties was acknowledged, as well as certain financial difficulties that Debtor was having. Toward that end, Google had offered to subsidize some of the one-time tooling costs for phase II production subject to acceptance of the demonstrator unit. When SeeCubic demanded that Debtor and all its employees disengage from Google per the preliminary injunction Order, Debtor complied.  In less than two months, SeeCubic managed to kill the project that Debtor had invested more than a year and considerable expense developing.

39.     The reason for the project's cancelation on February 3, 2021, assuming it cannot be revived by Debtor, is clear from an email exchange between Google and Mr. Stastney. *See* SEECUBIC-BKR-00000450 (marked as confidential by SeeCubic).  In the email, Mr. Stastney seems more interested in getting Google to provide proof of alleged interference by Debtor than in managing a valuable customer relationship. It is evident from the thread of communication that Google wanted to implement a new non-disclosure agreement since SeeCubic is a separate entity from Debtor, and that Google was prepared to move forward with the project despite the change. There was no desire to cancel the project due to Debtor's poor performance as Mr. Stastney claims. SeeCubic's failure to maintain Google as a customer results directly from Mr.

Stastney's desire to drag them into a petty legal battle rather than treat Google like the valuable customer it is. On January 11, more than a month after the project was handed to SeeCubic by Debtor, Mr. Stastney wrote to Google "to the extent you have an opportunity to gather and send us the history of all the successful or attempted communication by the former Stream TV Networks team with you since December 8, 2020 (or whatever you have available or can recall easily), we would appreciate receiving that so that we can spare you any further annoyance from them." The Google program manager responded immediately that he would have to consult with his legal counsel. After waiting another two weeks, Mr. Stastney suggested that SeeCubic's lawyers could talk to the Google lawyers. A week later one of the Google executives announced that they would not be moving forward with the project. If the deal is truly dead, it is a result of SeeCubic's inept customer relations, its focus on petty politics, and its lack of expertise in the consumer electronics industry.

40.     Mr. Stastney's description of Debtor's Google project as an "open-ended trial relationship without any serious commitments" does not accurately describe the phased approach to product development agreed between Google and Debtor. Although Debtor did not have a contract from Google for production and delivery of more than the initial two demonstrator units, the parties had negotiated a Phase 1 production of 100 units at $4,000 per unit for a total of $400,000 which would be used to partially offset Debtor's one-time tooling costs for manufacturing. Subject to satisfactory "mass produced" units in the Phase I production run, Google had indicated an initial purchase quantity of 10,000 units at approximately $2,000 per unit, generating gross revenues of approximately $20 million. Debtor had provided pricing to Google and Google had confirmed this non-binding plan via email with Debtor. Assuming that Debtor is unable to restore its relationship with Google and reactivate the project, the loss of this

potential revenue caused by SeeCubic is a damage that Debtor intends to pursue when appropriate.

41.    Mr. Stastney states in his Supplemental Declaration at ¶ 51 that Debtor's customers Marvel Digital Limited and B-Back, Inc. can only be satisfied with products containing the Ultra-D technology, but he makes this assertion without any specific knowledge of either customer. I am personally very close to the principal of B-Back and have worked with him for many years while he was building his business. B-Back has sold glasses-free 3D products featuring several different technologies, not just Ultra-D, and he has committed to purchase from Debtor regardless of the underlying technology. Marvel Digital Limited has its own Philips license and has been producing Multi-View products in sizes other than the Debtor-produced 65" displays. Marvel Digital has indicated an interest in working with Debtor on a 65" unit to replace the Ultra-D display if it is not available.

42.    Mr. Stastney further states in his Supplemental Declaration at ¶ 51 that the joint venture revenue share currently being negotiated with AOTEX "was founded and depends upon the use of [the] Ultra-D technology." This is another false statement based on speculation and lack of information. Neither Mr. Stastney nor SeeCubic have any understanding of the nature of the discussions between Debtor and AOTEX, which have revolved primarily around two-view products since the preliminary injunction Order was issued in December 2020. Both Debtor and AOTEX believe there are meaningful, if not significant, global opportunities for glasses-free 3D products of all types, and AOTEX has secured funding to support the joint venture and leverage Debtor's 3D expertise.

43.    Mr. Stastney states in his Supplemental Declaration at ¶ 52 that Debtor's

relationship with JoveAI "would provide [Debtor] little value beyond that of an ordinary service provider." Again, Mr. Stastney purports to know the workings of the business relationship between Debtor and JoveAI based on the relationship SeeCubic was able to achieve. It is likely true that SeeCubic has not been able to engage JoveAI as anything other than a vendor, especially after SeeCubic killed the Google deal that would have provided JoveAI with royalty payments on every unit. However, Debtor worked very closely with JoveAI for a year on the project and developed personal relationships that led to "creative" business thinking and a mutually-beneficial solution that offered Debtor a reduced cost-to-market and back-end benefits to JoveAI. Both parties remain committed to future development projects together. Mr. Stastney asserts that a project partner like JoveAI has little value unless they are delivering 3D technology, but this is far from the truth. One of the historical problems Debtor faced in bringing products to market was a lack of basic consumer electronics expertise in areas other than 3D. JoveAI is *exactly* the type of partner required for any product rollout.

44.     Mr. Stastney states in his Supplemental Declaration at ¶ 53 that Debtor "had significantly damaged the relationship with Robert Bosch GmbH ("Bosch") before SeeCubic became involved." This is another false and unsubstantiated statement included for the sole purpose of disparaging the Debtor. I am the one who personally negotiated the $3 million development agreement with Bosch over the course of several months, getting the deal memo signed in March 2020. Engineering effort on the project was delayed for several months while Bosch withheld payments until product pricing could be agreed not just with Debtor, but also with BOEVx, the video panel supplier. Due to COVID-19, Bosch had limited availability of its personnel which led to additional delays throughout the summer, but by Fall 2020, the project was greenlit by all parties to move forward and I worked with the Netherlands engineers of

Debtor's subsidiary to engage a German group to provide supplemental engineering resources. When SeeCubic assumed the project on December 8, 2020, it was running smoothly, there were no issues with Bosch that I was aware of, and we were negotiating the longform contracts. I do not know the current status of the project as I have respected the preliminary injunction Order.

45.    Mr. Stastney further states in his Supplemental Declaration at ¶ 54 that "SeeCubic has established an actual business relationship with BOE – the first real, meaningful relationship with BOE in the history of [Debtor] of SeeCubic – through its automotive division BOEVaritronix" ("BOEVx"). While Mr. Stastney is keen to praise the relationship with BOEVx, it was developed by me personally over the course of many months as described above while we worked together to determine a mass production plan that would result in the cost reductions required by Bosch. I have had hundreds of contacts with BOEVx via email, skype and phone, with a growing appreciation by both parties of mutually-beneficial opportunities that went well beyond the automotive industry. One project we were beginning to explore prior to the preliminary injunction Order, for example, was the potential for glasses-free 3D displays in the casino gaming industry and we had begun to exchange product specs. While I am pleased that SeeCubic has not destroyed the relationship that Debtor and I personally built with BOEVx, it is pure fiction that SeeCubic has achieved something that Debtor did not.

46.    Mr. Stastney states in his Supplemental Declaration at ¶ 55 that Debtor's bonding equipment "has been 'mothballed' inside the Suzhou facility … since being shipped from Hong Kong to Suzhou in 2016" and that "[i]t is unknown whether the equipment is damaged or even operable at this point." These are statements from a person who clearly doesn't know the history, the status, or have possession of the equipment. The bonding equipment has been in Suzhou since it was shipped from the Japanese manufacturer in 2014. It has never been in Hong Kong.

While it is true that the equipment was packed up for transport to its current location after production runs at an Original Equipment Manufacturer across town in Suzhou, it is not true that the operational condition is unknown. It is only unknown to Mr. Stastney because neither he nor SeeCubic have taken title or possession of the equipment. In anticipation of securing financing with a partner in an optical bonding collaboration, Debtor had the equipment inspected by the Japanese manufacturer, who confirmed that with minor maintenance the bonding line is still quite satisfactory. That manufacturer remains ready and willing to help with the equipment installation and start-up at a new location.

47.     Further, Debtor disputes that SeeCubic owns the Suzhou, China subsidiary. It clearly does not control the subsidiary; as confirmed most recently on April 17, 2021, Mathu Rajan remains the General Manager, his appointee and close associate Yeh remains the Executive Director, and I am the Supervisor. SeeCubic enjoys no control over the subsidiary because it never took the proper actions in China to legally acquire that subsidiary.

48.     Further, Mr. Stastney states that the only use of the bonding equipment is to produce products that incorporate the Ultra-D technology. This is also false. The bonding equipment was essentially an "off the shelf" product from the Japanese manufacturer that had one extra module added for the purpose of achieving extremely accurate alignment. It is very possible to disengage the alignment module and bond products of all kinds, whether they are 3D or not. Bonding applications include touch panels, scratch-resistant "gorilla glass," polarized lenses for outdoor displays, and much more. Participating in a bonding operation to leverage its multi-million-dollar equipment can generate meaningful revenue to Debtor.

49.     With respect to the Net Operating Loss ("NOL") reported by Debtor in its

Schedule A/B: Assets – Real and Personal Property (D.I. 131), I respectfully note the requirement of the Debtor to report its NOL to the U.S. Trustee. Debtor simply filled in the form with the information from its most recent tax return, prepared by an outside accountant, and has not offered the NOL as a primary asset for consideration in its bankruptcy proceeding. To the contrary, Debtor acknowledged in its filing that the NOL is "not reflected on Company Balance Sheet." Mr. Stastney states in his Supplemental Declaration at ¶ 60 that "there is zero support for the NOLs," referring to them as "speculative" while challenging both their existence and validity. The NOL total reflected in the Asset List reported above is the result of several years of cumulated operating loss and is documented in Debtor's 2018 tax return. Stastney's "change of control" comment would be relevant if he were now executive director of Debtor, which he is not. There has been no change of control of Debtor, which still retains its independence and ongoing operational ability regardless of any asset transfer.

**Other relevant facts.**

50.    In its bankruptcy case, the Debtor intends to maximize the value of its estate and business operations by pursuing recovery of other assets and funds transferred during the avoidance period.

51.    As set forth in the Debtor's schedules, which I helped to prepare, reviewed and confirmed based on the Debtor's business records, in addition to the secured creditors (SLS and Hawk), as of the Petition Date, the Debtor owed approximately $18 million to more than 100 unsecured creditors.  According to Schedule 1.1(b) of the Omnibus Agreement, which identifies creditor claims to be assumed by SeeCubic, none of this scheduled debt will be assumed by or paid by SeeCubic from the Debtor's assets or future operation of the Debtor's business if the

Debtor's assets are acquired by SeeCubic for the benefit of insiders, secured creditors and certain equity holders of the Debtor.

52.     The Debtor has operated its business for more than a decade and, while it is a defendant in several pending litigations regarding its debt obligations (including the litigation involving the secured creditors), the Debtor believes that it has a valuable business that can be reorganized using the unique tools provided by the Bankruptcy Code in a way that resolves its current financial troubles and enables the Debtor to strengthen its future business operations to benefit all constituencies.  Indeed, SeeCubic's financial statements show the value of the assets assumedly acquired from the Debtor, including the Debtor's Goodwill at the end of 2020, to be almost double the amount owed by the Debtor to its secured creditors.  *See* SeeCubic-BKR-00007261 (marked as confidential by SeeCubic).

53.     Debtor continues to have access to its most talented employees, the technology needed to develop its products and, assuming it is permitted to move forward in Chapter 11, will be able to finalize commitments for future funding sources, particularly through VTI, as well as post-petition customer contracts.

Dated:   April 27, 2021

_____
Charles M. Robertson

EXHIBIT 1

-----Oorspronkelijk bericht-----
Van: Shadron Lee Stastney <slstastney@seecubic.co>
Verzonden: woensdag 24 maart 2021 20:26
Aan: Ad Luijks / Luijks Advies B.V. <ad@luijksadvies.com>
CC: Krzysztof Kabacinski <kkabacinski@seecubic.co>; Franklin Rodgers <frodgers@seecubic.co>; Tijmen Klein Bronsvoort <Tijmen.Kleinbronsvoort@debrauw.com>
Onderwerp: Curado Trust

Ad,

Hope all is well, and your family all safe and healthy!

In addressing all the loose ends, could you please reach out to Curado Trust, administrator of the Curacao entity, to get the most recent amounts due to them, and to instruct them to liaise with Tijmen at DeBrauw on other transitional matters?  I believe Edward Logeman may be one contact there, but you may have another.  I am cc'ing Tijmen Klein Bronsvoort of DeBrauw on this email as well so you can provide his contact information if helpful.

Any questions, please let us know, and if we could resolve this quickly, that would help us moving things forward without delay.

Best,

Shad