## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| Stream TV Networks, Inc. | : | Case No. 21-10433 (KBO) |
| | : | |
| Debtor. | : | |
| | : | |
| | : | |

**SECOND SUPPLEMENTAL DECLARATION OF CHARLES M. ROBERTSON IN SUPPORT OF DEBTOR'S RESPONSE TO STATEMENT OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS REGARDING THE MOTIONS TO DISMISS THIS CHAPTER 11 CASE AND JOINDER TO THE OMNIBUS OBJECTION**

I, Charles M. Robertson, hereby declare under penalty of perjury:

1.      At all times relevant hereto, I have been the Executive Vice President at Stream TV Networks, Inc. ("**Debtor**"), a Delaware Corporation, and the debtor in possession in the above captioned Chapter 11 bankruptcy case. In this capacity, I am generally familiar with the Debtor's organization, financial affairs, and books and records.  At all times relevant hereto, I have been over 18 years old and am competent to make this declaration.

2.      Prior to December 2020, I was employed by Debtor since 2009 in various capacities, including as Vice President of Business Development.  In addition, during the period of June 2018 through December 2020, I served as the CEO of SeeCubic B.V., Debtor's subsidiary located in Eindhoven, the Netherlands.

3.      Prior to my employment at Debtor, I served for more than twenty years in various capacities in the film and television production industries.

4.      I submit this supplemental declaration (the "**Second Supplemental Declaration**") in connection with the (i) *Statement of the Official Committee of Unsecured Creditors regarding the Motions to Dismiss this Chapter 11 case and Joinder to the Omnibus Objection.* [D.I. 159] (the "**UCC Statement**") and (ii) my declaration in support of first day motions [D.I. 77].

5.      I was quite surprised to discover that the UCC Statement disclosed an agreement between the Unsecured Creditors Committee (the "**Committee**") and SeeCubic, Inc. ("**SeeCubic**") without the Debtor or its attorneys having been informed of any settlement, or even being advised that negotiations between those parties had commenced.  Had the Committee also reached out to Debtor, it would have learned that the agreement it reached with SeeCubic offers less than the prospective operations budget being negotiated with the Debtor's proposed debtor-in-possession lender, Visual Technology Innovations, Inc. ("**VTI**"), to fund operations, support a plan that addresses all of Debtor's creditors, and provide a pathway for Debtor's exit from bankruptcy.  Accordingly, the Committee apparently bound itself, even if temporarily, to a supposed settlement that provides merely the potential of a small recovery for creditors several years from now, without considering or determining any alternatives or other options available to it.

6.      Debtor and VTI's negotiations to date have resulted in an initial Support Agreement as well as a recent agreement in principle to address key financial and operational issues that will enable Debtor to successfully reorganize.  First, at VTI's request, Debtor will engage a Crisis Restructuring Officer ("**CRO**") that VTI will fund, subject to approval by the Court, to assist Debtor in navigating the bankruptcy and facilitating operations.  A CRO has been contemplated by Debtor for quite some time, but Debtor has not had the opportunity to focus its full attention on restructuring efforts due to the current litigation over and challenges to the bankruptcy filing

itself.  In addition to funding the payment of allowed administrative fees and expenses accrued to professionals as may be approved by the Court, VTI has agreed to provide a professional fee carveout, to be negotiated with the estate professionals.

7.      VTI has also agreed to provide funding to restart and continue Debtor's operations. This funding includes monies for the Debtor to pay certain mission-critical vendors and/or to assume certain contracts and pay any necessary cure amounts and post-petition critical trade payments, thereby reducing the balance of Debtor's overall unsecured claims significantly.

8.      Based on Debtor's understanding of its current debt priorities and funding available to VTI, Debtor anticipates being able to pay allowed claims of its unsecured creditors *in full* through a combination of initial payments on the effective date of a confirmed plan, plus relatively short-term promissory notes for the remaining balances of their allowed claims. Debtor would also maintain flexibility to add additional critical trade vendors or contracts to service current potential opportunities to the extent that they require the services of other unsecured creditors.

9.      The Debtor believes that the terms that it will present to its unsecured creditors will provide a significantly better outcome than the settlement accepted by the Committee, which also seems to lack any means of enforcement if Debtor's bankruptcy case is dismissed.

10.      In connection with its proposed DIP financing and future funding, VTI will sponsor and provide exit financing to preserve Debtor's professional and customer relationships and to help Debtor deliver on its promise of commercializing its technology.  Debtor anticipates a plan structure that, to the extent permitted by the Bankruptcy Code and approved by creditors, could enable shareholders to maintain or obtain shares in the reorganized Debtor.

11.     Debtor has various options to resolve its secured debt in a reorganization plan, including payment, enforcement of debt-to-equity conversion, or issuance of equity interests, depending on the outcome of Debtor's negotiations with those creditors.

12.     With respect to its resolution of its junior secured debt, Debtor has the ability to pursue enforcement of the pre-petition debt-to-conversion agreement executed between Debtor and Hawk Investment Holdings Limited ("**Hawk**" and the "**Hawk Conversion Agreement**"), which was executed on May 2, 2018 with an effective date of January 29, 2018, as well as related agreements between the Debtor and Hawk. Significantly, the secured debt of Hawk, which is allegedly approximately $138 million, inclusive of principal and interest, as of the date of Debtor's Chapter 11 filing, represents more than *92% of Debtor's total secured debt* and more than *82% of Debtor's combined secured and unsecured debt*. Successful conversion of most or all of the Hawk debt will have a tremendous impact on Debtor's financial position.  It is important to note that the enforceability of the Hawk Conversion Agreement was not at issue in the Delaware Chancery Court proceedings.   In its filings in the Debtor's bankruptcy case, SeeCubic has correctly acknowledged that the Hawk secured debt remains with Debtor.  As such, Debtor retains its options to address this debt through a variety of options, including the debt-to-equity conversion described in the Hawk Conversion Agreement.

13.     While Debtor has been diligently preparing its defense against the pending Motions to Dismiss, Debtor has simultaneously been positioning itself for an efficient and effective reorganization.

14.     In addition to securing funding to restart its operations and fund a plan of reorganization, Debtor has begun to investigate its rights under the Bankruptcy Code that it can

use to maximize the value of its estate, including the recovery of certain preferential payments made before Debtor filed for bankruptcy, and avoiding obligations that do not benefit the Debtor or its creditors.

15.     Debtor has filed a motion to reject a settlement agreement dated May 6, 2020 between Stream, its secured creditors, and certain of its shareholders (the "**Omnibus Agreement**") and also intends to seek recovery of some of its assets that were previously transferred to insiders, secured creditors and shareholders under that agreement before the bankruptcy case was filed because the value of those assets exceeds the amount owed by Stream to its secured creditors and the agreement is not in Stream's best interests.  Even at the time that the agreement was signed, the agreement was designed to benefit insiders, secured creditors and certain equity holders at the expense of Stream and its other constituencies.  *See* SeeCubic 00001253-54 attached as **Exhibit 1** and the Letter Agreement attached as **Exhibit 2**.

16.     Debtor's efforts to secure sufficient funding, recover assets, and continue the development and marketing of its technology through the Chapter 11 process will enable Debtor to emerge as a financially stable company for the benefit of its future operations and its creditors and interest holders.

17.     As indicated in the initial pleadings in this case, the Bankruptcy Code provides Debtor with certain rights that will be utilized to maximize the value of its estate to ensure that creditors receive an equitable recovery.  At a bare minimum, the Debtor should be afforded a meaningful opportunity to reorganize at this stage of its bankruptcy case.

Date: May 7, 2021

Charles M. Robertson

**EXHIBIT 1**

SEECUBIC 00001253-54

| From: | Shad Stastney [sstastney@gmail.com] |
| on behalf of | Shad Stastney <sstastney@gmail.com> [sstastney@gmail.com] |
| Sent: | 5/6/2020 4:40:02 PM |
| To: | Krzysztof Kabacinski [krzysztof@meon.pl] |
| Subject: | Fwd: Committee-requested revisions |
| Attachments: | Stream TV - Settlement Agreement Side Letter DRAFT 50620.docx; ATT00002.bin; Stream TV - Settlement Agreement DRAFT 050620.docx; ATT00004.bin |

FYI, as sent to Bob. Haven't heard back on a call yet.


Begin forwarded message:

**From:** Shad Stastney <slstastney@hotmail.com>
**Subject: Committee-requested revisions**
**Date:** May 6, 2020 at 4:34:27 PM EDT
**To:** Bob Morton <alrmortonjsy@gmail.com>
**Cc:** Colin Maltby <colin@first-sentinel.com>

Bob,

In case I missed you this evening, just off a long call with the Resolution Committee (Asaf and Kevin). Went very well, they are fully on board, but they did make the following requests in order to secure their agreement:

1. They feel it would be very helpful if all of the agreements around the Newco capital structure were NOT in the agreement they sign, which the Rajans will see. They don't want to take a view on Newco's capital structure, and they think it will only piss the Rajans off when they see parts of it. I agree with that, so I have redrafted into two agreements—an Omnibus Agreement, which all of us and the Company will sign (and the Rajans will see), and a Letter Agreement, which just SLS, Hawk and the Investors will sign (and will not be provided to them). Those are attached, for your review.

2. Their other issue is tougher—they will not agree to any subscription price for the carryover shares for investors. From their perspective, I certainly understand their point, it makes it very difficult for them to say they are acting in the best interest of all the common investors. They also make the point that many investors don't have cash now, and will be incentivized to pursue legal claims if left behind. So they're not movable on that point. Kevin also has an issue with David Walpole, who feels that he's been promised by you that he would get his replacement shares for free. So in the revised letter agreement, you will see that I removed that. I would think we can get Alastair's group, who were prepared to subscribe, to put in some cash on the right terms (perhaps $0.50/share). And I think we offer all shareholders that opportunity as well, up to a maximum of 10mm shares ($5mm proceeds). I would expect we'll get takers. So taken together, everyone would get the same shares for free; anyone who subscribes in the first 30 days after can get shares at $0.50 per share (up to the maximum of $5mm); next are the warrants at $1.00/share which expire in 3 months, and then next the warrants at $1.50/share that expire in 12 months. A pretty good valuation ladder, rational.

3. On the warrants, they also make the point that many investors may not have the cash to exercise those warrants in the next 3 or 12 months, and therefore they are effectively losing them. What we agreed to discuss is that those investors could instead choose to accept 3 year warrants, same strike price, but at a 1:6 ratio (i.e, for every 6 shorter term warrants they hold, they can get 1 longer-term one). That would still dramatically reduce our warrant issue, and would seem to mollify people like David Walpole, who got lots of warrants recently. I'm OK with that also if you are.

CONFIDENTIAL

In any case, attached please see the redrafted agreements, any thoughts or comments appreciated.  And I am available to discuss anytime if helpful.  The committee would like to sign this ASAP, latest first thing tomorrow morning.

Best,

Shad

CONFIDENTIAL                                                                      SEECUBIC-00001254

**EXHIBIT 2**

Letter Agreement

# LETTER AGREEMENT

AGREEMENT (this "<u>Agreement</u>"), dated as of May 6, 2020, by and among SLS Holdings VI, LLC, a Delaware limited liability company ("<u>SLS</u>"),  Hawk Investment Holdings Limited, an entity registered in Guernsey ("<u>Hawk</u>"), and certain equity investors of the Company listed on <u>Annex I</u> attached hereto (each an "<u>Investor</u>" and collectively, the "<u>Investors</u>").

WHEREAS, of even date herewith, the parties hereto have also executed that certain OMNIBUS AGREEMENT (the " <u>Omnibus Agreement</u>"), dated as of May 6, 2020, by and among Stream TV Networks, Inc., a Delaware corporation (the "<u>Company</u>"), SLS Holdings VI, LLC, a Delaware limited liability company ("<u>SLS</u>"), Hawk Investment Holdings Limited, an entity registered in Guernsey ("<u>Hawk</u>"), and certain equity investors of the Company listed on <u>Annex I</u> attached hereto (each an "<u>Investor</u>" and collectively, the "<u>Investors</u>").  All terms not defined herein shall be used according to their definitions in the Omnibus Agreement.

WHEREAS, the parties hereto wish to agree among themselves to certain additional matters related to the Omnibus Agreement, and on which their execution of the Omnibus Agreement is conditioned; and

WHEREAS, the parties desire to memorialize in this Agreement the terms and conditions of certain other actions to be performed by the parties, and this Agreement shall govern the respective rights and obligations of the parties in connection with such actions.

## ARTICLE I

## THE TRANSACTIONS

1.1    <u>Transactions</u>.  Subject to the terms and conditions set forth herein, and on the basis of and in reliance upon the representations, warranties, covenants and agreements set forth herein, the parties hereto shall promptly take the actions described in this <u>Section 1.1</u> in addition to all such transactions to be taken by each of them pursuant to the Omnibus Agreement (each, a "<u>Transaction</u>" and, collectively, the "<u>Transactions</u>"):

(a)    SLS and Hawk shall form Newco in accordance with the applicable laws of its jurisdiction of formation.  Newco shall issue (i) a promissory note to SLS as provided in Annex II, and (ii) a promissory note to Hawk as provided in Annex II.  The holders of such promissory notes shall jointly determine the size and composition of the initial Board of Directors of Newco, and shall name the initial executive officers of Newco.  Each promissory note issued by Newco referenced in clauses (i) and (ii) above shall have such other terms and conditions as set forth on <u>Annex II</u>.

(b)    Hawk shall receive 40,000,000 shares of Class A Common Stock of the Company in respect of any and all foregone accrued interest, penalties and

fees (including placement, brokerage, finder's or similar fees) applicable to the Hawk Notes (the "Hawk Issuance").  Immediately following the Hawk Issuance, Hawk shall be entitled to exchange its shares of Class A Common Stock of the Company for a pro rata portion of the common shares or equity interests of Newco on the terms and conditions as set forth on Annex II.

(c)     SLS shall receive 4,000,000 shares of Class A Common Stock of the Company in respect of any and all foregone accrued interest, penalties and fees (including placement, brokerage, finder's or similar fees) applicable to the SLS Notes (the "SLS Issuance").  Immediately following the SLS Issuance, SLS shall be entitled to exchange its shares of Class A Common Stock of the Company for a pro rata portion of the common shares or equity interests of Newco on the terms and conditions as set forth on Annex II.

(d)     In consideration of the Investors signing the Omnibus Agreement the Investors shall receive (i) 4,000,000 shares of Class A Common Stock of the Company, and (ii) 2,000,000 warrants of the Company, with a three-year term and a strike price of $1.00 per common share, in respect of any and all legal or other fees and expenses incurred in connection with the Lawsuit or the transactions contemplated hereby (the "Investor Issuance").  Immediately following the Investor Issuance, each Investor shall be entitled to exchange its shares of Class A Common Stock of the Company for a pro rata portion of the common shares or equity interests of Newco as on the terms and conditions as set forth on Annex II; provided, however, that the warrants included in the Investor Issuance shall be carried over in exactly the same number and terms.

1.2     Investors' Expenses.  Each of the Investors has funded or agreed to fund a pro rata portion of the fees and expenses related to the Lawsuit, this Agreement and the Transactions pursuant to one or more Inter-Party Agreements among the Investors. Each of the Investors, SLS, Hawk and Newco hereby agree that all such amounts shall constitute contributions made by such Investors to Newco respectively on the same terms and conditions and in exchange for notes of the same term and tenor as those to be issued by Newco to SLS and Hawk; provided, however, that any Investor may choose to instead forego all or a portion of such note in exchange for and in satisfaction of any future subscription for shares of Newco.

## ARTICLE II

## REPRESENTATIONS AND WARRANTIES

2.1     Representations and Warranties.  Each party hereto hereby represents and warrants to all of the other parties hereto as follows:

(a)     The execution, delivery and performance by such party of this Agreement and of the other documents contemplated hereby, to the extent a party thereto, has been duly authorized by all necessary action (subject to receipt by the Company of all of the applicable approvals).  If such party is not an individual, such party

2

is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization or incorporation.

(b)    Such party has the requisite power, authority, legal right and, if such party is an individual, legal capacity, to execute and deliver this Agreement and each of the other documents contemplated hereby, to the extent a party thereto, and to consummate the transactions contemplated hereby and thereby, as the case may be.

(c)    This Agreement and each of the other documents contemplated hereby, to the extent a party thereto, has been duly executed and delivered by such party and constitutes the legal, valid and binding obligation of such party, enforceable against such party in accordance with its terms, subject to (i) the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar laws relating to or affecting creditors' rights generally and (ii) general equitable principles (whether considered in a proceeding in equity or at law).

(d)    Neither the execution, delivery and performance by such party of this Agreement and the other documents contemplated hereby, to the extent a party thereto, nor the consummation by such party of the transactions contemplated hereby, nor compliance by such party with the terms and provisions hereof, will, directly or indirectly (with or without notice or lapse of time or both), (i) if such party is not an individual, contravene or conflict with, or result in a breach or termination of, or constitute a default under (or with notice or lapse of time or both, result in the breach or termination of or constitute a default under) the organizational documents of such party, (ii) constitute a violation by such party of any existing requirement of law applicable to such party or any of its properties, rights or assets or (iii) require the consent or approval of any person or entity, except, in the case of clauses (ii) and (iii), as would not reasonably be expected to be material to the ability of such party to consummate the transactions contemplated by this Agreement.

## ARTICLE III

## MISCELLANEOUS

3.1    <u>Amendments and Waivers</u>.  This Agreement may be modified, amended or waived only with the written approval of each of the parties hereto.  The failure of any party to enforce any of the provisions of this Agreement shall in no way be construed as a waiver of such provisions and shall not affect the right of such party thereafter or any other party hereto to enforce each and every provision of this Agreement in accordance with its terms.

3.2    <u>Successors and Assigns</u>.  This Agreement shall bind and inure to the benefit of and be enforceable by the parties hereto and their respective successors and permitted assigns.  No rights or obligations under this Agreement may be assigned by any party hereto without the prior written consent of each other party hereto.

      3.3    <u>Notices</u>.  All notices, requests and other communications to any party hereunder shall be in writing (including electronic mail ("e-mail") transmission, so long as a receipt of such e-mail is requested and not received by automated response or notice is given on the next business day by alternative means permitted by this <u>Section 3.3</u>).  All such notices, requests, and other communications shall be deemed received on the date of receipt by the recipient thereof if received prior to 5:00 p.m. on a business day in the place of receipt.  Otherwise, any such notice, request or communication shall be deemed to have been received on the next succeeding business day in the place of receipt.  All such notices, requests and other communications to any party hereunder shall be given to such party as follows:

If to the Investors:

Alastair Crawford
c/o Adams & Remers LLP
55-58 Pall Mall
London, United Kingdom SW1Y 5JH
Attention: Alastair Crawford
Email: alastair.crawford@gmail.com

with a copy (which shall not constitute notice) by email to:

Skadden, Arps, Slate, Meagher & Flom LLP
920 North King Street
Wilmington, Delaware 19801
Attention: Faiz Ahmad
Email: faiz.ahmad@skadden.com

If to SLS:

SLS Holdings VI, LLC
392 Taylor Mills Road
Marlboro, New Jersey 07746
Attention: Shad Stastney
Email: slstastney@hotmail.com

with a copy (which shall not constitute notice) by email to:

Quarles & Brady
411 E. Wisconsin Avenue, Suite 2400
Milwaukee, Wisconsin 53202-4426
Attention: Jonathan Hackbarth, Esq.
Email: jon.hackbarth@quarles.com

If to Hawk:

4

Hawk Investment Holdings Limited
Newport House
15 The Grange
St. Peter Port, Guernsey GY1 2QL, Channel Islands
Attention: [●]
Email:a.holt@albanytrustee.com; r.maunder@albanytrustee.com

with a copy (which shall not constitute notice) by email to:

First Sentinel
Attention: Colin Maltby
Email: colin@first-sentinel.com

       3.4    <u>Entire Agreement</u>.  Except as otherwise expressly set forth herein, this Agreement, together with the other documents contemplated hereby and the Omnibus Agreement, embodies the complete agreement and understanding among the parties hereto with respect to the subject matter hereof and supersedes and preempts any prior understandings, agreements, or representations by or among the parties, written or oral, that may have related to the subject matter hereof in any way. Each party acknowledges that it is not entering into this Agreement on the basis of or in reliance upon any promise, representation, or warranty other than as explicitly contained in this Agreement.  This Agreement shall be valid, binding and enforceable among the parties that have executed this Agreement as between such parties, notwithstanding the failure of any other person expected to be a party to this Agreement to so execute.

       3.5    <u>No Third Party Beneficiary</u>.  Nothing in this Agreement shall confer any rights, remedies or claims upon any creditors of a party hereto or any other natural person, corporation, company, partnership, association, limited liability company, limited partnership, limited liability partnership, joint venture, business enterprise, trust, or other legal entity not a party or a permitted assignee of a party to this Agreement.

       3.6    <u>Governing Law; Jurisdiction; Enforceability</u>.  This Agreement shall be governed in all respects by the laws of the State of Delaware, without regard to the conflicts of law rules of such State that would result in the application of the laws of any other State.  Each party hereby agrees and consents to be subject to the exclusive jurisdiction of the Court of Chancery of the State of Delaware or, if the Court of Chancery lacks subject matter jurisdiction, any court of the State of Delaware situated in New Castle County or the United States District Court for the District of Delaware in any suit, action, or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby.  Each of the parties irrevocably and unconditionally waives any objection to the laying of venue of any action, suit or proceeding arising out of or in connection with this Agreement in the Court of Chancery of the State of Delaware or, if the Court of Chancery lacks subject matter jurisdiction, any court of the State of Delaware situated in New Castle County or the United States District Court for the District of Delaware and hereby

5

further irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such action, suit, or proceeding brought in any such court has been brought in an inconvenient forum, and agrees not to raise any other objection to venue in any such court. It is agreed and understood that monetary damages would not adequately compensate an injured party for the breach of this Agreement, that this Agreement shall be specifically enforceable, and that any breach or threatened breach of this Agreement shall be the proper subject of a temporary or permanent injunction or restraining order. Further, each party hereto waives any claim or defense that there is an adequate remedy at law for such breach or threatened breach.

      3.7   <u>WAIVER OF JURY TRIAL</u>. FOR THE AVOIDANCE OF DOUBT, EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

      3.8   <u>Counterparts; Facsimile Signatures</u>. This Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which together shall constitute one instrument. This Agreement may be executed by facsimile, e-mail or .pdf format signature(s).

      3.9   <u>Other Definitional and Interpretative Provisions</u>. The words "hereof", "herein" and "hereunder" and words of like import used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. The captions herein are included for convenience of reference only and shall be ignored in the construction or interpretation hereof. References to Sections and Exhibits are to Sections and Exhibits of this Agreement unless otherwise specified. All Exhibits annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Exhibit but not otherwise defined therein shall have the meaning as defined in this Agreement. Any singular term in this Agreement shall be deemed to include the plural, and any plural term the singular. Whenever the words "include", "includes", or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation", whether or not they are in fact followed by those words or words of like import. "Writing", "written", and comparable terms refer to printing, typing, and other means of reproducing words (including electronic media) in a visible form. References to any statute shall be deemed to refer to such statute as amended from time to time and to any rules or regulations promulgated thereunder. References to any agreement or contract are to that agreement or contract as amended, modified, or supplemented from time to time in accordance with the terms hereof and thereof. References to any person or entity include the successors and permitted assigns of that person or entity. References from or through any date mean, unless otherwise specified, from and including or through and including, respectively. This Agreement is being entered into between sophisticated parties, each of which or whom has reviewed the Agreement, had the opportunity to discuss it with its, his or her counsel, and is fully knowledgeable about its terms and conditions. The parties therefore agree that this

6

Agreement shall be construed without regard to the authorship of the language and without any presumption or rule of construction in favor of any of them.

5.10    Expenses.  Except as set forth in Section 1.2 above, each party shall bear its own expenses in connection with the Transactions contemplated by this Agreement, including costs of their respective attorneys, accountants, investment bankers, brokers, and other representatives.

5.11    Non-Disparagement.  In consideration of the transactions contemplated hereunder, each party hereto agrees that, as long as the other parties comply with each of their respective obligations under this Agreement, such party shall not, directly or indirectly, (i) make any public statement concerning the circumstances resulting in the execution of this Agreement or (ii) make comments which are intended to disparage any other party hereto.

5.12    Confidentiality.  All information contained herein or related to the contents of this Agreement, including the terms and existence of this Agreement, is confidential, and shall not be disclosed to anyone including to any stockholder or investor of the Company not a party hereto, other than the parties hereto and their legal or financial advisors who (a) need to know the information to evaluate the Transactions or perform their respective obligations hereunder and (b) are bound to keep such information confidential, unless disclosure is expressly required in order to comply with, law, regulatory authority or judicial, legal or regulatory process, or in order to enforce a party's rights hereunder, in which case the other parties shall be notified in advance to the extent practicable and permitted by law.

[Signature Page to Follow.]

7

IN WITNESS WHEREOF, the parties hereto have executed this Omnibus Agreement as of the date first above written.

**SLS HOLDINGS VI, LLC**

By: _____

Name:   Shad L. Stastney

Title:

Managing Member

**HAWK INVESTMENT HOLDINGS LIMITED**

By: _____

Name:

Title:

IN WITNESS WHEREOF, the parties hereto have executed this Omnibus Agreement as of the date first above written.

**SLS HOLDINGS VI, LLC**

By: _____

    Name:

    Title:

**HAWK INVESTMENT HOLDINGS LIMITED**

By: _~~CMOMOR~~_____

    Name: EMMA MCINTOSH + LEE MCFLUNG

    Title: AUTHORISED SIGNATORIES FOR
    ALBANY DIRECTORS LIMITED AS SOLE
    DIRECTOR OF HAWK INVESTMENT
    HOLDINGS LIMITED

[Signature Page to the Omnibus Agreement]

Signed for and behalf of the Investors listed in Annex I

_____
Alastair Crawford

_____
Robert Petch

_____
Patrick Miles

# Annex I

## ANNEX II

## NEWCO CAPITALIZATION TERMS AND CONDITIONS

- <u>Incorporation</u>.  Newco shall be incorporated as a Delaware entity.

- <u>Bylaws</u>.  Newco shall be governed by bylaws or an operating agreement (the "<u>Bylaws</u>") in form and substance reasonably and mutually satisfactory to the Parties and shall include customary minority shareholder protections including tag along rights and pre-emption rights.

- <u>Board of Managers</u>.  With respect to the management of Newco, the Bylaws shall provide, among other things:
  - o Newco shall be managed by a board of directors (the "<u>Board</u>").
  - o The Board shall initially consist of three (3) persons.
  - o SLS shall have the power to nominate not more than one (1) person to the Board (who shall be the Executive Chairman of the Board).
  - o Hawk shall have the power to nominate not more than two (2) persons to the Board (one of whom shall be the Chief Executive Officer of Newco).
  - o Each of the Executive Chairman and the Chief Executive Officer of Newco shall earn an annual salary of not more than $250,000 per year (unless otherwise agreed to by the unanimous consent of the Board).

- <u>Business Plan.</u> The board will provide a detailed business plan to all parties within 30 days of incorporation including a pro-forma balance sheet.

## CONTRIBUTION AND EXCHANGE

- <u>Contribution of SLS Obligations</u>.

  - o Simultaneously upon the formation of Newco as described in Section 2(a), SLS shall contribute to Newco all of the outstanding SLS Obligations as of the date of the formation of Newco (the "Formation Date"), including all accrued but unpaid interest, fees and expenses allowable under the SLS documentation through such date (the "<u>SLS Contributed Obligations</u>").

  - o In exchange for the contribution of the SLS Contributed Obligations, SLS shall receive from Newco: (i) a secured promissory note, executed by Newco in favor of SLS, maturing on the date that is three (3) years following its execution, in a principal amount equal to the total amount of the net amount funded in cash by SLS to StreamTV (the "SLS Net Funded Amount") and bearing interest at 3.00% per annum (the "<u>New SLS Note</u>"); (ii) Common Stock of Newco in an amount equal to its current StreamTV common shares, plus a number of common shares as set forth in Section

1.1(g) hereof, and  (iii) Warrants of Newco in an amount equal to SLS's current Warrants issued to it by StreamTV on the terms described below.

- Contribution of Hawk Obligations.

  o  Simultaneously upon the formation of Newco as described in <u>Section 2(a)</u>, Hawk shall contribute to Newco all of the outstanding Hawk Obligations as of the Formation Date, including all accrued by unpaid interest, fees and expenses allowable under the Hawk documentation through such date (the "<u>Hawk Contributed Obligations</u>"; and, together with the SLS Contributed Obligations, the "<u>Contributed Obligations</u>").

  o  In exchange for the contribution of the Hawk Contributed Obligations, Hawk shall receive from Newco: (i) a secured promissory note, executed by Newco in favor of Hawk, maturing on a date that is three (3) years following its execution, in a principal amount equal to the total amount of the net amount funded in cash by Hawk to StreamTV (the "Hawk Net Funded Amount"), and bearing interest at 3.00% per annum (the "<u>New Hawk Note</u>"); (ii) Common Stock of Newco in an amount equal to Hawk's current share ownership of Newco, plus a number of common shares equal to the number of common shares as set forth in Section 1.1(f) hereof; and (iii) Warrants of Newco in an amount equal to Hawk's current Warrants issued to it by StreamTV on the terms described below.

- <u>Pari Passu</u>.  Any and all of the liens and security interests granted to SLS and Hawk in connection with the New SLS Note and New Hawk Note, respectively, shall be of equal priority and rank *pari passu* in all respects.

- <u>Conversion Option</u>.  Each of the New SLS Note and New Hawk Note shall be convertible at any time by the holder thereof into such number of common units of Newco at the greater of (i) $1.50 per common share, or (ii) the same terms and conditions as the most recent offering by the Company (the "<u>Conversion Option</u>"); <u>provided</u>, <u>however</u>, that in the case of (ii), the amount convertible by each of SLS and Hawk in respect to any particular offering shall be no greater than the total amount of such offering.  The New SLS Note and New Hawk Note may be converted in whole or in part from time to time.    Other terms and conditions of the Conversion Option shall be set forth in the definitive documentation governing the New SLS Note and New Hawk Note, and the terms of the Conversion Option shall be identical as to the New SLS Note and the New Hawk Note.

- <u>Amendments to the New SLS Note and the New Hawk Note</u>.  No amendment, modification or other change may be made to any of the terms and conditions contained in, and no action may be made by either SLS or Hawk to enforce, the New SLS Note or the New Hawk Note without the unanimous written consent of both SLS and Hawk.

- <u>Additional Shareholders</u>.  Promptly following the Formation Date, SLS and Hawk shall be issued shares in Newco equal to their previously-issued shares and warrants in the Company, and shall cause Newco to offer to all other shareholders of Stream TV as of the date Newco is incorporated (including the Investors as per Annex I and other than, for the avoidance of doubt, any person or entity affiliated with Mathu and/or Raja Rajan, or any such other party as deemed necessary by both SLS and Hawk, and any affiliated entities) for subscription Common Stock and Warrants at a price of $0.00 per share of Common Stock  (with no additional payment for a number of such Stream TV shareholders' associated  Warrants pro rata to the number of  its shares so purchased),  and otherwise on the terms and conditions set forth herein, but only upon the execution and delivery by each such shareholder of a release for the benefit of the Investors, SLS and Hawk, on terms and conditions mutually agreeable to each of the Investors, SLS and Hawk; provided, however, that the issued and outstanding shares of Common Stock (following any issuances pursuant to this <u>Section 2(g)</u>), may not exceed 150,000,000 shares.

- <u>Warrant Terms</u>.

    o  1/2 of Warrants exercisable at $1.00/share with a maturity date 3  months after the Formation Date
    o  1/2 of Warrants exercisable at $1.50/share with a maturity date 12 months after the formation date.
    o  Warrant holders to have the option prior to maturity of  any option to exchange any 6  such warrants for  1  warrant with the same strike price, expiring 3 years from the date of original issuance

- <u>Shareholders Agreement</u>.      Subject to final terms set forth in definitive documentation, each shareholder shall, as part of its subscription for shares  or otherwise, enter into a Shareholders Agreement that shall govern the material terms of ownership of Newco, including but not limited to control of Newco, protections from anti-dilution and transferability of shares.