UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| | . | Chapter 11 |
| IN RE: | . | |
| | . | Case No. 20-10766 (KBO) |
| STREAM TV NETWORKS, INC., | . | |
| | . | Courtroom No. 1 |
| | . | 824 North Market Street |
| | . | Wilmington, Deleware 19801 |
| Debtors. | . | |
| | . | May 10, 2021 |
| . . . . . . . . . . . . . . . | . | 9:37 a.m. |

TRANSCRIPT OF OMNIBUS HEARING ON SEECUBIC, INC.'S MOTION TO
DISMISS THE CHAPTER 11 CASE VIA ZOOM TELECONFERENCE
BEFORE THE HONORABLE KAREN OWENS
UNITED STATES BANKRUPTCY COURT

TELEPHONIC APPEARANCES:

For the Debtor:            Martin J. Weis, Esq.
                           DILWORTH PAXSON, LLP
                           One Customs House
                           704 King Street, Suite 500
                           Wilmington, DE 19899

                           - and -

                           Lawrence G. McMichael, Esq.
                           Anne M. Aaronson, Esq.
                           DILWORTH PAXSON, LLP
                           1500 Market Street
                           Suite 3500E
                           Philadelphia, PA 19102

(Appearances continued on next page.)

Audio Operator:            Madaline Dungey

Transcription Company:     Reliable
                           1007 N. Orange Street
                           Wilmington, Delaware 19801
                           (302)654-8080
                           Email: gmatthews@reliable-co.com

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

APPEARANCES (Cont'd):

For the U.S. Trustee:          Rosa Sierra, Esq.
                               OFFICE OF THE U.S. TRUSTEE
                               U. S. Department of Justice
                               844 King Street, Suite 2207
                               Lockbox #35
                               Wilmington, DE 19801

For the Official Committee     Christopher Samis, Esq.
of Unsecured Creditors:        POTTER, ANDERSON & CORROON, LLP
                               1313 N. Market Street, 6th Floor
                               Wilmington, DE 19801

For Visual Technology          John Sten, Esq.
Innovations, Inc.:             ARMSTRONG TEASDALE, LLP
                               225 Franklin Street
                               26th Floor
                               Boston, MA 02110

                               - and -

                               Jonathan Stemerman, Esq.
                               ARMSTRONG TEASDALE, LLP
                               300 Delaware Avenue
                               Suite 210
                               Wilmington, DE 19801

For SeeCubic, Inc.:            Jason Liberi, Esq.
                               Joseph Larkin, Esq.
                               Cameron Fee, Esq.
                               Carl Tullson, Esq.
                               Marley Ann Brumme, Esq.
                               SKADDEN, ARPS, SLATE, MEAGHER
                               & FLOM, LLP
                               One Rodney Square
                               920 North King Street
                               PO Box 636
                               Wilmington, DE 19899

                               - and --

                               Eben Colby, Esq.
                               SKADDEN, ARPS, SLATE, MEAGHER
                               & FLOM, LLP
                               500 Boylston Street
                               Boston, MA 02116

Also Appearing:                Reji Abraham
                               JAMUNA TRAVELS, INC.

                               Shad Stastney

INDEX

OPENING STATEMENTS:                                      Page

By:  Mr. Joseph Larkin                                   12
By:  Ms. Sierra                                          24
By:  Mr. Samis                                           25
By:  Mr. McMichael                                       30
By:  Mr. Sten                                            41

WITNESSES:

MATHU RAJAN

     Cross-Examination by Mr. Larkin                     62
     Examination by the Court                           104
     Redirect Examination by Mr. LaMichael              115
     Recross Examination by Mr. Stemerman               118
     Examination by the Court                           120
     Recross Examination by Ms. Sierra                  125

TIMOTHY McCARTHY

     Cross-Examination by Mr. Colby                     131
     Cross-Examination by Mr. Sten                      183
     Cross-Examination by Mr. Weis                      188
     Examination by the Court                           194

CHARLES ROBERTSON

     Cross-Examination by Mr. Colby                     198
     Examination by the Court                           221
     Cross-Examination by Ms. Sierra                    224
     Cross-Examination by Ms. Aaronson                  230
     Cross-Examination by Mr. Stemerman                 234

BARBARA RUMORA-SCHELTEMA

     Cross-Examination by Mr. Liberi                    237
     Cross-Examination by Mr. Stemerman                 248
     Cross-Examination by Mr. Weis                      251

SVEN DUMOULIN

     Cross-Examination by Ms. Aaronson                  254

INDEX

| EXHIBITS: | | I.D. | REC'D |
|---|---|---|---|
| Declarations of Mathu Rajan | | 9 | 9 |
| Declarations of Charles Roberton | | 9 | 9 |
| Declarations of Burlington Resources | | 9 | 9 |
| Declarations of Shad Stastney | | 9 | 9 |
| Expert Report of Sven Dumoulin | | 9 | 9 |
| Expert Report of Barbara Rumora-Scheltema | | 9 | 9 |
| | | | |
| TX 44 | Email, Tavill-Stastney | 83 | -- |
| TX 179 | Email, M. Rajan-McCarthy, 2/8/21 | 91 | -- |
| TX 181 | Email, Tavill-M. Rajan | 80 | -- |
| TX 193 | Stock purchase agreement, 2/10/21 | 140 | -- |
| TX 197 | Exercise of Drawdown Rights | 142 | -- |
| TX 261 | Email, R. Rajan | 102 | -- |
| TX 268 | Email, M. Rajan-Davis | 87 | -- |
| TX 285 | Declaration of Timothy McCarthy | 134 | -- |

1    (Proceedings commence at 9:37 a.m.)

2         THE COURT:  Good morning, Counsel.  This is Judge

3    Owens.  We're gathered today for the motion to dismiss in

4    Stream, as well as a few other matters that are scheduled on

5    the agenda.  We have a lot of ground to cover today, so why

6    don't I turn the podium over to counsel for -- or excuse me,

7    all the counsel and why don't you let me know how you're going

8    to proceed today.

9         MR. LARKIN:  Good morning, Your Honor.  Joe Larkin of

10   Skadden Arps on behalf of SeeCubic, Inc.  Your Honor, I'm happy

11   to lead off here in terms of the agenda.  We're here on

12   SeeCubic's motion to dismiss the Chapter 11 case.  I think

13   there are a couple of housekeeping items before we get started

14   on that.

15        We've met and conferred with counsel for the debtor

16   and VTI in terms of witness order and the submission of the

17   declarations, so I'm happy to walk through that for Your Honor

18   before we get to openings.

19        THE COURT:  That would be great; thank you.

20        MR. LARKIN:  So with respect to the declarations,

21   Your Honor, that have been submitted by the respective parties

22   here, I think we have an agreement with counsel for VTI and the

23   debtor that we'll all sort of jointly move those declarations

24   into evidence before we get to the witnesses.  There's no

25   objections to the admission of those declarations subject to

1 cross-examination from our standpoint.

2          THE COURT:  Okay.  Counsel for the debtors and VTI,

3 do you agree with that approach?

4          MR. McMICHAEL:  Good morning, Your Honor.  This is

5 Larry McMichael for the debtor.  My partners, Anne Aaronson and

6 Marty Weis are with me.  Yes, we agree.

7          THE COURT:  Okay; great.

8          Mr. Stemerman?

9          MR. STEMERMAN:  Good morning, Your Honor.  Jonathan

10 Stemerman on behalf of VTI.  Your Honor, we agree, as well.

11          THE COURT:  Okay; great.  Well, should we -- should i

12 go ahead and move them in now, Mr. Larkin, or do you want to

13 wait until we're ready for evidence?

14          MR. LARKIN:  I think that's fine, Your Honor.  We can

15 move them in now.

16          THE COURT:  Okay.  So just for the record --

17          MR. ABRAHAM:  Your Honor, my name is Reji Abraham.

18 I'm one of the creditors for Stream TV.  Can I have a minute to

19 talk?

20          THE COURT:  I'm sorry; I didn't catch your name?

21          MR. ABRAHAM:  Reji Abraham from Jamuna Travels, one

22 of the creditors for Stream TV.  Is it possible to get one

23 minute --

24          THE COURT:  I'm sorry; who do you represent?

25          MR. ABRAHAM:  Jamuna Travels, one of the creditors.

1 I'm in the Creditors' Committee, also, but I just want to say

2 one thing, you know?

3          THE COURT:  Okay.

4          MR. ABRAHAM:  Is it possible to give me one minute?

5          THE COURT:  Sure.

6          MR. ABRAHAM:  Because I voted yes to seek a big

7 proposal, but we got only one proposal that time, you know.

8 That is the reason I voted for that.  But a couple of days ago,

9 I got the proposal from Stream TV Network, and they are

10 proposing 100 percent to the unsecured creditors.  I really

11 wanted to go along with the 100 percent creditors.  I just want

12 to let the Court know.  That is the only reason I wanted to say

13 that.

14          Your Honor, thank you so much for your time.

15          THE COURT:  I'm sorry.  You said you wanted --

16          MR. SAMIS:  Your Honor, this is --

17          THE COURT:  I'm sorry.  I'm so sorry.  I'm having

18 trouble understanding you, and I apologize.  It's between the

19 video connection.  But I'm sorry, you just wanted to say that

20 you support what?

21          MR. ABRAHAM:  Stream TV proposal because they are

22 offering 100 percent of the unsecured creditors.  I just wanted

23 to let you know.  Can you hear me?

24          THE COURT:  Okay; thank you.

25          MR. ABRAHAM:  Okay.

1          THE COURT:  I can.

2          Mr. Samis, did you want to say something?

3          MR. SAMIS:  Your Honor, yes.  Can you hear my audio?

4          THE COURT:  I can.

5          MR. SAMIS:  Your Honor, this is Chris Samis from

6  Potter Anderson as proposed counsel for the Official Committee

7  of Unsecured Creditors.  Mr. Abraham is a member of the

8  Creditors' Committee.  His entity is Jamuna Travels.  That is

9  the name of the creditor.

10         I think he's trying to state that he was outvoted by

11  the other two committee members with regard to approval of the

12  settlement that was proposed by SeeCubic.  So he's the

13  dissident member of the Creditors' Committee that did not vote

14  to approve the settlement.

15         However, under the governance document of the

16  Committee and bylaws, you know, as a duly-constituted creditors

17  committee, it does provide for majority to approve such an

18  offer.

19         So I think he's stating that, you know, he is the

20  dissident member of the Creditors' Committee.  He is supporting

21  the alternative proposal.  But I just wanted to make that clear

22  for the record.

23         THE COURT:  Okay.  Thank you, Mr. Samis.

24         And thank you, Mr. Abraham, for putting that on the

25  record today.  I appreciate it.

1          Okay.  So turning back to the declarations, I want to

2    be clear as to the docket numbers of the declarations that are

3    being entered into evidence today because I have a stack in

4    front of me.

5          So there's two declarations by Mr. Rajan, Docket

6    Number 51 and 179.  I have three declarations by Mr. Robertson;

7    77, 178, and I believe there's one more.  Can someone give me

8    that docket number?

9          MR. LARKIN:  Your Honor, I think it's 180 if it's the

10   second supplemental declaration that came in on Friday.

11         THE COURT:  Okay.  I have a declaration of Burlington

12   Resources at 168.  And I have two declarations by Mr. Stastney

13   for Docket Number 47, Docket Number 170.  And I have a

14   declaration -- excuse me, not a declaration but an expert

15   report of Mr. Dumoulin at 171.  Are we admitting the expert

16   reports?

17         MR. LARKIN:  Yes, Your Honor.

18         THE COURT:  Okay.

19         MR. LARKIN:  Your Honor?

20         THE COURT:  And I apologize.  Then there's one more

21   expert report, and that would be -- sorry, give me a moment --

22   Ms. Rumora's at Docket Number 182.

23         Okay.  Did I miss anything?

24              (No audible response)

25         THE COURT:  Okay.  Well, they're admitted subject to

1  the parties' rights to cross-examine and redirect the

2  witnesses.

3    (Declarations of Mathu Rajan, Charles Robertson, Burlington

4    Resources, Shad Stastney and Expert Reports of Sven Dumoulin

5        and Barbara Rumora-Scheltema admitted into evidence)

6            MR. LARKIN:  Thank you, Your Honor.

7            THE COURT:  Okay.  Mr. Larkin --

8            UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

9            THE COURT:  -- anything else in terms of

10  housekeeping?

11            MR. LARKIN:  I think just in terms of the witness

12  order that we would propose, we have some witnesses who are

13  overseas and so we've agreed with the other side that the

14  witness order today subject to Your Honor's views, obviously,

15  would be Mathu Rajan; Tim McCarthy of Burlington Resources Asia

16  will testify second; Mr. Robertson from VTI and the debtor will

17  testify third; Ms. Rumora-Scheltema, VTI's Dutch law expert,

18  will testify after Mr. Robertson; then Mr. Dumoulin, our Dutch

19  law expert, and then Mr. Stastney will round out the batting

20  order today.

21            THE COURT:  I'm sorry.  Who was the last witness?

22            MR. LARKIN:  Mr. Shad Stastney, Your Honor.

23            THE COURT:  Oh, okay; thank you.

24            MR. LARKIN:  And, Your Honor, just one other --

25            THE COURT:  Okay.

1          MR. LARKIN:  -- (indiscernible) before I get

2    started.  I'm obviously at the podium right now.  Some of my

3    colleagues will also be presenting today.  They're not on

4    screen.  I think they're on another room, but my partner Eben

5    Colby from our Boston office will be presenting; my colleague

6    Jason Liberi will be presenting; and my partner Carl Tullson

7    will also be presenting, if necessary, Your Honor.

8          And with us today is also Mr. Stastney who's the

9    executive chairman of SeeCubic and a principal of SLS Holdings

10   is on the line today, as well, Your Honor.

11                          (Pause)

12          THE COURT:  Mr. Larkin, I can't recall.  Did the

13   parties agree on short openings?

14          MR. LARKIN:  We did, Your Honor, and I anticipate our

15   opening, at least on behalf of SeeCubic and SLS, will be about

16   15 minutes.  And we've also agreed to a chess-clock format,

17   parties supporting the motion versus parties opposing the

18   motion to split the time evenly over the next couple of days.

19          THE COURT:  Okay.  And you have -- you corresponded

20   -- for the record, you corresponded about this prior to today's

21   hearing via email with the chambers, and I communicated that

22   you should each designate time-clock keepers and that I will

23   not be responsible for keeping that time.  So I assume you all

24   have done that?

25          MR. LARKIN:  We have, Your Honor.  Mr. Cameron Fee

1  will be keeping the chess clock for the movants.

2         THE COURT:  Poor Mr. Fee.  Okay, thank you.  Thank

3  you, sir.

4         MR. LARKIN:  Among many other (indiscernible)

5  --

6         THE COURT:  Okay.

7         MR. LARKIN:  -- that he's doing in this case, Your

8  Honor.  He will bear that responsibility.

9         THE COURT:  Okay; great.  All right.  Well, then if

10  there's no opposition, why don't we just jump right into the

11  openings.  Is that acceptable to everyone?

12         UNIDENTIFIED SPEAKER:  Yes, Your Honor.

13         UNIDENTIFIED SPEAKER:  Good for the debtor, Your

14  Honor.

15         THE COURT:  Okay.  Okay; great.  All right.  Well,

16  Mr. Larkin, when you're ready.

17         MR. LARKIN:  Thank you, Your Honor.

18         Your Honor, we're here on our and the U.S. Trustee's

19  motion to dismiss the Chapter 11 case.  In an effort to help

20  orient the Court with the facts, we've prepared a short

21  presentation that I think provides a helpful roadmap for what

22  we're going to talk about today.

23         Your Honor, we filed our motion to dismiss shortly

24  after the petition was filed because we believe that the debtor

25  and, most importantly, its controlling stockholder and CEO, Mr.

1 Rajan, were attempting to use bankruptcy to escape final

2 judgment in the underlying court of chancery litigation.

3          The evidence that we've developed over the last month

4 has confirmed that the debtor filed this case to escape the

5 tentacles of the preliminary injunction and to attack the

6 validity of the omnibus agreement and the transfer of the

7 assets from the debtor to SeeCubic.

8          Expedited discovery has also confirmed that the

9 Chapter 11 case was filed in bad faith, in our view.  As we

10 explained in our papers and Your Honor will hear today, Mr.

11 Rajan is attempting to use his newly created VTI vehicle to

12 acquire the debtor's assets at a fraction of their value.  And

13 those are his words to Mr. McCarthy, his source of financing in

14 February of this year before the Chapter 11 case was filed.

15          And although the debtor has tried to persuade the

16 Court in its papers that bankruptcy will result in a

17 reorganization that will benefit all stakeholders, including

18 the unsecured creditors, I have to say I couldn't dream up a

19 plot that is more antithetical to the interests of creditors

20 than what Mr. Rajan attempted to pull off here.  And that's why

21 all of the parties that have seen the evidence, including the

22 U.S. Trustee and the Unsecured Creditors' Committee, agree that

23 this case should be dismissed.

24          Next slide, please.

25          Your Honor, the legal issue on our motion is

1  straightforward, was the Chapter 11 petition filed in good

2  faith.  We believe the evidence shows overwhelmingly that the

3  answer's no.  The Third Circuit has made clear that the Court

4  should examine the totality of the circumstances in making that

5  determination.

6          But there's two particular threshold inquiries here:

7  Does the petition serve a valid bankruptcy purpose, does it

8  maximize value of the estate's assets and does it preserve

9  going-concern value?  And then, secondly, was the petition

10 filed merely to obtain a tactical litigation advantage?  When

11 applying the evidence to that standard, Your Honor, it's

12 overwhelming that this case was filed in bad faith.

13         And you're going to hear from the debtor and VTI

14 about matters that are irrelevant to the motion to dismiss,

15 such as the debtor's alleged relationships, business contacts,

16 and events that occurred prior to the execution of the omnibus

17 agreement, and facts that have already been litigated in

18 Delaware.  Really all of that is meant to obfuscate the record

19 and distract from the dispositive inquiry before the Court of

20 whether the debtor's petition wasn't filed in good faith.

21         And let me just, you know, rest on this point.  The

22 U.S. Trustee has moved to dismiss the claim.  The UCC after

23 looking at the same discovery that we looked at and sitting

24 through the same depositions and reviewing the same documents

25 has concluded that dismissal of the Chapter 11 case is in the

1  best interest of the unsecured creditors.  And I'll note that

2  it was the debtor that pushed for the U.S. Trustee to form an

3  unsecured creditors' committee in response to our motion to

4  dismiss.

5            Next slide.

6            With respect to the first inquiry, Your Honor,

7  whether it serves a valid bankruptcy purpose, there's no

8  evidence that the bankruptcy will maximize the value of the

9  assets.  There's no evidence that bankruptcy will preserve

10 going-concern value.

11           Now the debtor, these aren't -- again, these aren't

12 my words, these aren't my witnesses' words.  The debtor's

13 witnesses and their documents confirm the following facts.  The

14 debtor has no employees.  It has no operations.  It has no

15 cash.  It has no revenue right now or prospect of generating

16 revenue in the near future.  And it has no assets.  And it has

17 no executed contracts with customers or distributors.

18           Next slide.

19           Your Honor, when I asked Mr. Robertson who wears two

20 hats here, he's an executive vice-president of the debtor and

21 he serves in a similar executive role at VTI under Mr. Rajan,

22 and he's the debtor's first-day declarant.  When I asked him

23 last week about the debtor's ability to generate revenue, these

24 were the answers he gave.

25           The debtor has not received any income or revenue

1 from a particular manufacturer who Mr. Robertson couldn't even
2 identify in his first-day declaration.  "Yes, Stream has no
3 financial resources."  Have there been any discussions or
4 negotiations with any of these potential customers?  Answer
5 would be no.

6       With respect to a product line that Mr. Robertson
7 talks about in his declaration that he will support future
8 revenue, I said is Stream currently pursuing that product line
9 or the development of that product line.  "Stream is not
10 currently pursuing anything given its lack of financial capital
11 to do so."  Those are the words of the first-day declarant and
12 the senior vice-president of the debtor.

13       With respect to the assets, I know that that's a word
14 that has been thrown around a lot in this case already.

15       Next slide, please.

16       These are the words of the debtor about a week after
17 Vice-Chancellor Laster entered his preliminary injunction order
18 in Delaware.  Again, these are Mr. Raja Rajan, then the general
19 counsel of the debtor, his words, on December 17th, 2020.  This
20 is an email that was sent to third parties after the PI order
21 was entered: "Does the assets of Stream TV and its subsidiaries
22 have all been transferred to a Delaware USA corporation named
23 SeeCubic Inc.?  Assets not only include tangible property, like
24 equipment, but may also include things like papers, plans,
25 strategies, and other documentation."

1            Your Honor, I couldn't have said it better myself.

2  This was the debtor's position in December of last year after

3  the PI had been entered, after they had been enjoined from

4  interfering with the omnibus agreement, past tense, assets have

5  all been transferred.

6            And when I asked Mr. Mathu Rajan about this email, he

7  said he hadn't seen it but, of course, he believed his brother

8  was being honest and wasn't trying to mislead anybody.

9            Your Honor, when you strip away -- next slide.  When

10 you strip away the rhetoric and the empty promises about

11 sources of financing that the debtor has secured and

12 manufacturing contracts that it thinks it can secure, it

13 becomes crystal clear that this Chapter 11 case was filed by

14 Mathu Rajan to obtain a tactical litigation advantage.  The

15 plan is very straightforward, and it's evident from their own

16 contemporaneous documents.  Let's escape the effects of the

17 preliminary injunction so that we can use VTI to acquire the

18 debtor's assets at a steep discount.

19           Now let's take a look, Your Honor -- and, again, just

20 to pause there, the debtor and its counsel have conceded that

21 they don't contest the validity of the omnibus agreement.

22 That's what they've said.  They've said it to Your Honor.

23 They've said it in depositions.

24           I asked Mr. Robertson about this -- this is slide 6.

25 I said, "You're not challenging what are the omnibus agreement,

1  are you?"  "No."  And, in fact, it goes beyond that.  "Are you

2  challenging any of the factual findings that the court of

3  chancery made in its December 8th, 2020 opinion?  Not that I'm

4  aware of."

5       But time and again since this case was filed, we've

6  heard about a tax -- collateral tax on the omnibus agreement

7  and the transfer of assets.  Your Honor, none of those issues

8  matter for today.

9       Now let's talk about some of the conflicts that we've

10 uncovered over the last month or so in discovery.

11      This is slide 7, please.

12      Your Honor, we talked about this in our reply brief,

13 and you're going to hear about it a lot today.  In our view,

14 and I think it's the position that the UCC and the U.S. Trustee

15 have also drawn after seeing the evidence, the debtor and VTI,

16 which is a vehicle that Mr. Rajan formed shortly after the

17 preliminary injunction was entered in December, are hopelessly

18 conflicted here.

19      Mr. Rajan is the sole director, the chief executive

20 officer, and the controlling stockholder of Stream.  Mr.

21 Robertson, the debtor's first-day declarant, is the executive

22 vice-president of Stream.

23      They also wear similar hats at VTI.  Mr. Rajan's the

24 president, the director, and the controlling shareholder of

25 VTI, the proposed plan sponsor and DIP lender of the debtor.

1 And Mr. Robertson is the executive at VTI, and he works

2 director under Mr. Rajan.

3          And as the testimony bore out in deposition, when

4 Stream TV and VTI are negotiating with each other, it's Mr.

5 Rajan on one side and Mr. Robertson on the other.  And

6 depending on what's being negotiated, they may be wearing their

7 Stream hat or their VTI hat or both hats.

8          And I asked Mr. Rajan -- slide 8, please -- you know,

9 how do you determine that the decisions you're making on behalf

10 of Stream are fair to the stakeholders of Stream and not the

11 stakeholders of VTI if you're a fiduciary of both companies.

12 And he said, well, because I take my VTI hat off when I'm

13 negotiating for Stream.

14          If it were only that easy, Your Honor.  There's no

15 special committee, there's no independent counsel, there's no

16 independent directors.  There's none of the procedural

17 safeguards that we all think about as sort of basic tenets of

18 fairness to protect minority stockholders and other

19 stakeholders.

20          Now let's talk about the timeline here in terms of

21 the tactical litigation advantage.  Your Honor, the omnibus

22 agreement was executed on May 6th, 2020.  As the court of

23 chancery found, the Rajan brothers, including Mr. Mathu Rajan

24 who's here today, refused to take any action to comply with the

25 omnibus agreement.

1    They filed in the court of chancery seeking to block

2 the transfer of assets pursuant to the omnibus agreement in

3 September of last year.  And on December 8th after a very full

4 record, Your Honor, seven depositions, twelve sworn

5 declarations, hundreds of exhibits, Vice Chancellor Laster

6 found that the debtor and Mr. Rajan were enjoined from taking

7 any action to interfere with the omnibus agreement.

8    And that includes asserting ownership rights to any

9 of the assets that used to belong to Stream TV, including the

10 Ultra-D technology and other IP, and asserting ownership rights

11 or control over TechnoVative or the Dutch subsidiaries.

12    Now with respect to some of the arguments that you're

13 going to hear today from the debtor, the Court found -- Vice

14 Chancellor Laster found on that record that the evidence that

15 the outside directors of Stream who approved the omnibus

16 agreement were validly appointed or acted as de-factor

17 directors and that that finding would support a grant of

18 summary judgment in SeeCubic's favor.

19    And he also found, contrary to what the debtor and

20 VTI have tried to argue here, that there was no evidence on

21 that record that the members of the resolution committee, the

22 independent directors, breached their fiduciary duties.  So

23 after that opinion came out, what happened?

24    Mr. Rajan went into full -- he went full board to try

25 to undo the omnibus agreement, incorporated VTI, which is

1 essentially an alter-ego company.  Shortly thereafter, he works

2 with a team and discusses a plan to cherry-pick the assets of

3 Stream TV for his new venture, VTI.  He discusses with

4 investors of VTI and the debtor to move the case out of the

5 court of chancery to federal court, i.e., bankruptcy court.

6       In February, he meets up with Mr. McCarthy, and he

7 makes him a proposal.  He makes Mr. McCarthy a proposal, and he

8 says VTI -- now he's wearing his VTI hat -- he says VTI has the

9 exclusive right to acquire all the assets of Stream TV, the

10 assets that were transferred to SeeCubic, but Mr. Rajan was

11 enjoined from interfering with them.

12       He says we have the exclusive right to acquire them,

13 and no only do we have the exclusive right to acquire them, I

14 have a plan that's going to allow us to acquire them in a

15 fraction of their value.  And Mr. McCarthy gets on board, as

16 we've seen from some of the filings over the last couple of

17 weeks.

18       Your Honor, two days before the Court was prepared to

19 enter a summary judgment in Delaware in favor of my clients and

20 against the Rajans and the debtor, they filed the petition.

21 And they filed a bare-bones petition.  There's no first-day

22 motions, no first-day declarations.  The plan was to avoid

23 final judgment in Delaware, plain and simple.

24       It wasn't until about a month later that we saw the

25 normal first-day filings that you would expect to see from the

1  debtor.  And it was only after we cried foul.

2             Again, Your Honor, don't take my word for it.

3             Can we go to slide 11?

4             Your Honor, this is an email from Knight Davis to Mr.

5  Rajan January 24th, a month before the filing.  Knight Davis is

6  a broker dealer that Mr. Rajan was working on to try and secure

7  financing for VTI.

8             And this was their narrative to investors like Mr.

9  McCarthy: "Attached is the revised back story as discussed."

10 It says, "Mathu will continue to challenge the Delaware court's

11 decision, and once he has the assets of Stream TV returned to

12 the company" -- Mr. Rajan knew that those assets had been

13 transferred to SeeCubic -- "Once the assets of Stream TV were

14 returned to the company, he will then be able to cherry-pick

15 from those assets."

16            February 8th -- next slide.  Mr. Rajan contacts Mr.

17 McCarthy who's with us today and you'll hear from.  He sends

18 him an investor deck on behalf of VTI, not Stream.  He says,

19 "It's the opportunity of a lifetime, Mr. McCarthy.  VTI has the

20 exclusive right to acquire Stream TV Networks, another blast of

21 (indiscernible) company."

22            He says, "We can acquire the company for a fraction

23 of the value" -- approximately U.S. $25 million, Your Honor,

24 after saying in the same email that he believes that Stream --

25 Mr. Rajan believes that Stream is actually worth between 200

1  and 600 million dollars.

2           I can't think of a more flagrant breach of fiduciary

3  duties of a director of the debtor working on behalf of VTI to

4  acquire the assets for a fraction of their value.  And you'll

5  hear from Mr. McCarthy, Your Honor.  Mr. McCarthy confirmed for

6  us last Friday that that was the plan.  He said it full stop

7  that was the plan.  He got the email, that was the plan.

8           Slide 13.

9           Here's the testimony, "That was your plan, right?

10 You're wearing your VTI hat, VTI would acquire Stream for a

11 fraction of its value?"  "Yes."  Mr. McCarthy, a week later in

12 deposition under oath says, "We can acquire the company" -- and

13 that's Stream TV -- "for a fraction of the value."

14          "That was the investment opportunity that you looked

15 at, correct?  And that was the plan as of the time you elected

16 -- at the time you elected to invest?"  "Correct."

17          That plan has not changed, Your Honor.

18          Next slide.

19          Your Honor -- can we go to the last slide, please?

20          The Chapter 11 case is nothing more than elaborate

21 attempt to violate the omnibus agreement, unwind the

22 transactions that had taken place, and funnel the debtor's

23 assets to Mr. Rajan through VTI.  The debtors have argued that

24 Prime Stone (phonetic) requires the Court to deny dismissal.

25 We disagree, Your Honor.  We think the Prime Stone factors

1 warrant dismissal.

2         There's no single factor here that's determinative,
3 Your Honor.  But the record will demonstrate that Stream's
4 Chapter 11 petition falls squarely on the patented abuse as
5 part of the filing spectrum.  There's no ongoing business.
6 It's effectively a two-party dispute that will be resolved in
7 the pending chancery court action if we're allowed to go back
8 there.  No cash.

9         There's no pressure from non-moving creditors like
10 the UCC.  There's improper pre-petition conduct.  We know VTI's
11 an alter-ego entity.  There's no possibility of reorganization
12 for the reasons I discussed.  And let's just thinks about the
13 subjective intent of the debtor that's evident from the
14 documents and testimony.  Prime Stone warrants dismissal here,
15 Your Honor.

16         Thank you, Your Honor.  And we look forward to
17 presenting out case today.  And I'm happy to answer any
18 questions.

19         THE COURT:  I have no questions at this time.  Thank
20 you, Mr. Larkin.

21         Before I turn the podium over to the parties that are
22 opposing the motion to dismiss, let me ask, Ms. Sierra, do you
23 have any presentation for opening?

24         MS. SIERRA:  Good morning, Your Honor.  Rosa Sierra
25 on behalf of the U.S. Trustee.  I do not have a presentation.

1 I just have a few remarks to make.

2          I just wanted to make the record clear the U.S.
3 Trustee still stands by its motion filed at Docket Entry 84 to
4 dismiss this case under Section 1112 of the Code because we
5 continue to believe this case was filed in bad faith to
6 relitigate or to use the tools of bankruptcy to second-guess
7 what the work that the chancery court already did pre-petition.

8          In that vein, Your Honor, you will be hearing a lot
9 more from SeeCubic and SLS during the course of this trial.
10 But the U.S. Trustee will participate in cross-examination and
11 closing arguments to the extent we deem necessary to assert our
12 position.

13          THE COURT:  Okay.  Thank you very much.  I appreciate
14 that.

15          Mr. Samis, given that the Committee supports
16 dismissal, did you have any opening remarks before I turn the
17 podium over to the debtors and VTI?

18          MR. SAMIS:  I do, Your Honor.  They'll be brief.

19          For the record again, Your Honor, Chris Samis from
20 Potter Anderson & Corroon as proposed counsel for the Official
21 Committee of Unsecured Creditors, I suppose for the next 48
22 hours or so anyway.

23          Just to discuss briefly what has transpired since the
24 last hearing, I think it will give Your Honor some useful
25 context in considering our position as it relates to the

1 filings of the parties.  Your Honor, when we were formed in

2 this case, we had an initial meeting where we established two

3 goals as an official committee of unsecured creditors.

4        One, we were going to examine the debtor's current

5 assets and liabilities and its ability to successfully

6 reorganize in these Chapter 11 cases and then, two, we were

7 going to analyze all of the options available to fill our

8 fiduciary duties to maximize recovery for general unsecured

9 creditors.

10       In fulfilling those goals, Your Honor, we decided

11 that we needed to investigate four key items in these cases:

12 first, the validity, amount, nature, and extent of the SLS

13 senior secured notes and the Hawk Investment Holdings Limited

14 junior secured notes; second, the current assets of the debtor,

15 including its asserted ownership interest in TechnoVative Media

16 and its subsidiaries and related corporate governance issues;

17 third, whether the omnibus agreement could be avoided or

18 declared otherwise unenforceable in this Chapter 11 case; and

19 fourth, the viability of any potential claims as to the assets

20 that the debtor could bring or could be brought on behalf of

21 the debtor to create a pathway to value.

22       In performing and concluding those investigations,

23 Your Honor, we reached a series of four related conclusions:

24       First, the SLS notes and the Hawk note appear to be

25 valid and perfected to the tune of over $150 million and not

1  subject to viable challenge through recharacterization or

2  subordination.

3          Second, Stream validly transferred its equity

4  interest in TechnoVative prior to the petition date.  Thus, the

5  debtor's estate should not include the TechnoVative assets or

6  its interest in its subsidiaries or their assets.

7          Third, the omnibus agreement is likely valid and

8  enforceable.

9          And, fourth, the salient value transferred by the

10 omnibus agreement via fraudulent transfer claim under Section

11 548 of the Bankruptcy Code is unlikely to be successful and,

12 similarly, a preference claim to avoid same is likely to be

13 unsuccessful.

14         Your Honor, reaching those conclusions, we were faced

15 with a pretty harsh outcome for general unsecured creditors, to

16 say the least.  At the time we were reaching those conclusions,

17 Your Honor probably recalls at the last hearing, I had made

18 mention of maybe the parties could find a creative solution to

19 reach some sort of pathway to value in an otherwise very

20 difficult case.

21         To their credit, SeeCubic did exactly that.  They

22 approached the Committee, and they outlined a settlement that

23 we then proceeded to negotiate.  And it resulted in a

24 settlement agreement.

25         The terms of the -- the salient terms of the

1  settlement agreement at a high level are the funding of the

2  liquidating -- litigation trust, I mean, out of $225,000; a

3  promissory note for $2.5 million maturing in three years at a

4  rate of 3 percent per annum; the contribution to the trust of

5  equity interests in SeeCubic up to a total of two million

6  shares; and then causes of action against the Rajans which I

7  think Your Honor will see may be valuable as suggested by

8  certain pre-petition and post-petition conduct that is going to

9  be discussed during the course of these proceedings.

10        Your Honor, the Committee examined that offer through

11 the lens, as I mentioned before, of a likely -- through the

12 lens of likely pathways to value.  And in conducting its

13 analysis, as set forth in our statement that we filed, it

14 necessarily needed to consider the hurdles that are in front of

15 the debtor and VTI.

16        Those are namely four items.  First, you know, in

17 order to succeed on their pathway to value, the debtors and VTI

18 would need denial of the motions to dismiss.  They would need

19 to timely receive adequate financing.  They would need to

20 either avoid of reject the omnibus agreement.

21        And when I talk about rejection of the omnibus

22 agreement, it's unclear what effect rejection of the omnibus

23 agreement at this juncture would even have if the omnibus

24 agreement's mandate was already effectuated.  Other corporate

25 action to take control of the assets was already completed.

1      And it's also unclear what good that would do if the

2  existing secured debt remained in place and there was no way to

3  negotiate with SLS or Hawk or eliminate that, which dovetails

4  to the last hurdle, which is the invalidation or restructuring

5  of the secured debt.

6      So, Your Honor, in considering those items, we

7  reached this settlement.  Importantly, I'd note a couple of

8  things about the settlement beyond merely its terms or its

9  salient economic terms.  One, there's essentially what amounts

10 to a fiduciary out.  If the motions to dismiss are denied, the

11 Committee is released from its obligations to support, and we

12 can recalibrate our strategy accordingly.

13     But I also want to note that we're not asking the

14 Court to approve or retain jurisdiction over the settlement

15 because it's going to be effectuated post-dismissal.  And then

16 the last thing I would note is that we discussed this

17 previously with the United States Trustee and they are not

18 opposing the settlement.

19     So I would save additional detail for our closing.  I

20 can recap.  We can respond to any arguments that are made about

21 the Committee's participation or the settlement itself.  But I

22 wanted Your Honor to hear all this before you heard evidence

23 because I think that it adds useful background context to where

24 the Committee sits in the case and what it is that we hope to

25 accomplish.

1         THE COURT:  Okay.  Thank you very much, Mr. Samis.  I

2   appreciate that.

3         MR. SAMIS:  Thank you..

4         THE COURT:  Okay.  Well, why don't -- is there anyone

5   else that wishes to make any opening statements in support of

6   the motions to dismiss?

7                    (No audible response)

8         THE COURT:  Okay.  Why don't I turn the podium over

9   to the opposition parties, the debtor and counsel for -- or,

10  excuse me, the debtor and VTI.

11        MR. McMICHAEL:  Good morning, Your Honor.  This is

12  Larry McMichael.  I am counsel for the debtor.  And I just

13  started my time clock so I can keep track of my time.

14        The one thing you have not heard from any of the

15  parties advancing the theory that the case should be dismissed

16  is a discussion of the law.  The law actually is a little

17  important here.  And it starts, as the Court knows, with the

18  Third Circuit's decision in SGL Carbon, one of my favorite

19  cases because, actually, it was my case.  Unfortunately, I was

20  trying another case that week so my partner Jim Rodgers argued

21  it.

22        I actually wrote the briefs.  And SGL Carbon, you

23  know, set in motion a series of decisions, both of the Third

24  Circuit and in lower courts, which developed a doctrine, it's a

25  judge-made doctrine of the good-faith requirement.  And it's

1  important we focus on what that requirement is and how it

2  relates to the so-called tactical litigation advantage.

3           Now, as we all know, every single bankruptcy results

4  in an automatic stay of pending litigation.  So every single

5  bankruptcy by definition creates some sort of tactical

6  advantage.  That's not what the law is; that's not what the

7  Third Circuit was talking about in SGL Carbon or in Integrated

8  Telecom.

9           What they're talking about is when a debtor seeks to

10  take advantage of the bankruptcy process when it is not in

11  financial distress.  That is the theme that runs throughout

12  those cases, is the debtor in financial distress.

13          I can stop just there for one second and point out

14  that our friends in the other side have made that case for me.

15  This debtor clearly is in financial distress.  There's no

16  question about it.  And this is the kind of case that is

17  perfectly appropriate to go into a bankruptcy proceeding.

18          Now there have been a number of Delaware bankruptcy

19  court decisions involving dismissal.  The Rent-A-Wreck case,

20  relatively recent case by Judge Silverstein, is actually very

21  helpful and very supportive because, once again, picking up on

22  what the Third Circuit has pointed out, it considers whether

23  the debtor was in financial distress.

24          If the debtor is not in financial distress and goes

25  into bankruptcy just to get the automatic stay, which is what

1  happened in SGL Carbon, or it goes into bankruptcy just to cap

2  a landlord's damages claim, which is what happened in In re

3  Telecom, or it goes into bankruptcy just to reject a license

4  agreement, which is what happened in Rent-A-Wreck, when the

5  company is otherwise not in financial distress, that is where

6  abuse occurs where courts have found there is no bad faith --

7  no good faith and the case could be dismissed.

8          That is not this case.  We are clearly in financial

9  distress.  This debtor is about as distressed as you can get.

10  So let's look at another Delaware case, and I think this is an

11  area where we actually agree with the other side about the

12  factors that the Court has to look at.  There are a variety of

13  factors that the Court looks at.  And that's why we're having a

14  hearing today because it is, as the Third Circuit said, a fact-

15  intensive inquiry.

16          The case that I think is most helpful here is a

17  decision by former Judge Gross in a case called Crown Village

18  Farm.  And that was a single-asset real estate case.  It was a

19  case where the debtor, like here, was seeking to adjudicate

20  some things in the bankruptcy court that would deprive

21  creditors of state-law rights.

22          And what Judge Gross pointed out in that case is the

23  factors, and he distilled them from a number of cases,

24  including SGL Carbon, the factors that courts should look at,

25  and I'll just go through them one by one.

1              Is it a single-asset case?  Okay, this case is not a

2   single-asset case.  There are numerous assets.  Okay, there is

3   intellectual property.  There is equipment.  There are customer

4   relationships.  There are assets.  It's not a single-asset

5   case.

6              Few unsecured creditors?  We have 100 unsecured

7   creditors owed $20 million.  This is not a case where there are

8   few unsecured creditors.

9              No ongoing business or employees?  Well, prior to the

10  stripping away of Stream's assets pre-petition by the insider

11  creditors, Stream had assets, and it had a business.  It was

12  developing the technology taking it to market.  And it had

13  employees.  Those employees for now are housed at VTI because

14  the debtor has no money because we haven't been able to get a

15  DIP loan in this case yet, but once we get past the motion to

16  dismiss and get a DIP loan, the debtor will have employees.  So

17  that factor doesn't point toward dismissal at all.

18             Petition filed on the eve of foreclosure?  No, this

19  was filed after foreclosure.  Effectively, SeeCubic has stepped

20  in as an agent for the two secured lenders and acquired assets

21  from the debtor under the omnibus agreement.  We don't deny

22  that that happened.  We do deny that they acquired all the

23  assets.  I think some of the assets actually were not

24  transferred.  But that's a question for another day.  That's

25  not a test that we need to speculate about today as to what

assets are still in the estate or what assets aren't in the

estate.   Section 544 and 548 will guide us there.

        Is it a two-party dispute?  That was something that

Mr. Larkin mentioned somewhat cavalierly, I thought.   It's

interesting that he thinks it's a two-party dispute.   As I

count them, there are two secured creditors; there's a debtor,

that's three; there's an unsecured creditors' committee, that's

four.  And that's assuming you don't count the unsecured

creditors individually.   If you do, there's another hundred.

All of those people have interests in the outcome of this case.

        And those hundred unsecured creditors, not a single

one of them is a party to the chancery court.   Chancery has no

jurisdiction to weigh and balance the fairness to creditors.

That's not the chancery court's job.   That's the bankruptcy

court's job.  And that's one of the principal reasons why this

case should not be dismissed.

        No cash?  That's not true.   The debtor has arranged

for cash.   The debtor proposed to bring in a million dollars

right after the case was filed through a DIP loan.   We haven't

gotten there yet, but the debtor will have cash and will have

the ability to prosecute its case and to reorganize.

        Pre-petition conduct improper?  Hard to tell.   You

know, I mean I'm not going to argue that big time.   You know,

we can all point to things that people did pre-petition and

whether it makes sense or not.   There's this whole business

1  about acquiring assets at a fraction of their value.  That's --

2  and I don't want to overstate it, it's a silly argument.  The

3  assets, if this case succeeds, will come back into the debtor.

4        Who acquired those assets before the bankruptcies?

5  SeeCubic acquired them.  How much did SeeCubic pay?  So far

6  nothing.  What are they obligated to do?  Well, they're

7  obligated to forgive their debt, but they haven't done that

8  yet.  And even if they did, it's $140 million worth of debt,

9  and everybody agrees the assets are worth two or three times

10  that, at least, okay.

11        Don't take my word for that.  You will see in

12  evidence SeeCubic's balance sheet valuing the assets and

13  putting a footnote saying this is their estimated fair market

14  value.  By the way, it's 336 million.  So, at most, they paid

15  140 for the 336.  So Mr. Rajan's not acquiring any assets for

16  himself.  He has no right to do that and no authority to do

17  that.

18        If we succeed, the assets will come back into the

19  estate.  I represent the estate.  And they will be subject to a

20  plan of reorganization, and the disposition of the assets will

21  be pursuant to a plan that will be confirmed by this Court.

22  And that will by definition be a fair disposition.  No one's

23  running off with assets here, nor could they.  It's just not

24  possible in a bankruptcy case to do that.

25        No pressure from creditors?  Well, that's not true.

1 We have enormous pressure from the secured creditors who are
2 stripping the assets out of the debtor, and we also have
3 lawsuits filed by unsecured creditors.  There is plenty of
4 pressure by creditors.

5          Debtor formed immediately pre-petition?  Debtor was
6 formed ten years ago.  This is not a case where the debtor was
7 created in order to take advantage of a bankruptcy.

8          And the subject of intent of the debtor?  So the
9 subject of intent's a little hard to measure because people
10 will point to various pieces of evidence and things like that.
11 But the bottom line here is that the debtor has an interest
12 itself, and the debtor has a fiduciary responsibility to its
13 creditors to maximize the value of the estate's assets and to
14 distribute fairly to creditors.

15          The debtor believes it can do 100-percent plan here,
16 and it has the financing to do that.  You'll hear a lot about
17 that later today briefly from Mr. McCarthy who is providing
18 financing to VTI who, in turn, will provide it to the debtor
19 through DIP loans or through exit financing.  There's plenty of
20 cash available or will be plenty of cash available to do what
21 needs to be done here and to treat people fairly.

22          So what is the consequence of dismissing the case?
23 Let's go back to the omnibus agreement.  The omnibus agreement
24 is a contract governed by state law.  State courts enforce
25 contracts.  That's what they do.  Secured creditors have

1  contracts all the time, and those contracts are enforced by

2  state courts.

3         It's not up to a state court to determine what's fair

4  to the estate or what's fair to other creditors.  That is

5  beyond the jurisdiction of the state court, beyond the

6  jurisdiction in this case.  So the chancery court because the

7  estate was not a party to the case because they didn't exist

8  until the petition was filed.  And not a single unsecured

9  creditor was a party to that case.

10         It approved -- the state court approved the

11 enforcement of the secured creditors' contract.  So we need to

12 look at that contract.  And on its face, you don't need to read

13 very far, you don't need to study it very carefully because on

14 its face, it is a fraudulent transfer in at least two ways.

15         The first way that's obvious is all of the assets of

16 Stream under the contract get moved to SeeCubic.  SeeCubic

17 assumes the secured debt and a tiny little fraction of the

18 unsecured debt, leaving 17 or 18 million dollars of unsecured

19 creditors behind.  It says it right in the contract.  That is a

20 contract designed to hinder, delay, or defraud the collection

21 of debt by unsecured creditors.  They have nothing left.  They

22 have claims against Stream that has no assets after the omnibus

23 is enforced.

24         As I said, it's right there on the face of it.  And

25 to make matters worse, SeeCubic takes on the equity.  Except

1 for the equityholders they don't like, the Rajans, all the

2 other equityholders in Stream become equityholders in SeeCubic.

3 So SeeCubic -- it's a great deal, SeeCubic gets the assets for

4 a half of what they're worth based on its own balance sheet,

5 assuming they forgive all the debt that they're supposed to

6 forgive.  The equity keeps their equity.  And $18 million of

7 unsecured creditors are left holding the bag with nothing in

8 it.

9       That's a fraudulent transfer.  Now we don't need to

10 decide today whether we have a good claim or not, and, you

11 know, I'm a little confused by Mr. Samis' position on that

12 because the last conversation I had with him before he switched

13 sides, he wanted to be a co-plaintiff and thought it was an

14 extremely strong claim.

15       But whether the claim is successful or not is not the

16 issue for today.  The question is is it a proper bankruptcy

17 purpose to challenge the transaction under the Bankruptcy Code,

18 Section 548, for the benefit of the estate, and it absolutely

19 is.  There's no question about that whatsoever.

20       Second thing is I've mentioned it before, there's a

21 valuation done by the debtor pre-petition valuing the

22 intellectual property between two and six hundred million.

23 There's the balance sheet of SeeCubic putting it at 336

24 million.  Close enough because the one thing we can agree to,

25 it's worth a lot.

1      There's enough value there to pay creditors and pay

2   them in full in a plan that's properly financed, which we have

3   arranged for.  That is what bankruptcy is here to do.  And, you

4   know, this theory that we're attacking the omnibus, yeah, we're

5   attacking it because it's a fraudulent transfer under the

6   Bankruptcy Code.

7      The chancery court doesn't look at Section 548 when

8   it decides to enforce contracts.  State courts don't do that.

9   That's not what they're there for.  This is a different legal

10  system.  And once it's in bankruptcy court, the contract is

11  subject to bankruptcy scrutiny.

12     The asset transfers, those that have occurred, are

13  also subject to bankruptcy scrutiny under 544.  And we'll see

14  how good those transfers are.  We have serious doubt as to

15  whether the TechnoVative stock would survive scrutiny under 544

16  but, once again, that's not a decision anybody has to make

17  today.  That's a case built on a separate record to be decided

18  later, but it's a valid bankruptcy purpose to look at transfers

19  and to bring assets back into the estate for the benefit of the

20  many unsecured creditors who are left holding the bag by the

21  omnibus agreement.

22     Now the fact that the Creditors' Committee made an

23  eleventh-hour deal and switched sides getting, you know, maybe

24  ten cents on the dollar if it works for them, that has little

25  to do with anything.  That's not one of the tasks.  That's not

1  one of the things the Court looks at.  What the Court looks at

2  is are we in financial distress?  Clearly we are.  Do we have a

3  valid bankruptcy purpose for the case?  Clearly we do.  I just

4  described it.

5        And can we reorganize?  It's very, very -- every

6  secured creditor in every debtor's case I've had for the last

7  40 years has told me you'll never reorganize, there's too much

8  secured debt, we have a veto right.  And, guess what, somehow

9  we find a way to reorganize because deals get made.  Money

10 comes in, creditors scratch their heads and say, okay, fine,

11 we'll take some cash and we'll go.  A lot of different ways of

12 reorganizing cases.

13       And I would submit it's very premature for the Court

14 today to say there's no possibility that this case can

15 reorganize, particularly when we have a very large amount of

16 incoming available capital to do that.

17       So that's the debtor's case, and that's why the Court

18 should deny the motions to dismiss.  It's not a plebiscite.

19 You know, this is not a vote of creditors.  What we have right

20 now is we've got the secured creditors who want their deal, and

21 we've got unsecured creditors who have hedged their bets.

22       And, by the way, two out of the three are the

23 unsecured creditors.  That's two members of the Committee out

24 of a hundred unsecured creditors.  That's not what the Court

25 should be looking at.  What the Court should be looking at is

1 the standards that are articulated by the Third Circuit and by

2 the case law -- financial distress, legitimate bankruptcy

3 purpose.  And we meet those.  We meet them easily.

4           Thank you, Your Honor.

5           THE COURT:  Thank you, Mr. McMichael.

6           Okay.  Does VTI want to make an opening statement?

7           MR. STEN:  I do, Your Honor.  Good morning.  My

8 name's John Sten.  I represent Visual Technology Innovations.

9 As you know, it's referred to often as VTI.  I'll try to keep

10 this brief.  I know those are famous last words for me, but I'm

11 running my clock we I know.

12           So VTI is the proposed financer of the debtor.  I

13 think that's fair.  And I want to talk a little bit about what

14 the evidence we believe is going to show here, Your Honor.  Now

15 you've heard, you know, from a lot of people and I'm batting

16 cleanup here, but I think the pieces that I'm going to talk

17 about are some of the most relevant here, which is as I just

18 said, VTI is the proposed financer of the debtor.

19           The evidence is going to show you, Your Honor, and

20 Mr. McCarthy who's going to testify is going to talk about this

21 and I invite the Court to ask whatever questions it wants of

22 him.  But it's going to show that it's VTI's intention to put

23 in place a financing plan in this case to pay off all the

24 creditors in the action, secured and unsecured, and to provide

25 enough capital so that any reorganized entity can move forward

1  with a viable going concern and business plan.

2          And as I said, this plan calls for an initial funding

3  which is in the neighborhood of 180 million.  You will hear

4  from Mr. McCarthy it originally started with an option to

5  increase it a bit more, around 120.  Now it's actually up to a

6  total of option to increase of up to $500 million, Your Honor.

7          So for something that everybody says on the other

8  side, movant's motion to dismiss says it's not really worth

9  much, we're foreclosing in order to pay off some of our debt,

10  the fact that there's someone who is going to tell you is

11  ready, willing, and able to fund this debtor to the tune of 180

12  million of 500 million should tell you something about the

13  perceived value of the assets here.

14          Now, Your Honor, I'm going to ask so I've had the

15  benefit of listening to everyone else, but you'd expect a plan

16  of financing like this to be met with open arms by everybody.

17  And, instead, what have you heard?  You've heard derision,

18  you've heard hostility, and you've heard some outright

19  mischaracterizations, which the evidence is going to show you.

20  I'll touch on some of them, but I don't really need to because

21  I know what the evidence is going to show.

22          But I want to step back and I'm not a bankruptcy

23  lawyer by trade.  I'm sure that will show up at some point

24  here.  But I asked myself why is this case that someone who

25  wants to come in and pay off the secured creditors in full with

1  interest, the unsecured in full, is met with such hostility.

2  In my mind, I'm like there must be something else at play here.

3  Why wouldn't they want to be repaid?

4          You know, and you heard a lot about Mathu Rajan and

5  Mr. McCarthy saying, oh, we could pick up this asset at, you

6  know, a fraction of the value.  Well, anything that's going to

7  occur here is going to occur under the bankruptcy court's watch

8  if it stays in a motion to dismiss.  And so anything that

9  occurs in that regard, Your Honor's going to have supervision

10  and oversight on.

11          So it sort of boggles the mind.  In fact, the only

12  way that something like that could happen is if this motion to

13  dismiss is allowed and then, with all due respect, then movants

14  -- SLS, Hawk, Shad Stastney, who we're going to talk about, and

15  SeeCubic -- then they can do something, you know, along the

16  line of which they've already tried to accomplish out of the

17  sight of both the debtor and this Court.

18          So it's obvious to me the secured debtors for all of

19  what they're saying is they don't want to be repaid.  What they

20  want is Stream's assets because they know they are more

21  valuable than their secured debt and that they're going to --

22  and that if they're able to acquire them fully and keep them

23  fully, they're going to have a windfall that benefits them and

24  a select few because, certainly, under that settlement of the

25  unsecured creditors, it's really not going to benefit them very

1  much.  I think that equals just a little bit over ten cents on

2  the dollar.

3        So, Your Honor, I want to talk a little bit and give

4  you some background because you've heard this case as being

5  about two individuals, and movants have made a big show of

6  trying to say, oh, it's Mathu Rajan as this alter ego of VTI.

7  It's not the case, and we're going to talk about that, Your

8  Honor, a little bit.

9        But before I do that, I want to talk about why this

10 is important to talk about, Mr. Stastney, SLS, and SeeCubic,

11 because I think you're going to understand that there is a

12 pattern of conduct here that is very important as to why this

13 case was filed in good faith because the pattern of conduct is

14 just what I'm saying, which is a predatory lender who is going

15 to take out and pull out at all stops in order to enrich

16 himself and his, for lack of a better word, cronies at the

17 expense of others.

18       Now people may ask why is the motivation of Stastney

19 and SeeCubic, which you're going to hear a lot about here,

20 relevant of whether or not the debtor filed this case in good

21 faith.  Well, it's because the subjective belief of the debtor

22 in filing in good faith has to be understood through their

23 eyes.  And as much as they want to say that this is a

24 litigation tactic, it's not.  Debtor came here seeking this

25 Court's protection.  It came here seeking this Court's

1  protection against a predator.  And this is a predatory action,

2  make no mistake.

3          You're going to hear, you know, you've heard a lot

4  about this chancery court.  Originally, debtor went to chancery

5  court to try to find protection.  No avail, we're not going to

6  get into whether that was a good or bad decision, but it found

7  itself at the end of it with SLS and SeeCubic and emboldened

8  and trying to take all the assets and leave it with all the

9  secured creditors -- or unsecured creditors, pardon me, Your

10  Honor.  With all the unsecured creditors.

11          Think of that.  You have at the end of December, as

12  the evidence is going to show, a schedule that comes out that

13  says that SeeCubic's going to take a million dollars of

14  unsecured creditors and assume those liabilities and leave

15  Stream holding the bag.  And there's email after email about

16  Mr. Stastney actually encouraging the creditors to go after

17  Stream in that regard.  So what choice did it have?  Well, one

18  choice was to file for bankruptcy, and that's what it did.

19          So I want to move back with my limited time to talk

20  about Mr. Stastney.  And you'll see why this is important

21  because this is not, as movants say, two individuals with a

22  dispute.  What this is is, as I say and the theme is going to

23  be the same which is this is a predator.  Mr. Stastney is a

24  predator.  And it shows he operates in the gray areas of

25  corporate and finance law.

1          And here's some examples, and it's interesting
2   psychology in a way because a lot of things of what you hear on
3   the other side, you know, obviously, that's how they would view
4   them because that's how they are.  That's how they operate.
5   And so, of course, they're going to project that on someone
6   else.  And here's where I'm showing it.

7          SLS is the movant along with SeeCubic, but both
8   SeeCubic and SLS, they're basically Shad Stastney.  That gets
9   hidden.  The lawyers kind of do their three-card monty, try to
10  keep that from showing it.  But Stastney's testimony's going to
11  show that SLS is Shad and two partners, neither of whom were
12  actually involved in Stream or currently involved in SeeCubic.
13  He admits they're passive investors and that he pulls all the
14  strings.

15         As to SeeCubic, it's actually, again, it's -- when
16  you boil it down, it's actually Stastney.  Now it tries to
17  dress it up by taking on the idea that because it purportedly
18  has the assets of Stream now that it has all these business
19  operations.  But, again, those are all downstream in the same
20  subsidiaries that they've always been in.  SeeCubic itself
21  didn't exist until May 20th.  Stastney's incorporator is the
22  executive chairman of the board of SeeCubic.

23         Now you've seen claims that it has 120 shareholders,
24  but it hasn't issued a single share of stock according to Mr.
25  Stastney.  Think about that, not a single share of stock has

1  been issued.  And there's no evidence of a corporate resolution

2  putting either Mr. Kabacinski or Stastney on the board.

3  They're the supposedly two board members.

4        For all intents and purposes, if you want to talk

5  about alter egos, SeeCubic is the alter ego of Stastney because

6  as the evidence in this case is going to show you, he does what

7  he wants, when he wants, and how he wants.

8        And talk about the pot calling the kettle black.  You

9  heard a lot about fiduciary duties and corporate formalities

10  and all that.  And you'll watch the evidence show you Mr.

11  Stastney just rides rough shot over it all.  Using this power

12  of attorney that he has for seemingly everything, he puts

13  himself on both sides of a number of transactions without

14  regard.  He makes up a document when he needs to and signs it

15  on both sides of it and sends it along to his lawyers.

16        There are no checks and balances on this man, and the

17  evidence is going to show this.  And this is the same pattern

18  he did for SLS and the same pattern that he did for the asset

19  company that -- asset management company that he had before.

20  And you're going to hear about that.  We're going to show you a

21  pattern of conduct that goes back years as to Mr. Stastney and

22  that runs through this case today, and it's very important

23  because it really bears on the reason why the debtor needed

24  bankruptcy protection.

25        For example, Mr. Stastney was an investment manager

1  of a company.  And the company -- the management company ran a
2  $5-billion investment fund.  Mr. Stastney's no longer that.  He
3  was barred by the SEC because as part of that, he took $2
4  million and didn't disclose it to his -- either to the fund or
5  to other management -- his other management partners who, by
6  the way, actually happened to be the same partners in SLS who
7  are termed as passive investors.

8         He had this inside deal that he just -- if you're
9  running a $5 billion fund, I don't know why you need to do
10  something like that, which actually bows up your ability to
11  operate as an investment manager in the future since he's
12  barred now.  But he did.  It did.

13         I'm also going to show you how since that -- since I
14  think going back ten years, Mr. Stastney's found himself as a
15  defendant in at least five different lawsuits as a defendant
16  for conduct that's very similar to what he does here.  It's
17  breach of fiduciary duty, fraud, breach of contract, tortuous
18  interference.  And I'm not even counting the litigations in
19  this case.

20         These are all separate litigation where he and his
21  companies acted as a predator to other companies and had to
22  fight off and, lo and behold, it wouldn't shock you, there are
23  a lot of lawyers here today are probably the lawyers in that
24  case -- those cases.  But this pattern of conduct shows you a
25  predatory lender who has a pattern of what he does.  He gives

money, he blows up the company, he takes the assets, he flips
them, he sells them, he does something, he never seems to run
them, for a profit.  And that's the pattern here, and it
carries over in their present dispute.

As the evidence is going to show, when Stastney --
when Mr. Stastney was on the board of directors of Stream and
serving as the CFO, he actively discouraged potential investors
from investing.  When he -- now this is at a time when Mr.
Stastney was on the board and CFO.  He learned about the
existence of the omnibus agreement.  Did he turn around and
tell his fellow board members or inform the company to which he
owed a fiduciary duty about that agreement?  No.  No, he
didn't.

Further, this sort of gray area slided through.  It
even runs into the Court here.  Now as Your Honor remembers,
when Mr. Stastney first came on the scene, he filed a
declaration here.  Exhibit 1, he states, was a true and correct
copy of the omnibus agreement.  He states that under oath.  As
you're going to see, Your Honor, that's not even true.
Instead, if you look at Exhibit 1 of that declaration, he tried
to slide it by everybody, including this Court.

There's a letter agreement and an omnibus agreement.
In fact, now magically, there are two different exhibits in
movant's papers.  But when he did it there, he tried to slide
it by just like he did in the chancery court, it turns out.

1 And, again, we're not going to -- we don't need to talk about

2 the validity of the omnibus agreement.  It's irrelevant.  It's

3 a red herring by the other side.

4     But what we do need to talk about is the pattern of

5 conduct that it represents because what it is is Mr. Stastney,

6 it's always deals within deals within deals that benefit him

7 and it's always a pattern that when someone gets in the way, he

8 buys them off just like he did to the Creditors' Committee

9 counsel here.  That's what he did, and I'll show you.

10     The omnibus agreement, it has Stream, it has certain

11 investors, it has SLS and Hawk.  So it has four ones.  So

12 that's the agreement we all originally came into this case

13 thinking about.  Well, as I just said, it turns out there's a

14 second one.  This is a little bit of the inner circle because

15 this time Stream's not in that contract.  Stream wasn't even

16 told about it.  The resolution committee didn't officially seem

17 to consider it.

18     Now we have found evidence that those people knew on

19 their personal emails and personally knew about it, but it's

20 not part of Stream's corporate record when it approved the

21 omnibus agreement.  So for all intents and purposes, it didn't

22 exist as a corporate matter.  But what it did do is it actually

23 obligated Stream to issue 48 million shares of Stream stock to

24 SLS, Hawk, and the investors.  So a side deal right from day

25 one.

1         Now it turns out we thought there were two

2 agreements.  Now we find out there's even an inner circle to

3 the inner circle.  Last week, we were given a document called,

4 weirdly enough, omnibus agreement.  This time it's just Hawk

5 and SLS.  And in answer to the question, one, Hawk has a 150

6 million in debt here.  Mr. Stastney and his SLS company have

7 like 11.

8         So why is Mr. Stastney the man about town and

9 everything here?  Well, it turns out that deal within a deal

10 within a deal which is Hawk gave up all power in this case to

11 Mr. Stastney and SLS to do what he wanted, when he wanted, and

12 how he wanted.  And, again, the investors who were a part of

13 that middle deal, they're not on this.  It's always with him.

14 There's always a deal within a deal within a deal.  And you're

15 going to see that here, as well.

16        So instead of the one omnibus agreement, now we're

17 dealing with three.  And, again, that pattern is important

18 because Mr. Stastney buys people's cooperation.  That's his

19 habit.  That's what's shown through all these things.  It's

20 even shown where magically in June 2020, you're going to see

21 the two resolution board people who voted for the omnnibus,

22 they somehow magically are showing up in this private placement

23 that's going out to investors for SeeCubic as board designees

24 for SeeCubic.

25        Now in some sort of weird revisionist history, Mr.

1  Stastney waves his hands and now they're no longer involved in

2  that at all and it's just him and Mr. Kabacinski again.  But

3  you're going to see the document that shows that they

4  originally were -- as early as June 2020 were going to be part

5  of SeeCubic.  And, again, it doesn't go towards the validity of

6  the omnibus agreement.  That's irrelevant here.

7          What it goes to is that this is a predator who buys

8  people off when it's in his best interest.  And he'll cut them

9  out when it's not, just like the creditors' committee, which

10 was cut out until we filed for -- until the debtor filed for

11 bankruptcy here.

12         And you're going to see in this whole case that his

13 whole predatory lending and predatory way of action is in full

14 view here.  Now, before we -- and as I hit my time limit, I

15 want to -- I'm going to jump around a little bit.  But I want

16 to talk about some of the things about assets.

17         Now you heard a lot about how supposedly Mr. Rajan

18 said that there was no assets here.  Well, what you're going to

19 hear is on the opposite side is Mr. Stastney says there are

20 assets here.

21         You're going to hear Mr. Stastney admit, as he did in

22 his deposition, that the debt of Hawk and SLS wasn't discharged

23 because there's still assets that remain outstanding as to the

24 debtor.  He admits straight out in his deposition debtor has

25 not conveyed, transferred, delivered, and assigned all of

1  Stream's assets to SeeCubic.  He admits it; not even a
2  question.
3         And they're not just small assets.  In fact -- and,
4  in fact, this isn't even one that he says he wants.  It turns
5  out, as my brother had mentioned, Mr. Stastney says that
6  SeeCubic did not take the goodwill of Stream.  And the reason
7  why is because if you take the goodwill of Stream, you're
8  actually in some ways considered a successor liability, and all
9  of the liabilities come with you.
10         So at some point, they figured this out and they say,
11  okay, well, we're going to now rewrite history again and say
12  we're not taking that goodwill.  But prior to not taking it,
13  they were valuing it around 270 million.  So if they didn't
14  take it, then that goodwill is now back as part of the debtor
15  and it's an asset, which is very, very important to understand
16  is that there are --
17         THE COURT:  I'm sorry.  I'm sorry.  I want to
18  interrupt you for one second.  How do you even take goodwill?
19  Explain that to me.  And that's just me --
20         MR. STEN:  When you --
21         THE COURT:  -- not understanding.  So how do you
22  actually buy goodwill?  What is goodwill?
23         MR. STEN:  Well, you can't -- well, that's the thing.
24  In an asset purchase, you can't buy goodwill because you're
25  only purchasing the assets.

1          And so -- and I can show accounting treatment, which

2    I do a lot of finance things, so that if you were to take

3    goodwill of a company, you're essentially taking the company

4    itself and you set yourself up for successor in interest

5    liability for that reason because goodwill is obviously -- you

6    can value goodwill, but it's actually, you know, the name, the

7    sort of business enterprise intangible value that you've built

8    up.

9          And it's not that you can't take it.  The problem is

10   if you take it, then really most times you're finding yourself

11   in a trap where you have successor in interest liability

12   because you're more or less taking the entire company.  When

13   you want to do an asset sale, you absolutely cannot take

14   goodwill without falling into that trap.

15          MR. McMICHAEL:  Your Honor, may I just address your

16   question?

17          THE COURT:  Thank you for clarifying.

18          Sure.  I hate to derail Mr. Sten's opening.  I just

19   wanted to --

20          MR. STEN:  But actually --

21          THE COURT:  -- clarify --

22          MR. STEN:  -- actually it's good because it gives me

23   that little breather where I can get to the end to kind of try

24   to wrap it up, Your Honor.

25          THE COURT:  Okay, good.  Well, Mr. McMichael, why

1  don't I turn the podium over to you and then Mr. Sten can
2  organize his last remaining remarks then.
3          MR. McMICHAEL:  Thank you, Your Honor.  And I just
4  want to answer to the Court's question very directly.  The
5  goodwill in this case is the prospective value of the
6  technology.  That's really what it comes down to.  And it does
7  line up with the debtor's valuation.  The valuation that
8  SeeCubic put on its balance sheet is generally consistent with
9  the debtor's valuation.  That's --
10         THE COURT:  Okay.  And you said that was roughly
11  around 200 million?
12         MR. McMICHAEL:  No.  The debtor's valuation --
13         UNIDENTIFIED SPEAKER:  About 300 --
14         MR. McMICHAEL:  -- is 200 to 600.  The SeeCubic
15  valuation is 336 million.  So the SeeCubic valuation is in the
16  range of the debtor's valuation.
17         THE COURT:  Okay.  Thank you.
18         MR. McMICHAEL:  Thank you, Your Honor.  Sorry to
19  interrupt.
20         MR. STEN:  No, it's good.  And I'll -- I have three
21  more points and then I'm done because I want to address this.
22         Movants in their opening, in their papers, they're
23  said this is a litigation tactic to avoid final judgment in
24  chancery court.  One of the things that -- again, sometimes I
25  just go back to basic common sense.  What litigation tactic

1 would that serve?  I mean the opinion of the chancery court on

2 the preliminary injunction which, again, is only preliminary,

3 still exists.  The statements of the chancery court still

4 exist.

5         So what is that something extra that the final

6 judgment would have gotten movants that they say debtors so

7 needed to avoid?  Final judgment?  Well, what would that have

8 done?  Well, you know what it would have done?  It would have

9 allowed the debtor to appeal a chancellor who actually finds

10 himself reversed quite often.

11         So if you want to talk about a bridge to nowhere,

12 which is the term you'll hear out of movant's mouth quite a

13 bit, you know, staying the chancery court at that stage is a

14 bridge to nowhere because now it's in the status Quorum.

15         I don't understand what the litigation tactic there

16 would have been given the fact that the -- you know, the terms

17 of the preliminary injunction order at that time.  And it

18 didn't seem to impede SeeCubic at all.  So it's an odd thing.

19         But I also think that's why they switched to this

20 acquire the assets cheap.  But that's not a litigation tactic.

21 That's -- isn't that really a tactic that happens in bankruptcy

22 normally, which is the debtor reorganizes and, you know, deals

23 are cut with creditors and everything else?

24         Now because of the fact and Mr. Stastney's actions

25 here, that's not going to happen.  It's VTI and debtor's

1  intention to pay 100 cents on the dollar, as you're going to

2  hear from Mr. McCarthy.  And I do want to touch on Mr.

3  McCarthy.

4        It's absolutely unfair for them to disparage him the

5  way it is.  He has come into this case, and he's going to

6  testify, Your Honor, he is a director of VTI which, by the way,

7  is a real company.  It has five current directors, two -- one

8  of them is Mr. McCarthy, one's picked by him, and one is going

9  to be picked by him to make six.  And then the other three are

10  the Rajans.

11        But it's not an alter ego, not even close.  And

12  Burlington Resources, by the way, Your Honor, it's a financial

13  investment company based in Hong Kong that has over a billion

14  dollars in assets.  To them this is not a big deal.  And a

15  majority of those assets are owned by Mr. McCarthy.  He's going

16  to be testifying here today from Spain, so we appreciate that

17  and hopefully we don't have any technological issues.

18        But he's going to come on and he's going to tell you

19  he's committed to financing VTI and the debtor, no

20  contingencies.  He's committed to paying off the secured

21  debtors in full, no contingencies.  He's committed to paying

22  off the unsecured debtors in full, no contingencies.  And he's

23  committed to financing the ongoing operations and needs of the

24  debtor.

25        Your Honor, normally in a bankruptcy, that would be

1  met with trumpets and open arms.  It never happens.  But,

2  again, I go back to look what you're met with, derision and

3  hostility because they don't want their debt -- the debt paid.

4  They want these assets which they know give them a windfall

5  that's commercially unreasonable for given the debt that they

6  have.  And Mr. Stastney has taken actions to make sure that

7  that happens, which is why the debtor ended up in bankruptcy

8  here.

9         One last thing is, as I said, the theme here, you

10 know, when the going get tough -- gets tough, Stastney cuts a

11 deal.  And that's exactly what happened.  The Unsecured

12 Creditors' Committee was formed which, by the way, is already a

13 positive aspect of the bankruptcy as is the fact that now

14 there's up to $500 million which could potentially be available

15 to recapitalize, refinance, and fund the debtor.  Those are two

16 fruits that would be expected when you file in good faith,

17 which is what happened here.

18        Well, let's talk about that unsecured creditor deal.

19 One thing that's important, one, it's basically trip insurance.

20 It goes away if the motion to dismiss is denied.  So while, you

21 know, I do question the fact that the only cash being turned

22 over now goes directly to the lawyers, the fact is is that if

23 the motion to dismiss is denied, the Creditors' Committee is

24 more or less in the same position.

25        Now Mr. Samis jokes that at least for 48 hours he's

1  the counsel for the Creditors' Committee.  And he doesn't mean

2  that to mean that whether it's the motion to dismiss or not, I

3  suspect.  But putting that aside, let's actually see what they

4  did.  They traded in order to get this trip insurance, which

5  only kicks in really if they're outside of bankruptcy.  They

6  say they're going to support SeeCubic's motion to dismiss.

7

8       So, again, here's somebody who is out in the cold,

9  all the creditors totally out in the cold.  The debtors file

10 for bankruptcy.  All of a sudden, Stastney cuts a deal with

11 them to get them on his side to get his way.  That's his

12 pattern.

13      But what do they actually do here?  Now it's

14 interesting.  I was listening to Mr. Samis talk about this

15 because I wondered what he was going to say.  He went through

16 and he basically says, yeah, the odds are -- you know, we don't

17 feel the odds are good for the debtor to do all these things.

18 So we hedged our bets.  Debtor has a tough road to hoe, and so

19 we hedged our bets.

20      But he never actually talks about the bad-faith

21 filing of the debtor that supposedly is the basis for the

22 motion to dismiss.  He talks about everything else saying,

23 well, we may not get such a good deal in bankruptcy.  But he

24 also knows that his motion to dismiss, you know, all those

25 things come on the table.  But he never ever talks about the

1 fact that there was any bad faith by the debtor in filing this.

2          And the same thing holds true in his papers, Your

3 Honor.  What the most he ever says which -- and it's

4 interesting because this term it appears at bottom, it shows up

5 a lot actually in Skadden's papers, so either Mr. Samis is the

6 sincerest form of flattery or something else.  But it says, "It

7 appears at bottom that the underlying dispute is more akin to a

8 two-party dispute that does not bar the bankruptcy."  That's

9 the most derogatory thing he says about the actual filing of

10 the debtor for bankruptcy.  And I think that's very telling in

11 this.

12          So, anyway, there you have it, Your Honor.  We

13 believe that this motion to dismiss should be denied because

14 not only does the evidence plainly show that it was filed in

15 good faith, but there have already been tangible benefits both

16 to the unsecured creditors and to the debtor.  It's given them

17 a chance to breathe.  It's given them a chance to secure

18 financing to move forward.  It's given them a chance to start

19 to take steps, hopefully, to reorganize, recapitalize, and

20 recover assets.

21          Now none of those things are a sure thing, but those

22 battles have yet to be won.  And so trying to figure that part

23 out, that's not what we're here for.  We're here for should

24 this debtor be in bankruptcy.  And I think when looked at in

25 totality, absolutely it should.  And all the good things that

1  are already starting to happen for it are all evidence that

2  that good-faith filing was made because these are the natural

3  things that would flow from such a filing.

4             Thank you, Your Honor.

5             THE COURT:  Okay.  Thank you very much, Mr. Sten.

6             Okay.  Well, then I think we're ready to proceed to

7  the -- for our first witness.  I'd actually like to take a

8  brief five-minute break before we do that.  So let's take a

9  five-minute break and we'll resume at 11, and then we'll hear

10 from Mr. Rajan.  Thank you so much.

11            (Recess at 10:54 a.m./Reconvened at 11:00 a.m.)

12            THE COURT:  Okay, parties, this is Judge Owens.  It's

13 11 o'clock, and we are back on the record.

14            So when you're ready.  I see Ms. Sierra.  Okay, VTI,

15 counsel for VTI, and the debtor are on.  And there is Mr.

16 Larkin.  So, okay, it looks like we're ready to go.

17            So, Mr. Larkin, should we swear in Mr. Rajan?

18            MR. LARKIN:  Apologies, Your Honor.  Yes, please.

19 Sorry about that.

20            THE COURT:  Okay.  And is it Mr. Rajan?  Is that

21 correct --

22            MR. RAJAN:  Yes, it is.

23            THE COURT:  -- how I pronounce your name, sir?  Okay.

24 Mr. Rajan, thank you very much for appearing in court today.

25 I'm going to swear you in.

1            MATHU RAJAN, SEECUBIC'S WITNESS, SWORN

2            THE COURT:  Okay.  Can you state your name and spell

3  your last name for our record?

4            THE WITNESS:  Yes.  It's Mathu Rajan.  M-A-T-H-U is

5  the first name; Rajan is R-A-J-A-N.  And that's my last name.

6            THE COURT:  Thank you so much.

7            THE WITNESS:  Okay.  Thank you, Your Honor, for

8  giving me a chance to present.

9            THE COURT:  Mr. Larkin, when you're ready.

10            MR. LARKIN:  Thank you, Your Honor.

11                        CROSS-EXAMINATION

12  BY MR. LARKIN:

13  Q    Mr. Rajan, good morning.  We met at your deposition.

14  A    Good morning.

15  Q    And we meet again today.  How are you today, sir?

16  A    Nice.  Nice to see you again.  Good morning.

17  Q    Mr. Rajan, you and your family currently own majority

18  control of the shares of the debtor, correct?

19  A    Yes.  We are the majority shareholder, correct.

20  Q    Okay.  And you're also still the CEO of the debtor,

21  correct?

22  A    Yes.

23  Q    And you're the sole director of the debtor, correct?

24  A    Of Stream TV, correct.

25  Q    Correct.  And will you agree with me that as an officer

1  and director of the debtor, you have fiduciary duties including

2  a duty of loyalty to the debtor?

3  A    Yes, I do.

4  Q    Okay.  Sorry, I didn't -- that didn't come through.

5  A    Yes, I do.

6  Q    Thank you..

7  A    Can you hear me?

8  Q    Thank you.  Yeah, that was great.  Mr. Rajan, I want to

9  talk about VTI.  We've heard a lot about VTI already this

10 morning, and it's in the papers quite a bit.

11      So let's just level set on what VTI is and how it was

12 formed.  You formed VTI, right, you personally formed VTI in

13 late December, early January of this year shortly after the

14 preliminary injunction was entered against you by the court of

15 chancery, correct?

16 A    Yes.  Yes, we did.

17 Q    And Mr. Dan Rink, he is the -- he's an in-house lawyer for

18 the debtor, correct?

19 A    Was an in-house lawyer for the debtor, not -- not -- not

20 currently right now.  He was moved to VTI because there were

21 lawsuit litigations, threats against him and some of the Stream

22 TV employees.  So people went to VTI.  You know, they were

23 threatening them and threatening potential directors, so

24  -- and customers and vendors and people associated with Stream

25 TV.  We had no protection at that point, so people for their

1  own safety went to VTI.

2  Q    So Mr. Rink when he went to VTI, he actually assisted you

3  with the incorporation of VTI in Nevada, correct?

4  A    Yeah.  That is correct.

5  Q    Okay.  And the corporate headquarters for VTI is your

6  parents' house at 1105 William Pennsylvania Drive in Bensalem,

7  PA; correct?

8  A    No.

9  Q    Okay.

10  A    That isn't correct.  No, we have an office in Nevada.  The

11  company is registered in Nevada.  VTI has an office in Nevada.

12  Stream TV has an office on Chestnut Street in Philadelphia, as

13  where the main headquarters are.  Then we have offices in other

14  parts of the world.

15  Q    Okay.  Let's go to your deposition, sir.

16          MR. LARKIN:  Todd, can we pull up 42, lines 2 through

17  9 of Mr. Rajan's deposition on April 28th?

18  BY MR. LARKIN:

19  Q    Mr. Rajan, you recall this?  I asked you at your

20  deposition and we'll wait for Mr. Fragg (phonetic) to pull this

21  up.

22  A    Mr. Larkin --

23          MR. FRAGG:  I'm sorry, what were the pages you wanted

24  from me?

25          MR. LARKIN:  It's page 42 of Mr. Rajan's deposition,

1  line 2.  Line 2 through 9.

2   (Audio played in court of Page 42, Lines 2 through 9 of Mathu

3                         Rajan's deposition)

4            MR. LARKIN:  Okay, thank you.

5  BY MR. LARKIN:

6  Q    Mr. Rajan, did I ask you that question at your deposition

7  and did you give me that answer?

8  A    You did ask that question.  If you went to the earlier

9  part of the deposition, you were being very aggressive with me

10 at that point.  And what I was trying to say but not

11 articulating well at that time was we did use 1105 William

12 Pennsylvania Drive to register the company, but we do have

13 corporate offices in Nevada and for VTI in the U.S.  Stream

14 TV's at 209 Chestnut.  We have offices outside the United

15 States.

16      So, yes, we do sometimes use convenient addresses when

17 we're registering companies, but what really matters is the

18 physical addresses.  So that's what we're doing.

19 Q    Mr. Rajan, did I ask you that question and did you give me

20 that answer at your deposition?

21 A    You did.

22 Q    Yes or no?

23 A    Yes.

24 Q    Thank you.  You're also the majority stockholder of VTI,

25 correct, sir?

1  A    Yes, I am.

2  Q    Okay.  And that's been the case since VTI's formation in

3  January, correct?

4  A    Yes.

5  Q    Okay.  And you're the president of VTI, right?

6  A    Temporarily I am the president.  New folks have joined the

7  management team, and as I have told you, contrary to your

8  opening statement, the majority -- the vast majority of the

9  board is other independent people.  Other people have joined

10 the -- the management.  You know, I'm winding down here at VTI,

11 so somebody else is present designee and is on the verge of

12 being president so which I -- and I clearly told you at my

13 deposition I am not the only director of VTI even though you

14 stated that in your opening statement.

15 Q    Okay.  Mr. Rajan, I asked you at your deposition:

16 "Q    Are you the current president of VTI or not?

17 "A    Yes, I'm the current president of VTI."

18       Do you stand by that testimony?  Whether you're the

19 outgoing president or not, you're currently the president,

20 right?

21 A    I believe so, yes.

22 Q    Thank you.  And you're also a director of VTI, correct?

23 A    One of many directors at VTI.

24 Q    Okay.  You just testified a moment ago that VTI has

25 offices outside of the United States; is that right?

1   A     Correct.

2   Q     Okay.  Are you aware that when I deposed Mr. Robertson

3   shortly after your deposition he told me that VTI in fact

4   doesn't have any other offices outside the United States other

5   than the office at your parents' house in Bensalem, PA?

6   A     He may have said that.  I -- I don't know.

7   Q     Okay.

8   A     You can ask him again today, I guess.

9   Q     We will.  We will.  And, in fact, you mentioned that VTI

10  has an office in Henderson, Nevada; is that right?

11  A     Yes.

12  Q     Okay.  And that's actually a very recent change, right?

13  Since Mr. Robertson and yourself were deposed, you made sure to

14  get another address in Henderson, Nevada that wasn't in

15  Bensalem, right?

16  A     We have changes every day in the company.  It wasn't as a

17  result of your deposition.  There is an office in Nevada which

18  we are -- VTI has.  And we're using that office to do work.

19  Q     Okay.  Let's take a look at -- I want to show you a

20  document that was produced to us the other day.

21        MR. LARKIN:  Todd, could we pull up TX-289?

22  BY MR. LARKIN:

23  Q     This is an April 30th, 2021 email from Bud Robertson to

24  yourself and some other folks at VTI.  Mr. Rajan, this is an

25  email -- I'll represent to you I took your deposition on April

1  28th, and we took Mr. Robertson just for the record on April

2  29th.  So this is an email the day after you two were deposed.

3  And Mr. Robertson writes to you and Dan Rink and your other,

4  Raja Rajan, Amanda von Ahnen, Nicole Maneen, and Suby Joseph.

5      It's true, sir, that all of the people copied on this

6  email are former employees of Stream, right?

7  A    Yes.

8  Q    Okay.  And I don't see any other independent directors or

9  anybody else who's not affiliated or formerly affiliated with

10  Stream on this email, right?

11  A    No, you see it right there.

12  Q    Yeah, okay.

13  A    But, no, it says it right there --

14  Q    So the subject --

15  A    -- on number one, do you see it says right there "draft

16  board services agreement for current directors, Tracy, Cliff

17  Morton, Glenn Hasen, Tim McCarthy, Sofia.  So I don't know why

18  you keep saying we don't have directors when it says right

19  there the word "current."

20  Q    Mr. Rajan, I'm going to ask the questions, okay, and your

21  counsel will have a chance to redirect and ask you whatever

22  questions they want to ask you.  I'm going to ask the questions

23  right now.

24      The subject of the email's "VTI corporate governance

25  issues."  Do you see that?

1  A    Yes.

2  Q    And if you go down the page, it says number I or letter I,

3  little I, "vote to adopt Henderson, Nevada address, the

4  Robertson office as formal interim business address."  Do you

5  see that?

6  A    Yes.

7  Q    Okay.  So that was a change -- you just testified a moment

8  ago that was a change you made the day after Mr. Robertson's

9  deposition and two days after your deposition, right?

10 A    Correct, but it wasn't in response to your deposition.  We

11 make changes all the time.

12 Q    Okay.  Well, let's go down --

13 A    (Indiscernible).

14 Q    -- to the next paragraph, the one that's in asterisks here

15 where Mr. Robertson writes to you -- this is, again, after you

16 both were deposed.

17     It says, "I think having the new board ratify the

18 documents previously executed unilaterally by Mathu, especially

19 the VTI-Stream support agreement, is important to rebut the

20 allegations.  But Mathu isn't negotiating in the best interest

21 of VTI, which is a direction that Skadden seemed to focus on

22 during some of my deposition."

23     Do you see that?

24 A    Yeah.

25 Q    Okay.

1  A    That's correct.

2  Q    Okay.  And do you see that he writes that the allegations

3  that Mathu isn't negotiating in the best interest of VTI?  Do

4  you see that?

5  A    Yes.

6  Q    Okay.  So Mr. Robertson's concern is that you weren't

7  negotiating in the best interest of VTI, not the debtor?

8  A    No.  He didn't say he had a concern.  He was concerned

9  that you were going to exaggerate it just like you're

10 exaggerating the directors and making up stories like you

11 continuously do.

12 Q    Let's talk about Mr. Robertson.  He's currently an

13 employee of VTI, correct?

14 A    That is correct.

15 Q    Okay.  And he's serving a senior executive of VTI, right?

16 A    Yes, he is.

17 Q    And he's been serving as a senior executive of VTI since

18 VTI was formed in January, right?

19 A    Yes.

20 Q    All right.  And Mr. Robertson's receiving a salary from

21 VTI, correct?

22 A    Yes, he is.

23 Q    I think he testified about $150,000 a year, right?

24 A    That is correct.

25 Q    Okay.  And but he's also the debtor's first-day declarant,

1  right?

2  A    Yes.

3  Q    Okay.  And if I understand it, VTI is the proposed DIP

4  lender to the debtor, correct?

5  A    Yes, he is.

6  Q    And VTI is also the proposed sponsor for a, you know, a

7  plan of reorganization that you claim the debtor will be

8  putting forward at some point, right?

9  A    Yes, that is correct.

10 Q    Okay.  And so if I understand the record from the

11 depositions, with respect to the negotiations for DIP and also

12 this plan sponsor agreement, you've been negotiating on behalf

13 of the debtor, right, with respect to VTI's plan sponsorship,

14 right?

15 A    Correct.

16 Q    Okay.  And Mr. Robertson has been negotiating on behalf of

17 VTI, correct?

18 A    No.

19 Q    Okay.  Let's go to your deposition.

20         MR. LARKIN:  Todd, can we go to 110?

21   (Audio played in court of Line 110 Mathu Rajan's deposition)

22         MR. LARKIN:  Thank you.  We played the wrong clip

23 there, but we'll get to that.

24 BY MR. LARKIN:

25 Q    So, Mr. Rajan, your testimony is that Mr. Robertson has

1  not been negotiating on behalf of VTI with respect to the plan

2  sponsor agreement?

3  A    You're mischaracterizing what I said, the context of what

4  I said.  You are talking in the context of business deals

5  regarding Stream TV and VTI.

6      Stream TV and VTI have assets outside the omnibus such as

7  stitching and titling, such as modified light field, that

8  they're working on together so Stream TV can get cash flow and

9  some of the other employees that are on furlough can come back

10 and some of the other employees that are on standby so they can

11 join at Stream TV if we can get past this motion to dismiss.

12 And we were talking on a business context.

13     And later when you asked me at the deposition, which

14 you're fully aware of, I said in terms of the DIP motions and

15 the reorganization plan and paying off the secured creditors

16 and the unsecured creditors, I said the investors are heavily

17 involved because it's their money.  So in the context of the

18 reorganization plan and also now paying off the SLS and Hawk

19 and the unsecured, it is the gentlemen who you're talking to

20 later, Tim McCarthy.

21     So you took -- again, you're misrepresenting what I said

22 in the deposition.  We were talking about business deals.

23 That's day-to-day operations, so Bud Robertson is involved.

24 When it comes to money on paying off the loans and making

25 everybody whole, you know, hundred cents on the dollar, that's

1  Tim McCarthy.

2      Now is Bud aware of what's happening?  Sure.  He's aware

3  of it.  But he's not the one writing the check.

4  Q    All right.  Mr. Rajan --

5          THE COURT:  I'm sorry.  I have to -- I'm sorry, I

6  have to interrupt because I want to understand your answer.  So

7  who is representing VTI in connection with this bankruptcy case

8  and the negotiations surrounding this bankruptcy case?  Mr.

9  McCarthy?

10          THE WITNESS:  It is for sales, operations, like the

11 two technologies which was the question they were asking at my

12 deposition.  That would be predominantly Bud Robertson.  When

13 it comes to money for investment into Stream TV, it's Tim

14 McCarthy.

15          Bud Robertson isn't --

16          THE COURT:  Okay.

17          THE WITNESS:  -- (indiscernible) the reorganization

18 plan.  He didn't -- he didn't decide to go pay SLS a lump-sum

19 payment.  And I told him that in the deposition.  He knows

20 that.

21          THE COURT:  Okay.  And I'm not trying to get to the

22 bottom of what happened during your deposition at the moment.

23 I'm just trying to understand.  So when it comes to negotiating

24 with the debtor and the debtor's creditors in this bankruptcy

25 case, Mr. McCarthy is the one that's negotiating with those

1  entities on behalf of VTI?

2          THE WITNESS:  No.  No, no; I'm sorry.  I'm sorry, no.

3  Let me be clear.  Okay, so there's -- there's two parts here.

4  There's money that VTI is going to give to Stream TV that can

5  be used to disburse to, we'll say the two big buckets, secured

6  and unsecured, okay?

7          Then in terms of going to the individual vendors and

8  working out their deals, Stream TV's doing that and I'm doing

9  that.  We are bringing in a chief restructuring officer

10 hopefully this week, early part of this week, and that chief

11 restructuring officer will take over the duties of the vendors.

12         But Mr. McCarthy is not involved with the individual

13 vendors.  He just approved the amount of money that will be

14 going from VTI to Stream TV to settle the debts and to

15 reorganize Stream TV.  But the disbursement of the funds from

16 Stream TV to those vendors and to the secured lenders

17 temporarily I'm handling it, but a chief restructuring

18 officer's going to take that over.

19         THE COURT:  Okay.  Thank you for --

20         THE WITNESS:  Does that answer your question?

21         THE COURT:  That does, and thank you very much for

22 clarifying.  And I apologize for interrupting, Mr. Larkin.

23         THE WITNESS:  You can interrupt and ask any question

24 you want.  I'm sorry if I wasn't clear.

25         MR. LARKIN:  Your Honor, I'll cover this in Mr.

1  Robertson's deposition, as well -- or, I'm sorry, Mr.

2  Robertson's cross-examination.  I'm happy to cover that point

3  with him as to what his view is about who he's negotiating for

4  and what agreements he's negotiating.

5  BY MR. LARKIN:

6  Q    Mr. Rajan, you agree that you're a fiduciary of VTI and

7  the debtor, correct?

8  A    I am a fiduciary of both.  Yes, I am.

9  Q    Fiduciary of both, right?  And you're represented by both

10 VTI's counsel at Armstrong Teasdale and debtor's counsel at

11 Dilworth Paxson, correct?

12 A    Stream TV is --

13          UNIDENTIFIED SPEAKER:  Objection.

14          THE WITNESS:  -- is represented by Dilworth.  VTI is

15 represented by Armstrong.  They're not representing me as an

16 individual, no.  Right now I am here for Stream TV.

17 BY MR. LARKIN:

18 Q    So you're wearing your Stream TV hat on -- your Stream TV

19 hat on today?

20 A    Yes.

21 Q    Okay.  All right.  We covered this a minute ago, but you

22 told me at your deposition that when Stream TV and VTI are

23 negotiating an agreement, you put your Stream TV hat on and

24 then Mr. Robertson or other members of the executive team at

25 VTI, they wear their VTI hats for those negotiations, right?

1  A    Yeah.  For business negotiations, yes.

2  Q    Okay.  And principally, Mr. Robertson would be your

3  counterparty to those negotiations, right?

4  A    Right.  So as an example, for like the stitching and

5  titling and the modified light field, Steam TV is going to be

6  getting a royalty.  And Bud Robertson was representing VTI in

7  those negotiations; I was representing Stream TV.  And those

8  are assets outside the omnibus.

9  Q    Okay.  We'll get to that in a minute.  And if I understand

10 your testimony correctly, sir, when you have -- when you're

11 negotiating for Stream TV, the way that you determine that the

12 decisions that you're making on behalf of Stream TV are fair to

13 the stakeholders of Stream TV and not VTI is you just take your

14 VTI hat off, right, and you put your Stream TV hat on, right?

15 A    Yeah, I'm trying to get a good deal for Stream TV.

16 Q    Okay.  But you're also a fiduciary for VTI in that same

17 negotiation, right?

18 A    No, I'm not.  I take my hat off and I'm, in essence,

19 stepping out of it.  You can call it abstaining or whatever you

20 want to call it.  I mean --

21 Q    But the way that you abstain is you just take that hat

22 off, proverbial hat, and then you have Mr. Robertson who works

23 for you at VTI handle the negotiations for VTI, right?

24 A    Yes.  And we -- we do try to include other people if

25 needed.  And, yes, that is how we're handling it at this time.

1  Q    But, principally, Mr. Robertson, right?

2  A    Yes.  For (indiscernible) negotiations.

3  Q    Okay.  And sometimes Mr. Rink who you said is now employed

4  by VTI is involved in those negotiations too, right?

5  A    Correct.

6  Q    Okay.  And so he's an in-house attorney for VTI, but he's

7  on loan to Stream TV when Stream TV needs in-house legal

8  services too, right?

9  A    Correct.

10 Q    All right.  And you told me that in your deposition that

11 when Stream and VTI are negotiating across the table from each

12 other and Mr. Rink is your counterparty to those negotiations,

13 you consider those discussions to be privileged, right?

14 A    Yes.

15 Q    Okay.  So you're having an across-the-table negotiation

16 with VTI and you consider those communications with your

17 counterparty to be privileged.  Right?  Okay.

18 A    Uh-huh.

19 Q    But you still think it's fair to both Stream and VTI, even

20 though you're claiming a common privilege over those

21 discussions, right?

22 A    Correct.

23 Q    Okay.  And it's also true that there was no -- there was

24 certainly no effort with respect to those negotiations to have

25 an independent director handle the negotiations for VTI, right?

1  You had either Mr. Rink or Mr. Robertson handle the

2  negotiations, correct?

3  A    For the day-to-day things that is true.  We have now

4  appointed a board, so now we're having discussions with the

5  board of VTI on a number of these items.

6  Q    Okay.

7  A    So we are trying to move quickly.  There isn't a lot of

8  time.  We started in January and February, and we're now adding

9  additional people and we're including those people in those

10  conversations and to broaden it out and to cause separation.

11  That's why we're bringing chief restructuring officer and we're

12  doing other things at VTI, bring somebody else in to be

13  president, and we're causing the separation.  We're doing all

14  that.

15  Q    But you are the current president, right?  There's no new

16  president yet, right?

17  A    Not yet.

18  Q    Okay.  And there's no chief restructuring officer yet,

19  right?

20  A    No, not --

21  Q    As you sit here today, right?

22  A    Not yet.

23  Q    Mr. Rajan, you've claimed -- the debtor has claimed, and

24  VTI as well, in a number of filings to the Court that

25  bankruptcy will enable the debtor to successfully and quickly

1  reorganize for the benefit of all stakeholders, correct?

2  A    That is correct.  Our purpose here is to reorganize.

3  That's why we're here.  Want to reorganize the debts and the

4  operations and get it moving.

5  Q    And that group of stakeholders would include the debtor's

6  unsecured creditors, right?

7  A    The unsecured creditors and secured creditors and -- both

8  groups.

9  Q    Okay.  And you're aware that the unsecured creditors

10 committee supports dismissal of the bankruptcy, right?

11 A    I'm fully aware.

12 Q    Okay.  As does the U.S. Trustee, correct?

13 A    Yes, I'm aware of it.

14 Q    Okay.  And it's also true that prior to the filing of the

15 bankruptcy you had communications with a number of investors in

16 both Stream and VTI about the Delaware Chancery Court

17 litigation and the steps that you may take post-injunction with

18 respect to the company, right?

19 A    That is correct.

20 Q    Okay.  But you didn't actually tell some of the investors

21 who you were soliciting for money in your new venture that

22 their money would be used to fund a bankruptcy, right?

23 A    That is incorrect.  People whose money was used for the

24 bankruptcy were told.  People whose money was not used for the

25 bankruptcy we did not.  And there was one investor who we had

1  suspicions on he was helping the other side, and now you gave

2  me evidence that he was, and his money was not used for the

3  bankruptcy.

4       And as I told you in my deposition, in the abundance of

5  caution Dilworth listed him on the list, but his money was not

6  used for the bankruptcy, and he was, in fact, sharing

7  information with the other side.  Whether he was a plant or not

8  I don't know, but that was unfortunate.  But the people whose

9  money was used for the bankruptcy were told.  Many of them gave

10 their money directly to counsel in some cases, and they were

11 told about it.

12 Q    Well, let's take a look at that, a communication you had

13 with one of your investors the day after the bankruptcy was

14 filed.  Could we go to TX 181?  I think this is the email

15 you're referring to, Mr. Rajan, but I just want to make clear.

16      You said that Mr. Tavill (phonetic) is one of the

17 investors you were concerned about; is that right?  This is an

18 email from Mark Tavill to --

19 A    Money was not used for the bankruptcy.  In an abundance of

20 caution Dilworth listed him.  His money was not used for the

21 bankruptcy, but clearly he was giving information to the other

22 side, which, you know, is disappointing, to put it mildly, and

23 he said a number of things on the phone that was derogatory

24 towards the other side, so I think he did that to win my

25 confidence so he could go give information to the other side.

Q    Okay.  Well, let's take a look at what Mr. Tavill --

Mr. Tavill is one of your investors in Stream, correct?

A    Yes, he is.

Q    And you also solicited him for money for your new venture

VTI in January, correct?

A    Yes, I believe so.

Q    All right.  And Mr. Tavill after receiving notice that the

Chapter 11 case had been filed he writes to you:

     Mathu, WTF.  It's not even a week since you extracted more

money from me after assuring me all that was good with a new

30-million-dollar investor already on board, a win in Superior

Court, et cetera.  Are all my shares, warrants, grants, loans,

et cetera, essentially worthless now?  I appreciate that my

investment numbers may be small to you, but they're significant

and meaningful to me.

     Do you see that?

A    Yes.

Q    Okay.  You never responded to Mr. Tavill's email in

writing, correct?

A    I don't remember responding to him in writing.  I called

him.

Q    Uh-huh.  Okay.  And, in fact, you told Mr. Tavill in

January before the filing of the bankruptcy that given Vice

Chancellor Laster's preliminary injunction order against you

and Stream, that you were looking to move the case out of the

1  Chancery Court into Federal Court, right?

2  A    Correct.

3  Q    Okay.  And that's exactly what you did when you filed for

4  bankruptcy, right?

5  A    Yeah, we filed for bankruptcy.

6  Q    Correct.  And you told Mr. Tavill January 22nd over the

7  phone that you were looking to move the case out of

8  bankruptcy -- or, I'm sorry, out of the Chancery Court to get

9  out from under the preliminary injunction, and that's what you

10 did when you filed for bankruptcy, right?

11 A    I didn't say to get out from under the preliminary

12 injunction.  I did not say that.  I said we are maxed out for

13 the company, because everybody wanted to know what's going to

14 happen with Stream TV, because he claimed that back then he was

15 very worried about the other side.  He felt like they were just

16 going to do a quick flip job and basically the opportunity was

17 going to be lost.  He wanted to know what Stream TV was going

18 to do.  It was --

19 Q    Right.

20 A    -- not to get out of the PI.  It is to reorganize the

21 company.  So they wanted to know what's next for Stream TV.

22 Q    You told me -- you just said that Mr. Tavill was very

23 derogatory about the other side, and I think you're referring

24 to Mr. Stastney.  So let's take a look at that email.

25      It's TX 44, Todd, if you could pull that up.

1    So, Mr. Rajan, this is the email -- we looked at this in

2  your deposition, but this is the email from Mr. Tavill to

3  Mr. Stastney on January 22nd.  And you see in the email

4  Mr. Tavill actually writes to Mr. Stastney in the first

5  paragraph in response to a conversation he had just had with

6  you the day before, but with respect to my clients he writes:

7    It's been a hard, busy couple weeks for me, Shad.  If not

8  fully subscribed, I'd still like to make a very small add-on

9  investment into the new company as a gesture of confidence in

10 you and goodwill.  If unavailable, that's okay, too.

11   So that's the investor in VTI and Stream who you're -- you

12 said was saying derogatory things about my client, right?

13 He's offering Mr. Stastney to invest further in SeeCubic,

14 right?

15 A    Right.  And if you look closely at the date, it says

16 January 22.  The other earlier email you pulled up is in mid

17 February, so he invests in VTI after he's invested in with

18 Mr. Stastney, so clearly he's somebody who likes to play both

19 sides.

20 Q    Okay.  Mr. Rajan, talked about it in the openings and I

21 certainly have it in my opening slides, but I just want to get

22 something clear, you know, right off the bat here in your

23 cross-examination.  The debtor, Stream TV, is not contesting

24 the validity of the omnibus agreement, correct?

25 A    In this court we are not contesting the validity of the

1 omnibus.  We're not here to contest the validity of the

2 omnibus.  We're here to reorganize.  I'm not going to get into

3 my views on the omnibus.

4      We had already stated in my affidavit that the information

5 regarding the letter agreement was hidden from the majority

6 shareholder by Mr. Stastney and Gollop and Gola, which would

7 have converted that transaction to an acquisition, not a

8 friendly foreclosure.  Wasn't brought up in the Chancery Court,

9 but that's a problem for the Chancery Court.

10      So we're here today to talk about reorganization, bring

11 money in, making all the debtholders whole.  We have assets

12 outside of the omnibus, and we'd like to go forward.  We're not

13 here to talk about the omnibus.

14 Q    Okay, so all of the facts that Mr. Sten talked about in

15 his opening about my clients, about all of the things that he

16 claims occurred prior to the execution of the omnibus agreement

17 by independent directors, they don't mean anything for purposes

18 of today, correct, based on the answer you just gave.  Because

19 that's not what we're here to talk about.

20 A    Mr. Sten is responding to your statements because you keep

21 bringing up the omnibus, and we're in federal court, we're in

22 bankruptcy.  Like Larry McMichael said, local courts enforce

23 documents all the time, whether it's -- and people go to

24 federal court through bankruptcy, there's hundreds of companies

25 that have done it, and franchise companies at Texaco.  We're

1  here to talk about reorganization and basically paying off the

2  debtors and basically reorganizing the company.  That's why

3  we're here.

4  Q    You would agree with me that as of December 8th, 2020 both

5  you in your individual capacity and Stream as the debtor, of

6  which you're the CEO, were enjoined from disputing the validity

7  of the omnibus agreement, including asserting control over the

8  assets that had been transferred to SeeCubic and the

9  subsidiaries of Stream that had been transferred to SeeCubic,

10 correct?

11 A    Yes.

12 Q    Okay.  And you testified in your deposition that you

13 believed that Stream's assets which were transferred to

14 SeeCubic pursuant to the omnibus agreement are worth between

15 200 and $600 million, correct?

16 A    The -- okay.  Again, the Ultra-D assets are worth between

17 200 to 600 million.  Stream TV has assets that have nothing to

18 do with the omnibus.  Then there is Ultra-D assets still

19 sitting in Stream TV.  So you've got to be very careful when

20 you say the 200 to 600 million.  We are only referring to

21 Ultra-D.  There's things that have nothing to do with Ultra-D.

22      You have to be very careful when you say all assets,

23 because everybody has acknowledged that even the Ultra-D

24 assets, a big chunk of them are still sitting in Stream TV, and

25 the ones that are in dispute weren't handled properly.  So

1  please don't say all assets are transferred.  They may have had

2  the right to transfer them, but they didn't follow the omnibus

3  properly and they didn't follow the local jurisdictions

4  properly.

5  Q    Okay.

6  A    You have to be more precise.

7  Q    Fair enough.  I'll take the 200 to 600 on the Ultra-D

8  technology that was -- that were transferred to SeeCubic,

9  Mr. Rajan.  So just taking that midpoint, it's your position

10 that the Ultra-D technology assets that were transferred to

11 SeeCubic are worth two -- between 200 and $600 million, right?

12 A    The Ultra-D assets were valued at 200 to 600.  They -- I

13 do not believe they were transferred to SeeCubic as of this

14 moment.

15 Q    Okay.  And shortly after you formed VTI you started

16 contacting a firm called Knight Davis wearing your VTI hat to

17 solicit investors in your new entity VTI, correct?

18 A    Correct.

19 Q    Okay.  And what you were pitching and what you and Knight

20 Davis were pitching with respect to those assets was that VTI

21 would be in a position to reacquire those assets for a fraction

22 of their value, correct?

23 A    Incorrect.

24 Q    Okay.

25 A    VTI was approaching investors.  A number of investors had

1  asked about including Stream TV, because I had to tell them

2  about what happened at Stream TV, that, you know, it was a

3  company I'd started.  Most investors who would like to invest

4  in a company who is including a Chapter 11 assets or company,

5  whatever you want to call it, are used to getting the equity at

6  a substantially lower discount.

7        So, yes, we received inquiries from investors at a

8  substantially lower discount, but as I told you in my

9  deposition, the valuation that VTI will be coming in now for

10 Stream TV is 293 million, and we are making all the creditors

11 whole.  The unsecured, hundred cents on the dollar, and the

12 secured, hundred cents on the dollar, and we're paying a pretty

13 good price.  You know, VTI would be 293 million pre-money.

14       So did we get phone calls from people and did we talk to

15 people who wanted a lower valuation, were bankers pushing me

16 for a lower valuation, were other people pushing me, yes, they

17 were.  But the moment Stream TV filed that bankruptcy I have a

18 responsibility to get top dollar for Stream TV, and that is

19 what we're doing.

20 Q    Mr. Rajan, let's take a look at an email between you and

21 Knight Davis on January 2nd.  This is -- you're wearing a

22 glasses-free hat here, which was a -- another entity that you

23 had formed.  This is TX 268.  And, Mr. Rajan, this is an email

24 from you to Glen Davis at Knight Davis, copying the same group,

25 Suby Joseph, Nicole Maneen, and it has a -- it's for a proposed

1 private placement investing in debt.  And you were subject to

2 the preliminary injunction order at this time, correct, sir?

3 A    Yes.

4 Q    Okay.  And you had been working with Knight Davis on a

5 backstory for the private placement investment in debt for your

6 new venture VTI, correct?

7 A    Correct.

8 Q    Okay.  So let's take a look at your backstory, and we

9 looked at this in your deposition.  Can you go to the last page

10 of the backstory?  And I want to ask you about the first

11 characterization of Vice Chancellor Laster's decision in

12 that -- the first full paragraph there that you and Knight

13 Davis had been working on.  Vice Chancellor Laster, he

14 considered the motion for preliminary injunction.  He had seven

15 depositions, 12 declarations, hundreds of exhibits in front of

16 him.  I understand you're not contesting any of the factual

17 findings.

18      And you -- the backstory that you were going to sell to

19 the investors in VTI is that in a shocked decision the judge

20 gave a hasty preliminary ruling in favor of the other party

21 based on the validity of the omnibus agreement, giving them a

22 right to take over the assets of Stream TV, correct?  Did I

23 read that correctly, sir?

24 A    You read it correctly, and as I stated in my deposition,

25 that basically I had asked the banker repeatedly not to

1  characterize Vice Chancellor Laster's decision -- we're not

2  here to debate the omnibus, but as I had told you in my

3  deposition, it was a preliminary decision.  The people on the

4  other side were not even deposed.  There is mass amounts of

5  information such as that letter agreement which was hid from

6  the majority shareholder, which would have required a

7  shareholder vote to change the charter, which would have made

8  it not a friendly foreclosure, which Vice Chancellor Laster was

9  never brought to his attention.

10      We had a long ways to go in the Chancery Court, but it

11  doesn't matter.  We're not here to talk about the omnibus.

12  Q    Okay.

13  A    And I told you in the deposition I had asked the banker

14  repeatedly not to characterize it this way, because we don't

15  want to be disrespectful to Vice Chancellor Laster and he

16  shouldn't be characterizing it this way.

17  Q    All right.  Mr. Rajan, just to keep this moving forward,

18  you would agree with me that we looked at another draft of this

19  backstory a few weeks later that was sent to you, but had the

20  same language in it about Vice Chancellor Laster --

21  A    Yeah, and I told --

22  Q    -- correct?

23  A    Yes, and I told him not to characterize that way.  I even

24  told him to stop handing it out --

25  Q    Okay.

1  A    -- because they didn't like the decision, the bankers and

2  a number of people didn't agree with the decision and they

3  thought that it shouldn't -- you know, it should have been

4  handled differently, and that is -- they're entitled to their

5  opinion --

6  Q    Okay.

7  A    -- but I told them to tone it down and stop talking that

8  way.

9  Q    I haven't seen any emails where you tell anybody to tone

10 it down or take a different view on it.

11 A    I told them that over the phone, and, yes, I did tell them

12 people that.

13 Q    All right.  So you go on, the -- your backstory goes on to

14 say in the last paragraph:

15      While VTI is able to press ahead with or without a court

16 decision in its favor, once Mathu has the assets of Stream TV

17 returned to the company, because they had been transferred, he

18 will then be able to cherry-pick from those assets, which will

19 assist in certain areas of development and production, but this

20 is not critical.

21      Did I read that correctly, sir?

22 A    Yes, you did read that correctly, because we do have

23 bankers and investors who hear about a Chapter 11 opportunity

24 who would like to get it at a lower price.  And so it does

25 happen all the time, but thankfully we now, as I outlined in my

1  affidavit, have a plan where we're giving a very good valuation
2  and we're making all the creditors whole.
3  Q    Okay.  Let's take a look at a document that we looked at
4  in my opening.  This is about five weeks later on February --
5  Mr. McCarthy.  In fact, so the plan was, based on the email
6  that we just looked at, you formed VTI and you were looking for
7  ways to reacquire the assets that had been transferred from
8  Stream TV to SeeCubic, correct?  Correct, sir, at the time?
9  A    We were not looking to reacquire the assets.  We were
10  looking to basically have Stream TV merged with VTI and
11  basically have Stream TV as an entity merged with VTI.  It was
12  not to reacquire assets.  First of all, there's many assets in
13  Stream TV and there's employees and personnel and other things.
14  We wanted to consolidate all of it.  Stream TV is not the only
15  thing that's a part of VTI.  There's other things in it, too.
16  Q    Will you go to TX 179, please?  Mr. Rajan, this is an
17  email.  We looked at this in your deposition.  It's from you to
18  Mr. McCarthy on February 8th, correct?
19  A    Correct.
20  Q    And you say:  Please find enclosed a PowerPoint on Stream
21  TV.  So this is February 8th, a couple of weeks before the
22  debtor filed for bankruptcy.  You were subject to a preliminary
23  injunction.  You're still subject to a preliminary injunction.
24  But you would agree with me that you were still subject to the
25  preliminary injunction order that enjoined you from asserting

1  control over the assets of Stream TV, including the

2  subsidiaries, correct?

3  A      Hang on a second here.  We are not asserting control over

4  the assets.  We do have a fiduciary responsibility as the -- as

5  an officer of Stream TV to declare bankruptcy to protect the

6  estate, and raising funds is a part of that.

7  Q      Mr. Rajan, I would just ask you to --

8  A      So you're taking a --

9  Q      -- (indiscernible).

10  A      -- completely different interpretation of the PI.

11  Q      Okay.  Well, we can look at the PI or whatever.  I'm not

12  going to waste time reading it.  I think the language of it is

13  pretty clear about what you were permitted to do or not do, but

14  let's take a look at this email that you sent to Mr. McCarthy

15  on February 8.  So you have a presentation on opportunity --

16  let's go to the next page -- where you say VTI -- on

17  February 8th:

18      VTI, of which you were the controlling stockholder and the

19  president at the time and the sole director, has the exclusive

20  right to acquire Stream TV Networks, another glasses-free 3D

21  company.  Stream has been valued between 200 and $600 million.

22      That was the Ultra-D technology that you were talking

23  about, correct?

24  A      Yes.

25  Q      Okay.  And that had been transferred to SeeCubic pursuant

1  to the omnibus agreement at the time, correct?  And you --

2  A    Incorrect.

3  Q    -- were telling Mr. McCarthy, right, that Stream has been

4  valued between US 200 million and 600 million based on those

5  assets that had been transferred, correct?

6  A    The assets have not been transferred at that time, nor at

7  this time.  They had the right to take the assets.  They have

8  not done it.  Transfers were not done properly in the

9  jurisdiction.  They didn't even follow the omnibus.  At that

10 point it was very clear, and now we know it wasn't even a

11 friendly foreclosure, which was not consistent with Vice

12 Chancellor Laster's position.  And, again, investors do want

13 when they hear Chapter 11 a substantially lower valuation.

14 Q    Okay.

15 A    Thankfully, Mr. McCarthy has agreed to a higher valuation

16 over time since we've done the filing because now there's been

17 a filing that has given Stream TV breathing space and we have

18 been able to explain more, where he is, thankfully, willing to

19 pay a higher valuation and pay all the creditors over time.  It

20 does --

21 Q    Mr. Rajan, can I interrupt you?

22 A    -- take time to explain things to investors and to educate

23 them and for them to understand the full value, so we're very

24 fortunate to have him where he's willing to pay all the

25 creditors off, a hundred cents on the dollar, and pay a 293

1 million pre-money valuation.  That's a lot higher than 25

2 million.

3 Q   Mr. Rajan, I don't know what question you're answering.

4 Your counsel will have a chance --

5              THE COURT:  Can I just inter --

6              MR. LARKIN:  -- to inquire.

7              THE COURT:  I just want to interject, all right,

8 because this has been going on long enough.

9              Mr. Rajan, when counsel asks you a question you have

10 to answer his question.

11              THE WITNESS:  Okay.

12              THE COURT:  Okay?  You may elaborate if you so wish

13 or your counsel can follow up on redirect, but we have very

14 limited time.  So I need you to answer the question that

15 Mr. Larkin poses.

16              THE WITNESS:  Okay.

17              THE COURT:  Your counsel is able to rehabilitate you

18 or ask follow-up questions during his time or her time on

19 redirect, okay?  But this is Mr. Larkin's time right now, so

20 you need to answer his questions.

21              THE WITNESS:  Okay, I --

22              THE COURT:  Okay.  And, also, because we're virtual

23 it's very difficult to interrupt or get more -- interrupt when

24 everyone is speaking.  So just listen very carefully to the

25 question that Mr. Larkin asks you and answer the question.

1              THE WITNESS:  Okay.

2              MR. LARKIN:  Thank you, Your Honor.

3              THE WITNESS:  Thank you.

4   BY MR. LARKIN:

5   Q    So, Mr. Rajan, you go on to write to Mr. McCarthy:  We can

6   acquire the company for a fraction of the value, approximately

7   US $25 million.  And that was your plan, correct, on

8   February 8, right?

9   A    That is the discussion we're having at that time.

10  Q    Okay.  Let's take a look at your deposition.  Let's take a

11  look at your deposition at 267, 18 to 22.  And that was your

12  plan, right?  That VTI -- you're now wearing your VTI hat --

13  that VTI would acquire Stream for a fraction of its value,

14  approximately US 25 million, correct?

15  A    Yes.

16  Q    Mr. Rajan, did you give me that testimony in your

17  deposition a couple weeks ago?

18  A    Yes.

19  Q    Okay.  And let's just take a look quickly at the debt that

20  you attached to Mr. McCarthy and the assets that you were

21  claiming at the time Stream TV owned.

22         Todd, could we go to VTI 1030 at slide 4 of the dec?

23  Slide 4 of the document, of Exhibit 179.  I think it's page --

24  there we go.  Next slide.  Next slide.  I think it's slide 7.

25         Sorry, Your Honor.  There we go.  Go back to that basic

1  company information.

2  BY MR. LARKIN:

3  Q    So, Mr. Rajan, on February 8 -- last slide, please.  Basic

4  company information.  Yeah.  So the investor pitch that you

5  were making to Mr. McCarthy on February 8, you're telling him

6  Stream TV Networks, right, utilizes an intel inside model, and

7  it's the world's leading glasses-free 3D system, correct?

8  A    Correct.

9  Q    Deriving its revenues from both sale of 3D kits for

10 inclusion in their devices and revenue from Ultra-D-enabled

11 content.  Stream TV's development efforts are based in the

12 Netherlands with a core group that began developing glasses-

13 free 3D technology for Phillips.  Ultra-D is fully patent

14 protected with all IB owned -- all IP owned by Stream TV

15 Networks.

16      Do you see that, sir?

17 A    Correct.

18 Q    Okay.  You understand that it's my client's position that

19 everything that's described in that box was transferred to

20 SeeCubic pursuant to the omnibus agreement?

21 A    Yes, and your client's incorrect.

22 Q    Okay.  But you knew on February 8 that you were subject to

23 a preliminary injunction order, right, that enjoined you from

24 asserting control over the assets and the subsidiaries of

25 Stream TV, right?

1  A    I'm not --

2  Q    You're telling Mr. McCarthy --

3  A    -- asserting control.

4  Q    Let me finish.  You're telling Mr. McCarthy that he's

5  got -- he has the right, the exclusive right if he invests in

6  VTI to acquire those assets, correct?

7  A    I'm not asserting control.  Asserting control would mean I

8  went in to the subsidiary and started making changes.  That is

9  assertion.  What I'm stating here is basically explaining to

10 him, which is my current position, is they didn't follow the

11 omnibus.  They didn't follow the rules for the local markets in

12 terms of transferring assets.

13      In fact, The Honor (phonetic) has written case study.  If

14 you look at it, if you don't do your UCC things properly in

15 terms of transferring your lender, you're out of luck.  They

16 didn't follow it.  And that's not for the purposes of today.

17 We're just trying to go through the bankruptcy, but when we get

18 to the turnover actions and the fraudulent conveyance we can

19 study it then.  But they didn't do procedures properly.

20 Q    Mr. Rajan, you didn't tell Mr. McCarthy any of that in the

21 presentation that you sent.

22 A    Yes, I did.  I did on the phone.

23 Q    Okay.

24 A    You weren't on the phone.

25 Q    You also -- according to Mr. McCarthy's testimony on

1  Friday, you didn't tell Mr. McCarthy that you and Stream were

2  enjoined from asserting ownership over the assets that were

3  transferred to SeeCubic, right?

4  A    I did tell him.  That was early in the bankruptcy.

5  Whether he remembered or not, whether he cares or not, that's a

6  whole another issue.

7  Q    Okay.  And you didn't tell Mr. McCarthy about the

8  existence of the omnibus agreement, correct?

9  A    No, I told him.

10 Q    Okay.  Well, we'll talk to Mr. McCarthy and --

11 A    You can talk to him.

12 Q    -- see what he has to say about it.  Mr. Rajan, let's turn

13 to a different topic.  My understanding from your first day

14 declaration is that if no substantial investments were made in

15 support of the debtor within 30 days after the petition being

16 filed the debtor would pursue a 363 sale, correct?

17 A    You mean when we filed -- when we did the filing in the

18 beginning for the bankruptcy?

19 Q    That's right.

20 A    Yeah, yeah, we did write that.  That is correct.

21 Q    Okay.  And you never intended to actually pursue a 363

22 sale, correct?

23 A    No.  We were looking at a 363 sale.  The problem with 363

24 sale is Mr. McCarthy is a person of considerable, you know,

25 means and contacts and investment.  If you do a 363 sale, as I

1  understand the mechanism some of the secured lenders could end

2  up getting paid, but then a number of other people may not get

3  paid, whereas if you do reorganization, which he has agreed to,

4  he -- you know, he could have pressed Stream TV, forced us into

5  363, but it's better for all the lenders, you know, secured,

6  unsecured, that they can get paid through reorganization and it

7  would be better, so -- for those people.

8       So putting on my Stream TV hat, we are going down

9  reorganization.  So the plan we are proposing is reorganization

10 to reorganize the company and pay off all the creditors and

11 those things.

12 Q    Okay.  So -- and with respect to this plan of

13 reorganization Dilworth is negotiating on behalf of the debtor

14 and Armstrong Teasdale is negotiating on behalf of VTI,

15 correct?

16 A    Yeah, they're going back and forth on a plan.

17 Q    Right.  And you control -- you still control those

18 entities, correct?

19 A    I -- but I basically abstain on VTI side.  Other people

20 are doing the VTI side.  I'm on the Stream TV side.  That's why

21 I was able to get the valuation up higher and I was able to get

22 Mr. McCarthy to agree to paying a hundred cents on the dollar.

23 Q    Okay.  There's no independent --

24 A    Less cost --

25 Q    -- committee --

1  A    -- and less time to do reorganization.

2  Q    Mr. Rajan, there's no independent committee of directors

3  of VTI who's negotiating with you, right?

4  A    The independent director is the investor himself, but

5  other people at VTI, the directors and the employees, know

6  about it, but the investor's doing his own negotiation.  You

7  know, he's not -- you know, he's leading his own negotiation.

8  Q    Okay.

9  A    We're not negotiating for him.

10 Q    Let's talk about the debtor's current assets, employees,

11 or revenues or the lack thereof.  We talked about this earlier,

12 but the debtor currently has no employees, right?

13 A    The debtor has people who are on furlough who could be

14 brought back, and it has people who are ready to join, ready,

15 willing and able to join Stream TV.  We were hoping for our DIP

16 motion when we first filed that didn't get approved yet, if

17 they can, then there is a number of engineers and other

18 personnel that will be joining Stream TV if we can get our DIP

19 motion passed, and there'll be people even joining the Stream

20 TV board again if we can get, you know, protection in the

21 bankruptcy court.

22 Q    Mr. Rajan, yes or no.  Does the debtor currently have any

23 employees on its payroll?

24 A    Right now, currently, Stream TV does not have

25 employees other --

1  Q    Thank you.

2  A    -- than me.

3  Q    Thank you.  And the debtor currently has -- is generating

4  no revenue, correct?

5  A    Stream TV does not have revenue.  It does have a deal for

6  stitching and tiling in the modified light field.

7  Q    Okay.  Well, we'll talk to Mr. McCarthy about that.  I'm

8  sorry, Mr. Robertson about that, that deal that you say you

9  have.  The debtor currently has no current ongoing operations,

10 correct, according to your first day declaration?

11 A    Not at this time, no.

12 Q    Okay.  And the current -- the debtor currently has no

13 cash, correct?

14 A    I believe we have some cash.  We were waiting for the DIP

15 motion.

16 Q    Okay.  Putting aside this DIP motion, the debtor currently

17 has no cash, correct?

18 A    Correct.

19 Q    Okay.  Isn't it true, sir, the -- your first day

20 declaration and Mr. Robertson's first day declaration you talk

21 about three platforms.  You talk about Ultra-D technology, two-

22 view products, which includes stitching and tiling, and then

23 multi-view products, right?  Those are the three platforms,

24 correct?

25 A    No.  It's modified light field, not multi-view.

1  Q    Okay.  Mr. Robertson calls it multi-view in his

2  declaration, but modified light.  Isn't it true that the debtor

3  currently has generated zero revenue for any existing contracts

4  for its two-view products or multi-view products?

5  A    For the new ones, no, it has not generated revenues for

6  that yet.  It's -- we were waiting for the DIP motion so the

7  engineers can rejoin, though, basically we can't bring the

8  revenue in because we assumed we were going to have the DIP

9  motion.

10 Q    Okay.  And with respect to the Ultra-D technology, Stream

11 actually acknowledged to a number of third parties in December

12 that the Ultra-D assets were transferred to SeeCubic, correct?

13 A    Stream did not officially make that declaration.

14 Q    All right.  Let's go to --

15 A    We had assumed that the foreclosure process would be done

16 properly, which it wasn't.

17 Q    Mr. Rajan, I don't know what question you're answering

18 right now, but we'll take a look at a document here.  TX 261,

19 please.  Mr. Rajan, we looked at this -- this is an email from

20 your brother, Raja, who at the time was the general counsel of

21 Stream TV, correct?

22 A    Correct.

23 Q    And your brother on behalf of Stream TV, about a week

24 after the preliminary injunction had been entered he writes to

25 one of your third-party vendors:

1      Dear David and Mr. Shen (phonetic).  We are writing to you

2  through our temporary gmail address as the Stream TV Network's

3  email system has been shut down.  The assets of Stream TV and

4  its subsidiaries have all been transferred to a Delaware USA

5  corporation named SeeCubic.

6      Skip to the next paragraph:  Assets not only include

7  tangible property like equipment, but may also include things

8  like papers, plans strategies, and other documentation.  Do you

9  see that?

10  A    Yes, I do.

11  Q    Okay.  And you don't have any reason to believe, as you

12  told me in your deposition, that your brother was being

13  dishonest or misleading third parties, correct?

14  A    I do not believe my brother was trying to be dishonest.

15  What I said was I believe it was an aspirational goal.  He

16  should have said should be transferred, but he, along with I,

17  we were assuming that the foreclosure process would be run

18  properly, which it wasn't.  And that is why when we went

19  forward we were astonished in January how poorly the process of

20  the foreclosure was handled, both through the omnibus and in

21  the local jurisdictions.  That's why even Mr. Stastney

22  testified there are Ultra-D assets still sitting in Stream TV.

23  Q    Mr. Rajan, your brother never retracted this email.  He

24  never sent a follow-up email, right?  Saying that, in fact --

25  A    He wasn't involved after this.

1  Q    Let me finish -- saying that the assets of Stream hadn't,

2  in fact, been transferred to SeeCubic, correct?

3  A    He wasn't -- he did not send an email.  He wasn't involved

4  at that point post this email.  You can ask him if you like and

5  talk to him, and he is a lawyer, so he can probably give you

6  his opinion.  The last time I spoke to him he said he is

7  astonished that both through the omnibus and even in the local

8  jurisdictions they haven't followed the procedures at all.

9         MR. LARKIN:  Mr. Rajan, I don't have any further

10  questions.  Thank you.

11         THE COURT:  Okay.  Well, I have a couple questions of

12  clarification, and then I will allow any recross or redirect.

13  Well, actually, I'll allow redirect, and then if Mr. Larkin has

14  any recross on the scope of my questions or the scope of the

15  further redirect to this, he may do so.

16         So, Mr. Rajan, I'm just -- I'm -- quite frankly, I'm

17  a little confused, and it's not meant to imply something

18  negative on behalf of any of the parties here, but I want some

19  clarity from the debtor's perspective on what the scope of the

20  debtor's assets were before the omnibus agreement and what the

21  scope of the assets were that are subject to the omnibus

22  agreement, and what the debtor currently thinks and claim that

23  there's assets that are outside the scope of the omnibus

24  agreement.

25         So let me just flesh that out so I fully understand

1  what the debtor's position is here.  What assets did Stream own

2  prior to the omnibus agreement?

3           THE WITNESS:  Prior to the omnibus agreement Stream

4  predominantly owned and did own at that time what they call the

5  Ultra-D assets.  That included patents that were held in the

6  Netherlands.  It included algorithms that were held in both the

7  United States and the -- the United States and in the

8  Netherlands.  Then there were optical technology that was held

9  in the Netherlands and at various points in Asia.  Then there

10 was manufacturing technology that was held in -- both in

11 the -- in Asia and in the -- it was held predominantly in Asia

12 and in the United States, manufacturing technology.  There was

13 a small piece of it in the Netherlands.  There was also

14 electronics technology that was held in the United States.

15          Then there were things like plan strategies,

16 documentations, other things that were held, you know, pretty

17 much in the United States, and then there were samples in

18 various parts of the world.  That was what Stream TV held prior

19 to the omnibus.  Then -- did I --

20          THE COURT:  Okay, and so --

21          THE WITNESS:  -- answer your question there?  Let's

22 stick with that one first.

23          THE COURT:  Okay, let's stick with that one.  So you

24 said they -- you said that they substantially owned the Ultra-D

25 assets, and then that list that you just gave me, is that part

1  of the Ultra-D assets --

2             THE WITNESS:  That was all Ultra-D.

3             THE COURT:  -- everything you just set forth?

4             THE WITNESS:  That was Ultra-D.  So there -- if you

5  were to look at it completely on a holistic level, there's

6  anywhere from like 12 to 15 different, we'll call them

7  components, okay, of Ultra-D in various points around the

8  globe.

9             THE COURT:  Okay.  And was that -- everything you

10 just listed, was that included in the scope of the omnibus

11 agreement?  Putting aside your position of whether the assets

12 were or were not transferred to SeeCubic, is that the -- are

13 all the things you just listed to me part of the omnibus

14 agreement?

15            THE WITNESS:  They had the right to acquire the 12 to

16 15 components; that is correct.  They did have the right --

17            THE COURT:  Okay.

18            THE WITNESS:  -- with the omnibus agreement to take

19 the 12 to 15 components.

20            THE COURT:  Okay.  So that's very helpful.  So what

21 else -- so you just described the Ultra-D components.  What

22 else beyond the Ultra-D components did the debtor own?

23            THE WITNESS:  No, the 12 to 15 I mentioned is the

24 complete Ultra-D.  It is a hundred percent of Ultra-D.

25            THE COURT:  Okay.

Rajan - Court                    107

1          THE WITNESS:  There was nothing of Ultra-D outside --

2          THE COURT:  Okay.

3          THE WITNESS:  -- of Stream TV.  Stream TV --

4          THE COURT:  Okay, and did --

5          THE WITNESS:  -- or Stream TV subsidiaries.  But at

6   that time of the omnibus, we'll say the day before the omnibus,

7   as a point of reference we'll say day before omnibus, all of

8   the assets were owned by Stream TV through either subsidiaries

9   or in the parent company.  So the drop-off point is the day

10  before the omnibus.  You know, Stream TV owns a hundred

11  percent.  It's not like there was a piece of Ultra-D outside of

12  Stream TV or Stream TV subsidiaries.

13         THE COURT:  Okay, that's very helpful.  So you

14  mentioned a few times on your cross-examination that there were

15  assets that are, quote, outside the omnibus agreement.  So my

16  next question is, please describe what those assets are.

17         THE WITNESS:  Okay.  I want to be respectful of your

18  question.  That's sort of step three.  Just a suggestion.  I

19  think you wanted to ask me, just my suggestion, what parts of

20  the 12 to 15 did they not take of the Ultra-D, before we go to

21  the non-Ultra-D assets.

22         THE COURT:  No.  I'm not interested --

23         THE WITNESS:  (Indiscernible).

24         THE COURT:  -- in answering that question.  I want to

25  know --

1              THE WITNESS:  Okay, that's --

2              THE COURT:  I want to know what assets Stream has,

3    okay, that are non-Ultra-D assets, okay, that are -- let's just

4    start there.  What assets does Stream own that are not part of

5    the 12 to 15 components that comprise the Ultra-D assets?

6    Anything?

7              THE WITNESS:  Yeah.  They have the -- they have

8    rights on the stitching and tiling, and they have the modified

9    light field, which is not Ultra-D, which is brought into Stream

10   TV, and they're working with VTI on the stitching and tiling

11   which is outside the omnibus that was brought in post-omnibus,

12   because, obviously, Stream TV was damaged badly by the omnibus

13   and by what happened in Delaware.  We have all these people

14   that are owed money, so we had to figure out a way -- you know,

15   how do we start generating revenue here and start keeping the

16   company alive.  So assets were brought in such as stitching and

17   tiling, which it's sharing with VTI, and modified light field,

18   which is a competitor to the Ultra-D technology, we brought

19   that into Stream TV.  So we can --

20             THE COURT:  Okay, this is very --

21             THE WITNESS:  -- replicate the Ultra-D without using

22   Ultra-D and create a -- you know, hate to do it, breaks our

23   heart, but a competitor to the Ultra-D technology.  Stream TV

24   would have sort of version number two.

25             THE COURT:  Okay.  So I just want to be clear, I

1  understand.  So the other assets that Stream currently

2  possesses are just assets that were brought in post-filing.  Is

3  that correct?

4         THE WITNESS:  The non-Ultra-D assets were brought in

5  post-filing, because, you know, thank god, we have the stay

6  order and protection.  So that was done post-filing.  Stream

7  TV, though, does have a number of the Ultra-D in its

8  possession.  That's separate.

9         THE COURT:  Okay, and I certainly understand that.

10 Okay.  So when you describe -- I want to flesh this out because

11 I want to be very clear.  When you describe rights under

12 stitching and tiling, can you explain, what is that?

13         THE WITNESS:  So VTI has some products that are based

14 on stitching and tiling technology.  It's a 250-inch unit, and

15 it's also a tablet.  It's also adding some additional products,

16 like a PC monitor and a laptop.  Stream TV engineers are going

17 to be helping the VTI engineers to improve the products and

18 improve performance, and in exchange for that they get a

19 royalty on the sales of those products, so it would bring

20 immediate cash flow into Stream TV so Stream TV can use that to

21 pay off some of the -- you know, the lenders and also

22 operations.

23         So that's why we wanted that DIP motion so we can get

24 those people back on the payroll, and then Stream TV can have

25 revenue share on those products.  Those are non-Ultra-D

1  products.

2          THE COURT:  Okay.  Again, very -- this is very

3  helpful, because I was confused in reading all of the various

4  submissions.  So VTI has the product and Stream has

5  essentially, I would say the know-how, the engineers that are

6  capable of helping VTI improve their products?

7          THE WITNESS:  That's right, because if you remember

8  the depositions, the stitching and tiling products don't look

9  quite as good as Ultra-D.  We have people who can help VTI make

10 it look better, so to close the gap with Ultra-D, Ultra-D is

11 the gold standard, and close the gap.  So that's one of the

12 opportunities for Stream TV to generate immediate cash flow to

13 help the operations.

14         THE COURT:  Got it.  Is there a contract that's

15 governing this --

16         THE WITNESS:  Yes.

17         THE COURT:  -- relationship?

18         THE WITNESS:  Yes.

19         THE COURT:  Yes, there is a contract?  Okay.

20         THE WITNESS:  Yes.

21         THE COURT:  Okay.  So walk me through the modified

22 light deal --

23         THE WITNESS:  Light field.

24         THE COURT:  -- which is not the Ultra-D.  Right.

25 Walk me through what that is.

1          THE WITNESS:  That is a competitor to Ultra-D.  There
2  were companies in the industry who reached out to myself and --
3  when we did the filing, and they came to us and said, look,
4  you're the ones who brought the team together for Ultra-D, you
5  went out and got the best technology.  We have technology, but
6  we need you to bring -- find the right engineers and put a team
7  together and help create a competitor to Ultra-D, because they
8  didn't want to go work with SeeCubic.  They would like to keep
9  the relationship with Stream TV.

10         So this is a code base that has algorithms for
11 realtime conversion and has it for rendering.  It has lens
12 technology.  VTI, you know, a number of the people have
13 tremendous amount of manufacturing experience, so we understand
14 manufacturing really well.  In fact, most of the bulk of the
15 manufacturing technology stayed inside Stream TV, so we know
16 how to go to mass production.  We got the yield rate at Stream
17 TV to 96 percent, so we know that in and out.

18         And so we are now working on a -- we needed the DIP
19 motion, but we are working on a competitor to the Ultra-D and
20 we have a number of ideas of how we want to improve the
21 technology to make it better than Ultra-D.  And we have
22 engineers on standby, so as soon as a DIP is approved they'll
23 be on the payroll in a matter of days and off we go.  We'll be
24 starting with a TV and a PC monitor, and then we'll be working
25 on smaller-scale devices, but the smaller scale is covered by

1  the stitching and tiling, so it's not going to be as big of a

2  priority.

3          And we are --

4          THE COURT:  Okay, again, very helpful.

5          THE WITNESS:  -- and we have companies, too, who are

6  going to give us orders for the modified light field, and if

7  you remember, that bonding equipment is still in Stream TV

8  USA's name, so we could use that to get the production up, and

9  that equipment can be used not only for Ultra-D, we can use it

10  for the modified light field.  We can even use it for the

11  stitching and the tiling.  So that is also -- but we also have

12  some other equipments that are already installed and

13  operational with some of the companies we work with, so we're

14  going to use that equipment until the equipment, you know, that

15  was so controversial, is up and running.

16          THE COURT:  Okay.  And so again, just so I fully

17  understand, the asset that Stream would bring to the table from

18  this competitive product is the essential know-how and

19  experience of the engineers that you will rehire when you get

20  the DIP financing.

21          THE WITNESS:  Correct.  That is absolutely correct.

22          THE COURT:  Okay.  Are there any -- well, okay,

23  that's very helpful.  Thank you so much.  And I guess my

24  next -- my last set of questions, really, there -- just some

25  confusion I want to clarify.

1          There was some discussion that you had on the record,

2   I think with Mr. Larkin, regarding the appointment of a CRO,

3   and at one point I think you said that it was VTI that was

4   looking to hire the CEO -- CRO.  Is that correct, or is it

5   Stream that's looking -- that intends to hire the CRO?

6          THE WITNESS:  The CRO is a Stream TV employee.  It'll

7   be named no later than Wednesday.  VTI has to sign off on it

8   because the CRO is going to be spending VTI's money, so, you

9   know, we have to get Mr. McCarthy to feel comfortable.  That's

10  the short story.

11         THE COURT:  And who is this supposed CRO?

12         THE WITNESS:  We have a candidate in California.  His

13  name is Greg Yorkson (phonetic).  Then before we go final --

14  he's most of the way there.  He's done a number of

15  restructurings.  He has tons of finance contacts, and he's led

16  restructuring.  We're 89 percent of the way there.  But before

17  we go final final Larry McMichael, who's debtor's counsel, had

18  four candidates that he sent over the weekend.

19         We can't interview them today.  We're hoping to do

20  that tomorrow if I don't have to do depositions tomorrow, and

21  then Mr. McCarthy's free, he will do it, and so will some of

22  the other people on the VTI board.  Some of the former Stream

23  TV employees want to talk to them, too, because they'll be

24  rejoining, and we will have that in place by no later than

25  Wednesday.

1              THE COURT:  Okay.  Thank you very much.  And just one

2   final question to double back to the modified light deal.  Do

3   you have any contracts or other agreements in place --

4              THE WITNESS:  We have a contract --

5              THE COURT:  -- with respect to today?

6              THE WITNESS:  We have the draft.  The issue with the

7   modified light field, that person, the company, is paying for

8   the production, it's like three million bucks, the production

9   setups.  So that was a DIP motion which we didn't submit.  We

10  have most of it written.  I can -- we can submit it, you know,

11  as soon as humanly possible.  These motions take a lot of work,

12  but we can -- we're anxious to get up and running.  I did a

13  call with them last night and they're pressing me to hurry up

14  because they -- they're also giving us a PO for -- I want to

15  say 8,000 units, I -- I'm sorry, 10,000 units.  They're also a

16  customer, too, so they're pressing us hard.  We will try to get

17  that to you as soon as humanly possible, and that will

18  consummate.  But we have it in draft.

19             THE COURT:  Okay.

20             THE WITNESS:  And so that --

21             THE COURT:  Thank you very much.

22             THE WITNESS:  -- because that is Stream TV's.  Yeah.

23             THE COURT:  Okay.  That's very helpful.  Thank you so

24  much for walking me through the scope of the assets that we're

25  talking about.  Again, it was very confusing when reading the

1  various documents.

2          So, Mr. McMichael, with that why don't I turn the

3  podium over to you.  Is that right?

4          MR. McMICHAEL:  Thank you, Your Honor.  And I just

5  have a very few questions for Mr. Rajan.

6                      REDIRECT EXAMINATION

7  BY MR. McMICHAEL:

8  Q    Mr. Rajan, I want to follow up on something the Court

9  asked, just to be sure that it's completely clear.  You

10 referenced some production equipment.  Do you remember that?

11 A    Yes.

12 Q    Okay.  Is that the equipment that's in Suzhou, China?

13 A    Yes.  There's production equipment in China, in Suzhou,

14 China, and then there's some other equipments that's also in

15 Asia, but they're minor equipments, as well.

16 Q    Okay.  Who bought the construction equipment in Suzhou,

17 China?

18 A    Stream TV USA bought it.

19 Q    Does Stream TV still have it?

20 A    Yes.

21 Q    And how much is that equipment worth, approximately?

22 A    The whole equipment, I think we paid -- the total bill

23 was -- on the invoices, I believe it was 15 million or 12

24 million.  We paid a couple million on it.  I think there's

25 7-1/2 still owed.  The value of the equipment, though, is very

1  high, which is a whole another issue.  But, yeah, 7-1/2 I think

2  is still owed.

3  Q    All right.  Is this equipment capable of producing things

4  other than Ultra-D screens?

5  A    Absolutely.

6  Q    All right.  So you can use it for the modified light field

7  or the stitching and tiling.

8  A    Yes, you can.

9  Q    All right.  Couple more questions.  VTI, and they may ask

10  you some questions as well because they're here, but just for

11  my purposes, as money comes into VTI is your ownership being

12  diluted?

13  A    Yes.

14  Q    All right.  And it presently has six directors of VTI?

15  A    One, two -- I think it's either six or seven.

16  Q    All right.  And that -- and only one of them is you.

17  A    Yeah, only one of them is me.

18  Q    All right.

19  A    Yes, that's --

20  Q    And I think you covered the CRO adequately.  Obviously,

21  are you waiting for the Court to rule on this motion before

22  hiring a CRO?

23  A    Yeah, that would be helpful.  Yeah, I think we need that

24  because he's got to get paid through the DIP.

25          MR. McMICHAEL:  Right.  Okay.  I have nothing

1  further, Your Honor.

2          THE COURT:  Okay.  Mr. Stemerman, did you want to

3  have any redirect?

4          MR. McMICHAEL:  Oh, excuse me.

5          THE COURT:  Or any --

6          MR. McMICHAEL:  I'm sorry.

7          THE COURT:  -- questioning of this witness?  I

8  apologize.  Did you guys -- did any -- was there an agreement

9  of whether VTI will be questioning any of the witnesses today?

10          MR. McMICHAEL:  VTI may have questions, Your Honor,

11  but I neglected to ask one question.  May I just go back and

12  ask one more?

13          THE COURT:  Yes.

14          MR. McMICHAEL:  Yes.  Okay.

15  BY MR. McMICHAEL:

16  Q    Mr. Rajan, you were asked by Mr. Larkin whether you were,

17  quote, challenging the omnibus agreement.  You said no, right?

18  You remember that?

19  A    No, we're not challenging.

20  Q    Okay.  But you understand that the debtor has a strategy

21  to avoid it under bankruptcy laws.

22  A    Yeah.  I mean, we view it as an executory contract.  Yeah,

23  I mean, it's an executory contract.  It's not yet completed.

24  The debt's still there.

25  Q    My point is that you're not challenging it under state

Rajan - Cross/Stemerman                   118

1  law.  You're not challenging Vice Chancellor Laster's ruling.

2  You're looking at it with a new lens, right, under

3  bankruptcy --

4  A    Yeah.

5  Q    -- law.

6  A    We're -- yeah, we're just going to do an executory

7  contract, and then we have to deal with it with, you know,

8  turnover actions and all those things.

9          MR. LARKIN:  Your Honor, I have to object.  I realize

10  it's belated because I was on mute.  I didn't want to interrupt

11  Mr. McMichael.  But it's hard to tell who's testifying here,

12  Mr. McMichael or Mr. Rajan.  I would ask him not to lead the

13  witness, as it is his witness.

14          THE COURT:  Okay.  Try not to lead the witness, but

15  we'll keep the testimony as it stands.  I think I understand it

16  very clearly.

17          MR. McMICHAEL:  That's all I have, Your Honor.  Thank

18  you.

19          THE COURT:  Okay.  Mr. Stemerman, I apologize.  I

20  probably should have gone to you next since you're -- you

21  should have -- we should allow the -- we should have allowed

22  Mr. McMichael to be cleanup hitter, I think.  So did you have

23  any questions for Mr. Rajan?

24          MR. STEMERMAN:  Just very briefly, Your Honor.

25                    CROSS-EXAMINATION

1  BY MR. STEMERMAN:

2  Q    Mr. Rajan, with respect to the directors at VTI, are --

3  you're a director yourself, correct?

4  A    Yes.

5  Q    Are any of the other directors family members of yours?

6  A    No.

7  Q    Are any of the other directors affiliated with Stream TV

8  in any way?

9  A    Are any of the directors affiliated with Stream TV?  A

10  number of them were never involved in Stream TV.

11  Q    And approx -- how many were never involved with Stream TV?

12  A    Three of them were never involved in Stream TV.  Two of

13  them led a company that made an investment in Stream TV, but

14  they left that company, and that company still has an

15  investment in Stream TV.  They worked at Qualcomm's engineering

16  arm.  They left that company and -- left that company because

17  it got acquired.

18       That company, Qualcomm's engineering arm, is still a

19  shareholder in Stream TV.  They used to be a debtholder, and

20  they followed the conversion agreement and converted their

21  debt.  They signed at the same time as SLS and Hawk and those

22  things, but they left and they're on their own right now.  They

23  didn't --

24  Q    Okay.

25  A    -- make an investment on their own as an individual

1  personally.

2  Q    And I just want to clarify.  Besides yourself are any of

3  the other directors of VTI currently affiliated with Stream TV,

4  the debtor?

5  A    Yeah, there is people.  Yeah.  There -- there's four of

6  them.  Were -- nothing to do with Stream TV.

7            MR. STEMERMAN:  Okay.  Thank you.  No further

8  questions.

9            THE COURT:  I apologize.  I'm confused there with

10  that testimony.  So, Mr. Rajan, so there's six directors, one

11  of which is -- are -- is you, so there's five left.  Is that

12  correct?

13            THE WITNESS:  Correct.

14            THE COURT:  Okay.  Okay, so of that five I thought I

15  heard you say that at least -- that two are equity holders in

16  Stream.

17            THE WITNESS:  No, no.  Yeah, let me explain it

18  better.  I'm sorry.  Okay, so let me put it this way.  So Tim

19  McCarthy is on the board.  He was never involved in Stream TV,

20  okay?  Sophia -- don't ask me to pronounce her last name,

21  hopefully she's not listening -- she was never an investor in

22  Stream TV, okay?  Then Glenn Hasen was never an investor in

23  Stream TV.  Tracy Rees and Cliff Morton worked at a company

24  called Intrinsyc, which was Qualcomm's engineering arm.

25  Intrinsyc made an investment into Stream TV, so Intrinsyc was a

1  debtholder.  Actually, they weren't even an equity holder.

2          They -- Intrinsyc converted their debt under the

3  conversion agreement to equity, and Tracy and Cliff did work at

4  Intrinsyc so they were involved with Stream TV, but in another

5  company.  They left Intrinsyc.  They're on their own right now

6  and they've joined the VTI board, but they didn't make a

7  personal investment.  Intrinsyc made it.  Intrinsyc is still

8  holding those shares, which was debt.  Okay?

9          THE COURT:  Okay.  Very helpful.  Thank you.

10          THE WITNESS:  Okay.

11          THE COURT:  Very helpful.  Okay.  Mr. Larkin, did you

12  have anything to follow up on the scope of my cross?  Or my not

13  really cross.  My clarifying questions.

14          MR. LARKIN:  I think just a couple of questions, Your

15  Honor.

16                      RECROSS-EXAMINATION

17  BY MR. LARKIN:

18  Q    Mr. Rajan, you testified that -- about the know-how of

19  certain engineers and employees of Stream TV.  I just want to

20  make sure I understand your testimony.  Stream TV currently has

21  no employees, correct?  As we sit here today.  I know that

22  there's people on furlough.  I know there's people working at

23  VTI.  Stream TV currently has no employees, correct?

24  A    Correct.  We didn't get our DIP motion, yes, so they

25  haven't joined the payroll.

1  Q    Okay.

2  A    They're not on the payroll.

3  Q    Correct.

4  A    Not yet.

5  Q    And it's also true that a number of the engineers and, if

6  you will, the brain power of Stream TV, has been transferred

7  pursuant to the omnibus agreement because of the -- let me

8  rephrase.  The -- a number of the employees that you're

9  referring to, they work at the subsidiaries of Stream TV that

10 were transferred to SeeCubic pursuant to the omnibus agreement,

11 correct?

12 A    Absolutely not.

13 Q    Okay.

14 A    That is incorrect.  Right now -- okay, let me be clear.

15 There are a number of 3D experts who are absolute geniuses

16 working in SeeCubic of the Netherlands, which is a Stream TV

17 subsidiary.  There is a dispute over the board, some people

18 think I'm still a board member, and those things in the

19 Netherlands are still under our control.  Some people would say

20 it's under SeeCubic of Delaware's control.

21      The employees who I'd mentioned are joining the payroll

22 through the DIP have nothing to do with those engineers in the

23 Netherlands.  We have different engineers in the Netherlands

24 that are not associated with SeeCubic of Delaware.  We have

25 other engineers in other parts of Europe, nothing to do with

1  SeeCubic of Delaware.  We have engineers in Asia that have

2  nothing to do with SeeCubic of Delaware or SeeCubic of the

3  Netherlands.  These are independent people that are -- and also

4  people in California -- who will go back on the payroll if our

5  DIP motion gets approved.

6  Q    Okay.  None of those people are currently --

7  A    The Netherlands people has to get sorted out in a separate

8  action, you know, that has nothing to do with that, has nothing

9  to do with today.

10       THE COURT:  But -- just to clarify.  But those are

11  the people that are going to -- that you hope will rejoin the

12  debtor?

13       THE WITNESS:  There is a --

14       THE COURT:  Employees that are currently --

15       THE WITNESS:  -- second (indiscernible) --

16       THE COURT:  -- employed?

17       THE WITNESS:  Their second team event -- okay, so let

18  me be more clear.  I should probably make a PowerPoint for you.

19  Okay.  There is engineers who are not associated with SeeCubic

20  of Delaware or SeeCubic of the Netherlands that will join

21  Stream TV's payroll once the DIP motion is approved.  Has

22  nothing to do with SeeCubic of Delaware.  Nothing to do with

23  SeeCubic of the Netherlands.

24       As far as the engineers in SeeCubic of the

25  Netherlands, we would love to get those people on our payroll.

1 That is independent of the DIP motion, okay, that was filed,

2 and that is in a later discussion regarding executory contract

3 and the omnibus.  And also there's an issue you're going to

4 hear from other witnesses regarding the board and all those

5 things, and that's something the lawyers have to explain to

6 you.

7           But what Mr. Larkin asked me was, was I referring

8 that the people in the Netherlands who are at SeeCubic of the

9 Netherlands, am I putting them back on the payroll at Stream TV

10 USA and using them for the stitching and tiling, and the answer

11 is no.  I have other -- we have other engineers.

12           THE COURT:  Okay.  Thank you very much for clarifying

13 that for me.

14           MR. LARKIN:  Your Honor, I have no further questions.

15 Thank you, and we thank the witness.

16           MS. SIERRA:  Your Honor --

17           THE COURT:  Okay.

18           MS. SIERRA:  -- Rosa Sierra --

19           THE COURT:  Thank you.

20           MS. SIERRA:  -- for the U.S. Trustee.  Sorry.

21           THE COURT:  I apologize.  I should have asked you if

22 you had any questions for this witness.  Go ahead.

23           MS. SIERRA:  No, I should have spoken up sooner.  May

24 I ask a few questions?

25           THE WITNESS:  Hi, Rosa.

1          THE COURT:  Sure.

2                          CROSS-EXAMINATION

3  BY MS. SIERRA:

4  Q    Hi, Mr. Rajan.  I have a few questions just following up

5  on some of Judge Owens' questions to you about the assets that

6  fall outside of the omnibus agreement.  So did you tes -- did I

7  hear you correctly and did you testify that those assets were

8  brought in post-filing?

9  A    Yes.

10 Q    Okay, those assets were not brought in pre-filing, but

11 after the omnibus agreement decision by the Chancery Court?

12 A    The stitching and tiling and VTI was there, but VTI

13 isn't -- didn't file bankruptcy.  Stream TV only signed its

14 agreement for VTI after the filing, because Stream TV's not

15 allowed to sign at that point.  And then once we filed we

16 signed it, and then the modified light field's going straight

17 into Stream TV.  That's not VTI.  VTI is paying for it, it'll

18 finance it, but it's not theirs.

19 Q    Okay, so just to -- like to redirect you back to my

20 question.

21 A    Okay.

22 Q    Let's start with the stitching and tiling.

23 A    Yeah.

24 Q    When did Stream acquire the stitching and tiling rights?

25 A    That's after filing.

1  Q    After filing.  Okay.  The modified light field --

2  A    Yeah.

3  Q    -- when did Stream TV acquire the rights to that?

4  A    That's after filing.

5  Q    Okay.  Beyond those two buckets of assets what other

6  assets fall outside of the Ultra-D technology?

7  A    Outside of the Ultra-D those are the only two.

8  Q    Those are the only two, and they were both --

9  A    At the time.

10  Q    -- acquired post-filing?

11  A    Yeah.

12  Q    Okay.  Now, you also testified about the engineers that

13  have nothing to do with SeeCubic of Delaware and SeeCubic of

14  the Netherlands, correct?

15  A    Correct.

16  Q    Those engineers, then, are just new engineers that are

17  going to be brought into Stream if the DIP motion is approved?

18  A    They're new engineers or they're people who used to work

19  with us many -- you know, awhile ago, who left, who are

20  rejoining, and they're also people who were consultants or were

21  not -- you know, and people we knew, but they were not on the

22  Stream TV payroll, but they're joining the Stream TV payroll.

23       And some of them are engineers in California who work for

24  vendors, and we have some people who work for vendors who are

25  going -- you know, they're big supporters of ours, these

1  particular companies, so they're going to sort of jump ship and

2  join our payroll, but with the permission of their current

3  employer.  They're trying to help us get the technology moving.

4  So some companies are going to let us take their employees,

5  with their permission.

6  Q    Okay, so how many engineers is that?

7  A    Will be up to about 50 people.  That doesn't include

8  SeeCubic of the Netherlands.

9  Q    Okay.  So there's 50 people currently waiting for the DIP

10 motion to get approved so they can come work at Stream TV?

11 A    Yeah.  Approximately, yes.

12 Q    Okay, and what is -- why couldn't they be -- why weren't

13 they hired before the filing of the bankruptcy?  What in your

14 view prevented that?

15 A    The -- what prevented hiring them prior to the bankruptcy

16 was at that time, you know, we -- you know, at that time we had

17 to then go bring money into Stream TV.  We didn't think it was

18 a good idea to bring money into Stream TV, because at that

19 point SeeCubic of Delaware was -- and Skadden -- were sending

20 us threatening letters every -- you know, three times a week,

21 you know, threatening our employees, threatening customers,

22 threatening vendors, and even threatening investors.  So we

23 didn't want to go bring money into Stream TV without protection

24 on Stream TV.

25      That's why a number of the Stream TV people went to VTI,

1  because they were even threatening the secretaries, so they

2  were threatening customers and vendors.  So it was a scary time

3  at that -- you know, at that point for those people.  So we

4  needed the protection of the bankruptcy.  That's why we're

5  here.  The reason why we're getting, you know, the investors

6  and everything now is because we have the protection of the

7  bankruptcy.

8  Q    So in your view you couldn't hire those employees because

9  you needed bankruptcy protection to employ them, even though

10  they would be working on assets that had nothing to do with the

11  omnibus agreement?

12  A    Yeah, because they -- the -- you haven't seen the letters

13  that we got.  They were very aggressive, so --

14  Q    So the answer to my question was yes?

15  A    Yeah, I didn't think it was a good idea legally to put

16  those people in jeopardy.

17        MS. SIERRA:  All right.  Your Honor, no further

18  questions.

19        THE COURT:  Okay.  Thank you.  Okay.  Well, we're

20  bouncing around back and forth, so let me -- probably a

21  little -- we'll be a little bit more orderly next time.

22        So, Mr. Michael -- McMichael, you always have the

23  last redirect in terms of the scope of the testimony, and so

24  I'd ask you do you have any follow-up questions based on

25  Ms. Sierra's questioning of Mr. Rajan?

1          MR. McMICHAEL:  Thank you, Your Honor.  I have no

2  questions.

3          THE COURT:  Okay.  Thank you.  Mr. Rajan, thank you

4  so much for your time and attention today to this matter.  It

5  was very helpful, and I appreciate you indulging me in my

6  questions.  Again, very, very helpful to -- for me to

7  understand the scope of the assets and the operations and

8  future hopeful operations of the debtor.  So with that, let me

9  tell you that you are released from the witness stand and you

10  may go about your day or stay on the line.

11          THE WITNESS:  Okay.  Well, thank you so much for your

12  time, Your Honor, and allowing me a chance to present.  And

13  I'll talk to counsel, if it help -- I can draw a PowerPoint for

14  you or something.  Okay.  All right.

15          THE COURT:  Okay.  That -- that's not necessary, but

16  thank you.  Bye bye.

17          MR. McMICHAEL:  Your Honor, may I just address --

18          THE COURT:  Okay.

19          MR. McMICHAEL:  -- a quick scheduling question?

20          THE COURT:  Yes.  I was actually going to ask you the

21  same thing.

22          MR. McMICHAEL:  Great.  So the next witness that

23  we've agreed to is Mr. McCarthy.  My understanding is that

24  Mr. McCarthy has a call at 1:00 on another matter and that -- I

25  mean, we could break now and reconvene at 1:30 or we could -- I

1 mean, I don't know what other parties want to do, but

2 Mr. McCarthy I think won't be available much before 1:30.

3              THE COURT:  Okay.  Mr. Larkin, does it make sense to

4 start Mr. McCarthy and then break for lunch during his call?

5              MR. LARKIN:  Yeah, I think that makes sense.  I --

6 you know, we have 45 minutes to -- my partner, Mr. Colby, will

7 actually be handling the examination, but I think we should go

8 until 1:00 and then we can break for however long Your Honor

9 wants, and we'll come back.

10             THE COURT:  Okay.  Well, we have a lot of ground to

11 cover I think today, so I'm amenable to a half-hour lunch

12 break.

13             MR. LARKIN:  Okay.

14             THE COURT:  Or whenever Mr. McCarthy can rejoin us.

15 So with that, let's call Mr. McCarthy to the stand.

16             Oh, there you are, Mr. McCarthy.  Nice to see you.

17             MR. McCARTHY:  Hi, there.  How are you?

18             THE COURT:  I'm doing well, thank you.  All right.

19 Let me swear you in before the testimony begins.

20                  TIMOTHY McCARTHY, WITNESS, SWORN

21                       CROSS EXAMINATION

22             THE COURT:  Okay, can you please state your name and

23 spell your last name for the record?

24             THE WITNESS:  Timothy McCarthy, and my last name is

25 M-c-C-a-r-t-h-y.

1          THE COURT:  Okay, thank you.  All right.  Let's begin

2   cross.

3          MR. COLBY:  Good afternoon, Your Honor.

4   BY MR. COLBY:

5   Q    Good afternoon, Mr. McCarthy.  Nice to see you again.

6   A    Nice to see you.

7   Q    Mr. McCarthy, in your deposition when we started I asked

8   you if you were testifying on behalf of Burlington, and you

9   said yes.  And then Mr. Sten corrected you and said you were

10  testifying as a director of VTI, and then you said I'm

11  testifying as a director of VTI.  Do you recall that exchange?

12  A    I do.

13  Q    Okay.  And you -- you've been a director of VTI since

14  April 28th?

15  A    That is correct.

16  Q    And the board of directors of VTI at least as of Friday

17  had had one meeting, correct?

18  A    That is correct.

19  Q    And Mr. Rajan is the controlling shareholder of VTI, is he

20  not?

21  A    That is correct.

22  Q    And not just because he currently owns the majority of

23  shares, but also because he has a class of shares that have 10

24  times voting right, correct?

25  A    That is correct.

1  Q    Now, going back to your deposition, you also said in that

2  deposition that VTI's lawyers were representing you there,

3  correct?

4  A    That is correct.

5  Q    All right.  Now, the reason why you were giving a

6  deposition is because you had submitted a declaration in this

7  case, correct?

8  A    Yes.

9  Q    And that declaration was submitted on behalf of Burlington

10 Resources Asia Limited, your company, wasn't it?

11 A    Correct.  That is correct.

12 Q    And you also testified that your declaration on behalf of

13 Burlington was absolutely the only reason why you were there

14 testifying.  Do you recall that?

15 A    Yes.

16 Q    Okay.  So sitting here today who are you testifying on

17 behalf of?

18 A    Well, you know, I suppose you could see it in terms of the

19 fact that I am an investor and Burlington is an investor in

20 VTI, and a very big investor, and, therefore, if you want to

21 talk about hats, there are two hats.  There's a Burlington hat

22 and there's a VTI hat.  Now, I happen to be -- at the same time

23 as an investor in Burlington, I happen to be a director of VTI,

24 recently appointed, but that represents the culmination of

25 months of discussion, negotiation, et cetera, and eventually

McCarthy - Cross/Colby                    133

1  agreeing and finalizing an investment agreement.  So the two

2  run hand in hand, but when I was referring to being represented

3  by counsel, I am being represented by counsel here of VTI as a

4  VTI director.

5  Q    Okay.

6  A    Because I am on the board of VTI.

7  Q    Okay.  I'm going to go back to my question, which is

8  sitting here today testifying to the Court on whose behalf are

9  you testifying, Burlington or VTI?

10 A    VTI.

11 Q    Okay.  Even though you submitted your declaration to the

12 Court on behalf of Burlington Resources.

13 A    Well, as I said, the two run together.  That is my

14 opinion.

15 Q    All right.  Now, you also told me that you spoke to

16 Mr. Rajan about your deposition before you gave a deposition,

17 correct?

18 A    Yes.

19 Q    Okay.  You told me that Mr. Rajan was very encouraging

20 about the position you were going to present and said that you

21 would make the case.  Correct?

22 A    Correct.

23 Q    Now, let's take a look at Exhibit SeeCubic TX 285.

24 Mr. McCarthy, Exhibit 285 is the declaration that you submitted

25 to this Court, correct?

1  A    Yes.

2  Q    And Mr. Rajan also requested that you provide this

3  declaration, did he not?

4  A    He did.

5  Q    And you requested through Mr. Rajan to be provided with a

6  draft of it, correct?

7  A    I base -- yes, that is correct.  Yes.

8  Q    And VTI provided the draft to you, correct?

9  A    They provided a draft, which I had originated.

10 Q    Now, the declaration that you submitted to this Court is

11 titled and is in fact a response to a statement of the Official

12 Committee of Unsecured Creditors, correct?

13 A    Correct.

14 Q    But until I showed it to you on Friday you had never even

15 seen the statement of the unsecured creditors committee,

16 correct?

17 A    That is correct, but I was aware of it.

18 Q    Right --

19 A    And I --

20 Q    -- and you had --

21 A    -- was aware --

22 Q    You had never laid your own eyes on it, correct?

23 A    Correct.

24 Q    And the way you were aware of it is you relied on Mathu

25 Rajan's description of it, correct?

1  A    And others, but definitely Mathu's, yes.

2  Q    All right.  But after reviewing it yourself -- let me back

3  up.  We sat there in your deposition as you read, correct?

4  A    Correct.

5  Q    And you asked Mr. Frank, you told him when you had

6  finished reading a page and you asked him to roll onto the next

7  one, correct?

8  A    Correct.

9  Q    All right.  And after reviewing it you stated that you had

10  no obvious disagreement with any assertion by the unsecured

11  creditors committee, correct?

12  A    I had no basic disagreement in terms of their right to

13  present their case.  That is correct.

14  Q    Okay.  But you read it -- you testified that you read it

15  in detail and you had no disagreement with any of its

16  assertions, correct?

17  A    Correct.

18  Q    Now, let's take a look at paragraph 7 of your declaration,

19  please.

20  A    Yeah.

21  Q    And in paragraph 7 you state that Burlington and its

22  associates are providing VTI with USD 180 million, with an

23  option to go to 230 million, and have executed agreements with

24  VTI on Monday, May 3rd, 2021.  Correct?

25  A    Correct.

1  Q    Now, your statement is that VTI and Burlington have
2  executed agreements on May 3rd, but you executed your
3  declaration on May 2nd.
4  A    I actually signed the agreement that I refer to on the
5  2nd, but it wasn't signed by Mathu, I think, until the 3rd.
6  There was basically the time align or the time difference
7  between Europe and the UK -- and the U.S., and also the
8  logistics of just getting it signed by both sides.
9  Q    Two things.  First of all, you would agree with me that
10 Europe is ahead of the U.S. in terms of time, correct?
11 A    I would.
12 Q    Okay.  And so it's not possible that Mr. Rajan signed the
13 declaration or the agreement a day ahead of you.
14 A    No, no.  I'm saying I signed it ahead of.
15 Q    Right.  So you signed it on May 2nd, and so my question to
16 you is, you say Burlington and VTI have executed agreements on
17 May 3rd.
18 A    Uh-huh.
19 Q    But that statement, you agreed with me on Friday that
20 statement was inaccurate, correct?
21 A    I mean, I think it's accurate because I would say that I
22 had committed to it and I had a verbal understanding that it
23 would be countersigned on the basis of an agreed negotiation.
24 Q    Okay.  But it hadn't yet been executed at the time you
25 signed your declaration, correct?

1  A    It hadn't been executed on the other side.  I had executed

2  it.

3  Q    Okay.  Now, your declaration also states that Burlington

4  is providing up to $230 million, but the May 3rd agreement that

5  you actually signed is an option for up to $300 million,

6  correct?

7  A    That is correct.  It's a bigger amount.

8  Q    Right.  So the statement in your declaration that the

9  amount was 230 million, that was inaccurate, correct?

10 A    It was understated.

11 Q    It was inaccurate, correct?

12 A    Inaccurate and understated.

13 Q    Now, in the sentence we just read there in paragraph 7, in

14 fact twice in paragraph 7, you make reference to Burlington's

15 partners and Burlington's institutional investors.  Do you see

16 that?

17 A    Yes.

18 Q    And some of the money that these investors are going to be

19 providing to VTI is going to be used to support Stream TV in

20 its bankruptcy restructuring, correct?

21 A    Logically that is correct.

22 Q    Right.  On Friday I asked you who were -- who are these

23 associates and institutional investors, and you refused to

24 answer that question, correct?

25 A    Correct.

1  Q    Even though I advised you that there are confidentiality

2  protections in place in this case that could maintain the

3  confidentiality of that information.  I advised you of that,

4  correct?

5  A    You did.

6  Q    Okay.  Now, you're the sole shareholder of Burlington?

7  A    I am.

8  Q    And you're the sole director?

9  A    I am.

10  Q    And you've been engaged with Mr. Rajan about investing in

11  VTI since late 2020, correct?

12  A    Yes.  I would say the beginning of the fourth quarter of

13  2020.

14  Q    And despite submitting your declaration about providing

15  assets to VTI, Burlington in all of that time -- well, let me

16  back up.  Since early February, so you've been talking to

17  Mr. Rajan since early February about -- in -- since late 2020

18  about investing, and since early February you've had at least

19  some sort of funding agreement in place with VTI, correct?

20  A    Correct.

21  Q    All right.  And in that period of time Burlington has not

22  actually delivered any cash to VTI, correct?

23  A    That is correct.

24  Q    Now, looking at your declaration in paragraph 7, you say

25  that the funds you're providing because they're coming from

1  overseas take some matter of days.  Correct?

2  A    Correct.

3  Q    All right.  And then in the second to last -- the third

4  line up, it's the second to last paragraph and it begins, but

5  this process?

6  A    Uh-huh.

7  Q    You say but this process is being initiated on the opening

8  of business Monday, May 3rd, 2021, and has been closed.  You

9  see that?

10 A    I do.

11 Q    Okay.  And when we spoke on Friday Burlington had not

12 actually initiated the transfer of any funds to VTI, correct?

13 A    That is correct.

14 Q    Notwithstanding the fact that you said in your declaration

15 that it would be initiated on Monday morning.  Right?

16 A    Basically, the agreement and the commitment has been

17 established and was established on the 3rd.  Funds will follow,

18 but they have not followed yet.

19 Q    And you have not -- sitting here today you have not yet

20 initiated the process of transferring cash to VTI's account.

21 Correct?

22 A    Correct.

23 Q    Okay.  So -- okay.  So let's take a look.  We talked about

24 the fact that you've had some sort of funding agreement with

25 VTI since early February.  Let's take a look at Exhibit 193,

1  SeeCubic TX 193.  So this is a stock purchase agreement dated

2  February 10th, 2021.  You see that?

3  A    I do.

4  Q    Recognize this document?

5  A    I do.

6  Q    Now, this document that you -- this February 10th stock

7  purchase agreement with VTI, between Burlington and VTI, it

8  contemplates a potential 30-million-dollar investment, correct?

9  A    That is correct.

10 Q    And if you take a look at paragraph 4 --

11 A    Uh-huh.

12 Q    So under paragraph 4 the way it works is that the company,

13 which is VTI, will present to the investor, which is

14 Burlington, opportunities, investment opportunities that

15 Burlington can either accept or decline.  Correct?

16 A    Correct.

17 Q    And let's take a look at paragraph 8.  Pursuant to

18 paragraph 8, just for signing this agreement Burlington was to

19 receive 987,839 shares of VTI, correct?

20 A    Correct.

21 Q    And Burlington would receive and keep those shares even if

22 it never invests anything in any of the opportunities presented

23 by VTI.  Correct?

24 A    That was the commercial term of the agreement, correct.

25 Q    All right.  And then if we look at paragraph 9, even

1  though the agreement contemplated a potential 30-million-dollar

2  investment, if Burlington invests only one million dollars it

3  would still get an extra 1.1 million shares of VTI as a bonus,

4  correct?

5  A    Correct.

6  Q    And that's -- is that in addition to the shares you would

7  actually receive in exchange for the million dollars?

8  A    Correct.

9  Q    Okay.  So let's take a look at 179.  This is an email from

10 Mathu Rajan to you on February 8th, 2021.  Do you recognize

11 this?

12 A    I do.

13 Q    And so around the same time as you were executing the

14 stock purchase agreement Mr. Rajan had presented you with an

15 investment opportunity as contemplated by that stock purchase

16 agreement, correct?

17 A    Correct.

18 Q    And that investment opportunity was for Burlington to

19 either accept or decline.  True?

20 A    Absolutely.

21 Q    And let's take a look at the next page of this exhibit,

22 which we've seen already today.

23 A    Uh-huh.

24 Q    This is the presentment of the investment opportunity

25 contemplated by the February 10th agreement, correct?

1  A    Correct.

2  Q    And it's described as VTI having the exclusive right to

3  acquire Stream TV Networks.  Do you see that?

4  A    I do.

5  Q    And that exclusive right to acquire Stream TV was the

6  basis of your initial contemplated 30-million-dollar investment

7  in VTI, correct?

8  A    Correct.

9  Q    Mr. Rajan tells you in this presentment that Stream was

10 worth between 200 and $600 million, but that VTI's exclusive

11 right to acquire it was for a fraction of that value, $25

12 million.  Correct?

13 A    Correct.

14 Q    That was the plan at the time you elected to invest in the

15 Stream TV opportunity, correct?

16 A    Yes.

17 Q    Okay.  Let's take a look at 197, Exhibit 197.

18 Mr. McCarthy, Exhibit 197 is titled Exercise of Drawdown

19 Rights.  Do you recognize this document?

20 A    I do.

21 Q    So this is a drawdown notice on the $30 million

22 invested -- I'm sorry, contemplated by the February 10th

23 agreement, correct?

24 A    Correct.

25 Q    And this is the form that you executed in order to take

1 advantage of the opportunity that Mr. Rajan had presented to

2 you to acquire Stream TV for a fraction of its value, correct?

3 A    Correct.  But I would add, if I may, that I was investing

4 in VTI based on my belief in VTI and everything that was within

5 VTI, separate and apart from Stream that Mathu Rajan had

6 presented to me and other members of VTI as well.  So it was,

7 yes, obviously connected to Stream, but it was connected to a

8 general, if you like, acquisition investment into VTI as a

9 whole.

10 Q    Okay.  Well, let's take a look at the document and see

11 what it says, Mr. McCarthy.  The very last line --

12 A    Uh-huh.

13 Q    -- says purpose.  Do you see that?

14 A    Sorry?

15 Q    Purpose.

16 A    Oh, yes.

17 Q    Purpose.  And it says the purpose of this exercise of

18 drawdown rights is to begin the takeover process of the Ultra-D

19 technology and kick-start stalled projects.  That was the

20 purpose of your exercising this option, correct?

21 A    Well, I would say that I was aware of other technologies

22 that were in VTI, and my view was that it was all three

23 technologies.  Yes, of course Ultra-D, which was in Stream, but

24 I was also very interested in stitch and tiling, and I was also

25 interested in modified light fields.

1  Q    Okay, well --

2  A    So --

3  Q    -- let's look --

4  A    -- it would -- okay, go ahead.

5  Q    Please, by all means.  I didn't mean to interrupt.

6  A    All right.  So I'm just making the point that I was

7  looking at it in a totality.

8  Q    Uh-huh.  Now, have you -- did you listen to Mr. Rajan's

9  testimony a few minutes ago?

10  A    Of course.

11  Q    Okay.  And so the modified light field and the stitching

12  and tiling, did you hear him testify that those projects are

13  ones that had commenced after the bankruptcy filing?

14  A    Yes, I did.

15  Q    Okay.  And that those are new projects and new technology

16  for Stream TV, correct?

17  A    Correct.

18  Q    Okay.  And this says begin the takeover process of the

19  Ultra-D technology and kick-start stalled projects, doesn't it?

20  A    It does.

21  Q    Okay.  Do you deny that that was the purpose of the

22  exercise of this drawdown?

23  A    No, I -- I'm not denying it.  I'm just presenting it in

24  terms of a broader investment strategy.  But, yes, obviously,

25  Ultra-D was a core part of the investment and Ultra-D was a

McCarthy - Cross/Colby                    145

1  technology that I was sold on as, you know, the star, if you

2  like, of the endeavor within VTI, Stream.

3  Q    Okay.  Now, I just have a couple more questions and then

4  release to your other business obligation.

5  A    You're kind.

6  Q    The drawdown gives you the option to provide cash or a

7  standby letter of credit to fulfill the 30-million-dollar

8  investment, correct?

9  A    Correct.

10  Q    And you did neither of those, correct?

11  A    That is correct.

12  Q    Because you renegotiated the stock purchase agreement into

13  a new agreement, correct?

14  A    Correct.

15  Q    Now, you acknowledge -- sitting here today you acknowledge

16  as an absolute fact that Stream's assets have left Stream and

17  are with SeeCubic, correct?

18  A    I do.

19  Q    Okay.  But part of the plan that you started here with

20  Mr. Rajan, part of the plan is getting those assets returned to

21  Stream, correct?

22  A    Absolutely, and within VTI.

23  Q    Okay.  But that's -- getting those assets is part of --

24  your understanding, part of the bankruptcy plan here, correct?

25  A    Correct.

McCarthy - Cross/Colby                    146

1  Q    Okay.  You describe Ultra-D as a world leader, correct?

2  A    Yes.  Absolutely.

3  Q    Okay.  And so --

4  A    I'm very excited about Ultra-D and I'm very excited about

5  the group.  That's why I'm investing 500 million in it.  And,

6  you know, I think that's the point that I want to make.

7  Apologies, and I know you have your case to make, but I am

8  actually a white knight here coming in, investing 500 million

9  into this group to restructure, to reorganize, to get it back

10 to work, and to make all the creditors historically that have

11 been disadvantaged by this group whole.  What can possibly be

12 bad about that or negative?

13 Q    Okay.  But getting the Ultra-D technology back into

14 Stream, getting it returned to Stream is a central part of that

15 plan you just described, correct?

16 A    Of course.

17 Q    And it's central to the acquisition of Stream that VTI

18 wants to make, correct?

19 A    Correct.

20 Q    Okay.  Let's -- if it's okay with the Court, pause now for

21 your other obligation, and we can resume -- do you -- I think

22 as -- on my client's behalf we're fine with a half-an-hour

23 lunch break.

24 A    Yes.

25 Q    Mr. McCarthy, how long do you need -- your thoughts and

1  others with their views on how long a break we should take.

2  A    Thank you.

3           THE COURT:  Mr. McCarthy, let me just ask you, how

4  long do you think your call will last?

5           THE WITNESS:  No more than half an hour.

6           THE COURT:  Okay.  So why don't we adjourn until

7  1:35.  That'll give Mr. McCarthy at least five minutes to

8  regroup after his call.  If you think you would like a -- you

9  know, why don't we rejoin, actually, at 1:40, okay?  That'll

10 give Mr. McCarthy --

11          THE WITNESS:  You're very kind, Your Honor.

12          THE COURT:  -- like 10 minutes to maybe eat some

13 lunch.  Okay.

14          THE WITNESS:  You're very kind.

15          THE COURT:  I would normally be more kind to you, but

16 we have a whole lot of ground to cover today and I don't

17 want --

18          THE WITNESS:  I understand.

19          THE COURT:  -- to waste time.

20          THE WITNESS:  I absolutely understand.

21          THE COURT:  Okay.

22          THE WITNESS:  Thank you.

23          THE COURT:  Okay, thank you.  And so before we

24 adjourn let me caution, sir, you're under -- you will remain

25 under oath during our break.  So you're not permitted to talk

1    to anyone about the substance of your testimony.  Do you

2    understand?

3                   THE WITNESS:  Totally understood.

4                   THE COURT:  Okay, great.  All right.  Well, have fun

5    on your call.  We'll adjourn until 1:40.  Thank you, all.

6                   THE WITNESS:  All the best.

7                   THE COURT:  Okay, bye bye.

8                       (Recess from 1:00 p.m. to 1:48 p.m.)

9                   THE COURT:  Good afternoon, parties.  I apologize for

10   my delay, my tardiness.  I've had a meeting that overran this

11   hearing, but it seems as if we're all ready to continue.  I see

12   that we have Mr. McCarthy.  Thank you, very much.

13                   And Mr. Colby, when you're ready.

14                   MR. COLBY:  Good afternoon.  Thank you, Your Honor.

15                       CROSS-EXAMINATION CONTINUED

16   BY MR. COLBY:

17   Q    And good afternoon, again, Mr. McCarthy.

18        Mr. McCarthy, I want to get back to the various stock

19   purchase agreements that you signed, but I want to pause and

20   digress for just a minute on another issue that came up this

21   morning.

22        Part of the reason why you entered into these various

23   stock purchase agreements is to support -- at least part of the

24   reason is to support financially Stream's bankruptcy

25   reorganization, correct?

1  A    Correct.

2  Q    And this morning, Mr. Rajan told us that you were the

3  negotiator for VTI regarding VTI's support of Stream's

4  restructuring, facing off across the table with somebody from

5  Stream.  Did you hear that this morning?

6  A    I did.  That's not actually correct.

7  Q    Okay.  Give me your understanding of then -- so let me

8  just back up.

9       You didn't have that role?

10 A    No, I don't have that role.  I think he corrected himself

11 later in the discussion.  Because essentially, I wouldn't have

12 the history yet in terms of understanding all of the facets and

13 assets of Stream to have that role.  What I am is a newly

14 appointed director who has basically committed a huge amount of

15 money to the group and I've increased that commitment today and

16 that is a substantial investment into the group which allows

17 VTI and VTI's management to essentially do what is necessary.

18 Q    Okay.  Great.  Thank you.

19      Now, let's get back to the terms of those investments and

20 take a look at TX 29.

21      Let us know when you're ready.  It sounds like you're

22 receiving some texts.  Let us know when you're ready.

23 A    Yes, of course.  Apologies.

24      Go ahead.

25 Q    Okay.

1                MR. COLBY:  So we're going to go to Exhibit 291,

2    Mr. Frank, which is the May 3rd stock purchase agreement.

3    BY MR. COLBY:

4    Q    Okay.

5         So where we left off before lunch was you had executed a

6    draw down on the February 10th stock purchase agreement which

7    contemplated a potential investment of $30 million, correct?

8    A    Correct.

9    Q    Okay.  But you never actually transferred any cash or gave

10   VTI a standby letter of credit.

11   A    Correct.

12   Q    Okay.  And that's because you renegotiated into this

13   May 3rd amended stock purchase agreement, correct?

14   A    That is correct.

15   Q    And this is the amended stock purchase agreement that is

16   the actual subject of the declaration that you've submitted to

17   the Court, correct?

18   A    Correct.

19   Q    Now, VTI drafted this document, correct?

20   A    They did.

21   Q    And the document represents an option to invest up to $300

22   million by Burlington, correct?

23   A    Correct.

24   Q    That's what you said.

25        You didn't consult with Burlington's in-house lawyers for

1  this potential $300 million investment, did you?

2  A    I made that investment decision myself.

3  Q    Right.  So you didn't consult with any lawyers about the

4  terms of a potentially $300 million investment?

5  A    I have in-house lawyers, but the investment decision, the

6  commercial decision, is my decision.

7  Q    Right.  And you didn't run this agreement by them, did

8  you?

9  A    No.

10 Q    Okay.  And in fact, you told me on Friday that VTI sent

11 you one copy of this agreement and you signed it, correct?

12 A    I had negotiated the commercial terms, but that is correct

13 (indiscernible) on the telephone.

14 Q    But you signed the first copy of this agreement that VTI

15 sent you.

16 A    Correct.

17 Q    Now, let's take a look at Paragraph 3 which breaks across

18 the page, so Mr. Frank is going to work some magic so we can

19 see it all at once.

20     This May 3rd agreement contemplates investment in three

21 traunches, correct?

22 A    Correct.

23 Q    And the deadline to close on the first $60 million traunch

24 is May 24th, correct?

25 A    Correct.

1  Q    And if Burlington doesn't close by then, then it loses the

2  option to invest that amount, right?

3  A    That is correct.  It actually commits to that investment

4  and it has to do that.  There is a grace period of seven days.

5  Q    Right.  And if --

6  A    (Indiscernible) that investment, just so you know.

7  Q    Right.  But if Burlington doesn't close -- we'll get to

8  what that means, but if Burlington doesn't close, the

9  opportunity to investors goes away, correct?

10 A    As that reads.

11 Q    Yeah.  Now, there are two more traunches contemplated by

12 this agreement on each subsequent year, correct?

13 A    Correct.

14 Q    And they work the same way, yes?

15 A    Correct.

16 Q    All right.  And if Burlington doesn't close each of those

17 traunches by their deadlines, then those opportunities to

18 invest also expire, right?

19 A    Correct.

20 Q    Okay.  Now, let's look at what it means to close one of

21 those investments.  Let's look at Paragraph 8.

22      It says that the investor shall pay to the company in

23 immediately available funds a payment equal to the investment

24 amount for each closing to the company's bank account by

25 executing the exercised form reflected to at Exhibit A hereto,

1  right?

2  A    Correct.

3  Q    And so that language describes what Burlington would need

4  to do in order --

5  A    Yes.

6  Q    -- to exercise its right to make the stock purchase

7  agreements that are described in Paragraph 3, right?

8  A    Correct.

9  Q    And so Burlington would need to execute that form that's

10  attached as Exhibit A, right?

11  A    That is right.

12  Q    And that's the step that would obligate Burlington to

13  transfer the money in immediately available funds and in

14  exchange, Burlington would receive its VTI stock, right?

15  A    Correct.

16  Q    So the options that we've described, those are exercised

17  by the execution of this Exhibit A, right?

18  A    This is not an option.  This is an --

19  Q    Well, I meant --

20  A    And the document that you're referring to establishes my

21  ability to get shares for my commitment.  That is the main

22  object of that (indiscernible).  As far as I'm concerned, this

23  is a commitment and I will fulfill it.  But I understand what

24  you're getting at.  You're trying to describe this as an option

25  rather than a commitment.

McCarthy - Cross/Colby                    154

1    This is a commitment as far as I'm concerned.  I'm doing

2    this investment.  And I don't know if you're aware of it, I've

3    actually increased the amount that I'm investing to 500 and

4    that is an absolute firm commitment.

5    Q    Yeah.  I would -- I'll get to the most --

6    A    Apologies --

7    Q    -- this today.

8    A    -- for jumping the gun.

9    Q    Yeah.  We'll get there.  I know you're anxious to make the

10   case to the Court, but we'll get there.

11       And I understand you're saying that you're -- you,

12   Mr. McCarthy, are committed to this investment.  I want to get

13   at what the legal obligations are pursuant to the document.  I

14   just want to make sure that we and the Court understand how the

15   documents that you signed work (indiscernible).

16   A    Of course.

17   Q    Okay.  So putting aside your personal convictions, the

18   commitment that you just described, the way that you'll

19   manifest that commitment is by executing Exhibit A, correct?

20   A    That is correct.

21   Q    All right.

22       So let's take a look at Exhibit A.

23       And that's -- yeah, Page 17.  Thank you.

24       Exhibit A says, and I'm looking at Paragraph 1.  Exhibit A

25   says, "The undersigned hereby elects to purchase shares of

1  Visual Technology Innovations, Inc."  Do you see that?

2  A    I do.

3  Q    All right.  So that's the form you would sign in order to

4  commit the purchase of shares and the investment that is

5  described in the main body of the agreement, correct?

6  A    Correct.

7  Q    All right.

8        So we're going to go one step closer to the one you want

9  to talk about.  We're going to May 6th, fair enough?

10  A    (No audible response)

11  Q    All right.

12        So let's take a look at Exhibit 293.

13        So this is a couple of days after you submitted your

14  declaration to the Court.  This is yet another amended stock

15  purchase agreement dated May 6th.  Do you see that?

16  A    I do.

17  Q    All right.

18        And the way this came about is that within a day of

19  signing the May 3rd agreement that we just looked at, Mr. Rajan

20  approached you about executing another SPA, correct?

21  A    Yes.

22  Q    And he told you that VTI needed to tighten up the language

23  but that the commercial terms were exactly the same, correct?

24  A    Yes.

25  Q    And Mr. Rajan told you that his in-house lawyers had taken

1  a closer look and it needed some tightening of the language,

2  correct?

3  A    Correct.

4  Q    And he also told you that the commercial terms would be

5  exactly the same, right?

6  A    Correct.

7  Q    And yet again, he sent you one copy -- somebody sent you

8  one copy of the document, somebody from VTI, one copy of the

9  document and you signed it, right?

10 A    I did.

11 Q    All right.

12      But as an astute business person with, as you've pointed

13 out, 40 years of experience in matters like this, had you seen

14 any change in the commercial terms, you would have noticed

15 that, right?

16 A    Of course.

17 Q    Yeah, of course.

18      Now, did Mr. Rajan actually tell you that -- let's take a

19 look.  Let's take a look at Exhibit 290.

20      And I appreciate that you haven't seen this document

21 before.

22          MR. COLBY:  No, we're looking at 298, SeeCubic

23 TX 298.

24          THE WITNESS:  Right.

25          MR. COLBY:  Yeah, not this one.

1      There you go, this one.

2  BY MR. COLBY:

3  Q    So I appreciate that you haven't seen this one before.

4  This is an example of some of the exceedingly and generally dry

5  and uninteresting correspondence that lawyers exchange amongst

6  each other by email.  But let's take a look.  This is an email

7  from debtor's counsel on Saturday, May 8th.  And in responding

8  to SeeCubic's request for documents that seem to have been

9  withheld on the basis of privilege, which we didn't agree with,

10 Mr. Weis said the following.

11     I'm going down to Paragraph 4, and it says, "With regard

12 to the recent agreement in principle, the only documents that

13 I'm aware of for which a privilege will be claimed are emails

14 among John Sten, Suby Joseph, and a bunch of other folks from

15 either VTI, Dilworth Paxson, or Armstrong Teasdale, okay?

16 A    Yeah.

17 Q    And then it says, these emails were sent on Thursday, 5/6,

18 which is the date that you executed that new agreement between

19 10:00 a.m. and 11:31 a.m. and reflect Mr. Sten's comments on

20 the revised VTI stock purchase agreement.  Do you see that?

21 A    I do.

22 Q    Did Mr. Rajan tell you that it was actually VTI's outside

23 litigation lawyers that were making changes to your financing

24 agreement with VTI?

25 A    I don't recall.

1  Q    He told you it was the in-house lawyers who wanted to

2  "tighten some language," right?

3  A    That was my recollection, but I didn't dwell on the point.

4  Q    Okay.  All right.

5       So let's go back to the May 6th version of the document,

6  which is 293.

7       And regardless of who was making edits to this document,

8  in the new May 6th version, the money, the timing, and the

9  obligations that you were agreeing to remained exactly the same

10  as the May 3rd agreement.  That's what you testified on Friday,

11  correct?

12  A    Yeah.

13  Q    All right.

14       And Paragraph 7 of the May 6th agreement discusses the

15  form of exercise that we saw, I believe it was Paragraph 8 in

16  the earlier version.

17  A    Right.

18  Q    And it references the form of exercise at Exhibit A that

19  Burlington would need to execute in order to obligate itself to

20  make the investment described in each traunch, correct?

21  A    Correct.

22  Q    And Exhibit A -- let's go to Exhibit A.  I think it's also

23  Page 17.

24       Exhibit A is exactly the same as the May 3rd Exhibit A,

25  correct?

1  A    Uh-huh.

2  Q    All right.

3       Now, at last, since May 6th, right, you have renegotiated

4  again this stock purchase agreement, correct?

5  A    That is correct.

6  Q    Okay.  Since your deposition.  And so, since we spoke in

7  your deposition last Friday, you've executed another amendment

8  and that changes the purported investment amount to $500

9  million.  That's what you said, right?

10 A    That is correct.

11 Q    Okay.  And let's take a look at it just for the completion

12 of the record.  It's Exhibit 159, VTI -- VTI Exhibit 159.

13 Thank you.

14      So this is the agreement that you were just referring to.

15 It's an amendment to the May 6th stock purchase agreement,

16 correct?

17 A    Correct.

18 Q    All right.

19      And this agreement contemplates that the amount that you

20 have the option to invest could go up to $500 million split

21 into four traunches, right?

22 A    Correct.

23 Q    And it has just a few changes to the one we just looked

24 at.

25 A    That is correct.

1  Q    Right.  Paragraph 1 says all the terms of the agreement we

2  just looked at are the same, correct?

3  A    Yes.

4  Q    Okay.  Paragraph 2 is the increase of the total amount

5  contemplated by the agreement to 500 million, correct?

6  A    Correct.

7  Q    And --

8  A    (indiscernible) traunches.

9  Q    Yeah.  And yeah.  Paragraph 3 describes the four

10 traunches, correct?

11 A    Correct.

12 Q    All right.

13     Paragraph 4 was voided.  Paragraph 4 in the old agreement,

14 we didn't look at it.  That was an option to accelerate your

15 investment, correct?

16 A    Right.

17 Q    All right.

18     And then Paragraph 5 says, "Except as expressly amended by

19 this agreement, the provisions of the May 6th agreement shall

20 remain in full force and effect," correct?

21 A    Correct.

22 Q    All right.

23     So this May 10th agreement that you sent over this

24 morning, that doesn't change the process by which you execute

25 the form of exercise, commit to send the immediately payable

1  funds to VTI, and receive shares of stock in exchange.  It

2  doesn't change any of that, does it?

3  A    No.

4  Q    Okay.

5      And sitting here today, Mr. McCarthy, have you executed

6  one of those four Exhibit A exercise forms?

7  A    I have not as we speak.

8  Q    Thank you.

9      Now, just a couple of more questions about this.  The $500

10 million contemplated investment now, that amount contemplates

11 the return of Stream TV's former assets, like Ultra D, back to

12 Stream TV, correct?

13 A    It does.

14 Q    Okay.  And if those assets are not returned to Stream,

15 nothing stops you from renegotiating yet again, the May 6th or

16 the May 10th investment agreements, correct?

17 A    Any businessman would adjust his negotiation to reflect

18 the value of what he's actually investing in.  So yes, that is

19 absolutely right.

20 Q    Okay.  And more broadly, sitting here today, I mean,

21 you've renegotiated this agreement several times.  As we look,

22 sitting here today, there's nothing that prevents from

23 renegotiating the current May 6th, May 10 agreement again,

24 correct?

25 A    I'll think you'll have noticed that every time I've

McCarthy - Cross/Colby                    162

1  negotiated or renegotiated, I've committed more funds to the

2  group.  So actually, it's actually cost me more if you like,

3  rather than it going the other way.  I mean --

4  Q    Yes.

5  A    And why am I doing that?  I'm doing that because I believe

6  in this investment and because I believe in it so much that I

7  want to get greater value in it today ahead of what I perceive

8  to be much greater value tomorrow.  It's that good.  I found

9  more cash and I've made that commitment.

10 Q    Mr. McCarthy, you and I are just on the same page because

11 you have segued exactly into what I want to talk about next.

12       You have that belief in this investment because, and I

13 want to go back to your declaration.

14 A    Yeah.

15 Q    As you said in your declaration, you've conducted due

16 diligence on the debtor, correct?

17 A    Correct.

18 Q    And you said that you're generally familiar with the

19 debtor's day-to-day operations, organization, financial

20 affairs, and books and records.  That's what she told the

21 Court, correct?

22 A    Right.  Are you talking about Stream now or VTI and

23 Stream?

24 Q    Oh, I'm sorry.  I'm sorry.  I misstated that and I

25 apologize.  I'm talking about VTI.

1  A    Yes, absolute.

2  Q    You said you've conducted due diligence on the debtor and

3  VTI.

4  A    Correct.

5  Q    No.  I'm sorry.  I corrected myself unnecessarily and I

6  apologized unnecessarily.

7       Let's look at the language of your declaration just

8  because I've confused it and I want to make sure we're crystal

9  clear.

10 A    Okay.

11 Q    So let's take a look at Exhibit 285.  You're just such an

12 agreeable guy, I agreed with you Mr. McCarthy, and --

13 A    (Laughs)

14      It's because I'm an Irishman.

15 Q    So let's take a look at 285 and let's take a look at

16 Paragraph 3.

17      You say, "I have conducted due diligence on the debtor and

18 VTI and I am generally familiar with the debtor's day-to-day

19 operations, organization, financial affairs, and books and

20 records."  You said to the Court under oath, correct?

21 A    Right.

22 Q    All right.  So let's take a look at some of that

23 diligence.

24 A    Okay.

25 Q    Now, you testified also in your deposition that Mr. Rajan,

1  you felt, had dealt with you in the spirit of full disclosure.

2  Isn't that right?

3  A    I did.

4  Q    And you testified that your diligence included a whole

5  raft of different information or data that management provided

6  to you, right?

7  A    Correct.

8  Q    And you started that diligence, to some degree, even

9  before that February 10th stock purchase agreement that we

10 looked at earlier, right?

11 A    Correct.

12 Q    And before you were presented with that exclusive

13 opportunity to acquire Stream TV for a fraction of its value,

14 you started your diligence back prior to that, right?

15 A    Yes.

16 Q    Okay.  But when you started those negotiations with

17 Mr. Rajan, VTI's president and controlling shareholder, he

18 didn't tell you and you didn't know that he was also the CEO,

19 controlling shareholder, and sole director of Stream, right?

20 A    I didn't know exactly at that time, that is correct.

21 Q    You didn't learn that until some time in early March, two

22 or three weeks after you signed that February 10th stock

23 purchase agreement, right?

24 A    Correct.

25 Q    And you agree with me with the fact that Mr. Rajan

1  controlling both of these entities, that would be a materially

2  fact for you to know as an investor, right?

3  A    Yes, it would be important.

4  Q    Because, as you said on Friday, of course, that would be a

5  conflict of interest in a transaction where VTI is going to be

6  acquiring Stream, right?  Do you agree with that?

7  A    That could be a potential conflict of interest, yes.

8  Q    Well --

9  A    However, what I would say is that from an investment point

10 of view, I saw Mathu Rajan as someone who was deeply

11 knowledgeable of both companies.  Patently, he had founded VTI

12 most recently.  He was a founder of Stream in the beginning.

13 He was involved with the group essentially for many years in

14 its development and essentially, I put a lot of belief behind

15 the fact that this was a man who had, if you like, been the

16 rainmaker, the driving force of both groups.  And I think that

17 was my major thought in terms of backing him and backing both

18 investments.

19 Q    Okay.  I'm going to go back to the question I just asked

20 you now, which is substantially the same as the question I

21 asked you on Friday.

22        MR. COLBY:  And I wanted to take a look at, if we

23 could, Mr. Frank, Page -- of Mr. McCarthy's transcript -- 133,

24 Lines 6 through 10.  133, 6-10.

25              (Clip of videotape deposition played)

1  BY MR. COLBY:

2  Q     That was your testimony on Friday, correct?

3  A     Of course.  Same word.

4        But what I would say in answer to that is, of course, as

5  you put it that plainly, yes.  There would be a conflict.  Of

6  course there would.  But, as I said to you, my considerations

7  were based on broader concepts and a broader, if you like,

8  consideration.

9  Q     Right.  In fact, the broader consideration that you

10 described on Friday was the rule of capitalism.  You said under

11 the rule of capitalism, we agree that each side would want to

12 maximize the benefit that it is going to receive from that

13 transaction.

14 A     Of course.

15 Q     Right?  Yeah.

16       And it would be impossible for Mr. Rajan to negotiate that

17 transaction on both sides because he would be conflicted in his

18 duties to the law of capitalism to maximize the return of the

19 transaction to each of those parties, right?

20 A     Yes.

21 Q     Now, as part of your diligence, you've familiarized with

22 what you believe to be VTI's technology, correct?

23 A     Yes.

24 Q     Okay.  But despite that extensive diligence that you

25 described to the Court in your declaration, and described that

1  you signed paperwork contemplating an investment of $300

2  million in that technology, in your deposition on Friday, you

3  had to refer to your handwritten notes when describing the

4  technology that VTI has access to.  You repeatedly had to refer

5  to your handwritten notes, correct?

6  A    Well, I'm not -- you know, of course.  And my answer to

7  that is, I am not an IT specialist.  I am a financier.  And

8  essentially, nothing wrong with referring notes -- referring to

9  notes for different technologies that are relevant in this

10 instance.  I mean, what's wrong with that?  I don't see what

11 the issue is.

12 Q    Well, I'm simply highlighting, and I want to confirm that

13 it's right.

14 A    Okay.

15 Q    But --

16 A    Yes, I did refer to my notes.

17 Q    Right.  Despite your due diligence, despite your zeal to

18 spend $300 million on this, you had to refer to your notes in

19 order to remember the terms stitching and tiling and multi-

20 view, right?  Yes.

21 A    I referred to my notes.

22 Q    Repeatedly, right?

23 A    I referred to my notes.  I don't see that that is a big

24 issue.

25 Q    Okay.

1  A    But, look, yes, I referred to my notes.  As I said to you,

2  even presidents do.

3  Q    Now, with regard to that technology, you also describe

4  seeing a demo of --

5  A    Yes.

6  Q    -- glasses-free 3D technology --

7  A    Yeah.

8  Q    -- right?

9       But you can't say whether or not that technology was

10  Ultra-D, or whether it was stitching or tiling, or whether it

11  was multi-view, or what it was, right?

12  A    Yeah.

13  Q    Okay.  So it very well could have been Ultra-D technology

14  that you were viewing.  You can't rule that out, right?

15  A    I can't rule that out.

16  Q    All right.

17       Now, I want to talk about contracts.  Mr. Rajan told you

18  that VTI had executed contracts with customers, correct?

19  A    Correct.

20  Q    Including one to put billboards in all the airports in the

21  United States, right?

22  A    Correct.

23  Q    Okay.  And you were surprised to learn when I told you

24  that Mr. Robertson, senior executive of VTI, who according to

25  Mathu Rajan this morning, was handling all the business

1  negotiations with you, or with Mathu.  You were surprised when

2  I told you that Mr. Robertson testified under oath that VTI did

3  not have any executed contracts.  That was a surprise to you on

4  Friday, right?

5  A    (No audible response)

6  Q    Is that a yes?

7  A    (No audible response)

8  Q    Okay.  Thank you.  I didn't mean to talk over you.  I

9  didn't know if I had not heard your first answer.  But your

10 answer was "correct," right?

11 A    Correct.

12 Q    All right.

13      And you were surprised to hear that because Mr. Rajan had

14 told you the opposite, right?

15 A    Correct.

16 Q    Okay.

17      Now, you also testified that you looked at a valuation --

18 A    Yes, I did.

19 Q    -- of Stream TV that was done by a fellow by the name of

20 Richard Pinzer (phonetic).  Do you recall that?

21 A    I do.

22 Q    Okay.  Let's take a look at it.  It's SeeCubic TX 286.

23      And this is a little awkward.  I'm not going to ask you

24 about any specifics.  It's an email that we can look at in this

25 PDF format and then there are two Excel files attached.  Okay.

1      MR. COLBY:  And do the Excel files have the same

2  exhibit number?  They're just separate.

3      MR. FRANK:  (Indiscernible)

4      MR. COLBY:  Oh, I'm sorry.  There are two -- well,

5  I'm just going to flash them on the screen really quickly, and

6  then we'll keep moving.

7      So it's the two next exhibits.  It's 286, 287, and

8  288.

9  BY MR. COLBY:

10 Q    I just want to confirm, Mr. McCarthy, that this is the

11 valuation that you saw.

12 A    Yes.

13 Q    Okay.

14      And you can see there are some tabs across the bottom.

15 This tab happens to be DCF.  Do you know what that means?

16 A    Yes.  Discounted cash flow.

17 Q    Got you.  Okay.

18      All right.  And then, let's look at the next one.

19      Okay.  So this is the valuation that you saw from

20 Mr. Rajan, right?

21 A    Correct.

22 Q    And let's go back to 286 just so we can confirm the date,

23 but I believe this was in February, as well.  February 13th.

24 Okay.

25      So your understanding -- you testified on Friday, your

1  understanding was that that valuation, which ranged from a

2  potential low of 200 million to a high of 600 million, was

3  based on the fact that the company was going gangbusters,

4  right?

5  A   My understanding was that it was based on a number of

6  things, including the intrinsic value of the IP of the product

7  that had been developed.

8  Q   And by that, you mean the Ultra-D product, right?

9  A   Of course.

10 Q   Okay.

11     But you also told me your understanding was that the

12 valuation was based on -- well, actually, let's go back because

13 this intrinsic value of the IP is something we've heard for the

14 first time today.  So let's take an actual look at your actual

15 answer to that question on Friday.

16         MR. COLBY:  Mr. Frank, let's go to 159, Lines 2

17 through 5.

18             (Clip of videotape deposition played)

19 BY MR. COLBY:

20 Q   Okay.

21     And by gangbusters, you told me on Friday, among other

22 things, you understood that the company had a commercialized or

23 commercial ready product, right?

24 A   Commercialized, ready, or in process product is what I

25 would say.

1  Q    Okay.

2  A    Obviously developed but still being refined and getting

3  better over time with more application and more investment.

4  Q    Okay.

5       Well, let's take a look at the next question and answer,

6  159, Line 6, through 159, Line 14.

7            MR. COLBY:  Actually, pause.  159, 6 through 159, 19.

8  Two questions and answers.

9            (Clip of videotape deposition played)

10 BY MR. COLBY:

11 Q    Okay.  So that was a correct at the end behind Mr. Sten's

12 objection, right?

13 A    Correct.

14 Q    Okay.  So on Friday when I told you that Stream has never

15 actually commercialized a product on any meaningful scale or

16 generating any meaningful revenue, you were surprised by that,

17 right?

18 A    I was surprised, yes.

19 Q    Yes.  And then, because that's not consistent with what

20 you had been told.  True?

21 A    Not totally.

22 Q    It was not totally consistent with what you had been told,

23 correct?

24 A    Correct.

25 Q    All right.

1  A    I will answer your question specifically, but --

2  Q    I appreciate --

3  A    -- my (indiscernible) is always that I take a bigger view.

4  Q    I see.  Okay.  So let's take a look at -- we've looked at

5  this already, but we're going to look at a different

6  attachment.  Let's take a look at Exhibit 179, TX 179, and this

7  is taking you back to that February 8th presentment of the

8  investment opportunity, the original investment opportunity?

9  A    Right.

10  Q    And we looked at the first attachment, which is the plan

11  to purchase at a fraction of value, but now, let's look at this

12  second attachment.

13  A    Um-hum.

14  Q    So this is a presentation about Stream TV and Ultra-D that

15  you received in connection with your decision to invest with

16  VTI, right?

17  A    Correct.

18  Q    Okay.  And we spent a lot of time on this before, but

19  let's just go to one slide.  It's Bates 1048.  And let's just

20  take a look at this.  This is a slide entitled, "Customer

21  Update."  Do you see that?

22  A    I do.

23  Q    Okay.  And let's go through this.  This was presented to

24  you in February.  When it was presented to you in February --

25  A    Um-hum.

1  Q    -- you had not been told that the Bosch (phonetic) project

2  was actually being run by SeeCubic at that point in time,

3  Correct?

4  A    Correct.

5  Q    And --

6            MR. STEN:  Objection.

7            MR. COLBY:  -- in what is presented to you --

8            MR. STEN:  Objection.  Which SeeCubic?

9            THE COURT:  Oh, that's a very good point.  Which

10 SeeCubic?

11           MR. COLBY:  Yes.  So it was --

12           THE COURT:  Several.

13           MR. COLBY:  Yes.

14 BY MR. COLBY:

15 Q    It was being run by both of them, correct?

16 A    You're talking about Delaware or you're talking about

17 Netherlands?

18 Q    Yes.  I'm talking about both of them.

19 A    Yeah.

20 Q    That was yes, right?

21 A    Correct.

22 Q    Okay.  You hadn't been told that it was being run by those

23 entities.  Now, let's take a look at Google.  At the time of

24 your investment you hadn't been told that the Google project

25 was canceled, right?

1  A    No, I wasn't; not that I can recall, anyway.

2  Q    Okay.  And you hadn't been told that the Google project

3  was a commitment for a demonstration unit, and that Stream TV

4  under the Rajan's management had been like 18 months late in

5  delay -- in delivering that demonstration unit.  You didn't

6  know that either?

7  A    No, I did not.

8  Q    Okay.  Now, we can go faster through the rest of them.

9  Wallway.  Were you told that Wallway had -- that Stream TV had

10 no contracts and no revenue from Wallway?

11 A    Nope.

12 Q    Were you told that Stream TV had no contracts and no

13 revenue from Skyworth?

14 A    Not that I recall.

15 Q    And were you told that Stream TV had no revenue and no

16 contracts with Lenovo?

17 A    Again, not that I recall.

18 Q    And were you told that Stream TV had no revenue and no

19 contracts with Chunghwa Telecom?

20 A    Again, same answer.

21 Q    Okay.  Now, you agreed with me on Friday that having --

22 without having sold any products to these entities, and without

23 having executed contracts, you agreed that that's not fairly --

24 that those entities are not fairly described as customers,

25 right?

1  A     Have you forgot the -- what I would say is that my

2  understanding is a lot of these contracts would have happened

3  but for what has gone on within the group.  There has been a

4  lot of division, basically, the splitting off of the chattel,

5  the base, and the secured base did a lot of damage to what --

6  to contracts that were happening and live and likely.

7  Q     Um-hum.

8  A     And it's very interesting that on this slide you've got

9  potential revenue rather than actual revenue.  And I'm a man

10 who invests in the future, not in the past, and I'm basically

11 looking at something from the point of view of where I see it

12 can go.

13        As I said to you on Friday, time and space and capital

14 will make the different, and if we can free up this group and

15 if I can be the adult in the room, which basically gets the

16 assets back into VTI's stream and where we are allowed to grow

17 this business from where it's got to, there is a fantastic

18 future.  And that's why I'm backing it and that's why I've

19 added the amount of investment that I'm going to make to it.

20 Q     Okay.

21 A     That can only be good.

22 Q     Mr. McCarthy, I know you've been looking forward to saying

23 that all morning.

24 A     You know what?  You've been holding me back.

25 Q     But I would actually just like you to answer my question.

McCarthy - Cross/Colby                177

1  A    Okay.

2  Q    Which was, you agreed with me, you know, you agreed with

3  me that absent having sold any products to these entities and

4  absent having received any meaningful revenue from these

5  entities, and absent any sort of executed contract with one of

6  these entities that you wouldn't fairly describe them as a

7  customer, right?

8  A    Correct.

9  Q    Okay.  Now, we're almost done, and a couple of other quick

10 things.  In connection with your investment in VTI and then

11 into Stream, no one ever told you that Stream's secured

12 creditors had security interests in all of Stream's assets,

13 right?

14 A    That's correct.

15 Q    And until I told you on Friday, no one had ever told you

16 that Stream's independent directors had executed an agreement

17 to transfer all of Stream's assets to the secured creditors to

18 satisfy those security interests, right?

19 A    Correct.

20 Q    And to this day -- well, at least as of Friday, you still

21 haven't seen that, that agreement that's referred to as the

22 Omnibus Agreement.  You haven't seen that agreement, right?

23 A    That is true.

24 Q    Okay.  And have you seen it since Friday?

25 A    I have.

1 Q    Okay.  Now -- and that includes -- that includes a

2 board -- you've had one VTI board meeting, right?

3 A    Yes.

4 Q    And in the board meeting --

5 A    I was made the director on the 28th, by the way.

6 Q    Right.  Yeah, you became a director on the 28th, and you

7 had a board meeting almost right around then, right?

8 A    Correct.

9 Q    Okay.  And in the board meeting it never came up that

10 VTI's investment in Stream was premised on assets that had been

11 signed away by Stream's board to satisfy a secured debt?

12 A    It -- that was not discussed.

13 Q    Okay.

14 A    We were discussing a number of other things.  I mean, it's

15 early days.  I've only just very much actively come into the

16 business in the last few --

17 Q    Right.

18 A    -- months.

19 Q    Right.

20 A    But yes.

21 Q    But no so early that you haven't claims to put up $500

22 million, $1/2 billion, Mr. McCarthy.

23 A    Well --

24 Q    That's what you say.

25 A    It's a lot of money.

1 Q    It is.  And it's a lot of money not to know -- it's a lot

2 of money not to know all this material information, right?

3 A    Well, I take a more positive view on things, and that is

4 that assets will be returned to the original founding company,

5 which is the Stream, and that we will have the opportunity to

6 do the right thing.

7 Q    Right.

8 A    Which is to reorganize, recapitalize and develop --

9 Q    But Mr. McCarthy, you're a smart and experienced

10 businessman.

11 A    I am.

12 Q    You are.  And you --

13 A    Yes.

14 Q    -- you are not sitting here today, you haven't executed

15 one of those Exhibit A's.  So you're not legally bound to pay

16 that $500 million, are you?

17           MR. STEN:  Objection.

18 BY MR. COLBY:

19 Q    What's your answer, Mr. McCarthy?

20 A    I am making the investment.

21 Q    No.  I understand you say that's your intent.  I'm asking

22 whether or not you are legally bound.  You have not signed one

23 of those Exhibit A exercise forms, correct?

24 A    I have not, but I will.

25 Q    Okay.

1          MR. STEN:  Your Honor, this is a legal argument about

2  the meaning of that term.

3          MR. COLBY:  It's not a legal argument, Mr. Sten.  I

4  have a couple more questions.

5          MR. STEN:  It's an absolutely legal argument and I

6  don't agree with your interpretation of that Exhibit A.

7          THE COURT:  I will overrule the objection.

8          MR. COLBY:  Thank you.

9  BY MR. COLBY:

10  Q    Okay.  Mr. McCarthy, one more subject matter, and that's

11  the preliminary injunction.  Do you know what I'm referring to

12  when I mention the preliminary injunction?

13  A    Not exactly.

14  Q    Okay.  Let's -- we looked at it on Friday.  Let's take a

15  look.  It is -- sorry -- Exhibit 1.

16          MR. COLBY:  Yeah.  Oh, it's in -- it's -- okay.

17  Sorry.  It's an attachment to Exhibit 1.  We have to scroll way

18  down.  Keep going.  So this is from the foreclosure action.

19  There -- so here.  So this is the opinion.

20  BY MR. COLBY:

21  Q    Sorry about this, Mr. McCarthy.  We'll get through it.

22  A    Don't worry.  Don't worry.

23  Q    Very good.

24          MR. COLBY:  Here's the opinion.  Keep going.  Keep

25  going.  I think it's all the way to the end.  Okay.  Todd, you

1  can go all the way down -- okay.  Now, you go up one, one more.

2  Okay.  All right.

3  BY MR. COLBY:

4  Q    Order granting motion for preliminary injunction.  Sorry

5  about that.  We looked at that, right, Mr. McCarthy, on Friday?

6  A    Yes.

7  Q    Yes.  Okay.  And prior to my showing it to you on

8  Friday --

9  A    Um-hum.

10 Q    -- neither Mr. Rajan, nor anybody associated with VTI had

11 told you that Mr. Rajan and Stream were subject to this

12 injunction, correct?

13 A    Correct, but I think --

14 Q    And nobody told you that the Chancery Court in Delaware

15 had prohibited Mr. Rajan from exercising or asserting any

16 ownership rights over any of Stream TV's assets, right?

17 A    Right.

18 Q    And when I asked you on Friday you agreed with me that Mr.

19 Rajan had lied to you about this, right?

20 A    I wouldn't say -- I mean, my recollection is that he

21 didn't mention it to me.  Did he lie?  I mean, you know,

22 that -- that I couldn't claim at all.  I mean, he didn't

23 declare this, is my recollection.

24 Q    Well, you and I agreed on Friday, you agreed that it was a

25 lie by omission, right?

1  A    That could be right.  He's Catholic.

2  Q    You agreed that it would have been material information

3  for you to know?

4  A    Of course.

5  Q    Of course, right.  And by not disclosing that material

6  information Mr. Rajan had lied to you at least by omission,

7  right?

8  A    Yes.

9  Q    Okay.  Thank you very much for your time.  I can't promise

10 I won't have more questions later, but I'm done for now.  Thank

11 you very much.

12         THE COURT:  Okay.  Who wishes to ask any questions of

13 Mr. McCarthy that's not VTI?  Ms. Sierra, do you want to ask

14 any questions of Mr. McCarthy?

15         MS. SIERRA:  Your Honor, Rosa Sierra, for the U.S.

16 Trustee.  I don't have any questions for Mr. McCarthy.

17         THE COURT:  Okay.  Mr. McMichael or one of your

18 colleagues, Mr. Weis.

19         MR. WEIS:  Your Honor, we'll ask questions, but we --

20 but I think we'd ask -- we talked to Mr. Sten and he would ask

21 them first.

22         THE COURT:  Oh, okay.  Is that correct --

23         MR. WEIS:  It's okay to --

24         THE COURT:  -- Mr. Sten?

25         MR. STEN:  Yeah.  I don't know if the unsecured

1  creditors' committee has any questions, though.

2            THE COURT:  Mr. Samis, do you have anything for the

3  witness?

4            MR. SAMIS:  The committee has no questions for this

5  witness, Your Honor.

6            THE COURT:  Okay.  Thank you for confirming.

7            Okay.  Mr. Sten, then, please go ahead.

8                          CROSS-EXAMINATION

9  BY MR. STEN:

10 Q    Good afternoon, Mr. McCarthy.  Actually, good evening your

11 time.

12 A    Good evening, John.

13 Q    That's unfortunately another long day for you.  I

14 apologize for that.

15 A    Oh.

16 Q    I'm just going to go through a few things we heard here.

17 So on cross you remember Mr. Colby called your statements to

18 fund VTI and Stream, he called it your personal convictions.

19 Do you recall that?

20 A    Yes.

21 Q    But taking that, is it -- the commitment to fund VTI and

22 Stream, is that a commitment of Burlington Resources?

23 A    Correct.

24 Q    And you speak for Burlington Resources, correct?

25 A    Correct.

1  Q    Who makes the investment decisions for Burlington

2  Resources?

3  A    I do.

4  Q    Do you have to consult with anyone else?

5  A    No.

6  Q    So that's more than just your personal conviction?

7  A    Completely.

8  Q    And so let me ask you, as you sit here today, is

9  Burlington Resources committed to funding its investment in VTI

10 and Stream?

11 A    You -- I lost the last bit of that sentence.

12 Q    Oh, I'm sorry.  I'm saying, as you sit here today --

13 A    Yeah.

14 Q    -- is Burlington Resources committing to funding its

15 investment in VTI and Stream?

16 A    Absolutely.

17 Q    Do you consider that a personal conviction?

18 A    I consider that a corporate commitment.

19 Q    Do you consider that a legal commitment?

20 A    Correct.

21 Q    So you would consider your -- Burlington Resources legally

22 bound to make the funding that's been discussed here today?

23 A    I do.

24 Q    Any outs, any contingencies, any weasel --

25 A    No.

1  Q    -- type things?

2  A    No.

3  Q    I'm going to keep my questions short, and I know my

4  brother's going to show you a couple documents, I think.  So

5  I'll let him do that part.

6  A    Right.

7  Q    But this is -- I can't let this part go.  Do you recall

8  during your direct you were asked about -- I'm going to talk

9  about me in the third person, Mr. Sten's comments?

10 A    Yes, I do.

11 Q    Do you remember Mr. Colby called me a litigation attorney?

12 A    Yes.

13 Q    Do you know that I'm also a corporate attorney?

14 A    That would -- I do, yes, I do, absolutely.

15 Q    You know I'm a corporate and securities attorney who

16 started his career at the SEC?

17 A    I actually didn't, but it wouldn't surprise me, John.

18 Q    Do you know I act as outside corporate counsel to a number

19 of other companies?

20 A    Again, I would -- that would seem totally logical to me.

21 Q    That's why I asked, because it's kind of logical.  So as

22 you sit here today, and as it was referred to, you went through

23 a very long deposition on Friday, correct?

24 A    It was exhausting.

25 Q    And that deposition occurred after you had executed a

1  number of purchase agreements and purchase agreement

2  amendments, correct?

3  A    Correct.

4  Q    And yet, after that -- or during that deposition you

5  learned a number of facts that maybe you weren't necessarily

6  fully aware of, correct?

7  A    Correct.

8  Q    Did that cause you to pull your investment?

9  A    No.  I actually increased it.

10          MR. STEN:  I have no further questions.

11          THE COURT:  Mr. Weis.

12          MR. WEIS:  Thank you, Your Honor.

13          MR. STEN:  Oh, I apologize.  I completely blanked on

14  one question, which is important.

15          THE WITNESS:  Go ahead, John.

16                  FURTHER CROSS-EXAMINATION

17  BY MR. STEN:

18  Q    What are the amount of assets under management for

19  Burlington Resources?

20  A    Billion.

21  Q    I'm sorry, what?

22  A    One billion.

23  Q    One billion.  And who controls those assets?

24  A    I do.

25  Q    And Burlington Resources, where is it located?

1  A    Hong Kong.

2  Q    And it's subject to the laws of Hong Kong, correct?

3  A    Correct.

4  Q    Including its banking privacy laws, correct?

5  A    Correct.

6  Q    And as you sit here today you're actually in Spain,

7  correct?

8  A    Correct.

9  Q    Which -- state the obvious -- is part of the European

10 Union?

11 A    Correct.

12 Q    Which means that you're also subject to the laws there, as

13 well?

14 A    Of course.

15 Q    Including the laws of banking privacy and other privacy

16 laws that are different from U.S. law, correct?

17 A    Absolutely right.

18 Q    So what would happen to you if you violated those laws?

19 A    I could face criminal and punitive consequences.

20 Q    Thank you.

21        MR. STEN:  Sorry for forgetting that.  It's always

22 the way.

23        THE WITNESS:  (Indiscernible).

24        THE COURT:  Mr. Weis, do you have any questions?

25        MR. WEIS:  I do, Your Honor.

1                        CROSS-EXAMINATION

2  BY MR. WEIS:

3  Q    Good afternoon, Mr. McCarthy.  My name is Martin Weis.

4  I'm here on behalf of Stream TV.

5  A    Hello.

6  Q    With regard to Burlington, what is the complete name of

7  the entity?

8  A    Burlington Resources Asia, Limited.

9  Q    And could you describe very briefly what it does?

10 A    It makes investments in businesses and companies in

11 organized nations globally.

12 Q    And --

13 A    Where there are opportunities for growth and development.

14 Q    Okay.  And with regard to the growth, development, was it

15 your testimony on Friday that you say it takes strategic stakes

16 in businesses that it likes?

17 A    Correct.

18 Q    Okay.  And it wants to take it -- take those businesses to

19 another level?

20 A    Correct.

21 Q    Okay.  Is VTI one of those instances?

22 A    Absolutely.

23 Q    All right.  And the one billion that it has under assets,

24 just to clarify the record, is that U.S. dollars?

25 A    Correct.

1  Q    And with regard to the size of the transaction with VTI,

2  you were describing it on Friday as small.  Is that correct?

3  A    Correct.

4  Q    And why do you say that?

5  A    Because historically, I've done bigger transactions, and

6  also, the fact that I see it as small relative to its potential

7  valuation.

8  Q    And does Burlington use its own money to make these

9  investments?

10  A    It uses money that it controls, its money and others'.

11  Q    Okay.  And was it your testimony on Friday that it uses

12  approximately 70 percent of its own money?

13  A    Correct.

14  Q    Okay.  Now, just to clarify, your testimony on Friday was

15  that the funding of the $180 million is not contingent or

16  conditional.  Is that correct?

17  A    Correct.

18  Q    All right.  And then with regard to the execution of the

19  subscription agreement to the amended asset purchase agreement,

20  you testified that that would be done imminently, correct?

21  A    Yes.

22  Q    And by imminently, what did you mean?

23  A    This month.

24  Q    All right.  And then you also testified that the funds

25  would be sent to VTI imminently, did you not?

1  A    Correct.

2  Q    And by imminently, what did you mean?

3  A    This month.

4  Q    And was it also your testimony that Burlington would still

5  have an interest in VTI without the Ultra-D technology?

6  A    Yes.

7  Q    And that investment would still be substantial?

8  A    Correct.

9  Q    All right.  Now, in your -- if we could -- if I could ask

10 if it could be put up on the screen, the May 6th agreement.

11 A    Yes.

12          MR. WEIS:  I think someone's going to try to put that

13 on the screen, Your Honor.

14          MR. COLBY:  Yeah, Max, I think, is going to put that

15 up.

16          THE COURT:  Who is the party that's wishing to put an

17 item on the screen?

18          MR. WEIS:  Attorney Max Feit, F-e-i-t.

19          THE COURT:  Okay.  Can we make that person a co-host.

20 You said Maxwell Feit.  Is that correct?

21          MR. WEIS:  Correct.  Yes, Your Honor, that's him.

22          THE COURT:  Okay.  Okay.  He has co-hosting

23 responsibilities and can share his screen when ready.

24          MR. WEIS:  Thank you, Your Honor.

25 BY MR. WEIS:

1  Q    Mr. McCarthy, do you see the document that's been placed

2  on the screen?

3  A    Yes, I do.

4  Q    Do you recognize that document?

5  A    I do.

6  Q    Can you tell the Court what it is, please?

7  A    It's an investment -- it's a stock purchase agreement

8  between Burlington and VTI.

9  Q    And is that an agreement that -- entered into?

10 A    I'm sorry.  You broke up there.  Could you say that again?

11 Q    Certainly.  Is that a --

12          MR. COLBY:  Could you get that full to Max, please.

13 I won't interrupt again, Marty.  I apologize.

14          THE WITNESS:  Yes.  Sorry.  I didn't hear your

15 question.

16 BY MR. WEIS:

17 Q    And that's an agreement that was entered into by

18 Burlington, correct?

19 A    Correct.

20 Q    Was your answer yes, sir?

21 A    Yes, it was yes.

22 Q    Okay.  All right.  I'm sorry.  Now, I'm having trouble

23 hearing.

24          MR. WEIS:  All right.  Max, if you could put the May

25 10 agreement up, please.

1  BY MR. WEIS:

2  Q    Mr. McCarthy, do you see an agreement that's now been

3  placed on the screen?

4  A    I do, yes.

5  Q    Can you -- do you recognize that document?

6  A    Yes.  This is the document of the 10th of May.

7  Q    Okay.  And is that -- and who are the parties to that

8  document?

9  A    Burlington and VTI.

10 Q    And did you execute that document on behalf of Burlington?

11 A    I did.

12 Q    Okay.  Thank you.  Now, is it fair to say that your deal,

13 meaning Burlington's, deal with VTI has evolved over time?

14 A    Yes.  It's been intricate.  That is a fair comment.

15 Q    Okay.  And we heard some talk earlier about board seats.

16 How many seats on the VTI board does Burlington have?

17 A    Burlington will have three out of six.

18 Q    Okay.  And there was also a question that was raised, Mr.

19 Colby in his --

20         MR. WEIS:  Max, we don't need that document anymore.

21 Thank you.

22 BY MR. WEIS:

23 Q    Mr. Colby in his examination of you asked you about the

24 unsecured creditors' committee statement.  Do you recall that

25 earlier today?

1  A    I do.

2  Q    Okay.  And he asked you if you testified on Friday that

3  you agreed with it, did he not?

4  A    I did.

5  Q    Okay.  And on Friday wasn't your answer more qualified?

6  A    You know what?  I may have been a little more qualified,

7  but I must admit, I don't remember precisely.  It was a very

8  long hearing or --

9           MR. WEIS:  Max, if you could put up the deposition

10  exhibit page 53.

11           Mr. Colby, I'm going to be referring to lines 18

12  through 22.

13           MR. COLBY:  Um-hum.

14  BY MR. WEIS:

15  Q    So if you can -- do you see page 53 --

16  A    Yes.

17  Q    -- Mr. McCarthy?  All right.  And what I'm -- what I'd

18  like to draw your attention to is the question that was asked

19  you, the actual question that was asked you on Friday was, "In

20  reviewing the UCC" -- I'm starting on line 13 -- "In reviewing

21  the UCC statement, which you just read, did you see any

22  assertions by the UCC that you disagreed with?"

23  A    Um-hum.

24  Q    Do you see the question?

25  A    I do, yeah.

1  Q    And then can you read on -- starting on line 19 what your

2  answer was?

3  A    Now --

4  Q    If you could read it out loud, sir.

5  A    Is that where it's Mr. Colby or?

6  Q    No.  Your answer is on line 19.

7  A    The answer's on line 19.  "No.  No.  I mean, I've just

8  read it in detail.  I'd have to go away and look at it in a

9  little more detail, I have to say.  But on first assessment,

10  no, not obviously."

11  Q    Okay.  Since Friday, sir, have you looked at that document

12  at all?

13  A    I haven't.

14  Q    Okay.  And then finally, you heard a lot of negatives

15  today in the questioning from SeeCubic about the debtor?

16  A    Yes.

17  Q    Okay.  Did you hear anything today in terms of negatives

18  that you didn't hear on Friday?

19  A    No.

20        MR. WEIS:  I have nothing further, Your Honor.  Thank

21  you very much.

22        Thank you, Mr. McCarthy.

23        THE COURT:  Okay.  I actually have a question,

24  because again, I get confused very easily apparently.  So I

25  apologize.  I want to clear up some of the -- some testimony,

1 and follow up questions to the extent that they need to.  But

2 there was a lot of discussion about your commitment, Mr.

3 McCarthy, and I think you made it very clear that you're

4 excited about this venture and that you're committed.  That was

5 abundantly made clear to me.  But so far it appears you've made

6 a $500 commitment, correct?

7          THE WITNESS:  Correct.

8          THE COURT:  Okay.  And was I correct in hearing that

9 you said that the funds will be transferred this month?

10          THE WITNESS:  The agreement anticipates tranche

11 payments, and the first payment is 60 million and that will be

12 made this month.

13          THE COURT:  Okay.  And then walk me through how the

14 next tranches are going to be made.

15          THE WITNESS:  So basically, on a monthly basis

16 thereafter there will be four tranches of 110 million.

17          THE COURT:  And so that's on a monthly basis.

18          THE WITNESS:  Correct.  There is a bit of a --

19          THE COURT:  Okay.

20          THE WITNESS:  -- grace period in between, but that's

21 not significant.

22          THE COURT:  Okay.  And so let me ask you this,

23 because you're so excited about the Ultra-D assets, and your --

24 it was made clear to you that those -- some of the assets are

25 comprised of the Ultra-D assets, 12 to 15 components, Mr Rajan

1  said.  Some may not be in the estate anymore, okay.

2           THE WITNESS:  Yes.

3           THE COURT:  And then some are subject to claims and

4  assertions by the secured lenders.  So what if those assets or

5  those components are never made available to the estate?

6           THE WITNESS:  I --

7           THE COURT:  What would happen to the $500 million

8  commitment?

9           THE WITNESS:  My commitment is still there, because

10 my belief is that with the capital, the time and the space,

11 even if what I am buying into -- but I hope this isn't the case

12 -- isn't totally complete, with the capital we'll be able to

13 build on it and very quickly get past where it was before.

14          THE COURT:  So in other words, the I guess other

15 assets that Mr. Rajan discussed -- and forgive me, I want to go

16 back in my notes to make sure that I state them correct -- the

17 rights under the stitching and the tiling and the modified

18 light deal.  Is that what you're indicating that you are

19 committed to?

20          THE WITNESS:  Absolutely.

21          THE COURT:  Okay.  So even if the Ultra-Do assets

22 aren't made available to VTI in some form or capacity, you're

23 prepared to fund 500 million to VTI?

24          THE WITNESS:  Yes.  I mean, I'd be very disappointed,

25 however, if the Ultra-D wasn't available, as well.  I have to

1  tell you.  But that is correct.

2          THE COURT:  Okay.  And your commitment is to VTI,

3  correct, not Stream, necessarily?

4          THE WITNESS:  It is to VTI, although patently I see

5  Stream as part of VTI's greater plan at maximum achievement in

6  terms of --

7          THE COURT:  And why is that?

8          THE WITNESS:  Because Ultra-D, I think, is a world-

9  beating application.  Modified light field is very good, but it

10  is behind.  So Ultra-D I see as the launchpad and the core

11  asset of the group.  So I would like very much for that to come

12  within VTI's control.

13          THE COURT:  Okay.  Okay.  Thank you very much.  That

14  was very helpful.

15          Okay.  Does anyone have any followup questions of Mr.

16  McCarthy, based on my questioning before I turn the podium over

17  to Mr. Colby?  No.  Okay.

18          Okay.  Mr. Colby, did you have any recross on any of

19  the scope -- or any of the questioning by the parties?

20          MR. COLBY:  No, Your Honor.

21          THE COURT:  All right.

22          MR. COLBY:  Thank you very much.

23          THE COURT:  Okay.  Mr. McCarthy, thank you so much

24  for your time and attention to this matter, including staying

25  awake into the later hours of the evening where you are.  You

1  can consider yourself released from our virtual witness box.

2      (Witness excused)

3              THE WITNESS:  You're very kind.

4              THE COURT:  Take care.

5              THE WITNESS:  All the best.  Bye-bye.

6              THE COURT:  Bye-bye.  Okay.

7              MR. LARKIN:  Good afternoon, Your Honor.  The movants

8  call Bud Robertson as their next witness.

9              THE COURT:  Okay.  Mr. Robertson, are you with us?

10 Oh, there you are, sir.  Nice to see you.

11             MR. ROBERTSON:  You, too.  Thank you.

12             THE COURT:  Okay.  I'm going to swear you in, sir,

13 and then I will tender you to Mr. Larkin.

14        CHARLES M. ROBERTSON, MOVANTS' WITNESS, SWORN

15             THE COURT:  Can you state your name for the record

16 and spell your last name?

17             THE WITNESS:  Yes.  It's Charles M. Robertson.

18 C-h-a-r-l-e-s, M. like Michael, Robertson, R-o-b-e-r-t-s-o-n.

19             THE COURT:  Thank you very much.

20             Mr. Larkin, when you're ready.

21                      CROSS-EXAMINATION

22 BY MR. COLBY:

23 Q   Mr. Robertson, we met at your deposition and we meet again

24 today.  Welcome back, sir.

25 A   Thank you.

1           MR. COLBY:  We covered a lot of ground already this

2    morning, Your Honor, and I have some topics that I was going to

3    cover with Mr. Robertson that I think we've plowed aplenty

4    here.  So I'm going to try and move efficiently here.

5    BY MR. COLBY:

6    Q    Mr. Robertson, you're currently the executive vice

7    president of Stream, correct?

8    A    That's correct.

9    Q    Okay.  And you're also currently employed by VTI, right?

10   A    Yes.

11   Q    All right.  And you're being paid an annual salary of

12   $150,000 per year by VTI, right?

13   A    That's correct.

14   Q    Okay.  And you've been employed by VTI since early January

15   of this year, right?

16   A    Correct.  I'm a consultant, but essentially, yes.

17   Q    Okay.  And you worked with Mr. Rajan to help form VTI,

18   correct, in January?

19   A    I wasn't involved in the formation process, but I have

20   been involved with him subsequent to that process.

21   Q    Okay.  And you're also the first day declarant of Stream

22   TV, correct?

23   A    Yes.

24   Q    That you've now submitted three declarations to Her Honor

25   so far in the case, right?

1  A    I have.

2  Q    And in your current position in VTI you don't have a

3  title, but you told me in your deposition you're functioning as

4  a senior executive, right?

5  A    I'd say that's fair, yes.

6  Q    Okay.  And you're currently being loaned out, if you will,

7  from VTI to Stream to provide similar services to the debtor,

8  correct?

9  A    Technically correct, yes.

10 Q    All right.  So you're wearing two hats, if you will.  You

11 have a Stream hat and you have a VTI hat, right?

12 A    That's correct.

13 Q    And you told me that -- at your deposition that regardless

14 of what hat you might be wearing at a particular moment, you

15 always have an obligation to act in the best interest of the

16 debtor, correct?

17 A    That's correct.

18 Q    Okay.  I'm correct that since VTI was formed in January

19 there have been negotiations between VTI and Stream with

20 respect to certain agreements, right?

21 A    Yes.

22 Q    Okay.  And for example, in your deposition you told me

23 about a sales and support agreement that was being negotiated

24 between Stream and VTI, right?

25 A    That's correct.

1  Q    Okay.  And Mr. Rajan led the negotiations for Stream of

2  that agreement, correct?

3  A    Yes.

4  Q    Okay.  And you lead the negotiations for VTI, correct?

5  A    Essentially, yes.

6  Q    All right.  So in that negotiation you have your VTI hat

7  on and Mr. Rajan has his Stream hat on, right?

8  A    Yes.

9  Q    Okay.  And Mr. Rajan, who you worked for, for years at

10 Stream TV and was also the controlling stockholder of VTI, he

11 decided that you would handle the negotiations for VTI,

12 correct?

13 A    I don't know that I would say that it was his decision.

14 There was a discussion about the need to have both sides

15 represented and what that deal could look like.

16 Q    Okay.  Well, let's take a look at what you told me at your

17 deposition.

18         MR. COLBY:  Mr. Frank, could you go to Mr.

19 Robertson's deposition at page 60, lines 4 through 10?  And I

20 can just read this.  We don't need to play the video, if you'd

21 just pull the page up for page 60 of Mr. Robertson's

22 deposition.  Try to save us some time here, Your Honor, on the

23 videos.

24         MR. FRANK:  Sorry.  It's actually easier for me to

25 pull up the video, if it's okay.

1          MR. COLBY:  That's fine.  All right.  Let's play it.

2   Thanks.

3       (Excerpt of Mr. Robertson's video deposition, page 60,

4   lines 4-10, played into the record.)

5   BY MR. COLBY:

6   Q    Mr. Robertson, did I ask you that question; did you give

7   me that answer in your deposition on April 29th?

8   A    I did.

9   Q    Okay.  Thank you.  And it's also true, sir, we've heard

10  today that there are some new members of the VTI board that

11  have come aboard, if you will, in the last few days leading up

12  to today's trial.  The new members of the VTI board didn't

13  decide who would handle the negotiations for VTI, right?  It

14  was Mr. Rajan?

15  A    Yeah, that's correct.  They were not involved.

16  Q    Okay.  And at least as of your deposition Mr. Rajan was

17  still the controlling stockholder of VTI, right?

18  A    That's my understanding, yes.

19  Q    Yeah.  And as the controlling stockholder of VTI, he has

20  the power to remove all of the directors of VTI if he wants to,

21  right?

22  A    There's been no indication of that desire, but I suppose

23  that's effectively correct.

24  Q    And with -- we heard a little bit about some negotiations

25  for the DIP loan earlier today from Mr. Rajan.  Mr. Rajan was

1  negotiating for the debtor with respect to that DIP loan,

2  correct?

3  A     Correct.

4  Q     Okay.  And you were involved on behalf of VTI, right?

5  A     I was not involved in any of the financial negotiations.

6  As Mr. Rajan said, I'm primarily an operations guy.

7  Q     And you don't recall telling me in your deposition that

8  you were involved on behalf of VTI and Mr. Rajan was involved

9  for the debtor in negotiating the terms of the DIP loan?

10 A     I don't recall saying that, no.  I probably said that I

11 was involved somehow in the paperwork and the preparation of

12 the filings.

13 Q     You don't recall telling me that you were involved in

14 those discussions, those negotiations with Mr. Rajan?

15 A     I don't recall that --

16 Q     And you would be --

17 A     -- I don't recall saying that.

18 Q     -- involved in some drafting of the documentation, right?

19 A     I don't recall saying that.

20 Q     Mr. Robertson, as the debtor's first day declarant --

21 we've heard about VTI.  Let's focus on the debtor, okay.

22 You're still the senior vice president of the debtor, correct?

23 A     Yes.

24 Q     All right.  And you're the debtor's first day declarant,

25 right?

1  A    Yes.

2  Q    And you swore to the Court that you were familiar with the

3  day-to-day business operations of Stream, correct?

4  A    Correct.

5  Q    Right.  You've worked in Stream for many years, right?

6  A    That's correct.

7  Q    Okay.  And as the debtor's first day declarant and the

8  senior vice president, you don't know what process the debtor

9  ran to seek out the most favorable financing for its DIP loan,

10 right?

11 A    That's correct.  Finance is not my area.

12 Q    Okay.  And you also have no idea as the debtor's first day

13 declarant and senior vice president of Stream whether Mr. Rajan

14 received any other indications of interest or DIP proposals,

15 other than VTI, right, from anyone other than VTI, right?

16 A    I know that he was exploring a number of options.  I don't

17 know which of those discussions resulted in an offer for

18 financing.  That's correct.

19 Q    Okay.  So let's turn in your declaration, Mr. Robertson.

20 I want to ask you some questions about some of the statements

21 that are made in there.  Let's talk about the debtor's

22 business, or the lack of a business, if you will.  The

23 debtor -- as of the petition date in February the debtor had no

24 day-to-day or regular course of business operations, correct?

25 A    It lacked the funding to do so, correct.

1  Q    Mr. Robertson, yes or no?  As of the petition date did the

2  debtor have any regular course of business operations?

3  A    I said correct.

4  Q    Okay.  And as of the petition date the debtor had no

5  employees, correct?

6  A    That's correct.

7  Q    Okay.  And as of the petition date it had no payroll,

8  correct?

9  A    That's correct.

10 Q    And even as of last week, or two weeks ago, I guess, now,

11 when I took your deposition, the answers to all of those

12 questions was the same, right?

13 A    The debtor was under a status quo order that prevented it

14 from obtaining any financing from mid-September.  So it ran out

15 of resources by the time that the petition was filed, and it

16 has not been allowed to obtain the DIP financing requested.  So

17 it doesn't have the cash resources in hand and has been

18 prevented from accepting any.  So the answer is, no, not at

19 this time.

20 Q    Let me ask you about the three platforms that you talk

21 about in your first day declaration, the three platforms for

22 Stream's business going forward.  In your first day dec, Mr.

23 Robertson, you testified that the debtor's business model

24 currently contemplates multiple paths to market, and there's

25 three separate product platforms.  There's two-view products,

1 multi-view products and Ultra-D products, right?

2 A    That's correct.  And for clarification for the Court, I

3 use the phrase "multi-view."  That's the same modified light

4 field that Mr. Rajan uses a different term.  We're talking

5 about the same thing.

6 Q    I really appreciate that clarification, Mr. Robertson.

7 A    And sorry to interrupt, but the stitching and tiling in

8 two-view also same thing, just different terms for the same

9 bucket of technology.

10 Q    Well, let's talk about those.  Let's take them one at a

11 time.  With respect to two-view products, which you've also

12 called the stitching and tiling products, right?

13 A    Correct.

14 Q    You talked about those a lot in your deposition.  And the

15 debtor, as of your deposition, did not have any contracts or

16 purchase orders for the sale of the two-view or the stitching

17 and tiling products, right?

18 A    It didn't have the funding to execute any agreements that

19 it could deliver on, no.

20 Q    The answer's no, right, Mr. Robertson?

21 A    That's correct.

22 Q    Thank you.  And in fact, in paragraph 9 of your

23 declaration --

24          MR. COLBY:  Can we go there, Todd, to paragraph 9 of

25 Mr. Robertson's first day declaration?  It's the TX-263.  Thank

1  you.

2  BY MR. COLBY:

3  Q    You'll see in paragraph 9 of your first day dec you state

4  that, "Stream has identified a developer/manufacturer of a two-

5  view, Glasses-Free 3D tablet, and has begun negotiations for

6  global distribution of its products, which currently has a

7  limited distribution."  Do you see that?

8  A    I do.

9  Q    Okay.  And you included that in your first day

10  declaration, because you wanted Judge Owens to believe that

11  Stream had this other buyable platform in the form of two-view

12  products, right?

13  A    That's correct.  It does.

14  Q    Okay.  You're not -- even though you reference in here,

15  you haven't been personally involved in any of the negotiations

16  with respect to two-view products that are referenced in your

17  first day dec, right?

18  A    I have been involved with -- this is -- this particular

19  manufacturer comes to us through a third party.  I have had

20  discussions.  I have received communication from that third

21  party on the product specifications, and this is a deal that

22  the debtor would bring into the company, if and when we're able

23  to consummate a deal.  Did I -- was I involved in negotiations

24  with that manufacturer directly?  No, I was not.

25  Q    Okay.  In fact, everything you've learned about that

1  unnamed manufacturer and the status of those negotiations came

2  directly from Mr. Rajan, right?

3  A    That's incorrect.

4  Q    Okay.  Mr. Robertson, as of your deposition last week you

5  didn't even know the name of that manufacturer, right, that

6  you're referencing in your first day declarations?

7  A    That's correct.  And the reason I don't know the name of

8  that is that the person -- the company that we're -- have been

9  discussing with bringing that product in had kept that fairly

10  close to the vest with me.  So I was -- I did not need to know

11  the name of that manufacturer when we were discussing how and

12  if that sales agreement or product could be brought into the

13  company.

14  Q    Okay.  And you don't know the status of those discussions,

15  right?

16  A    They're on hold as far as I know, pending Stream's ability

17  to, you know, close the deal.

18  Q    Okay.  And there's no executed contract with that unnamed

19  manufacturer, right?

20  A    I don't know the status of that.

21  Q    Okay.  The debtor hasn't received any revenue from this

22  unnamed developer, manufacturer, right?

23  A    As I've stated, we haven't executed an agreement yet, no.

24  Q    Let's talk about the tiling technology that you talk about

25  in your first day declaration.

1          MR. COLBY:  Todd, can you go to paragraph 11 of Mr.
2    Robertson's declaration?  It's page 3 of the dec.
3    BY MR. COLBY:
4    Q    Mr. Robertson, again, with respect to the tiling
5    technology that's referenced here you say, as of your first day
6    dec, Stream has identified a developer, manufacturer of a two-
7    view, Glasses-Free 3D video wall product and has begun
8    negotiations for global distribution of its product, which
9    currently has limited distribution in China."  Do you see that,
10   sir?
11   A    I do.
12   Q    Okay.  You haven't been involved in any discussions with
13   that manufacturer, either, right?
14   A    I personally have not, no.
15   Q    Okay.  And there haven't actually been -- so far as you're
16   aware, as the debtor's first day declarant, there haven't been
17   any discussions or negotiations with respect to any agreement
18   with any customer for this product, right?
19   A    As far as I'm aware, there have been discussions and
20   negotiations.  Again, this comes to us through a third party
21   that has indicated to us that it has customers ready and
22   waiting to take delivery, and they were looking for a partner
23   that could provide purchase order financing, as well as
24   potentially some 3D expertise for improvement of the product
25   over time.

1    So there were absolutely discussions between end user

2  customers and the third party that Stream is looking to engage

3  with directly.  And that engagement includes actually bringing

4  one or more of the individuals involved in that discussion

5  directly on board as employees.

6    And all that is anticipated in a nonexecuted but

7  negotiated -- fully negotiated agreement that, again, we're

8  trying to put things in queue, because we lack the financial

9  resources at this time to implement anything.

10  Q    Mr. Robertson, I asked you this last week in your

11  deposition, has the debtor had any direct contract discussions

12  with those customers that are referenced in your declaration

13  there?

14  A    The debtor has not, no.

15  Q    Thank you.  Let's go to paragraph 13.  You go on to state

16  here, and this is with respect to the tiling technology,

17  "Initial customers in the United States, Germany and Turkey,

18  have been identified for the Glasses-Free 3D video wall

19  products for placement in shopping malls and airports.

20  Contracts with these entities are expected once Stream is

21  permitted to proceed with its Chapter 11."

22    Do you see that?

23  A    I do.

24  Q    Okay.  As of your deposition you could only identify one

25  of those potential names, correct?

1  A    I believe that I identified three of them once I took a

2  moment to think, although I was not positive about the airport

3  in Germany being Frankfurt.  I thought that was the case and

4  later confirmed that it was.  I did confirm the Istanbul

5  Airport in Turkey, and I believe I identified the Mall of

6  America in Minnesota.

7  Q    All right.  And you produced a document to us subsequent

8  to your deposition.  It was just a list of names, right, list

9  of about 10 names that could potentially be customers for this

10  product at some point in the future, right?

11  A    Those were -- that was the list that was provided to me,

12  maybe not in exactly that form, by IQH3D, which is the third

13  party that we were having discussions about working within a

14  strategic relationship.

15  Q    Okay.  You're not aware of any discussions that the debtor

16  has had with any of these customers with the Glasses-Free 3D

17  video wall products that are referenced in your declaration,

18  right?

19  A    I am not aware of any direct discussions, no.

20  Q    Okay.  Are you aware that Mr. Rajan told potential

21  investors that he had a signed contract for that 3D video wall

22  product for every airport in the United States?

23  A    I'm not aware of that.

24  Q    Okay.  You'd certainly be aware of a contract that the

25  debtor had to sell its 3D video wall products to every airport

1  in the United States, right, if that contract existed?

2  A    I would think so, yes.

3  Q    All right.  Let's talk about the multi-view products that

4  you talk about in your declaration, Mr. Robertson, in paragraph

5  16.  You testified in your declaration in paragraph 16 that

6  Stream was interested in pursuing development, sales and

7  distribution of products utilizing technology developed by

8  Philips prior to 2009, correct?

9  A    I did.

10 Q    Okay.  It's also true, sir, that Stream was not currently

11 pursuing development, sales and distribution of these products,

12 correct?

13 A    It's pursuing the potential of developing products.  It is

14 not actively engaged, because it's not currently able to

15 conduct any active operations due to its funding at the moment.

16 Q    Okay.  So it's currently pursuing the possibility of

17 developing that product line.  Is that right?

18 A    Yes.  And this is what we got into in my deposition.  If

19 you remember, the word about does the company have any

20 operations, and my definition of the word "operations" and my

21 take on where we are is that we absolutely do have some

22 operations.  We don't have employees.  We are unable to spend

23 money like we need to, but we are doing what we can in this

24 pre-reorganization period to put things in queue with potential

25 customers, with potential partners.

1      And so those explorations are going on so that we won't be

2  starting at square zero when we get the okay to finally get

3  moving in Chapter 11.

4  Q    Okay.  Stream's not currently generating any revenue from

5  the multi-view products that are discussed as one of the three

6  platforms in your declaration, right?

7  A    That is correct.  That's why I said we're interested in

8  pursuing it.

9  Q    Got it.  And in fact, it's true, sir, that the multi-view

10 products that are discussed in your declaration, you view that

11 as an inferior technology to the Ultra-D technology, correct?

12 A    Well, what I would say, and this is for purposes of

13 clarification for the Court, is that back in 2009 Philips had a

14 technology that they were calling WOWvx, and that was the

15 starting point for Ultra-D.  And that technology was licensed

16 as modified light field or multi-view, whatever you want to

17 call it, was licensed to a number of companies.

18     Stream TV over a period of 10 years built on top of that

19 base technology and made certain improvements that, to use my

20 analogy of the automotive industry, we built a Rolls Royce.

21 But I do believe that there's a market for Toyotas and our

22 intention is to go back to that core technology and to continue

23 to build on it with lesser quality, but certainly sellable

24 quality, in my opinion.

25 Q    Got it.  So just so we're clear, the record's clear,

1  Ultra-D is the Rolls Royce of technologies, and the multi-view

2  is the Toyota in that analogy, correct?

3  A    As of this date it is, yes.

4  Q    All right.  And it's also true that while Stream was

5  pursuing the Rolls Royce of technologies, it wasn't also

6  simultaneously pursuing the development of Toyotas, right?

7  A    That's correct.  No need to.

8  Q    Yep.  And you haven't had any discussions with any

9  potential customer about the development, sale or distribution

10 of these multi-view solutions discussed in paragraph 16, right?

11 A    Those conversations are had by Matt Lowe, who is primarily

12 a sales guy.  Sales is not my area, so I have not personally,

13 no.

14 Q    Okay.  There's no agreements that have been signed by the

15 debtor, right?

16 A    There is a -- there's an agreement that's been negotiated

17 that we would intend to submit for approval by the Court,

18 assuming we get past the motion to dismiss, for a strategic

19 relationship with one of our existing customers for Ultra-D,

20 who's also been successfully selling multi-view, modified light

21 field Toyotas, if you want, for quite some time.  And he's

22 looking to the debtor to help continue that business.

23 Q    As of the petition date there were no -- there was no

24 signed contract.  In fact, there was no negotiated contract

25 subject to signature or court approval as of the petition date

1 with respect to the multi-view, Glasses-Free 3D technology,

2 correct?

3 A    There is a negotiated contract.  It has not yet been

4 signed.

5 Q    As of the petition date, sir?

6 A    As of the petition date, correct.  I had been negotiated.

7 Q    You didn't explain to the Court in your declaration that

8 the multi-view technology was the Toyota of technology relative

9 to the Ultra-D technology, correct?

10 A    That's irrelevant, but correct.

11 Q    And in fact --

12 A    The point -- the point here is whether or not the company

13 can reorganize around a product for market.  And I think you

14 can hardly argue that there isn't a market for Toyotas.  So the

15 purpose of that is to say that just because you're not selling

16 a Rolls Royce doesn't mean that you can't have a very

17 successful automotive business.

18 Q    Okay.  In fact, Mr. Robertson, you told me you're an

19 operations guy, right?  That's your --

20 A    Essentially, yes.

21 Q    Okay.  As of your deposition you had not put pen to paper

22 on how much it would actually cost the debtor going forward to

23 develop a network of development, sales and distribution of

24 multi-view Glasses-Free 3D solutions, correct?

25 A    We didn't intend to develop a network, as you say.  Our

1  intention is to initially service one or two key customers in

2  our early stage of reorganization, and grow from there.

3  Q    Yeah.  You hadn't put pen to paper on how much it would

4  actually cost to develop or sell or distribute multi-view

5  Glasses-Free 3D solutions, correct?

6  A    That's correct.

7  Q    And you didn't explain that to the Court in your

8  declaration, either, right, that this is so early stage that we

9  haven't even put pencil to paper to understand how much it

10 would cost to develop this inferior technology over the next,

11 you know, days, months, years, correct?

12 A    That's incorrect.

13 Q    You didn't --

14 A    Because --

15 Q    -- you didn't --

16 A    -- because --

17 Q    -- Mr. Robertson, you didn't tell the Court that in your

18 declaration, right?

19 A    I did not tell the Court that because that is not the

20 relevant factor here.  We've identified a partner that's

21 already successfully selling multi-view products that has

22 approached us to help them continue in that effort.  And if

23 they've got a successful business model for sell -- producing

24 and selling those kinds of products, obviously, there's a model

25 to be had.

1    Had we put pen to paper, as you say, and worked out all

2 those details, no, not yet, but we have the support and

3 enthusiasm of a strategic partner that wants us to work in that

4 area, which we were never willing to do before, because we

5 didn't deal in multi-view products.

6 Q    Right.  I just want to clarify something for the record.

7 We heard some testimony earlier today from Mr. Rajan that

8 Stream's two principal assets that had been acquired since the

9 petition was filed is a stitching and tiling contract with VTI,

10 and another agreement for modified light kit.  Do you

11 understand that testimony, sir?

12 A    I do.

13 Q    Okay.  And those -- these assets were acquired post

14 petition, right?

15 A    They were.  These are discussions that had been going on

16 for many months on how an arrangement could work, but until we

17 had the potential for funding on VTI, VTI was unable to really

18 follow through on the acquisition, as it were, in memorializing

19 it in any agreement.

20 Q    Okay.  So those assets that Mr. Rajan told the Court about

21 haven't actually been acquired yet by the debtor.  Is that

22 right?

23 A    Well, the assets are agreements in principle to do

24 business, right.

25 Q    Mister --

1  A    So they're not physical assets.

2  Q    I got it, right.  You -- we've certainly been hearing

3  about this a lot in this case.  You either own an asset or you

4  don't.  So you have an agreement in principle to acquire the

5  two-view technology, the stitching technology or the modified

6  light field technology, but as you sit here today the debtor

7  has not actually acquired those assets that Mr. Rajan testified

8  about earlier today, correct?

9  A    As far as I know, there's only one executed agreement for

10 funding distribution funding with a partner based on those

11 technologies.

12 Q    Okay.  How much did it cost?  How much did that asset cost

13 the debtor post-petition to acquire?

14 A    Well, these are strategic relationships.  They're -- it's

15 not an acquisition in the sense of something was paid.  This is

16 a distribution arrangement whereby there's revenue share to us

17 for the -- to the debtor for its provision of 3D expertise and

18 support.  So it's a sales and distribution support agreement

19 that will bring revenue into the debtor.

20 Q    I got it.  So this morning we heard about two platforms

21 that the debtor had acquired, and now, I'm hearing that it's a

22 strategic relationship, but -- that it's the function of an

23 agreement in principle?

24 A    Well, that's my -- that's why I was trying to earlier

25 define what an asset is.

1 Q    Um-hum.

2 A    So a contractual arrangement is an asset.  It's not a

3 tangible asset, but we've acquired the rights to serve as a

4 distributor through a support agreement with VTI to provide 3D

5 expertise and generate some revenue on product that we don't

6 have to develop from scratch.

7 Q    Yeah.

8 A    So that's the short-term path for us.

9 Q    Okay.  And that's the support agreement that Mr. Rajan

10 negotiated on behalf of Stream and you negotiated on behalf of

11 VTI, right?

12 A    Correct.

13 Q    Okay.  And there wasn't any independent committee of VTI

14 or an independent committee of the debtor, right, to negotiate

15 on behalf of the stakeholders of the debtor to make sure that

16 the terms of that contract were fair to the debtor, right?

17 A    Well, ultimately, any agreement on the debtor's side is

18 going to have to be approved by this Court, and any agreement

19 on the VTI side is going to have to be approved by the overall

20 board.

21 Q    Got it.  You've anticipated my next question.  So you

22 haven't sought bankruptcy approval -- you haven't -- excuse me.

23 Strike that.  You haven't sought approval from Judge Owens yet

24 of these contracts that Mr. Rajan testified about earlier today

25 are already assets of the debtor, correct?

1  A    That's correct, because Judge Owens said she wouldn't hear

2  any other motion until after we get past today.  So we tried to

3  put things in queue, but we haven't clogged up the docket yet.

4  Q    Mr. Robertson, I appreciate it.  I just wanted to clarify

5  the testimony that was provided earlier today by Mr. Rajan that

6  these were assets that have already been acquired by the debtor

7  post-petition, and I appreciate that clarification.

8  Q    Let me turn to Ultra-D, which is the third platform that

9  you talk about in your first day declaration.  Mr. Robertson, I

10 want to be very clear about the discussion of Ultra-D that's in

11 your declaration.  This entire discussion that's in your first

12 day declaration about Ultra-D involves intellectual property

13 and assets that were transferred to my client, SeeCubic,

14 pursuant to the Omnibus Agreement, right?

15 A    That would be eligible for transfer, yes.

16 Q    Okay.  I understand your position on it and I won't parry

17 with you on it now.  But my point is, sir, that for Judge Owens

18 to believe that the Ultra-D products that are discussed in your

19 declaration is a viable platform for the debtor going forward,

20 right, she would have to find that those assets actually are

21 property of the debtor and not SeeCubic, correct?

22 A    I believe that I stated in my declaration that if Stream

23 is able to reclaim the technology, it has some opportunities,

24 and there were some specific assets that I outlined that I

25 believed were still in the possession or control, or within

1  reach of Stream TV to support its position that not all assets

2  had been transferred simply because a claim was made.

3  Q    Okay.  And as you told me in your deposition, Mr.

4  Robertson, you're not -- you're not challenging the validity of

5  the omnibus agreement, correct?

6  A    That's correct.

7  Q    And you're not challenging any of the findings that were

8  made by Vice Chancellor last year's December 8th opinion,

9  correct?

10 A    No, I'm not.

11 Q    Okay.  Mr. Robertson, I don't have any further questions,

12 I thank you for your time.

13           MR. COLBY:  Pass the witness.

14           THE COURT:  Before I tender the witness, I just want

15 some -- in my continuing theme of trying to get clarity, I want

16 to ask a follow-up question, again, back to the multi-view and

17 the two-view.  As I understood the testimony of Mr. Rajan this

18 morning, the part that Stream intends to play in those

19 relationships is based on the know-how of people that are yet

20 to be hired by the debtor, is that correct?

21           THE WITNESS:  Since the debtor has no employees,

22 correct.  Everybody to support that -- but I wouldn't limit it

23 only to -- well, I guess if you broaden know-how to include

24 technical, as well as sales support, then, yes.

25           THE COURT:  Okay.

1            THE WITNESS:  And that technical would go beyond

2    engineering.  It's also -- we have content creation specialists

3    that really understand how to make unique content into the way

4    that even in non-Ultra-D products can make them look better

5    because of their expertise.

6            THE COURT:  Okay.  So why doesn't VTI just hire those

7    employees now and continue and start up those relationships?

8            THE WITNESS:  Well --

9            THE COURT:  What does Stream -- what is -- and I

10   guess to put a finer point on it, you know, what makes Stream

11   so special and necessary in these continued relationships or

12   businesses?

13           THE WITNESS:  Well, I think the bottom line is that

14   we spent, you know, eight or none years developing a Rolls-

15   Royce, and we spent a lot of time developing a customer base.

16   It's more than just a product, we -- and I think we

17   underestimated the extent of the effort that was going to be

18   involved.  Because it's like saying, "Hey, let's move from

19   black and white to color TV."  It's not just can you sell a TV,

20   it's, well, who's going to produce color programming?  How will

21   that content be made?   How will it be distributed?

22           There's a very large business plan that took much

23   longer than we anticipated.  But over the years, we found some

24   diehard big brands which maybe are not well-known here in

25   America, but Skyworth, Huawei, and Chunghwa Telecom that said -

1  - and Lenovo, we've seen a lot of things, you keep coming back

2  with newer and better demos, we're finally read, and we had to

3  wait for the panel industry to be able to make high quality

4  enough video panels that we could build on.  And so we finally

5  reached that point to be able to make a Rolls-Royce, and to

6  have some company say we'd like to start working with you to

7  develop real product for rollout, and that's -- that's the

8  timing that coincided with this.

9           So is there anything that prevents VTI from just

10 starting with Toyotas instead of the Rolls-Royce?  There isn't,

11 but we'd like to see -- and Mr. McCarthy said he would really

12 like to see whether there's a possibility that that technology

13 could somehow remain with the debtor or return to the debtor if

14 it's left.

15          THE COURT:  Okay.  And so just last question:  The

16 Rolls-Royce technology that you wish to continue with and

17 pursue, just for sake of clarity, that's the Ultra-D?

18          THE WITNESS:  That's correct.

19          THE COURT:  Okay.  And I like the car analogy, that

20 really helped me --

21          THE WITNESS:  Good.

22          THE COURT:  -- grasp the concepts that we're talking

23 about.  So thank you very much, I appreciate that.

24          THE WITNESS:  Good.

25          THE WITNESS:  All right, thank you so much, that's

1    been very helpful.

2            Ms. Sierra, did you have any questions for this

3    witness?

4            MS. SIERRA:  Yes, Your Honor, I have a few questions

5    on behalf of the U.S. Trustee.

6            THE COURT:  Okay; please go ahead.

7            MS. SIERRA:  Okay.

8                        CROSS-EXAMINATION

9    BY MS. SIERRA:

10   Q    Hi, Mr. Robertson.  Rosa Sierra on behalf of the U.S.

11   Trustee, I'm going to ask you a few questions today.

12   A    Okay, Ms. Sierra; good to see you.

13   Q    Good to see you, too.

14            So I think you testified on cross-examination that

15   you work for Stream, correct?

16   A    That's correct; I provide some services for Stream.  I'm

17   technically employed by VTI, but, yes.

18   Q    Okay.  So -- and -- so you answered my next question.

19   You're also employed by VTI.

20   A    Yes, that's correct.

21   Q    Okay.  And when you provide some services to Stream, to

22   whom do you report?

23   A    Primarily to Mathu Rajan as the CEO.

24   Q    And when you are employed by VTI, to whom do you report?

25   A    It depends.  Often, it's to Mathu Rajan as the President.

1  More recently, it's been responsive to requests coming from,

2  frankly, counsel for both VTI and the debtor, you know,

3  providing documents, reviewing things, that sort of thing.  So

4  I haven't been able to do very much on the operations front at

5  VTI since the motion to dismiss was filed.

6  Q    Okay.  But once you get to start -- assuming at one point,

7  you will get to start doing operations things for VTI, you will

8  be reporting to Mr. Rajan, correct?

9  A    I expect that, as Mr. Rajan said, that he'll be stepping

10  aside in a meaningful way, that Tracy Rees, who is one of the

11  board members now, and has been intended as a prospective

12  president, that when the funding comes through, we can finalize

13  his employment agreement, he would become the president.  Most

14  likely, I'd be reporting to him.

15  Q    Okay.  As of right now, Mr. Rajan is the President --

16  A    As of now, he is, yeah.

17  Q    -- of VTI?

18  A    Yes, he is; correct.

19  Q    Okay.  Okay.  So let's talk about the board membership at

20  VTI.  As of today's date, can you tell me the names of the

21  board members at VTI?

22  A    I can.  They are Mathu Rajan, was the first director.

23  And then in early April, somewhere I think around April 7th,

24  three more directors were added, and those were Cliff Morton,

25  Tracy Rees, and Glenn -- I'm going to say Hasen, H A S E N,

1  maybe it's Hasen, so those three were added in early April.

2         And then based on the status of the negotiations with

3  Burlington, who would be entitled to three seats when his

4  investment is fully consummated, he was provided with two seats

5  now for himself, and for Sofia Gadusi (phonetic).

6  Q    Okay.  So on March 17th, 2000 -- 2021, sorry, I got

7  confused there -- on March 17, 2021, VTI did not have six

8  directors?

9  A    Mathu was the sole director at that time.  However, on

10 March 5th, the articles of incorporation for Nevada and the

11 bylaws were amended and adopted to include an expansion of the

12 board to six seats in anticipation of the seats that Mr.

13 McCarthy would be obtaining whereby he would have three out of

14 six available seats.

15 Q    Okay.  So let me make sure I understood the testimony.  On

16 March 5th, the articles of incorporation of VTI were amended to

17 include an expansion of the board --

18 A    That --

19 Q    -- is that correct?

20 A    That's correct.

21 Q    But on March 5th, those new directors were not -- had not

22 yet been appointed, correct?

23 A    That -- that's correct.

24 Q    Okay.  Moving on to some of the discussion about the

25 Toyota technology, I also appreciate the analogy.  Would it

1  have been possible to -- let me back up.

2          In January of 2021, after VTI had been formed, did

3  Stream need court approval from a court to use assets that

4  didn't involve the omnibus agreement?

5  A    It would not have needed court approval, no.

6  Q    Okay.  So what was stopping Stream at that point from

7  executing and papering up the sales and distribution agreement

8  with the manufacturer that wants to partner up on the -- I

9  believe stitching and tiling technology?

10  A    Well, as I answered that same question in my deposition,

11  it's patently clear.  Stream was blocked from raising any

12  money, starting in September, somewhere around the 15th, by the

13  status quo order.

14          That was in place for three months until the

15  preliminary injunction came out on December 8th.

16          And on -- subsequent to December 8th, we took a good

17  look and said, okay, how can we move forward?  We're not

18  allowed to use the Cadillac technology, we've been talking

19  about exploring these other options, but it's going to require

20  some cash, and as part of -- one of the transfers that did

21  happen, according to the omnibus agreement, was that we had to

22  empty all our bank accounts and give all of the available cash

23  to SeeCubic, Inc.

24          So here you have the company that has prospects, but

25  its bank accounts have been drained, it's in no position to

1  execute an agreement to go forward, and you've got $18 million
2  worth of unsecured debt on the books and creditors who are
3  going to be screaming at you "How am I going to get my money?"
4  So we may have been able to reorganize and generate small
5  amounts of revenue, but we'd have been buried under $18 million
6  worth of debt, and we would have collapsed, and any investor
7  who looked at the situation would say that's just completely
8  untenable.
9  Q    Okay.  So the investors, in your opinion, find it more
10 attractive that Stream has been placed in a bankruptcy
11 proceeding, in a Chapter 11 proceeding?
12 A    Well, they do because it gives us some breathing room to
13 reorganize the debtor, and potentially move forward with these
14 other possible products.  And most importantly, it gives the
15 debtor access to tools that are unique to the Bankruptcy Code
16 to pursue not only rejection of executory contracts, but the
17 possibility of voiding those contracts if it can prosecute
18 successfully a fraudulent conveyance claim, fraudulent
19 transfer.
20        So I'm not saying that we're going to succeed in
21 those things, but there are possibilities that are open to the
22 debtor and any potential investor who sees, "Gee, could you do
23 Toyotas and Rolls-Royces, both?"  Okay, one may be a longshot,
24 it may not be possible, but while possibility exists, you know,
25 there are, you know, endless possibilities.

1  Q    Okay.  So just to go back to my initial question, there

2  was nothing necessarily stopping Stream from executing and

3  finalizing these agreements for the relationships for the non-

4  Ultra-D technology in January of 2021, correct?

5  A    There were financial impediments because any agreement

6  requires that Stream is going to be able to fill its

7  commitments.  And when you don't have the money to pay any

8  employees, even if it's only know-how that has to be

9  contributed, there was no way that Stream could, in good

10  conscience, enter into an agreement with anybody when it

11  doesn't know how it's going to possibly fulfill those because

12  we didn't see a possibility to bring in the necessary funding,

13  even on a minimal level given the huge amount of debt, and so

14  that's what really stopped us.

15        Was there anything practical?  No, we could have

16  entered into those agreements and really pursued those things,

17  and had we had some available cash to do that had we not been

18  battling -- nobody's talked about the pandemic, and the fact

19  that this is a glasses-free 3D technology that you have to see

20  with your own eyes.  And so for a year, we had to sit on our

21  hands and tell people it's great, and hope that they can trust

22  us because you've got no way to show people.  And that was a

23  significant impact to our business.

24  Q    Okay.

25        MS. SIERRA:  Those are all my questions, Your Honor.

1           THE COURT:  Okay; thank you very much.

2           All right, who's next in the examination of Mr.

3  Robertson?  Mr. McMichael, are you going to be asking any

4  questions of Mr. Robertson?

5           MR. McMICHAEL:  My partner, Ms. Aaronson, is covering

6  Mr. Robertson.

7           THE COURT:  Okay.

8           MS. AARONSON:  I didn't know if the committee had any

9  questions, though.

10          MR. SAMIS:  Nothing here, Your Honor.

11          THE COURT:  I figured the committee will chime in if

12 they have questions, so that's why I haven't been asking.

13          MS. AARONSON:  Okay; thank you.

14          THE COURT:  Okay.

15          MS. AARONSON:  Can you hear me all right?  I can turn

16 it up if --

17          THE COURT:  Go ahead.

18          MS. AARONSON:  okay.

19                          CROSS-EXAMINATION

20 BY MS. AARONSON:

21 Q    Mr. Robertson, how are you doing this afternoon?

22 A    I'm good, Ms. Aaronson; how are you?

23 Q    Good.  I'm going to go over a few things to clear up a

24 little bit of testimony that you gave earlier.

25          When you were asked by SeeCubic's counsel about your

1  involvement in finance, and you indicated that you are not

2  involved in the financing or the efforts to obtain DIP

3  financing, who is -- whose area is financing for Stream?

4  A    For Stream, it's primarily Mathu Rajan working with Suby

5  Joseph, who was the former VP of Finance, and Dan Rink, who is

6  primarily business affairs, documents, in-house legal.  So the

7  three of them generally have worked together on the preparation

8  of the documents based on negotiations that Mr. Rajan takes the

9  lead on.

10 Q    Okay.  And another line of questioning was regarding the

11 IQH3D and the agreements in principle for the tiling and the 2D

12 products.  And you were asked whether the debtor has -- whether

13 you, on behalf of the debtor, had direct contact with

14 customers, and you indicated you had not.

15      Is the relationship with the debtor between the

16 debtor and customers or between the debtor and IQH3D?

17 A    The relationship at the moment is between the debtor and

18 IQH3D.  But as I mentioned, part of the negotiated arrangement

19 with IQH is that there were four or five -- it might be five

20 individuals that would be brought into the debtor as employees.

21 So eventually, that sales agreement with those customers would

22 become internal rather than, you know, an arm's length

23 arrangement.

24      And I shouldn't even say "eventually," that was part

25 of the discussion, is that those deals would come in, and we

1 would then engage with those customers directly.  But that

2 required Stream to be able to, you know, expand its staff,

3 which we haven't been able to do.

4 Q    So -- but currently, those customers are customers of

5 IQH3D, not customers of Stream, or potential.

6 A    Yeah, I would -- I'd say potential customers because I

7 can't speak for whether they have existing arrangements or not,

8 but that's correct.  They are the customers of IQH3D, not of

9 the debtor.

10 Q    And there's been some discussion, both testimony of Mr.

11 Rajan and you, in connection with the assets relating to the 2D

12 and multi D platforms, and those assets being post petition

13 assets.

14        Is the bonding equipment related to those products or

15 used in those products?

16 A    Well, the bonding equipment -- as Mr. Rajan said in his

17 testimony, the bonding equipment's very versatile.  So it's

18 important to know that that equipment was developed by a

19 Japanese manufacturer who supplies bonding needs for customers

20 all over the world for all kinds of things, that's why we went

21 to them.  Because the in-house solution that was developed by

22 our team was not effective; the yield rate was poor; we had a

23 very failed experiment where we were unable to even produce 100

24 units based on the technology proposed by the Dutch R&D team.

25        And so Mr. Rajan went to Japan, he found a

1  manufacturer of equipment that is used for bonding in a variety

2  of applications.  and then that equipment, we said we have some

3  unique requirements for Ultra-D, can you make a modification

4  module so that it can do more than just the basics for somebody

5  else, and it can do more of what we need, and the answer was,

6  yes.

7          So in that equipment, there is one module that is --

8  has some alignment that's one of those Ultra-D components that

9  Mr. Rajan referred to, right, of those 12 to 15 components, one

10 of them is special alignment.

11         But you can pull that module out, and that machine is

12 just a bonding machine.  It can do a variety of things for a

13 variety of things for a variety of products, so we could use it

14 for two-view, we could use it for multi-view if, in fact, it's

15 determined that that equipment still remains the property of

16 Stream TV and has not, in some way, been transferred.

17 Q    So that -- in addition to the potential contracts that are

18 queued up for, you know, in the event the debtor is able to

19 proceed in bankruptcy, that is tangible property that the

20 debtor had prepetition that was -- that is available for those

21 two lines of business.

22 A    Yes, correct.

23 Q    All right.

24 A    And I will --

25 Q    To the --

1  A    And I would point out, if I may, that our strategic

2  partner that has expressed interest, and we've negotiated terms

3  on a cooperative bonding agreement, there's the opportunity to

4  provide just bonding services to other companies for other

5  products that don't even involve Stream TV or VTI.  So there's

6  a potential service arrangement where that equipment, when it's

7  not being used to manufacture our products, we could rent that

8  equipment out for other products.

9  Q    And presently, where is that bonding equipment?

10 A    That's in Suzhou, China.

11 Q    And is it in a debtor facility?

12 A    It is in a third party warehouse facility landlord

13 warehouse.

14 Q    Okay.  But SeeCubic isn't in possession of that equipment,

15 as far as you know.

16 A    As far as I know, they are not.

17          MS. AARONSON:  I have nothing further, Your Honor.

18          THE COURT:  Okay; thank you, Ms. Aaronson.

19          Mr. Stemerman?

20          MR. STEMERMAN:  Yes; thank you, Your Honor.

21          THE COURT:  Does your client wish to -- go ahead.

22          MR. STEMERMAN:  Just a few questions.

23                    CROSS-EXAMINATION

24 BY MR. STEMERMAN:

25 Q    Mr. Robertson, you said earlier about the board members of

Robertson - Cross/Stemerman                    235

1  VTI, I just had a couple of questions about them.

2          To your knowledge, does Sofia Gadusi have any

3  relationship with Stream TV?

4  A    To my knowledge, it's none whatsoever.  She's a

5  representative appointed by Mr. McCarthy.

6  Q    Same question as to Mr. McCarthy, does Mr. McCarthy have

7  any relationship with Stream TV?

8  A    None that I'm aware of, no.

9  Q    How about Glenn Hasen?

10 A    Glenn has some familiarity with Stream TV from previous

11 years.  He's been acting a little bit as an unofficial advisor,

12 but he has had no official relationship with Stream TV, but

13 it's his familiarity with the overall industry, and with our

14 venture -- with the debtor's previous venture that made him a

15 good choice.

16 Q    Besides familiarity, does Mr. Hasen have any current

17 relationship with Stream?

18 A    No.

19 Q    How about Tracy Rees?

20 A    No.

21 Q    And Cliff Morton?

22 A    No.

23          MR. STEMERMAN:  Thank you; no further questions.

24          THE COURT:  Did you say no further questions?

25          MR. STEMERMAN:  I did, Your Honor.

1          THE COURT:  Okay; thank you.

2          Mr. Larkin, I asked a few question of Mr. Robertson

3  before I tendered the witness for, I guess, what would be

4  considered redirect, although I'm not sure who's tendering the

5  witness either, VTI or the debtor, so perhaps I can get clarity

6  with the next witness.  But did you have any follow-up redirect

7  based on the substance of my questioning?

8          MR. LARKIN:  Nothing further from us, Your Honor;

9  thank you.

10          THE COURT:  Okay.  Mr. Robertson, thank you so much

11  for your time and attention today.  You can consider yourself

12  released from our virtual witness box today.

13          MR. ROBERTSON:  Great; thank you, Your Honor.

14          THE COURT:  Thank you.

15          MR. LARKIN:  Your Honor, I believe our next witness -

16  - I laid out the order of witnesses earlier today.  We have the

17  Dutch law expert scheduled to testify next because of the time

18  difference over in the Netherlands.

19          My colleague, Jason Liberi, will be calling the

20  debtor's Dutch law expert, if you will, on cross, and then she

21  will be followed by SeeCubic's Dutch law expert who the debtors

22  and VTI will, I guess, cross, and then we'll do redirect.  And

23  then we'll have Mr. Stastney either today or tomorrow, as time

24  permits.

25          THE COURT:  Okay.  So we think we can get through the

1 two experts today?

2          MR. LARKIN:  I think Mr. Liberi is prepared to do a

3 very direct cross, no pun intended, at least on our side, I

4 think that's right.  I'm not sure what the debtors --

5          THE COURT:  Okay.

6          MR. LARKIN:  -- are prepared to do.

7          THE COURT:  Okay.  Well, we'll just take one witness

8 at a time then.  Okay, Ms. Rumora, how do you pronounce your

9 last name, is it Scheltema?

10          MS. Rumora-Scheltema:  Well, technically it's

11 Scheltema, but Scheltema will do just fine.

12          THE COURT:  Well, I apologize because I'll probably

13 mispronounce it.  So welcome to these proceedings, and please

14 I'll swear you in before I tender you to Mr. Liberi for your

15 cross-examination.

16               BARBARA RUMORA-SCHELTEMA, SWORN

17          THE COURT:  Okay.  Can you please state your name for

18 the record, and spell your last name.

19          THE WITNESS:  It's Barbara Rumora-Scheltema.  And my

20 last name is spelled R U M O R A hyphen S C H E L T E M A.

21          THE COURT:  Okay; thank you very much.

22          And, Mr. Liberi, when you're ready.

23          MR. LIBERI:  Thank you, Your Honor.

24                    CROSS-EXAMINATION

25 BY MR. LIBERI:

1 Q    Good afternoon, Ms. Rumora; Jason Liberi at Skadden Arps

2 for SeeCubic.  We previously met at your deposition; it's good

3 to see you again.

4         I want to get right into it, Ms. Rumora.  You have

5 never been qualified or accepted as an expert in a United

6 States legal proceeding, correct?

7 A    That's correct.

8 Q    I'd like to look at Mr. Dumoulin's expert report.

9         MR. LIBERI:  Mr. Frank, that's SeeCubic trial Exhibit

10 282, and specifically Exhibit A to that report.

11 Q    Exhibit A to Mr. Dumoulin's report is a corporate

12 organizational chart created by Stream and signed by Mathu

13 Rajan.

14         Ms. Rumora, you're familiar with this organizational

15 chart, correct?

16 A    Yes, I am.

17 Q    I want you to focus on a couple of things for us.  First,

18 TechnoVative Media, Inc. USA, and second the three Netherlands

19 entities a bit further down in the organizational chart in the

20 structure, do you see them there?

21 A    Yes.

22 Q    Okay.  Those three entities, the Netherlands entities,

23 Ultra-D Cooperatief U.A., Stream TV International B.V., and

24 SeeCubic B.V., can we agree for purposes of the testimony today

25 that we'll refer to those collectively as the Dutch entities?

1  A    Yes.

2  Q    Now the expert report that you submitted doesn't contain a

3  summary or statement of legal opinion, so I want to be sure

4  that we all understand what opinions you are offering and not

5  offering here today.

6           As I understand it, you have been told to assume that

7  there is a dispute with respect to the ownership of

8  TechnoVative Media, Inc., and that whoever owns TechnoVative

9  Media, Inc. is the ultimate shareholder of the Dutch entity,

10 correct?

11 A    That is correct.

12 Q    And your opinion in this report, based on that assumption,

13 as I understand it, is that in the event of such a dispute with

14 respect to the ultimate shareholder of a Dutch entity, a

15 director that has been dismissed from a Dutch entity may be

16 able to challenge his or her dismissal in the Dutch courts, is

17 that correct?

18 A    That is correct.

19 Q    But sitting here today with respect to this case, you are

20 not aware of any such challenge in the Dutch courts with

21 respect to the appointment or dismissal of any directors at the

22 Dutch entity, correct?

23 A    I'm not aware of any such action.

24 Q    And your other opinion offered in this report, as I

25 understand it, its that a Dutch court considering a legal

1  question with respect to the appointment or dismissal of a

2  director at a Dutch entity would not automatically accept and

3  recognize a United States court decision, but rather would

4  engage in its own analysis to assess whether, and to what

5  extent, to recognize that U.S. court decision, is that correct?

6  A    That is correct.

7  Q    And that is the extent of the opinions you are offering in

8  this report and this case, correct?

9  A    Yes.

10 Q    Okay.  Now let's talk a little bit about opinions that

11 you're not offering in this report or this case.  You are not

12 offering any opinion on U.S. law, correct?

13 A    Yes, correct.

14 Q    You are not offering any opinion with respect to the

15 Delaware Chancery Court's December 8, 2020 opinion or order,

16 correct?

17 A    That's correct.

18 Q    You are not offering any opinion with respect to the

19 omnibus agreement at issue in this case, correct?

20 A    Correct.

21 Q    You are not offering any opinion with respect to who owns

22 TechnoVative Media, Inc., correct?

23 A    That's correct.

24 Q    You are not offering any opinion with respect to who,

25 therefore, is the ultimate shareholder of the Dutch entity,

1  correct?

2  A    Yes.

3  Q    Let's look at Paragraph 38 of your report, if we can, Ms.

4  Rumora.

5        MR. LIBERI:  Mr. Frank, that's SeeCubic trial Exhibit

6  238, Paragraph 38.

7  BY MR. LIBERI:

8  Q    Ms. Rumora, in Paragraph 38, you state, quote, "My

9  understanding is that there is a dispute as to who is the

10 ultimate shareholder of the Dutch entities, resulting in

11 uncertainty as to who can validly represent the members of

12 Coop."  End quote.

13        When you refer there to "Coop," you're referring to

14 Ultra-D Cooperatief U.A., correct?

15 A    That is correct.

16 Q    And you are not offering an opinion as to who can validly

17 represent the members of the Coop, correct?

18 A    Yes.

19 Q    And you are not offering an opinion on who are currently

20 the valid directors at any of the Dutch entities, correct?

21 A    That is correct, yes.

22 Q    Let's go to Paragraph 7 of your expert report, if we can,

23 Ms. Rumora.  In Paragraph 7, with respect to the Dutch

24 entities, you discuss the concept of control of a Dutch entity,

25 and you state the control, quote, "boils down to the question

1  who can lawfully represent these entities towards third

2  parties.  For example, when entering into agreements, buying or

3  selling assets, etc.," end quote.

4          This concept of control discussed in your report is

5  not from Dutch case law, or statutes, or precedent, but rather

6  is your own formulation of the concept of control for purposes

7  of this report, correct?

8  A    Well, as you can see in the first line of that paragraph,

9  that is, indeed, how I define control for the purpose of this

10  opinion.

11          And I should add that control is not a concept that

12  is defined under Dutch law.

13  Q    Okay.  So it is your own formulation of the concept for

14  the purposes of the report.

15  A    That's right, yes.

16  Q    And you have never before provided expert testimony or

17  opinion with respect to this formulation of the concept of

18  control, correct?

19  A    That's right.

20  Q    And in your formulation of the concept of control of a

21  Dutch entity, it is the directors of the Dutch entity that

22  exercise control, correct?

23  A    Yes.

24  Q    Okay.

25  A    And if I may add, the reason for doing so, among other

1  things, is that as I explain in my report, the issue here is

2  who can dispose over the assets of the Dutch company.  And a

3  shareholder cannot do that, but a director can, and that's why

4  I defined it in that manner.

5  Q    Okay; understood.  Ms. Rumora, for my next question here,

6  I want you to make two assumptions for purposes of my question:

7  First, I want you to assume that my client, SeeCubic, Inc. in

8  the United States, is the owner of TechnoVative Media, Inc.

9  and, therefore, the ultimate shareholder of the Dutch entity.

10         Second, I want you to assume that Mathu Rajan is a

11  director of the Dutch entities.

12         Do you understand what I'm asking you to assume?

13  A    Yes, I do.

14  Q    Now in that scenario, based on those assumptions, Stream

15  TV Networks, Inc., the debtor in this case, does not have any

16  control over the Dutch entities, correct?

17  A    That's -- that's how I understand it, yes.

18  Q    And in that same scenario, VTI does not have any control

19  over the Dutch entity, correct?

20  A    Under those assumptions, that's correct, yes.

21  Q    And that's because Mr. Rajan would be acting in his

22  personal capacity as the director exercising your formulation

23  of control at the Dutch entity, correct?

24  A    That is right, yes.

25  Q    And in that role as director, he would have a duty to act

1  in the best interest of the Dutch entity itself and its

2  stakeholders, correct?

3  A    Yes, and stakeholders as defined under Dutch law.

4  Q    Let's go to Paragraph 12 of your report.  In Paragraph 12,

5  you state that, quote, "In order to obtain an enforceable title

6  in the Netherlands, the plaintiffs under the order would be

7  required to initiate new adversarial proceedings against the

8  defendants in a Dutch court."  And I want to be clear, your

9  reference here to enforceable title in this paragraph relates

10 only to the recognition of a U.S. court order in the

11 Netherlands, correct?

12 A    Yes, I should probably apologize to the Court because this

13 is a translation issue.  I literally translated the Dutch term,

14 which is executory ala titel (phonetic), the better term would

15 probably be an enforceable decision.

16 Q    Understood.  So to be clear, your reference to enforceable

17 title in this paragraph has nothing to do with a title to

18 assets or ownership rights in assets or property of any kind,

19 correct?

20 A    No, it's a decision, a judgment.

21 Q    And you are not opining or suggesting here that if there

22 were a change in the ultimate shareholder of the Dutch

23 entities, that that would require the commencement of some

24 Dutch court proceeding, or other steps, to effectuate the

25 change of the ultimate shareholder with respect to its direct

1  and indirect ownership of the Dutch entity, correct?

2  A    That is correct, yes.

3  Q    Okay.  Let's go to Paragraph 19, if we can.  Ms. Rumora,

4  in Paragraph 19 of your report, you discuss how a director who

5  was previously dismissed from a Dutch entity, like Mr. Rajan

6  was previously dismissed by the Dutch entities here, might

7  challenge the validity of that dismissal in a Dutch court

8  proceeding, correct?

9  A    Yes.

10  Q    But sitting here today, you are not aware of any challenge

11  pending in a Dutch court by Mr. Rajan of this dismissal as a

12  director of the Dutch entities, correct?

13  A    At this moment, no, I'm not aware of any.

14  Q    Let's go to Paragraphs 32 through 35 of your report, if we

15  can.  In Paragraphs 32 through 35 of your report, Ms. Rumora,

16  you acknowledge that the Dutch Trade Register currently

17  reflects for each of the Dutch entities that Mathu Rajan was

18  dismissed as a director of those entities in December of 2020,

19  correct?

20  A    Yes, although that doesn't have any effect on the validity

21  of that dismissal.

22  Q    And for each of the Dutch entities, the Dutch Trade

23  Register currently reflects that Shad Stastney and Hans Zuidema

24  are the directors of those entities, correct?

25  A    That is correct, although I will (indiscernible).

1  Q    You -- sitting here right now, you are not aware of any

2  pending Dutch court proceeding challenging Mr. Rajan's

3  dismissal as a director or the appointments of Mr. Stastney and

4  Mr. Zuidema as directors, correct?

5  A    That is correct.

6  Q    Let's go to Paragraph 37, if we can.  In Paragraph 37 of

7  your report, you state that you have not seen the corporate

8  documents effectuating the dismissal of Mr. Rajan and the

9  appointments of Mr. Stastney and Mr. Zuidema as directors of

10 the Dutch entities.

11       In fact, VTI and its lawyers had those documents

12 before you issued your report, but the documents had not yet

13 been provided to you, correct?

14 A    That is correct.

15 Q    Sitting here today, you have now reviewed those documents,

16 correct?

17 A    Yes.

18 Q    And other than the fact that those documents describe Mr.

19 Rajan's dismissal as a dismissal for cause, which you thought

20 was odd, otherwise, those documents are largely in the form and

21 with the content that you would expect in connection with these

22 appointments and dismissals of directors, correct?

23 A    That is correct.

24 Q    Let's go to Paragraph 40, if we can.  In Paragraph 40 of

25 your report, Ms. Rumora, you state, quote, "To the extent that

1  the members of the Coop were not properly represented, it is,

2  therefore, my view that as a director, that as a matter of

3  Dutch law, Mr. Mathu Rajan is the sole lawful director of both

4  Coop, as well as the B.V.s," do you see that?

5  A    Yes, I do.

6  Q    Okay.  And as I understand it -- and we'll cover it now --

7  the phrase "to the extent that" is sort of carrying a lot of

8  the weight here in this paragraph that is a hypothetical, so to

9  be clear, you are not offering an opinion with respect to who

10  are the proper representatives of the Coop, correct?

11  A    That is correct.

12  Q    And you are not offering an opinion that Mathu Rajan is

13  the sole lawful director of the Coop and the B.V.s, correct?

14  A    That is correct.

15          MR. LIBERI:  I think that's all that I have for now,

16  Your Honor, reserving, as I need it.

17          THE COURT:  Okay; thank you, Mr. Liberi.

18          Ms. Sierra, do you have any questions for this

19  witness?

20          MS. SIERRA:  Rosa Sierra for the U.S. Trustee; I

21  don't have any questions for this witness.

22          THE COURT:  Okay; all right.

23          Mr. Stemerman, or Mr. Weis, Mr. McMichael, who is

24  going to take the first turn?

25          MR. STEMERMAN:  Your Honor, this is Jonathan

1  Stemerman, I will take the first turn.

2                       CROSS-EXAMINATION

3  BY MR. STEMERMAN:

4  Q    Ms. Rumora, Mr. Liberi asked you about certain meeting

5  minutes that were not provided to you prior to you writing your

6  report.  Do you recall the circumstances regarding those

7  meeting minutes and them being provided to you eventually?

8  A    Not exactly, no.

9  Q    Okay.  Do you recall when VTI's counsel received those

10  documents?

11  A    Well, my understanding is that that was very shortly

12  before my opinion was rendered.

13  Q    Thank you.  And when you were testifying earlier, you

14  mentioned regarding the listing of Board members in the Trade

15  Register, you said that it did not affect the validity of the

16  appointment.  Could you expand on that a little bit, please?

17  A    Registration of the directors or dismissal of directors in

18  the Trade Registry is not a constitutive element for a director

19  to be validly appointed.  So whether or not a director is

20  validly appointed depends on whether the proper procedure has

21  been followed and whether the proper person has taken that

22  decision, or persons have taken that decision.  But it doesn't

23  depend on whether or not he is registered in the Trade

24  Registry.

25            So while third parties in good faith may rely on

1  information in the Trade Registry, it's not conclusive.

2  Q    Thank you.  And earlier you were also asked about

3  fiduciary duties that Mathu Rajan would have as a director of

4  any of the Dutch entities.  Would the same be true with respect

5  to Mr. Stastney and Mr. Zuidema?  Do they also have fiduciary

6  duties to the Dutch entities?

7  A    Yes, a director under Dutch law has the duty to act in the

8  interest of the company and its stakeholders.  And those

9  stakeholders are defined in quite a broad sense, they're not

10 limited to shareholders, but they also include customers,

11 suppliers, creditors, employees, and anybody else that the

12 company deals with.

13          So it's really irrelevant who is the director, they

14 will always have to take into account those interests.

15 Q    And who do those fiduciary duties apply to for the

16 directors of the Dutch entities?

17 A    Well, like I said all of the stakeholders.  So that would

18 include normally the first stakeholders that you think of as a

19 director of a Dutch company would be the creditors of the

20 company, the employees of the company, and other parties that

21 the company does business with.  And, of course, the

22 shareholder is also an important stakeholder, but it's not the

23 most important one.

24 Q    And if Stream TV was the owner of the TechnoVative Media

25 stock, would the directors of the Dutch entities ultimately owe

1  fiduciary duties to Stream TV?

2  A    Well, yes, along with those other stakeholders I

3  mentioned, yes.

4  Q    You were also asked earlier about Mr. Rajan being able to

5  institute a proceeding to challenge his removal of a director,

6  is that correct?

7  A    Yes.

8  Q    Do you know whether Mr. Rajan still has the ability to

9  initiate such a proceeding under Dutch law?

10  A    Yes, he does.

11  Q    And do you know how long he has to make such an

12  application, initiate a proceeding?

13  A    Well, there's -- there's two concepts that play a role

14  here:  He can ask the court to declare that his dismissal was

15  void or that it was voidable.  The main difference being that a

16  voidable decision is one where procedures haven't been properly

17  followed.  A void decision is one where, for example, I would

18  have taken the decision as a shareholder when I'm not a

19  shareholder.

20          The main difference for the purpose of answering your

21  question is that asking the Court to declare that a decision is

22  void does not expire because the decision -- a void decision is

23  considered void ab initio, so from the start, it's never been

24  void.

25          A voidable decision can be voided, and there is a

1  statute of limitations of one year after the party who

2  challenges the decision becomes aware of the decision.

3  Q    Thank you.  And I believe you also testified that a U.S.

4  court order would not necessarily be enforceable under Dutch

5  law.

6  A    That is correct, yes.

7  Q    And if a U.S. court opinion -- or court order, I'm sorry,

8  enjoined Mr. Rajan from asserting that he was a board member of

9  any of the Dutch entities, you are not rendering any opinion

10  about whether or not that order would be enforceable in the

11  United States, are you?

12  A    No, I'm not.

13  Q    Okay.

14        MR. STEMERMAN:  Thank you; no further questions.

15                      CROSS-EXAMINATION

16  BY MR. WEIS:

17  Q    Good afternoon, Ms. Rumora.  Martin Weis, I'm here on

18  behalf of Stream TV.

19        Very brief, Mr. Liberi asked you a hypothetical about

20  control over the entity, depending on if SeeCubic was the

21  ultimate owner of the -- the ultimate shareholder of the debtor

22  companies, do you recall that hypothetical?

23  A    Yes.

24  Q    Okay.  I'd like to change it slightly for you, and see

25  what you think about it.  What if Stream was the ultimate owner

1 and shareholder of the debtor entity, assumption number one.

2          Assumption number two is that Mr. Stastney and Mr.

3 Zuidema are the directors of the Dutch entity.

4          Is it true that SeeCubic would not have any control

5 under those circumstances?

6 A    Yes.  I'm sorry, yes, that's true.

7 Q    Thank you.

8          MR. WEIS:  I have nothing further, Your Honor.

9          THE COURT:  Okay; thank you very much.

10          Ms. Rumora-Scheltema, thank you so much for your time

11 and attention.  You can consider yourself released from our

12 virtual witness box today.

13          MS. RUMORA-SCHELTEMA:  Thank you.

14          THE COURT:  Have a good night.

15          MS. RUMORA-SCHELTEMA:  Thanks.

16          MR. LARKIN:  Your Honor, just one quick housekeeping

17 matter before we turn to the next witness.  I believe Mr.

18 Dumoulin, our Dutch law expert, is in the waiting room, the

19 virtual -- the virtual waiting room for the virtual witness

20 box.  And if it would be possible to admit him -- ask the Court

21 staff to admit him, that would be helpful.

22          THE COURT:  I am not seeing him in our waiting room;

23 are you sure?

24          MR. LARKIN:  Yeah, he has been trying to get in, and

25 -- would it -- should we take a five-minute -- maybe a five-

1 minute break here just to see if we can get him in?  I

2 apologize, Your Honor.

3          THE COURT:  That's okay.  Let's take a five-minute

4 break, we'll come back at 4:20 and we'll see if he is ready for

5 us.

6          MR. LARKIN:  All right; thanks a lot.

7          THE COURT:  Thank you.

8              (Recess 4:15 p.m./Reconvene 4:21 p.m.)

9          THE COURT:  Okay.  Mr. Larkin, are you ready to

10 continue?

11          MR. LARKIN:  I am.  And, thank you, Your Honor, I

12 appreciate your indulgence.  Mr. Dumoulin was able to get in.

13 I would like to introduce my colleague, Marley Brumme, who will

14 be doing the cross-examination.  Or, I'm sorry, redirect.

15          MS. BRUMME:  Hi; good afternoon.

16          THE COURT:  Mr. Dumoulin, thank you for joining us.

17 I'm going to swear you in, and then I'll tender you.

18                    SVEN DUMOULIN, SWORN

19          THE COURT:  Can you please state your name, and spell

20 your last name for the record?

21          THE WITNESS:  Yes.  My name is Sven Dumoulin, and my

22 last name is spelled D U M O U L I N.

23          THE COURT:  Okay; thank you very much.

24          Okay, so I will tender you for cross-examination.

25 Ms. Aaronson, are you handling this in this instance?

1          MS. AARONSON:  Yes, I am, Your Honor; thank you.

2          THE COURT:  Okay.

3                      CROSS-EXAMINATION

4    BY MS. AARONSON:

5    Q    Good afternoon, Professor Dumoulin; I believe we met

6    during your deposition last week.  So I believe you testified

7    at your deposition that this is the first time that you've

8    served as an expert for trial, and that your deposition was the

9    first time you had been deposed, is that correct?

10   A    That is correct.

11   Q    Okay.  And in this matter, you were retained as an expert

12   on Dutch law by SeeCubic or its counsel?

13   A    Yes, that's correct.

14   Q    Before you were asked to serve as an expert for this

15   trial, your firm, De Brauw Blackstone and Westbroek, were they

16   retained by SeeCubic or by Skadden in this matter?

17   A    Yes.

18   Q    And approximately when did that occur?

19   A    I do not know that other than from the documents that I

20   have seen, which are the exhibits to my report and the Rumora

21   report, and what I saw in one of the exhibits of the Rumora

22   report was that that was about August of last year because in a

23   letter sent, I think by someone in my firm at the beginning of

24   August -- of August, 2020, I think, it was stated there that

25   they had been retained recently.

1  Q    Okay.  And do you know what the purpose of that retention

2  was?

3  A    No, not specifically, no.

4  Q    Do you know what work was performed on behalf of SeeCubic?

5  A    Not other than what I read in the file.

6  Q    And what did you read in the file?

7  A    Well, for instance, the letter that I mentioned, I think

8  there were -- letters were sent in relation to certain

9  appointments that had been made or that had allegedly been

10 made, so that type of work.

11 Q    And that would be appointments to the board of the Dutch

12 entities?

13 A    Yes.

14 Q    Okay.  And did those letters also include demands alleging

15 that SeeCubic owned the TechnoVative stock?

16 A    Yes.

17 Q    Okay; all right.  I'd like to start with some preliminary

18 questions about your report itself.  On Page 2 under the title,

19 "Assignment," you don't need to look at it, but if you have it

20 in front of you, that would be fine.

21        You list some information that forms the background

22 of your opinion in Paragraphs 6 through 10.  Where did the

23 background information come from?

24 A    I received that from both the members of my firm, who were

25 representing SeeCubic, and from Skadden Arps.

1  Q    Okay.  And are those assumptions that you were asked to

2  make in connection with your report?

3  A    Those assumptions are set out in the report primarily, I

4  think, in Paragraph 7.

5  Q    Okay.  And did you perform any independent research or

6  other investigation to determine whether those assumptions are

7  true?

8  A    No.

9  Q    Okay.  So the basis of your report is limited to the

10 assumptions provided to you by your firm and by SeeCubic.

11 A    Yes, but I'm also -- my report is also based on certain

12 documents which have been exhibited to that, for instance

13 minutes of meetings --

14 Q    Right.

15 A    -- and invitations to attend meetings.

16 Q    Okay.  But you didn't -- you didn't undertake a personal

17 examination of U.S. law or any validity of any of the

18 assumptions.

19 A    No, I didn't.

20 Q    Okay; thank you.  Okay.  And in your report, you've

21 attached an organization structure chart, correct?

22 A    Yes.

23 Q    Okay.  And the structure chart shows the U.S. entity,

24 TechnoVative Media, as the indirect parent of Ultra-D

25 Cooperatief, Stream TV International B.V., and SeeCubic B.V.,

1 which you refer to in your report as the Dutch entities

2 collectively, correct?

3 A    Correct.

4 Q    Okay.  And you've assumed that that organization structure

5 is accurate, and you haven't done your own research on that,

6 correct?

7 A    That is -- that's correct.

8 Q    Okay.  And at the bottom of Page 2 in 7C, you indicate

9 that SeeCubic -- and your understanding is that the SeeCubic

10 U.S. entity is different from SeeCubic B.V. that's one of the

11 Dutch entities, correct?

12 A    Correct.

13 Q    Okay.  So at the bottom of Page 2, you indicate that

14 SeeCubic U.S. acquired all of the shares of TechnoVative, do

15 you see that?

16 A    I do.

17 Q    All right.  And that's an assumption you were asked to

18 make; you don't know whether that's true or not.

19 A    That's an assumption.

20 Q    Okay.  And to determine the accuracy of that assumption,

21 is that a matter of Dutch law or U.S. law?

22 A    Insofar as I can see, that's a matter of U.S. law.

23 Q    Okay.  And then you don't know the requirements under U.S.

24 law to transfer stock of a U.S. company from one stockholder to

25 another, correct?

1  A    Correct.

2  Q    You're not an expert on U.S. securities laws.

3  A    Correct.

4  Q    Okay; all right.  So the next paragraph, top of Page 3 in

5  7D, you indicate that through the acquisition by SeeCubic U.S.

6  of all the shares in TechnoVative, SeeCubic indirectly acquired

7  shares in technology holdings and media holdings, and this is

8  also something you assumed, correct?

9  A    Correct.

10 Q    All right.  And the -- to determine the truth of that

11 assumption, is that a matter of U.S. law or Dutch law?

12 A    I think it's a matter of U.S. law.

13 Q    Okay; all right.  And then in Paragraph 7E, you indicate

14 that Mr. Stastney is authorized to represent technology

15 holdings and media holdings.  Again, they're the U.S.

16 subsidiary of TechnoVative Media.  This is also something that

17 you assumed, and you haven't independently researched that,

18 correct?

19 A    Correct.

20 Q    Okay.  And would that -- would Mr. Stastney's control over

21 the U.S. subsidiary of TechnoVative, is that a matter of U.S.

22 law or Dutch law?

23 A    Are you referring to the fact that he's authorized to

24 represent these entities?

25 Q    Yeah, authorized to represent the U.S. subsidiaries of

1 TechnoVative Media.

2 A    Yes, that's a matter of U.S. law insofar as I understand.

3 Q    Okay; all right.  And so consistent with what you've just

4 testified in Paragraph 4 -- Page 4, Paragraph 11, you provide

5 that Dutch law does not affect whether the ownership of

6 TechnoVative stock was validly transferred to SeeCubic.  But if

7 it was transferred, according to U.S. law, then Dutch law would

8 -- then SeeCubic would be recognized under Dutch law as the

9 indirect owner, correct?

10 A    Correct.

11 Q    Okay.  So your report doesn't address the application of

12 Dutch law in the event that TechnoVative stock was not

13 transferred in accordance with U.S. law, correct?

14 A    That's correct.

15 Q    Okay.  And you would agree that the ultimate ownership of

16 the Dutch entities is determined by the ownership of their

17 parent company, which is an issue of U.S. law.

18 A    That's correct.

19 Q    Okay.  Just a couple more questions, not related to the

20 stock in TechnoVative.  But is a Netherlands court order

21 necessary if someone wanted to enforce an order of a U.S. State

22 Court, Delaware Chancery Court order in the Netherlands?

23 A    Yes, that's correct.

24 Q    Okay.  And finally, if a director of a Dutch company is

25 suspended or removed from the board of directors of that Dutch

1  entity, does Dutch law provide an opportunity for that director

2  to contest or challenge the removal?

3  A    That depends on the -- on whether there is anything wrong

4  or incorrect with that decision.

5  Q    Right, but to make that determination the dismissed

6  director would have the ability to bring a challenge.

7  A    Yes.

8  Q    Okay.  And do you know how long that period runs?

9  A    That runs, in case a decision is voidable, 12 months.

10 Q    And what if it's void?

11 A    If it's void, then it's void, which means that it doesn't

12 need to be contested in court for it to be invalid.

13 Q    Okay.

14        MS. AARONSON:  Nothing further, Your Honor.

15        THE COURT:  Okay.  Mr. Stemerman, did you want to ask

16 any questions of this witness?

17        MR. STEMERMAN:  No questions from VTI, Your Honor.

18        THE COURT:  Okay.  Ms. Sierra, did you have any

19 questions for this witness?

20        MS. SIERRA:  No questions from the U.S. Trustee.

21        THE COURT:  Okay.  Then I will tender him for

22 redirect.

23        MS. BRUMME:  No questions from SeeCubic.

24        THE COURT:  Okay.  I guess we're all getting ready to

25 conclude for today.

1          So, Mr. Dumoulin, thank you so much for your time and

2     attention to this matter, and staying on the line into the late

3     hours of your night.  I appreciate your testimony and your

4     expert opinion today, you are released from our virtual witness

5     box.

6          MR. DUMOULIN:  Thank you very much.

7          THE COURT:  Thank you.

8          Okay.  So I don't think it makes any sense to call

9     the next witness.  I think I'm a little tired, and we've been

10    going at it all day, so -- and I don't think it makes sense to

11    put the next witness on the stand and sequester him --

12    virtually sequester him all evening.

13         So let's just resume tomorrow with the final witness

14    and closing arguments.  I have you returning at 3 o'clock, so

15    is that sufficient enough time to complete our final witness

16    and present closing arguments?  Mr. Larkin, what do you think?

17    You're on mute, though.

18         MR. LARKIN:  I -- I think -- I know we started the

19    day with an agreement on the chess clock.  I think particularly

20    the first witness went a little longer on cross than I would

21    have anticipated.  It's not a criticism, I know everyone's

22    doing their best here in the virtual world, and I do think it

23    would be helpful for Your Honor to hear closings from both

24    sides on this, and have an opportunity for both sides to

25    present their witnesses.

1          I think we have a little short of an hour left of our

2  allotted time on the chess clock.  I don't know how much time

3  my friends on the other side are going to spend with Mr.

4  Stastney.  I anticipate we'll have -- we could have potentially

5  an hour of redirect, it really just depends on what they elicit

6  on cross.

7          And then I would anticipate, you know, 15 to 20

8  minutes of closing.  So if we have any -- if Your Honor has

9  anymore time tomorrow other than those two hours, maybe three

10  hours might be enough time for us to finish tomorrow; I think

11  that'd be good.

12          THE COURT:  Okay.  Mr. Weis, Mr. McMichael, what do

13  you think?  Is three hours enough for concluding these

14  proceedings --

15          MR. McMICHAEL:  I think --

16          THE COURT:  -- tomorrow if I were to be able to start

17  at 2 o'clock?

18          MR. McMICHAEL:  I think we can get it done by 5, Your

19  Honor, I concur with Mr. Larkin's view on that.

20          MR. WEIS:  To be --

21          THE COURT:  Okay.

22          MR. WEIS:  And to be clear --

23          THE COURT:  Well, then -- I'm sorry, Mr. Weis, go

24  ahead.

25          MR. WEIS:  My apologies, Your Honor.  But to be

1 clear, we are sticking with the chess clock format.

2        THE COURT:  Right; I understand that.  But with

3 closings -- was the closing built into the chess clock format?

4        MR. WEIS:  It was, Your Honor.

5        MR. LARKIN:  It was, Your Honor, but -- and I think -

6 - you know, I'm only asking for -- I think it's an additional

7 15 to 20 minutes if we're going to allot three hours tomorrow,

8 I -- you know, as I said, it's -- I think it would be helpful

9 to Your Honor.

10        THE COURT:  Well, I think it would be helpful.  But

11 more importantly, I acknowledge that I took up some time with

12 my questioning, and I don't know how much that amounted to, but

13 I think it was probably at least 15 minutes that I took away

14 from the parties today.  So to the extent that someone's

15 attributing that to one side or the other, I don't think that's

16 appropriate, okay?

17        MR. WEIS:  No, we're not.

18        THE COURT:  So -- okay.

19        MS. AARONSON:  Just so you know, Your Honor --

20        THE COURT:  All right.  Well, let's do that --

21        MS. AARONSON:  We --

22        THE COURT:  Oh, I'm sorry, Ms. Aaronson?

23        MS. AARONSON:  Oh, that's okay.  I've been working

24 with someone at Skadden on the clocks, we've been keeping good

25 track of everybody's time, and we did not attribute your

1 questioning to any party.  It was free time, so --

2          THE COURT:  Okay.  Okay; great.

3          All right, well, let's just do this because I really

4 don't want to go over 5 o'clock.  So let's just start at 2

5 o'clock tomorrow, just for the sake of everybody, and I'll make

6 no position on the extra time.  And hopefully, we'll be able to

7 complete with plenty of time before 5 tomorrow based on the

8 chess clock.

9          So with that, let's adjourn today's hearing, and I

10 will plan to see you all at 2 o'clock, all right?  And I think

11 that you can continue to use the same registration link for

12 Zoom so you don't need to re-register, if my understanding is

13 correct.

14          Okay?  So I look forward to seeing you all at 2 p.m.,

15 and we'll consider the hearing adjourned.  Everyone have a good

16 night; take care.

17          THE COURT:  Thank you, Your Honor.

18          MULTIPLE SPEAKERS:  Thank you.

19          (Whereby the hearing concludes at 4:36 p.m.)

20

21

22

23

24

25

# CERTIFICATION

We certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter to the best of my knowledge and ability.

_/s/ Dipti Patel_

DIPTI PATEL, CET

_/s/ Dana Kelly_

DANA KELLY, CET

_/s/ Karen Watson_

KAREN WATSON, CET

_/s/ Beth Reid-Grigsby_

BETH REID-GRIGSBY, CET

_/s/ Karen Hartmann_                    May 12, 2021

KAREN HARTMANN, CET

**RELIABLE**