1

2

                    UNITED STATES BANKRUPTCY COURT
                         DISTRICT OF DELAWARE

3

4

5

6

7

8

                                    .   Chapter 11
IN RE:                              .
                                    .   Case No. 21-10433 (KBO)
STREAM TV NETWORKS, INC.,           .
                                    .
                                    .   Courtroom No. 3
                                    .   824 N. Market Street
                                    .   Wilmington, Delaware 19801
                                    .
                    Debtors.        .   May 11, 2021
. . . . . . . . . . . . . . . . .   2:00 P.M.

9

10

11

   TRANSCRIPT OF OMNIBUS HEARING ON SEECUBIC, INC.'S MOTION TO
                 DISMISS THE CHAPTER 11 CASE
             BEFORE THE HONORABLE KAREN B. OWENS
                UNITED STATES BANKRUPTCY JUDGE

12

TELEPHONIC APPEARANCES:

13

For the Debtors:       Martin J. Weis, Esquire
                       DILWORTH PAXSONLLP

14

                       704 N. King Street
                       P.O. Box 1031

15

                       Wilmington, DE 19899-1031

16

                       - and -

17

                       Lawrence G. McMichael, Esquire

18

                       Anne M. Aaronson, Esquire
                       Yonit A. Caplow, Esquire

19

                       1500 Market Street, Suite 3500E
                       Philadelphia, PA 19102

20

21

Audio Operator:        Madaline Dungey, ECRO

22

Transcription Company: Reliable

23

                       1007 N. Orange Street
                       Wilmington, Delaware 19801

24

                       (302)654-8080
                       Email:  gMathus@reliable-co.com

25

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

TELEPHONIC APPEARANCES (Cont'd):

For the U.S. Trustee:    Rosa Sierra, Esquire
                        UNITED STATES DEPARTMENT OF JUSTICE
                        OFFICE OF THE UNITED STATES TRUSTEE
                        844 King Street, Suite 2207
                        Lockbox 35
                        Wilmington, Delaware 19801

For SeeCubic, Inc.:    Joseph Larkin, Esquire
                        Jason Liberi, Esquire
                        SKADDEN, ARPS, SLTATE, MEAGHER
                          & FLOM LLP
                        One Rodney Square
                        920 N. King Street
                        Wilmington, Delaware 19801

                        - and -

                        Eben Colby, Esquire
                        500 Boylston Street
                        Boston, MA 02116

For Visual Technology    Jonathan Stemerman, Esquire
Innovations:              Rafael Zahralddin, Esquire
                        ARMSTRONG TEASDALE LLP
                        300 Delaware Avenue, Suite 210
                        Wilmington, Delaware 19801

                        - and -

                        John Sten, Esquire
                        225 Franklin Street, 26th Floor
                        Boston, MA 02110

For the Committee:    Christopher Samis, Esquire
                        POTTER ANDERSON & CORROON LLP
                        HERCULES PLAZA
                        1313 North Market Street, 6th Floor
                        P.O. Box 951
                        Wilmington, Delaware 19801

MATTERS GOING FORWARD:

Motion of SeeCubic, Inc. and SLS Holdings VI, LLC for an Order Dismissing Debtor's Chapter 11 Case [Filed: 3/12/2021; D.I.46]

United States Trustee's Motion for an Order Dismissing or Converting This Case to Chapter 7 [Filed: 3/24/2021; D.I. 84]

**Ruling:  Oral Ruling on Monday, May 17th**

SEECUBIC INC.'S WITNESS(s):

**SHADRON STASTNEY**

    Cross Examination by Ms. Aaronson          5

    Cross Examination by Mr. Sten              46

    Redirect Examination by Mr. Colby          102

1          (Proceedings commence at 2:01 p.m.)

2          THE COURT:  Good afternoon, parties.  This is Judge

3  Owens.  We are resumed for the Motion to Dismiss hearing in

4  Stream TV.  I think where we left off was that we were going

5  to hear from our last witness, but when I turn the virtual

6  podium over to it looks like Mr. Colby, and you can begin

7  things today.

8          MR. COLBY:  Thank -- thank you, Your Honor.  I

9  think because we've already submitted Mr. Stastney's

10  declaration and his direct testimony, we'll begin with cross

11  examination.

12          THE COURT:  Okay.  Mr. Stastney, I see that you are

13  joi -- here with us today.  Thank you very much for joining

14  us.  I'm going to swear you in.

15          MR. STASTNEY:  My pleasure.

16          THE COURT:  Thank you.  I'm going to swear you in

17  and then we -- I will tender you for cross examination.

18       SHADRON STASTNEY, SEECUBIC INC.'S WITNESS, SWORN

19          THE COURT:  Okay.  Can you please state your name

20  for the record and spell your last name?

21          MR. STASTNEY:  Sure.  You might need both.

22  Shadron, S-H-A-D-R-O-N, Stastney, S-T-A-S-T-N-E-Y.

23          THE COURT:  Thank you very much, Sir.  Okay.  Ms.

24  Aaronson, will you be doing first attempt at cross-

25  examination?

1    MS. AARONSON:  Yes, I will, Your Honor.  Thank you.

2  And just a -- as a housekeeping matter, we coordinated

3  yesterday with the folks at Skadden Arps on the timekeeping

4  and I think we're in agreement on where the time stands, so

5  excluding Your Honor's questions that were asked and the

6  responses, the movants, with their openings and their cross,

7  were at two hours and 15 minutes yesterday -- or no, two --

8  215 minutes yesterday, a little over three and a half hours.

9  And the respondents were 88 minutes, a little over an hour

10 and a half.  But today, obviously, since we're doing cross,

11 it'll be a little bit more weighted on our -- our end with

12 time, so.

13    And also, Isaac Stevens from Armstrong will be

14 pulling up exhibits on the screen for us today.  They're a

15 little more technologically advanced than us, so -- so it --

16 would the Court be so kind as to allow Mr. Stevens to share

17 screen during cross?

18    THE COURT:  Can we make Mr. Stevens a co-host,

19 please.  Okay.  Mr. Stevens, you have been made a co-host, so

20 you should be able to share your screen with us.

21    MR. STEVENS:  Thank you, Your Honor.

22    MS. AARONSON:  Thank you, Your Honor.  Okay.

23                    CROSS EXAMINATION

24 BY MS. AARONSON:

25 Q    Good afternoon, Mr. Stastney.  We met via Zoom during

1   your -- I guess your deposition a week or so ago, but I'll

2   remind you.  My name is Anne Aaronson and I'm with the law

3   firm of Dilworth Paxton, representing Stream TV in this

4   matter.

5   A    Good afternoon.

6   Q    So in the interest of time, just to summarize your

7   background from your deposition last week, I believe you

8   stated that you're -- you obtained an undergraduate degree

9   from the University of North Dakota, a law degree from Yale

10  Law School, but you're no longer a practicing attorney.  Is

11  that correct?

12  A    That's correct.

13  Q    Okay.  And you also stated that you've been involved

14  with various SLS entities since about 2010.  Correct?

15  A    That's correct.

16  Q    Okay.  Do you have a particular title at SLS Holdings?

17  A    Managing member.

18  Q    Okay.  And what about SLS Holdings VI, LLC?

19  A    Managing member.

20  Q    Okay.  And that SLS Holdings VI, LLC, that's the entity

21  that's the senior secured creditor in the Debtor's case.

22  Correct?

23  A    That is correct.

24  Q    All right.  Okay.  Has your role changed from managing

25  member since 2010?

1  A    No.  It has not.

2  Q    Okay.  And how many other principals are there of SLS

3  Holdings VI, LLC?

4  A    There are two other principals.

5  Q    Okay.  And who are they?

6  A    John Succo, S-U-C-C-O.

7  Q    Mm-hmm.

8  A    And Sky Lucas.

9  Q    Okay.  And are either of those involved with Stream TV?

10 A    Other than as holders of parts of SLS Holdings VI, no.

11 Q    Okay.  Okay.  Who made the decision for SLS Holdings VI

12 to loan money to the Debtor?

13 A    SL -- the -- the investors in SLS Holdings VI.

14 Q    Okay.  And as of today, what amount is owed by the

15 Debtor to SLS on account of its notes?

16 A    Approximately 11 and a half million dollars.

17 Q    Now, do you personally have a relationship to SeeCubic,

18 Inc?

19 A    Yes.

20 Q    Okay.  And what -- what is your role there?

21 A    I'm an executive --

22 Q    And when did -- when did that begin?

23 A    Upon formation of SeeCubic, Inc. in late May of 2020.

24 Q    Okay.  And -- and who formed that entity, SeeCubic?

25 A    I did.

1  Q    Okay.  And who chose the name SeeCubic, Inc.?

2  A    We discussed as a group.  I think between us and Hawk,

3  we agreed that SeeCubic, Inc. was the best name.

4  Q    Okay.  And -- and why did you believe that was the best

5  name?

6  A    Because SeeCubic has a historical reference to the

7  company and would resonate with people as a result.

8  Q    Okay.  So you understood that the SeeCubic name carried

9  with it a favorable industry recognition and value?

10 A    Not so much a favorable industry recognition and value,

11 but would feel comfortable to the historical participants in

12 SeeCubic, Inc.

13 Q    Okay.  Now, you stated in your deposition that as of the

14 date of your deposition, I guess a week ago, no shares of

15 SeeCubic had yet been issued to anyone, except maybe one

16 share that's -- was owed by you, personally.  Correct?

17 A    That is correct.

18 Q    Okay.  So you would remain the sole shareholder of

19 SeeCubic today.  Right?

20 A    I am the sole shareholder, although many people have the

21 rights to acquire the share's debt --

22 Q    Okay.  And there -- of those many people, how many of

23 those were also shareholders or investors in Stream?

24 A    I would say roughly 90 percent of those were also

25 shareholders or investors in Stream.

1  Q    Okay.  Has any shares in SeeCubic been issued to the

2  Debtor, Stream TV?

3  A    They have not.

4  Q    Okay.  But I believe -- we'll get to this more late, but

5  I believe the Omnibus Agreement requires SeeCubic to issue a

6  million shares of its stock to the Debtor.  Correct?

7  A    Correct.  Upon immediate conveyance of all of the

8  property of Stream to the Debtor -- I mean to SeeCubic,

9  rather, SeeCubic was to issue a million shares, and -- and we

10 will.

11 Q    Okay.  What -- what is SeeCubic's business?

12 A    SeeCubic operates the Ultra-D -- the subsidiaries which

13 are in the process of developing and commercializing the

14 Ultra-D technology.

15 Q    And how many employees does SeeCubic itself have now?

16 A    SeeCubic, Inc., the parent entity?

17 Q    Correct.  Correct.

18 A    Zero.

19 Q    Okay.  And how many employees does SeeCubic, through the

20 -- I guess your position would be Stream's former

21 subsidiaries, how many employees would it have?

22 A    SeeCubic's subsidiaries have a total of about 25

23 employees.

24 Q    Okay.  And did SeeCubic hire all of Stream's employees?

25 A    SeeCubic did not hire any of Stream's employees that

1  were still Stream's employees at the time of the PR order.

2  Q    Okay.  But the employees that are with the subsidiaries

3  now, they are all former Stream employees.  Correct?

4  A    They are --

5  Q    Or --

6  A    They all continue to be --

7  Q    They were employed by --

8  A    -- employees of the subsidiaries that they were employed

9  with before.

10 Q    Okay.  Thank you.  Does SeeCubic owe any debt to SLS?

11 A    SeeCubic has agreed that upon assumption of the debt

12 owed to SLS by Stream, it will owe S -- it will owe debts to

13 SLS.

14 Q    So -- so SeeCubic is -- is just taking on the debt that

15 the Debtor owes to SLS?

16 A    It is taking on a portion of that debt.

17 Q    Has See -- SLS invested any new money into SeeCubic?

18 A    Yes.  It has.

19 Q    Do -- do you know approximately how much?

20 A    Approximately $500,000.

21 Q    Okay.  Okay.  So we'll get back to SeeCubic in a few

22 minutes.  You -- you testified during your deposition that

23 you've been employed as CFO as Stream TV networks and served

24 two terms on Stream's board.  Correct?

25 A    I was previously employed as the CFO of Stream TV's

1  networks, Stream TV networks, and served two separate terms

2  on its board, yes.

3  Q    Okay.  And what were the periods were -- that you served

4  on the Board?

5  A    I served -- I served on the Board from the time of our

6  initial investment in 2011 until mid-2014; I don't remember

7  the exact time that I departed.  And I rejoined at the

8  Rajans' request in Septem -- rejoined the Board in September

9  of 2018 and departed January 30th of 2020.

10 Q    And for your second term, you were also the Vice-

11 Chairman of the Board.  Correct?

12 A    That is correct.

13 Q    And then when were you -- when were you CFO for Stream?

14 A    I was asked to join as CFO in December, December 1st of

15 2018.  And I served until January 30th of 2020.

16 Q    Okay.  So except for the -- a couple of months the

17 beginning of your second term, your second board term when

18 you were Vice-Chair coincided with the period that you were

19 CFO?

20 A    Except for the first three months.  Correct.

21 Q    Cor -- three months.  Okay.  All right.  How did you

22 first become a member of the Debtor's board?

23 A    Upon our initial investment, SLS had the right to name a

24 member to the Board, and SLS named me.

25 Q    Okay.  And why were you asked to leave the Board that

1  first time?

2  A    I was not asked to leave the Board.  SLS continued to

3  have its right to name a party, but the company's investment

4  bankers at the time indicated that because I had recently

5  entered into a Settlement Agreement with the SEC, it might be

6  in the best interest of the company and their fundraising

7  efforts, particularly, if I stepped down.

8  Q    All right.  And that -- that SEC involved allegations

9  that you breached a fiduciary duty to investors and were

10  self-dealing when you were principal of Vicis, or Viscis

11  (phonetic)?

12  A    Vicis?  Yeah.  It involved a failure to disclose a

13  principal transaction.

14  Q    And as a result of the -- the SEC settlement, you -- you

15  continue to be barred from associating with or being an

16  investment -- investment advisor at this time.  Correct?

17  A    That's correct.  I was barred for 18 months.  That

18  period expired some time ago, but I have not yet reapplied.

19  Q    Okay.  All right.  When you were on Stream's board the

20  first time, did you have confidence in the Debtor's product?

21  A    Yes.  I -- when we invested the first time, we had -- it

22  was -- the product was in its infancy.

23  Q    Uh-huh.

24  A    So we -- the money that we invested in 2011 and 2012

25  went to acquire the Philips' license in the first place and

1   to fund the creation of the Eindhoven facility.  So while it

2   was a very early-stage investment, we saw the potential.

3   Q    And then how did you come to join the Board the second

4   time?

5   A    I was asked by Mathu Rajan and the rest of the Board to

6   join the Board in 2018 to assist with fundraising, corporate

7   governance, and financial matters.

8   Q    Okay.  So at that point, you had sufficient confidence

9   in the -- in the Debtor's operations that you thought it was

10  a good idea that you would -- could join the Board again?

11  A    I noted that there were areas which required

12  improvement, and it was my belief, based on conversations

13  with Mathu and Raja at the time, that they were interested in

14  making those improvements.

15  Q    Okay.  All right.  And that was about two and a half

16  years ago that you rejoined the Board.  Right?

17  A    It was September of 2018.

18  Q    Okay.  Okay.

19  A    I'm not going to do the math.

20  Q    Yeah.  All right.  So I'm going to move to everyone's

21  favorite subject, the Omnibus Agreement.  So May 6th, 2020,

22  what's known as the Omnibus Agreement was signed.  Correct?

23  A    Yes.  The Omnibus Agreement between Stream and several -

24  - the secured holders and several investors.  Correct.

25  Q    All right.  So I'm going to refer to the version that's

1   docketed as Exhibit 1 to your Declaration in support of the

2   Motion to Dismiss for -- for these questions.  You testified

3   at your deposition that the settlement discussions for that

4   agreement began while you were still CFO and Vice-Chair of

5   Stream's board.  Correct?  Around September 2019-ish?

6   A    Yes.  Well, the discussions around the disposition of

7   SLS's debts began in September of 2019.

8   Q    And you testified that the original draft of the Omnibus

9   Agreement was prepared by Skadden Arps?

10  A    I believe that's correct.

11  Q    Okay.  All right.  So you just said a couple of minutes

12  ago that the Omnibus Agreement was signed by you on behalf of

13  SLS, but it was also signed by Hawk and representatives of

14  some shareholders and I guess for Stream.  Who signed it on

15  beha -- signed the Omnibus Agreement on behalf of Stream?

16  A    Two of the independent board members; I believe Asaf

17  Gola, G-O-L-A.

18  Q    Mm-hmm.

19  A    Asaf is A-S-A-F.  And Kevin Gollop, G-O-L-L-O-P.

20  Q    Okay.  And these two individuals, they were considered,

21  or nominated or appointed as a resolution committee of

22  Stream's board.  Correct?

23  A    That's correct.

24  Q    So it wasn't the full board, it's -- it was the two

25  directors.  Correct?

1   A    It was two of the independent directors who I believe

2   had been appointed as a resolution committee.

3   Q    Okay.  And when did they join Stream's board?

4   A    I believe it was in March of 2020.

5   Q    Okay.  So, like, two months before the Omnibus Agreement

6   was signed?

7   A    Yes.

8   Q    Okay.  And were they -- how did they get on the Board?

9   Were they recommended by Hawk, or by SLS?

10   A    No.  They were not recommended by SLS.  I don't know if

11   they were recommended by Hawk, but I know they were added and

12   announced by the Rajans.  I had not met either of those

13   people in person until well after the Omnibus Agreement was

14   signed.

15   Q    Okay.  Do you know whether they're still on Stream's

16   board?

17   A    I do not.  No.

18   Q    Okay.  Okay.  Do -- do either Mr. Gollop -- Gola or

19   Gollop have a relationship with SeeCubic at this time?

20   A    Yes.

21   Q    And what is their relationship?

22   A    They're both consultants to SeeCubic.

23   Q    Okay.  And does Mr. Gollop also have a right to be

24   issued shares in SeeCubic?

25   A    Mr. -- I'm sorry.  I apologize.  Mr. --

1  Q    Gollop.

2  A    Mr. Gollop has invested in SeeCubic.  Yes.

3  Q    Okay.  Okay.  Now, the Omnibus -- the version of the

4  Omnibus Agreement that's attached as Exhibit 1 to your

5  Declaration in support of the Motion to Dismiss, you've

6  asserted that that is a true and correct copy of the Omnibus

7  Agreement.  Correct?

8  A    Correct.

9  Q    Okay.  I was going to ask Isaac, could you please pull

10  up Stream tab 3 on the screen?  Okay.  So Mr. Stastney, this

11  is a document.  It's titled "Letter Agreement."  Do you see

12  that?

13  A    I do.

14  Q    Okay.  And this agreement is attached to your

15  Declaration as part of Exhibit 1.  Correct?

16  A    I believe that's correct.

17  Q    Okay.  But is this a separate agreement from the Omnibus

18  Agreement?

19  A    It is.

20  Q    Okay.  So why -- why was this attached as part of the

21  Omnibus Agreement to your Declaration?

22  A    The Omnibus Agreement and the Letter Agreement were,

23  during the course of negotiation, all part of the same

24  agreement.  And in the negotiations we went through with the

25  Rajans and up until the time of the resolution committee,

 1  they were the same agreement.  The terms from the Letter

 2  Agreement were included in the Omnibus Agreement.

 3      It was only as part of our negotiations with the

 4  resolution committee that the resolution committee felt that

 5  the terms of the Letter Agreement were more particular to

 6  NewCo, what was then NewCo, what would become SeeCubic, to

 7  its capital structure going forward and were not an

 8  appropriate topic on which they should be opining by signing

 9  the agreement.

10      So at that point, the terms specific to SeeCubic's

11  structure going forward were put into a Letter Agreement,

12  basically cutting and pasting from the Omnibus Agreement.

13  And what was left became the Omnibus Agreement.

14  Q    Okay.  And by "resolution committee," you mean Mr. Gola

15  and Mr. Gollop requested that the terms be pulled out

16  (indiscernible).

17  A    Correct.  We were dealing with them at that point as the

18  resolution committee.

19          MS. AARONSON:  Okay.  Isaac, can you pull up VTI

20  tab 115?

21          MR. STEVENS:  Sure.

22          MS. AARONSON:  Thank you.

23  BY MS. AARONSON:

24  Q    Okay, Mr. Stastney.  This is an email from May 6th,

25  2020, the date that the Omnibus Agreement and Letter

1  Agreement were apparently signed.  Do you recognize this

2  email?

3  A    I do.

4  Q    Okay.  And so this is an email from you to Mr. Morton,

5  who -- he's with Hawk.  Correct?

6  A    Bob Morton is the principal of Hawk.

7  Q    Yeah.  Okay.  And so in -- in paragraph 1, you indicate

8  that the resolution committee, Asaf and Kevin, feel it would

9  be helpful if the -- the terms surrounding NewCo's capital

10  structure were not in the agreement they sign, that the Ra --

11  Rajans would see.  Correct?  That's a -- an accurate unders -

12  - your -- your accurate understanding of why the terms were

13  pulled?

14  A    That's my understanding of why this issue was raised.

15  Yes.

16  Q    Okay.  And then the next sentence, "They don't want to

17  take a view on NewCo's capital structure and they think it

18  will only piss the Rajans off when they see parts of it."

19  A    That's correct.

20  Q    Okay.  So the terms from the Letter Agreement were taken

21  out of the Omnibus Agreement so that the Rajans wouldn't see

22  those terms?

23  A    That's incorrect.  They were taken out because the

24  resolution committee didn't feel comfortable opining on them

25  and there were portions of it which, given the history of

1  Stream, were going to be hot-button issues for the Rajans.

2  And since it was none of their concern, they were removed.

3      Particularly, the Rajans were going to be upset that SLS

4  and Hawk were willing to equitize their interests in moving

5  the debt to SeeCubic when they didn't have confidence doing

6  that in Stream.

7  Q   Okay.  Okay.  So now as a result of the Omnibus

8  Agreement and the Letter Agreement -- oh.  Isaac, you can

9  remove that.  Thank you.  As a result of the Omnibus

10  Agreement and the Letter Agreement being signed, all of

11  Stream's equity holders, except for the Rajans and their

12  affiliates, are now entitled to exchange their shares in

13  Stream for shares in SeeCubic.  Correct?

14  A   That is correct.

15  Q   Okay.  And since then, Mr. Gola and Mr. Gollop have also

16  received their consulting positions with SeeCubic?

17  A   That's correct.

18  Q   Okay.  And Mr. Gollop has his rights to receive equity,

19  I guess, if he made a new investment or as a result of

20  signing the Agreement?

21  A   Not as a result of signing the Agreement, only as the

22  result of a new investment that he made for -- for cash.

23  Q   Okay.  Okay.  So let's turn to Schedule 1.1B of the

24  Omnibus Agreement.  And that would be Stream tab 5, Isaac.

25  Thank you.  So Schedule 1.1B, what -- what is this schedule

1   to the Omnibus Agreement?

2   A    The -- this is a schedule that was mandated by the

3   Omnibus Agreement for what was then NewCo, what became

4   SeeCubic to provide, which listed the -- the liabilities of

5   Stream that SeeCubic specifically assumed.

6   Q    Okay.

7        THE COURT:  I apologize, Ms. Aaronson.  Do I have a

8   copy of this?

9        MS. AARONSON:  It's -- it is Stream tab 5, so I

10  believe you have our exhibits.  Correct?

11       THE COURT:  I have all the exhibits.  So what's the

12  exhibit number?  I'm sorry.  I didn't catch it.

13       MS. AARONSON:  It's -- it's tab 5 of Stream's

14  exhibits, so Stream -- it's the -- the fifth document in --

15       THE COURT:  I have -- I have VTI exhibits.  Is

16  there a separate binder for Stream exhibits?

17       MS. AARONSON:  I believe so.  Let me see.  Marty?

18  Mr. Weis?  He's on.  I thought that there -- a binder was

19  delivered.

20       THE COURT:  I have two binders from VTI and four

21  binders from See -- from SLS, or SeeCubic.

22       MR. WEIS:  There should be a -- there should be a -

23  - a Stream binder, and this -- and this should be Exhibit 5

24  to it.  I'll -- I'll go off-screen and track it down, Your

25  Honor.

1          THE COURT:  Okay.  Let's put up --

2          MR. STEVENS:  Your Honor?

3          THE COURT:  Just give me a few minutes so I can

4    look through the binders.  I'm sorry.  Was someone chiming

5    in?

6          MR. STEVENS:  The same document is VTI exhibit 103.

7          MS. AARONSON:  So VTI-103 is the same.

8          THE COURT:  Okay.  All right.  I prefer to work off

9    hard copies, so thank you.

10          MS. AARONSON:  Okay.  Okay.  Sorry.

11   BY MS. AARONSON:

12   Q    So Mr. Stastney, you see Schedule 1.1B.  Correct?

13   A    I do.  I do.

14   Q    Okay.  And what Stream liabilities and obligations are

15   being assumed under this schedule?

16   A    The list is there.  Would you like me to read through

17   it?

18   Q    Well, I guess what are the first -- it looks like the --

19   the initial one, two, three, four lines are the SLS and Hawk

20   obligations.  Who -- who are Andrew and Mark Russley

21   (phonetic)?

22   A    They were investors in Stream TV.

23   Q    Okay.  And so Stream is assuming the debt obligations to

24   those two investors?

25   A    Stream is not assuming them.  Or SeeCubic -- I mean --

1  Q    See -- I'm sorry.  SeeCubic is assuming those from

2  Stream?

3  A    That's correct.

4  Q    Okay.  And who is Todd Tuls?

5  A    Todd Tuls was an investor in Stream, who is also an

6  investor in SeeCubic.

7  Q    Okay.  And the same for the Robert French Revocable

8  Trust and Karen Donovan?

9  A    Yes.  Those are all -- were investors in Stream who are

10 also investors in SeeCubic.

11 Q    Okay.  And then Vayikra -- vi -- I don't know how to

12 pronounce that; Capital, LLC?

13 A    I don't know how to pronounce it -- I don't know how to

14 pronounce it, either, so.

15 Q    Okay.  So that -- that group is all investors in Stream

16 who are also owed debt?

17 A    By Stream.  Correct.

18 Q    Correct.

19 A    And that debt was assumed by SeeCubic.

20 Q    Okay.  And then the last on that list, that's Philips

21 Electronics.  That's a -- a -- I guess licensing fee.

22 Correct?

23 A    That is the royalty fee for the licensing agreement that

24 was between Stream and Philips and is now between SeeCubic

25 and Philips; correct.

1  Q    Okay.  And so all of those former investors in Stream

2  whose debt is being assumed by SeeCubic, are they now slated

3  to have rights and shares of SeeCubic?

4  A    They are.

5  Q    Okay.  And SeeCubic's not assuming any other obligations

6  of Stream.  Correct?  Unless they're on this list?

7  A    That's correct.

8  Q    Okay.  When was Schedule 1.1B prepared?

9  A    After -- in mid-December, shortly after the PI order.

10 Q    And who -- who prepared that?

11 A    Our internal finance consultant, Franklin Rogers, would

12 have prepared it for my -- for my review.

13 Q    Okay.  And so this Schedule was not circulated along

14 with the Omnibus Agreement at the time that the Omnibus

15 Agreement was reviewed and signed?

16 A    Yes.  None of the schedules were circulated at the time.

17 The company had several to provide and the -- SeeCubic had

18 two to provide.

19 Q    Okay.  And you stated at your deposition that you don't

20 believe any representations were made to those signing the

21 Omnibus Agreement about what liabilities were being assumed?

22 A    That's correct.

23 Q    Okay.  Okay.  And in exchange for trans -- Isaac, you

24 can bring that down.  Thank you.  In exchange for a transfer

25 of Stream's assets, the Omnibus Agreement requires that SLS

1  and Hawk dismiss the pending litigation in the Delaware

2  Superior and Chancery Courts.  Correct?

3  A    The foreclosure litigation?  Yes.

4  Q    Right.  Okay.  And has that litigation been dismissed?

5  A    It has not.  It was mutually agreed after the PI order

6  to stay that until after the final order of the Chancery

7  Court.  That remains stayed now.

8  Q    Mutually agreed by whom?

9  A    By SLS and by counsel for Stream at the time.

10  Q    Okay.  And has SLS reported any UCC lien satisfactions?

11  A    It has not.

12  Q    And do you know whether Hawk has filed a UCC lien

13  satisfaction?

14  A    I do not know.

15  Q    All right.  And you stated at your deposition that the

16  reason these -- these events haven't occurred is because

17  Stream hasn't an -- conveyed, transferred, or delivered all

18  of its assets to SeeCubic.  Correct?

19  A    Yes.  Stream was obligated to immediately convey,

20  transfer, and deliver all of its assets to SeeCubic and has

21  yet to do so completely.

22  Q    Okay.  And by the way, the parties to that -- the

23  pending litigation in the Chancery Court and the foreclosure

24  action, they're Stream, SLS, Hawk, the Rajans, some equity-

25  holders, and you.  Correct?

1  A    I'm sorry.  Could you restate that question?

2  Q    The -- the parties to the Chancery Court and Superior

3  Court litigation, they are Stream, SLS, Hawk, the Rajans,

4  some equity-holders, and you.  Correct?

5  A    Those are two separate groups.  So I think it's probably

6  more productive to talk about who is in which group.

7  Q    Well, I'll -- I'll just ask it a different way.  So no

8  unsecured creditors or contract parties or employees or

9  taxing authorities are party to any of the pending

10  litigation.  Correct?  Outside of bankruptcy.

11  A    Not as between -- with -- well, I believe there is

12  pending litigation against Stream from some of those counter-

13  parties.

14  Q    Correct.  Other -- that don't involve SLS.  But the

15  Chancery Court and the foreclosure proceeding don't involve

16  any creditors and contract parties?

17  A    That's correct.

18  Q    Right.  But you indicated there are other lawsuits filed

19  against the Debtor by other creditors?

20  A    I believe so.

21  Q    Yes.  Okay.  Okay.  And SeeCubic has not yet obtained

22  ownership or possession of the bonding equipment in China.

23  Right?  That's what you said at your deposition.

24  A    No.  We've obtained ownership, but possibly not

25  possession.

1  Q     And how do you believe you've obtained ownership?

2  A     Through the Omnibus Agreement, verified by the PI order

3  and the assignment assum -- and Assumption Agreement that

4  we've executed.

5  Q     But you haven't taken possession or had -- no court in

6  the Netherlands or China or any foreign country has entered

7  an order transferring any of the Debtor's assets to SeeCubic?

8  A     No, nor do I believe that would be necessary.

9  Q     Okay.  Okay.  And the Letter Agreement provides for

10 Stream to issue about 48 million shares of stock to SLS,

11 Hawk, and certain shareholders.  Correct?

12 A     That's correct.

13 Q     And that stock hasn't been issued by Stream yet?

14 A     That's correct.

15 Q     Okay.  Do you know whether Stream can issue that amount

16 of stock?

17 A     I don't know.

18 Q     Okay.  But you drafted the Letter Agreement.  Correct?

19 A     That's correct.

20 Q     All right.  And did you or anyone check Stream's charter

21 or any -- the formation documents to see whether Stream had

22 the ability to issue that stock?

23 A     We did not.  We assumed that the agreement would be --

24 that Stream would actually perform under the agreement.  And

25 typically in those situations, you'd make the change to the

1  charter that you need to make as you comply with the

2  agreement.

3  Q    Okay.  But that hasn't happened yet?

4  A    Not to the best of my knowledge; no.

5  Q    Okay.  And at the end of December, 2020, after the PI

6  order was entered, SeeCubic had prepared a balance sheet that

7  was showing the estimated fair value of its acquisition of

8  Stream's assets to be $338,429,616.

9          MS. AARONSON:  Isaac, could you please bring up

10  Stream tab 21C, which I know the judge doesn't have the

11  Stream binders, but do you -- do you know which VTI exhibit

12  that is?  The balance sheet?

13          MR. STEVENS:  Let me see.  It's 107.

14          MS. AARONSON:  107 of VTI.  Thank you.

15          THE COURT:  Thank you.  I have it.

16          MS. AARONSON:  Thank you, Your Honor.

17  BY MS. AARONSON:

18  Q    Let me just ask you, do you recognize this document?

19  A    I do.  This was the initial balance sheet we put

20  together in the immediate aftermath of the PI order.

21  Q    Okay.  And was this balance sheet used to solicit

22  prospective investors to SeeCubic, like Rocket?

23  A    Rocket was not a prospective investor, it was a

24  strategic counter-party.  It was distributed to Rocket.  It

25  was not distributed to anyone else.

1  Q    Okay.

2  A    And it was subsequently revised significantly, as we

3  note in the footnotes.

4  Q    Well, in the footnotes it said it -- it's subject to

5  revision, so.

6  A    As foreshadowed in the footnotes, it was subsequently

7  revised.

8  Q    Okay.  So in your deposition and your original

9  declaration, you take the position that SeeCubic owns -- and

10 I think you said this earlier, owns Stream's subsidiary

11 companies because SeeCubic acquired Stream's stock in

12 TechnoVative Media?

13 A    SeeCubic owns the former subsidiaries of Stream because

14 it acquired 100 percent of the ownership of TechnoVative

15 Media, Inc.

16 Q    Okay.  And when does SeeCubic believe that it acquired

17 that stock?

18 A    No later than September 4th of 2020.

19 Q    And why do you say "no later than"?

20 A    Because there are counter-parties who have taken the

21 view that it was acquired as of the signing of the Omnibus

22 Agreement.  There are some who take the view it was acquired

23 as of the resolutions, short -- a few days after the Omnibus

24 Agreement.  And we think there are some who could take the

25 view that it wasn't acquired until September 4th.  But

 1  following that point, it's clear.

 2  Q    Okay.  But wouldn't a transfer of the stock require a

 3  transfer of the TechnoVative stock certification from Stream

 4  to SeeCubic?

 5  A    It's my understanding that it would not.

 6  Q    Okay.  And See -- in your discovery, you've produced a

 7  copy of the original stock certificate.  Correct?

 8  A    I believe that's correct.

 9  Q    Okay.  But the original wasn't signed over by Stream.

10  Correct?

11  A    That is correct.

12  Q    And was the original ever provided by -- to SeeCubic by

13  Stream?

14  A    I believe it was not.

15  Q    Okay.

16  A    It's -- we had requested it a number of times, but it

17  was not provided.

18  Q    Okay.  Has Stream ever filed a certi -- an Affidavit of

19  Loss so that the certificate could be alternatively

20  transferred to SeeCubic?

21  A    No.  SeeCubic filed an Affidavit of Loss.

22  Q    Okay.  SeeCubic filed an Affidavit of Loss.  But did

23  SeeCubic lose the original certificate?

24  A    SeeCubic acquired the right and title to the original

25  certificate and when it discovered that it was either lost or

1  stolen or had been destroyed, it filed the Affidavit of Loss.

2  Q    But the -- the Affidavit of Loss wasn't executed on

3  Stream's behalf.  Right?  It was executed on SeeCubic's

4  behalf.

5  A    That's correct.

6  Q    And when was that Affidavit of Loss submitted?

7  A    I believe December 22nd of 2020.

8  Q    Okay.  But your position is that somehow, the stock was

9  transferred before the Affidavit of Loss was submitted?

10 A    That's correct.  It was transferred -- the right to it

11 was transferred on September 4th, 2020.

12 Q    Okay.  In your supplemental declaration, you -- you've

13 attached a two-page exhibit.  It's titled an Assignment and

14 Assumption Agreement.  It's dated about I believe September

15 6th of 2020?

16        MS. AARONSON:  Isaac, can you please pull that up?

17 It's Stream tab 24.  Again, I know VTI also has this exhibit,

18 so I'm not -- I'm not sure which number that is for VTI.

19        MR. STEMERMAN:  That should be 20.

20        MS. AARONSON:  20?  Okay.  Thank you.  Thank you.

21 Your Honor, do you -- do you have it?

22        THE COURT:  Yes.  I am good.  Thank you.

23        MS. AARONSON:  Okay.  Okay.

24 BY MS. AARONSON:

25 Q    Mr. Stastney, do you rec -- recognize this document?

1  A    I do.

2  Q    Okay.  And I believe during your deposition, you stated

3  that you prepared the document.  Correct?

4  A    That's correct.

5  Q    All right.  And you also confirmed that this agreement

6  doesn't have any schedules or attachments to it.  Correct?

7  A    That's correct.

8  Q    All right.  And this agreement -- thank you, Isaac.  I

9  was just going to ask if you could scroll down.  It is signed

10  by you on behalf of Stream and by you on behalf of SeeCubic.

11  Correct?

12  A    It was signed by me on behalf of Stream under a power of

13  attorney granted by the Omnibus Agreement.  Signed by me on

14  behalf of SeeCubic as the executive chairman.

15  Q    Okay.  And you confirmed during your deposition that

16  this agreement hasn't been notarized, witnessed, or certified

17  in any way.  Correct?

18  A    That's correct.

19  Q    And it hasn't been recorded as a matter of public record

20  anywhere.  Correct?

21  A    That's correct.

22  Q    Okay.  Would it surprise you to know that Stream's

23  management involved in this case said the first time they saw

24  this was attached as an exhibit to your declaration?

25  A    It would not.

1  Q    Okay.

2  A    It would surprise me if they had seen it, because there

3  would have been no occasion for them to.

4  Q    Okay.  All right.  So how would anyone know that this

5  agreement exists?

6  A    Well, this agreement was drafted in the immediate

7  aftermath of the transfer of the TechnoVative securities

8  because, in my experience, there are often vendors or

9  counter-parties who, of -- of particularly the assets that

10 were still held at that point directly by Stream TV Networks,

11 Inc. who want to see something which evidences transfer of

12 those assets or contracts or rights.  And so I drafted this

13 and signed it to have it on hand.  And two days later, Stream

14 filed for its Temporary Restraining Order.

15 Q    Okay.  And did -- but they didn't know about this

16 agreement.  So the filing for the Temporary Restraining Order

17 didn't have anything to do with this agreement.  Correct?

18 A    Other than the fact -- it had nothing to do with the

19 drafting of it, but it had to do with why it was never used

20 anywhere prior to post-December 8th.  There was no

21 opportunity to do so before we were told to stand down by

22 counsel in view of Stream's filing.

23 Q    Okay.  So after December 8th, was this provided to all

24 of Stream's contact parties and the -- I guess the non-Debtor

25 party to any of the assets that were transferred?

1  A    It has not, thus far.  The only party that has not

2  treated the Omnibus Agreement together with the PI order as

3  sufficient to evidence transfer of ownership is your client.

4  Q    But how would the non-Debtor parties to any of these

5  contracts or assets even know that the assets were

6  transferred or that contracts were transferred if you haven't

7  given them this document?

8  A    Thus far, everyone has treated -- everyone other than

9  your client has treated the Omnibus Agreement together with

10  the PI order as sufficient.

11  Q    But didn't you testify you didn't give this to other

12  people outside -- like, other contract parties?

13  A    I have not had to give this to anyone to evidence the

14  transfer.  Everyone else has looked at the Omnibus Agreement

15  and the PI order validating it as sufficient evidence of

16  transfer.

17  Q    Okay.  Has any filed a new UCC that you know of,

18  transferring the -- their liens or anything to SeeCubic from

19  Stream relating to any of the Transferred Assets?

20  A    I -- I apologize.  By anyone, who do you mean?

21  Q    Well, any of the -- any of the non-Debtor parties to the

22  contracts; say, equipment lessors that have a contract with

23  the Debtor.  They would have filed their UCC against the

24  Debtor to perfect their lien, and they would need to file a

25  new UCC against SeeCubic in order to keep their lien

1  perfected.

2  A    Yeah.  If -- if any of those liabilities were assumed.

3  I am not aware if anyone has filed their UCC.

4  Q    Okay.  All right.  But you say this document was signed

5  September of 2020, but this document wasn't mentioned in your

6  original declaration in connection with the Motion to

7  Dismiss.  Correct?

8  A    I don't recall.

9  Q    Okay.  And it also wasn't mentioned in SeeCubic's Motion

10  to Dismiss.  Correct?

11  A    I don't recall.

12  Q    All right.  So in your supplemental declaration, which

13  is SeeCubic's trial exhibit 276.

14        MS. AARONSON:  It's -- Isaac, would you please pull

15  that one up?  And scroll down to two -- to paragraph 37, if

16  you could.

17  BY MS. AARONSON:

18  Q    Okay.  So this is your supplemental declaration filed in

19  this case.  And paragraph 37 deals with that same Assumption

20  and Assignment Agreement.  Correct?

21  A    I -- I haven't -- didn't see the cover page to know --

22  Q    Okay.  I'm sorry.  Isaac, can you scroll back up to the

23  top real quick?  Thank you.  There it is.

24  A    Okay.  Sorry.  Thank you.

25  Q    I'm sorry.  I should have done that first.  All right.

1  So paragraph 37.  The -- the Assignment and Assumption

2  Agreement referenced in that paragraph, that's that same two-

3  page document we were just referring to.  Right?

4  A    That's correct.

5  Q    Okay.  And in paragraph 37, it says paragraph 1 of this

6  Agreement and Assumption -- or this Assignment and Assumption

7  Agreement provides that Stream hereby assigns and conveys to

8  SeeCubic, for the benefit of SeeCubic, its successors and --

9  okay.  So it's -- by that sentence, Stream is assigning and

10  conveying to SeeCubic all of its rights, title, and interest

11  to Transferred Assets.  Correct?

12  A    That's correct.

13  Q    And then the next sentence -- Isaac, if you could please

14  scroll down, is where SeeCubic hereby accepts the assignment

15  and conveyance of all the Transferred Assets by Stream.

16  Correct?

17  A    That's correct.

18  Q    All right.  So Transferred Assets; that's capitalized.

19  That's a defined term in the Omnibus Agreement.  Correct?

20  A    I -- if you'd go back to the Assignment and Assumption

21  Agreement, I believe that's what it said.

22  Q    Okay.  What was that?  That was -- blah.

23        MS. AARONSON:  Isaac, do you have that real quick?

24  The Assignment and Assumption Agreement?  Okay.

25  BY MS. AARONSON:

1  Q    So -- yeah.  Transferred Assets.  Okay.  Yes.  In

2  paragraph -- the third paragraph, second Whereas.  It says

3  that, as defined in the Omnibus Agreement, the Transferred

4  Assets.

5  A    Okay.

6           MS. AARONSON:  So -- Isaac, if you wouldn't mind?

7  Sorry for all these documents.  Could you pull up that --

8  it's tab 2.  Stream's tab 2, but it's the Omnibus Agreement

9  attached to Mr. Stastney's original declaration.  Okay.

10 BY MS. AARONSON:

11 Q    So Mr. Stastney, this is the Omnibus Agreement.

12 Correct?

13 A    At the -- correct.

14 Q    The page.  Okay.

15           MS. AARONSON:  So Isaac, can you scroll down to

16 page 3, paragraph 1.1A?

17 BY MS. AARONSON:

18 Q    Okay.  So 1.1A defines the Transferred Assets as all of

19 the assets listed or described below.  And so in each of

20 these subsections, there's a group of assets that is being

21 purportedly transferred pursuant to the Omnibus Agreement.

22 Correct?  Would you agree?

23 A    Yes.

24 Q    Okay.  And in subparagraph four of 1.1A -- so Isaac, if

25 you can move down to little four?  All right.  It says the

1   contracts listed, described, or otherwise identified in

2   Schedule 2.5, but I think that's a typo and it should be 2.6,

3   so -- because 2.5 of the Omnibus Agreement is actually a

4   capitalization information and 2.6 is the contracts.

5            MS. AARONSON:  Isaac, can you scroll down to

6   section 2.6?  Or Schedule 2.6, for reference.  Actually, it's

7   not -- I forgot.  The -- the schedule's not attached.  I'm

8   sorry.  But 2.6 is a document that you've produced in this --

9   as Exhibit 2 to your declaration.  So Isaac, if you could

10  bring that up?

11           MR. STEVENS:  Did you refer to it as first

12  declaration?

13           MS. AARONSON:  His -- I believe it's his

14  supplemental declaration, and it's attachment number two.

15           MR. STEVENS:  Okay.

16           MS. AARONSON:  Thank you.

17  BY MS. AARONSON:

18  Q    Okay.  So exhibit number two is this document.  Do you

19  recognize this document?

20  A    I do.

21  Q    Okay.  And so this -- this -- it looks like a

22  spreadsheet, but it doesn't have any header, footer, title,

23  or other indication.  How do you know that this is Schedule

24  2.6?

25  A    That is the schedule that was provided to us by the

1   Debtor in the, you know, four weeks after the Omnibus

2   Agreement was signed.

3   Q    So around -- I guess that would be like June of 2020?

4   A    Yeah.  Early -- or late to mid-June of 2020.

5   Q    Okay.  And these would be the material contracts that

6   were supposed to be transferred to SeeCubic under the Omnibus

7   Agreement and that SeeCubic agreed to accept from the Debtor?

8   A    That SeeCubic had the right to accept.  That's correct.

9   Q    Right.  But under the Assumption and Assignment

10  Agreement, the language we referred to earlier said that

11  SeeCubic agreed to accept them.

12  A    SeeCubic agreed to accept any that were assets, not --

13  not any that were liabilities.

14  Q    Okay.  Okay.  So this -- this schedule also was not

15  available to those signing the exec -- or the Omnibus

16  Agreement when it was executed.  Correct?

17  A    That's correct.  This was prepared by the company after

18  the fact, as -- as expected in the Omnibus Agreement.

19  Q    Okay.  Do any of these contracts that SeeCubic agreed to

20  accept, whichever -- whichever ones were agreed to accept, do

21  any of them have transfer assignment restrictions?

22  A    I'm -- I'm not sure.  I don't know.

23  Q    Okay.  Because the Debtor has a very specialized

24  business, so you would think contract parties who want top --

25  top-of-the-line I guess technology would -- you know,

1  whoever's fulfilling their contracts, it would -- would be a

2  material term of their contract.  Correct?

3  A    I'm sorry.  Could you restate that question?

4  Q    Well, the -- so if -- say Google is in a contract with

5  the Debtor for technology.  That contract would likely have a

6  restriction on transfer because they would want to make sure

7  that Stream was actually performing and not BestBuy or some

8  mechanic up the street.  Correct?  Not that -- BestBuy is a

9  good company, so -- it just -- it was the first one that came

10  to mind.  So that they -- they wouldn't just be able to

11  transfer the -- the contract to someone -- some mechanic up

12  the street?

13  A    I'm not sure I can answer that question.

14  Q    Okay.

15  A    I -- I don't quite understand what you're asking.  I

16  apologize.

17  Q    Okay.  But I believe you testified at your deposition

18  that to the extent that a contract required consent of a non-

19  Debtor party, that SeeCubic obtain that consent?

20  A    To the extent that SeeCubic wanted to transfer the

21  contract and consent was required, SeeCubic would have

22  acquired -- would have acquired that consent.  That's

23  correct.

24  Q    Okay.  And I -- I didn't see any of that in the

25  discovery, any consents from any contract parties.  So I

1  mean, maybe on redirect, your -- your counsel could discuss

2  that.  But I didn't see any that was produced, so I'm not

3  sure how many of these contracts transferred.

4      But anyway, let's look at a few of the more critical

5  contracts.  But first, going down the list, I wanted to

6  discuss number 11 on the list.  It says "DeMartino".  Right?

7  Do you see that?

8  A    I do.

9  Q    Okay.  And -- and so who is Mr. DeMartino?

10  A    I don't know.

11  Q    You don't know?  Okay.  It says the contract's

12  employment recruiter there.

13  A    Okay.

14  Q    Do you know whether SeeCubic has acquired that contract?

15  A    I don't believe so.

16  Q    Okay.

17  A    That would have been a liability that Stream owned.

18  Q    Okay.  And Mr. DeMartino, do you know whether he's the

19  chair of the creditors' committee in this case?

20  A    I believe he may be on the creditors' committee.  I

21  don't know if he's Chair or not.

22  Q    Okay.  And he signed the Settlement Agreement with

23  SeeCubic recently binding the unsecured creditors to support

24  dismissal of the case.  Correct?

25  A    I don't know who signed it.

1   Q    Okay.  A little bit above Mr. DeMartino is Dell, who's

2   number nine, I believe.  Yes.  The equipment lease.  I

3   believe this is A, an equipment lease of the Debtor's

4   computers or the server.  Do you know offhand?

5   A    I do not know.

6   Q    Okay.  And I believe I saw somewhere where the Debtor's

7   employees had turned over their laptops and other computer

8   equipment to SeeCubic.  Are you aware of that?

9   A    I believe certain of them had; yes.  Not all of them.

10          MS. AARONSON:  All right.  And so Isaac, I wanted

11   to return to Stream tab 22, which is the Dell lease.  I'm not

12   sure if VTI has that as an exhibit as well.

13          THE COURT:  I actually have found and located the

14   Stream binder.

15          MS. AARONSON:  Okay.

16          THE COURT:  So -- and it's my mistake.  I am

17   operating alone much these days and didn't check the mailbox.

18   I did find it.  Thank you very much.

19          MS. AARONSON:  Okay.  Great.  All right.  So it's -

20   - it's Stream tab 22.

21   BY MS. AARONSON:

22   Q    All right.  So Mr. Stastney, have you ever seen this

23   lease?

24   A    I have not.

25   Q    Okay.  Isaac, could you please scroll down to page 3,

1  under heading -- a little bit farther.  Next page.  Or maybe

2  -- page 3.  Hmm-hmm-hmm.  Right there.  Okay.  So section 5,

3  location, use, alteration, and inspection.  Okay.  So this

4  lease requires in that paragraph, the first sentence, that

5  the lease -- the equipment remain at the Debtor's premises,

6  absent Dell's prior written consent.  Do you see that?

7  A    I need --

8  Q    One, two -- third line down in number five.

9  A    Okay.  Mm-hmm.

10 Q    Do you know whether SeeCubic obtained Dell's consent to

11 remove the computer equipment?

12 A    SeeCubic has not -- has not assumed this lease, so no.

13 Q    Okay.  But you have computer equipment that's been

14 turned over by the Debtor?

15 A    I don't know if any of it is covered by this lease and

16 regardless, this is a liability --

17 Q    Okay.

18 A    -- that would stay with Stream.

19 Q    So for the contracts where there are hard assets that

20 are subject to a contract, SeeCubic has taken the property

21 but not the liability?

22 A    That's correct.

23 Q    Okay.  But --

24 A    Again --

25 Q    -- if this is a lease, then the Debtor doesn't own that

1 property.

2 A    If this is a lease, then I would have expected -- where

3 the -- where the Debtor didn't own the property, I expect it

4 wouldn't have been covered by the Omnibus Agreement.  And

5 when requested to turn it over, the employees of Stream who

6 had it wouldn't have turned it over.  Either this was covered

7 by the Omnibus Agreement or it wasn't.

8 Q    Okay.  But if it was covered by the Omnibus Agreement

9 and Stream -- and SeeCubic has computer equipment, but hasn't

10 accepted the liability, how does -- how does that work, under

11 the Omnibus Agreement?

12 A    I believe the same way it works under any foreclosure.

13 The secured creditors take the assets and not the

14 liabilities.

15 Q    Okay.  But it seems like Dell, I believe they filed a

16 UCC.  They would be the secured creditor with respect to the

17 computer equipment.

18 A    If -- if so, I'm sure they can assert their rights at

19 the time when they need to and we'll work that out.

20 Q    Okay.  Okay.

21      MS. AARONSON:  So Philips number -- I'm sorry.

22 Isaac, if you could pull that down and put schedule 2.6 back

23 up.  That's Exhibit 2 to Mr. Stastney's supplemental

24 declaration.

25 BY MS. AARONSON:

1    Q    So number 54 on that schedule is Philips.  Correct?  Do
2    you see that?
3    A    That's correct.
4    Q    All right.  And this is the license agreement.  Right?
5    The technology license agreement?
6    A    That's correct.
7    Q    Okay.  Isaac, can you bring up Stream tab 19?  Okay.
8    And in the interest of time, I know I'm going on here.  So
9    I'm going to skip down to section 11.1.  There it is.  Okay.
10   It's called "No Assignment".  So in this section -- do you
11   see -- do you see where I'm looking, on section 11?
12   A    I do.
13   Q    Okay.  So this section says that the agreement may not
14   be delegated or assigned to any third party without the
15   written consent of an authorized representative of Philips,
16   whose consent shall not be unreasonably held.  Do you know
17   whether SeeCubic has Philips' consent to a transfer of this
18   license?
19   A    We've discussed this with Philips and they've indicated
20   that they're happy to provide their consent, although we
21   don't have it signed yet.
22   Q    Okay.  And this is a non-exclusive license.  Correct?
23   A    I believe that's correct.  Yes.
24   Q    Okay.  So Stream isn't the only entity that has a
25   Philips license.  Correct?

1  A    That's correct.

2  Q    All right.  So Stream could get another license if

3  SeeCubic has in fact taken this license over?

4  A    That's correct.

5  Q    All right.  So Isaac, can you pull schedule 2.6 back up,

6  please?  Okay.  Thank you.  So it looks like schedule 2.6, if

7  you look down the list, there are a lot of what -- what

8  appear to be personal services contracts.  So -- which would

9  require the non-Debtor party to consent to a transfer.  Would

10  you agree?

11  A    I don't have any basis to reach that conclusion.

12  Q    Okay.  So -- but do you know whether SeeCubic took over

13  -- I mean, Dilworth's on the list, number 30.  But any of the

14  law firm, accounting, recruiter?  Any of those types of

15  contracts?

16  A    We did not assume of them, although we're in -- we're in

17  discussions with many of those groups to provide services to

18  SeeCubic going forward.

19  Q    Okay.  But -- so if -- you haven't assumed them yet.  So

20  the Debtor still has many of the contracts on this list?

21  A    The Debtor still has many of the contracts -- many of

22  the liabilities on this list, yes.

23  Q    Right.  And including Philips, because you're in

24  discussion with them for issuing the license.  Correct?  Or

25  agreeing to the transfer?

1   A   Well, we've taken the liability and we've taken the

2   right to the contract and we are in the process of

3   negotiating with Philips to novate it in the name of

4   SeeCubic.

5   Q   Right.  But right now, it's still in the name of Stream?

6   A   I -- that -- that sounds like a legal conclusion to me.

7   I'm not going to offer an opinion.

8   Q   Okay.

9        MS. AARONSON:  All right.  I'm just trying to --

10  all right.  I have nothing further.  I'll turn the witness

11  over.  Thank you, Mr. Stastney.

12        THE WITNESS:  Thank you.

13        THE COURT:  Okay.  Does anyone from Dilworth Paxson

14  -- oh.  Mr. Sten?  Sorry.

15        MR. STEN:  Me.

16        THE COURT:  Okay.  Go ahead, Sir.

17        MR. STEN:  Okay.  Thanks.

18                    CROSS EXAMINATION

19  BY MR. STEN:

20  Q   Good afternoon, Mr. Stastney.

21  A   Good afternoon.

22  Q   So I will try not to walk over some ground that's

23  already been tread here.  I'm sure I'll be reminded if I do,

24  but let me ask you a few things, starting with -- Isaac, can

25  you pull up Exhibit 134?

1       THE COURT:  While we're looking for that exhibit, I

2  assume the parties are keeping track of the exhibits that are

3  being referenced so that we can move them into evidence at

4  the conclusion of the trial?

5       MR. COLBY:  That's (indiscernible), Your Honor.

6       THE COURT:  I'm sorry.  What was that, Mr. Colby?

7       MR. COLBY:  Your assumption is correct.

8       THE COURT:  Okay.  Great.

9  BY MR. STEN:

10  Q   So Mr. Stastney, earlier in my sister's cross-

11  examination of you, you talked about your SEC settlement.

12  And is this a copy, Exhibit 134, evidencing that settlement

13  with the SEC?

14  A   It appears to be.  Yes.

15  Q   Okay.  And she had asked you a number of questions, so I

16  won't go into that.  Thanks, Isaac.  Mr. Stastney, how many

17  times have you been sued over the last 15 years?

18  A   I don't know.

19  Q   More than 10?

20  A   I don't know.

21  Q   Less than 10?

22  A   I don't know.

23  Q   Okay.  How about over the last 10 years?  Any better

24  guesstimating how many times?

25  A   I don't know.

1   Q     Okay.  More than 10?

2   A     I don't know.

3   Q     Okay.  Do you recall a suit, Mr. Stastney, <u>Hallal versus</u>

4   <u>Vicis Capital and Mr. Stastney</u> filed or -- in -- on January

5   27th, 2012?

6   A     I -- could you say that name again?  I'm sorry.

7   Q     <u>Hallal versus Vicis Capital and -- and Shadron Stastney</u>.

8   A     Yes.  I do.

9   Q     That was the shareholder derivative case.  Wasn't it?

10  A     I don't recall.

11  Q     You were sued for breach of fiduciary duty in connection

12  with a company called Medical Solutions Management.  Weren't

13  you?

14  A     I don't recall the -- the nature of that suit.

15  Q     It's actually quite surprising that you don't recall the

16  nature of that suit considering that one of your partners

17  from Vicis Capital, Christopher Phillips, ended up pleading

18  guilty to criminal fraud in connection with that issue.

19  Isn't that true?

20  A     No.  Chris was not one of the partners in Vicis Capital.

21  Q     But he was one of your partners.  Correct?

22  A     Not in Vicis Capital.  No.

23  Q     What was he a partner in?

24  A     Chris and I had an investment partnership together.  But

25  --

1  Q     So he was -- he was your partner?

2  A     In that investment partnership.  Yes.

3  Q     He was also involved in Medical Solutions Management,

4  correct?

5  A     I don't know how he was involved in Medical Solutions

6  Management.  Chris became an employee of Vicis Capital LLC.

7  And he was responsible for the oversight of a lot of the

8  companies in our portfolio.

9  Q     So isn't it true that that suit in Medical Solutions

10 Management was your part of the scheme to collect on certain

11 fraudulent insurance receivables?

12 A     No, it did not.

13 Q     Isn't it true that the FBI began investigating that

14 fraudulent scheme of MSMI in or around 2009?

15 A     I don't know the answer to that.

16 Q     Isn't it true that after the FBI began investigating

17 that fraudulent scheme you resigned from the board of MSMI?

18 A     I did resign from the board of MSMI.

19 Q     Isn't it true that you were accused, along with others,

20 in trying to pay-off a company called Global to collect on

21 those fraudulent insurance receivables?

22 A     I don't recall that.

23 Q     Isn't it true that you were also sued in a completely

24 separate suit by that company, the MSMI?

25 A     I don't know what you are making reference to.

1  Q     And that that suit was removed -- that suit was

2  dismissed after you and all the board members caused that CEO

3  to be removed.  Isn't that correct?

4  A     I don't know what you are referring to.

5  Q     Okay.  Do you recall that that suit, (indiscernible) v.

6  Vicis Capital Master Fund Limited, Shadron Stastney and

7  others, Docket 112 CV 10166 [phonetic], was settled after the

8  motion to dismiss by you and the other defendants were

9  unsuccessful?

10 A     I believe it was settled.  I don't recall the posture

11 exactly when it was settled.

12 Q     I'm surprised because I thought you said you didn't

13 recall the suit, but, okay, maybe I refreshed your

14 recollection.

15       Weren't you sued in 2012 also by a company named QHP

16 Financial Group?

17 A     I believe so, yes.

18 Q     That was in the Florida State Court, correct?

19 A     That's correct.

20 Q     That was for tortious interference with an existing and

21 prospective contractual and advantageous business

22 relationship, there's a mouthful, usurpation of corporate

23 opportunity, and civil conspiracy to usurp corporate

24 opportunity, also breach of fiduciary opportunity, and aiding

25 and abetting breach of opportunity.  Do you recall all that?

1  A      I do recall that.

2  Q      And that was an investment made by Vicis -- how do you

3  pronounce that?  I apologize.

4  A      Vicis.

5  Q      Vicis.  Wasn't that as a result of an investment made

6  by Vicis and QHP that put you on the board of directors?

7  A      It was.

8  Q      And later when QHP needed additional capital you and

9  Vicis refused to provide it, correct?

10  A      Yes.  QHP had been engaging in wrongdoing and we

11  refused to provide any additional capital.

12  Q      And you were sued as a result of that and also for the

13  fact that as part of the allegations you had entered into

14  negotiations with other third-parties, as is alleged, with

15  the intent of thwarting CHP's financial opportunities.  Do

16  you remember those allegations?

17  A      I don't remember the specific allegations, no.

18  Q      And, in fact, wasn't one of the allegations of the

19  alleged scheme that you and Vicis were trying to remove

20  capital from CHP and enable Vicis to acquire the business for

21  distressed prices well below the true value of that business?

22  A      I don't recall.

23  Q      Isn't it true that QHP was ultimately placed in a

24  receivership in a liquidation?

25  A      I believe that is correct, yes.

1  Q      So you were also sued by company <u>Telestrata v. Nettalk,</u>

2  <u>Stastney</u> S.D. Fla.2014.  Do you remember that case?

3  A      I do.

4  Q      And you were sued for breach of fiduciary duty,

5  correct?

6  A      I don't recall.

7  Q      It was alleged that you unlawfully took control of the

8  company to the detriment of the shareholders and its

9  authorized directors.  Do you remember that?

10  A      I remember the basis of the suit, yes.

11  Q      And that was settled as well, correct?

12  A      It was.  That was a party who had loaned money to the

13  company on which I was serving on the board and was

14  attempting, itself, to extract value from the company, and

15  the company decided to resist that.

16  Q      So you were also sued in that same year 2014,

17  <u>OptimizeRx v. Stastney</u> 2014.  Do you recall that?

18  A      I do.

19  Q      That's a claim for declaratory relief that time

20  involving a dispute over some stock that you thought you were

21  owed, correct?

22  A      That's correct.

23  Q      And, in fact, you were demanding that the company issue

24  stock via Form S-8 for work, at least, that the company

25  alleged was performed after employment there, correct?

1  A     That's correct.  (Indiscernible) contract.

2  Q     And wouldn't you agree with me, you're a smart finance

3  guy, that if S-8 stock was issued for work done outside an

4  employment contract that that would be illegal?

5  A     I don't recall that.

6  Q     So funny thing about that work, are you still licensed

7  as an attorney?

8  A     I am.

9  Q     And what state is that?

10 A     New York.

11 Q     And you said you weren't practicing as an attorney, but

12 in this case you -- some of the services you claimed are

13 actually legal services, correct?

14 A     I don't recall that.

15 Q     There was an allegation that you were performing legal

16 services to this company and that's why you wanted the stock.

17 A     I do deny that.  They were not legal services.

18 Q     Okay.  So if the complaint says that then that

19 complaint is wrong?

20 A     Correct.

21 Q     You were sued in 2013 by your driver for firing him

22 after he got cancer and diabetes, weren't you?

23 A     Yes.

24 Q     And what happened in that case?

25 A     We settled with him.

1  Q    So you have quite a history of litigation, sir.

2       Now moving on.  We heard about that you served as a

3  director of Stream and that you served as CFO, correct?

4  A    Different time periods, yes.

5  Q    One of those time periods was December 2018 to January

6  30th, 2020?

7  A    That was my as CFO.

8  Q    Right.  Were you also -- what was your term of board

9  director then? It was also September 2018 until January 30th,

10 2020, is that correct?

11 A    That's correct.

12 Q    And actually is it really January 30th or is more mid-

13 February?

14 A    January 30th.

15 Q    Okay.  We'll go back to that.

16      Isn't it true that during your deposition you admitted

17 that you actively discouraged potential investors from

18 investing in Stream during, at least, the second half of 2019

19 and into January 2020?

20 A    No, that's not correct.

21 Q    Okay.  Why don't we pull up Page 179, Lines 22 to 80 --

22 180, if you could do that on the deposition?  You might want

23 to take a read of this right there on the bottom of 179.

24 A    Okay.

25 Q    So, isn't it true on page 179 you talk about the fact

1  that you found that the Rajans, Mathu Rajan especially, was

2  committing questionable things with the expense recording of

3  the company at least as according to your testimony?

4           THE COURT:  Why don't you read the passage of the

5  deposition transcript that's relevant into the record.

6           MR. STEN:  Okay, Your Honor.  It says,

7           Question,

8           "During that time as CFO did you have concerns

9  about Stream's finances and financial controls?"

10          Answer,

11          "I did."

12          Question,

13          "What did you do about it as CFO?"

14          Answer,

15          "I talked with independent members of the board of

16 directors.  First I sent it to make those changes in Stream

17 and when they refused I spoke to the members of the board of

18 directors and laid out my concerns."

19          Question,

20          "Who was the CEO at this period in time?"

21          Answer,

22          "Mathu Rajan."

23          Question,

24          "So they were refused by the CEO?"

25          Answer,

1          "Yes."

2          Question,

3          "That includes the company's expense recording

4   being questionable?"

5          Answer,

6          "Yes."

7          Question,

8          "Isn't that something that falls under you as

9   CFO?"

10          Answer,

11          "Yes, it does and that is why I raised the issue

12   at the CFO indicating the way it was being done was not

13   acceptable.  No change was made."

14          THE WITNESS:  This was the CEO.

15          MR. STEN:  The CEO.  Thank you.

16          Then it says,

17          "And yet you stayed."

18          Isaac, can you scroll up just a little bit.

19          So then, Your Honor, I will skip ahead, but on the

20   bottom of 179 it says,

21          Question,

22          "So when you were fundraising did you make

23   disclosures to potential investors about these concerns and

24   about questions about the financial controls?"

25          MR. COLBY:  Objection, Your Honor.  Mr. Sten is

1  going to read and yet he stayed, he should also read the

2  answers to that question.

3          MR. STEN:  No, I'm going to.  Oh, and yet you

4  stayed, yeah, go ahead.  Go to the top of 179.  I highlighted

5  it to the board.

6          THE COURT:  Okay.  Then we jump down to 22, right?

7          MR. STEN:  Right.

8          THE COURT:  Okay.  You can continue.

9          MR. STEN:  Again, for clarity I'm just skipping to

10 this piece, but the middle part is pertinent as well.

11         Question,

12         "So when you were fundraising did you make

13 disclosures to potential investors about these concerns and

14 about questions about the financial controls?"

15         Answer,

16         "After June of 2019, yeah."

17         Question,

18         "Did you tell them that you consider yourself

19 ineffective in your role as CFO?"

20         Answer,

21         "I did."

22         So that speaks for itself as to my question.

23         THE COURT:  No. I think there actually needs to be

24 a question.

25         MR. STEN:  Okay.

1  BY MR. STEN:

2  Q    So is it the case, Mr. Stastney, that you were telling

3  investors derogatory information about Stream as part of your

4  spending time fundraising?

5  A    To the extent that I was doing fundraising after June

6  of 2019, which was very rare, I was certainly telling them my

7  honest opinion about Stream and the situation.  I was not

8  going to tell them anything untrue.

9  Q    Okay.  Now you recall during your deposition that you

10  admitted you knew about the draft and what eventually became

11  the omnibus agreement while you were still on the board and

12  while you were still the CFO of Stream?

13  A    I'm sorry, could you slow that down a little bit?  I

14  apologize.

15  Q    No, that's okay I'm probably going a little fast

16  because I'm trying to move it along.  I know we have a lot to

17  do today.

18       I said do you recall in your deposition that you

19  admitted that you knew about the draft of the documents that

20  eventually became the omnibus agreement at a time that you

21  were still on the board and the CFO of Stream, but that you

22  never informed the Rajans about it?

23  A    As I recall our discussion was that the discussions

24  around the omnibus agreement actually began between myself

25  and Raja Rajan in September of 2019.  Those discussions

1  became the omnibus agreement and the omnibus agreement served

2  as the basis for the discussions between all the parties

3  going into May of 2020.

4  Q    It's true, isn't it, that you had a copy of a draft

5  omnibus agreement on January 25th in your possession and you

6  never gave it to the Rajans?

7  A    As I recall, the email that you provided to me said

8  that -- sent me the draft and said at the same time it was

9  going to be providing the draft to the Rajans.

10 Q    That's not my question.  I asked if you provided it to

11 the Rajans.  You were the one on the board.

12 A    As I recall, when I got that email with the document

13 that you showed me in my deposition it said this document is

14 going to be provided to the Rajans.  So I did not provide it

15 to them?

16 Q    So you never provided it to them.  Did you talk to them

17 that there was a copy of an omnibus agreement at that point

18 in time?

19 A    We had been talking, Raja and I, since September of

20 2019 about drafting an agreement that would ultimately

21 resolve the issues as between the secured creditors and the

22 company.  So the fact that there was a draft that was going

23 to be provided to them imminently, according to that email,

24 is not something I alerted them to, no.

25 Q    And according to the email that you're talking about

1  that's the third-party, correct?

2  A     I don't understand your question, I apologize.

3  Q     Was there anyone else on that email that you're talking

4  about who was on the board of directors of Stream at that

5  point in time?

6  A     I don't recall.

7  Q     Okay.  I'll ask my question one last time just to see

8  if I can get a clear answer.  Did you provide anyone else on

9  Stream's board, namely the Rajans, with a copy of that draft

10 omnibus agreement?

11 A     I'm sorry, at which time period?

12 Q     On January 25th when you received a copy of the draft

13 omnibus agreement did you provide it to the Rajans?

14 A     I did not.

15 Q     Did you provide it to anyone on the Stream board of

16 directors?

17 A     The Rajans were the only two other members of the

18 Stream board at that time.

19 Q     Okay.  Did you tell the Rajans on January 25th or any

20 time while you were still on the board of directors that you

21 received the draft copy of the omnibus agreement?

22 A     I believe since that email indicated that it was going

23 to be immanently sent to the Rajans that I did not.

24         MR. STEN:  Isaac, could you pull up the

25 supplemental declaration of Mr. Stastney, please?  Go to the

1  front page so that Mr. Stastney can see it.

2           THE WITNESS:  Thank you.

3  BY MR. STEN:

4  Q     You recall from your earlier testimony what this

5  document is?

6  A     I do.

7  Q     And you had signed it under oath as part of this

8  proceeding, correct?

9  A     That's correct.

10          MR. STEN:  Could you go to Paragraph 22, Max or

11 Isaac? I don't know who I'm dealing with.  I apologize.

12 Scroll down, please.  Stop there.

13 BY MR. STEN:

14 Q     Mr. Stastney, do you see this bullet point in the top

15 of the page here that starts Mathu Rajan of VTI alleged that

16 I conspired to seize control of the debtors' engineering

17 equipment -- let me say it right, seize physical control of

18 the debtors' engineering computer services in Silicon Valley

19 for MotivIT, a third-party IT company managing the debtors'

20 IT infrastructure in the United States.  Do you see that?

21 A     Yeah, I don't think you read that quite correctly, but,

22 yes, I do see that.

23 Q     Do you stand by this testimony as you sit here today?

24 A     The testimony that Mathu and VTI allege that?

25 Q     No, the other part where you give an explanation of

1  what, in your version, really happened.

2  A     Yes, I do.

3  Q     Okay.  Do you remember, in your testimony, in your

4  depositions that even though Mr. Rajan is talking about this

5  occurring sometime in April 2020 it was your recollection

6  that this was actually sometime in July?

7  A     We actually acquired the service in July, that's

8  correct.

9          MR. STEN:  Isaac, will you pull up Exhibit 114,

10  please?  Go all the way to the bottom and we will work our

11  way from the bottom up.

12  BY MR. STEN:

13  Q     Mr. Stastney, is that your email sstastney@gmail.com?

14  A     That is one of my emails, yes.

15  Q     And, in fact, is that an email that somehow is

16  associated with Nettalk which is one of the companies you are

17  a part of that we talked about in your earlier litigation

18  issues?

19  A     I think they set it up for me originally before I was

20  Gmail savvy, yes.

21  Q     Yeah, to be honest I had that happen to me those name

22  pieces.

23          You recall that that is you on the email here, correct?

24  A     It is, yes.

25  Q     And who is Kauchik?

1  A     Kauchik was an employee of Stream and is now a

2  consultant.

3  Q     And at this point in time, March 9th, 2020, you weren't

4  an employee or a director of Stream TV, correct?

5  A     That is correct, (indiscernible).

6  Q     Chris Kapasinski [phonetic], was he a board of director

7  of Stream at that time?

8  A     I don't know.

9  Q     Okay.  Was he associated with Stream at that time?

10 A     I don't know.

11 Q     He was one of the directors when the omnibus agreement

12 was signed on May 6th, though, correct?

13 A     Yes, correct.

14 Q     So he either was or became part of Stream, correct?

15 A     I don't know which.

16 Q     Okay.  Why are you on this email?

17 A     I don't know.  This was from Kaushik.  I don't know why

18 he included me.

19        MR. STEN:  Can you scroll up, all the way.  Stop

20 here so we have full -- go back down.  Okay, stop.

21 BY MR. STEN:

22 Q     So there is an intermittent because -- who is Derick

23 Bowker?

24 A     I believe Derick is an employee at MotivIT.

25 Q     Okay.  And, in fact, you had dealings with Derick when

1  SeeCubic eventually took over the equipment or contracts with

2  MotivIT in the summer of 2020, correct?

3  A     Derick continues to be our client person at MotivIT.

4  Q     Okay.  You're on the email chain now at a time when you

5  are neither part of SeeCubic nor part of Stream, correct?

6  A     That's correct.

7  Q     This is an email from you, correct?

8  A     That's correct.

9  Q     And is it correct as of March 9th, 2020 Stream TV

10  Networks and all of its subsidiaries and affiliates are in

11  default under senior secured debt owed to SLS Holdings IV,

12  LLC of approximately $9.7 million?

13  A     Well other than the fact that I said SLS Holdings IV

14  instead of SLS Holdings VI, yes, that's correct.

15  Q     So that statement is not correct?

16  A     I inverted the I and the V in SLS Holdings, that's

17  correct.

18  Q     So you must have done it twice because you also signed

19  it as SLS IV, LLC?

20  A     I apparently did.

21  Q     So it is true that as of March 11th, 2020 Stream failed

22  to deliver all its assets and properties tangible and

23  intangible which the secured debt owed to SLS.  Is that true?

24  A     That is true.

25  Q     Is it your contention that it was supposed to deliver

1  all its assets and properties at that time?

2  A    It is my contention that that is what the security

3  agreement as between SLS and Stream required.

4  Q    The next paragraph down, as a result Stream is now in

5  foreclosure.  Is that your -- do you contend that that is

6  correct as of this time?

7  A    I do.

8  Q    And then it says and all assets of Stream TV are the

9  property of SLS.  Is it your contention as you sit here today

10 that as of March 12th, 2020 all assets of Stream TV were the

11 property of SLS?

12 A    According to the security agreement between SLS

13 Holdings VI, LLC and Stream, yes, the property had become the

14 property of SLS.

15 Q    And the next sentence says, additionally, SLS has been

16 granted a power of attorney by Stream to direct disposition

17 on behalf of Stream and all of those assets until it is fully

18 repaid.  Is it your contention that that is true?

19 A    It is.

20 Q    And that there was a power of attorney magically built

21 into the notes that gave that to you?

22 A    It was explicitly built into the security agreement.

23 Q    Okay.  So the next paragraph down its your contention

24 that where it says, therefore, whether or not Stream TV pays

25 any and all of its outstanding amounts to MotivIT SLS has

1  power of attorney for Stream TV that MotivIT holds such

2  assets in trust for SLS until directed otherwise by SLS,

3  correct?

4  A    Yes.

5  Q    Do you believe that that is what they should have done?

6  A    That is what this says.

7            MR. STEN:  Scroll up a little bit, Isaac, so we

8  can see this.

9  BY MR. STEN:

10 Q    Is anyone other than Kaushik from Stream or, actually,

11 not even him -- is there anyone from Stream on this email

12 from you to Derick?

13 A    I don't know who is on this email.

14 Q    Did you send a copy of this to Stream?

15 A    I don't know.

16 Q    Did you make them aware that you were trying to take

17 what they would have been considering their property at that

18 time?

19 A    I don't know, now do I know why I would have.  If they

20 were not on the email I don't know why I would have included

21 them. I would have had no obligation to do so.

22 Q    And the top one ends by Kaushik somehow thanking you,

23 correct?

24 A    Yes, that's correct.

25 Q    But he was an employee of Stream at that time, wasn't

1  he?

2  A     I don't know his status at Stream at that point.

3         MR. STEN:  Now I'm going to try to move through

4  quickly.  Let's go to the omnibus agreement.  We can stay on

5  that document and go through that one if it's easy.  It's

6  also number five to SeeCubic's exhibits, but either one,

7  Isaac or Max, whatever is quicker for you.  I think it's

8  actually easier if you stay with that first Docket 147 and

9  then just scroll down to the omnibus agreement.

10        Can you go to Section 1.1, please.  So keep going

11 down.

12        Your Honor, if I talk to fast, I get a habit

13 sometimes, please, I'll slow up.

14        Go back up, you're going too far.  Section 1.1.

15 Stop.  Go to the next page, Isaac.  Slowly go down.  Keep

16 going, keep going.  Top of Page 5.

17 BY MR. STEN:

18 Q     So this is 1.1(b) that we talked about, correct, Mr.

19 Stastney?

20 A     That we talked about?

21 Q     That everybody here has, I apologize.

22 A     Okay.  Yes.

23 Q     So I'm not going to get into that.  But it was your

24 testimony that that occurred -- that that schedule was

25 promulgated December of 2020?

1  A      That's correct.

2  Q      Okay.  So that occurred in December 2020.  When did the

3  operative part that's in 1.1(c) occur, May 20th?

4  A      Just a second.  Different times for the different parts

5  of that paragraph.

6  Q      Okay.  Well first sentence, when did SLS and Hawk form

7  NewCo?

8  A      Late May of 2020.

9  Q      Okay.  When did NewCo issue promissory notes and shares

10 to SLS and Hawk?

11 A      SLS and Hawk have determined how those will be issued,

12 but they have not yet been issued.

13 Q      Okay.  What about (d), when did the events in (d)

14 happen?

15 A      Well, they're entitled to exchange them out.  So that

16 happened as of the date of the agreement.

17 Q      Have any shares been issued?

18 A      They have not.

19 Q      So has (d) happened?

20 A      This deals with the entitlement, I believe.

21 Q      Okay.  What about the next one down, have any shares

22 been issued under (d)?

23 A      It's the same thing, this deals with an entitlement

24 with the transfer.

25 Q      So you make a distinction between an entitlement and an

1 actual event?  This doesn't obligate NewCo to actually issue

2 the shares?

3 A    It does obligate them to issue it.  You're asking about

4 timing.  What this provides is that they shall be entitled to

5 exchange (indiscernible).

6 Q    So what you are saying is that it's not immediately

7 occurring, correct?

8 A    It has not occurred.

9 Q    Okay.

10 A    The exchange has not occurred, the entitlement as of

11 May 6th.

12 Q    And is that your interpretation for the other

13 paragraphs here (f), (g), (e)?

14 A    I'm afraid we have to go through them.

15 Q    Its okay, we can go through them.

16 A    Okay. So for (f), yes, the entitlement was effective as

17 of May 6th.  The transfer has not yet occurred.

18 Q    What about (g)?

19 A    (g) is not an entitlement.  (g) describes what is going

20 to happen when the election to exchange happens.

21 Q    Okay.  And let's go back up, what about -- go all the

22 way up to the top of 1.1 please.  (a), has SLS and Hawk --

23 you said they stayed the foreclosure action?

24 A    SLS, and Hawk, and the debtor stayed the foreclosure

25 action.

1  Q     Okay.  But that is not the stay that is referred to
2  here, correct?  Actually after this omnibus agreement that is
3  when the foreclosure action was actually filed, correct?
4  A     No.  The foreclosure action was filed in March of 2020.
5  Q     So I have it reversed, okay.
6  A     Yes.
7  Q     But have the notes been extinguished?
8  A     No.  They've been stayed, but they have not been
9  extinguished.
10 Q     Okay.  That is because the company hasn't immediately
11 conveyed, transferred, delivered and assigned the right,
12 title and interest of the company, correct?
13 A     That is because they have not completed that delivery,
14 correct.
15 Q     Would you agree with me that 1.1(a) is also an
16 entitlement just like the other provisions of this Section
17 1.1.?
18 A     No.  Section 1.1(a) describes the actions that is to be
19 taken.
20 Q     And where is the verb in this that says the action
21 because is upon the verb?
22 A     Well you're stretching my grammar here, but it's a past
23 participle.  So SLS and Hawk agree to stay upon the company's
24 immediate conveyance, transfer, deliver and assignment.
25 Q     Right.

1  A     So conveyance, transfer, deliver and assignment of the

2  right.

3  Q     Is there anything saying that this agreement actually

4  causes the conveyance, transfer, deliver and assignment?

5  A     Yes, the language of this paragraph.

6  Q     So you don't see this as an entitlement even though the

7  entire other section of this paragraph deals with

8  entitlements.  Is that your testimony?

9  A     Well, the language of each of those sections says that.

10  Q    Is it your testimony that as your sit here today SLS is

11  owed approximately $11 million by the debtor and that it's

12  still a secured creditor?

13  A    That's correct.

14  Q    Okay.  Let me ask you, if the debtor would offer you

15  what it offered SLS to repay this debt would you accept it?

16  A    I don't believe I have the right to do so since the

17  omnibus agreement and the letter agreement have been signed.

18  Q    Yet you're still secured -- so you're telling me you're

19  holding a secured debt to a debtor that you don't believe can

20  be repaid ever?

21  A    Not by Stream TV Networks, Inc., no, I don't believe it

22  can be.

23  Q    So according to your testimony Stream would forever be

24  in debt to SLS no matter what?

25  A    No, not no matter what.  Once the conveyance is

1  complete the notes would be extinguished and the debt would

2  become debt of SeeCubic.  That has always been the plan and

3  as soon as we're able to complete that that's what will

4  occur.

5  Q    But it hasn't been completed as of yet?

6  A    That's correct.

7  Q    If the debtor were to offer Hawk to repay its notes

8  would Hawk be able to accept it?

9  A    I don't believe so.

10 Q    Okay.  Have you talked to Hawk about either VTI or

11 debtors intention to repay all of its creditors at a hundred

12 cents on the dollar?

13 A    I have.

14 Q    What was Hawk's response?

15 A    Hawk's response was that they have no interest to

16 engage in any settlement which would result in the Rajans

17 having any control of involvement in an entity going forward.

18 Q    Okay.  Even if it paid Hawk's entire secured debt?

19 A    That is the conversation I had with Hawk.

20 Q    Even though they, Hawk, then would have nothing to do

21 with Stream and would be completely paid off in full with

22 interest?

23 A    Hawk would still have warrants and stock as to which I

24 think they have ascribed the value that would at that point,

25 in their view, and (indiscernible), in my view be worthless

1   in an entity that was managed by the Rajans.

2   Q    Okay.  And what if that stock was also brought back as

3   part of that deal?

4   A    I can't answer that hypothetically.

5   Q    Isn't it true that up until the bankruptcy stay you had

6   -- as we talked about in your deposition isn't it true you

7   testified that up until the bankruptcy stay you were

8   attempting to collect, what you now call, SeeCubic's assets

9   in China that you claim to own?

10  A    We were attempting to change the constitution of the

11  directors and officers of those subsidiaries in China, yes.

12  Q    But that hasn't happened, correct?

13  A    No, that has not been completed.

14  Q    Okay.  Isn't it true that actually even after the

15  bankruptcy filing you continued with those activities?

16  A    Yes.  We continued to attempt to change the officers

17  and directors of our subsidiaries in China.

18  Q    Even after the bankruptcy was filed?

19  A    Yes.

20  Q    And isn't it true that debtor threatened to file a

21  motion for you violations of the automatic stay and only

22  didn't upon assurances that such activities would stop?

23  A    Yes.

24  Q    And so did you stop at that point?

25  A    We did.

1  Q    So I'm going to skip through the letter agreement

2  except to say I want to point out one thing.  During your

3  testimony (indiscernible) you said the terms of the letter

4  agreement were broken out because they had nothing to do with

5  Stream, correct, or words to that effect?

6  A    Not quite.  They were broken out because the resolution

7  took the view that they were unwilling to opine on the

8  conditions of that letter agreement because they had nothing

9  to do with Stream.

10  Q    Okay.  And I think you testified during that that one

11  of the reasons they are afraid that the Rajans would get mad

12  is because it had provisions that had Hawk and SLS equitizing

13  your debt, correct?  I think your exact words were -- well,

14  your exact words weren't at that part, but basically when

15  asked why that would make the Rajans mad you said that Hawk

16  and SLS didn't have confidence in doing that and Stream or

17  words to that effect.  Do you recall that?

18  A    I do.

19  Q    Okay.  Doesn't the letter agreement actually issue Hawk

20  and SLS 48 million or so shares of Stream?

21  A    The process from the letter agreement was that those

22  shares would be issued and then pursuant to the omnibus

23  agreement that we just saw, had Stream been in compliance

24  with the agreement those shares would have instantaneously

25  become shares of SeeCubic.

1    Q    I get your testimony which is consistent with what you

2    said in your deposition, but my point is this, and just

3    answer this yes or no please, isn't it true that the letter

4    agreement obligated Stream to issue 48 million additional

5    shares of Stream equity to SLS and Hawk?

6    A    Yes, within the confines of what I just said.

7    Q    Okay.  Now you may be aware, it turns out that there is

8    this third omnibus agreement, correct?

9    A    I regret also calling that an omnibus agreement, but,

10   yes, there is.

11          MR. STEN:  Can you throw up Exhibit 156, please.

12   BY MR. STEN:

13   Q    First we have the May 6th omnibus agreement.  Then we

14   had the letter agreement.  Now we have this other omnibus

15   agreement.  If you want we can scroll down to the bottom to

16   show where it's signed or I can just represent to you, it's

17   not controversial, it's signed by you and Hawk?

18   A    That's fine.  I'll take your representation.

19   Q    Okay.  So isn't it true that this new omnibus agreement

20   empowered SLS to act on behalf of both SLS and Hawk in

21   pursuing the assets of Stream.  Is that correct?

22   A    Not entirely.  This omnibus agreement was negotiated

23   between SLS and Hawk starting after or around the time of the

24   filing of the foreclosure suit in March of 2020 as a way of

25   allocating responsibilities and costs of that action.

1   Q    In fact one of the things it does is that SLS is

2   obligated to pay 10 percent of the cost while Hawk is

3   obligated to pay 90 percent of the cost, correct?

4   A    That is correct.  That is, basically, the break out of

5   the principal that was invested in Stream.  SLS invested,

6   roughly, 10 percent as much as Hawk did.

7   Q    And you disagree with me that no one in this case, the

8   debtor, the Rajans, anyone except maybe people on your side

9   knew about this omnibus agreement prior to last week?

10  A    No.  There would be absolutely no reason for them to

11  know this.

12  Q    Right.  So this was first produced to us last week,

13  correct?

14  A    I don't know when it was first produced.

15        MR. STEN:  Can you throw up Exhibit 157, please,

16  Isaac or Max?

17        THE COURT:  While we're doing this, Mr. Sten,

18  approximately how much longer do you have for your cross? I

19  only ask because I have a hard stop at five p.m. today.

20        MR. STEN:  I know, Your Honor. I am going to try

21  and pick it up.

22  BY MR. STEN:

23  Q    Do you know this document is being a private placement

24  memorandum for SeeCubic?

25  A    Could you scroll up to the top again, I apologize?

1  Q      I know the page (indiscernible).

2  A      Yes.

3  Q      And this is from June 2020?

4  A      That's correct.

5  Q      Kevin Gallup and Asup Gollar [phonetic] are listed as

6  board member designates in this private placement memorandum?

7  A      That's correct.

8  Q      And weren't they the actual resolution committee

9  members of Stream?

10  A      They were two of the independent directors, yes.

11  Q      But they were the resolution committee as well,

12  correct?

13  A      They were the resolution committee also, yes.

14         MR. STEN:  You can take that down and put up

15  Exhibit 132.

16         Your Honor, I'm going to try to endeavor to finish

17  by four at the latest.  I am trying to move as quickly as I

18  can.

19  BY MR. STEN:

20  Q      Exhibit 132, Mr. Stastney, is a May 12th email from you

21  to Colin Mikkers.  Who is Colin Mikkers?

22  A      Colin Mikkers is an employee of SeeCubic B.V. in the

23  Netherlands.

24  Q      Okay.  So on May 12th, 2020 am I correct that you're

25  telling Colin to change certain passwords and access to

1  certain Stream web internet sites to you and to Mr.

2  Kapasinski?

3  A      Let me take a moment to read this if I could.

4  Q      Of course.

5         (Witness reading to himself)

6  A      Okay.  Thank you.

7  Q      So is that correct that this is you directing Mr.

8  Mikkers to change internet access for certain Stream websites

9  and internet, and computing things over to you and Mr.

10 Kapasinski?

11 A      I believe to Mr. Kapasinski.

12 Q      Okay.  But you are ordering him to change access and to

13 deny access to Stream TV, correct?

14 A      To certain parties, yes.

15 Q      Okay.  And at this time SeeCubic hadn't even been

16 formed yet, correct?

17 A      That is correct.

18 Q      Okay.  And is it your contention that you had the

19 authority to do this under the omnibus agreement?

20 A      It is.

21         MR. STEN:  Scroll up, please, Isaac.

22 BY MR. STEN:

23 Q      So here Mr. Mikkers is telling you that he can't do

24 that, correct?

25 A      That's correct.

1       MR. STEN:  Go up a little more, Isaac.

2  BY MR. STEN:

3  Q     So as a result you sent him the settlement and by that

4  I take to mean by the omnibus agreement, correct?

5  A     I believe that is correct, yes.

6  Q     As well as subject board resolutions, is that correct?

7  A     That's correct.

8  Q     And did Mr. Mikkers change over internet access at that

9  time to Mr. Kapasinski?

10 A     He did not.

11 Q     Okay.  Let's go to the next exhibit, please, 113.  Do

12 you have an understanding of what this document is, it's

13 Exhibit 113, Mr. Stastney?

14 A     Could you scroll down, apologies.  Thank you.

15       Yes, I do.

16 Q     And is this the May 10th resolution of Stream TV's

17 resolution committee putting in effect the terms of the

18 omnibus agreement?

19 A     I believe that is correct, yes.

20 Q     So drawing your attention to the fourth paragraph that

21 actually starts fourth.  Right there, it says fourth,

22 resolved ownership of all subsidiaries of the company are

23 hereby transferred with immediate effect to SLS VI or SLS

24 Holdings VI, LLC on behalf of the counterparties to the

25 settlement agreement to be accomplished by endorsing and

1  transferring in full for no additional consideration for

2  certain certificate, 001, representing ownership of all

3  outstanding thousand shares of TechnoVative Media, Inc., a

4  Delaware corporation.  Do you see that?

5  A    I do.

6  Q    Did the omnibus agreement actually provide to transfer

7  assets of Stream to SLS Holdings VI?

8  A    I believe it did, yes.

9  Q    Do you want me to pull -- I can pull the omnibus

10 agreement back up where it says it's going to transfer to

11 NewCo if that would help refresh your recollection.

12 A    Well I believe what this says is on behalf of the

13 counterparties to the settlement agreement.

14 Q    But you with me that the omnibus agreement transfers

15 the assets to NewCo, if it transfers them at all, and SLS

16 Holding VI is not NewCo?

17 A    I believe the omnibus agreement pretty clearly

18 contemplates that NewCo, because it was called NewCo, was a

19 company that wasn't formed yet.  I think this contemplates

20 that on behalf of the counterparties to the settlement

21 agreement the certificate would be transferred to SLS

22 Holdings VI and at the appropriate time it would be

23 transferred to NewCo when it was formed.

24 Q    Again, that is not what the omnibus agreement says,

25 does it?

1  A     I don't recall exactly what the omnibus agreement says,

2  but I think it's very clear that this is an appropriate way

3  to make that transfer.

4  Q     Let's go to Exhibit 45, please.  Now we've seen this

5  document before, correct?  Well we heard talk of it earlier.

6  This is -- when you were talking with my assistant this

7  morning or early this afternoon about a stock transfer in

8  power on September 4th that purported to transfer

9  TechnoVative from Stream to SeeCubic is this the document

10 that you were referring to?

11 A     Yes, this is.

12 Q     Okay.  And you see it's signed by you, correct?

13 A     Yes, that's correct.

14 Q     And it says,

15       "Pursuant to irrevocable power of attorney granted by

16 Stream TV and its subsidiaries pursuant to Section 1.4 of the

17 omnibus agreement, and solely in such capacity."

18       Do you see that?

19 A     I do.

20 Q     Were the subsidiaries of Stream TV part of the omnibus

21 agreement?

22 A     Stream had the power to commit to them, I believe, yes.

23 Q     Were they signatories?

24 A     I don't believe they were.

25 Q     And Stream TV owned the shares of TechnoVative,

1  correct?

2  A      Up until the time of the omnibus agreement, yes.

3  Q      So it's your testimony as of the omnibus agreement

4  those assets went over to NewCo?

5  A      Those assets became the right of NewCo, correct.

6  Q      The right of NewCo.  So the entitlement of NewCo to

7  receive them?

8  A      Correct.

9  Q      And it says in the body of this Stream TV hereby in

10 each case to the extent such action was not validly completed

11 at an earlier date irrevocably conveys, transfers, and

12 delivers, and assigns all the issued and outstanding shares

13 of common stock are value, I don't know what's less than a

14 penny, per share of TechnoVative Media, Inc., a Delaware

15 corporation to SeeCubic, a Delaware corporation.  Correct?

16 A      That's correct.

17 Q      And it appoints you as the company's attorney, correct?

18 A      That's correct.

19 Q      And it's your contention that this document transfers

20 the ownership of TechnoVative Media from Stream to SeeCubic

21 if it hadn't occurred earlier, correct?

22 A      That's correct.

23 Q      Would it surprise you to know that the bylaws of

24 TechnoVative actually do not allow you to make a transfer in

25 this manner?

1   A      Which bylaws are you speaking of?

2   Q      The bylaws that were in existence --

3          (Phone disconnects)

4   A      I'm sorry, did I lose you?  Did we lose you, Mr. Sten?

5              THE COURT:  I think we may have lost Mr. Sten.  If

6   there is a colleague --

7              MR. ZAHRALDDIN:  Your Honor?

8              THE COURT:  Mr. Sten, can you hear us?

9          (No verbal response)

10             MR. ZAHRALDDIN:  Your Honor, this is Mr.

11  Zahralddin.  I'm texting Mr. Sten to try to get him back on.

12  I will alert you as soon as he responds back.

13             THE COURT:  Thank you very much.

14         (Pause in proceeding)

15             THE COURT:  Why don't we take a five minute break

16  and see if Mr. Sten is available in five minutes.  It will

17  give everyone an opportunity to stretch their legs as well.

18             So, Mr. Stastney, you are under oath during the

19  break and so you are not able to speak to anyone about the

20  substance of your testimony.  Do you understand that?

21             THE WITNESS:  I do, Your Honor.

22             THE COURT:  Okay.  Alright, let's resume in five

23  minutes which is a little bit before four p.m. and we will

24  see if Mr. Sten has rejoined.

25             Thank you all very much.

1          (Resume taken at 3:52 p.m.)

2          (Proceedings resumed at 4:00 p.m.)

3          THE COURT:  Okay.  I see that Mr. Sten has joined

4    us.  For the record this is Judge Owens and we're back all

5    together.

6          When you're ready, Mr. Sten, please go ahead and

7    move forward.

8          MR. STEN:  Sorry about that, Your Honor.  I could

9    actually hear and see, but for some reason my microphone and

10   camera decided to switch to my laptop which doesn't really

11   help you.

12         So we pulled up Exhibit 88.  I am not sure if I

13   had a question pending when I disappeared.

14         THE COURT:  If you did you'll have to restate it

15   because I have long forgotten it.  I am sure the witness has

16   too.

17         MR. STEN:  Yes.  So Exhibit 88, please go to the

18   tenth page or the ninth page, Isaac or Max.

19         Which one of you is doing this so I can stop doing

20   that?

21         MR. STEVENS:  It's Isaac.

22         MR. STEN:  Okay.  Go to Page 9, please.  Let's go

23   back to the front so Mr. Stastney can look at it.

24   BY MR. STEN:

25   Q    Do you recognize the document that is here as Exhibit

1  88, Mr. Stastney?

2  A    I see it.  It says the bylaws of TechnoVative Media,

3  Inc.

4  Q    Okay.  Is it your understanding that these are the

5  bylaws of TechnoVative Media, Inc., prior to what you purport

6  to be your changes or SeeCubic's changes on September 4th?

7  A    I don't know.

8  Q    Okay.  Let's go to page 9.  And for persons

9  (indiscernible), you know, but it is what it is.

10        Do you see Section 4.2, certificates of stock?

11  A    I do.

12  Q    Do you understand that a provision such as that

13  provides that stockholders have certificates that show their

14  ownership in a corporation?

15  A    I'm sorry, could you ask me that question again.  I

16  apologize.

17  Q    Do you have a general understanding of a what a

18  section, such as 4.2, how it operates?

19  A    No.

20  Q    Okay.  So, even though you work around finance and

21  bylaws and, in fact, on this same -- on September 4th, you

22  changed the (indiscernible).  You have no understanding of

23  how this works?

24  A    I have -- I don't have an understanding of how this

25  specific provision works.  This is not my area.

1  Q     Okay.  Even though you earlier said that just two days

2  after September 4th, you drafted an assumption and assignment

3  agreement, which is a fairly complex corporate document,

4  correct?

5  A     It's not fairly complex, at least based on my

6  experience.  And the Delaware treatment of stock certificates

7  is not something that I ever really got expertise in.

8  Q     Okay.  So, take a look at this certificate of stock.

9  It says every holder of this stock of the corporation shall

10 be entitled to have a certificate in such form as may be

11 prescribed by law and by the board of debtors, certifying the

12 number and classes of shares owned by such stockholder in a

13 corporation.

14       Do you see that?

15 A     I do.

16 Q     Do you have a general understanding of that that would

17 mean that each holder of stock of a corporation would have a

18 certificate?

19 A     Would be entitled to it, yes.

20 Q     Looking back at 4.3, transfers, the next section down,

21 do you have a general understanding that -- of what this

22 section provides for in the bylaws?

23 A     I'll read it if you'd like me to.

24 Q     Yes.

25 A     Okay.

1  Q    Okay.  Would you agree with me that Section 4.3 on

2  transfers provides that in order to transfer shares of stock

3  in this can corporation, which happens to be Tekno Media the

4  bylaws require that the certificate be surrendered to the

5  corporation and properly endorsed or accompanied by a written

6  assignment or power of attorney?

7  A    Well, what I believe it says is, the initial clause is:

8         "Except as otherwise established by the rules and

9  regulations adopted by the board of directors, and as

10 applicable by law."

11 Q    But I'm asking you, these bylaws, themselves, say that

12 this requires that that occur, correct?

13 A    This section of the bylaws say that, with that *proviso*.

14 Q    Okay.  And why sitting here do you think that *proviso*

15 is important?

16 A    Because there are other provisions which may modify

17 that statement.

18 Q    Are you aware of any other provisions that might modify

19 that statement?

20 A    I think Section 4.4 would modify that statement.

21 Q    But, as of September 4th, you had no reason to think

22 that there was a lost, stolen, or destroyed certificate?

23 A    Incorrect.  I believe we had every reason to believe

24 that the certificate had not been delivered to us, as was

25 required under the omnibus agreement.

1    Q     I agree with you that it has not been delivered to you,

2    as required under the omnibus agreement, and your

3    (indiscernible) was required.

4         But does that make it -- does not delivered mean it was

5    lost, yes or no?

6    A     Possibly.

7    Q     Does not delivered make it stolen, yes or no?

8    A     Very possibly, yes.

9    Q     Does not delivered mean it was destroyed?

10   A     Possibly.

11   Q     And, in fact, isn't it the case that you testified in

12   your deposition that you went into, without colorable claim,

13   you entered the premises of Stream on December 21st, 2020,

14   and looked for the stock certificate in Stream's offices,

15   correct?

16   A     We went into the office of Stream on December 21st with

17   the keys that had been provided to us by employees of Stream,

18   to take any property in that office, which had been

19   transferred to Cubic by the omnibus agreement.

20   Q     So, it is really your testimony that they provided you

21   those keys in order to enter Stream's offices?

22   A     It is.

23   Q     And who did that?

24   A     I believe Roger Roshan (phonetic) directed it and two

25   or three of the employees provided the keys.

1  Q      Is it your testimony that they provided the keys at the

2  same time they dropped off their laptops?

3  A      They didn't drop of their laptops.  We had to send

4  boxes that prepaid for them to put them into the boxes and

5  send them to us, and along with that, they provided the keys.

6  Q      Okay.  So, they put the keys in the box and sent it to

7  you?

8  A      They indicated on the email that they were going to

9  send the keys to us and they sent them to us.

10  Q      And were they sending the keys to you because they

11  believed the fact that you were going to assume IOI of those

12  premises?

13  A      I have no idea why they would -- what they believed

14  about our ownership of the premises.

15  Q      Okay.  But you didn't actually assume ownership of the

16  premises, did you?

17  A      We did not.

18  Q      Right.  So, when you entered those premises, you didn't

19  have any ownership claim to those premises, correct?

20  A      No, but we had authority under the power of attorney.

21  Q      Did you issue a power of attorney giving yourself the

22  authority?

23  A      The power of attorney was issued by the omnibus

24  agreement, giving me --

25  Q      Right.  But did you write out a power of attorney that

1 | says, I give myself authority on behalf of Stream to enter

2 | these premises.

3 |      Did you ever do that?

4 | A    I did not.

5 | Q    All right.  So, you entered?

6 | A    Under the power of attorney granted under the omnibus

7 | agreement.

8 | Q    Regardless of that, when you entered the premises

9 | (audio interference) in your deposition, you testified you --

10 | is someone talking or is it strange sounds?

11 |           THE COURT:  I think it was just interference.

12 |           You can continue.

13 |           MR. STEN:  Okay.

14 | BY MR. STEN:

15 | Q    When you entered the premises, one of the reasons you

16 | entered the premises, correct, was to look for that stock

17 | certificate, correct?

18 | A    We had no expectation of what we were going to get

19 | there, Owen the fact that there may be property that was

20 | transferred under the omnibus agreement that we would want to

21 | retrieve.

22 | Q    But you did look for the stock certificate on December

23 | 21st, 2020, correct?

24 | A    We took any stock certificates or any copy of any stock

25 | certificates that we found, yes.

1  Q     And, in fact, you did not find a copy of the techno

2  media stock certificate on that day, correct?

3  A     That's correct.

4  Q     Which is why the next day you issued an affidavit of

5  loss, correct?

6  A     That's correct.

7  Q     Right.  You didn't issue an affidavit of loss anytime

8  around September 4th, did you?

9  A     I did not.

10 Q     Right.  So, under that -- and you know what?  Let just

11 strike that.

12        If my reading of transfer is correct, that as of the

13 date that these poo bylaws were in force, Tekno Media's

14 bylaws and corporate rules required that a certificate be

15 presented to the corporation and properly endorsed.

16 If that is the case, would you agree with me that your

17 actions in the stock power agreement would be null and void?

18 A     That's a legal conclusion.  I would disagree, but I

19 would say that that's a legal conclusion that I'm not

20 qualified to make.

21 Q     Okay.  Pull up Exhibit 80?

22        MR. STEN:  I only have a few more exhibits, Your

23 Honor, I promise.

24        THE COURT:  Okay.

25 BY MR. STEN:

1  Q     Do you recall this document, Exhibit 80?

2  A     I'm sorry, can you scroll down.  Apologies.  Can you

3  scroll to the bottom.  Thank you very much.

4  Okay.  Yes, I do.

5  Q     Is this a letter from SeeCubic's lawyers, dated August

6  6th, 2020?

7  A     Yes.

8  Q     And (indiscernible) to the CEO of SeeCubic B.V., which

9  is, we've been referring to as "SeeCubic Netherlands"; is

10 that correct?

11 A     No, that is not correct.

12 Q     Okay.  And who is it to?

13 A     Mr. Loykes (phonetic).

14 Q     And who is Mr. Loykes?

15 A     Todd Loykes was the director of SeeCubic B.V., I

16 believe, at the time of this letter, or purported director.

17 Q     Okay.  And the law firm, this is the same law firm that

18 appeared here in this preparing and gave expert testimony?

19 A     That's correct.

20 Q     But not the same person, correct?

21 A     That's correct.

22 Q     And it says here, SeeCubic, this top of the third

23 paragraph:

24         "SeeCubic is the rightful, ultimate owner of the

25 Dutch SeeCubic entities."

1        Do you see that?

2  A    I do.

3  Q    And is it your contention, as you sit here today, that

4  as of August 6th, 2020, SeeCubic, Inc. was the rightful,

5  ultimate owner of the SeeCubic -- the Dutch SeeCubic

6  entities?

7  A    Absolutely.

8  Q    Okay.  Even though the stock Tekno Media had not been

9  transferred over to SeeCubic?

10 A    Again, I'm not clear on exactly when the stock was

11 transferred over to SeeCubic.  It was certainly no later than

12 September 4th, but as this is phrased, SeeCubic, Inc. was

13 definitely the rightful, ultimate owner of the Dutch SeeCubic

14 entities at that point.

15 Q    Okay.  Here's an odd question.  If you don't think --

16 if you're not posit wasn't September 4th, then how would it

17 have been transferred earlier?  Was there another stock power

18 agreement that we're all not aware of?

19 A    Several counterparties have taken a view that the

20 omnibus itself, or the omnibus agreement with the resolutions

21 adopted thereafter, were sufficient to transfer the stock,

22 firstly.

23       Secondly, this is not my language.  So, while I believe

24 this is correct, this was written by our Dutch entity.

25 Q    And when you say counterparties, who do you mean?

1  A     Particularly.  Bisra, in the Netherlands, who were the

2  previous administrator and supplier of a director to the

3  Dutch entities were they were inquired by Mathu Rashan, when

4  we attempted to change directors.

5  Q     Okay.  So, let's go to Exhibit 82, then.

6  Okay.  Are you familiar with this letter?

7  A     I don't recognize this letter.

8  Q     Okay.  But it's from your lawyers, August 6th, 2020?

9  A     Okay.  I see that.

10  Q     And is it a letter to -- who is Mr. Klein?

11  A     I don't know.  I would have to read the letter.

12  Q     Take a look -- take a gander at that first paragraph.

13  Does it say, we understand you are representing Bisra?

14  A     Yes.

15  Q     Okay.  So, is it your understanding that this is a Lehr

16  from your lawyers to Bisra?

17  A     I'm not sure if it's Bisra or counsel for Bisra, but

18  it's regarding Bisra.

19  Q     Okay.  And you just testified that Bisra took the

20  position that the shares were transferred pursuant to the

21  omnibus agreement?

22  A     I believe that's correct, yes.

23  Q     Okay.  Let's go to the second page, please.  Right

24  under the heading it says, SeeCubic is the ultimate owner of

25  Dutch SeeCubic entities.

1    Do you have any reason why if Bisra was taking that

2  position, your lawyers would be writing a letter telling them

3  that you own it?

4  A    It's not clear to me that this is to Bisra; I believe

5  this is to Bisra's counsel, who may or may not have been

6  aware of the position that Bisra had been taking.

7  Q    Okay.  But you are aware that this paragraph says:

8         "As you're aware, on May 6th, 2020, when the

9  omnibus agreement was concluded between Stream TV and certain

10 of its secured creditors, amongst whom SLS Holdings VI, LLC,

11 and Hawk Investments, Ltd.

12         Subsequently, on May 10th, 2020, the necessary

13 rulings were adopted by the board of directors; i.e., the

14 resolution committee of Stream TV, for amongst others; one,

15 the transfer of Stream TV's entire shareholding of

16 Teknodata -- Media, to SLS Holdings VI, LLC."

17    Do you see that?

18 A    I do.

19 Q    Okay.  And that's -- your understanding is that

20 resolution that we're talking about here is this Exhibit 113?

21 A    I don't know the exhibit number, but I believe that's

22 the one that we were looking at earlier, where SLS Holdings

23 was receiving it on behalf of the counterparties to the

24 settlement agreement, yes.

25 Q    Okay.  So, then, next, it says:

1          "Accordingly, Bisra communicated the following in

2 its letter to Stream TV, dated 24, July 2020."

3      Do you see that?

4 A    I do.

5 Q    Okay.  Do you recall a letter from Bisra to Stream TV,

6 dated 24, July 2020?

7 A    I don't know that I was a party to that letter.

8 Q    Okay.  And then it says:

9          "Taking the above into consideration, Bisra no

10 longer considered Stream TV Networks as the ultimate

11 shareholder of the companies and as a consequence, whereof

12 the engagement letter is no longer applicable and is hereby

13 terminated, per the date of this letter."

14      Do you see that?

15 A    I do.

16 Q    And is that what you're referring to when you say some

17 counterparties had taken that position?

18 A    I wasn't referring to this language.  I'm not sure I

19 have seen this language before, but that is -- it is Bisra's

20 position, among others, that I'm referring to.

21 Q    Okay.  And what is your position as to when it was

22 transferred?

23 A    No later than September 4, 2020.

24 Q    Do you believe it was earlier?

25 A    I believe it could have been earlier, yes.

1  Q     Do you have a belief at all as to when it was?

2  A     No later than September 4th, 2020.

3  Q     Okay.  Let's go to Exhibit 20(b).

4  Now, I think it was yesterday -- yeah, yesterday feels like a

5  year ago -- we heard talk about a relationship between Stream

6  TV and Googling.

7        Are you familiar with that?

8  A     I am.

9  Q     Okay.  (Indiscernible) comes up, isn't it true that in

10  January 2021, SeeCubic reached out to Global to notify them

11  that SeeCubic was taking over any projects between Stream TV

12  and Google?

13  A     I don't recall a date, but, yes, we certainly notified

14  Google.

15  Q     And isn't it true that Google consulted with its in-

16  house legal team and decided not to move forward with that

17  project?

18  A     Google consulted, internally and decided not to go

19  forward.

20  Q     Okay.  And in response to that, you sent this email

21  back to Google, correct?

22  A     That's correct.

23  Q     Now, the last paragraph says, and, finally, since

24  you're apprised of the legal situation, we trust that if you

25  receive any inquiries from our former management or

1  subcontractors/vendors, you refer them directly to us.

2       Do you see that?

3  A    I do.

4  Q    Why would you be telling Google that?

5  A    I think it's fairly self-explanatory.

6  Q    I asked you a question:  Why would you be telling

7  Google that?

8  A    So that if they received any inquiries from our former

9  management or subcontractor, vendors, that they would refer

10 them directly to us.

11 Q    Well, why would you expect them to refer them directly

12 to you?

13 A    Because, as it says here, they've been fully apprised

14 of the legal situation and they understand who the rightful

15 owner of the assets are.

16 Q    But that doesn't say if they talk about the assets.

17 They're just saying if you receive inquiries.

18 Is there a noncompetition agreement between you and Stream

19 TV?  Is there a noncompetition agreement in place between

20 Stream TV and SeeCubic?

21 A    Whatever the omnibus agreement provides, I believe, is

22 the business agreement between Stream TV and SeeCubic, as to

23 the separation of the assets.

24 Q    So, wouldn't Stream TV, as of February 11, 2021, be

25 free to contact Google about whatever business it wanted to?

1  A      Any business, other than the subject of business that
2  was transferred to SeeCubic, Inc.

3         And as of this date, I was aware of no other business
4  that Stream TV had with SeeCubic that was not subject to the
5  omnibus agreement and, theoretically, there could not have
6  been.

7  Q      And the omnibus agreement was on May 6th, correct?

8  A      That's correct.

9  Q      So, by February 11th, you're talking, there's a whole
10 six or seven months that had gone by.

11        Is it your contention that anything that happened after
12 May 6th with Stream TV is still an asset of SeeCubic's?

13 A      Yes, up until the 5th of November.

14 Q      So that --

15 A      Up until the omnibus agreement was fully satisfied,
16 everything that occurred with Stream TV was an asset of
17 SeeCubic, via the secured interests of the secured creditor.

18             MR. COLBY:  Your Honor --

19             MR. STEN:  Please turn to Exhibit 66 and 67.  This
20 is my last one, Your Honor.

21             THE COURT:  Thank you.  I want to be sensitive to
22 the Court's time and --

23             MR. STEN:  And I actually do appreciate it, Your
24 Honor.  It's, you know, the difficulty when you're trying to
25 get through your pieces, but they're, you know.

1     And the witness has not --

2  BY MR. STEN:

3  Q     Last exhibit.  Do you recall this Exhibit Mr. Stastney?

4  A     I do not.

5  Q     Okay.  Is that an email to you -- from you, at the top

6  of it so Travinsky (phonetic), Leo Reilly, and others?

7  A     It appears to be, yeah.

8  Q     And at the bottom, does that appear to be an email from

9  Reilly to you?

10 A     Could you scroll all the way down, please.  Yeah, uh-

11 huh.

12 Q     And is Leo Reilly one of stream's former employees?

13 A     Yes.

14 Q     Okay.  And who is Jove AI (ph)?

15 A     Jove AI is a consultant to or a vendor to Stream that

16 was working on, particularly, equipment relative to the

17 Google project.

18 Q     Okay.  And in this email, am I correct that you're

19 being told that Jove AI owns the designs of a certain

20 converter board and that they're not willing to give them up

21 to Stream or to SeeCubic?

22 A     I believe what this is saying is that the terms Stream

23 has negotiated with Jove AI, the despite the fact that Stream

24 paid the money, didn't give Stream any ownership rights in

25 the design of the converter board.

1       So, despite the fact that Stream had paid them money,

2   you Leo was explaining that this probably wasn't our property

3   or wasn't Stream's property and also explained to me what the

4   unit did.

5   Q     And you replied that Stream TV money went to pay for

6   it, whether it's related to Ultra-D or not, it's ours.

7       Do you remember saying that?

8   A     I do.

9   Q     And is, you also said, We're going to pursue them?

10  A     Yeah.

11  Q     And you also said, At the very least, we're going to

12  scare them as much as possible to make them careful with

13  Mathu going forward?

14  A     I do recall that.

15  Q     And by "Mathu," you mean Mathu Rashan?

16  A     Yes, I believe Mathu Rashan, who had been communicating

17  with them either, directly or indirectly, from and after the

18  date of the preliminary injunction up to this point and

19  beyond.

20          MR. STEN:  Okay.  I have no further questions,

21  Your Honor.

22          THE COURT:  Okay.  Thank you very much.

23          Ms. Sierra, did you have any questions for this

24  witness before I tender him for redirect?

25          MS. SIERRA:  Rosa Sierra for the U.S. Trustee,

1   Your Honor.  No questions, Your Honor.

2               THE COURT:  Okay.  Thank you.

3               Mr. Colby?

4               MR. COLBY:  Yes, thank you, Your Honor.  I will be

5   very brief, I believe.

6                       REDIRECT EXAMINATION

7   BY MR. COLBY:

8   Q     Mr. Stastney, Mr. Sten has made a point this afternoon

9   of the fact that the secured lenders have not released their

10  security interests in the Stream assets.

11        Do you recall those questions?

12  A     I do.

13  Q     Do you care to explain to the Court why you have not

14  done that?

15  A     Well, in short, because the debtor continues to

16  obstruct our completion of the omnibus agreement in every

17  possible way, you know, including the filing of the

18  bankruptcy motion.

19        We have attempted, yet again, to finalize it and

20  transfer all the assets and as soon as that is completed, we

21  will be happy to finalize our side of the bargain.

22  Q     Did you have any particular point in mind when you

23  might do that?

24  A     Well, we had hoped it would be shortly after February

25  26th when the Delaware Chancery Court was to be eligible, at

1 least, the issue is final judgment regarding the preliminary

2 injunction.  We now hope that as soon as we are able to

3 resume in the Delaware Chancery Court, it will happen then.

4 Q    Okay.  I'd like to ask you just a couple of questions

5 and they're very discrete about some of those asset transfers

6 that you talked about here today.  Do you recall Mr. Sten

7 asking you about BTI Exhibit, Exhibit 114.  And that was just

8 an email.  We don't -- I'm not even sure we even need to look

9 at it, but it was an email that started with an individual by

10 the name of Cossack energy and it involved your security

11 interest in the servers that were being managed by Motive IT?

12 A    I do recall, yes.

13 Q    Okay.  What year was that?

14 A    I believe that was 2020.

15 Q    2020, okay.

16 A    Uh-huh.

17 Q    And it was before or after the omnibus agreement?

18 A    It was before the omnibus agreement.

19 Q    You also were asked some questions today about the

20 TechnoVative stock certificates.

21      Do you recall those?

22 A    I do.

23 Q    And what's your view as to Stream TV's obligations with

24 respect to the stock certificate, per the omnibus agreement?

25 A    Per the omnibus agreement, Stream TV was to immediately

1  convey and deliver to us that stock certificate.

2  Q     Had it done that by September 4th?

3  A     It had not.

4  Q     And do you consider it, in light of those

5  circumstances, do you consider it practicable or

6  impracticable as to whether or not you could transfer this

7  physical stock certificate?

8  A     We considered that impracticable.  We had asked many

9  times for it to be delivered and it had not been delivered.

10  Q     Okay.  You were asked a couple of questions about

11  assets in China, and I want to break that into two different

12  issues.  First, I believe you referenced Chinese

13  subsidiaries, do you recall that?

14  A     I do.

15  Q     Okay.  What is your view and the basis for your view as

16  to who owns the Chinese subsidiaries?

17  A     SeeCubic, Inc. owns the Chinese subsidiaries, because

18  they are the wholly-owned subsidiaries in the line that runs

19  up through TechnoVative Media, Inc.

20  Q     Okay.  And what issues were you trying to deal with,

21  with respect to the Chinese subsidiaries, even --

22  (indiscernible).

23  A     Sure.  Well, beginning in December, almost immediately

24  after the omnibus agreement, we ultimately, with the help of,

25  the minimal help with Stream, engaged with Chinese counsel

1   and began working to replace the director and the responsible

2   person, which was a particular Chinese position in those

3   subsidiaries.  When we ask for their resident inspector

4   general nations, they refused.  When we asked for compliance,

5   they refused, and so we started the process of replacing.

6   Q     Okay.  And I want to ask about equipment that's also in

7   China and, of course, clearly, this is also referred to as

8   the bonding equipment that was discussed yesterday.

9        And the mutual standstill agreement that you

10  referenced, with respect to asserting ownership over that

11  equipment, what was going on, for lack of a more

12  (indiscernible) question, what was going on with the bonding

13  equipment that went to the mutual standstill agreement?

14  A     Sure.  So, we -- the bonding equipment was among the

15  equipment listed on the schedules to the omnibus agreement

16  and that was transferred to SeeCubic, Inc. and after December

17  8th of 2020, we became aware through counsel that the

18  landlord of the facility in China had either taken possession

19  of or control of that equipment and was holding that versus

20  repayment of an obligation under the lease for that I

21  understand in.

22       We subsequently became aware through the court in China

23  that the obligation for that facility had been transferred

24  from Stream TV Network, Inc., where it had originated, to our

25  Suzhou subsidiary.  And as a result, it had become our

1  problem.

2       So, we were moving as expeditiously as we could to

3  establish our authority over the subsidiaries so we could

4  resolve that problem.

5  Q    Okay.  And you mentioned a second ago, that with

6  respect to the Chinese subsidiaries -- we're switching topics

7  slightly -- an obligation that it had incurred and you said

8  it became your problem.

9       Were there any other obligations of various

10 subsidiaries of Stream TV at the time that you effected their

11 transfer to Cubic?

12 A    There were.

13 Q    Okay.  And do they appear on that schedule of assumed

14 liabilities we looked at earlier today?

15 A    They do not.

16 Q    Okay.  What happened to them?

17 A    Well, effectively, as liabilities of subsidiaries,

18 which when you take ownership of a subsidiary, you take

19 ownership of all of their assets and liability.  There's no

20 option not to.  So, we have been dealing with all of those

21 liabilities since December 8th.

22 Q    Okay.  Great.

23      And I'm going to move on, and this is just the last

24 thing that I want to talk to you about.

25              THE COURT:  Just a real quick -- I'm sorry -- just

1  a real quick point of clarification with your last bit of

2  testimony.

3              When you said you were taking care of it, what do

4  you mean by taking care of those liabilities?

5              THE WITNESS:  So, with respect to the liabilities

6  of subsidiaries, Your Honor?

7              THE COURT:  Yeah, that's correct.

8              THE WITNESS:  Yeah.  So, we have been either re-

9  negotiating or paying those obligations off.  So, we have

10 been dealing with them consensually with the counterparties.

11             THE COURT:  Okay.  And is that also the case for

12 the landlord?

13             THE WITNESS:  The -- the --

14             THE COURT:  I apologize.

15             THE WITNESS:  Of the landlord?

16             No, we have been unable to deal with the landlord

17 up to this point because Mathu Rajan continues to contend

18 he's the director of that subsidiary of ours and A.J. Yee

19 (phonetic) contends that he's the responsible person.  And

20 the landlord requires that any settlement of that obligation

21 be effectuated by an authorized party of that subsidiary.

22             So, we are moving as quickly as we can to achieve

23 that so we can enter into a settlement with the landlord.

24             THE COURT:  Okay.  Thank you very much for

25 clarifying that.

1        I apologize for interrupting, Mr. Colby.

2        MR. COLBY:  No problem.

3   BY MR. COLBY:

4   Q    So, Mr. Stastney, were you present for yesterday's full

5   billing arguments by the parties?

6   A    I was.

7   Q    And did you hear yourself referred to as a creditor?

8   A    I did.

9   Q    Okay.  And Mr. Samis asked you some questions about

10  past litigations today, correct?

11  A    That's correct.

12  Q    Okay.  How do you respond to either the express or

13  implied suggestion that you're a predatory lender in this

14  situation?

15  A    From my perspective, it's exactly the opposite.

16  You know, we invested in Stream in 2011 -- a decade ago at

17  this point -- and, again, in 2012.  I personally invested in

18  2017 and 2018 and have been as big a supporter of the company

19  as we could be for as long as we possibly could.

20        That included extending our debt, I think, on five or

21  six different occasions, from 2014 to 2020, in the hopes that

22  they would accomplish what we thought they were capable of

23  accomplishing until it became clear that they couldn't.

24  Q    Okay.  And did you provide personal services to the

25  company?

1  A      Yeah, I mean, I served on the board from 2011 to 2014.

2  And, again, I started working with the company informally in

3  2016.  I was asked to join the board in 2018.  Was asked to

4  become CFO in 2018, as well, and did everything I could to

5  attempt to fix the problem within the company until it became

6  clear that because of the Rajan's control, that was not going

7  to be possible.

8  Q     Okay.  Are there any aspects of the loans that you made

9  to Stream TV that you think either reflect or do not reflect

10 the characteristics of predatory lending?

11 A      Well, I think do not.  I mean, we try to structure our

12 investments, which are loans -- not all of them, but some are

13 -- as company-friendly loans, as much as possible.  So, they

14 carry low interest rates -- this was 5 percent well below

15 what the company would have merited at that point, I mean,

16 well below -- and we took most of our compensation as equity,

17 which means we're effectively aligning ourselves with the

18 company, and not as a threat.

19 Q     Okay.  Do the extent that there was suggestion in the

20 opening argument that the settlement agreement that has been

21 reached with the unsecured creditors here was somehow

22 untoward, how would you respond to that?

23 A      Well, we attempted to provide for the unsecured

24 creditors already in the settlement agreement or in the

25 omnibus agreement by awarding them one million shares.

1  That's the shares that were going into Stream were intended

2  to compensate.  We felt that that would probably be

3  sufficient at the end of the day if we succeeded to

4  compensate them for their debt.

5       You know, to the extent that this process has revealed

6  that they have a different view on the valuation of what

7  would be appropriate for their shares, I think, or for their

8  claims, and we were happy to engage with them and happy to

9  reach an agreement.

10  Q     Okay.  And do you have a view as to, with respect to

11  the various constituencies, do you have an interest into --

12  do you have a view with respect to the outcome that you've

13  reached after (indiscernible)?

14  A     We continue to believe that the omnibus agreement is a

15  very fair and complete resolution for everyone.  The secured

16  creditors are addressed.  The shareholders are addressed.

17  The unsecured creditors are address.  So, I continue to

18  appeal, as I believe the Chancery Court did, that it's a fair

19  resolution of claims.

20  Q     Is anybody coming out of the situation whole?

21  A     No one is coming out whole.  The secured creditors are

22  equitizing a lot of their interests.  The shareholders are

23  losing a significant portion of their warrant value and the

24  unsecured creditors are attempting not to pay, depending on

25  how the stock performs, are not getting made whole either.

1  That, unfortunately is the situation that Stream found itself

2  in when we took over.

3  Q    Okay.

4           MR. COLBY:  That's all I have.  Thank you very

5  much.

6           THE COURT:  Okay.  Thank you, Mr. Stastney.  I

7  appreciate your time and attention to the matter today.

8           You are released from our virtual witness box.

9           THE WITNESS:  Thank you very much, Your Honor.

10      (Witness excused)

11           MR. LARKIN:  Your Honor, this is Joe Larkin.  I'm

12  prepared to close.  I think I'll be very brief and if that's

13  all right with Your Honor, I will jump right into it.

14           THE COURT:  That would be greet.  Thank you.

15           MR. LARKIN:  Sure.  First, Your Honor, we thank

16  you very much for your time over the last couple of days.  I

17  know that you covered a lot of ground in a very short period

18  here.  I thought it would be helpful to refocus on the

19  threshold inquiry here on our motion to dismiss, in deciding

20  whether the petition was filed in good faith.  And that's the

21  issue that is in front of Your Honor.

22           And we've heard a will the of testimony today at

23  that I really don't think was related to that issue, so I

24  thought it would be helpful to refocus.

25           The question in front of Your Honor is whether the

1  petition was filed in good faith at the time that it was

2  filed and the threshold inquiries are the same.  Was it filed

3  merely to gain a taxable litigation advantage or does it

4  serve a valid bankruptcy purpose?

5        And it's the debtors' ultimate burden to make that

6  good faith showing.  We made a prima facie showing that the

7  filing was made in bad faith, and it's the debtors' burden to

8  demonstrate good faith.  And the good faith inquiry, as I

9  said, has to be analyzed at the time that the petition was

10  filed, back in February, about two months, two and a half

11  months after, when the debtor and BTI tried to sort paper

12  over a really bad record on the eve of trial.

13        The testimony from the debtors' witnesses show

14  indisputably, that the answer to both questions calls for

15  dismissal of the case.  With respect to the tactical

16  litigation advantage, Your Honor, I don't think you really

17  need to look any further than Mr. Rajan's testimony on cross-

18  examination and the timeline that we included in our opening

19  slide that lays out the key events from the time the omnibus

20  agreement was executed to the filing of the bankruptcy.

21        Mr. Rajan did his best yesterday to runaway from a

22  lot of very pointed questions, but the two questions he

23  didn't runaway from and answered unequivocally to, when I

24  asked him, you know, when the PI order was entered in

25  December and was he looking to move the case out of Chancery

1  and into Federal Court, and he said yes.

2          And he did so because he was looking to give

3  himself time to set up BTI in order to undue the omnibus

4  agreement and acquire the debtors' assets for a fraction of

5  their value.  That's the February 8th email between Mr. Rajan

6  and Mr. McCarthy.

7          The debtors offered no evidence on those points.

8  We heard no evidence as to why the bankruptcy was filed when

9  it was in February.  We know when the Court in Delaware was

10  going to be prepared to enter summary judgment and you heard

11  no evidence from any witness to rebut that testimony.

12          Now, my friend, Mr. McMichael, on the other side,

13  he pointed out in opening that we didn't set up the case law

14  very much.  And I do want to apologize on the SGL Carbon case

15  and I think Mr. McMichael has really misstated the law in the

16  Third Circuit with respect to good faith and bad faith on a

17  motion to dismiss.

18          Mr. McMichael would have you believe that anytime

19  a Chapter 11 petition is filed by a debtor that's in

20  financial distress, it's\evidence of a good faith filing or

21  that the only time a Chapter 11 case is filed in bad faith is

22  when the debtor is otherwise financially healthy, but

23  attempting to avoid a bad litigation outcome.  And that's not

24  the law in this circuit.

25          SGL Carbon and Integrated Telecom make clear that

1   it is fact-intensive inquiry that must consider the totality

2   of the circumstances of a particular case.  And just to focus

3   on SGL Carbon, Your Honor, this is Judge Scirica, the Chief

4   Judge of the Third Circuit at the time, in discussing the

5   totality of the circumstances standard, he said that 165 of

6   that decision, bad faith, right, encourages (indiscernible)

7   that bad faith is a pattern of concealment, evasion, and

8   direct violation of the Code or a court order can clearly

9   establish an improper motive.

10         And the evidence that we elicited yesterday shows

11  that there have been repeated violations of the preliminary

12  injunction order and repeated efforts by the Weil guys,

13  continuous efforts to undo the omnibus agreement.  That is

14  all the testimony we heard today.  It was that the debtors

15  and BTI tried to elicit from Mr. Stastney, despite the

16  repeated representations to Your Honor that we're not

17  challenging the omnibus agreement, right.  They said that

18  repeatedly.  Their witnesses have sworn to that in deposition

19  and in front of Your Honor.  They said, we're not here to

20  relitigate the facts and circumstances that were already

21  decided by Vice Chancellor Esther, but that's exactly what

22  they're doing.  And I told you that's what they're going to

23  do yesterday when we started and that's what they did.

24         Your Honor, the let me turn to the second inquiry

25  here, the no-valid bankruptcy purpose.  Again, I don't need

1  to look any further than the testimony from Mr. Rajan and Mr.

2  Robertson on this point.

3          It is undisputed that at the time that the

4  petition was filed, the debtor had no employees, no

5  operations, no cash, no revenue, and no assets.  So, what's

6  the purpose of the bankruptcy filing?

7          It's to unwind the omnibus agreement and that's

8  it.  And that's continues today.  That purpose has not

9  changed.

10         Post-petition, you heard yesterday about some

11  post-petition assets.  Mr. Rajan tried to convince Your Honor

12  that the debtor has acquired, post-petition, no assets in the

13  form of constituency and tiling and modified light field

14  technology that will help it successfully reorganize.

15         But, respectfully, to Mr. Rajan, Mr. Robertson put

16  the lie to that story.  The stitching and tiling platform and

17  the modified weight-field platform, they're not real.  There

18  are no post-petition acquisitions.  There are no contracts:

19  there's nothing closely resembling a commercial relationship

20  that would support a successful reorganization of the debtor,

21  even with those post-petition assets.  Mr. Robertson, the

22  debtors' first day declarant, doesn't even know the name of

23  the counterparties to those alleged relationships and

24  testified that there have been no direct discussions when the

25  debtor and these customers.  They are, as Mr. Robertson

1  testified, simply relationships.

2           And as we also learned, contrary to what Mr. Rajan

3  told McCarthy back in February, talking about concealment and

4  abetting.  There's no contract between the debtor and anyone

5  to supply any airport anywhere in the world with any of this

6  technology, let alone, all the airports in the United States,

7  but that was the representation that Mr. Rajan made to Mr.

8  McCarthy back in February to try to get him to invest in BTI.

9           And, again, just to go back to the Chancery Court

10  decision, Your Honor, I have to pause.  I have to disagree

11  with Mr. Rajan's characterization of Vice Chancellor

12  Lasseter's preliminary injunction as hasty.  That decision

13  was based on the sworn testimony of witnesses, either through

14  oral or written testimony and hundreds of exhibits.

15           And anyone who's ever appeared before Vice

16  Chancellor Lassiter, as I have many times, knows that he

17  doesn't do anything hastily.  It was made of a very full,

18  evidentiary record and I think Vice Chancellor Lasseter's

19  findings are clear with respect to the omnibus agreement,

20  with respect to the independence of the resolution committee

21  that approved that agreement, with respect to the kickbacks

22  to the to unsecured creditors under the omnibus agreement.

23  All of those findings, we heard from Mr. Robertson yesterday

24  and from debtors' counsel, they are not challenging.

25           Let me just touch a little bit on some of these ad

1  hominem attacks on Mr. Stastney and CLF, as he

2  (indiscernible).  We heard these attacks interestingly from

3  BTI, not the debtors' counsel, and BTI has played an

4  interesting role in these proceedings, Your Honor, but we

5  didn't here any attacks from debtors' counsel on Mr.

6  Stastney.

7          And none of the attacks we've heard are actually

8  relevant to the motion to dismiss, as long as the petition

9  was filed in good faith.  And, again, as I've said, the

10  debtor and (indiscernible) are not contesting Vice Chancellor

11  Lassiter's findings that the omnibus agreement was approved

12  by independent directors, that it was a valid exercise of the

13  secured lenders' rights before they closed on the assets,

14  and, again, as I said, that it gave unsecured creditors

15  certain valuable givebacks that they weren't actually

16  entitled to.  Those are not contested for purposes of the

17  motion.

18          And, finally, Your Honor, I want to touch a little

19  bit on what I call the too little too late elements of this

20  defense of the motion.  We heard yesterday, really, for the

21  first time, about some governance changes that BTI, not even

22  the debtor, but BTI planned to implement if the case is

23  permitted to proceed in Chapter 11.

24          Respectfully, this is all too little, too late.

25  It's all completely litigation-driven, as evidenced by Mr.

1  Robertson's email to Mr. Rajan on April 30th that I showed

2  during Mr. Rajan's testimony yesterday.  And you can't chew

3  on a bad faith filing under Section 1112(b)(2), post-

4  petition, Your Honor.

5         Mr. Rajan instilled the controlling stockholders

6  sole director and CEO of the debtor.  You heard about how

7  there was going to be an expansion of the Board of BTI.  The

8  similar expansion of the Board of the debtor.  There are no

9  governance changes at the debtor.  There's no CRO.  We heard

10 about a CRO, if there was going to be a CRO appointed back at

11 the 341 meeting two months ago.  It still hasn't happened.

12        We heard that there was going to be a new

13 president back at the 341 meeting.  There's going to be a new

14 president.  A week at BTI -- it's not going to be Mr. Rajan.

15 It still hasn't happened.  All empty promises, Your Honor.

16 They'll say anything they can to survive here and there's

17 just no merit to it.

18        And Mr. McCarthy and Mr. Robertson testified with

19 respect to the negotiations of these entities.  Mr. Rajan is

20 handling all of the negotiations here.  Mr. McCarthy hasn't

21 been involved in the negotiations of the DIP.  It really

22 impeached Mr. Rajan's testimony on that point.

23        He said, that's simply not true.  I haven't been

24 involved in those negotiations.  And Mr. Robertson has been

25 Mr. -- I'm sorry -- Mr. Robertson has been Mr. Rajan's

1  handpicked counterparty to these negotiations.

2          And, finally, Your Honor, I'll talk about

3  Burlington Resources eleventh-hour financing proposal.

4  Furtow & King (phonetic), as Mr. McCarthy testified, it's

5  still not legally bound to invest a single cent to BTI and

6  they haven't, whether it's a legal commitment or some

7  commitment that Mr. McCarthy is making (indiscernible),

8  there's not any commitment to invest any money into the

9  debtor, right.

10          There was no testimony suggesting a commitment by

11  Burlington to invest in the debtor and there was no testimony

12  about Burlington's commitment to BTI and the they'll be

13  contributed to the debtor.  It's an ever-changing agreement

14  and it's simply an option that remains on the side as we sit

15  here today.  And I think if Mr. McCarthy testified,

16  (indiscernible) to a creditor, if the Ultra-D assets are not

17  returned to Stream, that is, if the omnibus agreement isn't

18  unwound, right, he reserves the right once again to

19  renegotiate the terms of that agreement.  He'll just

20  renegotiate it again.  So, with that, Your Honor, we would

21  ask that the motion be granted.

22          Your Honor, I'm happy to do the admission of the

23  exhibit at the end of closings if -- or I could do them now.

24  Whatever you'd like.

25          THE COURT:  Let's wait until the end of the

1  hearing.

2            MR. LARKIN:  Sure.  Thank you, Your Honor.

3            THE COURT:  Okay.  Ms. Sierra, did you want to

4  make a closing?

5            MS. SIERRA:  Your Honor, Rosa Sierra for the U.S.

6  Trustee.

7            I did want to make a few remarks, but I want to be

8  mindful that I'm on the same time clock as SLS and SeeCubic,

9  and if for some reason they're over already, I don't think I

10  have much more to say, other than what's already been said.

11  But I know in the interests of moving this forward, I don't

12  want to take up too much time.

13            So, if I have some -- a few minutes, if someone

14  from SeeCubic could let me know, I will, but if not, I'm more

15  than happy to move on and let the debtors go with their

16  presentation.

17            THE COURT:  I'm happy to hear a few minutes from

18  the U.S. Trustee's Office on this, regardless of the time.

19            MS. SIERRA:  Okay.  Thank you, Your Honor.

20            Okay.  So, there's a few matters that we wanted to

21  bring to Your Honor's attention in closing remarks, and I

22  will (indiscernible) the motion -- the specifics about the

23  motion to dismiss.  I wanted to make a comment about the

24  committee's statement and the committee's disclosure of the

25  settlement agreement with SeeCubic in this case.

1          For the record, we, the U.S. Trustee takes -- has

2     no reason to take any position on that.  Importantly, the

3     committee and SeeCubic are not seeking approval of the terms

4     of that settlement agreement.  From what I understand,

5     they're not seeking to incorporate the terms of that

6     settlement agreement into any order, dismissing this case,

7     and for those reasons, we just don't see a reason to opine on

8     that, to supplement it, to not support it; that statement is

9     what it is.  So, that's the first point.

10          On the motion to dismiss, I think the Mr. Larkin

11     said it correctly.  I think the real focus here is on 1112(b)

12     and what constitutes good faith, and that, as we -- as he's

13     discussed, that really is about whether this (indiscernible)

14     pre-petition was filed for a valid bankruptcy purpose and

15     whether it was filed to gain a tactical advantage.

16          On the valid bankruptcy purpose, Your Honor,

17     there's two (indiscernible) maximization of value and

18     preserving of a going-concern.  Simply put, we don't believe

19     that there are any assets in this estate to maximize value or

20     to preserve a going-concern, and even if there are, the

21     current preliminary injunction order by the Chancery Court

22     eliminates any rights to do anything with those assets.  So,

23     for these reasons, we believe the bankruptcy case, the

24     bankruptcy petition did not serve a valid bankruptcy purpose.

25          You heard a lot of testimony about other assets

1   and I think what the testimony revealed during the trial and

2   the last few days of this hearing, Your Honor, is that there

3   are some issues with the credibility of that testimony.  I

4   don't believe there was a clear answer as to when this

5   stitching and tiling technology existed or the debtor

6   required the rights to it, as well as the modified light

7   field.

8           We heard some pretty incredible testimony about

9   how there's 50 new employees just waiting on standby and

10  waiting for this motion to dismiss to be granted in order for

11  them to get hired by Stream in order to put this technology

12  in the field to work.  Simply put, Your Honor, I don't

13  believe that we -- the U.S. Trustee does not believe there's

14  much credibility there.

15          And, importantly, the proposed finance investor of

16  BTI that's allegedly going to put in enough funds into this

17  estate to make this all work, made it clear that the star of

18  BTI answering is the old (indiscernible) technology.  And

19  that's exactly the technology that SeeCubic asserts that

20  they've taken ownership of.

21          And to be clear, Your Honor, we don't take this

22  position because we're taking sides here and we want to

23  SeeCubic prevail over Stream and we really want to see the

24  debtor fail.  That's not our role in this case, but by don't

25  want this Court to be in a position to have to second-guess

1  or relitigate or work on the same issues that the well-

2  reasoned opinion of the Chancery Court already did.  In our

3  view, that's not a valid bankruptcy purpose, to come into

4  bankruptcy to second-guess a state court order defining the

5  rights of property ownership in these assets.

6          And with regard to the second inquiry on the good

7  faith, the tactical advantage, I think the timing of this

8  petition, as Mr. Larkin put it, says it very clearly.  With a

9  mandatory injunction in place, it would have been hard for

10  the debtor to propose or support proposing in bankruptcy

11  right now, which is to take back the asset so to, you know,

12  file a motion for rejection of the omnibus agreement on to

13  say it's a constructive property right transfer.

14          So, respectfully, we would disagree with the

15  assertion that whether there has been a mandatory injunction

16  in place would not have changed the outcome here.  Clearly,

17  that seems to be what the debtor was trying to avoid.

18          And, Your Honor, we understand that dismissing a

19  case is a strong remedy, but we do think the facts of this

20  case warrants that.  And should this case remain in

21  bankruptcy, I think the testimony and the prior record in

22  this case makes a little bit of, presents some issues as to

23  the governance issues at the GI level, at the Stream level,

24  at the representation of the firm -- who's representing which

25  party -- how many independent directors there are.  So, it's

1   something that, for those reasons, Your Honor, given that

2   they're present with the governance in this case and the

3   filing of the petition, in bad faith, pursuant to 1112(b),

4   the U.S. Trustee supports dismissal of this case and we think

5   the dismissal motion should be granted.

6               THE COURT:  Okay.  Thank you very much.

7               Mr. Samis, did you have anything to add?

8               MR. SAMIS:  Your Honor, yes.  I was also sharing

9   time, so if Your Honor would be kind enough to hear us, we

10  would appreciate to have an opportunity to make a couple of

11  points.

12              THE COURT:  How far are we over right now, do we

13  know?

14       (No verbal response)

15              THE COURT:  Okay.  Well, in the interests of time,

16  Mr. Samis --

17              MR. SAMIS:  We're not over.  We still have --

18              THE COURT:  Okay.  Mr. Samis, that's fine.  Let's

19  just continue.  Let's push through.

20              MR. SAMIS:  Okay.  Thank you, Your Honor.

21              Your Honor, just for the record, Chris Samis from

22  Potter Anderson & Corroon here, on behalf of the official

23  committee of unsecured creditors.

24              I just want to use this opportunity quickly to

25  respond to some comments that were made in the opening and

1    make a couple of observations on the key evidence and then

2    make a couple of closing points.

3            On the openings, with respect to the debtors'

4    opening, Mr. McMichael made a comment that they'll be real

5    eager to be a co-Plaintiff in the avoidance action that we're

6    going to involve the omnibus agreement and that we had

7    essentially conceded that there's an extremely strong

8    fraudulent transfer claim.

9            To be sure, I did have a call with Mr. McMichael

10   shortly after the committee's appointment.  That was at the

11   initial stages of our investigation and far in advance of

12   receiving the initial settlement offer from SeeCubic.

13           To be clear, at that early time, I did acknowledge

14   that we would likely be interested in joining such an action

15   if the case remained in Chapter 11 and I noted that if the

16   facts were as the debtors and BTI saw them, it could be a

17   strong position; however, our investigation was ongoing, as I

18   also indicate.

19           That, I think is a far cry from endorsing the

20   position, as strong after concluding the facts of the

21   investigation and then turning tail, as was implied.  So, I

22   want the Court to be clear on the timeline and order of

23   events of this interaction as it was interpreted.

24           With regard to the BTI opening, there was a

25   statement that we were quote, unquote, bought off.  I think

1   this is an unfair characterization.  We reached a settlement

2   with SeeCubic after completing as fulsome an investigation as

3   we could under the time allowed.  I noted that what we

4   examined and what we concluded in my opening statement, and

5   our filed statement at Docket Number 159, goes into detail.

6   I'm sure the Court has read it.  But for ease of reference,

7   we analyzed the perfection and validity of the secured claims

8   of paragraph 6 and 8 of that statement.  We analyzed our

9   opinion on the transfer of asset at paragraphs 9 and 10 of

10  that statement, and we analyzed the avoidance of the omnibus

11  agreement at paragraphs 11 through 13 of that statement of.

12          There was also a statement that all of the money

13  that was going into the trust under the proposed settlement

14  was going to pay lawyers.  That is not true.  Amount are

15  going to fund the trust.

16          While Potter Anderson would be paid for its

17  services, we would almost certainly be paid at a discount and

18  the trust is going to be adequately capitalized to fund the

19  trust through and a noticing and distribution agent to

20  accomplish what needs to be accomplished in order to get the

21  constituency value.

22          Your Honor, there was also a comment made about

23  hedging bets.  My comment in my opening on the fiduciary-out,

24  you know, our settlement agreement wasn't met to telegraph to

25  Your Honor that we were hedging.  I needed to confront the

1  argument in the opposing papers that the committee somehow

2  locked itself up and stunted its decision-making process.

3         To be clear, we engaged with all of the parties,

4  had multiple conversations at various points in time on a

5  variety of issues.  So, very simply, the committee processed

6  all the information available for it and made an informed

7  decision and then settled; however, it also knew that it

8  needed to be able to exercise its fiduciary duties in the

9  event that the (indiscernible) were denied.  So, that is

10 their reason for that provision.  SeeCubic agreed, it was a

11 negotiated provision, and we asked for it for exactly that

12 reason.

13        And then, finally, there were some comments made

14 about the extent of our comments of the parties' actions and

15 whether or not we truly supported the arguments that were

16 being made by SeeCubic, because we mostly concentrated on our

17 investigation and our findings.

18        The clear answer, the response is, Your Honor, is

19 that we joined fully the arguments of SeeCubic.  We just, for

20 the sake of judicial efficiency and this hearing, it's a

21 joinder.  It is what it is and we wanted to hit the points

22 that we thought were unique to us.

23        Your Honor, turning then, to the evidence, from

24 the testimony, it really appears that this entire dispute

25 centers on the Ultra-D technology, which is what our own

1  investigation concluded.  Mr. McCarthy's testimony, he

2  acknowledged that Ultra-D was always the flagship technology,

3  all the while perplexing to be proposing to commit more and

4  more money on very little diligence after he conceded being

5  misled by omission by his potential business partner, and

6  regardless of whether or not the Ultra-D technology is now

7  owned by the debtor, he's pledged to commit up to $500

8  million.

9          Indeed, that seems to be half the total funds that

10 he said Burlington has under management, but I believe he

11 said it was $1 billion.

12         So, two things here.  Number one, I would note

13 that the testimony that he delivered was contradicted by some

14 questioning by Mr. Stilman at his deposition.  He actually

15 stated that in the event that the Ultra-D technology was not

16 owned by extreme, that he would probably renegotiate and

17 commit less investment, which is consistent with some of the

18 arguments that you just heard.

19         I would also note, again, as was previously

20 stated, there is no real commitment here yet.  He has adduced

21 on cross he hasn't signed the necessary document committing

22 the funds yet and BTI has received no investment to date.

23 So, finally, I think just for context on Mr. McCarthy's

24 testimony, it's important to know how things came together.

25 You know, the committee went to great lengths to get

1  investment and financing documentation in this case from the

2  beginning.  It was one of the first things we asked for and I

3  emphasized to BTI that in my view, concrete evidence of this

4  investment in financing is going to be critical to convincing

5  Your Honor that this case should remain in Chapter 11.

6         In the beginning, BTI told us that it was coming

7  together in the amount of approximately $33 million and their

8  goal was to have it in hand by the time of cheering and,

9  indeed, while the primary thrust of our request to adjourn

10  initially was getting up to speed in the case, we were also

11  hopeful that the investment financing would become clearer in

12  the intervening period.

13         We continued to ask for documentation periodically

14  and we received nothing.  Indeed, the absence of information

15  on the investment and financing was an important factor that

16  the committee took into consideration in approving the

17  SeeCubic settlement.

18         You know, then, the settlement was signed up and

19  we filed our statement and then suddenly, investment

20  documentation started to pour in, going through multiple

21  iterations of ever increasing amounts and more finite terms.

22  But also, ever-extending the timeline to the receipt of the

23  funding.  So, all of this gives us some pause with regard to

24  the credibility of Mr. McCarthy's testimony.

25         You know, on the Robertson testimony, Your Honor,

1  again, he conceded that the entire case was really about

2  trying to recapture the role of (indiscernible) all for new

3  technology.  Key points, I think from his testimony.

4         The U.S. Trustee, Ms. Sierra, elicited with her

5  questioning, again, that assets entered the estate post-

6  petition, the other assets entered the estate post-petition.

7  So, the question of whether or not they're even property of

8  the estate is front and center.  But even ignoring that

9  issue, Your Honor, your own questioning about whether or not

10  BTI would just hire the employees and then monetize the other

11  assets to either the BTI level or, you know, through some

12  sort transfer agree extreme, you know, I think that

13  highlights at the end of the day, and in his response, Mr.

14  Robertson's response is that, you know, the only reason

15  they're still doing it, pursuing this angle is they really

16  want the (indiscernible) technology.

17         So, (indiscernible) with a longshot.  So, I think

18  what this all -- this fuels down to, Your Honor, is that if

19  the debtor doesn't own the Ultra-D technology at this point,

20  then the testimony suggests that the other assets may not be

21  estate property or if they are, they may be of little or no

22  value and to Your Honor's point, they might be able to be

23  monetized better outside of a bankruptcy proceeding.

24         So, despite all the protestations to the contrary,

25  I'm not really sure at this point how this isn't just a

1 collateral attack on the omnibus agreement and that seems

2 like something that should work itself out in the context of

3 the (indiscernible) proceeding.

4         So, Your Honor, you top all of that off with the

5 fact that the investment and financing are questionable and

6 possibly illusory, and you have every reason that you need to

7 dismiss this case.  And, again, even assuming that the

8 investment and financing are real, there's nothing to use it

9 for in the bankruptcy because there's no assets that needs to

10 be with monetized in this Chapter 11.

11         So, Your Honor, with all that and the additional

12 hurdles that were in front of a recovery through the

13 committee and if these cases were to stay in Chapter 11, in

14 the unlikely event that the case is not dismissed, I think

15 Your Honor sees why the committee settled and why we joined

16 the motion to dismiss.

17         Finally, Your Honor, on the settlement, itself, I

18 just want to emphasize, again, that it is to be effectuated

19 post-dismissal.  If non-estate assets contributed by SeeCubic

20 or trust for the benefit of unsecured creditors, we're not

21 asking Your Honor to take jurisdiction over the

22 administration of that trust or any claims process, thus, the

23 Jevic and *sub rosa* plan arguments that are in the opposition

24 papers are red herrings.  There's no class fitting going on

25 here in an approved settlement, a structured dismissal, a

1  plan, or otherwise.  These are non-estate assets being

2  voluntarily contributed to a (indiscernible) formed entity

3  outside of the bankruptcy by the secured parties.

4            So, Your Honor, with that, I'll close and I'm

5  happy to answer any questions.

6            THE COURT:  I don't think I have any questions at

7  this time.  Thank you, Mr. Samis.

8            MR. SAMIS:  Thank you.

9            THE COURT:  Mr. McMichael, how much time does your

10 side have planned for closings?  I would like to complete

11 this proceeding tonight, but I need to take a break and deal

12 with some personal coordination issues on my side.  So, how

13 much time do you have budgeted?

14           MR. MCMICHAEL:  We have 40 minutes left on our

15 clock and we will split that roughly evenly between the

16 debtor and BTI.

17           THE COURT:  Okay.  If you're able to --

18           MR. MCMICHAEL:  Whatever the Court wants to do.

19           THE COURT:  I want to finish tonight, but I'm

20 butting up against some personal commitments and I have no

21 time for the remainder of the week to hear you and I want to

22 decide this issue as soon as possible.  So, let's take a

23 five-minute break and we'll come back at 10 after 5:00.

24           To the extent you can shave any time off of that,

25 I would be grateful, but, of course, I'm not going to require

1   you to truncate your time or your closing presentations.  So,

2   a quick five-minute break and I'll be back on and then we'll

3   conclude the closings.

4               Thank you, all.

5         (Recess taken at 5:06 p.m.)

6         (Proceedings resumed at 5:11 p.m.)

7               THE COURT:  Okay.  Mr. McMichael, this is what --

8   for the record, this is Judge Owens.  We're back on the

9   record.  Thank you for that break so I could arrange who is

10  going to be transport for my daughter to her ballet class

11  tonight, and I was able to do that, so I am now able to

12  concentrate 100 percent on the closing arguments.  So, with

13  that, let me turn the podium over to you, Mr. McMichael.

14              MR. MCMICHAEL:  Thank you, Your Honor.  Larry

15  McMichael for the debtor.  And I certainly understand the

16  Court's dilemmas.  My son, who is now 32, is a professional

17  ballet dancer.  He did not get his skills from his father.

18              THE COURT:  You know what, then after the

19  conclusion of these proceedings, if and when that happens,

20  we'll have to discuss the -- you know, how nice it is to have

21  a ballet dancer in the family.

22              MR. MCMICHAEL:  I know a lot about it.

23              Your Honor, this case -- I want to step back a

24  little bit because this case involves a financially

25  distressed debtor that has attractive new capital and that

1   has a number of reorganization options for the benefit of its

2   creditors.  This is a motion to dismiss because some parties

3   really don't want the case going forward for their own

4   economic reasons, and I fully understand that and, you know,

5   there's nothing wrong with that.  They are entitled to take

6   their shot, but it's a motion to dismiss and the standard for

7   dismissal is very high.  I mean, yes, we have a burden to

8   show good faith and I'm going to do that, but all -- like any

9   motion to dismiss, all doubts are resolved in favor of the

10  debtor and allowing the case to proceed.

11          Now, let me start with a clear stake in the

12  ground, an undisputed fact -- and there aren't many in this

13  case, but there is one undisputed fact, and that is that the

14  debtor was at the time of the petition in financial distress.

15  So let's start with what everybody likes to talk about and

16  that is the good work that Judge Laster did prepetition.

17  What Judge Laster said about the debtor was, quote, "Stream

18  is insolvent and failing," close quote.  That's in his

19  opinion, page 48, line 4.

20          Our schedules show $170 million of debt -- and of

21  course that depends on the forgiveness occurs, it may be

22  less, maybe it's only $20 million of debt, it's still a lot

23  of debt -- and the debtor is unable to pay that debt absent a

24  reorganization.  The moving parties are correct, the debtor

25  has no cash.  It has the ability to borrow money from a DIP

1   lender, but at the moment it has no cash.  So it could not be

2   clearer that the debtor is in financial distress.

3         Now, we have to stop there for a second.  What is

4   the consequence of that?  Mr. Larkin thinks I don't

5   understand the law and particularly Stream TV.  I know

6   exactly what Stream TV is.  And he's right that the existence

7   of this undisputed fact does not establish good faith in and

8   of itself, but it is one of the major factors.

9         If you look at every single decision decided not

10  only in the Third Circuit, but in the District of Delaware,

11  on dismissals, they were cases where the debtor was not in

12  financial distress.  So we're not that.  Okay?  There is no

13  case that I have found where a clearly financially distressed

14  debtor seeking bankruptcy relief was dismissed.

15        Now, let's look at what the cases actually say

16  about that because there is helpful analysis in all of these

17  cases that will give the Court some guidance as to what to do

18  here, starting with SGL Carbon, 1999.  Okay?  "The petition"

19  -- quote, this is a quote -- "The petition is not filed in

20  good faith unless it serves a valid reorganization purpose."

21        Why did the Third Circuit find there was no valid

22  reorganization purpose in the SGL case?  It tells you that,

23  quote, "SGL Carbon's financial disclosure documents give no

24  indication the company needs to reorganize."  That's the SGL

25  opinion at page 166.

1        The Third Circuit contrasted that situation with

2   genuinely distressed debtors like Stream TV in this case.

3   What the Third Circuit said was, quote, "When financially

4   troubled petitioners seek a chance to remain in business, the

5   exercise of bankruptcy powers is justified."  That's at the

6   opinion at 165.

7        What's the takeaway?  The takeaway here is when

8   you have a financially healthy company that goes into

9   bankruptcy just to obtain the automatic stay, which is

10   exactly what happened with SGL Carbon, that's gaining a

11   tactical litigation advantage.  I'll get back to that in a

12   second, but that is not this case.  This case involves a

13   financially distressed debtor and nobody contests that, there

14   is no dispute about that.

15        Integrated Telecom, 2004, five years later, the

16   Third Circuit addresses the same situation, what happens when

17   a financially health debtor files to take advantage of the

18   limitation on landlords' claims under Section 502(b)(6)?

19   What do they say?  Because Integrated was not in financial

20   distress, its bankruptcy petition was not filed in good

21   faith.  That's the conclusion, okay?  That's at page 129 of

22   that opinion.

23        When the debtor is in financial distress, as in

24   this case, what the Third Circuit said is, quote, "We believe

25   it to be a truism that it is not bad faith to seek to avail

1  one's self of a particular protection in the bankruptcy code;

2  Congress enacted such protections with the expectation that

3  they would be used."

4          Fast forward, two years ago, Judge Silverstein,

5  your colleague, confronted another similar situation in the

6  Rent-A-Wreck case.  Once again, debtors were not in financial

7  distress, unlike the case here.  What did she have to say?

8  Quote, "A valid bankruptcy assumes a debtor in financial

9  distress."

10          So, the same point, a healthy company filing for

11  bankruptcy to gain a tactical advantage by using some aspect

12  of the bankruptcy code is not a legitimate bankruptcy.  None

13  of those cases support dismissal here because this is a

14  financially distressed debtor.

15          Now, essentially, Mr. Larkin is not wrong,

16  financial distress is not equal to good faith.  The Third

17  Circuit has articulated the test and I'll address both of

18  them.  Here's what the Third Circuit said.  Quote -- these

19  are the tests that the Court is to apply when dismissing --

20  quote, "Our cases have focused on two inquiries that are

21  particularly relevant to the question of good faith.  One,

22  whether the petition serves a valid bankruptcy purpose, for

23  example by preserving a going concern or maximizing the value

24  of the debtor's estate; and, two, whether the petition is

25  filed merely" -- merely -- "to obtain a tactical litigation

1  advantage."  Okay?

2         That language was said by the Third Circuit not

3  once, but twice, SGL Carbon at 165, repeated in Integrated

4  Telecom at page 199 of the Third Circuit opinion there.  That

5  is the law in the Third Circuit.  Okay?  We have to look at

6  those two things.

7         Now, what evidence is before you on them?  This

8  case -- you know, both the SeeCubic and the U.S. Trustee's

9  Office has said we're trying to undo the omnibus agreement.

10  Well, to some degree, they're right.  You know, I can't deny

11  that.  To some degree they're right because it's a fraudulent

12  transfer, and I'll get into that in a minute, but that's not

13  really what is at issue here.  The question is not what we're

14  trying to do; the question is whether the bankruptcy code

15  allows a debtor to bring assets back into the estate under

16  certain circumstances.  The answer is it does, there are a

17  number of provisions that allow it.

18         The relevant provisions here are Sections 548 and

19  Section 544 where the debtor contests the validity of

20  transfers not under state law.  It has nothing to do with

21  anything that Judge Laster decided, this is under federal

22  bankruptcy law.  This Court has exclusively jurisdiction to

23  deal with that and this Court has an obligation to exercise

24  that jurisdiction, as all federal courts do.  This is not a

25  Judge Laster issue.  An agreement can be perfectly valid

1  under state law, creditors' rights are perfectly enforceable

2  under state law, that doesn't mean that they are enforceable

3  in a bankruptcy.  They frequently are not because the

4  bankruptcy law is different from state law, that's why we

5  have a bankruptcy code and that's why it preempts state law.

6            So what was this petition filed to do?  Well, the

7  first thing it was filed to do was to stop the stripping of

8  assets out of the debtor because, even as Mr. Stastney has

9  now clearly testified, the omnibus agreement has not been

10  fully implemented.  The debtor has not delivered everything

11  it was obligated to deliver, SeeCubic has not done what it's

12  obligated to do; we're right in the middle of it.  Okay?  If

13  the case survives today, Your Honor will hear more about that

14  when you hear the motion to reject the omnibus agreement,

15  which is a right the debtor has in Chapter 11 where the

16  contract is executory, as this one plainly is.

17            But filing a bankruptcy petition to stop a secured

18  creditor from stripping out assets of the debtor is a very

19  typical reason for bankruptcies.  If that were a ground for

20  dismissing a case because we're standing in the way of a

21  secured creditor's exercise of remedies, there would be very

22  few Chapter 11 debtors that would survive that test.  That's

23  not what the Third Circuit said.  The Third Circuit says, is

24  there a valid bankruptcy purpose.  The way you answer that

25  question is by looking at what the bankruptcy code allows the

1  debtor to do when it's in financial distress, as we clearly

2  are, and whether we are planning to do that and we are.

3       So that is a valid bankruptcy purpose, stopping

4  the stripping of assets of the debtor through the use of the

5  automatic stay, recovering assets that have already been

6  taken.  The Court doesn't need to prejudge that.  The Court

7  doesn't need to decide today whether our 548 claim is a good

8  claim or a bad claim, it just needs to know that that's what

9  we're trying to do and that is a valid bankruptcy purpose

10 when we are plainly insolvent.  We're trying to bring assets

11 back into the estate for the benefit of creditors.  And,

12 lastly, we're trying to bring in new capital.

13       There's no requirement anywhere, in the Third

14 Circuit or anywhere else, that the debtor's bankruptcy case

15 has to be prefunded at the time it's filed.  In fact, this

16 debtor is way ahead of the game.  Most debtors I represent

17 don't have financing lined up until they're well into a case.

18 This debtor is well ahead of the game.  Is the financing a

19 hundred percent binding?  I don't know.  You know, it looks

20 like it is, but certainly Mr. McCarthy said he was making

21 funds available.  But whether it's 500 million or a hundred

22 million or 50 million, we can reorganize on $50 million,

23 that's plenty of money.  We can reorganize at a number of

24 those levels and the Court doesn't need to get too far into

25 that, all you have to understand is that the debtor filed the

1   petition in order to attract new capital and it has.  That is

2   a valid bankruptcy purpose.

3           So these are all valid bankruptcy purposes

4   intended to preserve both the going concern of Stream and to

5   maximize the value of its estate to the benefit of creditors.

6   They don't serve any basis -- there is no basis, therefore,

7   of dismissal of the case.

8           Now, was the case filed merely to obtain a

9   tactical litigation advantage?  Let's focus on the term

10  "merely" for a second because, as we all know and as I

11  mentioned in my opening, every bankruptcy case involves an

12  automatic stay; it brings pending state court litigation to a

13  halt, it prevents the enforcement of judgments against the

14  debtor.  That happens in every single case.  Congress created

15  that automatic stay for a reason, it's supposed to be used,

16  and the fact that it is being used is not in any way

17  suggesting that there is any bad faith.

18          Bad faith arises when you have a fact pattern like

19  SGL Carbon where you have a debtor in no need of

20  reorganization, perfectly healthy, that is filing for the

21  exclusive purpose of obtaining the automatic stay.  Because

22  it is undisputed that the debtor is insolvent and in

23  financial distress in this case, that's not the situation at

24  all.  Plus, you know -- I wasn't born yesterday, as you can

25  probably tell -- the concept that we would file to obtain a

1   litigation advantage after we lose is kind of ridiculous.  If

2   I wanted to file a case to obtain an advantage I'd do what

3   SGL Carbon did, I'd file at the outset of the case where you

4   have a chance to derail it right at the beginning; not

5   litigate it, lose it, then file, that's no tactical

6   advantage, they already won.  Whether it's a preliminary

7   judgment or a final judgment, who cares?  It's not a big deal

8   from the standpoint of the debtor.  We're stuck with that

9   result as a matter of state law, but that has nothing to do

10  with our federal bankruptcy rights, which are preempted.

11          The case easily passes both Third Circuit tests.

12  There are valid reorganizational purposes, the Court doesn't

13  need to decide whether they'll work or not; sometimes they

14  do, sometimes they don't, but there are valid purposes to the

15  filing.  There is financing available and there's no reason

16  that the Court should dismiss a case in that posture just

17  because all the other people would rather not have to deal

18  with it.  That's not a test, that's not one of the two

19  factors the Third Circuit has laid out.

20          Now, I want to go into a little bit of detail just

21  so the Court understands precisely where we are on the

22  omnibus agreement because it's not complicated from the

23  debtor's standpoint, looking at it through a bankruptcy lens,

24  not a state court lens.

25          I'd like -- Isaac is the person who is in control

1 of the documents -- Isaac, let's start with Section 1.1(a),

2 okay?

3          This is Docket 147, it's attached to the Stastney

4 affidavit, Your Honor -- or the declaration -- I'm not sure

5 if you want to just look at the screen or do you want to get

6 the paper in front of you.  But 1.1(a) says basically that

7 all right, title, and interest of the company -- that's my

8 client, Stream -- you know, in all of its property and assets

9 of every kind, every nature, is transferred to Newco.  I'm

10 obviously short-circuiting the exact language, but that's the

11 essential finding, that's the essential provision of the

12 omnibus agreement.  All of the assets as of the date of the

13 omnibus, okay, of May 6th, all of the assets go to Newco, all

14 right?

15          What does Newco do?  Let's go to 1.1(b).

16          Okay, Newco assumes some debt.  You have to look

17 at the schedule to see what debt it assumes.  Let's look at

18 schedule 1.1(b).  It assumes the secure debt -- okay, there

19 are the first two items -- it assumes about a little less

20 than two and a half million dollars of unsecured debt, one is

21 the Phillips license, which is not really due and payable

22 yet, and two is the rest of these people are all investors.

23 In other words, they're not trade creditors, okay?

24          So right now, on the face of the omnibus

25 agreement, all of the assets are being transferred and

1  somewhere between 17 and $20 million of debt which is on our

2  schedules is being left behind.  Okay?

3           Now, the other side could say, well, that's a

4  foreclosure, that's what happens in foreclosures.  Okay, but

5  here's what doesn't happen in foreclosures.  Let's go to (d).

6  Each holder of the class A common stock, except for the

7  holders that Mr. Stastney doesn't like, i.e. the Rajans, each

8  holder exchanges their respective shares of class A common

9  stock of the company for an identical number of shares in

10 Newco for no cost, for no cost.  Okay.

11          And what did Mr. Stastney tell you a few minutes

12 ago?  He told you that SeeCubic is 90 percent owned by the

13 equity holders of Stream.

14          Now, put those three things together.  All the

15 assets go to the equity and to the secured creditors and

16 bypass the unsecured creditors.  Mr. Stastney made it clear

17 he had no intention of paying unsecured creditors.  He said,

18 well, I'll give them a million shares of my stock, whatever

19 that's worth, if anything, but they're owed $17 million.  I

20 would submit that, on its face, this is a fraudulent

21 transfer, and that's before considering the value of the

22 transferred assets, which also would render it a fraudulent

23 transfer.

24          Now, as I said, the Court doesn't need to decide

25 this case.  This is a case that will be brought the regular

1  way through an adversary proceeding, it will be fully

2  litigated and decided, there's no reason to prejudge it, but

3  attacking the transaction based on this theory is a valid

4  bankruptcy purpose.  And not only is it a valid bankruptcy

5  purpose, Stream TV, as a fiduciary for its unsecured

6  creditors, had an obligation to do something and not just sit

7  around and let all the assets disappear leaving the debt

8  behind.  That's what the transaction does.

9         Now, it's to me shocking that the U.S. Trustee

10 seems to have no problem with that at all.  You know, it's

11 perfectly fine for the equity holders to take the assets and

12 make a deal with the secured creditors, leaving the unsecured

13 creditors behind.  But the fact is, Stream, confronted with

14 this situation, has a fiduciary obligation to do something

15 and what companies do when they're under this type of

16 distress, under this type of pressure, is they file for

17 Chapter 11, they seek protection of a higher law, of the

18 bankruptcy law, which is preemptive, which takes everybody's

19 interests into account; not just the secured creditors'

20 interests, not just the equity, but it takes the unsecured

21 creditors' interests into account.

22         A lot has been made of the fact that Stream has no

23 assets.  Well, that's simply not true, and you know that just

24 from listening to Mr. Stastney's testimony.  He said that

25 Stream hasn't transferred all the assets it's supposed to

1  transfer yet.  So those assets are still in Stream and, as

2  long as Stream is in bankruptcy, they're protected by the

3  automatic stay, they're not going anywhere.

4          Stream, in addition to those assets, has the

5  avoidance claims that I've just described both under 548 and

6  544.  Stream owns the equipment in China.  And new contracts

7  coming into Stream, I think they present a nice opportunity

8  for Stream even if the fraudulent transfer case is

9  unsuccessful -- I don't think it will be unsuccessful, but

10  even if it is, there are opportunities to reorganize around

11  new business opportunities not involved with the Ultra-D

12  technology.  Mr. McCarthy says he'd continue to invest in

13  those things -- and, right, probably not as much, but he

14  would continue to invest, and that's enough for us to

15  reorganize, provide a cash stream to pay the 20 million of

16  creditors that are still in this estate, and we want to pay

17  them in full.  What's wrong with that?  Why is that a bad

18  result, why is that a bad goal for a debtor?  It's not and

19  the debtor should be allowed to pursue that goal.

20          So what's on the screen now is just a couple of

21  options for reorganizing.  Stream does have a contract, I've

22  looked at it.  It requires Court approval.  We have not

23  sought Court approval because the Court has said it doesn't

24  want to deal with anything until it gets past the motion to

25  dismiss.  By the way, that's also already having sought Court

1 approval for a CRO, which we have lined, but those things --

2 assuming the motion is denied, those things will all start

3 happening very quickly.  But we have the stitching in

4 Thailand technologies, Mr. Robertson talked about them, Mr.

5 Rajan talked about them.  You know, there are criticisms

6 that, oh, it's all hypothetical, it might not happen.  You

7 know, maybe it won't, maybe it will, but it doesn't matter.

8 It is an option, it is a business that we can pursue that we

9 are pursuing, and that is a legitimate bankruptcy goal.  It's

10 an operation that we want to preserve at Stream.

11         Why can't VTI do it itself?  VTI will address

12 that, I'm not going to preempt that, but VTI will address

13 very clearly why it doesn't want to do that.  But one thing I

14 can tell the Court is that Stream wants to pay the creditors

15 and Stream can't pay the creditors without revenue, unless we

16 get some of the assets back, which we'll try to do first.

17 But we can't pay creditors without revenue and we need some

18 revenue opportunities and these are revenue opportunities

19 that we want to put in Stream for the purpose of paying

20 creditors.  Again, what's wrong with that?  That's what we're

21 supposed to be doing.

22         Multi-view modified light, same thing, and that's

23 dependent on the Phillips license.  The Phillips license is

24 not exclusive, as Mr. Stastney explained, so the Phillips

25 license is available.  We've arranged for a replacement

1  Phillips license through another technology company that's

2  right out here.  And we can also use the bonding equipment

3  that we own in a Chapter 11 to make materials for others in

4  just a simple -- you know, a simple fee-for-service operation

5  to generate revenue.  There are a number of business

6  opportunities out there for Stream, none of which will happen

7  if the case is dismissed.  And the creditors, if the case is

8  dismissed, will get their paltry ten cents on the dollar from

9  SeeCubic that they've agreed to, but that's -- by the way,

10  they being two creditors out of a hundred.  They couldn't

11  even get the majority of the committee to agree to it.  Okay?

12  You heard from a dissenting creditor yesterday -- I don't

13  know who the guy was, but he showed up, he seemed pretty

14  unhappy.

15        So, you know, that is -- that is what we're here

16  to do.  We are here to try to reorganize a company, we have

17  some options, we have some businesses, we have financing, and

18  we have debt that we want to pay.  We also have customer

19  relationships that are out there.

20        Now, let me -- because time is short, I'm going to

21  move quickly through the rest of this.  Let me just -- you

22  can take this down, Isaac.  We're done with these slides.

23  Thank you.

24        Let me talk about some relevant facts.  And,

25  unfortunately, a lot of the last two days was spent, frankly,

1  by both sides eliciting irrelevant facts.  But who said what

2  to whom about business dealings that were evolving at the

3  time, not relevant.  It's not part of a Third Circuit test;

4  it has nothing to do with a valid bankruptcy purpose, it has

5  nothing to do with whether we're filing just to gain a

6  tactical advantage.  Okay?  So, you know, whatever Mr. Rajan

7  did or didn't say to Mr. McCarthy, all I can tell you is that

8  by Monday Mr. McCarthy was fully informed and he increased

9  his commitment.  So that's really the relevant part.  The

10  relevant part is there is potential capital to be brought in.

11              Conflicts of interest.  Every debtor I've

12  represented has conflicts of interest, mostly with insiders

13  who are still in control of the debtors.  Bankruptcy has lots

14  of different ways of dealing with conflicts, you know,

15  through CROs, through court approvals of transactions outside

16  the ordinary course.  There is no basis to dismiss a case

17  because there are conflicts of interest; there are plenty of

18  ways to deal with that.

19              So what we have here, as I started with, a

20  financially distressed debtor in need of bankruptcy

21  protection, with options and with good motives to recover

22  assets to benefit all creditors, this shouldn't be a

23  difficult case.  The petition was plainly filed in good faith

24  under applicable standards and for valid bankruptcy purposes.

25  All the dismissing of this case will do is deprive the debtor

1   of its right to try to reorganize, it will deprive the debtor

2   of the business opportunities that would allow it to generate

3   revenue to pay the debt that it is still obligated to pay,

4   and that is not consistent with what we're all here to do.

5          Thank you, Your Honor.

6          THE COURT:  Thank you, Mr. McMichael.

7          Okay, I have no questions.  I'll turn the podium

8   over to Mr. Stemerman.

9          MR. STEMERMAN:  Thank you, Your Honor.  And I'll

10  be mindful of Your Honor's time as well here, but the

11  determination of whether the debtor's bankruptcy was filed in

12  good faith is based on the totality of the circumstances.

13  And even if a Chapter 11 debtor is not operating and has no

14  employees, its bankruptcy petition may still be filed in good

15  faith if it is designed to maximize the value of its assets

16  through creditors and equity security interests.  That's what

17  the Third Circuit said in In re American Capital Equipment.

18          Now, as Your Honor is well aware, a finding that a

19  bankruptcy petition was not filed in good faith should not be

20  lightly inferred.  And, as Judge Fox for the U.S. Bankruptcy

21  Court for the Eastern District of Pennsylvania stated in In

22  re Canon Cellular Investments, bankruptcy petitions can be

23  filed to prevent an asset loss to a secured creditor and the

24  Chapter 11 petition filed will be in good faith when

25  reorganization is possible.

1         As Mr. McMichael ably explained, the debtor has

2   met its burden of proof that the bankruptcy was filed in good

3   faith and that reorganization is possible.  As Mr. McMichael

4   outlined, the debtor has assets, it has assets outside of

5   those subject to the omnibus agreement that can enable it to

6   maximize its value and reorganize.  It has contracts,

7   including the Phillips contract, which is Debtor's Exhibit

8   19, it still has that contract.  It has NOLs, it has

9   significant good will.  And as the Third Circuit noted in

10  Signal 4 (ph) and Integrated Telecom, preserving good will,

11  even in the context of liquidation, is a valid reorganization

12  purpose.  And although the debtor ran out of funds first

13  because of the status quo order in the chancery court, then

14  with the preliminary injunction order in the chancery court,

15  and now with the delay in approving the DIP financing in this

16  bankruptcy case, it has continued to utilize its good will to

17  put itself in a position to reorganize and to move forward as

18  a going concern.

19        VTI's proposed capital infusion increases the

20  value of the debtor's estate and is going to allow the debtor

21  to be able to successfully reorganize.  You have heard Mr.

22  McCarthy testify that through Burlington a company with $1

23  billion of assets that are under management he is committed

24  to investing in VTI.

25        And, Isaac, if you could pull up VTI Exhibit 153?

1   If you could go to Section 6, please, on page 2?

2          Your Honor can see that that is a binding

3   commitment.  You heard some argument today that there is no

4   binding commitment.  That financing is binding.

5          Thanks, Isaac.  You can take that down.

6          Section 6 says "the validity of the agreement is

7   not subject to the execution of the first closing, but

8   binding and irrevocable upon execution of this agreement."

9          The agreement has been executed, Your Honor,

10  there's no dispute about that, it is a binding commitment.

11         THE COURT:  Okay.  So where can -- what is the

12  provision VTI can look to, to demand payment?

13         MR. STEMERMAN:  Well, Your Honor, this is an

14  enforceable contract.

15         THE COURT:  Right.  So what's the trigger?  What's

16  the condition of funding, where is that?  Just point me to

17  that so I can review it after the close of the hearing today.

18         MR. STEMERMAN:  I believe -- I believe it's in one

19  of the first paragraphs.  Right?  So if you take a look in

20  paragraph 2, for example, you've got the investment amount

21  and then you've got the -- in paragraph 3 that the investment

22  amount is split into three tranches with the first $60

23  million being required to come in on or before May 24th of

24  this year.  Now, there is a seven-day cure period, which is

25  at the bottom of the paragraph, but that's where they would

1  look to enforce that agreement.

2          THE COURT:  Okay.  Thank you.

3          MR. STEMERMAN:  You're welcome.

4          So, Your Honor, Burlington has committed to fund,

5  you know, and invest in VTI, and VTI in turn is committed to

6  funding a DIP and to being a plan sponsor with the goal of a

7  full recovery for all of the debtor's creditors, but it's not

8  going to be a blank check.  There is going to be a DIP

9  budget, there's going to be reporting requirements, there's

10 going to be milestones, there's going to be a CRO of the

11 debtor; there's going to be a process put in place with

12 funding to allow the debtor to restructure, reorganize, and

13 ultimately emerge from bankruptcy with exit financing that

14 will provide for a full recovery of the debtor's creditors

15 and allow the debtor to move forward with proper

16 capitalization.

17          And I want to repeat part of that because it bears

18 repeating -- a full recovery for the debtor's creditors.  And

19 that's true whether the Ultra-D assets stay with Stream or go

20 to SeeCubic.  And why is that?  It's because, if the debtor's

21 Ultra-D assets are transferred to SeeCubic, then the SLS

22 debt, which is at most approximately $11.5 million, will hop

23 that and certain other debt set forth in Schedule 1.1(b) gets

24 extinguished from Stream.  What's left is a general unsecured

25 body that is owed less than $20 million.

1          If the Ultra-D assets stay with Stream or return

2   to Stream, then the secured debt must also be paid.  But you

3   heard Mr. McCarthy's testimony, Burlington is more than

4   willing to fund those amounts through VTI, which Mr. McCarthy

5   will control as his equity investments in the company.

6          Under either scenario, it is the far greater

7   result for the debtor's general unsecured creditors than what

8   they would get if this case is dismissed.

9          Now, what's standing in the way of this, Your

10  Honor?  It's SeeCubic and SLS; more specifically, Shad

11  Stastney.  We haven't heard from Hawk (ph) directly, so we do

12  not know what Hawk's position is, but we do know that Mr.

13  Stastney does not want SLS to be paid in full, even though he

14  testified that he does not believe he would be made whole --

15  or SLS would be made whole by the omnibus agreement.

16         So why else would Mr. Stastney refuse Mr. McCarthy

17  and Burlington's money and prevent VTI from buying out SLS's

18  position in Stream?  The only reason is if Mr. Stastney

19  believes that Stream's assets are subject to the -- that

20  transferred assets subject to the omnibus are worth more than

21  the secured debt.

22         Mr. Stastney at his deposition testified that the

23  assets were worth approximately $80 million.  That's more

24  than ten times the amount of principal that's owed on the SLS

25  notes.  Mr. Stastney's presentation to investors, which is at

1  VTI Exhibit 107, as shown today, listed the value of the

2  transferred assets as over $330 million, that's more than

3  twice the totality of Stream's secured debt, assuming that

4  none of it is subject to conversion or reduction in any other

5  way.

6            So let's assume that Mr. Stastney in that

7  presentation overvalued the assets by twice as much as what

8  they're actually worth, that's still more than the secured

9  debt SLS and See -- of SLS and SeeCubic that they claim is

10  owed.

11            Now, Mr. Stastney has a history of being sued and

12  settling cases.  Mr. Stastney was actively involved in

13  discouraging investors from investing in Stream while he was

14  CEO and a member of Stream's board.  At the same time that he

15  was doing this, he was planning a takeover of Stream's

16  business.  Mr. Stastney stated his intent to scare as much as

17  possible Stream vendor JoveAI, which is at VTI Exhibit 65.

18            We saw today that Mr. Stastney falsely claimed

19  ownership of Stream's assets as early as March 12th, 2020.

20  That's before the omnibus agreement was signed.  He claimed

21  ownership of the Dutch subsidiaries through is law firm on

22  August 6th.  He pointed to Vistra for this proposition that

23  SeeCubic was the ultimate owner of the Dutch entities.  But

24  Vistra is a debt entity itself, it is not a law firm, and Ms.

25  Rumora, VTI's expert, addressed this particular issue in

1  paragraph 9 of her expert report.

2       But we -- as we also heard Mr. Stastney testify,

3  there's a difference between an entitlement to acquired

4  property and the actual transfer of that property, and, as

5  we've heard multiple times, not all of that property has been

6  transferred.  Mr. Stastney testified that any asset Stream

7  acquired even post the May execution of the omnibus agreement

8  between the assets of SeeCubic until the bankruptcy was

9  filed.  Your Honor, that to me sounds like a pretty valid

10 reason to file for bankruptcy even outside of any litigation

11 in the chancery court.

12      In fact, SeeCubic continued to pursue acquisition

13 of Stream's subsidiaries even after the bankruptcy was filed.

14 Post-petition, we heard that they are still negotiating a

15 transfer of the debtor's license with Phillips.

16      Now, I want to turn to a couple things too that

17 have been said about VTI and Mr. Rajan, for example.  You

18 heard Mr. Larkin in his opening call VTI the alter ego of

19 Stream.  The term alter ego has a very real, real meaning.

20 There is no evidence that VTI is the alter ego of Stream

21 under that definition, but even if we're using it as some

22 sort of colloquialism, VTI and Stream are not the same.  VTI

23 has a six-member board, only one of whom, Mr. Rajan, is

24 currently connected to Stream, and Mr. McCarthy's investment

25 will give Mr. McCarthy and Burlington a controlling interest

1  in VTI.

2  You also heard testimony that Tracey Reese (ph),

3  who is currently a director in VTI, will be taking over as

4  president of VTI soon.

5  Now, I wanted to turn to a couple things that were

6  said about Mr. Rajan too and one of them in particular, Your

7  Honor, I can't let go.  We've now heard several times -- not

8  from any witness -- that Mr. Rajan said something about

9  having contracts with all the airports in the United States.

10  None of the witnesses testified that that is what was said

11  and in fact, Your Honor, you'll see nothing in the record at

12  all that it was ever said, and the reason why is because it

13  was never said.  For whatever reason, they're just making

14  that up, I don't know why.

15  You've also heard that the bankruptcy was filed

16  just two days before the Vice Chancellor Laster was set to

17  enter summary judgment in the chancery court matter, but that

18  is purely speculation.  In point of fact, the petition, the

19  bankruptcy petition, was filed two days prior to SeeCubic's

20  deadline to file its reply brief, but there's no indication

21  that -- you know, as to when the Court is going to make its

22  ruling.  And, as Mr. McMichael also stated, you know, the

23  time to file for a tactical litigation advantage was far

24  before a summary judgment briefing.

25  And as was stated -- not here on the hearing for

1  the motion to dismiss, but actually at a couple hearings back

2  -- part of the delay in the debtor filing for bankruptcy was

3  the debtor had -- you know, the debtor did not have any cash,

4  it needed to obtain funding in order to retain Mr.

5  McMichael's firm.  And so that was the impetus.  Once there

6  was enough cash, they filed.

7            Now turning to the committee settlement, Your

8  Honor.  The committee settlement actually proves that the

9  bankruptcy was filed in good faith and for a valid

10  reorganization purpose, and to maximize the value of the

11  estate.  But the committee, in exchange for an immediate

12  payment to its proposed counsel and the promise of a payment

13  to creditors in about three years, is contractually obligated

14  to support dismissal.  It's not even that they can't simply

15  just not oppose dismissal, pursuant to Section 3 of the

16  settlement agreement, the committee must actively support it

17  and they cannot take any action that may prevent dismissal.

18  That's likely why the committee did not ask a single question

19  of the debtor's or VTI's witnesses, because any answer they

20  elicited that would support a finding of good faith would

21  likely violate that settlement agreement.

22            THE COURT:  Mr. Stemerman, let me just interrupt.

23  You have five minutes and then I need to conclude.  Okay?

24            MR. STEMERMAN:  That's fine, Your Honor.  I am

25  almost done.

1          THE COURT:  Okay.

2          MR. STEMERMAN:  But the settlement agreement, Your

3  Honor, would not be possible, there would be no potential

4  recovery to Stream's unsecured creditors that's set forth in

5  the settlement agreement without the bankruptcy.

6          Isaac, if you could please pull up slide 7 of the

7  PowerPoint?

8          Your Honor, I'm almost done, but I wanted to

9  answer the question of why it is that VTI supports Stream's

10 reorganization.  Why doesn't VTI merely go it alone, right?

11 And the reason is simple, Your Honor.  Stream has been in

12 existence for over a decade.  It offers something that money

13 just simply can't buy and that's the good will that it has.

14 It has a rich history of developing the world's best graphic

15 3-D technology.  It's got brand recognition.  When somebody

16 is looking for something related to 3-D -- you know, glasses,

17 3-D technology, they're not looking to VTI -- VTI was

18 recently formed -- they've heard of Stream, they know about

19 it.

20          And, you know, it comes with as well the know-how

21 of the other employees that have been furloughed by Stream.

22 There's just -- there's something familiar about it that is

23 important and something that VTI feels brings value.

24 Importantly, VTI supports Stream's reorganization plan.  They

25 want to create a reserve to satisfy the unsecured creditors,

1  pay the unsecured creditors, and fund operations to exit from

2  bankruptcy.

3          And why is it that this bankruptcy is important,

4  Your Honor?  And, Isaac, you can take that down.  It's to

5  give the debtor some breathing room.  The debtor -- although

6  this case was filed at the end of February, the debtor has

7  not actually had an opportunity for breathing room.  It's

8  been fighting the motion to dismiss and all the things that

9  come along with it essentially since the case was filed.  But

10  the debtor has already obtained some of the benefits that

11  filing for bankruptcy gives debtors.  And Mr. McMichael

12  touched on it as well.  It has allowed funding to come in.

13  The debtors now, having filed and having received these

14  funds, should be given an -- or at least having the funds

15  become available -- should be given the opportunity to

16  reorganize, it should be given the opportunity to use the

17  tools of bankruptcy to maximize the value of the estate.

18          And I just wanted to very briefly touch on one

19  other thing.  If assets of the debtor have not been properly

20  transferred, the debtor should be allowed an opportunity to

21  explore that in bankruptcy.  SeeCubic argues that

22  TechnoVative shares, for example, have been constructively

23  transferred.  I would note that the stock certificate, which

24  is at VTI Exhibit 92, contains a restriction on the transfer,

25  first and foremost.  But any time, Your Honor, I hear

1  something has been constructively transferred, that suggests

2  to me that the transfer is not obvious and there is some

3  factual and legal inquiry that needs to be made.  Today's

4  hearing is not the time for that; it's something that can be

5  more fully explored as the case moves forward.  But if as VTI

6  and the debtor believe that it has not been validly

7  transferred, that is a potential asset of the debtor's

8  estate.

9       So the debtor just simply, Your Honor, should be

10  allowed the chance to provide a recovery, a chance that would

11  not be possible outside of the bankruptcy.

12       Thank you.

13       THE COURT:  Thank you, Mr. Stemerman.  I

14  appreciate you being able to truncate your presentation to

15  accommodate my personal commitments.

16       Before we go, let's talk about exhibits.  You can

17  handle it -- you can either move them now or you can file

18  something.  But I think I have a good running list, but I

19  think I missed a few.

20       So, Mr. Larkin, why don't I yield the podium to

21  you?

22       MR. LARKIN:  All right, thank you, Your Honor, and

23  then you again for your time today and allowing us to finish

24  today.

25       The admitted exhibits that I have, at least from

1  our side, I have SeeCubic TX-289, 181, 44, 268, 179, 261,

2  197, 193, 291, 293, 298, 159, 286, 287, 288.

3  　　　　　THE COURT:  Okay.  Mr. Weis, do you have any

4  exhibits that you'd like to move?

5  　　　　　MR. WEIS:  Yes, Your Honor.  This would be -- can

6  you hear me?  I'm sorry.

7  　　　　　THE COURT:  I can, yes.  Thank you.

8  　　　　　MR. WEIS:  Can you hear me?  Your Honor, the

9  Stream Exhibits 1, 2, 3, 5, 6, 9, 12A and 12B, 13, 14, 15,

10  18, 19, 21C, as in Charlie, 22, 24, and we also referenced

11  VTI 159.

12  　　　　　THE COURT:  Okay.  Mr. Stemerman?

13  　　　　　MR. STEMERMAN:  Your Honor, I don't know if

14  somebody on my side has a list of exhibits that we

15  specifically mentioned over these last two days.  I was under

16  the impression that the parties had exchanged witness -- or

17  exchanged exhibit lists and had gone through exhibits which

18  the parties either had objections to or did not have

19  objections to, and I was under the impression that, at least

20  for the exhibits where no objection had been made, that those

21  exhibits would be -- you know, would be moved into evidence

22  just simply because there was no objection to them.

23  　　　　　THE COURT:  Well, I have hundreds --

24  　　　　　MR. STEMERMAN:  But we can certainly --

25  　　　　　THE COURT:  -- of exhibits here, so -- I have

1  hundreds of exhibits.

2          MR. STEMERMAN:  I know, Your Honor.

3          THE COURT:  So, if they're not referenced during

4  the trial, what do you want me to do with them?

5          MR. STEMERMAN:  Your Honor, we can put together a

6  list for you for sure.

7          THE COURT:  I think that would be best.

8          MR. LARKIN:  Your Honor, we're happy to meet and

9  confer with counsel for VTI and the debtors, but I agree with

10  Your Honor's position.  I mean, the exhibits I just read were

11  exhibits that were actually used and came in through

12  witnesses (indiscernible) it certainly wasn't our intention

13  to swamp Your Honor with hundreds of exhibits simply because

14  we had supplied them as potential exhibits for --

15          THE COURT:  That's what I thought.  I thought we

16  were just moving the exhibits that you referenced.  I mean,

17  listen, you can move all the -- let's put it this way, I'm

18  not going to -- we didn't talk about this ahead of time.  So

19  if you want to move all the exhibits, that's fine.  I'll just

20  tell you, if a party didn't reference them or rely on them,

21  you know, I'm left to my own devices when it comes to those

22  exhibits.

23          So, Mr. Stemerman, you know, Mr. Larkin, Mr. Weis,

24  do we want to just move all the exhibits and be done with it?

25          MR. LARKIN:  Your Honor, again, I don't want to

1  swamp you with exhibits and I don't intend to rely on -- or

2  ask Your Honor to rely on exhibits that we didn't use with

3  witnesses over the last two days.  So I'm happy to just

4  (indiscernible) --

5          THE COURT:  Okay, all right.  Mr. Stemerman, I can

6  tell you what the list of exhibits are that I have in my --

7  on my running sheet that you referenced, which is VTI 115,

8  103, 107, 20, Stream 6, Stream 22, Stream 19, VTI 134, 114,

9  5, 156, 157, 132, 113, 45, 88, 80, 82, and 66.

10         Now, perhaps there are others that I missed.  I

11  try to keep a fairly close handle on what's being referenced

12  as a point of -- a point of organization on my part.

13  However, how do you want to handle it?

14         MR. STEMERMAN:  Your Honor, I think we want to go

15  back and double check and make sure that that was everything,

16  but we'll get a list over to you shortly.

17         THE COURT:  Okay.

18         MR. MCMICHAEL:  Your Honor, if I might make a

19  suggestion?  I think Mr. Larkin is correct, I think what we

20  ought to do is the three parties ought to meet and confer in

21  the morning and come up with a comprehensive list, get it to

22  the Court, and that way there won't be any dispute about it.

23  I'm sure we can do that and deliver something to you promptly

24  tomorrow.

25         THE COURT:  I think that makes sense to have a

1 complete and fair record.  And you can docket that list of

2 exhibits for me and that would be very helpful.

3         So in terms of when we're going to meet again --

4 listen, I would love to write on this, I think it's a very

5 interesting issue and, you know, you could write gobs and

6 gobs, for lack of a better term, on it.  But the reality is,

7 is that my schedule is fairly compact in recent -- in the

8 recent days and I fear that I'm not going to be able to get

9 you a timely ruling if I sit down and write on it.

10         So my thought was that I would render an oral

11 ruling on this matter in the afternoon of Monday the 17th and

12 that should give me adequate time.  And if it doesn't, if

13 something pops up and it interferes with my ability to render

14 the ruling, I will reach out to you and we'll push it a day

15 or two.  But with that being said, let's reconvene at 3

16 o'clock on Monday the 17th.  Okay?

17         MR. MCMICHAEL:  Thank you, Your Honor.

18         THE COURT:  All right.

19         MR. LARKIN:  Thank you, Your Honor.

20         MR. STEMERMAN:  Yes, Your Honor.

21         THE COURT:  Thank you all very much.  I appreciate

22 your patience with the Zoom.  It can be very difficult to

23 have evidentiary hearings via Zoom, but you all handled it

24 very well.  And it maybe made it easier for our witnesses who

25 appear to be testifying, you know, all over the world.  So I

1  appreciate all of their efforts as well and their patience.

2           And, with that, we'll adjourn the hearing and I'll

3  take the matter under advisement, and I look forward to

4  seeing you all at 3:00 p.m. on Monday.  If any issues arise

5  with respect to the exhibits, reach out to Ms. Lopez and she

6  can convey what the issues are.  And I can either communicate

7  with you via email or I can get you on the phone for a quick

8  call.  All right?

9           Thank you all very much and have a wonderful

10 evening.  We'll consider this matter adjourned.  Take care.

11          COUNSEL:  Thank you, Your Honor.

12      (Proceedings concluded at 6:01 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1                             CERTIFICATE

2

3        I certify that the foregoing is a correct transcript

4   from the electronic sound recording of the proceedings in the

5   above-entitled matter.

6
    /s/Mary Zajaczkowski              May 12, 2021
7   Mary Zajaczkowski, CET**D-531

8
    /s/William J. Garling             May 12, 2021
9   William J. Garling, CE/T 543

10

11  /s/ Tracey J. Williams            May 12, 2021

12  Tracey J. Williams, CET-914

13

14  /s/ Sarah Fetz                    May 12, 2021

15  Sarah Fetz, Transcriber

16

17

18

19

20

21

22

23

24

25